**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| GLOBAL CLEAN ENERGY HOLDINGS, INC., *et al.*,[1] | ) ) ) | Case No. 25-90113 (ARP) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**DECLARATION OF
JOHN WALSH, MANAGING DIRECTOR OF
ALVAREZ & MARSAL NORTH AMERICA, LLC,
IN SUPPORT OF THE DEBTORS' FIRST DAY MOTIONS**

I, John Walsh, declare as follows under penalty of perjury that if called to testify, I would testify competently to the facts and opinions set forth in this Declaration.

1.      I am over the age of 18 and I am authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

2.      I submit this declaration in support of the above-captioned debtors' and debtors-in-possession (collectively, the "Debtors") first day motions filed contemporaneously herewith.

3.      On April 16, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11, 11 U.S.C. §§ 101–1532 the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases is set forth in greater detail in the *Declaration of Noah Verleun, Chief Executive Officer of Global*

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/GCEHoldings.  The location of Debtor Global Clean Energy Holdings, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is: 6451 Rosedale Highway, Bakersfield, California 93308.

*Clean Energy Holdings, Inc., in Support of the Debtors' Chapter 11 Petitions* (the "Verleun Declaration" and together with this Declaration, the "First Day Declarations").

4.      Unless otherwise indicated, the statements set forth in this declaration are based upon (a) my personal knowledge, (b) information learned from my review of relevant documents, (c) information I received from the team at Alvarez & Marsal North America, LLC ("A&M") working under my supervision or the Debtors' management team and other advisors, or (d) my experience as a restructuring professional.  I am not being specifically compensated for this testimony other than through payments that are proposed to be received by A&M as a professional retained by the Debtors, subject to this Court's approval.

**Professional Background**

5.      I am a Managing Director at A&M, a restructuring advisory services firm and the proposed financial advisor to the Debtors.  A&M is a leading restructuring consulting firm with extensive experience providing high quality, specialized management and restructuring advisory services to debtors and distressed companies.   Specifically, A&M's core services include turnaround advisory services, interim and crisis management, revenue enhancement, claims management, and creditor and risk management advisory services.  A&M provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including:  (a) developing or validating forecasts, business plans, and related assessments of strategic position; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating financial restructuring packages.  A&M has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases.  A&M is known for its ability to

work alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization.

6.     Since the Debtors engaged A&M in November 2024, A&M has worked closely with the Debtors' management and other professionals with respect to the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projections, budgets, and other financial information.

7.     I have over 12 years of experience advising companies in acquisitions and distressed situations.  Through roles as a restructuring advisor, I have substantial experience helping to stabilize financially distressed companies, and developing business plans and liquidity forecasts to accomplish the necessary restructuring of their operations and finances.  I have advised clients in numerous major bankruptcy cases, including *In re Vertex Energy, Inc.*, No. 24-90507 (CML) (Bankr. S.D. Tex. Nov. 19, 2024); *In re Sunlight Fin. Holdings Inc.*, No. 23-11794 (MFW) (Bankr. D. Del. Dec. 1, 2023); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. June 13, 2022); *In re Superior Energy Services, Inc.*, No. 20-35812 (DRJ) (Bankr. S.D. Tex. Jan. 15, 2021); *In re Northeast Gas Generation, LLC*, No. 20-11597 (MFW) (Bankr. D. Del. July 17, 2020); *In re Weatherford Int'l PLC*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. Aug. 22, 2019); *In re Parker Drilling Co.*, No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 15, 2019); *In re New MACH Gen, LLC*, No. 18-11368 (MFW) (Bankr. D. Del. July 2, 2018); *In re Castex Energy Partners, L.P.*, No. 17-35835 (MI) (Bankr. S.D. Tex. Dec. 4. 2017); and *In re Key Energy Servs., Inc.*, No. 16-12306 (BLS) (Bankr. D. Del. Nov. 14, 2016).  I received my bachelor's degree in political science from the University of Colorado and an MBA from Goizueta Business School at Emory University, with concentrations in accounting and finance.  I am a Certified Insolvency and Restructuring Advisor.

8.      This Declaration sets forth the relevant facts in support of each of the Debtors' first day motions (collectively, the "First Day Motions").

**First Day Motions**[2]

9.      The Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions include the following:

**A.  Administrative Motions.**

1.  *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion");

2.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information of Natural Persons, (II) Waiving the Requirement to File a List of Equity Security Holders, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (IV) Granting Related Relief* (the "Creditor Matrix Motion");

3.  *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) Rule 2015.3 Financial Reports, (II) Modifying the Requirements of Bankruptcy Local Rule 2015-3, and (III) Granting Related Relief* (the "SOFAs / Schedules Extension Motion"); and

4.  *Debtors' Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent* (the "Claims Agent Retention Application").

**B.  Operational Motions Requesting Immediate Relief.**

1.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using their Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, and (C) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief* (the "Cash Management Motion");

---

[2]   Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Verleun Declaration or the corresponding First Day Motion, as applicable.

2.  *Debtors' __Emergency__ Motion for Entry of an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (II) Continue Employee Benefits Programs, and (III) Granting Related Relief* (the "Wages Motion");

3.  *Debtors' __Emergency__ Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "Taxes Motion");

4.  *Debtors' __Emergency__ Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "Utilities Motion");

5.  *Debtors' __Emergency__ Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief* (the "NOL Motion");

6.  *Debtors' __Emergency__ Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Obtained Prepetition and Pay Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreements Entered into Prepetition, (C) Continue to Pay Brokerage Fees, and (D) Renew, Amend, Supplement, Modify, Extend, or Purchase Insurance Policies and Surety Bonds, and (II) Granting Related Relief* (the "Insurance Motion"); and

7.  *Debtors' __Emergency__ Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(b)(9) Claimants, (B) Lien Claimants, (C) Critical Vendors, and (D) USDA Grant Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "Critical Vendors Motion").

10.    The First Day Motions seek authority to, among other things, honor employee-related wage and benefits obligations, pay certain key vendors and suppliers to ensure that the Debtors' business operations are not disrupted by these chapter 11 cases, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that, with respect to relief requested on an emergency basis, the Debtors have tailored their requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors'

operations and any delay in granting the emergency relief described in the First Day Motions would hinder the Debtors' operations and cause irreparable harm.  It is my view that the failure to receive the requested emergency relief during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.

11.     I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and such facts shall be deemed incorporated herein by reference as if fully stated herein.  I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations, constitutes a critical element in successfully restructuring the Debtors' businesses, and is in the best interest of the Debtors' estates.

## I.     Administrative Motions.

### A.     Joint Administration Motion.

12.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief.  The Debtors request that one file and one docket be maintained for all of the jointly-administered cases under the case of Global Clean Energy Holdings, Inc.

