## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL CLEAN ENERGY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 25-90113 (ARP) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

### DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION CREDIT, (B) GRANT SENIOR SECURED LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION PARTIES; (III) MODIFYING THE AUTOMATIC STAY; (IV) AUTHORIZING CONTINUATION OF THE PREPETITION SOA AND SSA, AS AMENDED; (V) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER POSTPETITION TRANSACTIONS UNDER THE SOA AND SSA; (VI) SCHEDULING A FINAL HEARING; AND (VII) GRANTING RELATED RELIEF

**Emergency relief has been requested. Relief is requested not later than 11:00 a.m. (prevailing Central Time) on April 16, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on April 16, 2025, at 11:00 a.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's homepage. Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/GCEHoldings. The location of Debtor Global Clean Energy Holdings, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is: 6451 Rosedale Highway, Bakersfield, California 93308.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion")[2] seeking approval of postpetition debtor-in-possession ("DIP") credit and authority to use cash collateral.  In support of this Motion, the Debtors submit:   (a) the *Declaration of Christian Tempke in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Credit, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Parties; (III) Modifying the Automatic Stay; (IV) Authorizing the Continuation of the Prepetition SOA and SSA, as Amended; (V) Authorizing the Debtors to Enter into and Perform Under Postpetition Transactions Under the SOA and SSA; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (the "Tempke Declaration") filed contemporaneously herewith; (b) the *Declaration of John Walsh in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Credit, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Parties; (III) Modifying the Automatic Stay; (IV) Authorizing Continuation of the Prepetition SOA and SSA, as Amended; (V) Authorizing the Debtors to Enter into and Perform Under Postpetition Transactions Under the SOA and SSA; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (the "Walsh DIP Declaration") filed contemporaneously herewith; and (c) the First Day Declarations.

---

[2]   A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Noah Verleun, Chief Executive Officer of Global Clean Energy Holdings, Inc., in Support of the Debtors' Chapter 11 Petitions* (the "Verleun First Day Declaration") and the *Declaration of John Walsh, Managing Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' First Day Motions* (the "Walsh First Day Declaration" and together with the Verleun First Day Declaration the "First Day Declarations"), filed contemporaneously herewith and incorporated by reference herein.  Capitalized terms used but not otherwise defined in this Motion shall have the meanings

## **Preliminary Statement**

1.        The Debtors commenced these chapter 11 cases to pursue a comprehensive reorganization of their businesses with the support of their key prepetition stakeholders.  Following months of arm's-length, hard-fought negotiations, the Debtors entered into the Restructuring Support Agreement with the Consenting Stakeholders to effectuate the value-maximizing transactions contemplated therein.  The Debtors require additional liquidity, however, to fund the administration of these chapter 11 cases and preserve the value of their estates as they pursue confirmation of the Plan.  The proposed DIP Facilities provide the Debtors with the necessary and only actionable capital to operate in the ordinary course during the postpetition period as they execute on their restructuring strategy.  The DIP Facilities, including the compromises embodied by the stipulations and releases set forth in the DIP Order, represent a critical piece of the global resolution among the parties, which will avoid value-destructive litigation during these cases.

2.        In recent years, the Debtors have faced substantial financial and operational challenges, due in large part to the construction delays at the Bakersfield Facility and related cost overruns, which were compounded by global supply chain issues, high inflation, and an increasingly uncertain regulatory landscape.  Given the considerable strain that these challenges placed on the Debtors' business, the Debtors, at the direction of its board of directors, began to explore strategic and capital structure alternatives in late 2023.  The Debtors engaged Lazard Frères & Co. LLC ("Lazard") as its investment banker and, near the end of July 2024, commenced a strategic financing process to raise capital for—and gauge market interest in—the Upstream Business (the "Upstream Capital Process").  By the October 2024 indication of interest ("IOI")

---

ascribed to them in the First Day Declarations, the DIP RCF Credit Agreement, the DIP Term Loan Credit Agreement, the DIP CTCI Contract, or the Interim Order (each as defined herein), as applicable.

deadline, the Debtors only receive two (2) non-binding IOIs.  While the Upstream Capital Process continued during the fourth quarter of 2024 and first quarter of 2025, the Debtors decided, in December 2024, to expand the scope of this process to include a comprehensive marketing process for the sale of all or substantially all of the Company's assets (the "Sale Process").  As part of the sale process, potential buyers could express an interest for the consolidated business, the Upstream Business, and the Downstream Business.  The Debtors requested first-round IOIs for the Sale Process and second-round non-binding IOIs for the Upstream Capital Process to be submitted by February 24, 2025.  Notwithstanding these efforts, the Debtors did not receive any IOIs with respect to either the Upstream Capital Process or the Sale Process by the bid deadlines.

3.     With their liquidity runway shortening, the Debtors, with the assistance of their advisors, initiated discussions with certain of their existing stakeholders, including the Prepetition Term Loan Lenders, the Prepetition RCF Lenders, and CTCI Americas, Inc.(the "Consenting Stakeholders"), with respect to potential in-court and out-of-court solutions.  As the Debtors would require additional financing to fund projected operating losses and the costs of an in-court process, the Debtors engaged their existing stakeholders to discuss the terms of potential debtor-in-possession financing while also soliciting interest from potential third-party financing sources.  In mid-January 2025, the Debtors, with the assistance of Lazard, initiated outreach to third parties on potential DIP financing.  Three parties ultimately submitted indications of interest to fund some or all of the Debtors' postpetition financing needs, subject to certain terms and conditions (including lien and claim priority over the existing capital structure).  In parallel, the Debtors obtained financing proposals from the Prepetition Term Loan Lenders and the Prepetition RCF Lenders as well as a proposal from CTCI to supply the Company with goods and services pursuant to a new construction services contract.

4

4.      After careful evaluation of the third-party indications of interest and the financing proposals from the Debtors' existing stakeholders, the Debtors, in consultation with Lazard and their other advisors, ultimately determined that the DIP Facilities proposed by the DIP RCF Lenders and the DIP Term Loan Lenders, coupled with a new agreement on construction services with the DIP Contractor, represented the best and only actionable postpetition financing for the Debtors.  Accordingly, the Debtors negotiated the terms of the DIP Facilities with the Consenting Stakeholders in connection with negotiating the Restructuring Support Agreement and the Plan.

5.      As described in the First Day Declarations and in the Walsh DIP Declaration, the Debtors have an acute need for incremental liquidity as they enter chapter 11.  As of the Petition Date, the Debtors have approximately $2.3 million of cash on hand, which is wholly insufficient to continue ordinary course operations in addition to funding the administration of these chapter 11 cases.  Accordingly, the Debtors and certain of the Consenting Stakeholders have agreed to the terms of the DIP Facilities, which will provide the funding necessary to support the Debtors' clear path to emergence, for the benefit of all parties in interest.

6.      As described more fully below, the proposed DIP Facilities consist of:

- **DIP RCF Facility**:  a priming, senior secured, superpriority debtor-in-possession revolving credit facility in the aggregate principal amount of up to $100 million, exclusive of obligations under the SOA and SSA, comprised of (i) subject to entry of the Interim Order, revolving loans incurred pursuant to a "creeping roll-up" and conversion of Prepetition RCF Obligations into DIP RCF Loans on a dollar-for-dollar basis, (ii) subject to entry of the Interim Order, a roll up of approximately $25 million of principal Prepetition Term Loan Obligations (plus any interest accrued thereon) into DIP RCF Loans, and (iii) subject to entry of the Final Order, a roll up of all remaining Prepetition RCF Obligations into DIP RCF Loans;

- **DIP Term Loan Facility**:  a superpriority, priming secured debtor-in-possession credit facility in the aggregate principal amount of $75 million, comprised of (i) $25 million in new money term loans, $15 million of which shall be available upon entry of the Interim Order, and

5

(ii) subject to entry of the Final Order, a roll up of $50 million of Prepetition Term Loan Obligations into DIP Term Loan Obligations; and

- **DIP CTCI Payment Facility**:  up to $75 million of goods, services, and other consideration supplied by the DIP Contractor pursuant to the DIP CTCI Contract, $25 million of which shall be provided by the DIP Contractor upon entry of the Interim Order, with superpriority liens and claims attaching to the any funds advanced by the DIP Contractor under the DIP CTCI Contract.

Additionally, the DIP Facilities will allow the debtors to access cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral") on a consensual basis.  Access to the proceeds of the DIP Term Loan Facility, the DIP RCF Facility, the DIP CTCI Payment Facility, and Cash Collateral is essential for the Debtors to maintain normal-course operation of their businesses and is a prerequisite to the successful administration of these chapter 11 cases.

7.      Further, pursuant to the Motion, the Debtors seek to assume the SOA and SSA, as defined and described more fully below, subject to and upon entry of the Final Order.  The SOA and SSA, taken together with the Prepetition RCF Facility, supply the Feedstock (as defined below) to the Bakersfield Facility, provide the working capital to purchase the Feedstock, address the right and title to the Feedstock and the Products (as defined below), and govern the transfer of the Products offsite by Vitol.  Put simply, these three agreements are economically interdependent, fundamental, and critical to the Debtors' operation of the Bakersfield Facility.  The Debtors' continued performance under the SOA and SSA is therefore critical to the Debtors' ability to purchase Feedstock and sell Products.  Further, the DIP RCF Lenders conditioned access to the DIP RCF Facility on assumption of the SOA and SSA, and the Debtors require access to the proceeds under the DIP RCF Facility to have sufficient liquidity to perform under the SOA and SSA.  Accordingly, absent assumption of the SOA and SSA (in addition to approval of the DIP Facilities), the Debtors will be unable to operate their business in the ordinary course postpetition.

8.    The Debtors believe that the DIP Facilities constitute the best available postpetition credit.  During the prepetition period, Lazard, on behalf of the Debtors, contacted a number of third-party financial institutions identified as potential sources of in-court or out-of-court financing.  Although the Debtors received three non-binding third-party financing proposals, no third party expressed interest in either a junior financing or financing on a non-consensual priming basis considering the outstanding Prepetition Obligations and value-destructive nature of a priming dispute.  Accordingly, and in an exercise of their sound business judgment, the Debtors determined that obtaining the DIP Facilities from the DIP Lenders and the DIP Contractor was necessary to pursue a value-maximizing restructuring transaction.

9.    The DIP Facilities are the result of extensive arm's-length, good-faith negotiations among the Debtors, the DIP Lenders, and the DIP Contractor over the course of several months and are necessary to preserve the Debtors' estates and consummate the transactions contemplated by the Restructuring Support Agreement and the Plan.  For the reasons set forth in this Motion, the First Day Declarations, the Tempke Declaration, and the Walsh DIP Declaration, the DIP Facilities are necessary to avoid immediate and irreparable harm to the Debtors and their estates and is in the best interests of the Debtors, their estates, and all stakeholders.  Accordingly, the Debtors respectfully request the Court approve the DIP Facilities and the continued use of Cash Collateral and enter the DIP Orders.

## **Jurisdiction and Venue**

10.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges from the United States District Court for the Southern District of Texas*, entered May 24, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this

Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1, 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

## Background

13.     Global Clean Energy Holdings, Inc. (together with its Debtor and non-Debtor subsidiaries, "Global Clean" or the "Company") is a vertically integrated company focused on producing ultra-low carbon renewable fuels from its patented varieties of *Camelina sativa* ("Camelina"), a nonfood feedstock.  This unique "farm-to-fuel" business model allows Global Clean to achieve greater efficiencies throughout the value chain, lower the carbon intensity of its finished product, and provide a solution to the "food versus fuel" dilemma through its focus on a feedstock that does not compete with food.  Global Clean currently owns the world's largest portfolio of patented Camelina genetics and has established operations across the globe to plant, process, transport, and refine their Camelina into biomass feedstock, biofuel oil, and renewable fuel, including at its state-of-the-art renewable fuels facility in Bakersfield, California (the "Bakersfield Facility").  Global Clean employs or retains over 150 people and, in 2024,

managed contracts with hundreds of growers around the world that planted more than 124,000 acres of Camelina in support of its worldwide operations.

14.     On April 16, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases is set forth in greater detail in the First Day Declarations, filed contemporaneously herewith and incorporated by reference herein.

15.     The Debtors have filed a motion contemporaneously herewith requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

## **Relief Requested**

16.     The Debtors seek entry of an interim order, substantially in the form attached hereto (the "Interim Order") and a final order (the "Final Order," and, together with the Interim Order, the "DIP Orders") granting the following relief:[3]

- **_DIP RCF Facility_**:  authorizing the Debtors to enter into a priming, senior secured, superpriority postpetition revolving credit facility in the aggregate principal amount of up to $100,000,000 exclusive of obligations under the SOA and SSA (such revolving credit facility along with, on, and after the Petition Date, the supply and offtake facilities provided by Vitol under the SOA and SSA the "DIP RCF Facility," and all amounts extended or deemed to be outstanding under the DIP RCF Facility, the "DIP RCF Loans"), consisting of (a) new money loans incurred by the borrower under the DIP RCF Credit Agreement (as defined below) ("DIP RCF New Money Loans") (b) subject to and effective upon entry of the Interim Order, revolving loans incurred pursuant to a "creeping roll-up" and conversion of the Prepetition RCF Obligations into

---

[3]     The Debtors will file the form of Final Order prior to the Final Hearing.

