IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| GLOBAL CLEAN ENERGY HOLDINGS, INC., *et al.*,[1] | ) ) ) ) | Case No. 25-90113 (ARP) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**DECLARATION OF CHRISTIAN
TEMPKE IN SUPPORT OF THE DEBTORS'
<u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
TO (A) OBTAIN POSTPETITION CREDIT, (B) GRANT SENIOR
SECURED LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, AND (C) UTILIZE CASH COLLATERAL;
(II) GRANTING ADEQUATE PROTECTION TO PREPETITION PARTIES;
(III) MODIFYING THE AUTOMATIC STAY; (IV) AUTHORIZING THE
CONTINUATION OF THE PREPETITION SOA AND SSA, AS AMENDED;
(V) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM
UNDER POSTPETITION TRANSACTIONS UNDER THE SOA AND SSA;
(VI) SCHEDULING A FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

I, Christian Tempke, hereby declare under penalty of perjury:

1. I am a Managing Director at Lazard Frères & Co. LLC ("<u>Lazard</u>"), which has its principal office at 30 Rockefeller Plaza, New York, New York 10012. Lazard is the proposed investment banker for the Debtors in the above-captioned chapter 11 cases.[2]

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/GCEHoldings. The location of Debtor Global Clean Energy Holdings, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is: 6451 Rosedale Highway, Bakersfield, California 93308.

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the Motion, the Interim Order, the *Declaration of Noah Verleun, Chief Executive Officer of Global Clean Energy Holdings, Inc., in Support of the Debtors' Chapter 11 Petitions* (the "<u>Verleun First Day Declaration</u>"), or the *Declaration of John Walsh, Managing Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' First Day Motions* (the "<u>Walsh First Day Declaration</u>" and together with the Verleun First Day Declaration the "<u>First Day Declarations</u>"), filed contemporaneously herewith, as applicable.

2.      I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Credit, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Parties; (III) Modifying the Automatic Stay; (IV) Authorizing the Continuation of the Prepetition SOA and SSA, as Amended; (V) Authorizing the Debtors to Enter into and Perform Under Postpetition Transactions under the SOA and SSA; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (the "Motion").[3]  I am familiar with the DIP Facilities and the material terms thereof.

3.      Except as otherwise indicated, all statements set forth in this Declaration are based upon the following: (a) my personal knowledge, belief, or opinion; (b) information learned from my review of the Debtors' books and records and materials filed in these chapter 11 cases; (c) information supplied to me or verified by the Debtors' employees or advisors and/or employees of Lazard working directly under my supervision and direction; and (d) my professional experience, knowledge, skill, education, and/or training concerning financial restructurings, sale and capital raise transactions.  If called as a witness, I could and would testify competently to the statements set forth in this Declaration on that basis.  I am not being specifically compensated for this testimony other than through payments received by Lazard as a professional proposed to be retained by the Debtors.[4]  I am over the age of eighteen years and am authorized to submit this Declaration on behalf of the Debtors.

---

[3]  The significant terms of the DIP Facilities are set forth in greater detail in the DIP Motion.  For the avoidance of doubt, any description of the DIP Facilities herein or in the DIP Motion is qualified in its entirety by reference to the DIP Documents or the Interim Order, as applicable.

[4]  Pursuant to Lazard's engagement letter with the Debtors, subject to Court approval thereof, Lazard will be entitled to receive certain fees in connection with the transactions described herein.

**Background and Qualifications**

4. I am a Managing Director in the Restructuring & Liability Management Group at Lazard. Lazard is the primary U.S. operating subsidiary of a preeminent international financial advisory and asset management firm founded in 1848. Lazard is a global investment bank providing financial advisory services, including with respect to mergers and acquisitions, capital raises, and restructurings. Together with its predecessors and affiliates, Lazard has been advising clients around the world for more than 175 years. Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority. Since 1990, Lazard professionals have been involved in over 500 restructurings, representing over $1 trillion in debtor assets.

