IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| GLOBAL CLEAN ENERGY HOLDINGS, INC., *et al.*,[1] | ) ) ) ) | Case No. 25-90113 (ARP) |
| Debtors. | ) ) | (Joint Administration Requested) |

**DECLARATION OF
JOHN WALSH IN SUPPORT OF THE DEBTORS'
EMERGENCY MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
TO (A) OBTAIN POSTPETITION CREDIT, (B) GRANT SENIOR
SECURED LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, AND (C) UTILIZE CASH COLLATERAL;
(II) GRANTING ADEQUATE PROTECTION TO PREPETITION PARTIES;
(III) MODIFYING THE AUTOMATIC STAY; (IV) AUTHORIZING THE
CONTINUATION OF THE PREPETITION SOA AND SSA, AS AMENDED;
(V) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM
UNDER POSTPETITION TRANSACTIONS UNDER THE SOA AND SSA;
(VI) SCHEDULING A FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

I, John Walsh, hereby declare under penalty of perjury as follows:

1. I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), proposed financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors"). A&M has served as the Debtors' principal financial advisor since November 4, 2024. In that capacity, I have been directly involved in and obtained first-hand knowledge of the events and circumstances leading up to these chapter 11 cases.[2]

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/GCEHoldings. The location of Debtor Global Clean Energy Holdings, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is: 6451 Rosedale Highway, Bakersfield, California 93308.

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the Motion, the Interim Order, the *Declaration of Noah Verleun, Chief Executive Officer of Global Clean Energy*

2.  I submit this declaration (the "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Credit, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Parties; (III) Modifying the Automatic Stay; (IV) Authorizing the Continuation of the Prepetition SOA and SSA, as Amended; (V) Authorizing the Debtors to Enter into and Perform Under Postpetition Transactions under the SOA and SSA; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (the "Motion")[3]. I am familiar with the DIP Facilities and the material terms thereof.

3.  Except as otherwise indicated, the statements set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the A&M team, the Debtors' management team, and/or the Debtors' other advisors, my review of relevant documents and information, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the statements set forth in this Declaration on that basis. I am not being specifically compensated for this testimony other than through payments received by A&M as a professional proposed to be retained by the Debtors. I am over the age of 18 and I am authorized to submit this Declaration on behalf of the Debtors.

---

*Holdings, Inc., in Support of the Debtors' Chapter 11 Petitions* (the "Verleun First Day Declaration"), or the *Declaration of John Walsh, Managing Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' First Day Motions* (the "Walsh First Day Declaration" and together with the Verleun First Day Declaration the "First Day Declarations"), filed contemporaneously herewith, as applicable.

[3] The significant terms of the DIP Facilities are set forth in greater detail in the DIP Motion. For the avoidance of doubt, any description of the DIP Facilities herein or in the DIP Motion is qualified in its entirety by reference to the DIP Documents or the Interim Order, as applicable.

**Background and Qualifications**

4. Since its inception in 1983, A&M has become a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas. A&M specializes in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. A&M's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including developing or validating forecasts and business plans and related assessments of a business' strategic position; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages. A&M has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases. A&M is known for its ability to work alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization.

5. I have over 12 years of experience advising companies in acquisitions and distressed situations. Through roles as a restructuring advisor, I have substantial experience helping to stabilize financially-distressed companies, and developing business plans and liquidity forecasts to accomplish the necessary restructuring of their operations and finances. I have advised clients in numerous major bankruptcy cases, including *In re Vertex Energy, Inc.*, No. 24-90507 (CML) (Bankr. S.D. Tex. Nov. 19, 2024); *In re Sunlight Fin. Holdings Inc.*, No. 23-11794 (MFW) (Bankr. D. Del. Dec. 1, 2023); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. June 13, 2022); *In re Superior Energy Services, Inc.*, No. 20-35812 (DRJ) (Bankr. S.D. Tex. Jan. 15, 2021); *In re Northeast Gas Generation, LLC*, No. 20-11597 (MFW) (Bankr. D. Del. July

17, 2020); *In re Weatherford Int'l PLC*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. Aug. 22, 2019); *In re Parker Drilling Co.*, No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 15, 2019); *In re New MACH Gen, LLC*, No. 18-11368 (MFW) (Bankr. D. Del. July 2, 2018); *In re Castex Energy Partners, L.P.*, No. 17-35835 (MI) (Bankr. S.D. Tex. Dec. 4. 2017); and *In re Key Energy Servs., Inc.*, No. 16-12306 (BLS) (Bankr. D. Del. Nov. 14, 2016). I received my bachelor's degree in political science from the University of Colorado and an MBA from Goizueta Business School at Emory University, with concentrations in accounting and finance. I am a Certified Insolvency and Restructuring Advisor.