13.     Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  Accordingly, I understand that entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

14.     I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**B.     Creditor Matrix Motion.**

15.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to redact certain personally identifiable information of natural persons, (b) waiving the requirement to file a list of, and provide notice directly to, certain equity security holders of GCEH, (c) approving the form and manner of notifying creditors of the commencement of the chapter 11 cases and other information, and (d) granting related relief.

16.     I believe that the redaction of personally identifiable information is appropriate because (a) such information can be used to perpetrate identity theft and phishing scams, or locate survivors of domestic violence, harassment, or stalking under section 107(c)(1) of the Bankruptcy Code, and (b) disclosure of such information risks violating relevant law.

17.     I believe the requirements to file a list of, and to provide notice directly to, equity security holders should be waived as to the Debtors according to the Court's discretion under Bankruptcy Rule 1007(a)(3) and 2002(d).  I understand that the Debtors' common stock is traded over-the-counter with over 50 million shares outstanding as of the Petition Date, a significant amount of which cannot be readily traced to specific individual holders.  The Debtors would be required to obtain the names and addresses of its widely-dispersed equity security holders from a security agent.  Accordingly, I believe preparing and submitting such a list would be an undue burden and expense to the estates.

18.     I believe that the form of serving notices as requested in the Creditor Matrix Motion is warranted.  The Debtors have a significant number of parties in interest in these chapter 11 cases.

7

The cost of traditional mail service would impose a significant financial burden on the Debtors. Also, the Debtors do not maintain records of mailing addresses for many of these contacts. Email service is the most efficient and cost-effective manner to complete service of all interested parties, and service of notices via email to such parties is warranted under the circumstances and will alleviate an administrative burden otherwise imposed on the Debtors. The Debtors also propose that Epiq undertake all mailings and email service, as applicable, directed by the Court or the U.S. Trustee, including the Notice of Commencement.

19.     I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### C.     SOFAs / Schedules Extension Motion.

20.     Pursuant to the SOFAs / Schedules Extension Motion, the Debtors seek entry of an order: (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by an additional forty (40) days through and including June 9, 2025, for a total of fifty-four (54) days from the Petition Date and (b) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 to fifty-four (54) days after the Petition Date (*i.e.*, June 9, 2025).

21.     I believe ample cause exists to grant the relief requested herein. To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to hundreds of creditors, assets, leases, and contracts from each Debtor entity.

Collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors, their employees, and their advisors, especially in light of the complexity of the Debtors' businesses.  Because this information is voluminous and located in numerous places throughout the Debtors' organization, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

22.     Further, I believe that extending the deadline to file the initial 2015.3 Reports will provide the Debtors with the necessary time to examine the books and records of their non-Debtor subsidiaries that are subject to Bankruptcy Rule 2015.3.  The additional time will also enable the Debtors to work with their financial advisors and the U.S. Trustee to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

23.     I believe that the relief requested in the Schedules and Statements Extension Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**D.     Claims Agent Retention Application.**

24.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Epiq to act as the claims, noticing, and solicitation agent is appropriate under the circumstances and is in the best interest of the Debtors' estates.  Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

## II.     Operational Motions.

### A.     Cash Management Motion.

25.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) continue using their cash management system, as described in the Cash Management Motion and as further illustrated in Exhibit A of the Cash Management Motion, (b) maintain their existing bank accounts, business forms, and books and records, and (c) continue Intercompany Transactions, as defined in the Cash Management Motion, and funding consistent with the Debtors' historical practices, subject to the terms described in the Cash Management Motion; (ii) granting administrative expense status to postpetition Intercompany Transactions; and (iii) granting related relief.

26.     The Cash Management System includes eighteen (18) bank accounts, all held with U.S. Bank, which is an authorized depository under the U.S. Trustee Guidelines.  The Debtors use the Cash Management System to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Cash Management System allows the Debtors to control funds, ensure cash availability for the Debtors' operating entities, and reduce administrative costs by facilitating the movement of funds among multiple entities.  The Debtors' treasury function is responsible for daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions.  The treasury and accounting functions regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.  None of the Debtors' cash transfers are performed on an automated basis (*i.e.*, all cash settlements are completed manually through the Debtors' treasury function).  Given the economic and operational scale of the Debtors' businesses, it is my understanding that

any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' businesses and operations to the detriment of their estates and numerous stakeholders.

27.     ***Operating Accounts.***  The Operating Accounts are utilized to fund daily operations, collect various proceeds, and satisfy obligations such as payment of invoices.  The Operating Accounts process the receipts and disbursements related to the Debtors' ongoing business operations, including purchasing, procurement, manufacturing, production, sales, marketing, R&D, distribution, and corporate support services.  Each of the Operating Accounts perform a combination of the following:

- <u>Disbursements</u>.  The treasury function utilizes funds to pay third-party vendors, international Non-Debtor Affiliates, project costs, and upstream obligations.  The treasury function also manages payroll disbursements.  The Debtors typically process vendor disbursements throughout the week.

- <u>Receipts</u>.  The Debtors collect downstream and upstream revenue.  The treasury function then assesses disbursement needs and allocates funds to other accounts for feedstock payments, repayments on the Revolving Credit Facility, and international disbursements.

- <u>Grants</u>.  The Debtors collect proceeds from the USDA Grant and utilize the proceeds to reimburse expenses in accordance with the USDA Grant.

- <u>Adequate Assurance</u>.  The Debtors intend to set aside funds to provide adequate assurance to various utility providers.

28.     ***Primary Concentration Account.***  The Debtors' Primary Concentration Account serves as a concentration account for upstream revenue, downstream revenue, and loan proceeds in order to support the payment of vendor payments, payroll, and other Debtor obligations throughout the enterprise.  Additionally, it funds the GCE International Development, LLC account (x2461) and the GCEH Ventures, LLC account (x2453), which in turn fund the international Non-Debtor Affiliates.

29.     ***Revolving Credit Facility.***  Certain of the Debtors are party to the RCF Agreement. The Revolving Credit Facility under the RCF Agreement is drawn on by the Bakersfield

Renewable Fuels, LLC account (x0016).  Funds are transferred from the Bakersfield Renewable Fuels, LLC account (x0016) to the Bakersfield Renewable Fuels, LLC account (x5539) in order to make feedstock payments or repayments on the Revolving Credit Facility.  Additionally, the Bakersfield Renewable Fuels, LLC account (x0016) receives settlement proceeds from Vitol in relation to true up of the Portfolio Price Position as defined in the DIP Motion, and the Bakersfield Renewable Fuels, LLC account (x5539) disburses settlement proceeds to Vitol as necessary on account of the Portfolio Price Position.

30.     ***Dormant Accounts.***  Four of the Debtors' Bank Accounts—the GCE Holdings Acquisitions, LLC account (x6968), Global Clean Energy Holdings, Inc. account (x5712), Bakersfield Renewable Fuels, LLC account (x0008), and BKRF OCB, LLC account (x0024)—are currently not in use.