DIP RCF Loans, whereby the Debtors shall be deemed to remit all collections and proceeds of the DIP Collateral (including all renewable diesel and RINs or other environmental credits) securing the DIP RCF Facility (the "RCF Collections") to the Prepetition RCF Agent for application to the Prepetition RCF Obligations (other than amounts incurred pursuant to the SOA or the SSA) in accordance with the Prepetition RCF Loan Documents on each business day, and upon such deemed remission and application an equivalent amount shall be deemed advanced as DIP RCF Loans, thereby, on each business day, creating a reduction in the Prepetition RCF Obligations (other than amounts incurred pursuant to the SOA or SSA) in accordance with the Prepetition RCF Loan Documents in the amount of RCF Collections, and a corresponding increase in DIP RCF Loans amounts subject to this clause (b), (the "DIP RCF Creeping Roll-Up Loans"), (c) subject to and effective upon entry of the Interim Order, conversion into DIP RCF Loans of outstanding Prepetition Term Loan Obligations (as defined below) advanced by the Prepetition RCF Lenders (as defined below), in the aggregate principal amount of $25,000,000 *plus* capitalized and accrued interest (but excluding any prepayment premium in respect thereof) in the amount of $2,768,128.25 (the "DIP RCF Tranche D Roll-Up Loans"), and (d) subject to and effective upon entry of the Final Order, conversion into DIP RCF Loans of all remaining Prepetition RCF Obligations (other than amounts incurred pursuant to the SOA or the SSA) not already converted into DIP RCF Loans prior to entry of the Final Order (the "DIP RCF Final Roll-Up Loans," and together with the DIP RCF Creeping Roll-Up Loans and DIP RCF Tranche D Roll-Up Loans, the "DIP RCF Roll-Up Loans") ((a) – (d), collectively, the "DIP RCF Loans");

- ***DIP Term Loan Facility***:  authorizing the Debtors to enter into a priming, senior secured, superpriority, postpetition term loan facility in the aggregate principal amount of $75,000,000 (the "DIP Term Loan Facility," and all amounts extended or deemed to be outstanding under the DIP Term Loan Facility, the "DIP Term Loans"), consisting of:  (a) a $25,000,000 new money term loan facility (the "New Money DIP Term Loans"), $15,000,000 of which shall become available upon entry of the Interim Order (the "Interim DIP Term Loan Amount"), and (b) subject to and effective upon entry of the Final Order, $50,000,000 of term loans resulting from a partial "roll-up" of certain outstanding Prepetition Term Loan Obligations (the "Roll-Up DIP Term Loans," and together with the DIP RCF Roll-Up Loans, the "Roll-Up DIP Loans");

- ***DIP CTCI Payment Facility***:  authorizing the Debtors to obtain priming, senior secured, superpriority, postpetition credit in the aggregate principal amount of $75,000,000  (the "DIP CTCI Payment Facility," and together with the DIP RCF Facility and the DIP Term Loan Facility, the "DIP Facilities," and all amounts paid, extended, or deemed extended under the DIP CTCI Payment Facility, the "DIP CTCI Payments"), including $25,000,000 in DIP CTCI Payments under the DIP CTCI Payment Facility (the "Interim DIP CTCI Amount") to be provided by the DIP Contractor during the Interim Period;

- ***DIP Documents***:  approving the terms of, and authorizing the Debtors party thereto to enter into:  (a) that that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, by and among the Debtors, the lenders party thereto (collectively,

in such capacities, the "DIP RCF Lenders"), and Vitol Americas Corp., as administrative agent and collateral agent (in such capacities, the "DIP RCF Agent," and together with the DIP RCF Lenders, the "DIP RCF Secured Parties"), substantially in the form attached as Exhibit A to the Interim Order (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP RCF Credit Agreement"), and all agreements, documents, and instruments delivered or executed in connection thereof (as amended, restated, supplemented, waived, and/or modified from time to time, and, collectively, with the SOA and SSA, the "DIP RCF Documents"); (b) that that certain Senior Secured Super-Priority Debtor-In-Possession Term Loan Credit Agreement, by and among the Debtors, the lenders party thereto (collectively, in such capacities, the "DIP Term Loan Lenders"), and Orion Energy Partners TP Agent, LLC ("Orion"), as administrative agent and collateral agent (in such capacities, the "DIP Term Loan Agent," and together with the DIP Term Loan Lenders, the "DIP Term Loan Secured Parties"), substantially in the form attached as Exhibit B to the Interim Order (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Term Loan Credit Agreement" and together with the DIP RCF Credit Agreement, the "DIP Credit Agreements"), and all agreements, documents, and instruments delivered or executed in connection thereof (collectively, the "DIP Term Loan Documents"); and (c) that that certain Project Management, Procurement, Construction, Operation and Maintenance Support Agreement, by and among the Debtors and CTCI Americas, Inc. (solely in its capacity as holder of DIP CTCI Claims, the "DIP Contractor," together with the DIP RCF Agent and the DIP Term Loan Agent, the "DIP Agents," and the DIP Contractor, together with the DIP RCF Secured Parties and the DIP Term Loan Secured Parties, the "DIP Secured Parties"), substantially in the form attached as Exhibit C to the Interim Order (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP CTCI Contract"), and all agreements, documents, and instruments delivered or executed in connection thereof (collectively, the "DIP CTCI Documents," and together with the DIP RCF Documents and the DIP Term Loan Documents, the "DIP Documents");

- **Cash Collateral**: authorizing the Debtors to use Cash Collateral (as defined in section 363(a) of the Bankruptcy Code), in accordance with the terms of the DIP Orders, the Budget (subject to the Permitted Variances set forth in the DIP Credit Agreements and the DIP CTCI Contract), and the DIP Documents;

- **Budget**: authorizing the Debtors to use the proceeds of the DIP Facilities in accordance with the budget prepared by the Debtors, substantially in the form attached to the Interim Order as Schedule 1 (the "Initial Budget" and, as updated, amended, supplemented, or otherwise modified from time to time, pursuant to the DIP Documents and the DIP Orders, the "Budget"), subject to the Permitted Variances, and as otherwise provided herein and in the DIP Documents;

- **Adequate Protection**: authorizing the Debtors to provide adequate protection of the liens and security interests of the Prepetition Parties to protect against, and solely to the to the extent of any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral;

- ***DIP Obligations***:  authorizing the Debtors to incur and pay under the DIP Credit Agreements, the DIP CTCI Contract, and the other DIP Documents, the applicable principal, interest, and fees under the DIP Documents (the "DIP Obligations") as such amounts become earned, due, and payable, all to the extent provided in, and in accordance with, the DIP Orders and the DIP Documents;

- ***DIP Liens***:  subject to the Carve-Out, granting the DIP Agents, for the benefit of the DIP Secured Parties, valid, enforceable, nonavoidable, and fully perfected security interests in and liens upon (the "DIP Liens") all present and after-acquired property of the Debtors of any nature whatsoever, and all cash and cash equivalents contained in any account maintained by any of the Debtors, and, subject to entry of a Final Order, all Avoidance Actions Proceeds (but excluding, for the avoidance of doubt, any Avoidance Actions) of the Debtors or their estates (collectively with all rents, issues, products, offspring, proceeds and profits of any or all of the foregoing, but excluding "Excluded Property" as defined in the DIP Credit Agreements, the "DIP Collateral"), subject only to the payment of the Carve-Out, and on the terms and conditions (including with respect to lien priority set forth in the Interim Order and in the other DIP Documents);

- ***Administrative Expense Claims***:  subject to the Carve-Out, granting superpriority administrative expense claims (the "DIP Superpriority Claims") in favor of the DIP Secured Parties against each of the Debtors' estates on account of the DIP Obligations to the extent set forth and with the claim priority in the DIP Orders;

- ***Sections 506(c) and 552(b) Waivers***:  subject to entry of the Final Order, the waiver of the Debtors' and their estates' rights to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

- ***No Marshaling***:  subject to entry of the Final Order, a finding that neither the DIP Secured Parties nor the Prepetition Parties, in their respective capacities as such, shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable;

- ***Automatic Stay***:  modification of the automatic stay imposed by section 362 of the Bankruptcy Code, solely to the extent necessary to permit the Debtors, the DIP Agents, the DIP Lenders, and the Prepetition Parties to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders;

- ***Assumption of SSA and SOA***: subject to and upon entry of the Final Order, assumption of the SSA and SOA pursuant to section 365(a) of the Bankruptcy Code;

- ***Immediate Enforcement***:  waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order and the Final Order, as applicable, and authorization for the Borrower, upon entry of the Interim Order, to immediately request, borrow, and draw DIP Term Loans, DIP RCF Loans, and DIP CTCI Payments, as set forth in the DIP Documents;

- ***Final Hearing***:  scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of the Final Order within 30 days of the Petition Date, or as soon as practicable thereafter based on the Court's availability; and

- ***Related Relief***:  granting such other and further relief as is just and proper.

**Concise Statement Pursuant to**
**<u>Bankruptcy Rule 4001 and the United States Bankruptcy Court</u>**
**<u>for the Southern District of Texas Procedures for Complex Chapter 11 Cases</u>[4]**

17.     The following chart contains a summary of the material terms of the proposed DIP Facilities (the "<u>Summary of Material Terms</u>"), together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.

| Bankruptcy Rule | Relief Requested |
|---|---|
| **DIP Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | **DIP RCF Facility**:  Bakersfield Renewable Fuels, LLC.  *See* DIP RCF Credit Agreement Preamble.<br><br>**DIP Term Loan Facility**:  Global Clean Energy Holdings, Inc.  *See* DIP Term Loan Credit Agreement Preamble.<br><br>**DIP CTCI Payment Facility**:  Bakersfield Renewable Fuels, LLC.  *See* DIP CTCI Contract Preamble. |
| **DIP Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | With respect to all DIP Facilities, all Debtors (other than the applicable DIP Borrowers) in the Chapter 11 Cases.<br><br>*See* DIP RCF Credit Agreement § 1.01; DIP Term Loan Credit Agreement § 1.01; DIP CTCI Contract ¶ E. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | **DIP RCF Facility**:  Certain Prepetition DIP RCF Lenders, in their capacity as postpetition credit lenders.  *See* DIP RCF Credit Agreement Preamble.<br><br>**DIP Term Loan Facility**:  Certain Prepetition DIP Term Loan Lenders, in their capacity as postpetition credit lenders.  *See* DIP Term Loan Credit Agreement Preamble.<br><br>**DIP CTCI Payment Facility**:  CTCI Americas, Inc.  *See* DIP CTCI Contract Preamble. |
| **Termination Date**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | With respect to the DIP RCF Facility and the DIP Term Loan Facility, the "<u>DIP Termination Date</u>" means the earliest to occur of: (a) the Maturity Date, (b) the date of the termination of the Commitments or the acceleration of all of the Obligations under this Agreement following the occurrence and continuance of an Event of Default in accordance with Article VII, (c) the date of the termination of the Commitments or acceleration of amounts owed by any Loan Party thereunder, (d) the first Business Day |

---

[4]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Credit Agreements, DIP CTCI Contract, and the Interim Order.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Rule | Relief Requested |
|---|---|
| | on which the Interim DIP Order expires by its terms or is terminated, unless the Final DIP Order has been entered and become effective prior thereto, (e) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Term Loan Agent, (f) the dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the DIP Term Loan Agent, (g) the closing of a sale of all or substantially all of the equity or assets of the Loan Parties (unless effectuated pursuant to an Approved Plan), (h) the date of payment in full in cash of all Obligations (other than any contingent Obligations that survive the expiration or termination of this Agreement) and termination of all of the Commitments in accordance with the terms herein, and (i) the effective date of any Loan Party's Approved Plan, provided that the Termination Date may be extended, with respect to the use of Cash Collateral, with the prior written consent of the Prepetition DIP Term Loan Agents and Prepetition DIP Term Loan Lenders, and otherwise, with the prior written consent of the DIP Term Loan Agent and the Secured Parties. <br><br> With respect to the DIP CTCI Payment Facility, "Maturity Date" is the earliest to occur of (i) the date that is six months after the Petition Date; (ii) the effective date of an Approved Plan; (iii) the date of the termination of the Restructuring Support Agreement with respect to any party to the Restructuring Support Agreement; and (iv) the date that the Contractor demands payment after an Event of Default (as defined in the DIP CTCI Contract). <br><br> The DIP Termination Date may be extended, with respect to the use of Cash Collateral, with the DIP Agents' consent. <br><br> *See* Interim Order ¶ 29; DIP RCF Credit Agreement, § 1.01; DIP Term Loan Credit Agreement, § 1.01; DIP CTCI Contract § 3.2.1. |
| **Commitment** <br> Bankruptcy Rule 4001(c)(1)(B) | The DIP Facilities commitments total an aggregate amount up to $250 million, consisting of: <br><br> **DIP RCF Facility**:  a priming, senior secured, superpriority debtor-in-possession revolving credit facility in the aggregate principal amount of up to $100 million (the "DIP RCF Facility"), consisting of (a) DIP RCF New Money Loans; (b) subject to and effective upon entry of the Interim Order, DIP RCF Creeping Roll-Up Loans; (c) subject to and effective upon entry of the Interim Order, $27.8 million of DIP RCF Tranche D Roll-Up Loans; and (d) subject to and effective upon entry of the Final Order, DIP RCF Final Roll-Up Loans. <br><br> **DIP Term Loan Facility**: a superpriority, priming secured debtor-in-possession credit facility in the aggregate principal amount of $75 million (the "DIP Term Loan Facility"), comprising (i) $25 million in new money term loans, including $15 million in New Money DIP Term Loans (the "Interim DIP Term Loan Amount") upon entry of the Interim Order and (ii) subject to entry of the Final Order, a roll up of $50 million of Tranche D claims under the Prepetition Term Loan Credit Agreement; and <br><br> **DIP CTCI Payment Facility**:  superpriority, senior secured priming credit (the "DIP CTCI Payment Facility," and together with the DIP RCF Facility and the DIP Term Loan Facility, the "DIP Facilities") to be provided by the DIP Contractor in an aggregate value of up to $75 million, with up to $25 million in DIP CTCI Payments under the DIP CTCI Payment Facility (the "Interim DIP CTCI Amount") to be provided by the DIP Contractor during the Interim Period. |