5. Lazard and its senior professionals have extensive experience in the reorganization, restructuring, and sale of distressed companies, in both out-of-court and in-court contexts. In addition, Lazard's investment banking professionals have extensive experience advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees, and prospective buyers in chapter 11 proceedings. Lazard's business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including, among others: *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. Dec. 13, 2024); *In re Steward Health Care System, LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. June 12, 2024); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Jan. 22, 2024); *In re Inversiones Latin Am. Power Ltda.*, No. 23-11891 (JPM) (Bankr. S.D.N.Y. Jan. 3, 2024); *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex. Dec. 6, 2023); *In re SVB Fin. Grp.*, No. 23-10367 (MG) (Bankr. S.D.N.Y. Aug. 16, 2023); *In re Nat'l Cinemedia, LLC*, No. 23-90291 (DRJ) (Bankr. S.D. Tex. June 6, 2023); *In re SiO2 Med. Prods., Inc.*, No. 23- 10366

(JTD) (Bankr. D. Del. May 25, 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. June 9, 2023); *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr. S.D.N.Y. Jan. 13, 2023).

6. I have been employed at Lazard since 2007 and specialize in advising public and private companies and creditor groups in complex financial restructurings, recapitalizations, capital raises, and sale transactions. Specifically, I have represented companies and creditor groups in connection with raising capital in the bankruptcy context, including assisting chapter 11 debtors in obtaining and negotiating the terms of debtor-in-possession ("DIP") financing, exit financing loans, and equity rights offerings. During the course of my career, I have been involved in a variety of restructuring and recapitalization engagements, including Wellpath Holdings, Enviva, Rockall Energy, JCPenney, Gavilan Resources, Forever 21, Toys "R" Us, Gymboree, Jones Energy, Westinghouse, LINN Energy, Stone Energy, RCS Capital, Millennium Health, RadioShack, Chassix, Momentive, Quiznos, OGX, Eastman Kodak Company, and several others. Additionally, I have submitted declarations and provided testimony related to those matters in a number of chapter 11 cases. I have a B.A. in economics from Northwestern University. I hold Series 24 and Series 79 Investment Banking Representative licenses.

## Lazard's Retention by the Debtors

7. In January 2024, Global Clean Energy Holdings, Inc. and the other Debtor entities engaged Lazard as their investment banker to assist in the evaluation of strategic and capital structure alternatives. Based on Lazard's work with the Debtors throughout 2024 and leading up to the Petition Date, I and other members of the Lazard team are familiar with the Debtors' capital structure, liquidity needs, and business operations. I have been personally involved in the negotiation of the Restructuring Support Agreement ("RSA") and the Debtors' efforts to obtain and negotiate postpetition financing.

**The Debtors' Liquidity Constraints**

8. The Debtors have faced substantial financial challenges in recent years, due in large part to construction delays at the Bakersfield Facility and related cost overruns, which were compounded by global supply chain issues and high inflation. These operational burdens led to increased liabilities, delays in commencement of operations, and liquidity constraints. The Debtors' prepetition capital structure includes approximately $2.1 billion in total potential claims as of the Petition Date, which are more fully described in the Verleun First Day Declaration and can be summarized as follows:

| Facility | Approx. Principal Amount Outstanding as of 04.11.2025 | Maturity |
|---|---|---|
| **Revolving Credit Facility** | $39.1 million | 12/1/2027 |
| **Senior Secured Term Loan** | $1,096.3 million | 12/31/2025 |
| **Total Secured Funded Debt Claims (excluding Intercompany Debt)** | **$1,135.4 million** | |
| **CTCI Secured Payment Obligations** | $949.3 million[5] | N/A |
| **Project Manager Service Provider Payments** | $9.2 million | N/A |
| **Total Facility-Related Claims** | **$958.5 million** | |
| **CCI Notes** | $33.9 million | 04/30/2025 |
| **Other Notes** | $6.0 million | 10/2025–06/2050 |
| **Total Notes Claims (excluding Intercompany Debt)** | **$39.9 million** | |
| *Total Potential Claims (excluding Intercompany Debt)* | *$2,133.8 million* | |
| | | |
| **Intercompany Debt** | | |
| **HoldCo Loan Facility (Intercompany)** | $49.4 million | 11/04/2027 |
| **SusOils Secured Promissory Note (Intercompany)** | $34.9 million | 08/22/2025 |
| **Rosedale Notes (Intercompany)** | $48.6 million | 02/23/2032 |