## A&M's Retention by the Debtors

6. Since being retained in November 2024, A&M has provided various financial advisory services to the Debtors in connection with managing liquidity, developing a long-range business plan, and evaluating and advancing strategic alternatives. Additionally, A&M has worked closely with the Debtors' management and other professionals retained by the Debtors, including the Debtors' proposed investment banker, Lazard Frères & Co. LLC, and proposed counsel, Kirkland & Ellis with respect to the Debtors' restructuring and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations. As a result of my role and experience with the Debtors through A&M's engagement, my review of relevant documents, and my discussions with other individuals who manage the Debtors' day-to-day business operations and affairs, I am generally familiar with the Debtors' business, financial affairs, and books and records.

## The Debtors' Need for the DIP Facilities and Access to Cash Collateral

7. As of the Petition Date, the Debtors' total cash balance is approximately $2.3 million. That amount is insufficient to finance the Debtors' working capital needs and the costs of administering these chapter 11 cases. As a result, the Debtors require immediate access

to the proposed DIP Facilities and continued use of Cash Collateral. Access to the DIP Facilities and Cash Collateral is critical to ensure that the Debtors are able to successfully administer their chapter 11 cases, preserve the value of their estates for the benefit of all parties in interest, and pursue the value-maximizing restructuring transactions contemplated under the Restructuring Support Agreement and Plan. During these chapter 11 cases, the Debtors will need to use the cash generated from their operations, as well as their current cash on hand, to, among other things, (a) satisfy payroll obligations, (b) honor obligations under their material contracts, (c) maintain insurance coverage, (d) pay taxes, and (e) make any other payments essential to the continued management, operation, and preservation of the Debtors' business.

8. In connection with preparing for a potential chapter 11 filing and determining the Debtors' postpetition financing requirements, A&M worked with the Debtors and their advisors to prepare projected cash forecasts for the Debtors' business during these chapter 11 cases. These projections reflect a number of factors, including, among other things, operational performance of the underlying business, impact of these chapter 11 cases on daily operations, fees and interest expenses associated with the DIP Facilities, and the projected costs (including professional fees) associated with effectuating a successful reorganization as contemplated under the Restructuring Support Agreement and the Plan. The Initial Budget reflects the weekly cash flow forecast for the thirteen-week period following the Petition Date, and I believe that the Initial Budget provides a reasonable estimate of the Debtors' capital needs during the postpetition period.

9. Based on the estimates contained in the Initial Budget, the Debtors, in consultation with A&M and the DIP Lenders, determined that they would require immediate access to approximately $40 million of incremental liquidity as soon as practicable after the Petition Date, in addition to the use of Cash Collateral, to fund operations, capital expenditures, and the

administrative costs of these chapter 11 cases. In addition, the Debtors, in consultation with A&M and the DIP Lenders, determined they would require access to revolving credit in the aggregate principal amount of up to $100 million under the DIP RCF Facility and new money term loans in the aggregate principal amount of $25 million under the DIP Term Loan Facility, in addition to continued use of Cash Collateral, to fund the duration of these chapter 11 cases. Further, the $75 million in value provided under the DIP CTCI Payment Facility will substantially ease the Debtors' liquidity pressures during chapter 11. The proceeds from the DIP Facilities and Cash Collateral will allow the Debtors to continue operating as a going-concern during these cases, preserve the value of the Debtors' estates for the benefit of all key stakeholders and minimize disruption during an orderly and swift reorganization.

10. Absent the ability to access the funds available under the DIP Facilities and Cash Collateral, the Debtors would likely face a value-destructive and immediate interruption to their operations and lose support from key stakeholders on which the Debtors' business depends, including vendors and employees. These interruptions, in turn, would hinder the Debtors' ability to maximize the value of their estates through a successful reorganization because the Debtors would likely be forced to curtail their operations significantly, which would harm all stakeholders. Without a new source of postpetition liquidity, the Debtors' businesses will likely be irreparably harmed. As a result, I believe the proposed DIP Facilities and access to Cash Collateral are necessary for a value-maximizing reorganization in these chapter 11 cases.

## SOA and SSA Assumption

11. Pursuant to the Motion, the Debtors are also seeking to assume the SOA and SSA in connection with entering into the DIP Facilities, both dated as of June 25, 2024, and both between BKRF and Vitol. The SOA and SSA, taken together with the Prepetition RCF Facility, supply the feedstock to the Bakersfield Facility, provide the working capital to purchase that

feedstock, address the right and title to the feedstock and the renewable fuels finished products, and govern the transfer of the Products offsite by Vitol. I believe that, put simply, these three agreements are economically interdependent, fundamental, and critical to the Debtors' operation of the Bakersfield Facility.