31.     ***Ramp Program.***  As part of the Cash Management System, the Debtors maintain the Ramp Program, a credit card program administered by Ramp Business Corporation, to cover purchases and employee expenses.  The Ramp Program is primarily used for IT subscriptions, equipment, and maintenance parts and supplies, as well as travel expenses of the Debtors' employees.  There are currently fifty-four (54) active cards under the Ramp Program, and approximately sixty-three (63) employees are authorized to use the cards.  Expenses incurred on account of the Ramp Program are billed directly to the Debtors and do not pass through the applicable employees' personal financial accounts.  The credit cards have a credit limit of $494,000 in the aggregate with no deposit.  On average, the Debtors historically have spent approximately $110,500 per month on account of the Ramp Program.  The Debtors pay expenses incurred on account of the Ramp Program by the first of the month.  Payments are auto-debited from the Primary Concentration Account.  The Debtors' inability to maintain the Ramp Program would

impose a hardship on the continued operation of the Debtors' businesses.  The Ramp Program is integral to the Debtors' cash management and accounting functions and essential to the continued operation of the Debtors' businesses.  As of the Petition Date, the Debtors estimate that approximately $48,000 is owed to Ramp on account of the fifty-four (54) active cards.

32.     ***Debtor Intercompany Transactions.***    In the ordinary course of business, the Debtors engage in the Debtor Intercompany Transactions, which result in Debtor Intercompany Claims.  The Debtors' accounting function records and reconciles the Debtor Intercompany Claims on a regular basis in the Debtors' Intercompany System.  The Debtors engage in four different types of intercompany activity:

- Operational.  Standard operational transactions include payroll and expenses. GCE funds payroll on behalf of SusOils, BKRF, and GCEH, which creates intercompany payables at these entities.

- Secured Term Loan Funding.  The BKRF OCB, LLC account (x3329) receives incremental cash proceeds from the Debtors' senior secured lenders as term loan commitments have been upsized periodically.  Cash proceeds are then distributed via intercompany transfers to other Bank Accounts for the benefit of other Debtors, creating an intercompany payable at these entities.

- Intercompany Notes.  There is a $34.9 million secured promissory note due from SusOils to BKRF OCB, LLC that is settled in the ordinary course of business.

- USDA Grant.  Pursuant to the USDA Grant, certain eligible personnel and related expenses at SusOils, Inc. are expensed to GCEH, creating an intercompany obligation between GCEH to SusOils, Inc.  GCEH, as the primary USDA Grant awardee, then submits reimbursement claims to the USDA and applies the proceeds received by the USDA to satisfy intercompany obligations created at GCEH.

33.     These Debtor Intercompany Transactions are an essential component of the Debtors' operations and are crucial to the Debtors' ability to process payroll, make payments to third-party vendors, and provide enterprise-wide management.

34.     I believe the Debtors will be able to closely monitor and record the Debtor Intercompany Transactions in the Intercompany System to ensure that no Debtor, stakeholder, or

creditor is prejudiced as a result of continuation of ordinary course Debtor Intercompany Transactions and that the Debtors will continue to track and settle postpetition intercompany transfers consistent with historical practice in their system.

35.     I understand that the Debtors would be unduly burdened both financially and logistically if the Debtors were required to halt Debtor Intercompany Transactions.  If the Debtor Intercompany Transactions were to be discontinued, the Cash Management System would be materially disrupted, causing significant repercussions to the Debtors' operations, as well as the Debtors' creditors and stakeholders.  Moreover, the Debtors rely on the Debtor Intercompany Transactions to continue the smooth operation of their businesses, including the ability to pay employee wages and satisfy external obligations to vendors and other counterparties.  Further, granting the Debtor Intercompany Transactions administrative expense status will ensure that no stakeholders' substantive rights are altered.

36.     ***Non-Debtor Intercompany Transactions.***  In the ordinary course of business, the Debtors and the Non-Debtor Affiliates engage in routine business transactions with each other related to the Non-Debtor Intercompany Transactions which result in the Non-Debtor Intercompany Claims.  The Debtors estimate that approximately $3 million in Non-Debtor Intercompany Transactions will be required during the course of these chapter 11 cases.  The Debtors maintain separate dedicated accounting systems and bank accounts from the accounting systems of the Non-Debtor Affiliates.  To facilitate this, the Debtors track all fund transfers through the Cash Management System and can ascertain, trace, and account for all Non-Debtor Intercompany Transactions with independent books and records.

37.     At any given time, there may be Non-Debtor Intercompany Claims owed by one Non-Debtor Affiliate to a Debtor.  As shown in <u>Exhibit A</u> of the Cash Management Motion,

Non-Debtor Intercompany Transactions consist of Debtors funding the Non-Debtor Affiliates, and the Non-Debtor Affiliates then using those funds for their operating expenses.  The Non-Debtor Intercompany Transactions are an essential component of the Debtors' operations and are crucial to the Debtors' ability to make payments to international Non-Debtor Affiliates' accounts in order to fund international upstream expenses, which is ultimately beneficial to the Debtors' vertically integrated operations.

38.     I believe the Debtors will be able to closely monitor and record the Non-Debtor Intercompany Transactions under the Intercompany System to ensure that no Debtor, stakeholder, or creditor is prejudiced as a result of continuation of ordinary course Non-Debtor Intercompany Transactions and that the Debtors will continue to track postpetition intercompany transfers consistent with historical practice in their system so that each Non-Debtor Intercompany Transaction is recorded and accounted for.

39.     I understand that the Debtors would be unduly burdened both financially and logistically if required to halt Non-Debtor Intercompany Transactions.  If the Non-Debtor Intercompany Transactions were to be discontinued, the Non-Debtor Affiliates would not have any funding and would not be able to operate, causing significant repercussions to the Debtors' overall operations, as well as the Debtors' creditors and stakeholders by diminishing the value of the Non-Debtor Affiliates, whose equity value flows directly to the Debtors by virtue of being direct and indirect parent entities.  Without the ability to continue those transactions, the Debtors' enterprise would be significantly damaged.

40.     ***U.S. Trustee Authorized Depositories.***  It is my understanding that the U.S. Trustee Guidelines generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the

15

U.S. Trustee.  I understand that U.S. Bank, where the Debtors maintain their Bank Accounts, is an authorized depository under the U.S. Trustee Guidelines.

41.      ***Business Forms and Books and Records.***  As part of the Cash Management System, the Debtors use a variety of Business Forms in the ordinary course of business. The Debtors also maintain the Books and Records to document their financial results and a wide array of operating information.  It is my understanding that it could cause a significant disruption to the Debtors' business operations and could increase administrative expense to the Debtors' estates if the Debtors were unable to continue using all of the Business Forms and Books and Records in existence immediately before the Petition Date, without reference to the Debtors' status as chapter 11 debtors in possession.