| Bankruptcy Rule | Relief Requested |
|---|---|
| | *See* Interim Order ¶¶ i, vi, x; DIP RCF Credit Agreement, § 2.01; DIP Term Loan Credit Agreement, § 2.01; DIP CTCI Contract § 3.1. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | With respect to all DIP Facilities, conditions to commitment, closing, and funding to include customary conditions for financings of this type, as well as any other conditions agreed to by the Debtors and the DIP Agents, including, without limitation, entry of Interim DIP Order or the Final DIP Order, as applicable, execution and delivery of the DIP Documents, delivery of an Initial Budget, perfection of collateral via the Interim DIP Order as to certain collateral (without the need for any execution, recordation, or filing of any mortgages, deeds of trust, pledge or security agreements, lockbox or control agreements, financing statements, or any other similar documents or instruments, or the possession or control by the DIP Agents or the DIP Lenders of, or over, any assets), delivery of closing deliverables, payment of all reasonable and documented out-of-pocket fees, costs, and expenses owed to the DIP Agents and the DIP Lenders pursuant to the DIP Documents (including their advisors and counsel), no continuing default or event of default, and accuracy of representations and warranties. |
| | *See* DIP RCF Credit Agreement Article IV; DIP Term Loan Credit Agreement Article IV. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | **DIP RCF Facility**:  The DIP RCF Loans shall bear interest at a rate of 12.5% per annum. |
| | **DIP Term Loan Facility**:  The DIP Term Loans shall bear interest at a rate of 8.0% per annum, payable monthly in arrears in kind. |
| | During the continuance of an event of default, all overdue amounts of principal and interest under the DIP RCF Facility and DIP Term Loan Facility will bear interest at the applicable rate, plus 2.0% per annum. |
| | **DIP CTCI Payment Facility**:  The DIP CTCI Payment Facility does not have an interest rate. |
| | *See* DIP RCF Credit Agreement § 1.01; DIP Term Loan Credit Agreement § 1.01. |
| **Use of DIP Facilities and Cash Collateral** Bankruptcy Rule 4001(c)(l)(B)(ii) | From and after the Petition Date, the Debtors shall use proceeds of borrowings or DIP CTCI Payments, as applicable, under the DIP Facilities only for the purposes specifically set forth in the Interim Order and the DIP Documents, and, in each case, in compliance with the Budget (subject to any Permitted Variances or Variance Limit, as applicable (as defined in the DIP Credit Agreements and the DIP CTCI Contract, as applicable, the "Permitted Variances")) and the terms and conditions in the Interim Order and the DIP Documents. |
| | Subject to the written consent of each DIP Agent, no portion of the Carve-Out, the proceeds of the DIP RCF Facility, DIP Term Loan Facility, DIP CTCI Payment Facility, the DIP Collateral, the Prepetition Collateral, or any Cash Collateral may be used to (or support any other party to) litigate, object to, contest, or challenge in any manner or raise any defenses to the debt, collateral position, liens, or claims of any of the DIP RCF Agent, the DIP RCF Lenders, the DIP Term Loan Lenders, the DIP Term Loan Agent, the DIP Contractor, CTCI (solely to the extent the Restructuring Support Agreement has not been terminated) or the other Prepetition Parties, whether by challenging the validity, extent, amount, perfection, priority, or enforceability of the indebtedness under the DIP Facilities, the Prepetition RCF Credit Agreement, the Prepetition Term Loan Credit Agreement, the Prepetition CTCI Obligations, or the validity, extent, perfection, priority, or enforceability of any mortgage, security interest, or lien with respect thereto or any other rights or interests or replacement liens with respect thereto or any other rights or interests of any of the DIP Secured Parties, or by seeking to subordinate or recharacterize the DIP Facilities (or amounts outstanding thereunder), the Prepetition RCF Credit Agreement (or amounts outstanding thereunder), the Prepetition Term Loan Credit |

| Bankruptcy Rule | Relief Requested |
|---|---|
| | Agreement (or amounts outstanding thereunder), or the Prepetition CTCI Agreements, or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or by asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the DIP Secured Parties, or the Prepetition Parties, or any of their respective officers, directors, agents, or employees; provided, that such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $75,000 (the "Investigation Budget Amount") incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the Stipulations (the "Investigation") before the applicable Challenge Deadline (as defined below).  In addition, none of the Carve-Out, proceeds of the DIP RCF Facility, the DIP Term Loan Facility, the DIP Collateral, the Prepetition Collateral, payments or proceeds of payments made pursuant to the DIP CTCI Contract, nor any Cash Collateral shall be used in connection with (a) preventing, hindering, or delaying any of the DIP Secured Parties', or the Prepetition Parties' enforcement or realization upon the DIP Collateral or the exercise of rights by the DIP Agents, or the Prepetition Parties once an Event of Default has occurred and is continuing, (b) using or seeking to use Cash Collateral or selling or otherwise disposing of the DIP Collateral other than as provided in the Interim DIP Order, (c) using or seeking to use any insurance proceeds related to the DIP Collateral without the consent of the applicable DIP Agents or Prepetition Parties, or (d) incurring Indebtedness (as defined in the DIP Term Loan Credit Agreement and the DIP RCF Credit Agreement) other than in accordance with the Budget or other than as permitted in the DIP Documents; provided, that the foregoing limitations shall not prevent the Debtors and their professionals, or any other party in interest, from being heard on whether an Event of Default has occurred and is continuing. *See* Interim Order ¶¶ 12, 32. |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition RCF Secured Parties, the Prepetition Term Loan Secured Parties, CTCI (to the extent provided in paragraph 16(a) of the Interim Order), and the DIP Secured Parties, as applicable. *See* Interim Order ¶ H. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | **Fees**:  With respect to the DIP RCF Loans, a facility fee equal to 5.00% per annum on the average unused portion of the DIP RCF Facility DIP Credit Agreement, calculated and paid quarterly in arrears (or monthly if an event of default exists), and on the maturity date or earlier termination. The DIP CTCI Contract provides for a 16.5% margin on the Cost of the Work (as defined in the DIP CTCI Contract), consisting of (i) 8% per annum on the goods, services, and other consideration actually provided by CTCI and (ii) any amounts in excess of such 8%. Such amounts shall be accrued (but not paid in cash) during these chapter 11 cases and will be rolled into the Exit Facilities pursuant to the terms of the Restructuring Support Agreement. There are no fees associated with the DIP Term Loan Facility. **Prepayments**: The DIP Loans contain mandatory prepayment provisions customary for financings of this type. *See* DIP RCF Credit Agreement §§ 2.03, 2.09; DIP Term Loan Credit Agreement § 2.06. |

| Bankruptcy Rule | Relief Requested |
|---|---|
| **DIP Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | With respect to all DIP Facilities, customary for financings of this type including, but not limited to:<br><br>(a)      On May 9, 2025 (the "Initial Reporting Date"), the Debtors shall deliver to the DIP Agents a detailed 13-week rolling cash forecast, containing line items of sufficient detail to reflect the Debtors' projected cash flows and disbursements for the applicable period, which shall thereafter be updated as necessary but not less than once every four weeks (each, a "Proposed Budget"). The DIP Secured Parties shall have five (5) Business Days after receipt thereof to object in writing to any Proposed Budget, upon the expiration of which period the Proposed Budget shall become an Approved Budget and shall replace the then-operative Approved Budget for all purposes; *provided* that, if the DIP Secured Parties timely object in writing to any Proposed Budget, then the current Approved Budget shall remain the Approved Budget. The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved in accordance with the applicable agreement, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. The Debtors shall operate in accordance with the Approved Budget and, subject to the Variance Limit, all disbursements shall be consistent with the provisions of the Approved Budget. The Debtors may submit additional Proposed Budgets to the DIP Secured Parties, but until the DIP Secured Parties approve such Proposed Budget in writing, such Proposed Budget shall not become an Approved Budget and the Debtors shall continue to comply with the then-operative Approved Budget.<br><br>(b)      Beginning on April 24, 2025, and on the Thursday of each calendar week thereafter, the Debtors shall deliver to the DIP Agents, in a form consistent with the form of the Approved Budget, a variance report comparing the Debtors' actual receipts and disbursements for the prior calendar week and the prior four calendar weeks (on a cumulative basis) with the projected cash flows and disbursements by line item for such week and the prior four calendar weeks (on a cumulative basis) as reflected in the applicable Approved Budget for such weeks, which variance report shall include a report from a financial officer of the Debtors identifying and addressing any variance of actual performance to projected performance for such prior weekly periods (such report, the "Weekly Variance Report").<br><br>(c)      No later than 4:00 p.m. Central Time on the Initial Reporting Date and on each Thursday thereafter that is the two (2)-week anniversary of the Initial Reporting Date (each such date, a "Bi-Weekly Variance Testing Date" and each such two (2)-week period, the "Bi-Weekly Variance Testing Period"), the Debtors shall deliver to the DIP Agents (for circulation to the DIP Secured Parties) and the DIP Agents a report detailing (i) on a line item by line item basis, the aggregate receipts and disbursements of the Debtors during the applicable Bi-Weekly Variance Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between such disbursements made during such Bi-Weekly Variance Testing Period by the Debtors against the applicable Approved Budget (a "Bi-Weekly Variance Report" and together with the Weekly Variance Report, the "Variance Reports").<br><br>*See* DIP RCF Credit Agreement § 5.26; DIP Term Loan Credit Agreement § 5.20; DIP CTCI Contract § 14.15. |
| **Financial Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Minimum liquidity: The DIP Loan Parties shall maintain, at all times while the DIP Loans remain outstanding, $5,000,000 in unrestricted cash (subject to the Control Agreement), Availability (as that term is defined in the DIP RCF Agreement), availability under the DIP CTCI Contract, or a combination of the foregoing amounting to $5,000,000 in |

| Bankruptcy Rule | Relief Requested |
|---|---|
| | aggregate. |
| | Budget variance testing: As of any Bi-Weekly Variance Testing Date, for the Bi-Weekly Variance Testing Period ending on the Friday preceding such Bi-Weekly Variance Testing Date, the Loan Parties shall not allow aggregate disbursements, excluding disbursements with respect to professional fees and G&A Disbursements, to be greater than 115% of the estimated aggregate disbursement for such item in the Approved Budget for such Bi-Weekly Variance Testing Period (collectively, the "Variance Limit"). Additional variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to the DIP Term Loan Agent's and DIP RCF Agent's reasonable approval. |
| | *See* DIP RCF Credit Agreement §§ 6.18, 6.24; DIP Term Loan Credit Agreement §§ 6.17, 6.18. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | The DIP Credit Agreements require compliance with the milestones set forth in the Restructuring Support Agreement (as such term is defined in the Restructuring Support Agreement), unless extended or waived in writing by the DIP Agents (which may be by email). |
| | The Debtors shall comply with the below milestones: |
| | a)  no later than three (3) days after the Petition Date, subject to Bankruptcy Court availability, the Bankruptcy Court shall have entered the Interim Order; |
| | b)  no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order; |
| | c)  no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered an order (which may be a DIP Order) approving the Loan Parties' assumption of the SOA and SSA on a final basis; |
| | d)  no later than thirty (30) days after the Petition Date, the Debtors shall have filed the Plan and Disclosure Statement; |
| | e)  no later than sixty (60) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement; |
| | f)  no later than one hundred and ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the order confirming the Plan; and |
| | g)  no later than one hundred and twenty (120) days after the Petition Date, the Plan Effective Date shall have occurred. |
| | *See* DIP RCF Credit Agreement §1.01; DIP Term Loan Credit Agreement § 1.01. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i) | In accordance with the lien priority schedule set forth on Exhibit D to the Interim Order, the Debtors will grant the following liens. |
| | **DIP Liens**:  Subject and subordinate in all respects to the Carve-Out and as security for the DIP Obligations, effective immediately upon entry of the Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Secured Parties are hereby granted valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests and liens on all real and personal property, whether now existing or hereafter arising and wherever located, |

| Bankruptcy Rule | Relief Requested |
|---|---|
| | tangible or intangible, of each of the Debtors (the "<u>DIP Collateral</u>"), including, without limitation (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments (including, without limitation, promissory notes), documents, securities (whether or not marketable) and investment property (in each case, together with all securities accounts and security entitlements related thereto, all financial assets carried therein, and all commodity accounts and commodity contracts related thereto), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, vehicles, franchise rights, trade names, trademarks, service marks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany obligations, fee interests in real property owned by the Debtors, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and other electronic storage media and related data processing software related to the foregoing, and accessions, products, rents, profits, and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all owned real property interests and all real property leases and proceeds thereof; (c) actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; (d) upon entry of a Final Order providing for such relief, the proceeds of any avoidance actions (such actions, "<u>Avoidance Actions</u>") brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents (the "<u>Avoidance Action Proceeds</u>"); provided, that no liens shall attach to any Avoidance Actions; (e) upon entry of the Final Order providing for such relief, the proceeds of any exercise of the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code and; (f) all assets of the Debtors that are not otherwise subject to valid, perfected, enforceable, and unavoidable security interests or liens in existence as of the Petition Date or valid liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code) (the "<u>Unencumbered Collateral</u>"); and any liens permitted by the applicable DIP Documents to be senior in priority to such DIP Liens and solely to the extent any such liens were valid, binding, enforceable, properly perfected, and non-avoidable and not subordinated as of the Petition Date (the "<u>Permitted Senior Liens</u>"), as set forth in the Interim Order and in accordance with the priorities set forth in <u>Exhibit D</u> to the Interim Order (all such liens and security interests granted to the DIP RCF Agent, for the benefit of itself and the DIP RCF Lenders (the "<u>DIP RCF Liens</u>"), to the DIP Term Loan Agent, for the benefit and of itself and the DIP Term Loan Lenders (the "<u>DIP Term Loan Liens</u>"), and to the DIP Contractor, for the benefit of itself (the "<u>DIP CTCI Liens</u>"), pursuant to the Interim Order and the DIP Documents, and the foregoing liens, collectively, the "<u>DIP Liens</u>"): <br><br>**DIP Superpriority Claims**: Subject and subordinate to the Carve-Out, upon entry of the Interim Order, the DIP Secured Parties are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against each of the Debtors in the Chapter 11 Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations (a) with, except as provided in <u>Exhibit E</u> to the Interim Order, priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), |