---

[5] Such amount represents the amount asserted by CTCI through March 31, 2025, and do not include fees, costs, and interest accruing after that date. As set forth in the Restructuring Support Agreement and the DIP Orders,

9. As discussed more fully in the Verleun First Day Declaration, the Debtors have entered into the RSA with the Consenting Stakeholders and have filed the Plan to pursue a comprehensive reorganization of their business. I understand that the Debtors require over $115 million in incremental capital in order to administer these chapter 11 cases and continue ordinary course operations (assuming emergence from bankruptcy by early August 2025 in accordance with the Milestones as outlined below). Based on my experience as a restructuring professional and my familiarity with the Debtors, their capital structure, and their liquidity needs, I believe that the proposed DIP Facilities provide the necessary liquidity to pursue the Plan and consummate the value-maximizing transactions contemplated therein, subject to meeting certain conditions and being able to raise the incremental exit financing during the chapter 11 cases, on the best available terms to the Debtors.

### The Prepetition Marketing Process

10. In response to their ongoing liquidity challenges, the Debtors, with the assistance of Lazard and their other advisors, evaluated potential in-court and out-of-court solutions to address their liquidity constraints and right-size their capital structure.

11. At the end of July 2024, the Debtors, with the assistance of Lazard, commenced a strategic financing process to raise capital for—and gauge market interest in—the Upstream Business (the "Upstream Capital Process"). In connection with that process, Lazard contacted over 100 parties with over 20 parties executing NDAs and obtaining confidential information on the Upstream Business. The Debtors requested indications of interest ("IOIs") for the Upstream Capital Process in October 2024 and were able to obtain two non-binding IOIs. The Company,

---

such amount is reflective of the global settlement discussed herein and all parties in interest's rights with respect to such amount are preserved should the Restructuring Support Agreement terminate.

with the assistance of Lazard, continued to advance the Upstream Capital Process during the fourth quarter of 2024 and the first quarter of 2025.

12. In addition, in mid-December 2024, the Debtors, with the assistance of Lazard, launched a marketing process for the sale of all or substantially all of the Company's assets (the "Sale Process"). Potential buyers could express an interest for the consolidated business, the Upstream Business, and/or Downstream Business. As part of the Sale Process, the Debtors, with the assistance of Lazard, contacted over 75 parties. Over 20 interested parties executed an NDA, including certain parties who previously executed NDAs with the Company in connection with the Upstream Capital Process, and obtained confidential information about the Debtors' business. The Debtors and Lazard facilitated due diligence with potential buyers under NDA, including diligence calls and meetings with management. The Debtors requested IOIs for the Sale Process and second-round bids for the Upstream Capital Process to be submitted to the Debtors by February 24, 2025. Notwithstanding these efforts, the Debtors did not receive any IOIs or bids by the bid deadline. Nevertheless, the Debtors have continued to facilitate diligence with certain parties in interest leading up to the Petition Date.

13. Beginning in December 2024, the Debtors also shifted their focus on engagement with certain of their existing stakeholders regarding a comprehensive recapitalization, including the Prepetition Term Loan Lenders, CTCI, and, later on, the Prepetition RCF Lenders. Over the past few months, the Debtors, the Prepetition RCF Lenders, the Prepetition Term Loan Lenders, CTCI, and their respective advisors have worked extensively to negotiate the RSA and Plan. As further set forth in the Verleun First Day Declaration, the Debtors believe that the transactions contemplated by the RSA and Plan are the best available path forward to maximize value for the Debtors' estates.