12. I understand that the Debtors source Feedstock under the SOA, pursuant to which Vitol contracts with third-party suppliers and sells and delivers required volumes to BKRF for use at the Bakersfield Facility. After the Feedstock is converted into Products, BKRF sells the renewable diesel, certain renewable biproducts, and other Renewable Attributes produced at the Bakersfield Facility to Vitol. I further understand, that, pursuant to the SSA, BKRF granted Vitol certain exclusive leaseholds, nonexclusive rights, and easements that allow Vitol to properly access and transport Products. Legal title and custody of the Products sold transfers from BKRF to Vitol when loaded into rail cars or trucks by BKRF, as specified in the SOA. Vitol then resells the Products to third-parties and any Products sold to Vitol but not resold to a third party is valued for borrowing base purposes under the Prepetition RCF Agreement. To provide BKRF protection from fluctuations in pricing of Feedstock and Products, the SOA incorporates weekly portfolio price adjustments. The Portfolio Price Position is an aggregate physical pricing true-up reflecting changes in the market value of Feedstock and Product between the dates that Feedstock is sold to BKRF. The physical pricing true-ups are indexed to the actual performance of CBOT soybean oil and NYMEX heating oil futures, as well as other relevant commodity contracts. I understand that the Portfolio Price Position partially offsets decreases in commodities pricing of Feedstock and Product owned by the Debtors. As of the Petition Date, the Debtors held a net payable position under the SOA of approximately $9.4 million.

13. I believe that the Debtors' continued performance under the SOA and SSA is critical to the Debtors' ability to purchase Feedstock and sell Products. Further, I understand that the DIP RCF Lenders conditioned access to the DIP RCF Facility on assumption of the SOA and SSA, and the Debtors require access to the proceeds under the DIP RCF Facility to have sufficient liquidity to perform under the SOA and SSA. Given the Debtors' liquidity and working capital cycle, absent assumption of the SOA and SSA (in addition to approval of the DIP Facilities), I believe that the Debtors will not have the means to purchase the necessary Feedstock required to produce the Products and will be unable to operate their business in the ordinary course postpetition.

## The Continued Benefit of the SOA and SSA

14. The SOA works alongside the Prepetition RCF Agreement to allow the Debtors to procure Feedstock on terms that are more favorable than those that they could otherwise receive from other feedstock suppliers. The ability to draw on the Prepetition RCF Facility, allows the Debtors to pay Vitol on five-day terms for Feedstock following delivery. Additionally, I understand the Portfolio Price Position protects the Debtors from the impact of potential market fluctuations in commodity pricing. Overall, the Prepetition RCF Facility funds a significant portion of the Bakersfield Facility's operation by financing the working capital that the Debtors are required to deploy to operate the Bakersfield Facility. The SSA, in turn, eases the administrative burden of storing and transferring the Products from BKRF to Vitol. Vitol is able to have direct access to the Products and easily transport it from the Bakersfield Facility.

15. Due to the integral nature of the SOA and SSA to the Debtors' businesses and the necessity of the agreements for the Debtors to continue as a going concern, I believe any disruption to either agreement (or the related Prepetition RCF Facility and anticipated DIP RCF Facility provided by Vitol) would harm the operation of the Bakersfield Facility, divert the Debtors'

resources away from expeditiously proceeding through these chapter 11 cases, and result in a substantial loss of value to the Debtors' estates.

16.    I believe that both the SOA and SSA are important to the Debtors' business and assumption will ensure that the relationship between BKRF and Vitol continues uninterrupted postpetition.  Further, the Debtors' assumption of the SOA and SSA will provide assurance to Vitol that the Debtors intend to continue to operate the Bakersfield Facility in accordance with their obligations under the agreements throughout these chapter 11 cases and upon emergence therefrom.  Finally, Vitol agreed to continued provision of the Prepetition RCF Facility through the relief sought in the Motion, but this agreement was conditioned on the assumption of the SOA and SSA.

17.    Accordingly, I believe that the assumption of the SOA and the SSA is value-maximizing for all stakeholders in these chapter 11 cases, is essential to the operation of the Bakersfield Facility, and is a sound exercise of the Debtors' reasonable business judgment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  April 16, 2025                              */s/ John Walsh*
                                                                   John Walsh
                                                                   Managing Director
                                                                   Alvarez & Marsal North America LLC