42.      ***Bank Fees.***  The Debtors incur Bank Fees in connection with maintaining the Bank Accounts.  The Bank Fees primarily consist of general account services, balance related services, depository services, account reconciliation services, image services, wire transfer fees, information services, remote deposit services, and miscellaneous fees from the Cash Management Bank.  The Debtors incur approximately $7,000 per month, in the aggregate, in Bank Fees.  As of the Petition Date, the Debtors estimate that they owe the Cash Management Bank approximately $6,000 on account of unpaid Bank Fees.

43.      I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**B.      Wages Motion.**

44.      As of the Petition Date, the Debtors employ or retain over 160 people on a full-time or part-time basis.  Pursuant to the Wages Motion, the Debtors seek entry of an order authorizing

the Debtors to pay prepetition wages, salaries, and other compensation and reimbursable expenses, and to continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.  The Debtors' workforce performs a wide variety of job functions that are essential to the Debtors' business operations, including:  (a) "upstream" research; (b) "midstream" logistics functions (including research, plant breeding, cultivation, grain handling, and logistics services); (c) "downstream" operations at the Bakersfield Facility (including health and safety oversight, project management, and facility operations); and (d) corporate management.  The Employees' skill, knowledge, and understanding of the Debtors' businesses and operations are not only critical to operational stability and efficiency but ultimately to the Debtors' restructuring.  The Employees rely on the Compensation and Benefits to pay for their daily living expenses.  Furthermore, the Debtors and their estates may be harmed by business disruption if they are unable to provide the Compensation and Benefits consistent with past practice, including as a result of Workforce attrition.  Consequently, I believe the relief requested in the Wages Motion is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

45.     In addition to the Employees, the Debtors engage approximately thirty-five (35) Independent Contractors, who work together with the Employees across the Debtors' Bakersfield Facility and upstream operations, and corporate support staff.  The Independent Contractors are an important supplement to the Debtors' Workforce.  Without the continued, uninterrupted services of their Employees and Independent Contractors, the Debtors' business operations may be disrupted, and the administration of the Debtors' estates will be materially impaired.

46.     In the ordinary course, the Debtors have accumulated prepetition claims relating to, among other things, unpaid compensation, withholding obligations, reimbursable expenses,

payroll processing, health and welfare coverage and benefits, the workers' compensation program, the 401(k) plan, paid leave and unpaid leave, and other benefits (all as defined in the Wages Motion) that the Debtors have provided in the ordinary course.

47.     The Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Employee Compensation and Benefits in approximately the following amounts:

| Relief Sought | Prepetition Amount |
|---|---|
| **Compensation, Withholding, and Expense Reimbursement** | **$2,300,000** |
| Wage Obligations | $510,000 |
| Staffing Agency Fees and Independent Contactor Obligations | $1,700,000 |
| Non-Employee Director Compensation | N/A |
| Non-Insider Bonus Programs | N/A |
| Reimbursable Expenses | $90,000 |
| **Employer Payroll Taxes** | **$40,000** |
| **Wage and Benefit Service Provider Obligations** | **$7,000** |
| **Health and Welfare Coverage and Benefits** | **$10,000** |
| Medical and Dental Plans | N/A |
| Life and AD&D Insurance Coverage | $10,000 |
| Other Coverage | N/A |
| **Workers' Compensation** | **N/A** |
| **401(k) Plan** | **$230,000** |
| **Paid Leave Benefits** | **$1,000,000** |
| **Non-Insider Severance Benefits** | **N/A** |
| **Additional Benefits Program** | **$15,000** |
| **Total** | **$3,602,000** |

48.     ***Wage Obligations***.  In the ordinary course, the Debtors incur Wage Obligations to their Employees for, among other things, wages, salaries, overtime, and other obligations.  Because Employees generally are paid in arrears, the Debtors have accrued but not yet paid certain Wage Obligations as of the Petition Date.  Further, wages may be due and owing as of the Petition Date given a reconciliation process, based on overtime and other calculations, between amounts that the Debtors have paid relative to amounts that Employees believe they are owed.  That reconciliation process may reveal additional amounts that are owed to such Employees.  I believe that the

Debtors' non-payment of Wage Obligations would cause the Debtors' Workforce to experience substantial financial hardship.  Considering the substantial benefit the Debtors' Workforce provide to the Debtors' estates and the significant costs to fill any vacancies caused by non-payment, I believe it is critical that the Debtors maintain their Employee base.

49.     ***Staffing Agencies and Independent Contractors.***     The Debtors retain certain Independent Contractors indirectly through external Staffing Agencies and labor sub-contractors or agents.  The Debtors leverage Staffing Agencies to identify and retain Independent Contractors on the Debtors' behalf and manage those Independent Contractors at the Debtors' Bakersfield Facility and upstream operations.  Similarly, certain Independent Contractors, who work side by side with the Debtors' Employees across the Debtors' Bakersfield Facility and upstream operations and corporate support staff, receive payment of Staffing Agency Fees through the Staffing Agencies based on periodic invoices submitted to the Debtors.  I believe the authority to pay Staffing Agency Fees and Independent Contractor Obligations is critical to maintaining uninterrupted business operations and administering their estates in a value-maximizing manner.

50.     ***Non-Employee Director Compensation.***  GCEH's board of directors is comprised of GCEH's Chief Executive Officer and five Non-Employee Directors.  Each Non-Employee Director receives annual cash compensation for their services on a monthly or quarterly basis.  The Non-Employee Directors also are entitled to reimbursement for reasonable out-of-pocket expenses in connection with their duties.

51.     ***Non-Insider Bonus Programs.***  The Debtors maintain two (2) Non-Insider Bonus Programs in the ordinary course of business, including tailored bonus plans designed to motivate, reward, and retain certain of their non-insider Employees as an additional component of overall compensation.  These programs are (a) the Major Event Award Policy and (b) the Annual Bonus

Program.  The Major Event Award Policy at the Bakersfield Facility offers Employees a benefit (such as a cash payment or additional vacation days) when a Major Event (as defined in the Major Event Award Policy) has been met.  Payments under the Major Event Award Policy are made at the Company's discretion on an *ad hoc* basis.  The Annual Bonus Program offers each Eligible Employee a bonus based upon Company-determined bonus metrics, subject to their start date. The Non-Insider Bonus Programs offer Employees added incentive to meet predefined metrics applicable to their roles and the opportunity to earn bonus payments for outstanding performance. I believe that the Non-Insider Bonus Programs are crucial to maintaining Employee morale, motivation, and loyalty and avoiding the disruption that would result if certain key Employees were to leave their positions, especially during the pendency of these chapter 11 cases.