| Bankruptcy Rule | Relief Requested |
|---|---|
| | 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code, (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law, and (c) which shall have the relative priorities inter se set forth on Exhibit E to the Interim Order.<br><br>*See* Interim Order ¶¶ 8, 10. |
| **Carve-Out**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders each shall include a carve-out, in the form described and set forth in the Interim Order.<br><br>*See* Interim Order ¶ 31. |
| **Challenge Deadline**<br>Bankruptcy Rule 4001(c)(l)(B) | The Interim Order provides that the Committee shall have until sixty (60) days from the date of the formation of the Committee (if appointed) and (ii) as to any other party in interest with requisite standing, seventy-five (75) days following the entry of the Interim Order, and (iii) as to the DIP Contractor and CTCI, solely in the event Restructuring Support Agreement is terminated at any time during the Chapter 11 Cases, seventy-five (75) days following such termination of the Restructuring Support Agreement, as such deadlines may be extended per the Interim Order, to investigate and commence a challenge to the Debtors' Stipulations.<br><br>*See* Interim Order ¶ 38. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | As adequate protection (the "Adequate Protection") for any diminution in value resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and the priming of the Prepetition Parties' respective interests in the Prepetition Collateral (including by the Carve-Out), and for any other reason authorized by the Bankruptcy Code ("Diminution in Value"):<br><br>The Prepetition RCF Secured Parties, are entitled to receive adequate protection of their interests in the Prepetition Collateral, including, without limitation, the Cash Collateral, pursuant to sections 361, 363, and 507(b) of the Bankruptcy Code.  The Prepetition RCF Secured Parties will receive (a) solely to the extent of any Diminution in Value of its interests in the Prepetition Collateral, RCF Adequate Protection Liens (as defined below) with the relative priorities set forth on Exhibit D to the Interim Order and RCF 507(b) Claims (as defined below) with the relative priorities set forth on Exhibit E to the Interim Order; (b) current payment of reasonable and documented fees and out-of-pocket expenses and other disbursements; and (c) financial and other reporting.<br><br>The Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Secured Parties, is entitled to receive adequate protection of their interests in the Prepetition Collateral, including, without limitation, the Cash Collateral, pursuant to sections 361, 363, and 507(b) of the Bankruptcy Code.  The Prepetition Term Loan Secured Parties will receive (a) solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral, (i) Term Loan Adequate Protection Liens (as defined below) with the relative priorities set forth on Exhibit D to the Interim Order and (ii) Term Loan 507(b) Claims (as defined below) with the relative priorities set forth on Exhibit E to the Interim Order; (b) current payment of reasonable and documented fees and out-of-pocket expenses and other disbursements; and (c) financial and other reporting.<br><br>CTCI is entitled to receive adequate protection of its interests in the Prepetition Collateral, including, without limitation, Cash Collateral, pursuant to sections 361, 363, and 507(b) of the Bankruptcy Code.  CTCI will receive (a) solely to the extent of any Diminution in Value of its interests in the Prepetition Collateral, if any, (i) CTCI Adequate Protection Liens (as defined below) with the relative priorities set forth on Exhibit D to the Interim |

| Bankruptcy Rule | Relief Requested |
|---|---|
| | Order and (ii) CTCI 507(b) Claims (as defined below) with the relative priorities set forth on <u>Exhibit E</u> to the Interim Order; (b) so long as the Restructuring Support Agreement has not been terminated, current payment of reasonable and documented fees and out-of-pocket expenses and other disbursements; and (c) financial and other reporting.<br><br>*See* Interim Order ¶¶ 14-16. |
| **Stipulations**<br>Bankruptcy Rule 4001(c)(l)(B)(iii) | Subject to the rights of all parties in interest (including any Committee) set forth in paragraphs 38 and 48 of the Interim Order, as an inducement to the Prepetition Parties to make the financial accommodations under the DIP Facilities, the Debtors admit, stipulate, acknowledge, and agree as follows (paragraphs G(i) through G(xviii) below are referred to herein, collectively, as the "Stipulations," and each, a "<u>Stipulation</u>"); *provided* that the Stipulations in (i) paragraphs G(ix) through and including G(xi), (ii) paragraph G(xv), and (iii) paragraph G(xvi) (in each case, solely as they relate to CTCI) and the releases set forth in paragraph G(xvii) (solely as they relate to CTCI) (the "<u>Standstill Stipulations</u>") shall only be valid and binding on the Debtors and all other parties in interest to the extent the Restructuring Support Agreement is not terminated by any Consenting Stakeholder (as defined in the Restructuring Support Agreement) at any time during these Chapter 11 Cases, and that upon such termination of the Restructuring Support Agreement, the Standstill Stipulations (or any orders or findings with regard thereto) (x) shall not be used by any party for any purpose whatsoever in the Chapter 11 Cases or otherwise, and (y) shall be void *ab initio* and of no further force and effect to the extent the Restructuring Support Agreement is terminated at any time, and the rights of all parties (including, for the avoidance of doubt, the Debtors, the Prepetition RCF Secured Parties, the Prepetition Term Loan Secured Parties, and CTCI) are reserved with respect to such Standstill Stipulations.<br><br>*See* Interim Order ¶¶ G, 38. |
| **Releases**<br>Bankruptcy Rule 4001(c)(l)(B)(viii) | Effective upon entry of the Final Order, the Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Parties (with regard to CTCI, in its capacity as provider of the Prepetition CTCI Arrangements), the DIP Secured Parties, and all current and future DIP Lenders, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, directors, employees, attorneys, and agents, past, present, and future, and their respective heirs, predecessors, successors, and assigns, each solely in their capacities as such (collectively, the "<u>Released Parties</u>"), of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever relating to, as applicable, (i) the Interim Order, the DIP Facilities, the DIP Documents, and the transactions contemplated hereunder or thereunder, and (ii) the Prepetition Facilities, the Prepetition Documents, and the transactions contemplated thereunder, in each case including, without limitation, (a) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (b) any and all claims and causes of action arising under the Bankruptcy Code, and (c) any and all claims and causes of action with respect to the validity, priority, perfection, or avoidability of the liens or claims of the Prepetition Parties, the DIP Term Loan Agent, the DIP Term Loan Lenders, the DIP RCF Agent, or the DIP RCF Lenders; provided, that the foregoing releases shall not apply with respect to any act or omission of a Released Party that constitutes gross negligence, actual fraud, or willful misconduct.  The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Obligations or the DIP Obligations that the Debtors may now have or may claim to have against the Released Parties arising out of, connected with, or |

| Bankruptcy Rule | Relief Requested |
|---|---|
| | relating to any and all acts, omissions, or events occurring before this Court's entry of the Interim Order. <br><br> *See* Interim Order ¶¶ G(xvii), 44. |
| **Waiver of Section 506(c) and 552(b)** <br> Bankruptcy Rule 4001(c)(1)(B)(x) | The DIP Orders shall provide that, subject to the entry of the Final DIP Order, the DIP RCF Agent, the DIP RCF Lenders, the DIP Term Loan Agent, the DIP Term Loan Lenders, the DIP Contractor, the DIP Collateral, the Prepetition RCF Agent, the Prepetition RCF Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, CTCI, and the Prepetition Collateral shall at no time be subject to marshalling or to surcharge under section 506(c) of the Bankruptcy Code (the "506(c) Waiver") or the "equities of the case" exception under section 552(b) of the Bankruptcy Code (the "552(b) Waiver"). <br> *See* Interim Order ¶¶ 40, 42. |
| **Events of Default** <br> Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreements contain events of default that are usual and customary for DIP financing. <br> *See* DIP RCF Credit Agreement § 7.01; DIP Term Loan Credit Agreement § 7.01; DIP CTCI Contract Exhibit E. |
| **Waiver/Modification of the Automatic Stay** <br> Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order. <br> *See* Interim Order ¶ 20. |
| **Indemnification** <br> Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Facilities contain indemnification provisions ordinary and customary for financings of this type. <br> *See* DIP RCF Credit Agreement § 10.03(b); DIP Term Loan Credit Agreement § 10.03(b); DIP CTCI Contract § 7.6. |

### **Statement Regarding Significant Provisions**

18.     The Interim Order contains certain of the provisions (the "Significant Provisions")

identified in paragraph 8 of the Complex Case Procedures as set forth below:

- ***Plan Confirmation Milestones.***  The DIP Credit Agreements contain milestones regarding these chapter 11 cases, as outlined in the summary of material terms.  *See* DIP RCF Credit Agreement § 1.01, "Milestones"; DIP Term Loan Credit Agreement § 1.01, "Milestones."

- ***No Cross-Collateralization.***  The DIP Orders do not authorize, and the DIP Facilities does not provide for, any cross-collateralization of the Debtors' funded debt.

- ***Roll Up***.  Without any further action by the Debtors or any other party and upon entry of the Interim Order, the Prepetition RCF Obligations shall be converted into DIP RCF

Creeping Roll-Up Loans and the Prepetition Term Loan Obligations advanced by the Prepetition RCF Lenders shall be converted into DIP RCF Tranche D Roll-Up Loans. Upon entry of the Final Order, the remaining Prepetition RCF Obligations not already converted into DIP RCF Loans shall be converted into DIP RCF Final Roll-Up Loans and $50 million of outstanding Prepetition Term Loan Obligations advanced by the Prepetition Term Loan Lenders shall be converted into Roll-Up DIP Term Loans. The conversions (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition RCF Lenders and Prepetition Term Loan Lenders to provide postpetition liquidity and permit access to Cash Collateral, and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Obligations. *See* Interim Order ¶ J(viii).

- **_Liens on Avoidance Actions_**.  No liens will be granted on claims or causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively the "Avoidance Actions"), but, subject to and effective upon entry of the Final Order, liens will be granted on all proceeds of, recoveries related to, and property received or recovered on account of the Avoidance Actions (the "Avoidance Actions Proceeds"). *See* Interim Order ¶ 8.

- **_Default Provisions and Remedies_**.  The Interim Order provides for an Enforcement Notice Period (as defined in the Interim Order), whereby the applicable DIP Agent shall seek an emergency hearing before the Court with five (5) business days' written notice to seek relief to exercise its remedies.  At the Enforcement Hearing (as defined in the Interim Order), the Court may consider whether an Event of Default occurred and fashion any appropriate remedy, including, but not limited to, termination of the Debtors' use of Cash Collateral, enforcement of DIP Liens, or other remedies with respect to the DIP Collateral.  During the Enforcement Notice Period, which shall not expire until the Enforcement Hearing ends, the Debtors may continue to use Cash Collateral to fund the Carve-Out, meet payroll obligations, and pay expenses associated with the Debtors' businesses that are necessary to avoid immediate and irreparable harm to the Debtors' estates, in accordance with the Budget. *See* Interim Order ¶¶ 28–30.

- **_Releases of Claims_**.  Subject to and effective upon the Final Order, the Debtors will provide customary releases to the DIP Secured Parties and the Prepetition Parties with respect to the DIP Documents, the Prepetition Documents, and any transactions contemplated or arising thereby.  For the avoidance of doubt, the releases set forth in paragraph G of the Interim Order shall be binding, subject to the terms of paragraph 38 of the Interim Order, solely to the extent that the Restructuring Support Agreement is not terminated by a Consenting Stakeholder. *See* Interim Order ¶¶ G(xvii), 44.

- **_Limitations on the Use of DIP Proceeds, DIP Collateral, and Cash Collateral_**.  Subject to the written consent of each DIP Agent, no portion of the Carve-Out, the proceeds of the DIP RCF Facility, DIP Term Loan Facility, DIP CTCI Payment Facility, the DIP Collateral, the Prepetition Collateral, or any Cash Collateral may be used to (or support any other party to) litigate, object to, contest, or challenge in any

manner or raise any defenses to the debt, collateral position, liens, or claims of any of the DIP RCF Agent, the DIP RCF Lenders, the DIP Term Loan Lenders, the DIP Term Loan Agent, the DIP Contractor, CTCI (solely to the extent the Restructuring Support Agreement has not been terminated), or the other Prepetition Parties, whether by challenging the validity, extent, amount, perfection, priority, or enforceability of the indebtedness under the DIP Facilities, the Prepetition RCF Credit Agreement, the Prepetition Term Loan Credit Agreement, the Prepetition CTCI Obligations (solely to the extent the Restructuring Support Agreement has not been terminated), or the validity, extent, perfection, priority, or enforceability of any mortgage, security interest, or lien with respect thereto or any other rights or interests or replacement liens with respect thereto or any other rights or interests of any of the DIP RCF Agent, the DIP RCF Lenders, the DIP Term Loan Agent, the DIP Term Loan Lenders, the DIP Contractor, or CTCI (solely to the extent the Restructuring Support Agreement has not been terminated), or by seeking to subordinate or recharacterize the DIP Facilities (or amounts outstanding thereunder), the Prepetition RCF Credit Agreement (or amounts outstanding thereunder), the Prepetition Term Loan Credit Agreement (or amounts outstanding thereunder), or the Prepetition CTCI Agreement (solely to the extent the Restructuring Support Agreement has not been terminated), or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or by asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the DIP Secured Parties or the Prepetition Parties or any of their respective officers, directors, agents, or employees; *provided*, that such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $75,000 (the "**Investigation Budget Amount**") incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the Stipulations (the "**Investigation**") before the applicable Challenge Deadline (as defined below).  In addition, none of the Carve-Out, proceeds of the DIP RCF Facility, the DIP Term Loan Facility, the DIP Collateral, the Prepetition Collateral, payments or proceeds of payments made pursuant to the DIP CTCI Contract, nor any Cash Collateral shall be used in connection with (a) preventing, hindering, or delaying any of the DIP Secured Parties' or the Prepetition Parties' enforcement or realization upon the DIP Collateral or the exercise of rights by the DIP RCF Agent, the DIP Term Loan Agent, the DIP Contractor, or the Prepetition Parties once an Event of Default has occurred and is continuing, (b) using or seeking to use Cash Collateral or selling or otherwise disposing of the DIP Collateral other than as provided herein, (c) using or seeking to use any insurance proceeds related to the DIP Collateral without the consent of the applicable DIP Agents or Prepetition Parties, or (d) incurring Indebtedness (as defined in the DIP Term Loan Credit Agreement and the DIP RCF Credit Agreement) other than in accordance with the Budget or other than as permitted in the DIP Documents; *provided*, that the foregoing limitations shall not prevent the Debtors and their professionals, or any other party in interest, from being heard on whether an Event of Default has occurred and is continuing.  *See* Interim Order ¶ 32.

- ***No Non-Consensual Priming Liens.***  The DIP Orders grant consensual fully perfected priming liens on all DIP collateral subject to the Prepetition Liens, subject to the lien

priorities set forth in <u>Exhibit D</u> to the Interim Order for the benefit of the DIP Secured Parties.

- ***No Limitations on the Ability of Estate Fiduciaries to Fulfill their Duties.*** The DIP Orders do not limit the ability of the estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

19.     The inclusion of each of the applicable Significant Provisions in the Interim Order is appropriate and necessary to permit the Debtors' access to the DIP Facilities.  The terms and conditions of each of the Significant Provisions included in the Interim Order are the result of arm's-length and hard-fought negotiations among the Debtors, the DIP Lenders, and the DIP Contractor who are unwilling to provide the DIP Facilities absent the inclusion of these provisions. Further, no third party has presented a better DIP credit proposal given the circumstances of these chapter 11 cases and, particularly, in light of the costs and time that would necessarily be incurred in a priming fight.  As set forth herein, in the First Day Declarations, the Walsh DIP Declaration, and the Tempke Declaration, granting the relief requested pursuant to the Interim Order is critical to the continued operation of the Debtors' businesses and will permit the Debtors to smoothly transition into these chapter 11 cases and maximize the value of the Debtors' estates for the benefit of all interested parties.  Accordingly, the Debtors submit that the Significant Provisions in the Interim Order are appropriate and necessary under the facts and circumstances of these chapter 11 cases and should be approved.