14. As the Debtors require additional financing to fund projected operating losses, working capital, and the cost of an in-court process, the Debtors engaged their existing stakeholders to discuss the terms of potential DIP financing while also soliciting interest from potential third-party financing sources. In mid-January 2025, the Debtors, with the assistance of Lazard, initiated outreach to third parties on potential DIP financing. Lazard ultimately contacted over 80 parties in connection with DIP financing and over 40 parties executed NDAs and were provided access to a confidential data room. Three parties submitted indications of interest to fund some or all of the Debtors' postpetition financing, subject to certain terms and conditions. All three financing proposals required the priming of the collateral securing the Prepetition Term Loan Credit Agreement and included substantial fees and interest, significantly exceeding those of the proposed DIP Facilities. In addition, the Company obtained financing proposals from the Prepetition Term Loan Lenders and CTCI in connection with the RSA as well as a financing proposal from the Prepetition RCF Lenders. After careful evaluation of the third-party indications of interest and the financing proposals from the Debtors' existing stakeholders, the Debtors, in consultation with Lazard and their other advisors, ultimately determined that the DIP Facilities proposed by the DIP RCF Lenders and the DIP Term Loan Lenders, coupled with a new agreement on construction services with the DIP Contractor, represented the best and only actionable postpetition financing for the Debtors.

**The Proposed DIP Facilities**

15. The proposed DIP Facilities consist of: (a) a priming, senior secured, superpriority debtor-in-possession revolving credit facility in the aggregate principal amount of up to $100 million, exclusive of obligations under the SOA and SSA (the "<u>DIP RCF Facility</u>"), consisting of (i) DIP RCF New Money Loans, (ii) subject to and effective upon entry of the Interim

Order, the DIP RCF Creeping Roll-Up Loans, (iii) subject to entry of the Interim Order, a roll-up of $27.8 million of Tranche D claims under the Prepetition Term Loan Credit Agreement, and (iv) subject to entry of the Final Order, roll-up of all remaining Prepetition RCF Obligations into DIP RCF Loans; (b) a superpriority, priming secured debtor-in-possession credit facility in the aggregate principal amount of $75 million (the "DIP Term Loan Facility"), comprising of (i) $25 million in new money term loans and (ii) subject to entry of the Final Order, a roll-up of $50 million of Tranche D claims under the Prepetition Term Loan Credit Agreement; and (c) superpriority senior secured priming credit (the "DIP CTCI Payment Facility," and together with the DIP RCF Facility and the DIP Term Loan Facility, the "DIP Facilities") to be provided by CTCI Americas, Inc. ("CTCI" and, solely in its capacity as a holder of DIP CTCI Claims, the "DIP Contractor") in an aggregate value of up to $75 million, pursuant to that certain Project Management, Procurement, Construction, Operation, and Maintenance Support Agreement (the "DIP CTCI Contract"), by and between the Debtors and the DIP Contractor.

16. In addition to providing critical incremental financing, the DIP Facilities will also allow the Debtors to access Cash Collateral within the meaning of section 363(a) of the Bankruptcy Code on a consensual basis. I believe that access to the proceeds of the DIP Term Loan Facility, DIP RCF Facility, the DIP CTCI Contract, and Cash Collateral is essential for the Debtors to maintain operation of their businesses in the ordinary course and is a prerequisite to the successful administration of these chapter 11 cases. Moreover, as a condition of funding the DIP Facilities, the DIP Credit Agreements, in accordance with the RSA and the Exit Facilities term sheet attached thereto, contemplate that the DIP Facilities will be converted into financing for the Exit Facilities upon emergence. Converting the DIP Facilities is a necessary term of the transaction.