52.     ***Reimbursable Expenses.***  The Debtors have policies whereby the Debtors reimburse Employees, in the ordinary course of business, for reasonable approved business and other expenses incurred in connection with the performance of their assigned duties.  The Debtors either pay business-related expenses directly, or Employees pay and subsequently seek reimbursement or file expense reports for such expenses within the scope of their employment. The Reimbursable Expenses are incurred by Employees performing their job functions in the ordinary course of business.  I believe it is essential to the continued operation of the Debtors' businesses that the Debtors continue reimbursing, or making direct payments on behalf of, the Employees for such expenses.  I believe that the Debtors' inability to pay the Reimbursable Expenses could impose a hardship on Employees where such individuals incurred Reimbursable Expenses directly and with the understanding that such expenses would be reimbursed in short order.

53.    ***Employee Deductions and Taxes.***  During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support, spousal support, services charges and related fees, and pre-tax and after-tax deductions payable pursuant to certain of the Health and Welfare Coverage and Benefits.  The Debtors also are required by law to withhold from Employee compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes for remittance to the appropriate federal, state, and local taxing authorities.

54.    ***Employer Taxes.***  The Debtors also are required by law to withhold from Employee compensation additional amounts for state and federal unemployment insurance.  The Debtors must match certain of the Employee Payroll Taxes from their own funds and pay Employer Payroll Taxes, based upon a percentage of gross payroll, and forward to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed.

55.    ***Wage and Benefit Service Provider Obligations.***  The Debtors utilize certain human resource information systems and payroll processing software to manage their biweekly payroll.  In connection with maintaining and operating a biweekly payroll system, the Debtors must pay certain fees.

56.    ***Health and Welfare Benefits.***  The Debtors offer their Eligible Employees the opportunity to participate in a Medical Plan through Blue Shield of California.  Additionally, as specified in their individual separation agreements, Employees may elect, at their own expense, to continue coverage of benefits provided under COBRA.  The majority of the Debtors' Employees are enrolled in the Medical Plan.   Under the Medical Plan, participants and their eligible dependents (usually spouses; and, under certain plans, children, sometimes at an additional cost)

receive coverage for, among other things, preventative care, doctor visits, hospital care, prescription drugs, and wellness treatments.

57.     Additionally, the Debtors offer their Employees the opportunity to participate in several health and welfare benefit plans, administered by MetLife, including a dental plan, a vision plan, a life and AD&D insurance plan, and a disability insurance plan.  The majority of the Debtors' Employees are enrolled in the MetLife Plans in addition to the Medical Plan.  As part of the MetLife Plans, participants and their eligible dependents receive coverage for, among other things, teeth cleaning, eye exams, vision correction, and various other vision and dental treatments. The MetLife Plans also provide life, AD&D and short and long-term disability coverage to all active, Eligible Employees.  From the date of hire, Employees are covered for the basic life and AD&D coverage which includes up to $200,000 of Basic Term Life coverage at no cost to the Employee, unless they elect to purchase additional coverage for themselves and their dependents.

58.     The Debtors offer additional Health and Welfare Coverage and Benefits, such as, among other things, the EAP, HSA, and FSA.  Under the Additional Benefit Programs, Eligible Employees can contribute pre-tax dollars up to prescribed federal limits for tax advantaged savings.  The HSA and FSA programs are administered by Health Equity and P&A Group, respectively, and the EAP is administered by LifeWorks.  The Additional Benefit Programs are at the election of each Employee and only require *de minimis* administrative costs or obligations for the Debtors.

59.     ***Workers' Compensation Program.***  The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which they have Employees.  The Workers' Compensation Program is supported with a guaranteed cost insurance policy with Everest National Insurance Company.

60.     ***401(k) Plan.***  The Debtors provide all Employees with the ability to participate in a 401(k) plan administered by Transamerica.  In addition, the Debtors utilize Apollon Wealth Management LLC as a broker to select and manage their 401(k) Plan and pay for the brokerage services.  The 401(k) Plan provides for pre-tax salary deductions up to limits set by the Internal Revenue Code, and all Eligible Employees over the age of twenty-one (21) who have completed at least sixty (60) days of employment with the Debtors may participate in the 401(k) Plan.  The Debtors provide certain matching contributions for Eligible Employees.  Under the 401(k) Plan, the Debtors contribute safe harbor matching contributions equal to 100% of the first 6% of eligible pay for all Employees, added to their 401(k) Plan.

61.     ***Paid Time Off and Paid Leave Benefits.***  The Debtors maintain several paid leave benefit programs for Employees, providing paid leave for, among other things, PTO, FMLA leave, paternity/maternity leave, and bereavement.  In the ordinary course of business, the Debtors provide paid time off to the Employees as one of the Paid Leave Benefits.  PTO accrues at a specified rate based on the Employee's years of service on a bi-weekly basis.  Employees may accrue a maximum of two hundred forty (240) hours of unused PTO, which can carry over into the next calendar year.[3]  In the ordinary course of business, the Debtors have provided Employees with one-time elections to receive cash payments equivalent to some or all of the Employee's unused PTO, to allow for continued accrual of PTO for those Employees.  PTO may be used as a Paid Leave Benefit for qualifying absences under the Family and Medical Leave Act.  Employees who are terminated or resign are entitled to a cash payment in lieu of the accrued but unused PTO pursuant to the requirements of California Law.  I believe that continuation of the Paid Leave Benefits policies in accordance with prior practice is essential to maintaining Employee morale

---

[3]     Executives are not subject to a cap on accrual of PTO hours.

during these chapter 11 cases.  Further, I believe that the policies are broad-based programs upon which all Employees have come to depend.

62.    ***Non-Insider Severance Benefits.***  In the ordinary course of business, the Debtors maintain a practice of paying severance to certain non-Insider Employees.  At the discretion of the Debtors' management team and determined on a case-by-case basis, Employees are eligible for Non-Insider Severance Benefits upon their departure from the Company.  The Non-Insider Severance Benefits are calculated by reference to certain metrics such as the terminated Employee's salary, their time of service with the Debtors prior to termination, and specific circumstances surrounding the termination.  Non-Insider Severance Benefits are either paid in a lump sum around the time of the Employee's termination or consistent with the Employee's schedule of salary payments, on a case by case basis, over a period of several bi-weekly pay periods.  The amount of Non-Insider Severance Benefits which an Employee may receive fluctuates based on a number of factors including the Employee's length of service and certain qualitative factors.  A minimum severance offering of two (2) weeks' pay is typically provided to all Eligible Employees regardless of their length of service.  Non-Insider Severance Benefits are calculated on base salary only.  All Non-Insider Severance Benefits are subject to applicable taxes.