**<u>Prepetition Capital Structure</u>**

20.     Global Clean's prepetition capital structure includes approximately $2,133.8 million in total potential claims (excluding intercompany claims) as of the Petition Date, which can be summarized as follows:

| Facility | Approx. Principal Amount Outstanding as of 04.11.2025 | Maturity |
|---|---|---|
| Revolving Credit Facility | $39.1 million | 12/1/2027 |
| Senior Secured Term Loan | $1,096.3 million | 12/31/2025 |
| Total Secured Funded Debt Claims (excluding Intercompany Debt) | $1,135.4 million | |
| CTCI Secured Payment Obligations | $949.3 million[5] | N/A |
| Project Manager Service Provider Payments | $9.2 million | N/A |
| Total Facility-Related Claims | $958.5 million | |
| CCI Notes | $33.9 million | 04/30/2025 |
| Other Notes | $6.0 million | 10/2025–06/2050 |
| Total Notes Claims (excluding Intercompany Debt) | $39.9 million | |
| *Total Potential Claims (excluding Intercompany Debt)* | *$2,133.8 million* | |
| | | |
| Intercompany Debt | | |
| HoldCo Loan Facility (Intercompany) | $49.4 million | 11/04/2027 |
| SusOils Secured Promissory Note (Intercompany) | $34.9 million | 08/22/2025 |
| Rosedale Notes (Intercompany) | $48.6 million | 02/23/2032 |

## I.    Secured Funded Debt Claims

### A.    Revolving Credit Facility

21.    Certain of the Debtors are party to that certain Credit Agreement, dated as of June 25, 2024, by and among Debtor Bakersfield Renewable Fuels, LLC ("BKRF"), as borrower, Debtors BKRF OCB, LLC and BKRF OCP, LLC, as guarantors, the lenders party thereto (collectively,  the "Prepetition RCF Lenders"),  and Vitol Americas Corp. ("Vitol"),  as administrative agent and collateral agent (the "Prepetition RCF Agent") (as may be amended,

---

[5]    Such amount represents the amount asserted by CTCI through March 31, 2025, and do not include fees, costs, and interest accruing after that date.  As set forth in the Restructuring Support Agreement and the DIP Orders, such amount is reflective of the global settlement discussed herein and all parties in interest's rights with respect to such amount are preserved should the Restructuring Support Agreement terminate.

restated, amended and restated, supplemented, waived, or otherwise modified from time to time, and the facility thereunder, the "Prepetition Revolving Credit Facility").

22.     The Prepetition Revolving Credit Facility provides for up to $75 million of borrowing, subject to borrowing base availability.  As of April 11, 2025, the outstanding balance under the Revolving Credit Facility was $39.1 million with $35.9 million of borrowing capacity, subject to borrowing base availability.  The Revolving Credit Facility provides for an interest rate at 12.50% and matures on December 1, 2027.

23.     The Prepetition Revolving Credit Facility is guaranteed by Debtors BKRF OCB, LLC and BKRF OCP, LLC, and is secured by first priority senior liens on substantially all of the real property and assets of BKRF OCB, LLC, BKRF OCP, LLC, and BKRF, subject to certain liens.  The liens and priorities of the Prepetition Revolving Credit Facility, and the related contractual rights of the parties thereto, in each case in relation to the Prepetition Term Loan Facility (as defined below) are governed by that certain Prepetition Intercreditor Agreement, dated as of June 25, 2024, by and among Vitol, as Prepetition Revolving Credit Facility representative, Orion Energy Partners TP Agent, LLC ("OIC"), as Prepetition Term Loan (as defined below) representative, the Prepetition Term Loan creditors party thereto from time to time, and Debtors BKRF, BKRF OCB, LLC, and BKRF OCP, LLC (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Intercreditor Agreement").  Pursuant to the Prepetition Intercreditor Agreement, obligations under the Prepetition Revolving Credit Facility, including obligations under the SOA and the SSA, are provided payment and lien priority over the Prepetition Term Loan Facility (as defined below) with respect to all pledged assets and any non-overlapping collateral between the Prepetition

Revolving Credit Facility and the Prepetition Term Loan Facility is deemed to be held in favor of both the Prepetition Revolving Credit Facility and the Prepetition Term Loan Facility.

**B.      Senior Secured Term Loan Facility.**

24.      Certain of the Debtors are party to that certain Credit Agreement, dated as of May 4, 2020, by and among Debtor BKRF OCB, LLC, as borrower, and Debtor BKRF OCP, LLC, as holdings, Debtor BKRF, as project company, the Prepetition Term Loan Lenders, and OIC, as administrative agent and collateral agent (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Term Loan Agreement" and the facility thereunder, the "Prepetition Term Loan Facility").

25.      The Prepetition Term Loan Facility provided for a senior secured term loan facility in an aggregate principal amount of $1,096.3 million and consists of five separate tranches of term loans (collectively, the "Prepetition Term Loans") consisting of the following amounts:

| Tranche | Aggregate Principal Amount |
|---|---|
| Tranches A & B | $327.5 million |
| Tranche C | $18.6 million |
| Tranche C+ | $325.8 million |
| Tranche D | $424.3 million |
| **Total** | **$1,096.3 million** |

26.      The Prepetition Term Loan Facility provides for a non-default interest rate at 15.00% per annum and matures on December 31, 2025.  As described more fully below, the Debtors upsized the Prepetition Term Loan numerous times to account for the delays and cost overruns in completing construction of the Bakersfield Facility, and more recently, to achieve consensus on a global settlement and continue the Company as a going concern.

27.     The Prepetition Term Loan Facility is guaranteed by Debtors BKRF OCP, LLC, BKRF, and SusOils, and secured by first priority senior liens on substantially all of the real property and assets of BKRF OCB, LLC, BKRF OCP, LLC, BKRF, and SusOils, as well as certain assets of GCEH, subject to certain liens.  The liens and priorities of the Prepetition Term Loan Facility, and the related contractual rights of the parties thereto, in each case in relation to the Prepetition Revolving Credit Facility, are governed by the Prepetition Intercreditor Agreement. As of the Petition Date, approximately $1,096.3 million in unpaid principal remains outstanding under the Term Loan Facility.[6]

## II.     Bakersfield Facility-Related Claims

28.     In addition to their funded debt obligations, the Debtors' capital structure is potentially subject to various claims related to the construction of the Bakersfield Facility.

### A.     CTCI Payment Obligations

29.     On May 18, 2021, Debtor BKRF entered into a Turnkey Agreement for the engineering, procurement, and construction of the Bakersfield Facility (the "Prepetition CTCI Agreement") with CTCI, which generally provided for CTCI to act as the general contractor for the engineering, procurement and construction of the Bakersfield Facility.  CTCI has been paid approximately $150.9 million in connection with work performed under the Prepetition CTCI Agreement.

30.     Disputes between the Debtors and CTCI ultimately led to the Debtors' providing notice of the Prepetition CTCI Agreement.  CTCI has alleged that the Debtors have failed to make payments owed to CTCI of at least approximately $949.3 million under the Prepetition CTCI

---

[6]     For the avoidance of doubt, this amount excludes fees, premiums, and interest and is limited to the Prepetition Term Loan Facility principal of $1,096.3 million.

Agreement (the "Prepetition CTCI Obligations"). The Company and the Prepetition Term Loan Lenders disputes not only the validity of the CTCI Payment Obligations but also the amount thereof. Regardless, CTCI has filed a mechanic's lien against the Bakersfield Facility in the amount of the CTCI Payment Obligations (the "CTCI Mechanic's Lien") and has asserted that the CTCI Mechanic's Lien is not junior to the Company's other secured funded debt obligations.

### B. Project Manager Service Provider Payments

31. BKRF is party to that certain Professional Services Agreement with Entara LLC (as successor-in-interest to ESG Energy Partners, LLC d/b/a Crossbridge Energy Partners) dated May 22, 2023 (the "PSA") for project management and other related services, including supporting the commissioning and start-up activities of the Bakersfield Facility. The PSA provided for payment of two-thirds of the invoices in cash with the remainder to be paid 90 days after substantial completion of the Bakersfield Facility or credited to the next tranche of debt to the Term Loan Agreement (the "Project Manager Service Provider Payment Obligations"). On August 29, 2024, BKRF entered into a separate agreement converting $7 million of the Project Manager Service Provider Payment Obligations into Tranche D Loans. As of the Petition Date, approximately $9.2 million remains outstanding on account of the Project Manager Service Provider Payment Obligations.

### III. Notes Claims

### A. CCI Notes

32. Debtor GCE Holdings Acquisitions, LLC ("GCEH Acquisitions") is party to that certain ISDA Master Agreement dated October 15, 2018 (the "Derivative Forward Contract") with Castleton Commodities International LLC ("CCI"). The Company entered into the Derivative Forward Contract in order to fund operating expenses while it focused on the acquisition and

construction of the Bakersfield Facility.  However, in 2020, Debtor GCEH Acquisitions and CCI agreed to terminate the Derivative Forward Contract and replace it with a fixed payment obligation (the "CCI Notes Obligations").  Pursuant to a letter agreement dated as of March 24, 2024, Debtor GCEH Acquisitions and CCI fixed the CCI Notes Obligations in the aggregate amount of approximately $33.9 million to be paid in seven installments in accordance with the schedule set forth therein.  As of the Petition Date, approximately $33.9 million remains outstanding on account of the CCI Notes Obligations.[7]

### B.    Other Notes

33.    Certain of the Debtors are also party to other loans and notes payable facilities for miscellaneous financings (collectively, the "Other Notes").  The Debtors also require financing to enter into and replace certain insurance policies that are expiring or required for additional identified risks, including pursuant to one premium financing agreement that covers several insurance policies financed at 8.25%.  The Company expects that it will continue to finance certain policy premiums consistent with past practice.  The maturity dates for the Other Notes ranges from October 2025 to June 2050 and may either be secured or unsecured.  As of the Petition Date, approximately $6.0 million remains outstanding on account of the Other Notes.

## IV.    Intercompany Debt

### A.    HoldCo Loan Facility

34.    Certain of the Debtors are party to that certain Credit Agreement, dated as of May 4, 2020, by and among Debtor BKRF HCB, LLC, as borrower, and Debtor BKRF HCP, LLC, as pledgor, the lenders from time to time party thereto (collectively, the "HoldCo Loan Lenders"),

---

[7]    This amount excludes fees, premiums, and interest and is limited to the CCI Notes principal.

and Debtor Global Clean Energy Holdings, Inc. ("GCEH") (as assignee of OIC), as administrative agent and collateral agent (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "HoldCo Loan Agreement" and the facility thereunder, the "HoldCo Loan Facility").

35.     The HoldCo Loan Facility provides for a senior secured term loan facility in an aggregate principal amount of $49.4 million.[8]   The HoldCo Loan Facility provides for a non-default interest rate at 15.00% per annum and matures on November 4, 2027.

36.     The HoldCo Loan Facility is guaranteed by Debtor BKRF HCP, LLC and secured by liens on substantially all of the assets of Debtors BKRF HCB, LLC and BKRF HCP, LLC.  As of the Petition Date, approximately $49.4million in unpaid principal remains outstanding under the HoldCo Loan Facility.[9]

### B.     SusOils Secured Promissory Note

37.     Debtor Sustainable Oils, Inc. entered into that certain intercompany Amended and Restated Secured Promissory Note, dated as of June 25, 2024 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "SusOils Promissory Note") in the amount of $34.9 million in favor of Debtor BKRF OCB, LLC.  The SusOils Promissory Note provides for an interest rate of 15.00% and matures on August 22, 2025.  The SusOils Promissory Note is secured by liens on substantially all of the assets of Sustainable Oils,

---

[8]   As a result of that certain Settlement and Mutual Release Agreement, dated as of June 25, 2024, by and among GCEH, BKRF, SusOils, ExxonMobil Renewables LLC and ExxonMobile Oil Corporation, the principal amount of the HoldCo Loan Facility was reduced by $18 million from $67.4 million to $49.4 million.

[9]   This amount excludes fees, premiums, and interest and is limited to the HoldCo Loan Facility principal.

Inc.  As of the Petition Date, approximately \$34.9 million in unpaid principal remains outstanding under the SusOils Promissory Note.[10]

### C.      Rosedale Notes

38.      Debtor Rosedale FinanceCo LLC entered into that certain intercompany Promissory Note, dated as of February 23, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Rosedale Promissory Note") in the amount of approximately \$48.6 million in favor of Debtor GCEH.  The Rosedale Promissory Note provides for an interest rate of 20.00% or 25.00% payment-in-kind and matures on February 23, 2032.  The Rosedale Promissory Note is unsecured.  As of the Petition Date, approximately \$48.6 million in unpaid principal remains outstanding under the Rosedale Promissory Note.[11]

### V.      Equity Interests.

39.      On December 29, 2020, Debtor GCEH's common stock began trading on the OTCQB marketplace under the ticker symbol "GCEH".  Debtor GCEH's certificate of incorporation authorizes the Board to issue 500 million shares of common stock ("Common Shares") and 50 million shares of preferred stock (the "Preferred Shares"), each at \$0.01 par value per share.  As of April 8, 2025, 50,219,640 Common Shares have been issued and are outstanding and no Preferred Shares are outstanding.

### The Debtors' Immediate Need for Access to the DIP Facilities and Cash Collateral

40.      As further described in the Walsh DIP Declaration, the Debtors require immediate access to the proposed DIP Facilities and continued use of Cash Collateral to successfully administer their chapter 11 cases, preserve the value of their estates for the benefit of all parties in

---

[10]   This amount excludes fees, premiums, and interest and is limited to the SusOils Promissory Note principal.