9

17. In addition to the new money loans under the DIP RCF Facility and the DIP Term Loan Facility and the new money amount under the DIP CTCI Contract, the DIP Facilities feature a roll-up of prepetition term loans, including the following: (a) subject to entry of the Interim Order, under the DIP RCF Facility, a reduction in the RCF Obligations in an amount commensurate with RCF Collections, and a corresponding increase in DIP RCF Loans and (b) subject to entry of the Interim Order, under the DIP RCF Facility, (i) a roll-up of approximately $27.8 million of Tranche D claims under the Prepetition Term Loan Credit Agreement; and (ii) a roll-up of all remaining Prepetition RCF Obligations into DIP RCF Loans, and under the DIP Term Loan Facility, a roll-up of $50 million of Tranche D claims under the Prepetition Term Loan Credit Agreement (collectively, the "Roll-Up DIP Loans").

18. I believe that the Roll-Up DIP Loans are reasonable under the circumstances of these chapter 11 cases. The DIP RCF Lenders required approval of the DIP RCF Creeping Roll-Up Loans and the DIP RCF Tranche D Roll-Up Loans upon entry of the Interim Order as a condition to funding the DIP RCF Facility. In particular, the DIP RCF Tranche D Roll-Up Loans are given in consideration of the additional liquidity provided postpetition by the DIP RCF Lenders under the DIP RCF Facility, their commitment to provide exit financing to fund the Debtors' go-forward business, and their continued performance under the SOA (which, I understand, is a "forward contract" and thus may be terminated postpetition). In addition, the Debtors were able to agree with the DIP RCF Lenders that the DIP RCF Facility would have an expanded borrowing base of an incremental fixed amount of $35 million to account for the roll-up of the $27.8 million of Tranche D claims, plus approximately $7 million of incremental borrowing base to provide additional liquidity to the Debtors, relative to the Revolving Credit Facility.

19. In connection with the DIP Facilities, the Debtors have agreed, subject to Court approval, to grant priming liens on certain unencumbered property, including all present and after-acquired property of the Debtors, and to pay certain fees and interest in connection with the DIP Facilities. The Debtors exchanged several term sheets with the DIP Lenders and the DIP Contractor throughout the negotiation process to improve terms. Specifically, the Debtors have agreed to pay, as noted in the Motion:

- *Interest Rates*. The DIP RCF Loans shall bear interest in cash at a rate of 12.5 percent per annum (same as the Revolving Credit Facility non-default interest rate). During the continuance of an event of default, all overdue amounts of principal and interest under the DIP RCF Loans will bear interest at the applicable rate, plus 2.00% per annum. The DIP Term Loan Facility shall bear interest at a rate of 8.00% per annum, payable monthly in arrears in kind. During the continuance of an event of default, all overdue amounts of principal and interest under the DIP Term Loans will bear interest at the applicable rate, plus 2.00% per annum.

- *Fees*. With respect to the DIP RCF Loans, a facility fee equal to 5.00% per annum on the average unused portion of the DIP RCF Facility DIP Credit Agreement, calculated and paid quarterly in arrears (or monthly if an event of default exists), and on the maturity date or earlier termination. The DIP Term Loan Facility shall have no upfront or commitment fee.[6]

20. The interest rates and fees are (a) well within the range of interest and fees in comparable DIP financings, (b) integral components of the overall terms of the DIP Facilities, and (c) required by the DIP Lenders as consideration for the extension of postpetition financing. Importantly, the Debtors will only pay cash interest with respect to the DIP RCF Facility and will PIK interest under the DIP Term Loan Facility, providing greater liquidity flexibility throughout these chapter 11 cases. Further, importantly, the Debtors were able to obtain commitments from

---

[6] The DIP CTCI Contract provides for a 16.5% margin on the Cost of the Work (as defined in the DIP CTCI Contract), consisting of (i) 8% per annum on the goods, services, and other consideration actually provided by the DIP Contractor and (ii) any amounts in excess of such 8%. Such amounts shall be accrued (but not paid in cash) during these chapter 11 cases and will be rolled into the Exit Facilities pursuant to the terms of the Restructuring Support Agreement.

the DIP RCF Lenders, the DIP Term Loan Lenders, and the DIP Contractor to roll over outstanding DIP obligations into the Exit Facilities on terms and conditions outlined in the RSA, thereby reducing the amount of exit financing that is required for the Debtors to emerge from bankruptcy. Given the Debtors' liquidity needs, the timing and cost of administering these chapter 11 cases, the lack of viable alternatives, and based on my experience and knowledge of the market for DIP financing, I believe the interest rate and fees are well within the range of other similar DIP financings and appropriate under the circumstances.