63.    ***Additional Benefit Programs.***  In addition to the foregoing, the Debtors offer Employees a range of ancillary benefits, including, for certain employees, a monthly allowance for a cellular phone, or a monthly allowance for a vehicle.  The aggregate monthly cost of the Additional Benefits Program is approximately $15,000.

64.    I believe that the Debtors' timely payment of workforce-related obligations is necessary for the Debtors to maintain ordinary course operations and avoid personal financial hardship to the Employees.  I understand there is no practical or legal alternative by which the

Debtors can deal with the Compensation and Benefit Obligations. Therefore, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to continue to effectively operate their businesses during these chapter 11 cases.

### C. Taxes Motion.

65.     In the ordinary course of business, the Debtors collect, withhold, and incur: (a) income taxes; (b) franchise taxes; (c) property taxes; and (d) regulatory taxes and fees, as well as other governmental taxes, fees, assessments, interest, penalties, and additions to tax. The Debtors pay or remit, as applicable, the Taxes and Fees to various governmental authorities on a periodic basis (*e.g.*, monthly, quarterly, semi-annually, or annually) depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations. The Debtors estimate that approximately $3,003,000 in Taxes and Fees are outstanding as of the Petition Date[4]:

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date |
|---|---|---|
| Income Taxes | The Debtors pay income, withholding, or similar taxes to federal and state Authorities in the United States. The amount of income taxes incurred is based on the jurisdictions in which the Debtors do business, generally payable on an annual basis. | $18,000 |
| Franchise Taxes | The Debtors pay certain franchise taxes that are required for the Debtors to conduct business in the ordinary course and comply with state laws. Such franchise taxes are accrued and paid on a quarterly or annual basis. | $44,000 |
| Property Taxes | The Debtors incur taxes related to certain real and personal property holdings, payable as such taxes come due in the ordinary course of business, on either a quarterly or annual basis. | $2,818,000 |

---

[4]   The Debtors cannot predict the amounts of any potential Assessments that may result from Audits, if any. Accordingly, the Debtors' estimate of outstanding Taxes and Fees as of the Petition Date does not include any amounts relating to potential Assessments.

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date |
|---|---|---|
| Regulatory and Other Taxes and Fees | The Debtors pay Taxes and Fees related to compliance with regulatory requirements, including periodic licensing, permitting, reporting, and similar requirements, generally payable on an annual, quarterly, or other periodic basis, depending on the specific Tax or Fee. | $123,000 |
| | **Total:** | $3,003,000 |

66.     Additionally, the Debtors may become subject to Audits on account of tax returns and/or tax obligations in prior years during these chapter 11 cases.  Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors.  I also understand that the ability to undertake the Tax Planning Activities without any delay will enable the Debtors to preserve the ability to optimally structure the Debtors' go-forward business, for the benefit of their stakeholders.

67.     I understand that any failure by the Debtors to pay the Taxes and Fees, including Assessments, could materially disrupt the Debtors' business operations in several ways, including (but not limited to): (a) the Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from administering these chapter 11 cases; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the Debtors' estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' chapter 11 cases. Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both.  In addition, I have been informed that nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code. Additionally, I understand that the Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property

of the Debtors' estates.  I also understand that the Taxes and Fees must be paid in order to continue operations.

68.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to effectively operate their business during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**D.     Utilities Motion.**

69.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (a) determining that the Adequate Assurance Procedures provide the Utility Providers with adequate assurance of payment, (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, (c) approving procedures for resolving any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the Proposed Adequate Assurance, and (d) granting related relief.

70.     I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, hence, the overall success of these chapter 11 cases.  To the extent any Utility Provider were to refuse or discontinue service, even for a brief period, the Debtors' business operations—particularly at the Debtors' renewable fuels plant in Bakersfield, California—would be severely disrupted, and this could potentially endanger the health and safety of the Debtors' employees.  Further, any disruption of Utility Services would materially impair the Debtors' revenue-generating and production capabilities to the detriment of all stakeholders in these chapter 11 cases.  Accordingly, I believe it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

71.     I submit that the Adequate Assurance Procedures will provide a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their business operations uninterrupted.

72.     I understand that as of the Petition Date, $1,100,000 is in arrears on account of prepetition Utility Services and that on average, the Debtors pay approximately $635,000 each month for third-party Utility Services.

73.     I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors' estate, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their business in chapter 11 without disruption.

**E.      NOL Motion.**

74.     Pursuant to the NOL Motion, the Debtors seek entry of an order approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to Debtor Global Clean Energy Holdings, Inc.'s existing classes (or series) of common stock or any Beneficial Ownership therein and directing that any purchase, sale, other transfer, or declaration of worthlessness with respect to common stock shall be null and void *ab initio*.

75.     It is my understanding that the Tax Attributes are of significant value to the Debtors and their estates and that an ownership change of common stock may negatively impact the Debtors' utilization of the Tax Attributes.

76.     For these reasons, I believe the relief in the NOL Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest.

**F.      Insurance Motion.**

77.     In the ordinary course of business, the Debtors maintain approximately 60 Insurance Policies that are administered by approximately 75 Insurance Carriers.  Specifically, the

Insurance Policies provide coverage for the following aspects of the Debtors' general operations: general liability, business auto liability, workers' compensation, pollution liability, terrorism, railroad rolling stock, D&O liability, cyber liability, crime, employment practices liability, business liability, foreign liability, property, equipment, and marine stock throughput. In addition, certain of the Insurance Policies provide layers of excess liability coverage.

78.     The Insurance Policies are typically one year in length and renew annually at various times throughout the year. Certain Insurance Policies may be longer or shorter than one year, such as the pollution liability Insurance Policy that is five years in length and the foreign liability Insurance Policy that is approximately ten months in length. For certain Insurance Policies, the Debtors' finance the Insurance Premiums through a PFA. For the Insurance Policies not financed through the PFA, the Debtors pay the Insurance Premiums directly to the Insurance Carrier or indirectly through insurance brokers. The annual Insurance Premiums total approximately $9 million in the aggregate, of which approximately 75% percent are financed through the PFA. As of the Petition Date, the Debtors believe that they owe approximately $20,000 on account of Insurance Premiums. The Debtors request authority to maintain their existing Insurance Policies, pay any outstanding Insurance Premiums, continue to honor their obligations under the Insurance Policies, and to renew, amend, supplement, modify, extend, or purchase new Insurance Policies, as applicable, in the ordinary course of business and consistent with past practice to ensure uninterrupted coverage.

79.     I believe that the continuation and renewal of the Insurance Policies, and entry into new Insurance Policies, is essential to preserving the value of the Debtors' businesses, properties, and assets. In many instances, the coverage provided by the Insurance Policies is required by the regulations, laws, credit documents, customer contracts, and other arrangements that govern the

Debtors' operations, as well as the Bankruptcy Code and the U.S. Trustee Guidelines. Accordingly, I believe it is critical for the Debtors to maintain appropriate insurance coverage at all times.