[11]   This amount excludes fees, premiums, and interest and is limited to the Rosedale Notes principal.

interest, and pursue the value-maximizing restructuring transactions contemplated under the Restructuring Support Agreement and Plan. *See* Walsh DIP Decl. ¶ 7. As of the Petition Date, the Debtors' total cash balance is approximately $2.6 million. *Id.* That amount is insufficient to finance the Debtors' working capital needs and the costs of administering these chapter 11 cases. *Id.* During these chapter 11 cases, the Debtors will need to use the cash generated from their operations, as well as their current cash on hand, to, among other things, (a) satisfy payroll obligations, (b) honor obligations under their material contracts, (c) maintain insurance coverage, (d) pay taxes, and (e) make any other payments essential to the continued management, operation, and preservation of the Debtors' business. *Id.*

41.     In connection with preparing for a potential chapter 11 filing and determining the Debtors' postpetition financing requirements, the Debtors, with the assistance of their advisors, to prepare projected cash forecasts for the Debtors' business during these chapter 11 cases. *Id.* at ¶ 8. These projections reflect a number of factors, including, among other things, operational performance of the underlying business, impact of these chapter 11 cases on daily operations, fees and interest expenses associated with the DIP Facilities, and the projected costs (including professional fees) associated with effectuating a successful reorganization as contemplated under the Restructuring Support Agreement and the Plan. *Id.* The Initial Budget reflects the thirteen-week cash flow forecast for the thirteen-week period following the Petition Date. *Id.* Based on the estimates contained in the Initial Budget, the Debtors, in consultation with their advisors, the DIP Lenders, and the DIP Contractor, determined that they would require immediate access to approximately $40 million of incremental liquidity as soon as practicable after the Petition Date, in addition to the use of Cash Collateral. *Id* at ¶ 9.

42.     Absent the ability to access the funds available under the DIP Facilities and Cash Collateral, the Debtors would likely face a value-destructive and immediate interruption to their operations and lose support from key stakeholders on which the Debtors' business depends, including vendors and employees.  These interruptions, in turn, would hinder the Debtors' ability to maximize the value of their estates through a successful reorganization because the Debtors would be forced to curtail their operations significantly, which would harm all stakeholders.  Accordingly, without a new source of postpetition liquidity, the Debtors' businesses will be irreparably harmed.

**Alternative Sources of Credit Are Not Available on Better Terms**

43.     As further described in the Tempke Declaration, the Debtors do not have any better sources of credit readily available than the proposed DIP Facilities under the circumstances of these chapter 11 cases.  The Debtors, with the assistance of Lazard, have conducted robust market checks both for alternative transaction structures and alternative postpetition financing.  Following these marketing processes, the Debtors, in consultation with their advisors, determined that the transactions contemplated by the Restructuring Support Agreement are value-maximizing for the Debtors and that the DIP Facilities present the best available option for postpetition credit.  As further described in the Tempke Declaration, the Debtors, with the assistance of Lazard, commenced the Upstream Capital Process and then the Sale Process, facilitating due diligence with potential buyers under nondisclosure agreements ("NDAs"), including diligence calls and meetings with management.  *See* Tempke Decl. ¶¶ 10–12.  Notwithstanding these efforts, the Debtors were only able to obtain two non-binding IOIs through the Upstream Capital Process and did not receive any IOIs or bids by the Sale Process bid deadline.  *Id*.

44.     As the Upstream Capital Process and the Sale Process progressed, the Debtors also began to focus on engagement with certain of their existing stakeholders regarding a

comprehensive recapitalization, including the Prepetition Term Loan Lenders, CTCI and, later on, the Prepetition RCF Lenders. *Id*. at ¶ 13. Over the past few months, the Debtors, the Prepetition RCF Lenders, the Prepetition Term Loan Lenders, CTCI, and their respective advisors have worked extensively to negotiate the Restructuring Support Agreement and Plan. *Id.* As the Debtors require additional financing to fund projected operating losses, working capital, and the cost of an in-court process, the Debtors engaged their existing stakeholders to discuss the terms of potential DIP financing while also soliciting interest from potential third-party financing sources. *Id*. at ¶ 14.

45.     In mid-January 2025, the Debtors, with the assistance of Lazard, initiated outreach to third parties on potential DIP financing. *Id*. Lazard ultimately contacted over 80 parties in connection with DIP financing and over 40 parties executed NDAs and were provided access to a confidential data room. *Id*. Three parties submitted indications of interest to fund some or all of the Debtors' postpetition financing, subject to certain terms and conditions. *Id*. However, all three DIP proposals required the priming of the prepetition term loan collateral and included substantial fees and interest, significantly exceedingly those of the proposed DIP financing. *Id*. After careful evaluation of the third-party indications of interest and the DIP proposals from the Debtors' existing stakeholders, the Debtors, in consultation with Lazard and their other advisors, ultimately determined that the DIP Facilities proposed by the DIP RCF Lenders and the DIP Term Loan Lenders, coupled with a new agreement on construction services with the DIP Contractor represented, the best and only actionable postpetition financing for the Debtors. *Id*.

## SOA and SSA

46.     BKRF is a party to that certain Offtake Agreement, dated as of June 25, 2024, by and among BKRF and Vitol (as amended, restated, amended and restated, supplemented, waived,

or otherwise modified from time to time, the "<u>SOA</u>"), and that certain Supply Services Agreement, dated as of June 25, 2024, by and among BKRF and Vitol (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "<u>SSA</u>").  Pursuant to the SOA, Vitol sells and causes to be delivered, and BKRF exclusively purchases from Vitol, feedstock, such as Camelina, soybean oil, and canola oil (the "<u>Feedstock</u>").  *See* Walsh DIP Decl. ¶ 12.  Legal title and custody of the Feedstock transfers from Vitol to BKRF when delivered to the Bakersfield Facility, as specified in the SOA, and the Feedstock is then converted into renewable finished diesel, naptha, and other similar renewable finished product output from the facility (the "<u>Product</u>").  *Id.*  Pursuant to the SSA, Debtor BKRF granted Vitol certain exclusive leaseholds, nonexclusive rights, and easements that allow Vitol to properly access and transport Products.  *Id.*  Legal title and custody of the Products sold transfers from Debtor BKRF to Vitol when loaded into rail cars or trucks by Debtor BKRF, as specified in the SOA.  *Id.*  Vitol then resells the renewable fuel products to third-parties and any renewable fuel products sold to Vitol but not resold to a third party is valued for borrowing base purposes under the Prepetition RCF Agreement.  *Id.*

47.     To facilitate the purchase of the Feedstock, the Debtors also rely on Vitol to provide working capital through the Prepetition RCF Facility.  *Id.* at ¶ 13.  Using the cycle formed by the SOA and Prepetition RCF Facility (as illustrated below and in **Exhibit 1** attached hereto), the Debtors are provided the working capital means by Vitol to purchase and refine the Feedstock.  In addition, to provide BKRF protection from fluctuations in pricing of Feedstock and Products, the SOA provides a weekly true-up mechanism to ensure movements in commodity prices do not adversely impact the borrowing base under the Prepetition RCF Agreement.  *See* Walsh DIP Decl. ¶ 13.  The weekly changes in commodity pricing impacts the Debtors' borrowing base

availability under the Prepetition RCF Facility via the portfolio price position adjustment mechanism associated with the outstanding futures positions, as illustrated in **Exhibit 2** attached hereto.  Given the Debtors' liquidity and working capital cycle, absent the Prepetition RCF Facility (and, during the postpetition period, the DIP RCF Facility), the Debtors would not have the means to purchase the necessary Feedstock required to produce the Product.  *See* Walsh DIP Decl. ¶ 13.

## I.        The Supply and Offtake Agreement

48.        The SOA is part of an integrated suite of agreements among the Debtors and Vitol that are critical to the Debtors' operation of the Bakersfield Facility.  Taken together, these agreements support the working capital investment required to operate the Debtors' businesses, facilitate the Debtors' sourcing of Feedstock, and provide for the purchase of finished Product.

### A.        The Feedstock Arrangement

49.        Vitol is the sole supplier of Feedstock for the Bakersfield Facility.  Pursuant to the SOA, Vitol identifies Feedstock supply opportunities and presents supply offers to BKRF.  BKRF consults with Vitol and determines whether it wants to accept or reject these offers.  Upon BKRF's acceptance of the offer, Vitol will enter into contracts with third parties to purchase Feedstock (the "Feedstock Contracts").[12]  The price per pound of Feedstock delivered by Vitol to BKRF is the sum of the applicable Feedstock Contract price plus all actual out-of-pocket and allocated storage, transportation, and other logistics costs incurred by Vitol or its affiliates to deliver Feedstock to the Bakersfield Facility plus certain handling and administrative fees.

---

[12]   One of the Feedstock Contracts is between Vitol and Sustainable Oils, Inc., one of the Debtor entities, to purchase Feedstock, specifically Camelina oil, pursuant to the SOA.  That Feedstock Contract represents one of the Debtors' primary efforts to fully vertically integrate its operations by providing Camelina oil for production of Product.

50.     The SOA includes a schedule that lists certain maximum monthly quantities of Feedstock (the "Feedstock Monthly Maximum Quantities").  Additionally, BKRF provides Vitol with a good faith forecast on a rolling three-month basis of BKRF's weekly requirements for Feedstock (the "Feedstock Forecast"). If the Feedstock Forecast for a particular month is higher than Feedstock Monthly Maximum Quantity, then Vitol may elect to increase the Feedstock Monthly Maximum Quantity for that particular month.  If Vitol does not elect to do so, then BKRF may purchase the difference between the Feedstock Monthly Maximum Quantities and the Feedstock Forecast from a third party.

51.     On a particular month, if Vitol fails to deliver to BKRF all or any portion of the Feedstock as required under the SOA, then Vitol will pay BKRF damages pursuant to the SOA. If BKRF fails to purchase all or any portion of Feedstock available for purchase, then BKRF will pay Vitol damages calculated pursuant to the terms of the contract.

**B.      Product and Invoicing**

52.     Once Vitol delivers Feedstock to the Bakersfield Facility, BKRF is responsible for the unloading, storage, and handling of the Feedstock. The Feedstock is then used to create the Product, which is purchased almost exclusively by Vitol.[13]  BKRF will provide, on a rolling three-month basis, a good faith forecast of its weekly production of Product (the "Provisional Product Forecast").  BKRF, in consultation with Vitol, will use commercially reasonable efforts to modify its plans for the production of Product and the associated Provisional Product Forecast as requested by Vitol in order to produce the final forecast (the "Product Forecast").

---

[13]    The Debtors have certain contractual arrangements with another third party for the sale of renewable propane, renewable butane, and certain other byproducts.

53.     Similar to the Feedstock arrangement, the SOA includes a schedule of the maximum monthly quantities of Product (the "Product Monthly Maximum Quantities").  If the Product Forecast or the amount produced for a particular month ends up exceeding the Product Monthly Maximum Quantities, then Vitol may elect to increase the Product Monthly Maximum Quantities for the month.  If Vitol does not elect to purchase all of the excess Product, then BKRF may sell all or any applicable portion of the excess Product to a third party.

54.     Vitol will identify Product sale opportunities and present these offers to BKRF. BKRF, in consultation with Vitol, will either accept or reject the offers.  Upon BKRF's acceptance of the offer, Vitol will enter into a contract with the applicable third party (the "Third Party Product Contract").  For each month, if Vitol fails to purchase all or any quantity of Product as required by the SOA, then it will pay BKRF an amount determined by the terms of the SOA.  Similarly, if BKRF fails to deliver all or any quantity of Product for the purchase by Vitol, then BKRF will pay Vitol an amount determined by the terms of the SOA.  The price per gallon of Product is determined pursuant to the SOA and depends on whether any associated Renewable Attributes are sold with the Product.

55.     The Feedstock Contracts have payment due on five-day terms while the Product sales will have receipts paid in five to ten days, depending on the product type.  As a result, to ensure adequate cash to make payments for Feedstock, BKRF draws upon the Prepetition RCF Facility.  BKRF submits a weekly borrowing base certificate each Wednesday based on Feedstock, Product inventories, accounts receivables, and Renewable Attributes calculated using a 90% advance rate.  Inventory volumes reported are based on end-of-day levels each Monday and pricing is based on Tuesday's market pricing. The borrowing base calculation is also affected by the weekly Portfolio Price Position mark-to-market adjustment (defined below).  The weekly draws

to support payment for the Feedstock, and subsequent repayments on the Prepetition RCF Facility using receipts once that Feedstock is refined into Product and sold thereafter, are then based on the updated borrowing base certificate.

### C. Portfolio Price Position

56.     The final essential component of the SOA is that it incorporates weekly portfolio price adjustments (the "Portfolio Price Adjustments") to protect against any possible degradation in value of Vitol's collateral.

57.     Under the SOA, the Portfolio Price Position is an aggregate physical pricing true-up reflecting changes in the market value of Feedstock and Product between the dates that Feedstock is sold to BKRF.  The physical pricing true-ups are indexed to the actual price performance of Chicago Board of Trade ("CBOT") soybean oil futures and New York Mercantile Exchange ("NYMEX") heating oil futures, as well as other relevant commodity contracts.  The Portfolio Price Position partially offsets decreases in commodities pricing of Feedstock and Product owned by the Debtors.  The Portfolio Price Position for a given month is settled to Vitol or the Debtors, as applicable, on the first of the following month.

58.     This arrangement (illustrated in further detail and in **Exhibit 2** attached hereto) mitigates Vitol's exposure to adverse movements in the relative prices of Feedstock and Product, thereby protecting against degradation in value of Vitol's collateral and providing the Debtors essential mitigation of risk exposure with respect to their ability to draw upon the Prepetition RCF Facility.

## II.     The SSA

59.     Pursuant to the SSA, BKRF has granted Vitol an exclusive leasehold on specified renewable diesel storage tanks (the "Storage Tank Lease") and non-exclusive rights and easements

that allow Vitol to properly access and transport the Product and, specifically, the renewable diesel stored in the RD storage tanks (the "RD Storage Tanks").  However, BKRF has a license to use the RD Storage Tanks to store BKRF's renewable diesel to the extent there is excess capacity in the tanks, and they are not needed for the storage of Vitol's renewable diesel.  With the exception of BKRF's license to store renewable diesel, no other Product is commingled with Vitol's renewable diesel in the RD Storage Tanks.

60.     In addition to the Storage Tank Lease, BKRF has granted Vitol various non-exclusive easements and use rights to a particular portion of the Bakersfield Facility and its pumps, pipelines, lines, loading, racks, and other facilities.  These easements and use rights allow Vitol to access and use the facilities necessary for the storage of the renewable diesel in the RD Storage Tanks and for the transportation, handling, and loading of the Product at the Bakersfield Facility.  Further, Vitol has a right of access and egress to and from the Bakersfield Facility provided it complies with certain requirements including providing advance written notice and following designated paths.

61.     This arrangement works in tandem with the SOA to enable Vitol to easily and seamlessly store, handle, load, and transport the Product that it purchases under the SOA.  It makes the transition from the Bakersfield Facility to Vitol and then, eventually, to third parties as efficient and seamless as possible, and it is an important component of the overall arrangement between Vitol and BKRF.