21. The proposed DIP Facilities also contain certain milestones, which are consistent with the timelines set forth in the RSA. These milestones provide a roadmap for the Debtors' chapter 11 process and exit from bankruptcy.

- *Petition Date + 3 days*: The date by which the Bankruptcy Court shall have entered the Interim Order.

- *Petition Date + 30 days*: The date by which the Bankruptcy Court shall have entered the Final Order and an order (which may be the Final Order) approving the Loan Parties' assumption of the SOA and SSA on a final basis, and the date by which the Debtors shall have filed the Plan and Disclosure Statement.

- *Petition Date + 60 days*: The date by which the Court shall have entered an order approving the Disclosure Statement.

- *Petition Date + 110 days*: The date by which the Court shall have entered an order confirming the Plan.

- *Petition Date + 120 days*: The date by which the Plan Effective Date shall have occurred.

22. The DIP milestones were required by the DIP Lenders and the DIP Contractor as a condition to providing the DIP Facilities and were a critical inducement for their willingness to provide the Debtors with the liquidity necessary to fund these chapter 11 cases.

**The Proposed DIP Facilities are the Best**
**Postpetition Financing Arrangement Available to the Debtors**

23. Based on my experience with the Debtors and their business, similar DIP financing transactions, and my involvement in the marketing and negotiation of the DIP Facilities, I believe that the DIP Facilities are the best postpetition financing option available to the Debtors, and the terms and conditions thereof are fair and reasonable under the facts and circumstances of these chapter 11 cases.

24. *First*, the proposed DIP Facilities are expected to provide the Debtors with access to crucial liquidity at the outset of these chapter 11 cases that will allow the Debtors to operate the Debtors' business in the ordinary course, meet critical obligations, and preserve going-concern value as the Debtors pursue a value-maximizing restructuring.

25. *Second*, as described above, the terms of the proposed DIP Facilities are the result of hard-fought negotiations and a thorough DIP marketing process. In anticipation of the commencement of these chapter 11 cases, the Debtors, with the assistance of Lazard and their other advisors, solicited other sources of postpetition financing to determine whether the Debtors could obtain postpetition financing on better terms than those provided by the DIP RCF Lenders, the DIP Term Loan Lenders, and the DIP Contractor.

26. As previously stated, Lazard solicited over 80 parties on their willingness to provide postpetition financing. However, the outstanding Prepetition Obligations and value-destructive nature of a potential priming dispute resulted in only one actionable proposal: the DIP Facilities offered by the DIP RCF Lenders, the DIP Term Loan Lenders, and the DIP Contractor. Indeed, of the financial institutions identified as potential sources of alternative DIP financing, none expressed an interest in providing financing on better terms than that of the DIP Facilities. Significantly, no party was willing to provide DIP financing to the Debtors on a junior or unsecured

13

basis. The proposed DIP Facilities not only provide crucial liquidity to the Debtors during these chapter 11 cases, but also facilitate the CTCI Settlement under the RSA. As a result, the Debtors determined that the DIP Facilities were the best available financing source under the circumstances.

27. ***Third***, I believe that the principal economic terms proposed under the DIP Facilities are reasonable and well within the range of DIP financings approved in other chapter 11 cases of similar size and complexity. Specifically, the economic terms (such as the contemplated pricing, fees, interest rate, and default rate), conversion of the DIP Facilities to Exit Facilities, the Roll-Up DIP Loans, and the DIP milestones, were all negotiated at arm's length and were a prerequisite to the DIP Lenders' and the DIP Contractor's willingness to fund the DIP Facilities and consent to the use of Cash Collateral. Given the financial and operating condition of the Debtors, the timing, cost, and risk of administering these chapter 11 cases, the absence of any other actionable financing alternatives, and the other factors and circumstances discussed herein and in the First Day Declaration, I believe these terms are generally consistent as a whole with the market for DIP financing facilities of similarly situated companies.