80. ***Premium Finance Agreements.***  In the ordinary course of business, the Debtors finance the premium payments for 39 Insurance Policies pursuant to one PFA with the PFA Lender.  Currently, approximately $4 million will come due in the coming months under the PFA, with no amounts in arrears.  The Debtors expect the remaining payments will come due postpetition in the ordinary course.  Continuing to perform under the PFA in the ordinary course of business on a postpetition basis is essential for the payment and maintenance of the Insurance Policies and is in the best interests of the Debtors' estates.  In light of their financial circumstances, alternative insurance premium finance companies may not be willing to provide insurance premium financing to the Debtors on attractive market terms on a postpetition basis.  As a result, I believe it is critical for the Debtors to perform under their existing PFA.  The Debtors seek authority to pay any outstanding prepetition obligations under the PFA and to continue to honor their obligations under the PFA as they come due on a postpetition basis in the ordinary course of business and consistent with past practice.

81. ***Deductibles and Self-Insured Retentions.***  Certain Insurance Policies require that the Debtors pay various Deductibles.  In addition, or as an alternative, to the Deductibles, certain Insurance Policies use SIRs.  The Deductibles and SIRs typically range from approximately $1,000 to $250,000 depending on the Insurance Policy.  As of the Petition Date, I understand that there are not any accrued but unpaid obligations with respect to any of the Deductibles or SIRs.  The Debtors risk losing their Insurance Policies if they fail to pay their Deductibles or SIRs, which would not only greatly increase the risk related to the Debtors' operations but may also cause them

to violate state laws requiring the Debtors to have such policies.  Accordingly, out of an abundance of caution, the Debtors seek authority to pay any prepetition amounts owed on account of any Deductibles and SIRs and to continue to honor any amounts owed on account of any Deductibles or SIRs in the ordinary course of business on a postpetition basis.

82.     ***Insurance Broker and Claims Administration.***  The Debtors obtain the Insurance Policies primarily through their Insurance Brokers.  The Insurance Brokers, among other things, assist the Debtors in negotiating and obtaining comprehensive insurance coverage, enabling the Debtors to obtain Insurance Policies on advantageous terms and at competitive rates.  In exchange for these services, the Debtors pay the Insurance Brokerage Fees.  The Debtors pay the Insurance Brokerage Fees as a component of the Insurance Premiums.  As of the Petition Date, I understand that there may be some amounts outstanding on account of the Insurance Brokerage Fees.  To ensure the continuity of the services provided by the Insurance Brokers, the Debtors seek authority to satisfy any prepetition Insurance Brokerage Fees and to continue honoring Insurance Brokerage Fees on a postpetition basis in the ordinary course of business.  I believe the preservation of the agreements and arrangements in place with the Insurance Brokers is necessary for the maintenance of the Insurance Policies and for the efficient operation of the Debtors' business.  Absent such services, I believe the Debtors would spend significant time negotiating with the Insurance Carriers and such time would have a detrimental impact on these chapter 11 cases.

83.     The Debtors also employ Sedgwick to administer and pay claims made against certain of the Insurance Policies.  The Debtors do not pay Sedgwick any additional amounts on account of administering and managing such claims against the Insurance Policies.  The cost of Sedgwick's services is included in the Insurance Premiums.  Further, Sedgwick does not pay such claims on behalf of the Debtors.  Instead, the applicable claims are paid by the Insurance Carriers

31

in accordance with the provisions of the applicable Insurance Policy, so the Debtors do not incur any additional amounts on account of claims administration.  I believe that continuing the foregoing is necessary to ensure that the Debtors can administer insurance claims on a postpetition basis in the ordinary course of business.

84.     ***Surety Bond Program.***  In the ordinary course of business, the Debtors maintain the Surety Bond Program.  As of the Petition Date, the Debtors believe that they owe approximately $7,000 on account of the Surety Bond Program.  In exchange for Surety Brokers' services, the Debtors pay the Surety Brokers certain Surety Brokerage Fees, which are paid to the Surety Brokers either directly by the Debtors to the Surety Brokers or withheld upon return of the proceeds or collateral upon release of the applicable Surety Bond.  The Surety Premiums related to the Surety Bond Program generally are determined on an annual, per-bond basis, and are paid by the Debtors when the Surety Bonds are issued and annually upon renewal until the Surety Bonds are released.  As of the Petition Date, the Debtors have six Surety Bonds totaling $599,330 and pay approximately $8,222 annually in Surety Premiums.

85.     I believe the continuation of the Surety Bond Program is critical to the Debtors' ongoing operations and preserving value during these chapter 11 cases.  The Debtors must be able to provide financial assurance to, among potentially others, its employee benefits plan and public agencies.  In turn, the Debtors should be able to maintain the existing Surety Bond Program, including paying the premiums and fees due in connection therewith and providing collateral, renewing or potentially acquiring additional bonding capacity as needed, and executing other agreements as needed, in each case, in the ordinary course of business in connection with the Surety Bond Program.  Failure to provide, maintain, or timely replace the Surety Bonds may

prevent the Debtors from undertaking essential functions related to their operations and fulfilling, among other things, their obligations under federal and state law.

86.     For the foregoing reasons, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to continue to effectively operate their businesses during these chapter 11 cases.

### G.    Critical Vendors Motion.

87.     Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to pay, in the ordinary course of business, certain prepetition amounts owing on account of (a) 503(b)(9) Claims, (b) Lien Claims, (c) Critical Vendor Claims, and (d) USDA Grant Claims; (ii) confirming the administrative expense priority status of Outstanding Orders and authorizing, but not directing, the payment of such obligations in the ordinary course of business; and (iii) granting related relief.

88.     The Debtors request authorization to pay certain outstanding prepetition claims of the 503(b)(9) Claimants, Lien Claimants, Critical Vendors, and USDA Grant Vendors, subject to the limitations set forth in the Interim Order and Final Order.  The following table summarizes the categories of Trade Claims that the Debtors request authority to pay pursuant to the Critical Vendors Motion and the estimated prepetition amounts outstanding within each such category:

| Category | Description of Services Provided | Estimated Amount Due or Due to be Paid Within 21 Days (Interim Order) | Estimated Amount Outstanding as of Petition Date (Final Order) |
|---|---|---|---|
| 503(b)(9) Claimants | Suppliers that provided goods and raw materials to the Debtors that were received within twenty (20) days before the Petition Date. | $215,000 | $400,000 |
| Lien Claimants | Suppliers of goods or services utilized by or provided to the Debtors that may assert | $6.5 million | $12.7 million |