## III.     The Continued Benefit of the SOA and SSA

62.     The SOA works alongside the Prepetition RCF Agreement to allow the Debtors to procure Feedstock on terms that are more favorable than those that they could otherwise receive from other feedstock suppliers.  *See* Walsh DIP Decl. ¶ 11.  The ability to draw on the Prepetition

RCF Facility allows the Debtors are able to pay Vitol on five-day terms for Feedstock following delivery. *Id*. at ¶ 15. The SOA also eases the administrative and financial pressures on the Debtors by transferring the burden of sourcing potential Feedstock supply offers, purchasing Feedstock, sourcing potential Product purchase offers, and selling Product on agreed upon terms to Vitol. Additionally, the Portfolio Price Position protects the Debtors from the impact of potential market fluctuations in commodity pricing. *Id*. at ¶ 14. Overall, the Prepetition RCF Facility funds a significant portion of the Bakersfield Facility's operation by financing the working capital that the Debtors are required to deploy to operate the Bakersfield Facility. *Id*. The SSA, in turn, eases the administrative burden of storing and transferring the Products from BKRF to Vitol. *Id.* Vitol is able to have direct access to the Products and easily transport it from the Bakersfield Facility. *Id*.

63. Due to the integral nature of the SOA and SSA to the Debtors' businesses and the necessity of the agreements for the Debtors to continue as a going concern, any disruption to either agreement (or the related Prepetition RCF Facility and anticipated DIP RCF Facility provided by Vitol) would harm the operation of the Bakersfield Facility, divert the Debtors' resources away from expeditiously proceeding through these chapter 11 cases, and result in a substantial loss of value to the Debtors' estates.

## **Basis for Relief**

## I.  **The Debtors Should be Authorized to Obtain Postpetition Credit Through the DIP Documents.**

### A.  **Entry into the DIP Documents is an Exercise of the Debtors' Sound Business Judgment.**

64. The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facilities, including the Roll-Up DIP Loans, and continued use of Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority credit under certain circumstances discussed

in detail below.  *See generally* 11 U.S.C. § 364.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").

65.     To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

66.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargain[s]" to acquire funds for its reorganization).

67.     The Debtors' decision to enter into the DIP Facilities, including the Roll-Up DIP Loans, is a sound exercise of the Debtors' business judgment and the product of arm's-length and hard-fought negotiation among the Debtors, the DIP Lenders, and the DIP Contractor. *See* Tempke Decl. ¶ 27.  No third party was willing to provide the Debtor postpetition credit on better terms and the Debtors and their advisors determined that significant postpetition credit would be required to successfully administer these cases for the benefit of all stakeholders. *Id.* at ¶ 26.  Accordingly, the DIP Facilities represent the best option to the Debtors given their liquidity requirements and the realities imposed by the Debtors' capital structure. *Id.* at ¶ 29.  In addition, the Debtors were able to agree with the Prepetition RCF Lenders that the DIP RCF Facility and Exit RCF Facility would have an expanded borrowing base of an incremental fixed amount of $35 million to account for the roll-up of the approximately $27.8 million of Tranche D claims, plus approximately $7 million of incremental borrowing base to provide additional liquidity to the Debtors, relative to the Revolving Credit Facility. *Id.* at ¶ 18.

68.     The DIP Facilities provide, together with access to Cash Collateral, certainty with respect to the capital necessary for the administration of these chapter 11 cases through the anticipated effective date and will ultimately convert to the Exit Facilities in accordance with the Restructuring Support Agreement that will the fund the Debtor's go-forward business post-emergence. *Id.* at ¶¶ 16, 27.  The DIP Facilities, taken as a whole, offer the best available financing option to the Debtors under the facts and circumstances of these chapter 11 cases. *Id.* at ¶ 32.  Accordingly, this Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.     The Debtors Should Be Authorized to Grant DIP Liens and Superpriority Claims to the DIP Secured Parties.**

69.     The Debtors propose to obtain credit under the DIP Facilities by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide (a) first priority liens on substantially all of the Debtors' assets, including previously unencumbered property and priming liens on Prepetition Collateral except for the Excluded Property and (b) junior priority liens on certain property subject to Permitted Liens (as defined in the DIP Documents).

70.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (holding that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to credit under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;
>
> the credit transaction is necessary to preserve the assets of the estate; and
>
> the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See id.*; *see also In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988).

71.     The Debtors satisfy each part of this test.  The DIP Lenders and the DIP Contractor will not fund the DIP Facilities on any other terms, and no other existing stakeholder or third party

has presented a better debtor-in-possession financing proposal.  *See* Tempke Decl. ¶ 26.  Absent

the DIP Facilities, which, together with access to Cash Collateral, will provide certainty that the

Debtors will have sufficient liquidity to administer these chapter 11 cases and comfort to their

employees and vendor constituencies that business will continue in the ordinary course, the value

of the Debtors' estates would be impaired to the detriment of all stakeholders.  *See* Walsh DIP

Decl. ¶ 10.  Importantly, the DIP Contractor will only be granted the DIP CTCI Liens and the DIP

Superpriority Claims solely to the extent of any DIP CTCI Payments actually provided under the

DIP CTCI Contract.  Given the Debtors' circumstances, the Debtors believe that the terms of the

DIP Facilities, as set forth in the DIP Documents is fair, reasonable, and meets the standard for

obtaining postpetition credit.

72.     In the event that a debtor is unable to obtain unsecured credit allowable as an

administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the

Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of

debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b)

or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not

otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject

to a lien."  11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured

credit.  *See* Tempke Decl. ¶ 26.  Therefore, approving (a) superpriority claims in favor of the DIP

Lenders and the DIP Contractor (in accordance with the claim priorities set forth in Exhibit E of

the Interim Order) and (b) first priority liens on unencumbered collateral (in accordance with the

lien priorities set forth in Exhibit D of the Interim Order) and unencumbered property of the

Debtors' estates, and is a sound exercise of the Debtors' business judgment.

73.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if either (a) the Prepetition Parties have consented or (b) the Prepetition Parties' interest in collateral is adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

74.     Here, the Prepetition Parties have consented or are deemed to have consented to the DIP Facilities.  As set forth more fully herein and in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests of such parties, including the granting of superpriority priming liens on Prepetition Collateral (in accordance with the lien priorities set forth in Exhibit D of the Interim Order).  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

## C.     No Comparable Alternative to the DIP Facilities Is Reasonably Available on More Favorable Overall Terms.

75.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986).  In circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank*

*FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (explaining that a debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

76.     The Debtors do not believe that more favorable alternative postpetition credit is reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' solicitation of alternative financing proposals.  As set forth in the Tempke Declaration, the Debtors engaged with certain stakeholders and third parties regarding potential financing for a chapter 11 process, but ultimately the Debtors did not receive any actionable offers to provide credit on a priming basis.  *See* Tempke Decl. ¶ 14.  Simply put, the DIP Facilities provides the Debtors with the best postpetition credit available to pursue a value-maximizing restructuring. Therefore, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.     Continued Access to Cash Collateral Is Warranted and Should Be Approved.

77.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use Cash Collateral with the consent of the secured party.  Here, the DIP Lenders and the Prepetition Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

78.     As described above and in the Walsh DIP Declaration, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' businesses and smooth entry

into the chapter 11 cases.  *See* Walsh DIP Decl. ¶¶ 7–10.  The projections included in the Initial

Budget rely on the assumption that the Debtors will continue to access cash generated through

ordinary course operations, and the Debtors would require further postpetition financing if they

could not access Cash Collateral.  *Id.* at ¶ 9.  Access to Cash Collateral is critical to supplement

the proceeds of the DIP Facilities and support the necessary liquidity required for the Debtors to

maintain ordinary course operations and administer these chapter 11 cases.  Use of Cash Collateral

is in the best interests of the Debtors' estates and all of their stakeholders, including the Prepetition

Parties, and that the Interim Order should be approved.

### III.   Adequate Protection Provided to the Prepetition Parties Is Appropriate and Should be Approved.

79.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests

in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code

provides for adequate protection of interests in property due to the imposition of the automatic

stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of

the Bankruptcy Code provides examples of forms of adequate protection, such as granting

replacement liens and administrative claims, courts decide what constitutes sufficient adequate

protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564

(3d Cir. 1994).

80.     As set forth in the Interim Order, the Debtors propose to provide the Prepetition

Parties with a variety of adequate protection to protect against the postpetition Diminution in Value

of the Prepetition Collateral, including Cash Collateral, resulting from the use, sale, or lease of

Prepetition Collateral by the Debtors and the imposition of the automatic stay.  Pursuant and

subject to the conditions in the Interim Order, the adequate protection packages for the Prepetition

RCF Secured Parties, the Prepetition Term Loan Secured Parties, and CTCI include, each

respectively, (a) a valid, perfected replacement security interest in and lien on all DIP Collateral (in accordance with the lien priorities set forth in Exhibit D thereto), (b) superpriority claims against each of the Debtors (in accordance with the claim priorities set forth in Exhibit E thereto), (c) payment of certain fees, expenses and disbursements, and (d) certain reporting and financial information rights (collectively, the "Adequate Protection Packages"), subject and subordinate to the Carve-Out.  In light of the Prepetition Parties' consent to the Debtors' use of Cash Collateral and the priming liens provided under the DIP Facilities, the proposed Adequate Protection Packages to be provided for the benefit of the Prepetition Parties is appropriate.  The Debtors' provision of the Adequate Protection Packages is not only necessary to protect against any Diminution in Value of the Prepetition Collateral, but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using Cash Collateral, subject to the terms and limitations set forth in the Interim Order and the DIP Documents, for the benefit of all parties in interest and the Debtors' estates.

**IV.     The Roll-Up Is Appropriate.**

81.     The DIP Facilities provide for:  (a) subject to entry of the Interim Order, under the DIP RCF Facility, (i) a reduction in the Prepetition RCF Obligations in an amount commensurate with RCF Collections, and a corresponding increase in DIP RCF Loans and (ii) a roll up of $25 million of Prepetition Term Loans Obligations (plus any interest accrued thereon) and (b) subject to entry of the Final Order, (i) under the DIP RCF Facility, a roll up of all remaining Prepetition RCF Obligations and (ii) under the DIP Term Loan Facility, a roll up of $50 million of Prepetition Term Loans Obligations.

82.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Payment of existing obligations is appropriate where necessary to protect and preserve the estate, including an

operating business's going concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).  The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

83.     Repayment of prepetition debt through a roll-up is a common feature in debtor-in-possession financing arrangements.  Here, the DIP Facilities would not be accessible to the Debtors absent their agreement to the Roll-Up DIP Loans.  The Roll-Up DIP Loans were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, is an integral component of the overall terms of the DIP Facilities and was required by the DIP Lenders as consideration for the extension of postpetition credit, including in respect of accepting junior liens on any property subject to the Permitted Liens.  *See* Tempke Decl. ¶ 17.  In particular, the DIP RCF Lenders required the DIP RCF Creeping Roll-Up Loans and the DIP RCF Tranche D Roll-Up Loans upon entry of the Interim Order as a condition to funding the DIP RCF Facility. *Id.*

84.     Granting the Roll-Up DIP Loans is reasonable under the circumstances of these chapter 11 cases.  With respect to the DIP RCF Roll-Up Loans, the roll-up is given in consideration of Vitol's agreement to provide necessary liquidity by rolling prepetition credit into postpetition credit and Vitol's agreement to continue performing under the SOA and the SSA, notwithstanding

that the SOA is classified as a "forward contract."  Further, Vitol has consented to the Debtors'

use of Cash Collateral and has committed to provide exit financing to fund the Debtors' go-forward

business as part of the comprehensive reorganization contemplated by the Restructuring Support

Agreement and the Plan.  With respect to the Roll-Up DIP Term Loans, the roll-up is given in

consideration of the DIP Term Loan Lenders' extension of new money loans and consent to use

Cash Collateral.  Additionally, the Roll-Up DIP Term Loans comprise part of the comprehensive

settlement contemplated under the Restructuring Support Agreement and the DIP Facilities,

whereby the DIP Term Loan Lenders agreed to settle certain claims and causes of action, subject

to the continuing effectiveness of the Restructuring Support Agreement.

85.     The importance of roll-up features in DIP facilities has been repeatedly recognized

by courts in this district and others, and such courts have granted relief similar to the relief

requested herein, including with respect to approving roll-ups on an interim basis.  *See e.g.*,

*In re Digital Media Solutions, Inc.*, No. 24-90468 (ARP) (Bankr. S.D. Tex. Nov. 4, 2024)

(authorizing approximately a $120 million DIP financing facility, including an interim roll-up of

approximately $22 million); *In re Venator Materials PLC*, No. 23-90301 (DRJ) (Bankr. S.D. Tex.

May 16, 2023) (authorizing a $275 million DIP new money term loan facility and an interim roll

up of $190 million in prepetition ABL obligations);  *In re Nielson & Bainbridge*, LLC,

No. 23-90071 (DRJ) (Bankr. S.D. Tex. Feb. 10, 2023) (authorizing a 60 million DIP financing

facility, including an interim roll-up of $30 million); *In re Invacare Corp.*, No. 23-90068 (CML)

(Bankr. S.D. Tex. Feb. 2, 2023) (authorizing a $70 million DIP term loan facility, including an

interim term loan roll-up of $17.5 million, and a DIP ABL loan facility $27.7 million, including

an interim roll-up of $10.3 million); *In re Altera Infrastructure L.P.*, No. 22-90130 (MI) (Bankr.

S.D. Tex. Aug. 16, 2022) (authorizing a $70 million DIP term loan facility, including an interim

roll-up of $20 million).  For the foregoing reasons, and because no other party has put forward a credit proposal with better terms, the granting of the Roll-Up DIP Loans is reasonable, appropriate, a sound exercise of the Debtors' business judgment, and ultimately in the best interests of all stakeholders given the lack of alternatives.

## V.    The Scope of the Carve-Out Is Appropriate.

86.    All liens and claims granted by the DIP Orders as security for the DIP Obligations and the Prepetition Loan Obligations, including, without limitation, the DIP Liens, the DIP Superpriority Claims, and the proposed Adequate Protection, are subject to the Carve-Out contained in the DIP Orders.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").  The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of the Clerk of this Court, U.S. Trustee fees, and professional fees of the Debtors and any statutory committee appointed under section 1102 of the Bankruptcy Code in these chapter 11 cases.