28. ***Fourth***, through my participation in negotiations concerning the DIP Facilities, I understand that the DIP RCF Roll-Up Loans and the Roll-Up DIP Term Loans are a strict requirement of the DIP RCF Lenders and the DIP Term Loan Lenders, respectively, in agreeing to provide the DIP Facilities. By entering into the DIP Facilities with the support of the DIP Lenders and DIP Agents, the Debtors will receive immediate access to Cash Collateral and necessary financing. Based on my conversations with the Debtors and their other advisors, absent immediate access to the DIP Facilities, the Debtors will not be able to operate their business on a go-forward basis or preserve the Debtors' estates as a going concern. I also believe that a roll-up

of prepetition loans for consideration contemplated under the DIP Facilities is within the range of other court approved DIP financings utilizing roll-ups. In light of the foregoing, I believe that the terms of the Roll-Up DIP Loans are reasonable and appropriate under the circumstances.

29. The terms of the proposed DIP Facilities are the product of weeks'-long, hard-fought, arm's-length, good faith negotiations between the Debtors, the DIP Lenders, and the DIP Contractor. I believe that the proposed DIP Facilities represent the best option presently available to the Debtors and are in the best interest of the Debtors and their estates. The economic terms of the DIP Facilities and related collateral and security package are market and reasonable, and the quantum of the DIP Facilities affords the Debtors runway to administer these chapter 11 cases, move toward plan confirmation, and maximize value for the benefit of all stakeholders.

### The Proposed Adequate Protection is Fair and Appropriate

30. In addition to accessing the proceeds of the DIP Facilities, it is critical that the Debtors are able to continue to utilize the Prepetition Collateral, which includes substantially all of the Debtors' assets, including Cash Collateral. As adequate protection solely to extent of Diminution of Value for the Prepetition RCF Secured Parties, the Prepetition Term Loan Secured Parties, and CTCI, (the "Prepetition Parties), the Debtors propose to provide, among other things:

- replacement liens in favor of the Prepetition Parties on the Prepetition Collateral;

- adequate protection payments in favor of the Prepetition Parties for payment of reasonable and documented legal and other professional fees and expenses pursuant to the terms of the applicable DIP Documents;

- superpriority administrative expense claims subject to the Carve-Out and junior to certain claims in accordance with the terms of the Interim Order; and

- other customary protections of the DIP Collateral package and the financial reporting and milestone requirements.

31. Based on my experience with similar DIP financing transactions, I believe that the proposed adequate protection terms are generally consistent with terms regularly required by secured lenders in similar circumstances and reasonable to provide under the DIP Facilities given the facts and circumstances of these chapter 11 cases.

## Conclusion

32. In light of the foregoing and based on my experience as a restructuring professional and involvement in similar transactions, I believe that the DIP Facilities are reasonable and appropriate under the circumstances and offer the best available financing option for the Debtors under the facts and circumstances of these chapter 11 cases. I believe that the proposed DIP Facilities are in the best interest of the Debtors' estates and are essential to fund the Debtors' operations and the administration of the chapter 11 cases. In addition, the DIP Facilities are integral to the RSA and the Prepetition Parties' willingness to support these chapter 11 cases. In my view, based on the discussions I participated in and observed, they were negotiated at arm's length, and are, in the aggregate, appropriate and represent the best terms currently available to the Debtors. Accordingly, I believe that approval of the DIP Facilities is in the best interests of the Debtors, their estates, and all parties in interest, and should therefore be approved by this Court.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 16, 2025                                   /s/ *Christian Tempke*
                                                         Christian Tempke
                                                         Managing Director
                                                         Lazard Frères & Co. LLC