| Category | Description of Services Provided | Estimated Amount Due or Due to be Paid Within 21 Days (Interim Order) | Estimated Amount Outstanding as of Petition Date (Final Order) |
|---|---|---|---|
| | mechanic's, possessory, construction, transportation, or other similar liens. | | |
| Critical Vendors | Specialized suppliers of goods and services that are critical to maintain the Debtors' day-to-day operations, including to ensure the health, safety, regulatory, and environmental compliance of the Debtors' operations, or which are sole or limited-source providers of the goods and services necessary for the uninterrupted operations of the Debtors' businesses, but which are not Lien Claimants, 503(b)(9) Claimants, or other suppliers. | $7.8 million | $12.8 million |
| USDA Grants Program[5] | The USDA/NRCS Grant Program (the "Grant Program") is a reimbursement program administered by the USDA/NRCS where payments to be made to third-party vendors, essential personnel, and farmers (collectively, the "USDA Grant Vendors") are submitted by the Debtors on their behalf. The Grant Program funds are only accessible to the Debtors for pre-approved distribution to certain USDA Grant Vendors and the Debtors would not otherwise be able to access this capital. The USDA Grant Vendors provide critical research, data analytics, and other services in order to advance the Debtors' production and marketing of climate-smart commodities and Camelina. | N/A | $4.4 million |
| **Total amount of Trade Claims:** | | $14.5 million | $30.3 million |
| **Total as percentage of total funded debt:** | | 1% | 3% |

---

[5]   The Debtors have confirmed that no Insiders have been or will be compensated pursuant to the USDA Grant Program.

89.     I understand that to effectuate the Debtors' business model and maintain the Debtors' facilities and operations in the ordinary course, the Debtors require continued access to critical goods and services provided by the Debtors' trade vendors and suppliers.  I also understand many of the Trade Claimants are virtually irreplaceable due to the specialized nature of the products and services they provide.

90.     *Critical Vendors.*  The Critical Vendors include, among others, those that provide certain critical services the Debtors depend upon to operate their businesses related to, among other things, facility expenses, natural gas, raw materials, health and safety, and regulatory and environmental compliance.  I understand that the Debtors obtain such services, equipment, and parts from a number of highly specialized vendors, service providers, and other businesses. I understand the Debtors' trade relationships with the Critical Vendors are often on an order-by-order basis and without long-term contracts.  I understand that the Debtors believe that replacement of these Critical Vendors would likely be impossible or would result in substantially higher costs for the Debtors.  In particular, I understand that certain Critical Vendors are the sole source providers of replacement parts necessary to maintain the Debtors' equipment and the inability to acquire these parts would result in the deterioration of the Debtors' equipment.

91.     I believe that if the Critical Vendors are not paid, there is a risk that such vendors may cease doing business with the Debtors, which I believe would harm the Debtors' businesses and significantly impair their going-concern viability.  Accordingly, I believe that the Debtors should have the authority to pay these Critical Vendors to avoid bringing harm to the Debtors' estates and that there are limited alternatives to replacing these Critical Vendors on short notice.

92.     I understand that the Debtors are not proposing to pay any insiders, as that term is defined by section 101(31) of the Bankruptcy Code, by the Critical Vendors Motion.

35

93.     ***503(b)(9) Claimants.***   The Debtors may have received certain goods from the 503(b)(9) Claimants within the 20-day period immediately preceding the Petition Date, thereby giving rise to 503(b)(9) Claims.   Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.   Rather the Debtors obtain supplies on an order-by-order basis.   As a result a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.

94.     ***Lien Claimants.***   The Debtors routinely do business with third-party contractors who I understand may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered.   The Lien Claimants provide key goods and services for the maintenance and operation of the Debtors' Bakersfield Facility, including mechanical, repair, construction and transportation services, as well as storage of gain and seed for the Debtors' upstream business.

95.     I understand that under certain non-bankruptcy laws, the Lien Claimants may be able to assert liens on the products in their possession or on the property they improved, as applicable, to secure payment of the charges or expenses incurred in connection with unpaid obligations.   Accordingly, I understand that in the event these claims remain unpaid, the Lien Claimants could attempt to assert such liens and refuse to deliver or release goods in their possession or otherwise impede the Debtors' use of this property until their claims are satisfied and their liens redeemed.   Therefore, I believe it is in the best interest of the estates to pay the Lien Claims as the disruption cause by retention of property or products to the Debtors' estates in many cases would likely be greater than the appliable Lien Claims

96.     ***USDA Grant Claims.***   The Debtors participate in a five-year Grant Program administered by the USDA under which the USDA provides the Debtors with reimbursement for

three programs.  The USDA reimburses the Company for (a) approximately sixteen delineated third-party vendors, who submit monthly invoices to the Debtors for essential services related to the continuation and success of various pilot projects approved by the USDA, (b) 50 percent of the cost-share expenses incurred and attributable to the Grant Program, such as personnel costs and travel, and (c) payments to farmers, whose payments is conditioned on timely grain delivery. The purpose of the Grant Program is twofold: (i) to conduct large-scale pilot projects designed to measure and validate the climate-smart practices for Camelina, which ultimately grows product awareness and maximizes value to the Debtors; and (ii) to focus on overall operational efficiency, including data collection and agronomic services.  I understand that the Debtors disburse funds to awardees from the Grant Program's earmarked reserve pursuant to agreed-upon guidelines and would not otherwise be able to access these funds.

97.    I understand that the Debtors have requested authority to continue to administer the Grant Program in the ordinary course of business and consistent with past practices.  I understand that the funds disbursed under the Grant Program are not the Debtors' funds and must be distributed in accordance with the requirements and timeline of the Grant Program and applicable master service agreements, including but not limited to, monthly invoices, quarterly performances, financial and progress reports, and compliance with government audits.

98.    I understand that given the extended duration of the study, any disruption to the Grant Program would have lasting consequences potentially undermining the integrity of the research.  Moreover, I understand the benefits to the Debtors of continuing their research and maintaining their established scientific partnerships yields far greater benefits for the Debtors and their stakeholders than the uncertainty that delayed disbursements of Grant Program funds would case.

99.     ***Outstanding Orders.***   Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date.   To avoid the risk of becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers might refuse to ship or transport such goods (or might recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.   To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders, and (b) authorizing the Debtors to satisfy such obligations in accordance with their historic practices.

100.     For the foregoing reasons, I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to continue to effectively operate their businesses during these chapter 11 cases.   Absent the relief requested in the Critical Vendors Motion, the Debtors risk losing access to critical products and services which would jeopardize operations and diminish the value of the Debtors' estates to the detriment of all stakeholders.   Absent the ability to continue honoring obligations to such vendors, the Debtors' ability to continue utilizing such vendors' services may be imperiled, which would, in turn, jeopardize certain of the Debtors' key customer relationships and their ability to maintain or capture additional business therefrom.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  April 16, 2025

/s/ *John Walsh*
John Walsh
Managing Director
Alvarez & Marsal North America LLC