**VI.     The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agents and DIP Lenders under the DIP Documents.**

87.     In connection with negotiating the DIP Facilities, the Debtors have agreed, subject to Court approval, to pay certain fees and premiums to the DIP Agents and the DIP Lenders. In particular, as noted above, the Debtors have agreed to pay the fees consisting of the following:[14]

> *Interest Rates*.  The DIP RCF Loans shall bear interest in cash at a rate of 12.5 percent per annum (same as the Revolving Credit Facility non-default interest rate). During the continuance of an event of default, all overdue amounts of principal and interest under the DIP RCF Loans will bear interest at the applicable rate, plus 2.00% per annum.  The DIP Term Loan Facility shall bear interest at a rate of 8.00% per annum, payable monthly in arrears in kind.
>
> *Fees*.  With respect to the DIP RCF Loans, a facility fee equal to 5.00% per annum on the average unused portion of the DIP RCF Facility DIP Credit Agreement, calculated and paid quarterly in arrears (or monthly if an event of default exists), and on the maturity date or earlier termination.  The DIP Term Loan Facility shall have no upfront or commitment fee.[15]

88.     As set forth in the Tempke Declaration, the principal economic terms proposed under the DIP Facilities, such as the contemplated pricing, fees, interest rate, and default rate, are reasonable and well within the range of DIP financings approved in other chapter 11 cases of

---

[14]   The below description of fees is intended as an illustrative summary only and is qualified in its entirety by the terms of the DIP Documents.

[15]   The DIP CTCI Contract provides for a 16.5% margin on the Cost of the Work (as defined in the DIP CTCI Contract), consisting of (i) 8% per annum on the goods, services, and other consideration actually provided by CTCI and (ii) any amounts in excess of such 8%.  Such amounts shall be accrued (but not paid in cash) during these chapter 11 cases and will be rolled into the Exit Facilities pursuant to the terms of the Restructuring Support Agreement.

similar size and complexity.  *See* Tempke Decl. ¶ 27.  The fees and rates to be paid under the

proposed DIP Facilities were the subject of hard fought and arm's-length negotiation, and (a) well

within the range of interest and fees in comparable DIP financings, (b) integral components of the

overall terms of the DIP Facilities, and (c) required by the DIP Lenders as consideration for the

extension of postpetition financing.  *Id.* at ¶ 20.  Specifically, the Debtors have agreed, subject to

Court approval, to pay the fees described above, in accordance with the DIP Documents, as

consideration for the extension of postpetition credit.  The Debtors considered the fees described

above when determining that the DIP Facilities constituted the best terms on which the Debtors

could obtain the postpetition credit necessary to continue their operations and fund their cases.

Accordingly, this Court should authorize the Debtors to pay the interest and fees provided under

the DIP Documents.

**VII.    The DIP Lenders and the DIP Contractor Should be Afforded Good-Faith Protection
           under Section 364(e) of the Bankruptcy Code.**

89.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect
> the validity of any debt so incurred, or any priority or lien so granted,
> to an entity that extended such credit in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

90.    The DIP Facilities are the result of (a) the Debtors' reasonable and informed

determination that the DIP Lenders and the DIP Contractor offered the best terms on which to

obtain critical postpetition credit given the circumstances and (b) extensive good-faith, arm's-length negotiations between the Debtors and the Prepetition Parties.  The terms and conditions of the DIP Facilities are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  The obligations arising under the DIP Facilities and other financial accommodations made to the Debtors have been extended by the DIP Lenders and the DIP Contractor in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and, therefore, the DIP Lenders and the DIP Contractor are entitled to all of the protections afforded thereby.

**VIII.   The Automatic Stay Should Be Modified on a Limited Basis.**

91.    The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified, solely to the extent necessary, to allow the Debtors, the DIP Agents, the DIP Lenders, and the Prepetition Parties to implement and effectuate the terms of the Interim Order.  The Interim Order further provides that the automatic stay shall be vacated and modified, subject to certain limitations, to the extent necessary to permit the DIP Agents and the DIP Lenders to exercise certain remedies upon the occurrence of an event of default by the Debtors under the DIP Credit Documents.  *See* Interim Order ¶ 29.  The relief requested herein is necessary to give full force and effect to the DIP Facilities and, accordingly, the automatic stay should be modified on a limited as required and in accordance with the terms of the Interim Order.

**IX.   Failure to Obtain Immediate Interim Access to the DIP Facilities and Cash Collateral Will Cause Immediate and Irreparable Harm.**

92.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct an interim expedited

hearing on the motion at which it may authorize a debtor to obtain credit and use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rule 4001(b)(2), 4001(c)(2).

93.     Section 363(c)(3) of the Bankruptcy Code authorizes the Court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "[o]n motion by the debtors, a hearing. . . . will routinely be conducted as a first day hearing to consider either cash collateral use and/or interim debtor-in-possession financing . . . ."  Complex Case Procedures ¶ 5.

94.     The Debtors require immediate access to the DIP Facilities.  As of the Petition Date, the Debtors' total cash on hand is approximately $2.3 million, which is insufficient to operate their enterprise and continue paying their debts as they come due.  Walsh DIP Decl. ¶ 7.  The Debtors' business requires immediate access to the DIP Facilities and Cash Collateral to, among other things, satisfy payroll, pay vendors, maintain insurance coverage, pay expenses related to the upkeep and maintenance of their facilities and equipment, and fund the administrative costs of their chapter 11 cases.  *Id.* at ¶ 10.

95.     The Debtors will be unable to operate their business or otherwise fund these chapter 11 cases without access to Cash Collateral and the liquidity provided by the DIP Facilities. *Id*.  As such, the Debtors require immediate access to postpetition credit and the use of Cash Collateral to operate their business, preserve value, and to avoid immediate and irreparable harm to the Debtors' estates.  *Id.*

96.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this Motion and

enter the proposed Interim Order authorizing the Debtors to enter into the DIP Facilities and use

the Cash Collateral.

**X.      Assumption of the SOA and SSA is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved.**

97.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject

to the court's approval, may assume . . . any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a).  A debtor's assumption of an executory contract or unexpired lease is ordinarily

governed by the "business judgment" standard.  *See Mission Prod. Holdings, Inc. v. Tempnology*

*LLC*, 139 S. Ct. 1652, 1658 (2019) ("The bankruptcy court will generally approve that choice [to

assume or reject], under the deferential 'business judgment' rule.").   The business judgment

standard requires a court to approve a debtor's business decision unless that decision is the product

of "bad faith, whim, or caprice."  *See In re Idearc Inc.*, 423 B. R. 138, 162 (Bankr. N.D. Tex. 2009)

("The issue . . . is whether [the debtor's decision] is so manifestly unreasonable that it could not

be based on sound business judgment, but only on bad faith, or whim or caprice.") (quoting

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985))

(internal quotation marks omitted).

98.     Assumption of an executory contract or an unexpired lease is appropriate where

such assumption would benefit the estate.  *See In re Pisces Energy, LLC*, No. 09-36591-H5-11,

2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("Courts apply the 'business judgment

test,' which requires a showing that the proposed course of action will be advantageous to the

estate and the decision be based on sound business judgment.").   Upon finding that a debtor

exercised its sound business judgment in determining that assumption of certain contracts or leases

is in the best interests of its creditors and all parties in interest, a court should approve the

assumption under section 365(a) of the Bankruptcy Code.  *See Richmond Leasing Co. v. Capital*

*Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("As long as assumption of a lease appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code . . . .") (quoting *Allied Technology, Inc. v. R.B. Brunemann & Sons*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982)).

99.    Assumption of the SOA and the SSA is within the Debtors' business judgment and is in the best interests of their estates.  The SOA and SSA are critical to the Debtors' operations.  As discussed above, these agreements are at the center of the day-to-day operations of the Bakersfield Facility.  On the Feedstock side of the SOA, Vitol is responsible for sourcing Feedstock offers, entering into Feedstock contracts with BKRF's approval, and then buying and selling all of the Feedstock to BKRF.  On the Product side of the SOA, Vitol is responsible for sourcing offers to purchase Product, entering into such third-party contracts with BKRF's approval, and then purchasing Product and Renewable Attributes for itself and for these third parties.  Finally, the SSA governs the day-to-day ability of Vitol to easily store and access the Product it purchases pursuant to the SOA.

100.    If Vitol were to stop performing under the agreements, production at the Bakersfield Facility would not be able to continue and the Debtors' day-to-day operations and cash flow would be severely disrupted, a value-destructive outcome.  Additionally, because the DIP RCF Facility contemplates converting the Debtors' prepetition obligations under the SOA and SSA into DIP RCF Obligations upon entry of the Final Order, the Debtors will not need to cure any amounts under these agreements in cash upon assumption.  Importantly, absent the relief requested herein, the Debtors risk (a) losing access to the financing provided by Vitol or (b) Vitol seeking termination of the SOA under the argument such agreement is a "forward" contract.  As

set forth above, such risks, if they were to materialize, would completely halt operations of the Bakersfield Facility and significantly harm the value of the Debtors' Downstream Business.

101.    Accordingly, the Debtors' decision to assume the SOA and SSA, subject to entry of the Final Order, is appropriate under the circumstances and reflects the Debtors' sound business judgment.

### XI.    The Debtors Have Satisfied, or Will Satisfy, the Adequate Assurance Requirements of Section 365 of the Bankruptcy Code.

102.    Pursuant to section 365(b)(1)(A) of the Bankruptcy Code, a debtor may not assume an executory contract or unexpired lease unless, at the time of assumption, the debtor cures or provides adequate assurance that the debtor will promptly cure any existing default. *See* 11 U.S.C. § 365(b)(1)(A); *see also In re Liljeberg Enters., Inc.*, 304 F.3d 410, 444 (5th Cir. 2002) (holding that the debtor must provide adequate assurance that it will cure the default amount); *L.R.S.C. Co. v. Rickel Home Ctrs. Inc. (In re Rickel Home Ctrs.)*, 209 F.3d 291, 298 (3d Cir. 2000) (finding that that the debtor must cure defaults or provide adequate assurance of prompt cure).  Further, pursuant to section 365(b)(1)(C) of the Bankruptcy Code, if a default is outstanding, a debtor seeking to assume an executory contract or unexpired lease must provide adequate assurance of future performance under such contract or lease.

103.    Here, as of the Petition Date, the Debtors held a net payable position under the SOA of approximately $9.4 million.  As provided for in the Interim Order and pursuant to the DIP RCF Credit Agreement, the Debtors propose to convert all prepetition obligations under the SOA and SSA into DIP RCF Obligations.  The Debtors submit that their agreement to perform on a postpetition basis under the SOA and SSA along with the conversion of prepetition obligations into DIP RCF Obligations provides adequate assurance of future performance under the contracts. To the extent the Court believes additional adequate assurance is necessary, BRKF previously

delivered credit support in an amount equal to $5,000,000 on the effective date of the SOA (the "BKRF Credit Support") and Vitol has a first priority, present and continuing security interest in, and lien on (and right of setoff against), and assignment of, all cash obtained by Vitol resulting from a draw on the BKRF Credit Support.  Further, Vitol has confirmed that Vitol supports the relief requested herein.

104.    For the foregoing reasons, the Debtors have satisfied all requirements to assume the SOA and the SSA pursuant to section 365 of the Bankruptcy Code and request that this Court enter the Order authorizing such assumption.

### Emergency Consideration

105.    Pursuant to Bankruptcy Local Rule 9013-1, the Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days following the commencement of a chapter 11 case if "relief is needed to avoid immediate and irreparable harm."  For the reasons discussed above, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the requested relief in this Motion during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture and cause irreparable harm.  The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders.  The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and have satisfied the standard of Bankruptcy Rule 9013, and the Court should grant the requested relief.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

106.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

107.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended as or should be construed or deemed to be:  (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, other than the SOA and the SSA; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (i) a waiver of the obligation of any party in interest to file a proof of claim; or (j) otherwise affecting the Debtors'

rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

**<u>Notice</u>**

108.    The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agent under the Debtors' DIP Facilities and counsel thereto; (d) counsel to the RCF Lenders and Vitol; (e) counsel to the Prepetition Term Loan Agent; (f) counsel to CTCI; (g) the United States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service; (i) the Environmental Protection Agency; (j) the United States Securities and Exchange Commission; (k)  the state attorneys general for states in which the Debtors conduct business; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request that the Court enter the DIP Orders granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated:  April 16, 2025

/s/ Jason L. Boland

| | |
|---|---|
| **NORTON ROSE FULBRIGHT US LLP** | **KIRKLAND & ELLIS LLP** |
| Jason L. Boland (SBT 24040542) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Robert B. Bruner (SBT 24062637) | Joshua A. Sussberg, P.C. (*pro hac vice* pending) |
| Julie Harrison (SBT 24092434) | Brian Schartz, P.C. (TX Bar No. 24099361) |
| Maria Mokrzycka (SBT 24119994) | Ross J. Fiedler (*pro hac vice* pending) |
| 1550 Lamar Street, Suite 2000 | 601 Lexington Avenue |
| Houston, Texas 77010-3095 | New York, New York 10022 |
| Telephone:    (713) 651-5151 | Telephone:    (212) 446-4800 |
| Facsimile:    (713) 651-5246 | Facsimile:    (212) 446-4900 |
| Email:    jason.boland@nortonrosefulbright.com | Email:    jsussberg@kirkland.com |
|     bob.bruner@nortonrosefulbright.com |     bschartz@kirkland.com |
|     julie.harrison@nortonrosefulbright.com |     ross.fiedler@kirkland.com |
|     maria.mokrzycka@nortonrosefulbright.com | |
| | - and - |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | Peter A. Candel (*pro hac vice* pending) |
| | 333 West Wolf Point Plaza |
| | Chicago, Illinois 60654 |
| | Telephone:    (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |
| | Email:    peter.candel@kirkland.com |
| *Proposed Co-Counsel to the Debtors* | *Proposed Co-Counsel to the Debtors* |
| *and Debtors in Possession* | *and Debtors in Possession* |

## **Certificate of Accuracy**

In accordance with Bankruptcy Local Rule 9013-1(i), I hereby certify that the foregoing statements regarding the nature of the emergency are true and accurate to the best of my knowledge.

*/s/ Jason L. Boland*
Jason L. Boland

## **Certificate of Service**

I certify that on April 16, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' proposed claims agent.

*/s/ Jason L. Boland*
Jason L. Boland