THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL CLEAN ENERGY | ) | Case No. 25-90113 (ARP) |
| HOLDINGS, INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT**
**CHAPTER 11 PLAN OF REORGANIZATION OF**
**GLOBAL CLEAN ENERGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**NORTON ROSE FULBRIGHT US LLP**
Jason L. Boland (SBT 24040542)
Robert B. Bruner (SBT 24062637)
Julie Harrison (SBT 24092434)
Maria Mokrzycka (SBT 24119994)
1550 Lamar Street, Suite 2000
Houston, Texas 77010-3095
Telephone:    (713) 651-5151
Facsimile:    (713) 651-5246
Email:  jason.boland@nortonrosefulbright.com
          bob.bruner@nortonrosefulbright.com
          julie.harrison@nortonrosefulbright.com
          maria.mokrzycka@nortonrosefulbright.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Brian Schartz, P.C. (TX Bar No. 24099361)
Ross J. Fiedler (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:      jsussberg@kirkland.com
            bschartz@kirkland.com
            ross.fiedler@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Peter A. Candel (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/GCEHoldings.  The location of Debtor Global Clean Energy Holdings, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is: 6451 Rosedale Highway, Bakersfield, California 93308.

Facsimile:       (312) 862-2200
Email:           peter.candel@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

<u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

THE DEBTORS ARE PROVIDING THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF GLOBAL CLEAN ENERGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "<u>PLAN</u>").  THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  FUTURE APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XV HEREIN.

THE DEBTORS AND CERTAIN HOLDERS OF CLAIMS, INCLUDING THE CONSENTING STAKEHOLDERS, SUPPORT THE PLAN.  THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS BEFORE OR AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE PLAN SUPPLEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN <u>ARTICLE IX</u> OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE XV HEREIN, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT (IF AND ONCE OBTAINED) DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN. THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF (IF AND ONCE BANKRUPTCY APPROVAL IS OBTAINED) SOLICITING VOTES FOR AN CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. ALL HOLDERS OF CLAIMS AND/OR INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING, WITHOUT LIMITATION, UNDER ARTICLE IV OF THE PLAN) IN FULL.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER, THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE EXTENT PERMITTED UNDER APPLICABLE LAW. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. IF EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT UNDER A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES ISSUED UNDER THE PLAN CONSULT THEIR OWN LAWYER CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES IN COMPLIANCE WITH THE FEDERAL SECURITIES LAWS AND ANY APPLICABLE "BLUE SKY" LAWS. THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF SUCH SECURITIES.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. ALTHOUGH THE DEBTORS BELIEVE THE EXPECTATIONS REFLECTED IN SUCH FORWARD-LOOKING STATEMENTS ARE BASED ON REASONABLE ASSUMPTIONS, THE DEBTORS CAN GIVE NO ASSURANCE THAT THEIR EXPECTATIONS WILL BE ATTAINED, AND IT IS POSSIBLE THAT ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE INDICATED BY THESE FORWARD-LOOKING STATEMENTS DUE TO A VARIETY OF RISKS AND UNCERTAINTIES. FORWARD LOOKING STATEMENTS MAY INCLUDE, BUT ARE NOT LIMITED TO, STATEMENTS ABOUT:

- THE DEBTORS' PLANS, OBJECTIVES, INTENTIONS, AND EXPECTATIONS;

- **THE DEBTORS' BUSINESS STRATEGY;**

- **THE DEBTORS' FINANCIAL STRATEGY, BUDGET, AND PROJECTIONS;**

- **THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**

- **THE SUCCESS OF THE DEBTORS' OPERATIONS;**

- **THE COSTS OF CONDUCTING THE DEBTORS' OPERATIONS;**

- **THE DEBTORS' LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;**

- **THE LEVEL OF UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;**

- **THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;**

- **THE TERMS OF CAPITAL AVAILABLE TO THE DEBTORS;**

- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS;**

- **THE EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **THE DEBTORS' COUNTERPARTIES' CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION CLAIMS OR REGULATORY PROCEEDINGS;**

- **THE GOVERNMENTAL REGULATIONS AND TAXATION APPLICABLE TO THE DEBTORS, INCLUDING ANY CHANGES THERETO;**

- **THE RISKS ASSOCIATED WITH THE DEBTORS' FAILURE TO COMPLY WITH THE EXTENSIVE LAWS AND GOVERNMENTAL REGULATIONS APPLICABLE TO THE U.S. ENERGY INDUSTRY;**

- **ENVIRONMENTAL HEALTH AND SAFETY LIABILITIES;**

- **THE OVERALL HEALTH OF THE AGRICULTURAL INDUSTRY AND AGRICULTURAL OPERATIONS GENERALLY;**

- **THE OVERALL HEALTH OF THE OIL AND GAS INDUSTRY AND THE PRICE OF OIL AND NATURAL GAS; AND**

- **THE OVERALL HEALTH OF THE ALTERNATIVE FUEL INDUSTRY AND THE PRICE OF ALTERNATIVE FUELS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND OTHER FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; THE**

DEBTORS' INABILITY TO MAINTAIN RELATIONSHIPS WITH SUPPLIERS, EMPLOYEES, AND OTHER THIRD PARTIES AS A RESULT OF THE CHAPTER 11 FILING OR THOSE PARTIES' FAILURE TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; THE PERFORMANCE OF THE ALTERNATIVE FUELS INDUSTRY; THE REGULATORY ENVIRONMENT; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE FINANCIAL CONDITION OF THE DEBTORS' PRIMARY CUSTOMER; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS, INCLUDING PANDEMICS, SUCH AS THE COVID-19 PANDEMIC, THAT MAY CAUSE GENERAL BUSINESS DISRUPTIONS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  The projections and forward-looking information contained or incorporated by reference herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted.  Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws").  The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  Any representation to the contrary is a criminal offense.  The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.

The Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Common Equity and New Preferred Equity (the "Solicitation") under the Plan, and to the extent such exemption is not available, then such New Common Equity and New Preferred Equity will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws.  Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................ 1

II.    PRELIMINARY STATEMENT ....................................................................... 1

III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
STATEMENT AND THE PLAN ..................................................................... 6

    A.    What Is Chapter 11? ............................................................................. 6

    B.    Why Are the Debtors Sending Me this Disclosure Statement? ...................... 6

    C.    What Are the Restructuring Transactions Under the Plan? ........................... 7

    D.    What Are the Effects of the Plan and the Restructuring Transactions
on the Debtors' Ongoing Business? ................................................... 7

    E.    Will Any Party Have Significant Influence over the Corporate
Governance and Operations of the Reorganized Debtors? ........................... 7

    F.    Am I Entitled to Vote on the Plan? ......................................................... 7

    G.    How Do I Vote For or Against the Plan? ................................................. 9

    H.    What is the Deadline to Vote on the Plan? .............................................. 9

    I.    What Will I Receive from the Debtors if the Plan Is Consummated? ............ 9

    J.    What Will I Receive from the Debtors if I Hold an Allowed
Administrative Claim, DIP Claim, Professional Fee Claim, or Priority
Tax Claim? ........................................................................................ 13

    K.    If the Plan Provides that I Get a Distribution, Do I Get it upon
Confirmation or When the Plan Goes Effective?  What Is Meant by
"Confirmation," "Effective Date," and "Consummation"? ......................... 15

    L.    Is There Potential Litigation Related to the Plan? ..................................... 15

    M.    Does the Plan Preserve Causes of Action?  How Will the Preservation
of Causes of Action Affect My Recovery Under the Plan? ......................... 15

    N.    Will There Be Releases, Injunction, and Exculpation Granted to
Parties in Interest as Part of the Plan? ................................................... 16

    O.    Do I Have to Grant the Releases Under the Plan?  Can I Opt Out of the
Releases? ........................................................................................... 21

    P.    What Are the Consequences of Opting Out of the Releases Provided by
the Plan? ........................................................................................... 21

    Q.    What Are the Sources of Cash and other Consideration Required to
Fund the Plan? ................................................................................... 21

    R.    Are There Risks to Owning the New Common Equity or New Preferred
Equity upon the Debtors' Emergence from Chapter 11? ........................... 22

i

| | S. | How Will Undeliverable Distributions and Unclaimed Property Be Treated Under The Plan? | 22 |
| | T. | Are any Regulatory Approvals Required to Consummate the Plan? | 22 |
| | U. | Why Is the Bankruptcy Court Holding a Confirmation Hearing? | 22 |
| | V. | What Is the Purpose of the Confirmation Hearing? | 22 |
| | W. | When Is the Confirmation Hearing Scheduled to Occur?  What Other Milestones Are Notable in These Chapter 11 Cases?  When Are Those Milestones Scheduled to Take Place? | 23 |
| | X. | Whom Do I Contact if I Have Additional Questions with Respect to this Disclosure Statement or the Plan? | 24 |
| | Y. | Do the Debtors Recommend Voting in Favor of the Plan? | 24 |
| | Z. | Who Supports the Plan? | 24 |
| | AA. | Can the Plan be Modified, Revoked, or Withdrawn? | 24 |
| | BB. | What Happens to My Recovery If the Plan Is Not Confirmed or Does Not Go Effective? | 25 |
| IV. | | SOLICITATION AND VOTING PROCEDURES | 25 |
| | A. | Holders of Claims or Interests Entitled to Vote on the Plan. | 25 |
| | B. | Votes Required for Acceptance by a Class. | 25 |
| | C. | Claims and Noticing Agent. | 25 |
| | D. | Solicitation Package. | 25 |
| | E. | Distribution of the Solicitation Package and Plan Supplement. | 26 |
| | F. | Voting on the Plan. | 26 |
| | G. | Certain Factors to Be Considered Prior to Voting. | 26 |
| V. | | THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW | 27 |
| | A. | The Debtors' Corporate History and Business Operations. | 27 |
| | B. | Organizational Structure. | 30 |
| | C. | Prepetition Capital Structure. | 30 |
| VI. | | EVENTS LEADING TO THE CHAPTER 11 FILINGS | 34 |
| | A. | Challenges Facing the Debtors' Business. | 34 |
| | B. | Disruption Stemming from Macroeconomic Headwinds | 36 |
| | C. | The Company's Prepetition Restructuring Initiatives. | 36 |
| VII. | | MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES | 38 |

|   | A. | First Day Relief. | 38 |
|---|----|------------------|-----|
|   | B. | The Proposed DIP Facilities. | 38 |
|   | C. | Proposed Confirmation Schedule. | 39 |
|   | D. | Schedules and Statements. | 41 |
|   | E. | Establishment of a Claims Bar Date. | 41 |
|   | F. | Retention Applications. | 41 |
| VIII. | | SUMMARY OF THE PLAN | 41 |
|   | A. | General Settlement of Claims and Interests. | 41 |
|   | B. | Restructuring Transactions. | 42 |
|   | C. | Director, Officer, and Manager Liability Insurance. | 42 |
|   | D. | Employment Obligations. | 42 |
|   | E. | Cancellation of Notes, Instruments, Certificates, and Other Documents. | 43 |
|   | F. | Section 1146 Exemption. | 43 |
|   | G. | The Reorganized Debtors. | 44 |
|   | H. | Sources of Consideration for Plan Distributions. | 44 |
|   | I. | Private Company | 45 |
|   | J. | Corporate Existence | 45 |
|   | K. | Vesting of Assets in the Reorganized Debtors. | 46 |
|   | L. | Corporate Action. | 46 |
|   | M. | New Organizational Documents. | 46 |
|   | N. | Directors and Officers of the Reorganized Debtors. | 47 |
|   | O. | Effectuating Documents; Further Transactions. | 47 |
|   | P. | Certain Securities Law Matters. | 47 |
|   | Q. | Preservation of Causes of Action. | 48 |
|   | R. | Closing the Chapter 11 Cases. | 48 |
| IX. | | OTHER KEY ASPECTS OF THE PLAN | 48 |
|   | A. | Treatment of Executory Contracts and Unexpired Leases. | 49 |
| X. | | PROVISIONS GOVERNING DISTRIBUTIONS | 52 |
|   | A. | Timing and Calculation of Amounts to Be Distributed. | 52 |
|   | B. | Disbursing Agent. | 52 |
|   | C. | Rights and Powers of Disbursing Agent. | 52 |

|      | D.   | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 53 |
|      | E.   | Manner of Payment. | 54 |
|      | F.   | Compliance with Tax Requirements. | 54 |
|      | G.   | Allocations. | 54 |
|      | H.   | No Postpetition Interest on Claims. | 54 |
|      | I.   | Foreign Currency Exchange Rate. | 54 |
|      | J.   | Setoffs and Recoupment. | 55 |
|      | K.   | Claims Paid or Payable by Third Parties. | 55 |
| XI.  | PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS | | 56 |
|      | A.   | Allowance of Claims. | 56 |
|      | B.   | Claims Administration Responsibilities. | 56 |
|      | C.   | Disputed Claims Process. | 56 |
|      | D.   | Disputed Claims Reserve. | 56 |
|      | E.   | Estimation of Claims and Interests. | 56 |
|      | F.   | Adjustment to Claims or Interests without Objection. | 57 |
|      | G.   | Disallowance of Claims or Interests. | 57 |
|      | H.   | No Distributions Pending Allowance. | 57 |
|      | I.   | Distributions After Allowance. | 57 |
| XII. | SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS | | 58 |
|      | A.   | Discharge of Claims and Termination of Interests. | 58 |
|      | B.   | Release of Liens. | 58 |
|      | C.   | Releases by the Debtors. | 58 |
|      | D.   | Releases by the Releasing Parties. | 60 |
|      | E.   | Exculpation. | 61 |
|      | F.   | Injunction. | 62 |
|      | G.   | Protections Against Discriminatory Treatment. | 62 |
|      | H.   | Document Retention. | 62 |
|      | I.   | Reimbursement or Contribution. | 63 |
| XIII. | CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN | | 63 |
|      | A.   | Conditions Precedent to the Effective Date. | 63 |

| | B. | Waiver of Conditions. | 64 |
|---|---|---|---|
| | C. | Effect of Failure of Conditions. | 64 |
| | D. | Substantial Consummation. | 64 |
| XIV. | | MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN | 64 |
| | A. | Modification and Amendments. | 64 |
| | B. | Effect of Confirmation on Modifications. | 65 |
| | C. | Revocation or Withdrawal of Plan. | 65 |
| XV. | | RISK FACTORS | 65 |
| | A. | Bankruptcy Law Considerations. | 65 |
| | B. | Risks Related to Recoveries Under the Plan. | 69 |
| | C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses. | 71 |
| | D. | Risks Related to the Offer and Issuance of Securities Under the Plan. | 75 |
| | E. | Miscellaneous Risk Factors and Disclaimers. | 76 |
| XVI. | | CONFIRMATION OF THE PLAN | 77 |
| | A. | The Confirmation Hearing. | 77 |
| | B. | Requirements for Confirmation of the Plan. | 77 |
| | C. | Feasibility. | 77 |
| | D. | Acceptance by Impaired Classes. | 78 |
| | E. | Confirmation Without Acceptance by All Impaired Classes. | 78 |
| | F. | Liquidation Analysis. | 79 |
| | G. | Valuation Analysis | 79 |
| XVII. | | CERTAIN SECURITIES LAW MATTERS | 79 |
| | A. | New Common Equity and Preferred Equity. | 79 |
| | B. | Exemption from Registration Requirements; Issuance of New Common Equity and New Preferred Equity under the Plan. | 80 |
| | C. | Resales of New Common Equity and New Preferred Equity; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code. | 81 |
| XVIII. | | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN. | 83 |
| XIX. | | Recommendation. | 84 |

**EXHIBITS**[2]

| | |
|---|---|
| EXHIBIT A | Plan |
| EXHIBIT B | Restructuring Support Agreement |
| EXHIBIT C | Company Organizational Chart |
| EXHIBIT D | Financial Projections – TO COME |
| EXHIBIT E | Liquidation Analysis – TO COME |
| EXHIBIT F | Valuation Analysis – TO COME |

---

[2]   Each Exhibit is incorporated herein by reference.

## I.        INTRODUCTION

Global Clean Energy Holdings, Inc. ("GCEH") and the other above-captioned debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "Global Clean" or the "Company") submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Joint Chapter 11 Plan of Reorganization of Global Clean Energy Holdings, Inc. and its Debtor Affiliates* (the "Plan").[3]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS AND CERTAIN STAKEHOLDERS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST AVAILABLE RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR SUCCESSFULLY COMPLETING THE CHAPTER 11 CASES.   THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.       PRELIMINARY STATEMENT

Global Clean's story begins in 2007, when it relocated from Salt Lake City, Utah to Los Angeles, California to ride the wave of a rapidly growing biofuels industry.  At the time, our predecessor, Global Clean Energy Holdings, LLC, was a start-up focused on the cultivation of seed oil from the Jatropha plant to be used to produce biodiesel.  After acquiring the trade secrets associated with Global Clean Energy Holdings, LLC, the Company expanded its Jatropha business internationally and explored other plant species as potential feedstock candidates for biofuel production.  Over the next eighteen years, Global Clean came to develop and own the world's largest portfolio of proprietary varieties of Camelina sativa ("Camelina"), a versatile ultra-low carbon oilseed used as feedstock for the production of renewable diesel ("RD").  On December 29, 2020, Debtor GCEH's common stock began trading on the OTCQB marketplace under the ticker symbol "GCEH".  As of the close of business on April 11,2025, GCEH's common stock was trading at $0.37.

Today, Global Clean is a vertically integrated renewable energy company that aims to provide sustainable, environmentally friendly renewable fuel that can be used as a 100% replacement for conventional petroleum-based fuels and reduce global greenhouse gas emissions by up to 85%.  The Company has established operations across the globe to plant, process, transport, and refine Camelina and other biofuel feedstock into renewable fuel.  This unique "farm-to-fuel" business model allows Global Clean to streamline operations, lower carbon emissions, and provide a solution to the "food versus fuel" dilemma (which occurs when the production of biofuel diverts land and resources from the production of food crops) by focusing on feedstock that does not compete with sustenance crops.

To support its worldwide operations, Global Clean directly employs over 150 people, and manages contracts with hundreds of growers around the world who plant more than 124,000 acres of Camelina.  Global Clean's vertically integrated business model is comprised of three principal business segments:

1.  **Upstream Business.**  Debtor Sustainable Oils, Inc. ("SusOils"), a direct subsidiary of Debtor Global Clean Energy Holdings, Inc. ("GCEH"), pioneers the Company's Camelina breeding and cultivation efforts in North America, while Camelina Company España S.L.U. ("CCE") and Global Clean Renewable (Argentina) S.R.L., each a non-Debtor, lead these efforts in Europe and South America, respectively.   The upstream business revolves around the cultivation of feedstock through the

---

[3]   Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the *Declaration of Noah Verleun, Chief Executive Officer of Global Clean Energy Holdings, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. [●]] (the "Verleun Declaration") or the Plan, as applicable.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

development of Camelina varieties and partnerships with farmers across the globe who grow the Camelina crops (the "Upstream Business").

2. **Midstream Business.** The Upstream Business's global cultivation efforts are complemented by strategic partnerships with blue-chip logistics and transportation providers, like Louis Dreyfus Company ("LDC"), who assist in the transportation, storage, and pre-refinement processing of post-extraction feedstock (the "Midstream Business"). The Midstream Business thereby acts as the link between the Upstream Business and Downstream Business (as defined below).

3. **Downstream Business.** The centerpiece of the Company's biofuel production initiatives is its state-of-the-art renewable fuels facility located in Bakersfield, California (the "Bakersfield Facility" or "Facility"). Through its Debtor subsidiary Bakersfield Renewable Fuels, LLC ("BKRF"), Global Clean owns and operates the Bakersfield Facility, which utilizes feedstock, such as Camelina, to produce RD and various other renewable fuel co products (the "Downstream Business"). The Downstream Business critically depends on its "supply and offtake" partnership with Vitol Americas Corp. ("Vitol"), a global trading firm that supplies the Company with feedstock (including soybean oil and canola oil) and purchases all RD volumes to sell to the end market.

While the Company will benefit greatly from a business model that maintains control over every point of the value chain, it took years of growth and expansion to evolve the Company's strategic positioning into what it is today.

Throughout the last decade, the Company's ability to anticipate and evaluate industry trends was a large contributor to this growth. Several years ago, a new industry trend began to emerge—the acute rise in demand for biofuel, which was primarily driven by the evolving regulatory landscape. Various state and national policies aimed at reducing the use of fossil fuels and improving air quality, such as the federal Renewable Fuel Standard program (the "RFS Program") and California's low-carbon fuel standard ("LCFS") program,[4] grew in prominence and increased demand for renewable energy products. Notably, statewide programs like California's LCFS program offer incentives to customers who purchase RD and require conventional fuels to be blended with biofuels that dilute their conventional carbon components. This combination of regulatory mandates and financial incentives translated to a significant increase in consumer demand for biofuel,[5] and the price for RD soared. In light of this trend, Global Clean observed that refining companies with RD capabilities had a considerable—and lucrative—advantage.

To capitalize on the continued rise in demand for "greener" fuels and incentive based regulation, the Company completed a series of strategic acquisitions. In 2013, the Company acquired Sustainable Oils LLC (a predecessor to SusOils), a global leader in Camelina genetics and production. At the same time, Camelina was approved by the U.S. Environmental Protection Agency (the "EPA") under the RFS Program to produce both biomass-based diesel and advanced biofuel. The EPA's evaluation confirmed Camelina and its co-products met the emissions reduction thresholds prescribed in the RFS Program, offering Camelina a competitive advantage over other oilseed crops with an RFS Program pathway. The Company further supplemented its Camelina cultivation efforts through the purchases of: (a) Debtor Agribody Technologies, Inc. ("ATI") in 2021 (a then-emerging agricultural biotechnology company focused on genomic engineering); (b) Entira, Inc. in November 2021 (an agriculture business and marketing consulting firm); and (c) CCE in December 2021 (Europe's largest Camelina crop innovator and seed producer).

To achieve vertical integration, in May 2020, the Company raised senior secured term loans from a group of lenders (the "Term Loan Lenders") led by Orion Infrastructure Capital ("OIC") in an initial amount of $300 million

---

[4]   While the RFS Program mandates that a minimum volume of renewable fuels be blended into transportation fuels, the LCFS sets an annually increasing targeted reduction in transportation-related carbon emissions.

[5]   California's RD consumption grew substantially after its LCFS went into effect in 2011. Between 2011 and 2021, consumption grew from 1 million barrels to 28 million barrels per year, over 18 times its original volume. While almost all U.S. RD is consumed in California, most is not produced there. U.S. Energy Information Administration (July 20, 2023), https://www.eia.gov/todayinenergy/detail.php?id=57180#.

to finance the acquisition and related construction of the Bakersfield Facility.  The Bakersfield Facility's strategic location allows the Company to readily avail itself of LCFS credits, a competitive advantage over other companies who faced significant logistical challenges and costs transporting finished products to California.

Immediately following the purchase, the Company focused on retooling and converting the existing crude oil refinery into a state-of-the-art renewable fuels refinery.  To that end, on April 30, 2020, the Company entered into an agreement with Arb, Inc. (the "Initial Contractor") for the engineering, procurement, construction, pre-commissioning, commissioning, start-up, and testing of the Bakersfield Facility (the "Initial EPC Contract").  Due to various external factors, the Initial EPC Agreement was terminated after an approximately six month period of the Initial Contractor being on site.  In May 2021, BKRF replaced the Initial Contractor by entering into a Turnkey Agreement for the engineering, procurement and construction ("EPC") of the Bakersfield Facility (the "EPC Agreement") with CTCI Americas, Inc. ("CTCI"), an engineering services company whose publicly traded parent is based in Taiwan.  Pursuant to the EPC Agreement, CTCI agreed to complete the engineering, procurement, construction, pre-commissioning, commissioning, start-up, and testing of the Bakersfield Facility by January 2022 (the "Project").  Under the assumption that it would soon begin to produce millions of gallons of renewable fuels, the Company entered into a product offtake agreement with ExxonMobil Oil Corporation ("EMOC"), pursuant to which EMOC agreed to purchase a committed volume of RD produced by the Company.

By all measures, construction of the Bakersfield Facility was intended to facilitate the next chapter of the Debtors' businesses.  The Project, however, began to experience problems early on.  Significant delays and cost overruns plagued the Project for years.  A series of disputes and litigation with CTCI relating to the Project ensued.  Nearly two years after the Project was expected to be completed, the Company and CTCI negotiated an interim settlement agreement, but various disputes between the parties persisted.  As a result, on October 21, 2024, the Company notified CTCI that an incurable default continued under the EPC Agreement, that it was terminating the EPC Agreement for cause, and that it was exercising its right to complete all remaining work on the Bakersfield Facility.

The setbacks, actual litigation, and threatened litigation related to the construction of the Bakersfield Facility hindered the Company's ability to realize the full potential of its vertically integrated business model in a timely manner and, eventually, posed an existential risk to the Company.  The failure to operationalize the Bakersfield Facility on the originally anticipated timeline led EMOC to purportedly terminate the product offtake agreement with the Company in early 2023.  Even though the Company disputed the validity of the alleged termination, the event forced the Company to find an alternative offtake partner; jeopardized the Company's relationship with, and the confidence of, its vendors and partners; and engendered default and related remedy risk with its senior secured lenders.[6]  Additionally, the Company's operating budgets, including its scheduled financial commitments, had been based on the assumptions that the Bakersfield Facility would generate significant revenues following substantial completion in January 2022, a time when prices for RD saw marked increases.  Without those assumptions materializing, the Company's liquidity suffered, and it was forced to incur substantial sums of additional debt from its existing lenders to fund costs and delays associated with the Project, including monthly operating costs of the Company.  From August 2022 through June 2024, the Company's Term Loan Lenders agreed to eight successive amendments to their credit agreement to provide the Company with over $382.4 million of incremental term loans to support the Project and the business, albeit with significant concessions made by the Company in favor of the Term Loan Lenders.  This is in addition to the most recent rounds of financing described herein.  All told, the Term Loan Lenders have funded a total of $818.5 million into the Company, which amounts have been used to fund critical aspects of the business, including the Company's Upstream Business operations.

On top of the operational challenges, the Company simultaneously confronted an oversaturated market for low emission biofuels and a changing regulatory environment.  The surplus of biofuels has been destructive to producers' profit margins, threatening to destabilize the RD sector.  To make matters worse, the renewable energy

---

[6]   It was not until June 2024 that the dispute with EMOC was settled.  As a result of that settlement, the Company began its critical relationship with Vitol—entering into a $75 million Revolving Credit Facility, the existing supply and offtake agreement, and a storage services agreement.  Through these agreements, which I detail further herein, Vitol supplies feedstock to the Bakersfield Facility and finances part of the Company's working capital.

industry had started to face, and continues to face, rising costs and uncertainty around environmental credits. In particular, there has been a recent shift in the regulatory landscape due to the expiration of the Biodiesel Blenders' Tax Credit ("BTC") on December 31, 2024. Although the BTC was replaced with the Section 45Z Clean Fuel Production Tax Credit ("45Z"), structural differences between the programs, such as the change from a volume-based incentive under the BTC to an emissions-based incentive under the 45Z, and the lack of guidance on implementation of the 45Z credits, has caused significant trepidation and massive disruption in the industry. As a result, certain market participants have exited projects entirely.[7]

Given the considerable strain that these operational and industry challenges placed on Global Clean's business, the Company, at the direction of its board of directors (the "Board"), began to explore strategic and capital structure alternatives in late 2023. In January 2024, the Company engaged Lazard Frères & Co. LLC ("Lazard") as its investment banker. Soon thereafter, the Company, with Lazard's assistance, commenced a strategic financing process to raise capital for—and gauge market interest in—the Upstream Business (the "Upstream Capital Process"). Lazard contacted more than 100 parties, and over 20 parties executed non-disclosure agreements with the Company, receiving access to confidential information detailing the Upstream Business. The process initially produced two non-binding indications of interest ("IOIs") from strategic players in the industry.

While the Company continued to explore the Upstream Capital Process, the only reliable path to address the Company's liquidity struggles was the continued support from at least its Term Loan Lenders. In the fall of 2024, the Company retained Kirkland & Ellis, LLP ("K&E"), as legal counsel, and Alvarez & Marsal ("A&M"), as financial advisor, to assist the Company in managing liquidity, engaging with the Term Loan Lenders, and developing a more comprehensive review of all available alternatives. In parallel, the Board proactively addressed its corporate governance structure, appointing Mr. Todd Arden to serve as an independent and disinterested director. Mr. Arden, a seasoned director with substantial restructuring experience, comprised a special committee of the Board (the "Special Committee") along with an existing independent director (Ms. Susan Anhalt) to evaluate restructuring alternatives and address any conflict matters associated with a potential transaction.

Shortly after their engagement, the Company came to the view that the value-maximizing path forward for the Company likely involved a global resolution with CTCI coupled with continued support from the Term Loan Lenders, or, if resolution could not be achieved, a solution underwritten by the Term Loan Lenders in a contested in-court process. In the fall of 2024, the Company's advisor team began to engage in earnest with an ad hoc group of the Term Loan Lenders (collectively holding approximately 96% of the Term Loans, the "Ad Hoc Term Lender Group") and their advisors—Latham & Watkins LLP, as legal counsel, and Perella Weinberg Partners, as financial advisor. These discussions centered around how to address the litigation matters with CTCI and additional funding while the Company developed a framework for either a consensual or non-consensual path forward.

Shortly thereafter, the Company and its advisors commenced discussions with CTCI on a potential global settlement related to the various disputes between the parties. In addition to disagreements concerning the amount of CTCI's claims, there also emerged a dispute among the Term Loan Lenders and CTCI as to the relative priority of their claims. The Term Loan Lenders and the Company, on the one hand, believed that CTCI's claims are contractually subordinated to the secured claims of the Term Loan Lenders. The Term Loan Lenders also believed that CTCI's claims are invalid and unenforceable. CTCI disputed these contentions. There is no doubt that this priority dispute, if not resolved, could have resulted in all-out, value-destructive war between the Term Loan Lenders and CTCI, which would have cast a dark shadow of uncertainty over these chapter 11 cases and the Company's future. Instead, in an effort to seek consensus across its capital structure, the Company facilitated discussions between CTCI, including through its advisors—Davis Wright Tremaine LLP and Haynes and Boone, LLP, as legal counsel, and BDO Capital Advisors, LLC, as financial advisor—and the Ad Hoc Term Lender Group and their advisors. Those discussions resulted in several months of hard-fought, good faith negotiations between the parties and the Company on the terms of a global settlement and a value-maximizing restructuring transaction for the Company. Those

---

[7]   For example, Air Products (NYSE: APD) recently terminated an agreement related to a sustainable aviation fuel expansion project, cancelled plans to construct a 35 metric ton per day facility to produce green liquidity hydrogen in New York, and terminated a project in Texas for the production of carbon monoxide due to unfavorable project economics.   https://www.airproducts.com/company/news-center/2025/02/0224-air-products-to-exit-three-us-based-projects.

negotiations included several in-person meetings, including in New York between advisors in December 2024 and in Tokyo, Japan between principals and advisors in January 2025, and countless more meetings, conferences, and discussions among the parties and their respective advisors in the intervening months. The Company also engaged with Vitol, the lender under the Company's revolving credit facility and a key contract counterparty, to negotiate the terms of complementary restructuring transactions.

During the heat of these restructuring negotiations (December 2024 to April 2025), and despite the overhang risk related to relative lien and claim priority, the Term Loan Lenders agreed to six additional amendments to the credit agreement to provide the Company with over $75 million of additional loans, approximately half of which was advanced in just the two months prior to the Petition Date. It is indisputable that without the continued support from the Term Loan Lenders, the Company likely would not have been able to achieve consensus on a global settlement, to operationalize the Bakersfield Facility, and to continue the Company as a going-concern. At the same time, even with the various disputes between the Company and CTCI, CTCI has played a key role in helping to get the Bakersfield Facility to where it is today.

In parallel with these restructuring negotiations, the Company, with assistance from Lazard, expanded its marketing process for the Upstream Business in December 2024 to include a comprehensive marketing process for all, substantially all, or any portion of the enterprise. However, the Company did not receive any actionable proposals to date.

As the Lazard process and stakeholder negotiations played out in real time, it became clear that the best way to address the Company's balance sheet and its material liabilities was through an in-court restructuring process. Further, it became clear that all potential financing parties, including the Ad Hoc Term Lender Group, Vitol, and CTCI, would require the protections afforded to debtor-in-possession ("DIP") financing before providing any incremental liquidity.[8] Even with such potential protections, interest from potential third-party DIP financing sources was almost nonexistent, reflecting the extremely acute and fragile nature of the Company's financial situation and the uncertain regulatory landscape.

Fortunately, as discussed below, the time amongst the Debtors' stakeholders and their advisors was well spent, as the Company was able to reach agreement with, and support from, Vitol, the Ad Hoc Term Lender Group, and CTCI (collectively, the "Consenting Stakeholders"). As soon as significant stakeholders identified a potential path forward at the end of March 2025, the Debtors engaged in round-the-clock negotiations aimed at finalizing, within their narrow liquidity runway, the broadest possible support from its stakeholders for an in-court restructuring,



---

[8]   A detailed description of Lazard's prepetition marketing efforts is set forth in the *Declaration of Christian Tempke in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Tempke in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Tempke Declaration"), filed contemporaneously herewith.

ultimately obtaining the support of the Consenting Stakeholders for a comprehensive restructuring plan on the timeline set forth below.

In the days and weeks leading up to the Petition Date, the Debtors and the Consenting Stakeholders continued to negotiate and finalize, among other things, (a) DIP financing to fund the Company's operations during these chapter 11 cases, being provided by the Consenting Stakeholders, (b) a restructuring support agreement (the "Restructuring Support Agreement" or "RSA"), which is attached hereto as **Exhibit B**, and (c) a related chapter 11 plan (the "Plan"), which is attached hereto as **Exhibit A**.  As described in various motions filed on the Petition Date along with the Debtors' chapter 11 petitions (the "First Day Motions"), these commitments will allow the Debtors to access the incremental liquidity needed to finance the restructuring transactions contemplated in the Plan, operate in the ordinary course of business during these chapter 11 cases, and proceed efficiently through the restructuring process.

The Restructuring Support Agreement and the Plan reflect months of difficult discussions that have not only kept the Company operational, but have been carefully structured to avoid a prolonged in-court process enabling the restructured Company to emerge as a viable going concern.  This is especially meaningful now, as the Bakersfield Facility has recently become operational and is beginning to fulfill its long-standing goal of producing renewable diesel at scale from vegetable oils, including Camelina oil.  The restructuring transactions embodied in the Restructuring Support Agreement and the Plan represent the Debtors' only currently viable going concern alternative and a value maximizing path forward.  The Debtors aim to expeditiously implement such transactions for the benefit of its stakeholders and as required by the Restructuring Support Agreement, which contains milestones contemplating emergence in four months.  The Debtors believe that goal and timeline is achievable considering the significant consensus and support obtained in advance of these chapter 11 cases.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.   What Is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.   Why Are the Debtors Sending Me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to (a) prepare a disclosure statement containing adequate information sufficient to enable a hypothetical reasonable investor to make an informed decision regarding acceptance of the Plan and (b) share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

C.        **What Are the Restructuring Transactions Under the Plan?**

The Restructuring Support Agreement and the Plan contemplate a recapitalization of the Debtors, through which the Debtors will exchange issue the New Common Equity, the New Preferred Equity, and the Takeback Debt and enter into the Exit Facilities.

D.        **What Are the Effects of the Plan and the Restructuring Transactions on the Debtors' Ongoing Business?**

The Restructuring Transactions will be effectuated through a reorganization under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will continue to operate their business as a going concern.  Following Confirmation, the Plan will be consummated on the Effective Date, which is the date that is the first Business Day after Confirmation on which (a) the Confirmation Order is in effect and not subject to stay; (b) all conditions precedent to the occurrence of the Effective Date set forth in Article XIII.A herein have been satisfied or waived in accordance with Article XIII.B herein; and (c) the Debtors declare the Plan effective.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

E.        **Will Any Party Have Significant Influence over the Corporate Governance and Operations of the Reorganized Debtors?**

As of the Effective Date, the term of the current members of the board of directors of GCEH shall expire, and the members of the New Board shall be appointed for the initial term.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

F.        **Am I Entitled to Vote on the Plan?**

Your eligibility to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of [May 16], 2025). Except for Administrative Claims, DIP Claims, Professional Fee Claims, or Priority Tax Claims, as described in subsection I below, each category of Holders of Claims or Interests, pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows, including each Class's respective voting status:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Prepetition RCF Claims | Impaired | Entitled to Vote |
| Class 4 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 5 | Prepetition EPC Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| Class 10 | GCEH Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Subsidiary Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

1.      **Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

2.      **Voting Classes, Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

3.      **Controversy Concerning Impairment.**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interest, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

4.      **Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

5.      **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.E of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.      **How Do I Vote For or Against the Plan?**

Detailed instructions regarding how eligible Holders of Claims or Interest can vote on the Plan will be included in the Debtors' *Solicitation and Voting Procedures*, to be filed at a later date. *See* Article IV of this Disclosure Statement, entitled "Solicitation and Voting Procedures," for more information.

H.      **What is the Deadline to Vote on the Plan?**

The Voting Deadline is [June 25], 2025, at 4:00 p.m., prevailing Central Time.

I.      **What Will I Receive from the Debtors if the Plan Is Consummated?**

The following chart summarizes the anticipated recovery to Holders of Claims or Interests under the Plan, which estimates may vary from the final amounts Allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

The projected recoveries set forth in the table below are estimates only and therefore are subject to change. For a complete description of the Debtors' classification and treatment of claims and interests, reference should be made to the entire Plan.[9]

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, compromise, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

| SUMMARY OF EXPECTED RECOVERIES[10] | | | | |
|---|---|---|---|---|
| **Class** | **Claim/ Interest** | **Treatment of Claim/Interest** | **Projected Amount of Claims ($MM)** | **Projected Recovery** |
| 1. | Other Secured Claims | On the Plan Effective Date, each Holder of an Allowed Other Secured Claim shall receive, unless otherwise agreed to by such Holder:<br><br>(a) in full and final satisfaction of such Allowed Other Secured Claim, (i) payment in full in Cash | $[●] | 100% |

---

[9]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

[10]    The Debtors expect to file the exhibits to this Disclosure Statement, including the Financial Projections, Valuation Analysis, and Liquidation Analysis, shortly following the Petition Date, and in any event prior to the hearing on the adequacy of the Disclosure Statement, which will further inform the summary of expected recoveries for each Class of Claims and Interests, among other things.

| | | SUMMARY OF EXPECTED RECOVERIES[10] | | |
|---|---|---|---|---|
| Class | Claim/ Interest | Treatment of Claim/Interest | Projected Amount of Claims ($MM) | Projected Recovery |
| | | in an amount equal to its Allowed Other Secured Claim or (ii) delivery of the collateral securing its Allowed Other Secured Claim;<br><br>(b) Reinstatement of its Allowed Other Secured Claim; or<br><br>(c) such other treatment rendering its Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| 2. | Other Priority Claims | On the Plan Effective Date, each Holder of an Allowed Other Priority Claim, in full and final satisfaction of such Allowed Other Priority Claim, unless otherwise agreed to by such Holder, shall be paid in full in Cash on the Plan Effective Date or in the ordinary course of business as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code. | $[●] | 100% |
| 3. | Prepetition RCF Claims | On the Plan Effective Date, each Holder of an Allowed Prepetition RCF Claim shall receive, in full and final satisfaction of such Allowed Prepetition RCF Claim, unless otherwise agreed to by such Holder (subject to the parties' consent rights set forth in Section 3.02 of the RSA), and solely to the extent such Allowed Prepetition RCF Claim is not converted into a DIP Claim, conversion of such Allowed Prepetition RCF Claim into the Exit RCF Facility. | $[●] | [●]% |

| SUMMARY OF EXPECTED RECOVERIES[10] | | | | |
|---|---|---|---|---|
| Class | Claim/ Interest | Treatment of Claim/Interest | Projected Amount of Claims ($MM) | Projected Recovery |
| 4. | Prepetition Term Loan Claims | On the Effective Date, each Holder of an Allowed Prepetition Term Loan Claim shall receive, in full and final satisfaction of such Allowed Prepetition Term Loan Claim, unless otherwise agreed to by such Holder (subject to the parties' consent rights set forth in Section 3.02 of the RSA), and solely to the extent such Allowed Prepetition Term Loan Claim is not converted into a DIP Claim, its *Pro Rata* share of:<br><br>(a) the Takeback Debt apportioned to Holders of Allowed Prepetition Term Loan Claims on the terms and conditions set forth in the Exit Facilities Term Sheet;<br><br>(b) 4/9ths (44.4%) of the New Preferred Equity, in accordance with the terms and conditions of the Governance Term Sheet; and<br><br>(c) 100% of the New Common Equity. | $[●] | [●]% |
| 5. | Prepetition EPC Claims | On the Plan Effective Date, each Holder of an Allowed Prepetition EPC Claim shall receive, in full and final satisfaction of such Allowed Prepetition EPC Claim, unless otherwise agreed to by such Holder (subject to the parties' consent rights set forth in Section 3.02 of the RSA), its *Pro Rata* share of:<br><br>(a) the Takeback Debt apportioned to Holders of Allowed Prepetition EPC Claims, on the terms and conditions set forth in the Exit Facilities Term Sheet; and<br><br>(b) 5/9ths (55.6%) of the New Preferred Equity, in accordance with the terms and conditions of the Governance Term Sheet. | $[●] | [●]% |
| 6. | General Unsecured Claims | On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim, its *Pro Rata* share of the GUC Cash Pool; *provided* that the GUC Cash Pool shall be reduced dollar-for-dollar for the Allowed professional fees and expenses incurred by any official committee of unsecured creditors appointed in the Chapter 11 Cases; *provided*, *further*, that if the Class of General Unsecured Claims votes to accept the Plan, the Holders of Allowed Prepetition Term Loan Claims and the Holders of Allowed Prepetition EPC Claims have agreed to waive, solely for purposes of distributions from the GUC Cash Pool, entitlement to any deficiency claim with respect to any portion of their Claims that is deemed unsecured | $[●] | [●]% |

| | | SUMMARY OF EXPECTED RECOVERIES[10] | | |
|---|---|---|---|---|
| Class | Claim/ Interest | Treatment of Claim/Interest | Projected Amount of Claims ($MM) | Projected Recovery |
| | | (*provided* that any such unsecured portion is not the result of a challenge by any party of any Liens or security interests asserted by the Holders of Prepetition Term Loan Claims or the Holders of Prepetition EPC Claims, as applicable). | | |
| 7. | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims (if any) shall be cancelled, released, discharged, and extinguished and will be of no further force or effect, and the Holders of such Claims will not receive any distribution on account of such Claims. | $[●] | [●]% |
| 8. | Intercompany Claims | On the Plan Effective Date, Intercompany Claims shall be (i) Reinstated or (ii) set off, settled, discharged, contributed, cancelled, converted to equity, and released without any distribution on account of such Intercompany Claims, or otherwise addressed at the option of the Reorganized Debtors. | $[●] | [●]% or [●]% |
| 9. | Intercompany Interests | On the Effective Date, Intercompany Interests shall be (i) Reinstated or (ii) set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Allowed Intercompany Interest, or otherwise addressed at the option of the Reorganized Debtors. [11] | N/A | [●]% or [●]% |
| 10. | GCEH Existing Interests | On the Effective Date, each Holder of an Allowed GCEH Existing Interest shall, in full and final satisfaction, settlement, release, and discharge of such Allowed GCEH Existing Interest, have its Allowed GCEH Existing Interest be cancelled, released, extinguished, and of no further force or effect, and such Holder shall not receive any distribution, property, or other value on account of such Allowed GCEH Existing Interest. | N/A | [0]% |
| 11. | Subsidiary Existing Interests | On the Plan Effective Date, each Allowed Subsidiary Existing Interest shall, in full and final satisfaction, release, and discharge of such Allowed Subsidiary Existing Interest, be cancelled, released, discharged, and extinguished and will be of no further force or effect, and the Holders of such Allowed Subsidiary Existing Interests shall not receive any distribution, property, or other value under the Plan on account of such Allowed Subsidiary Existing Interests. | N/A | [0]% |

---

[11]   To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Common Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

**J.      What Will I Receive from the Debtors if I Hold an Allowed Administrative Claim, DIP Claim, Professional Fee Claim, or Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> of the Plan.

1.      **Administrative Claims.**

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of such Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim (including claims of the type described in section 503(b)(9) of the Bankruptcy Code) shall be paid in full in Cash:  (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or Reorganized Debtors, as applicable; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

2.      **DIP Claims.**

On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed DIP Claim, each Holder of an Allowed DIP Claim (which shall include interest, fees, and all other amounts due and owing under the DIP Facilities and the New CTCI Documents) shall receive, on account of such Allowed DIP Claim:

a.      with respect to Allowed DIP Claims on account of the DIP RCF Facility, (i) conversion into the Exit RCF Facility or (ii) such other treatment agreed to by Holders of DIP RCF Claims (subject to the parties' consent rights set forth in Section 3.02 of the RSA);

b.      with respect to Allowed DIP Claims on account of the New CTCI Agreement, (i) conversion into the Post-Exit CTCI Senior DIP Payment Obligations or (ii) such other treatment as agreed by CTCI (subject to the parties' consent rights set forth in Section 3.02 of the RSA); and

c.      with respect to Allowed DIP Claims on account of the DIP Term Loan Facility, (i) conversion into the New Senior Secured Term Facility or (ii) such other treatment agreed by Holders of DIP Loan Claims (subject to the parties' consent rights set forth in Section 3.02 of the RSA).

Unless and until Allowed DIP Claims are satisfied in accordance with the terms of the Plan, then notwithstanding entry of the Confirmation Order and anything to the contrary in the Plan or the Confirmation Order, (i) none of the DIP Claims shall be discharged, satisfied or released, or otherwise affected in whole or in part, and each of the DIP Claims shall remain outstanding, (ii) none of the Liens securing the DIP Claims shall be deemed to have been waived, released, satisfied, or discharged, in whole or in part, and (iii) neither the DIP Credit Agreements, the New CTCI Agreement, nor any other agreement, instrument, or document executed at any time in connection therewith shall be deemed terminated, discharged, satisfied or released, or otherwise affected in whole or in part, and each such agreement, instrument and document shall remain in effect.

Upon the satisfaction of Allowed DIP Claims in accordance with the terms of the Plan, all Liens and security interests securing the DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Person or Entity.

3.      **Professional Fee Claims.**

a.      **Final Fee Applications and Payment of Professional Fee Claims**

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

b.      **Professional Fee Escrow Account.**

No later than the Effective Date, the Debtors or the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until such time as all Professional Fee Claims have been paid. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

c.      **Professional Fee Amount.**

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

d.      **Post-Confirmation Fees and Expenses.**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

4.      **Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim,

14

on the Effective Date, each Holder of such Allowed Priority Tax Claim shall be treated in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

5.      **Payment of Restructuring Expenses.**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth in the Plan, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors, as applicable, shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

**K.      If the Plan Provides that I Get a Distribution, Do I Get it upon Confirmation or When the Plan Goes Effective?  What Is Meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can become effective. Initial distributions to Holders of Allowed Claims or Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date. *See* Article XVI of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to Consummation of the Plan.

**L.      Is There Potential Litigation Related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and Confirmation of the Plan, which objections potentially could give rise to litigation. *See* Article XV.C.7 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases" and Article XVI.E. of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent (whether deemed or otherwise) of rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" or "cramup" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article XV.A.7 of this Disclosure Statement, entitled "Nonconsensual Confirmation."

**M.      Does the Plan Preserve Causes of Action?  How Will the Preservation of Causes of Action Affect My Recovery Under the Plan?**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII thereof. The Reorganized Debtors' rights to

15

commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Person or Entity may rely on the absence of a specific reference in the RSA, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including <u>Article VIII</u> of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### N. Will There Be Releases, Injunction, and Exculpation Granted to Parties in Interest as Part of the Plan?

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties, and includes injunction provisions, as set forth in <u>Article VIII</u> thereof. The Debtors believe that the Restructuring Transactions contemplated in the Plan are the only paths available to the Company to avoid a liquidation via chapter 7 of the Bankruptcy Code. As such, the Debtors' releases, and third-party releases included in the Plan appropriately offer certain protections to, among others, parties who constructively participated in the Debtors' restructuring process by supporting the Plan. For example, the Consenting Stakeholders, who are "Released Parties" under the Plan, play an integral role in the Restructuring Transactions under the Plan pursuant to their obligations under the RSA.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve value of the Debtors' Estates for the benefit of all parties in interest.

**<u>IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT VALIDLY OPT OUT OF THE RELEASES WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.</u>**

The Debtors believe that the Debtor Releases, Third-Party Releases, and exculpation and injunction provisions included in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part herein.

The release provisions contained in the Plan remain subject to the investigation by the Special Committee of the board of directors of GCEH. The Debtors, acting at the direction of the Special Committee, reserve the right to revoke, withdraw, or modify the Plan in advance of the Confirmation Date.

Key provisions of the Plan defining the Debtor Releases, Third-Party Releases, exculpation, and injunction are below.

"*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the independent directors or managers of any Debtor, for conduct within the scope of their duties; and (c) any statutory committees appointed in the Chapter 11 Cases and each of their respective members, solely in their respective capacities as such.

"*Related Party*" means, collectively, with respect to any Entity, each of, and in each case in its capacity as such, such Entity's current and former directors, managers, officers, committee members, members of any governing body, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Entity's respective heirs, executors, estates, and nominees.

"*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders; (d) the Agents; (e) the Consenting Stakeholders; (f) all Holders of Claims; (g) all Holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through this clause (i); provided, however, that, in each case, an Entity shall not be a Released Party if it:  (i) elects to opt out of the Third Party Release; or (ii) timely objects to the Third Party Release, and such objection is not resolved before Confirmation.

"*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders; (d) the Agents; (e) the Consenting Stakeholders; (f) all Holders of Claims; (g) all Holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through this clause (i); provided, however, that, in each case, an Entity shall not be a Releasing Party if it:  (i) elects to opt out of the Third Party Release; or (ii) timely objects to the Third Party Release and such objection is not resolved before Confirmation.

1.      **Releases by the Debtors.**[12]

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against,**

---

[12]   For the avoidance of doubt, the releases by the Debtors set forth herein and in the Plan remain subject to the investigation by the Special Committee.

or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors and their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtors, or the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Prepetition RCF Facility, the Prepetition Term Loan Facility, the Terminated EPC Agreement, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, any adversary proceedings, the formulation, preparation, dissemination, negotiation, entry into, or filing of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the DIP Facilities, the New CTCI Agreement, the DIP Documents, the New Preferred Equity Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any other Definitive Document, or any Restructuring Transactions, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the DIP Documents, the New Preferred Equity Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or the Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any Causes of Action described, identified, or otherwise included in the Schedule of Retained Causes of Action, (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan, or (c) any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

2.        Releases by the Releasing Parties.

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors

under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties (other than the Debtors and the Reorganized Debtors), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, and their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Prepetition RCF Facility, the Prepetition Term Loan Facility, the Terminated EPC Agreement, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in  or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, any adversary proceedings, the formulation, preparation, dissemination, negotiation, entry into, or filing of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, any contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan, or (b) any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Release.

        3.      **Exculpation**.

Notwithstanding anything contained in the Plan to the contrary, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documents, or any Restructuring Transactions, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents, the Class B Purchase Agrement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

        4.      **Injunction**.

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors,  the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in

**connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Causes of Action or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors and any property dealt with by the Plan until the closing of these Chapter 11 Cases.**

**No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to <u>Article VIII.C</u>, <u>Article VIII.D</u>, and <u>Article VIII.E</u> of the Plan, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Reorganized Debtor, Exculpated Party, or Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.**

**O.      Do I Have to Grant the Releases Under the Plan?  Can I Opt Out of the Releases?**

If you vote to accept the Plan, you cannot opt out of the releases set forth in <u>Article VIII.D</u> of the Plan (the "<u>Third-Party Releases</u>").  By voting to accept the Plan, you are consenting to grant the Third-Party Releases.

You can opt out of providing the Third-Party Releases if (a) you are a Holder of Claims or Interests (i) that is deemed to accept the Plan, (ii) is eligible to vote on the Plan and abstains from voting on the Plan, (iii) votes to reject the Plan, or (iv) that is deemed to reject the Plan, and (b) you affirmatively opt out of the releases provided by the Plan by checking the applicable box on the Opt-Out Form indicating that they opt not to grant the releases provided in the Plan.

**P.      What Are the Consequences of Opting Out of the Releases Provided by the Plan?**

If a Holder of a Claim or Interest opts out of the Third-Party Releases, such Holder will not be a "Releasing Party" and will preserve any direct Causes of Action that it may have against the Released Parties.  Such Holder will also not be a "Released Party," and, the Reorganized Debtors and any third party that is a Releasing Party will preserve all Causes of Action against such Holder.

Upon the Effective Date, the Reorganized Debtors will be vested with authority to commence, litigate, and settle any and all retained Causes of Action.  By opting out of providing the Third-Party Releases under the Plan, a Holder also forgoes the opportunity to receive the Debtor Release under the Plan.  As a result, after the Effective Date, the Reorganized Debtors may pursue any Causes of Action held by the Debtors that are preserved under the Plan against a Holder that opts out of the Third-Party Releases.

**Q.      What Are the Sources of Cash and other Consideration Required to Fund the Plan?**

The Debtors shall fund or make distributions under the Plan, as applicable, and in each case consistent with the Restructuring Transactions Steps Memorandum with (i) the Exit RCF Facility, (ii) the Exit Term Loan Facilities, (iii) the Exit EPC Claims, (iv) the New Common Equity, (v) the New Preferred Equity, and (vi) the Debtors' Cash on hand.

Each distribution and issuance referred to in <u>Article VI</u> of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Equity and New Preferred Equity, will be exempt from Securities Act registration, as described more fully below.

**R.     Are There Risks to Owning the New Common Equity or New Preferred Equity upon the Debtors' Emergence from Chapter 11?**

Yes. *See* Article XV of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**S.     How Will Undeliverable Distributions and Unclaimed Property Be Treated Under The Plan?**

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable or otherwise cannot be delivered, no distribution to such Holder shall be made unless and until the Disbursing Agent, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months following such distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred. To the extent such unclaimed property or interests in property is comprised of New Common Equity or New Preferred Equity, such New Common Equity or New Preferred Equity shall be cancelled. The Disbursing Agent shall adjust the number of shares of New Common Equity and New Preferred Equity outstanding as of the date of such cancellation to ensure that the distributions of New Common Equity and New Preferred Equity contemplated under the Plan are given full force and effect.

**T.     Are any Regulatory Approvals Required to Consummate the Plan?**

To the extent that any regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained (or in certain cases substantially all such approvals have been obtained), and the Debtors are engaging as appropriate in order to procure such approvals, authorizations, consents, rulings, or documents (as applicable).

**U.     Why Is the Bankruptcy Court Holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**V.     What Is the Purpose of the Confirmation Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a chapter 11 plan, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

**W.      When Is the Confirmation Hearing Scheduled to Occur?  What Other Milestones Are Notable in These Chapter 11 Cases?  When Are Those Milestones Scheduled to Take Place?**

Under the RSA, the Debtors agreed to certain milestones to ensure an orderly and timely implementation of the Restructuring Transactions, and on the Petition Date, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Chapter 11 Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* (the "Disclosure Statement Motion"), proposing the below case timeline, subject to Bankruptcy Court approval and availability.  *See* Article IV of this Disclosure Statement, entitled "Solicitation and Voting Procedures," for more information.

Pursuant to the Disclosure Statement Motion, the Debtors have requested that the Confirmation Hearing before the Bankruptcy Court shall be on [●], 2025, at [●] [a.m. / p.m.], prevailing Central Time, in accordance with the notice of the Confirmation Hearing that will accompany the order approving the Disclosure Statement (the "Order").  The Confirmation Hearing may be adjourned from time to time without further notice.  The Debtors have requested that objections to Confirmation of the Plan must be Filed and served on the Debtors, and certain other parties, **by no later than [●], 2025, at 4:00 p.m., prevailing Central Time**.

| Event | Proposed Date and Time (if any) |
|---|---|
| Disclosure Statement Objection Deadline | May 16, 2025, at 4:00 p.m., prevailing Central Time |
| Voting Record Date | May 16, 2025 |
| Disclosure Statement Hearing Date | May 23, 2025, at [●] [a.m. / p.m.], prevailing Central Time, subject to the Bankruptcy Court's availability |
| Solicitation Deadline[13] | Three (3) business days following the entry of the order approving the Disclosure Statement (or as soon as reasonably practicable thereafter) |
| Publication Deadline | Five (5) business days following the entry of the order approving the Disclosure Statement (or as soon as reasonably practicable thereafter) |
| Plan Supplement Deadline | Seven (7) days prior to the Plan Objection Deadline (or as soon as reasonably practicable thereafter) |
| Voting Deadline | June 25, 2025, at 4:00 p.m., prevailing Central Time |
| Plan Objection Deadline | June 25, 2025, at 4:00 p.m., prevailing Central Time |
| Opt-Out Deadline | June 25, 2025, at 4:00 p.m., prevailing Central Time |
| Deadline to File Voting Report | Two (2) business days before the Confirmation Hearing Date |
| Confirmation Hearing Date | July 1, 2025, at [●] [a.m. / p.m.], prevailing Central Time, subject to the Bankruptcy Court's availability |

---

[13]   With respect to Holders of Claims that are entitled to vote to accept or reject the Plan and that file Proofs of Claim or, in the absence of filed Proofs of Claim, as to which the Debtors file relevant schedules after the Voting Record Date but before the Claims Bar Date, the Debtors and Claims and Noticing Agent will distribute Solicitation Packages as soon as reasonably practicable following receipt of such Proof of Claim or filing of such Schedules.

**X.     Whom Do I Contact if I Have Additional Questions with Respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims and Noticing Agent via one of the following methods:

By regular mail, hand delivery, or overnight mail at:

>Global Clean Energy Holdings, Inc. Claims Processing Center
>c/o Epiq Corporate Restructuring, LLC
>10300 SW Allen Blvd., Beaverton, OR 97005

By electronic mail at:

>GCEHoldings@epiqglobal.com

By telephone at:

>(888) 754-0507 (domestic, toll free) or
>+1 (971) 257-5614 (international)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the Claims and Noticing Agent at https://dm.epiq11.com/GCEHoldings (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy (for a fee).  PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

**Y.     Do the Debtors Recommend Voting in Favor of the Plan?**

Yes, the Debtors believe that the Plan provides for a larger distribution to all Holders of Claims or Interests than would otherwise result from any other available alternative.  The Debtors believe that the Restructuring Transactions set forth in the Plan, which recapitalize the Debtors' funded debt obligations, deleverage the Debtors' balance sheet, and project their emergence from chapter 11 shortly after the Plan is confirmed, are in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**Z.     Who Supports the Plan?**

The Plan is supported by the Debtors and the Consenting Stakeholders, who have agreed in principle regarding the terms of the RSA and the Restructuring Term Sheet and who collectively hold 100% of the Prepetition RCF Claims, 96% of the Prepetition Term Loan Claims, and 100% of the Prepetition EPC Claims.

**AA.    Can the Plan be Modified, Revoked, or Withdrawn?**

Yes.  Except as otherwise specifically provided in the Plan, and subject to the consent rights set forth in the RSA, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code.  In conjunction therewith, the Debtors may also determine, as appropriate, not to resolicit votes on such modified Plan, provided that any such modification (whether material or immaterial) is in accordance with the terms of the Plan and the RSA.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the

Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

### BB.   What Happens to My Recovery If the Plan Is Not Confirmed or Does Not Go Effective?

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code, and in the alternative, the Chapter 11 Cases may be dismissed.  Conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims or Interests in the Voting Classes.  *See, e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2). The conversion to chapter 7 would require entry of a new Claims Bar Date, which may increase the amount of Allowed Claims and Interests and thereby reduce Pro Rata recoveries.  *See* Fed. R. Bankr. P. 1019(2), 3002(c).  Either alternative would bring additional risks and uncertainties.

## IV.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot (the "Ballot") to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan.

### A.   Holders of Claims or Interests Entitled to Vote on the Plan.

The Debtors are soliciting votes to accept or reject the Plan from Holders of Claims or Interests in Classes 3, 4, 5, and 6 (each, a "Voting Class," and collectively, the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims or Interests in the Voting Class have the right to vote to accept or reject the Plan.  The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 7, 8, 9, 10, and 11.

### B.   Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than half of the number of total allowed claims that have voted and an affirmative vote of at least two-thirds of the dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.   Claims and Noticing Agent.

The Debtors have retained Epiq Corporate Restructuring, LLC (the "Claims and Noticing Agent") as, among other things, the Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

### D.   Solicitation Package.

The following materials constitute the solicitation package (collectively, the "Solicitation Package") distributed to Holders of Claims or Interests in the Voting Classes:

- the Disclosure Statement Order;

- the approved Disclosure Statement and the schedules attached thereto, including the Plan;

- the Solicitation and Voting Procedures;

- the appropriate Ballot, together with detailed voting instructions with respect thereto and a pre-addressed, postage prepaid return envelope;

- the Cover Letter;

- the Confirmation Hearing Notice; and

- such other materials as the Bankruptcy Court may direct.

**E.      Distribution of the Solicitation Package and Plan Supplement.**

The Debtors will cause the Claims and Noticing Agent to distribute the Solicitation Package to Holders of Claims or Interests in the Voting Classes by no later than [three (3)] business days after the entry of an order approving the Disclosure Statement (or as soon as reasonably practicable thereafter).

The Solicitation Package (except the Ballots) may also be obtained from the Claims and Noticing Agent by: (i) calling the Claims and Noticing Agent at (888) 754-0507 (domestic, toll free) or +1 (971) 257-5614 (international); (ii) emailing GCEHoldings@epiqglobal.com; and/or (iii) writing to the Claims and Noticing Agent at Global Clean Energy Holdings, Inc. Claims Processing Center, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://dm.epiq11.com/GCEHoldings, or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than [seven (7)] days prior to the Plan Objection Deadline.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims and Noticing Agent by:  (i) calling the Claims and Noticing Agent at the telephone numbers set forth above; (ii) visiting the Debtors' restructuring website, https://dm.epiq11.com/GCEHoldings; or (iii) writing to the Claims and Noticing Agent at Global Clean Energy Holdings, Inc. Claims Processing Center, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005.

**F.      Voting on the Plan.**

Detailed instructions regarding how eligible Holders of Claims or Interests can vote on the Plan will be contained in the *Solicitation and Voting Procedures* that will accompany the order.

**G.      Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in the Voting Classes pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article XV of this Disclosure Statement.

## V.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.     The Debtors' Corporate History and Business Operations.

#### 1.     The Company's History.

Global Clean has grown into a true "farm-to-fuel" business through strategic acquisitions and organic growth. Tracing its origins back to 1991 when it operated as a developmental-stage bio-pharmaceutical company, in 2007, Global Clean turned its focus to the production and sale of seed oils for producing biofuel.  During this period the Company obtained trade secrets, know-how, business plans, relationships, and other information critical to succeeding in the biofuel industry through the acquisition of Global Clean Energy Holdings, LLC, which specialized in cultivating seed oil for use in the production of biodiesel.

Armed with its newfound industry expertise, Global Clean expanded its business in Central America and forged partnerships with local companies and farmers in the region.  During its early years focusing on biofuel, Global Clean tested many plant species, eventually coming to focus on the development of Camelina.  Camelina proved to be an ideal fuel source due to its high oil content, short growing season, ability to thrive in marginal soils, and low carbon intensity.  Global Clean accelerated its Camelina operations by acquiring Debtor SusOils in March 2013, a plant science and crop production company focused on Camelina, along with certain assets, patents, intellectual property, and other rights related to the development of Camelina.

In 2013, Global Clean's Camelina was approved by the EPA as an advanced renewable fuel feedstock and granted a "pathway" for production under the RFS Program, which requires U.S. transportation fuel to contain a minimum volume of renewable fuel each year.[14]  In 2015, Global Clean was granted a first of its kind pathway for its Camelina by the California Air Resources Board under its LCFS initiative, allowing California fuel producers to create biodiesel or RD using the Debtors' proprietary feedstock.  To this day, Global Clean's Camelina varieties are the *only* Camelina feedstock that can be used to produce LCFS-compliant fuel.  Expanding upon these successes, Global Clean continued to bolster its Camelina operations by acquiring ATI, an emerging agricultural biotech company, and CCE, Europe's largest Camelina crop innovator and seed producer, in 2021.

Global Clean also expanded vertically by developing its in-house biofuel production capabilities to complement its seed production and cultivation capacity.  In 2020, Global Clean purchased all of the equity interests in BKRF (known then as Alon Bakersfield Properties, Inc.), which owned a crude oil refinery.  Over the next four years, Global Clean transformed this refinery into the Bakersfield Facility—the centerpiece of the RD operations.  In addition, Global Clean entered into strategic partnerships in North America, South America, and Europe, including with LDC, for transportation, logistics, and other services to connect its growing operations.  In the fall of 2024, the

---

[14]   A fuel pathway consists of three components: a biomass feedstock, a biofuel production process, and a fuel type. The fuel pathway is assigned to a renewable fuel category (known by its D code provided in Table 1 of 40 C.F.R. §80.1426 in the RFS Program regulations) which signifies which RIN (as discussed and defined below) the biofuel is eligible for to be in compliance with the RFS Program.

Company also expanded operations into Canada.[15]  As detailed below, the Company's strategic expansion has resulted in a vertically integrated supply chain that allows the Company to control every aspect of the biofuel production process from seed to farm and from farm to fuel.

2.  **The Company's Operations.**

Global Clean's vertically integrated operations consist of three primary business segments:  (a) the "Upstream Business," which develops the Debtors' propriety Camelina varieties and partners with farmers across the globe to grow the Debtors' crops; (b) the "Midstream Business," which coordinates with blue-chip logistics and transportation providers to transport, store, and process the Debtors' feedstock; and (c) the "Downstream Business," which utilizes Camelina and other biofuel feedstock to produce RD.  Each of these segments and their operations and outputs are detailed below:

a.  **Upstream Business – From Lab to Farm.**

The Company's Upstream Business exists at the intersection of science and sustainable agriculture.  The Company owns the world's largest portfolio of proprietary Camelina genetics, which includes a broad collection of Camelina genetic materials, numerous commercial varieties with intellectual property protection in the United States, European Union, and Argentina, and several patents in genomic engineering held by Debtor ATI.  The Company's Camelina varieties are bred to increase yield, quicken maturity, and increase tolerance to drought and pests.  Unlike traditional feedstocks such as corn and soybean, Camelina is a "low water use" crop that can be grown in the spring and the winter, on fallow and idle land, and in rotation with other crops like wheat.  Camelina does not compete with other crops for scarce water resources or create a "carbon penalty" from direct or indirect land use.  At the same time, Camelina's ultra-low carbon properties make it an ideal fuel source for achieving a "net zero" greenhouse gas footprint.

The Company operates multiple centers for breeding its proprietary Camelina varieties across North America, South America, and Europe.  The Company also operates a facility in Spain for the production of planting seeds in Europe and has contractual relationships for seed production in North America and South America.

To grow its Camelina varieties, the Company partners with growers around the world.  In 2024, the Company contracted with approximately 500 growers.  The Company's partnerships with local farmers have gained traction in recent years, nearly doubling from approximately 65,000 acres planted in 2023 to over 124,000 acres planted in 2024.  The Company's existing partnerships with established Camelina growers, and accompanying acreage, provide it a distinct first-mover advantage over competing Camelina developers and other feedstock producers.

As described below, the Company expects Camelina cultivation by the Upstream Business to increase in the years to come, eventually becoming the main feedstock for the Downstream Business, and the industry at large.

b.  **Midstream Business – From Farm to Refinery.**

The Company's data-driven Midstream Business provides critical grain handling and logistics services to transport Camelina feedstock from the farm to production facility, acting as the critical link between the Upstream Business and the Downstream Business.  The Midstream Business is supported by a worldwide network of logistics providers and grain elevator operators.  With over 15 years of experience in oil seed harvesting, extractions, and marketing, the Midstream Business helps to ensure the ultra-low carbon intensity of the Debtors' fuels, maximize efficiency, reduce costs, and optimize the Company's production process.

In North America, the Company's Midstream Business is enhanced by the strategic location of the Bakersfield Facility.  California is the leading consumer of RD in the United States, accounting for approximately 1.4 billion gallons of the approximately 1.7 billion gallons of RD that were consumed in 2022.  Notably, the

---

[15]  Global Clean's Canadian operations are conducted through a direct non-Debtor subsidiary of Debtor Global Clean Energy Texas, LLC, which is an entity incorporated under the laws Texas.

Bakersfield Facility is located on a main railroad and close to two major interstate highways that connect key markets in Northern and Southern California.  It is also linked to an existing pipeline network in the San Joaquin Valley, which is a large distillate demand center for trucking and agriculture.  As a result, the Company can easily ship Camelina in bulk from multiple growing regions across the United States to the Bakersfield Facility with minimal transportation and energy costs.

In addition to connecting the Upstream Business with the Downstream Business, the Midstream Business also sells protein rich camelina meal, a byproduct of the oil extraction process produced by the Downstream Business, to the animal feed industry.  The revenue generated from the sale of the meal helps subsidize the production of Camelina oil, generating cost savings.  In 2024, the Company generated $3.9 million in revenue from its sale of meal and other biomass, and expects this figure to increase as Camelina production continues to expand.

c.        **Downstream Business – From Refinery to Market.**

Finally, Global Clean engages in the production of renewable fuels through its Downstream Business.  The centerpiece of these efforts is the Bakersfield Facility.

The Company has converted the Bakersfield Facility into a state-of-the-art renewable fuel facility.  Despite delays and cost overruns, the Bakersfield Facility became commercially operational in December 2024.  RD currently accounts for approximately 90% of the production at the Bakersfield Facility, with the balance being other RD co-products, such as renewable propane, renewable naphtha, and renewable butane.  As the Upstream Business works to expand Camelina production, the Company has secured the necessary feedstock to supply the Downstream Business from Vitol through entry into the Prepetition SOA.  This ensures that the Bakersfield Facility will continue to operate and produce renewable fuel products without disruption.

Because RD is chemically identical to conventional diesel and fully compatible with modern infrastructure, it can be used as a 100% replacement for conventional diesel.  Compared to traditional fossil fuel, RD contains fewer contaminants, allowing it to burn cleaner and reduce emissions by up to 85%.  RD also has several advantages as compared to other biofuels.  Unlike traditional biodiesel, RD does not need to be blended for use in modern engines and does not experience cold weather performance, water absorption, or microbial growth issues.  Further, the Company's Camelina-based RD can be produced with an ultra low carbon intensity—far lower than that for RD produced from soy or canola.

Additionally, regulatory programs promote the use of renewable fuels for transportation.  In particular, the RFS Program incentivizes the production and use of renewable fuels through renewable volume obligation mandates.  Renewable transportation fuels are tracked through 38-character renewable identification numbers ("RINs"), which are physically "attached" to the fuel until it is either blended with non-renewable transportation fuel (e.g., ethanol blending with gasoline) or used in its unblended form to displace a conventional transportation fuel (e.g., RD).  Obligated parties demonstrate compliance with the RFS Program by retiring the RINs into a system controlled by the EPA after they have blended the renewable fuels through their own activities or those of other market participants.  Refiners that cannot blend enough renewable fuel to separate sufficient RINs to meet their RFS Program obligations can buy separated RINs on an unregulated secondary market.  Through the production of RD at the Bakersfield Facility, Global Clean generates RINs that can be sold to conventional refiners who must purchase them to comply with their federal regulatory requirements.

Since selling its first gallons of RD in December 2024, the Bakersfield Facility has produced approximately 450,000 barrels of RD and other co-products.  Pursuant to the Prepetition SOA, Vitol purchases all of the RD produced at the Bakersfield Facility, and may purchase other similar renewable finished product output from the Bakersfield Facility.  Other RD co-products are sold to Vitol, which purchases renewable naphtha, and various other buyers, such as Midstream Energy Partners, which purchases renewable butane and renewable propane.  As a result, the Bakersfield Facility generated approximately $26 million in revenue in 2024 and expects to generate $560 million in revenue in 2025.

Although the Bakersfield Facility currently focuses on the production of RD, it has the potential for future expansion and/or addition of sustainable aviation fuel ("SAF") production capabilities.  Corporate decarbonization commitments coupled with certain government mandates and legislation have provided economic incentives and

increased demand for SAF, creating a potentially lucrative market opportunity on top of the successes for which Global Clean is poised in its core business. Global Clean's vertically integrated business model, including the Bakersfield Facility, leaves the Company uniquely positioned to seize upon this opportunity in the future.

**B.      Organizational Structure.**

As set forth on the structure chart attached hereto as <u>Exhibit B</u>, Debtor GCEH is the Company's ultimate parent entity. Global Clean's organizational structure consists of 19 entities, 15 of which are Debtors in these chapter 11 cases.

**C.      Prepetition Capital Structure.**

Global Clean's prepetition capital structure includes approximately $2,133.8 million in total potential claims (excluding intercompany claims) as of the date hereof (the "<u>Petition Date</u>"), which can be summarized as follows:

| Facility | Approx. Principal Amount Outstanding as of 04.11.2025 | Maturity |
|---|---|---|
| **Prepetition RCF Facility** | $39.1 million | 12/1/2027 |
| **Prepetition Term Loan Facility** | $1,096.3 million | 12/31/2025 |
| **Total Secured Funded Debt Claims (excluding Intercompany Debt)** | **$1,135.4 million** | |
| **CTCI Secured Payment Obligations** | $949.3 million[16] | N/A |
| **Project Manager Service Provider Payments** | $9.2 million | N/A |
| **Total Facility-Related Claims** | **$958.5 million** | |
| **CCI Notes** | $33.9 million | 04/30/2025 |
| **Other Notes** | $6.0 million | 10/2025–06/2050 |
| **Total Notes Claims (excluding Intercompany Debt)** | **$39.9 million** | |
| *Total Potential Claims (excluding Intercompany Debt)* | *$2,133.8 million* | |
| | | |
| **Intercompany Debt** | | |
| **HoldCo Loan Facility (Intercompany)** | $49.4 million | 11/04/2027 |
| **SusOils Secured Promissory Note (Intercompany)** | $34.9 million | 08/22/2025 |
| **Rosedale Notes (Intercompany)** | $48.6 million | 02/23/2032 |

1.      **Prepetition RCF Facility.**

Certain of the Debtors are party to that certain Credit Agreement, dated as of June 25, 2024, by and among Debtor BKRF, as borrower, Debtors BKRF OCB, LLC and BKRF OCP, LLC, as guarantors, the lenders party thereto (collectively, the "<u>RCF Lenders</u>"), and Vitol, as administrative agent and collateral agent (the "<u>Prepetition RCF</u>

---

[16]   Such amount represents the amount asserted by CTCI through March 31, 2025, and does not include fees, costs, and interest accruing after that date. As set forth in the Restructuring Support Agreement and the DIP Order, such amount is reflective of the global settlement discussed herein and all parties in interest's rights with respect to such amount are preserved should the Restructuring Support Agreement terminate.

Agent") (as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition RCF Credit Agreement" and the facility thereunder, the "Prepetition RCF Facility").

The Prepetition RCF Facility provides for up to $75 million of borrowing, subject to borrowing base availability.  As of April 13, 2025, the outstanding balance under the Prepetition RCF Facility was $39.1 million with $35.9 million of borrowing capacity, subject to borrowing base availability.  The Prepetition RCF Facility provides for an interest rate at 12.50% and matures on December 1, 2027.

The Prepetition RCF Facility is guaranteed by Debtors BKRF OCB, LLC and BKRF OCP, LLC, and is secured by first priority senior liens on substantially all of the real property and assets of BKRF OCB, LLC, BKRF OCP, LLC, and BKRF, subject to certain liens.  The liens and priorities of the Prepetition RCF Facility, and the related contractual rights of the parties thereto, in each case in relation to the Prepetition Term Loan Facility are governed by that certain Intercreditor Agreement, dated as of June 25, 2024, by and among Vitol, as Prepetition RCF Facility representative, Orion Energy Partners TP Agent, LLC, as Prepetition Term Loan Facility representative, the Prepetition Term Loan creditors party thereto from time to time, Debtors BKRF, BKRF OCB, LLC, and BKRF OCP, LLC (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Intercreditor Agreement").  Pursuant to the Intercreditor Agreement, obligations under the Prepetition RCF Facility, including obligations under the Prepetition SOA and the Prepetition SSA, are provided payment and lien priority over the Prepetition Term Loan Facility with respect to all pledged assets and any non-overlapping collateral between the Prepetition RCF Facility and the Prepetition Term Loan Facility is deemed to be held in favor of both the Prepetition RCF Facility and the Prepetition Term Loan Facility.[17]

<h2 align="center">2.     Prepetition Term Loan Facility.</h2>

Certain of the Debtors are party to that certain Credit Agreement, dated as of May 4, 2020, by and among Debtor BKRF OCB, LLC, as borrower, and Debtor BKRF OCP, LLC, as holdings, Debtor BKRF, as project company, the Term Loan Lenders, and OIC, as administrative agent and collateral agent (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement" and the facility thereunder, the "Prepetition Term Loan Facility").

The Prepetition Term Loan Facility provided for a senior secured term loan facility in an aggregate principal amount of $1,096.3 million and consists of five separate tranches of term loans (together the "Term Loans") consisting of the following amounts:

| Tranche | Aggregate Principal Amount |
|---|---|
| Tranches A & B | $327.5 million |
| Tranche C | $18.6 million |
| Tranche C+ | $325.8 million |
| Tranche D | $424.3 million |
| **Total** | **$1,096.3 million** |

The Prepetition Term Loan Facility provides for a non-default interest rate at 15.00% per annum and matures on December 31, 2025.  As described more fully below, the Debtors upsized the Term Loans numerous times to

---

[17] For the avoidance of doubt, this amount excludes fees, premiums, and interest and is limited to the Prepetition RCF Facility principal of $39.1 million.

account for the delays and cost overruns in completing construction of the Bakersfield Facility, and more recently, to achieve consensus on a global settlement and continue the Company as a going concern.

The Prepetition Term Loan Facility is guaranteed by Debtors BKRF OCP, LLC, BKRF, and SusOils, and secured by first priority senior liens on substantially all of the real property and assets of BKRF OCB, LLC, BKRF OCP, LLC, BKRF, and SusOils, as well as certain assets of GCEH, subject to certain liens.  The liens and priorities of the Prepetition Term Loan Facility, and the related contractual rights of the parties thereto, in each case in relation to the Prepetition RCF Facility, are governed by the Intercreditor Agreement.  As of the Petition Date, approximately $1,096.3 million in unpaid principal remains outstanding under the Prepetition Term Loan Facility.[18]

### 3. Bakersfield Facility-Related Claims.

In addition to their funded debt obligations, the Debtors' capital structure is potentially subject to various claims related to the construction of the Bakersfield Facility.

#### a. Prepetition EPC Claims.

On May 18, 2021, Debtor BKRF entered into the Terminated EPC Agreement with CTCI, which generally provided for CTCI to act as the general contractor for the engineering, procurement and construction of the Bakersfield Facility.  CTCI has been paid approximately $150.9 million in connection with work performed under the Terminated EPC Agreement.

Disputes between the Debtors and CTCI ultimately led to the Debtors' providing notice of the termination of the Terminated EPC Agreement.  CTCI has alleged that the Debtors have failed to make payments owed to CTCI of at least approximately $949.3 million under the Terminated EPC Agreement (the "Prepetition EPC Claims").  The Company and the Term Loan Lenders dispute not only the validity of the Prepetition EPC Claims but also the amount thereof.  Regardless, CTCI has filed a mechanic's lien against the Bakersfield Facility in the amount of the Prepetition EPC Claims (the "CTCI Mechanic's Lien") and has asserted that the CTCI Mechanic's Lien is not junior to the Company's other secured funded debt obligations.

#### b. Project Manager Service Provider Payments.

BKRF is party to that certain Professional Services Agreement with Entara LLC (as successor-in-interest to ESG Energy Partners, LLC d/b/a Crossbridge Energy Partners) dated May 22, 2023, (the "PSA") for project management and other related services, including supporting the commissioning and start-up activities of the Bakersfield Facility.  The PSA provided for payment of two-thirds of the invoices in cash, with the remainder to be paid 90 days after substantial completion of the Bakersfield Facility or credited to the next tranche of debt to the Term Loan Agreement (the "Project Manager Service Provider Payment Obligations").  On August 29, 2024, BKRF entered into a separate agreement converting $7 million of the Project Manager Service Provider Payment Obligations into Tranche D Loans.  As of the Petition Date, approximately $9.2 million remains outstanding on account of the Project Manager Service Provider Payment Obligations.

### 4. Notes Claims.

#### a. CCI Notes.

57.    Debtor GCE Holdings Acquisitions, LLC ("GCEH Acquisitions") is party to that certain ISDA Master Agreement dated October 15, 2018 (the "Derivative Forward Contract") with Castleton Commodities International LLC ("CCI").  The Company entered into the Derivative Forward Contract in order to fund operating expenses while it focused on the acquisition and construction of the Bakersfield Facility.  However, in 2020, Debtor GCEH Acquisitions and CCI agreed to terminate the Derivative Forward Contract and replace it with a fixed payment

---

[18]    For the avoidance of doubt, this amount excludes fees, premiums, and interest and is limited to the Prepetition Term Loan Facility principal of $1,096.3 million.

obligation (the "CCI Notes Obligations").  Pursuant to a letter agreement dated as of March 24, 2025, Debtor GCEH Acquisitions and CCI fixed the CCI Notes Obligations in the aggregate amount of approximately $33.9 million to be paid in seven installments in accordance with the schedule set forth therein.  As of the Petition Date, approximately $33.9 million remains outstanding on account of the CCI Notes Obligations.[19]

        **b.**        **Other Notes.**

Certain of the Debtors are also party to other loans and notes payable facilities for miscellaneous financings (collectively, the "<u>Other Notes</u>").  The Debtors also require financing to enter into and replace certain insurance policies that are expiring or required for additional identified risks, including pursuant to one premium financing agreement that covers several insurance policies financed at 8.25%.  The Company expects that it will continue to finance certain policy premiums consistent with past practice.  The maturity dates for the Other Notes range from October 2025 to June 2050 and may either be secured or unsecured.  As of the Petition Date, approximately $6.0 million remains outstanding on account of the Other Notes.

        **5.**        **Intercompany Debt.**

        **a.**        **HoldCo Loan Facility.**

Certain of the Debtors are party to that certain Credit Agreement, dated as of May 4, 2020, by and among Debtor BKRF HCB, LLC, as borrower, and Debtor BKRF HCP, LLC, as pledgor, the lenders from time to time party thereto (collectively, the "<u>HoldCo Loan Lenders</u>"), and Debtor GCEH (as assignee of OIC), as administrative agent and collateral agent (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "<u>HoldCo Loan Agreement</u>" and the facility thereunder, the "<u>HoldCo Loan Facility</u>").

The HoldCo Loan Facility provides for a senior secured term loan facility in an aggregate principal amount of $49.4 million.[20]  The HoldCo Loan Facility provides for a non-default interest rate at 15.00% per annum and matures on November 4, 2027.

The HoldCo Loan Facility is guaranteed by Debtor BKRF HCP, LLC and secured by liens on substantially all the assets of Debtors BKRF HCB, LLC and BKRF HCP, LLC.  As of the Petition Date, approximately $49.4 million in unpaid principal remains outstanding under the HoldCo Loan Facility.[21]

        **b.**        **SusOils Secured Promissory Note.**

Debtor SusOils entered into that certain intercompany Amended and Restated Secured Promissory Note, dated as of June 25, 2024 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "<u>SusOils Promissory Note</u>") in the amount of $34.9 million in favor of Debtor BKRF OCB, LLC.  The SusOils Promissory Note provides for an interest rate of 15.00% and matures on August 22, 2025.  The SusOils Promissory Note is secured by liens on substantially all of the assets of Debtor SusOils.  As of the Petition Date, approximately $34.9 million in unpaid principal remains outstanding under the SusOils Promissory Note.[22]

---

[19]   This amount excludes fees, premiums, and interest and is limited to the CCI Notes principal.

[20]   As a result of that certain Settlement and Mutual Release Agreement, dated as of June 25, 2024, by and among GCEH, BKRF, SusOils, ExxonMobil Renewables LLC and ExxonMobile Oil Corporation, the principal amount of the HoldCo Loan Facility was reduced by $18 million from $67.4 million to $49.4 million.

[21]   This amount excludes fees, premiums, and interest and is limited to the HoldCo Loan Facility principal.

[22]   This amount excludes fees, premiums, and interest and is limited to the SusOils Promissory Note principal.

c.       **Rosedale Notes.**

Debtor Rosedale FinanceCo LLC entered into that certain intercompany Promissory Note, dated as of February 23, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Rosedale Promissory Note") in the amount of approximately $48.6 million in favor of Debtor GCEH.  The Rosedale Promissory Note provides for an interest rate of 20.00% or 25.00% payment-in-kind and matures on February 23, 2032.  The Rosedale Promissory Note is unsecured.  As of the Petition Date, approximately $48.6 million in unpaid principal remains outstanding under the Rosedale Promissory Note.[23]

6.       **Equity Interests.**

As previously mentioned, on December 29, 2020, Debtor GCEH's common stock began trading on the OTCQB marketplace under the ticker symbol "GCEH".  Debtor GCEH's certificate of incorporation authorizes the Board to issue 500 million shares of common stock ("Common Shares") and 50 million shares of preferred stock (the "Preferred Shares"), each at $0.01 par value per share.  As of April 8, 2025, 50,219,640 Common Shares have been issued and are outstanding and no Preferred Shares are outstanding.

## VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.   Challenges Facing the Debtors' Business.

Despite the Company's success in expanding its renewable energy business and streamlining operations, Global Clean has been negatively impacted by persistent delays and cost overruns in the construction of the Bakersfield Facility, as well as operational challenges facing the green energy industry as a whole.

1.       **Construction Delays and Cost Overruns Related to the Bakersfield Facility.**

Although completion of the Bakersfield Facility ranks among the Debtors' most significant achievements to date, it came at substantial—existential—cost.  Construction delays caused the Company to incur costs substantially greater than originally anticipated and delayed the start of operations, thereby losing out on years of critical revenue.

The issues related to the construction of the Bakersfield Facility began soon after the Company's acquisition of Debtor BKRF and its efforts to retool the nearly 80 year old, then idled, crude oil refinery.  In connection with the acquisition, the Company entered into an Initial EPC Contract with the Initial Contractor for the engineering, procurement, construction, pre commissioning, commissioning, start-up and testing of the Bakersfield Facility.  The Company's relationship with the Initial Contractor was short lived due to various external factors.  In particular, the start of the project roughly coincided with the onset of the global COVID-19 pandemic.  COVID-19 significantly disrupted the Company's supply chain and caused a widespread shortage of key materials.  Freight rates and transit times increased significantly, causing significant increases in construction costs and delays that hampered the construction of the Bakersfield Facility.  As a result, the Company terminated the Initial EPC Agreement and its relationship with the Initial Contractor.

The Company turned to CTCI, a global firm whose parent is based in Taiwan, which was familiar with the project, to replace the Initial Contractor as the general contractor and perform the remaining services due under the Initial EPC Agreement.  The Company then entered into the EPC Agreement with CTCI in the hopes—as set forth by the terms of the EPC Agreement—that CTCI could complete the construction of the Bakersfield Facility in a timely and cost-efficient manner.  The EPC Agreement provided that any lien, claim, or encumbrance that CTCI had, or may have had in the future, would be subordinate to specified "Lender" liens.

Pursuant to the EPC Agreement, construction of the Bakersfield Facility was to be completed by no later than January 22, 2022, and CTCI's costs and fees were not to exceed $178 million.  Unfortunately, those commitments were not achieved due to a host of problems related to the Project, including licensing, inadequate staffing, change

---

[23]    This amount excludes fees, premiums, and interest and is limited to the Rosedale Notes principal.

order estimations, ordering delays, and unanticipated turnover of personnel. Despite the turnkey nature of the EPC Agreement, the Company was forced to divert significant resources to address these issues.

As a result, on January 10, 2023, BKRF and CTCI entered into that certain Amendment No. 2 to the EPC Agreement (the "EPC Amendment"), which, among other things, provided for: (a) a guaranteed minimum price of $275 million; (b) a revised payment schedule; (c) liquidated damages commencing on a new date of substantial completion of March 31, 2023; and (d) the ability for CTCI, in certain circumstances, to record a mechanic's lien for certain amounts and foreclose on or file suit with respect to such mechanic's lien within a certain time. The EPC Amendment reaffirmed that any lien, claim, or encumbrance that CTCI had, or may have in the future, would be subordinate to specified "Lender" liens. In connection with the EPC Amendment, Debtor GCEH executed that certain Owner Parent Guarantee, dated as of January 10, 2023, which provided a guaranty in favor of CTCI for amounts owed by BKRF under the EPC Amendment.

Following further disputes regarding CTCI's performance, CTCI served a demand for mediation and arbitration pursuant to the EPC Agreement on April 13, 2023, seeking $550 million. After extensive negotiations, Debtor BKRF and CTCI entered into that certain Heads of Agreement for Proposed Settlement, dated as of October 30, 2023 (the "HOA"), and Interim Settlement Agreement, dated as of December 18, 2023 (the "ISA"). Under the ISA, the parties agreed that Debtor BKRF would pay certain limited amounts to CTCI and other payments would be suspended. The HOA and ISA also reaffirmed that any lien, claim, or encumbrance that CTCI had, or may in the future have, would be subordinate to specified "Lender" liens.

The issues related to the Project persisted, and on October 21, 2024, Debtor BKRF notified CTCI that it was terminating the EPC Agreement for cause because of incurable defaults by CTCI. Debtor BKRF exercised its right to complete all remaining work and drew down a $17.8 million line of credit provided by CTCI in support of its obligations under the EPC Agreement.

On December 2, 2024, CTCI served Debtor BKRF with a notice of its recordation of the CTCI Mechanic's Lien, which purported to secure a claim for approximately $924.3 million. Then, on December 6, 2024, CTCI filed an action to foreclose on the CTCI Mechanic's Lien, but eventually agreed to stay the proceedings pending further arbitration. As of the Petition Date, the arbitration remains ongoing, though dormant, and the foreclosure action remains stayed. However, the Debtors are hopeful that such disputes will be finally resolved based on the settlement discussed herein, as embodied in the RSA.

The nearly three-year delay in completing the Bakersfield Facility and the cost associated with delayed construction and the related disputes with CTCI put the Company in a precarious financial position. In particular, the Company anticipated the Bakersfield Facility would commence operations years ago and begin generating significant revenues that would not only fund operations, but also assist the Company in servicing its debt obligations. Moreover, the eventual completion of construction of the Bakersfield Facility cost the Company significantly more than originally anticipated, resulting in significant impacts to the Company's liquidity and operations.

Specifically, the Company was forced to obtain additional debt financing to fund operating expenses and account for the absence of anticipated revenue. Because the Company does not have credit or equity facilities available with financial institutions, stockholders, or third-party investors outside of its existing lenders, it worked with the Term Loan Lenders to provide the necessary capital. In their continued support of the Company and through a series of amendments to the Term Loan Agreement, at the Company's request, the Term Loan Lenders repeatedly increased the borrowing capacity under the Term Loan Agreement. The additional liquidity provided through these amendments was critical in enabling the Company to continue its operations, including operationalizing the Bakersfield Facility and providing the runway to negotiate the Restructuring Support Agreement, the DIP Facilities, and the Plan. As of the Petition Date, the Company has incurred approximately $518.5 million in additional Term Loans through these amendments. Moreover, the Prepetition EPC Claims, the Project Manager Service Provider Payment Obligations, and the CCI Notes Obligations are the result of delays in the construction of the Bakersfield Facility.

The issues relating to the construction of the Bakersfield Facility also led to adverse effects for the Company, including damaging the Company's standing with third parties. For example, in 2019, the Company entered into that certain Product Offtake Agreement (the "POA"), dated as of April 10, 2019, with EMOC pursuant to which EMOC agreed to purchase approximately 135 million gallons of RD per year for five years and 67.5 million gallons of RD

for six months after that.  But, due to the failure of the Bakersfield Facility to commence operations by the provided outside date of June 30, 2023, Exxon sent the Company a notice purportedly terminating the POA.  On June 25, 2024, Debtors GCEH, BKRF, and SusOils entered into a settlement with ExxonMobil Renewables LLC and EMOC (collectively, "Exxon") resolving disputes under the POA and related agreements whereby, among other things, the Company agreed to pay Exxon approximately $18.3 million.

In short, the delays in completing the Bakersfield Project and the ongoing disputes with CTCI have strained the Debtors' liquidity and operations, and necessitated the Filing of these chapter 11 cases.

**B.     Disruption Stemming from Macroeconomic Headwinds**

As the COVID-19 pandemic abated, it gave way to a sustained period of high interest rates and inflation.  As a result, Global Clean experienced increases in prices of products, services, and costs of inputs used in its continued construction efforts, including the cost of natural gas, utilities, transportation, and labor.  At the same time, declining prices for RINs and California LCFS credits depressed margins for RD producers.

More recently, changes to the regulatory landscape have negatively impacted the renewable fuels industry.  Prior to 2025, the BTC incentivized the production and use of renewable fuels by providing for a tax credit based on the volume of RD produced or used in a blending process.  On December 31, 2024, the BTC expired and was replaced with 45Z, effective as of January 1, 2025.  45Z also provides a tax credit for the production of renewable fuels, but is based on emissions levels, not volume.  The differences between the BTC and 45Z, and the lack of guidance on 45Z's implementation, and the general unpredictability of shifts in government policy, has led to significant uncertainty that has negatively impacted renewable fuel producers, like Global Clean.  These challenges and headwinds ultimately proved to be too much for the Company when combined with the other liquidity and operational challenges it was facing.

**C.     The Company's Prepetition Restructuring Initiatives.**

**1.     Prepetition Marketing Process.**

In January 2024, the Company engaged Lazard to assist in evaluating potential strategic and capital structure alternatives.  At the end of July 2024, the Debtors, with the assistance of Lazard, commenced the Upstream Capital Process.  In connection with that process, Lazard contacted over 100 parties with over 20 parties executing NDAs and obtaining confidential information on the Upstream Business.  The Debtors requested IOIs for the Upstream Capital Process in October 2024 and were able to obtain two non-binding IOIs.  The Company, with the assistance of Lazard, continued to advance the Upstream Capital Process during the fourth quarter of 2024 and first quarter of 2025.

In addition, in mid-December 2024, the Debtors, with the assistance of Lazard, launched a marketing process for the sale of all or substantially all of the Company's assets (the "Sale Process").  Potential buyers could express an interest for the consolidated business, the Upstream Business, and/or Downstream Business.  As part of the Sale Process, the Debtors, with the assistance of Lazard, contacted over 75 parties.  Over 20 interested parties executed an NDA, including certain parties who previously executed NDAs with the Company in connection with the Upstream Capital Process, and obtained confidential information on the Debtors' business.  The Debtors and Lazard facilitated due diligence with potential buyers under NDsA, including diligence calls and meetings with management.  The Debtors requested IOIs for the Sale Process and second-round bids for the Upstream Capital Process to be submitted to the Debtors by February 24, 2025.  Notwithstanding these efforts, the Debtors did not receive any IOIs or bids by the bid deadline.  However, the Debtors have continued to facilitate diligence with certain parties in interest leading up to the Petition Date.

**2.     Appointment of Disinterested Director and Establishment of the Special Committee.**

On November 25, 2024, the Company appointed Todd Arden to act as an advisor to the Board with the possibility of becoming a director at the subsequent request of the Company.  On December 16, 2024, to ensure a thorough and fair process with respect to the Debtors' review of their strategic alternatives, the Company (a) appointed Todd Arden to the Board as an independent and disinterested director, and (b) established the Special Committee

36

comprised of the Board's independent directors, Todd Arden and Susan L. Anhalt (together, the "Disinterested Directors").

The Board delegated to the Special Committee, among other things, (a) exclusive authority to review, discuss, consider, negotiate, approve, authorize and act upon matters relating to a transaction in which a conflict of interest exists or is reasonably likely to exist between the Company or its stakeholders and the Board under applicable law (a "Conflict Matter"), (b) authority to investigate and determine, in the Special Committee's business judgment, whether any matter related to a transaction constitutes a Conflict Matter and that any such determination shall be binding on the Company, and (c) non-exclusive authority to review, discuss, consider, negotiate, approve, and authorize the Company's entry into and consummation of a restructuring alternative.

Over the course of the restructuring process, the Disinterested Directors met with the Company's advisors and management team on numerous occasions to consider stakeholder feedback and provide guidance to Global Clean's management team and advisors. The Disinterested Directors ultimately recommended to the Board the entry into the Restructuring Support Agreement, the DIP Facilities, and the filing of these chapter 11 cases.[24]

3. **Entry into the RSA.**

Prior to commencing these chapter 11 cases, and following months of arm's length negotiations between the Debtors and the Consenting Stakeholders regarding the potential terms of a proposed value maximizing transaction, the Debtors and the Consenting Stakeholders entered into the Restructuring Support Agreement. The material terms of the Restructuring Transactions memorialized in the Restructuring Support Agreement are further set forth in the Plan.

The Plan contemplates a comprehensive reorganization that will result in an infusion of new financing to fund Global Clean's emergence from these chapter 11 cases and a sustainable pro forma capital structure that will provide Global Clean with substantial operational breathing room. The Plan issues $2.1 billion of take back paper in the form of new revolving loans (i.e., the Exit RCF Facility), new super senior term loans (i.e., the New Super Senior Exit Facility), new senior secured term loans (i.e., the New Senior Secured Exit Facility, the First Out Subordinated Senior Secured Term Facility, and Subordinated Senior Secured Term Facility), new junior term loans (i.e., the Subordinated Junior Term Facility), and post-confirmation payment obligations (i.e., the Post-Exit CTCI Senior DIP Payment Obligation and EPC Claims) (collectively, the "Exit Facilities").

A key portion of the Plan is the settlement with CTCI embodied therein. Upon the effective date of the Plan, CTCI will receive its *pro rata* share of the Takeback Debt and 55.6% of the New Preferred Equity in full and final satisfaction of the Prepetition EPC Claims. The CTCI Settlement avoids costly and time-consuming litigation that had the prospect of delaying the Debtors' speedy path through these chapter 11 cases. Resolution of this potentially protracted litigation, the Debtors' restructured balance sheet that will provide the Company greater operational breathing room, and the potential improved optimization and debottlenecking at the Bakersfield Facility toward increased RD production will position Global Clean well for the future.

The Debtors will fund or make distributions under the Plan with the Exit Facilities, the issuance of new equity interests (i.e., the New Common Equity and New Preferred Equity), and cash on hand. In particular, and among other things, the Plan provides for: (a) the conversion of Allowed Prepetition RCF Claims into the Exit RCF Facility; (b) each Holder of Allowed Prepetition Term Loan Claims to receive its *Pro Rata* share of apportioned Takeback Debt, 4/9ths (44.4%) of the New Preferred Equity, and 100% of the New Common Equity; (c) each Holder of Allowed Prepetition EPC Claims to receive its *Pro Rata* share of apportioned Takeback Debt and 5/9ths (55.6%) of the New Preferred Equity; and (d) each Holder of Allowed General Unsecured Claims to receive its *Pro Rata* share of the GUC Cash Pool, provided that the GUC Cash Pool is subject to certain reductions.

---

[24]   An investigation related to the releases contemplated by the Plan remains ongoing.

To effectuate this comprehensive restructuring and ensure the Debtors' successful emergence from chapter 11, the Debtors have agreed to seek approval of the following proposed timeline to move swiftly through these chapter 11 case.

| Event | RSA / DIP Milestones |
|---|---|
| Entry of the Interim DIP Order | No later then three (3) days after the Petition Date |
| Entry of the Final DIP Order | No later than thirty (30) days after the Petition Date |
| Entry of an order assuming the Prepetition SOA and the Prepetition SSA | No later than thirty (30) days after the Petition Date |
| Entry of an order approving the Disclosure Statement | No later than sixty (60) days after the Petition Date |
| Entry of an Order approving the Exit Facilities | No later than seventy-five (75) days after the Petition Date |
| Entry of an order confirming the Plan | No later than one hundred and ten (110) days after the Petition Date |
| Plan Effective Date | No later than one hundred and twenty (120) days after the Petition Date |

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief.

Each of the Debtors Filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petitions") on the Petition Date.  Concurrently therewith, the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and other third parties following the commencement of the Chapter 11 Cases.  All of the relief requested by the First Day Motions and throughout the Chapter 11 Cases will be subject to any orders regarding the DIP Facilities and the Debtors' use of cash collateral.

A brief description of each of the First Day Motions is set forth in the Verleun Declaration.  The First Day Motions, and all orders for relief ultimately entered in the Chapter 11 Cases in connection therewith and generally over the course of the Chapter 11 Cases, can be viewed free of charge at https://dm.epiq11.com/GCEHoldings.

### B.    The Proposed DIP Facilities.

To fund the administration of these chapter 11 cases, preserve the value of the Debtors' estates, and consummate the transactions contemplated by the Restructuring Support Agreement and the Plan, the Debtors propose entering into three separate but related debtor-in-possession financing facilities, all explained more fully in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. [●]] (the "DIP Motion"), which include:  (a) a priming, senior secured, superpriority debtor in-possession revolving credit facility in the aggregate principal amount of up to $100 million, exclusive of obligations under the SOA and the SSA (such revolving credit facility along with, on and after the Petition Date, the supply and offtake facilities provided by Vitol under the SOA and the SSA, the "DIP RCF Facility"); (b) a superpriority, priming secured debtor in possession credit facility in the aggregate principal amount of $75 million (the "DIP Term Loan Facility"); and (c) that certain proposed payables arrangement (the "DIP CTCI Payment Facility") to be provided by CTCI in an aggregate value of $75 million, pursuant to that certain Project Management, Procurement, Construction, Operation, and Maintenance Support Agreement (the "DIP CTCI Contract," and together with the DIP RCF Facility and the DIP CTCI Payment Facility, the "DIP Facilities"), dated as of April 16, 2025, by and between the Debtors, CTCI, and the DIP CTCI Agent.  The DIP Facilities will also allow the Debtors to access cash collateral.

As more fully described in the DIP Motion, the Debtors also seek to assume the Prepetition SOA and the Prepetition SSA in connection with entering into the DIP Facilities.[25]  Therefore, in addition to funding operations generally, the DIP Facilities, and specifically the DIP RCF Facility, are necessary to ensure that the Debtors can continue to perform under the Prepetition SOA and Prepetition SSA, which are critical to ensuring the Debtors' ability to purchase feedstock, sell RD and other renewable fuel co-products, and operate their businesses, including the Bakersfield Facility, in the ordinary course postpetition.  Additionally, pursuant to the New CTCI Agreement, CTCI will supply the Debtors with no less than $75 million in goods, services, and other consideration, as more fully described in the DIP Motion.

Access to the DIP Facilities and Cash Collateral is critical to ensure that the Debtors are able to successfully administer their chapter 11 cases, preserve the value of their estates for the benefit of all parties in interest, and pursue the value-maximizing restructuring transactions contemplated under the Restructuring Support Agreement and Plan.  During these chapter 11 cases, the Debtors will need to use the cash generated from their operations, as well as their current cash on hand, to, among other things, (a) satisfy payroll obligations, (b) honor obligations under their material contracts, (c) maintain insurance coverage, (d) pay taxes, and (e) make any other payments essential to the continued management, operation, and preservation of the Debtors' business.

Without immediate access to the DIP Facilities and Cash Collateral, the Debtors could face a value destructive interruption to their businesses and lose support from important stakeholders on whom the Debtors' businesses depend.  This, in turn, would force the Debtors to curtail operations, hindering the Debtors' ability to effectuate the restructuring transactions contemplated in the Restructuring Support Agreement and maximize the value of their estates.

### C.    Proposed Confirmation Schedule.

As discussed above, the Debtors agreed to certain milestones under the RSA in order to ensure an orderly and timely implementation of this comprehensive restructuring.  In order to ensure the expeditious confirmation of the Plan in accordance with these milestones, the Debtors, on the Petition Date, filed the Disclosure Statement Motion proposing the below case timeline, subject to Bankruptcy Court approval and availability.  It is imperative that the Debtors proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs.

| Event | Proposed Date and Time (if any) | Description |
|---|---|---|
| Disclosure Statement Objection Deadline | May 16, 2025, at 4:00 p.m., prevailing Central Time | Deadline by which parties in interest may object to the Disclosure Statement and adequacy thereof. |
| Voting Record Date | May 16, 2025 | Date for determining (i) which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and (ii) whether Claims have been properly assigned or transferred to an assignee under Bankruptcy Rule 3001(e) such that the assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim. |

---

[25]    As of the Petition Date, the Debtors held a net payable position under the Prepetition SOA of approximately $9.4 million.

| Event | Proposed Date and Time (if any) | Description |
|---|---|---|
| Disclosure Statement Hearing Date | May 23, 2025, at [●] [a.m. / p.m.], prevailing Central Time, subject to the Bankruptcy Court's availability | Date of the hearing at which the Bankruptcy Court will consider the adequacy of the Disclosure Statement. |
| Solicitation Deadline[26] | Three (3) business days following the entry of the order approving the Disclosure Statement (or as soon as reasonably practicable thereafter) | Deadline by which the Debtors must distribute Solicitation Packages, including the Ballots, to Holders of Claims entitled to vote to accept or reject the Plan. |
| Publication Deadline | Five (5) business days following the entry of the order approving the Disclosure Statement (or as soon as reasonably practicable thereafter) | Date by which the Debtors will submit the Confirmation Hearing Notice in a format modified for publication (the "Publication Notice," and such date, the "Publication Deadline"). |
| Plan Supplement Deadline | Seven (7) days prior to the Plan Objection Deadline (or as soon as reasonably practicable thereafter) | Date by which the Debtors shall file the Plan Supplement. |
| Voting Deadline | June 25, 2025, at 4:00 p.m., prevailing Central Time | Deadline by which Holders of Claims in the Voting Classes may vote to accept or reject the Plan pursuant to Bankruptcy Rule 3017(c), and by which all Ballots must be properly executed, completed, and delivered as specified in the Solicitation and Voting Procedures. |
| Plan Objection Deadline | June 25, 2025, at 4:00 p.m., prevailing Central Time | Deadline by which any objections to Confirmation of the Plan must be filed. |
| Opt-Out Deadline | June 25, 2025, at 4:00 p.m., prevailing Central Time | Deadline by which any Opt-Out Forms must be received as specified in the Solicitation and Voting Procedures. |
| Deadline to File Voting Report | Two (2) business days before the Confirmation Hearing Date | Date by which the report tabulating votes on the Plan (the "Voting Report") shall be filed with the Bankruptcy Court. |

---

[26]   With respect to Holders of Claims that are entitled to vote to accept or reject the Plan and that file Proofs of Claim or, in the absence of filed Proofs of Claim, as to which the Debtors file relevant schedules after the Voting Record Date but before the Claims Bar Date, the Debtors and Claims and Noticing Agent will distribute Solicitation Packages as soon as reasonably practicable following receipt of such Proof of Claim or filing of such Schedules.

| Event | Proposed Date and Time (if any) | Description |
|---|---|---|
| Confirmation Hearing Date | July 1, 2025, at [●] [a.m./p.m.]., prevailing Central Time, subject to the Bankruptcy Court's availability | Date of the hearing at which the Bankruptcy Court will consider Confirmation of the Plan. |

### D.      Schedules and Statements.

The Debtors will File their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements").  In accordance with the Bankruptcy Court's order, such Schedules and Statements will be filed by [●], 2025 or such later date as the Bankruptcy Court may direct.

### E.      Establishment of a Claims Bar Date.

The Debtors will File a motion seeking an order establishing the date that is 14 days after the Debtors file their Schedules and Statements as a general claims bar date, and [●], 2025 as the governmental claims bar date.

Any party required to file a proof of claim under the Bar Date Order which failed to do so before the applicable bar date is forever barred, estopped, and enjoined from asserting such claim against the Debtors and the Debtors will be forever discharged from any indebtedness or liability relating to such claim.  Such party will not be permitted to vote to accept or reject the Plan or receive any recovery under the Plan.

### F.      Retention Applications.

The Debtors plan to File applications and orders seeking Bankruptcy Court approval of the retention of the Debtors' bankruptcy advisors, including Kirkland & Ellis LLP as legal counsel, Norton Rose Fulbright US LLP as their co-counsel, Lazard Frères & Co. LLC as their investment banker, Alvarez & Marsal North America, LLC as their restructuring advisor, and Epiq Corporate Restructuring, LLC as their Claims and Noticing Agent.  The Debtors may file applications and orders seeking Bankruptcy Court approval of the retention of additional advisors, as necessary.

## VIII.   SUMMARY OF THE PLAN

The Plan contemplates the following key terms, among others described herein and therein:

### A.      General Settlement of Claims and Interests.

As discussed in detail herein and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

**B.      Restructuring Transactions.**

Before, on, and after the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including taking any actions set forth in the Restructuring Transactions Steps Memorandum, which transactions may include, as applicable, any of the following:  (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (iv) the execution, delivery, and entry into the Exit Facilities Documents; (v) the issuance and distribution of the New Common Equity as set forth in the Plan; (vi) the issuance and distribution of the New Preferred Equity as set forth in the Plan; (vii) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (viii) such other transactions that, in the reasonable business judgment of the Debtors or the Reorganized Debtors, as applicable, and the DIP Lenders are required to effectuate the Restructuring Transactions; (ix) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized GCEH, which purchase shall be structured as a taxable transaction for United States federal income tax purposes; and (x) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

The Confirmation Order shall authorize the Debtors and the Reorganized Debtors, as applicable, to undertake the Restructuring Transactions contemplated by the RSA and other Definitive Documents, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

**C.      Director, Officer, and Manager Liability Insurance.**

After the Effective Date, Reorganized GCEH will not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions on or after the Effective Date.

**D.      Employment Obligations.**

On the Effective Date, the Reorganized Debtors shall (a) assume the Assumed Agreements and (b) assume and/or honor in the ordinary course of business any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for health care benefits, disability benefits, savings, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity on or after the effective date of any such agreement or, in each case, the full amount necessary to satisfy such obligations shall be set aside to satisfy such obligations.

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**E.      Cancellation of Notes, Instruments, Certificates, and Other Documents.**

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements, and indentures, shall automatically be deemed cancelled, discharged, and of no further force and effect, and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, certificates, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan or a Confirmation Order.

Notwithstanding the foregoing or anything to the contrary herein, any such agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of, as applicable: (a) enabling Holders of Allowed Claims under such agreements to receive distributions under the Plan as provided herein, and (b) allowing and preserving the rights of the Agents, and any other applicable paying agent or trustee to (i) make distributions in satisfaction of Allowed Claims under such agreements, (ii) maintain and exercise their respective charging liens, against any such distributions, (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in making such distributions, (iv) maintain and enforce any right to indemnification, expense reimbursement, contribution, or subrogation or any other claim or entitlement, (v) exercise their rights and obligations relating to the interests of their holders, and (vi) appear and be heard in these Chapter 11 Cases.

If the record holder of any GCEH Existing Interests is DTC or its nominee or another securities depository or custodian thereof, and such underlying securities are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each Holder of such GCEH Existing Interests or other Debtors' securities shall be deemed to have surrendered such Holder's securities underlying such Holder's GCEH Existing Interests or other Debtors' securities.

**F.      Section 1146 Exemption.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (including, for the avoidance of doubt, any transfers from a Debtor to a Reorganized Debtor or to any other Person) of property under or in connection with the Plan, including or pursuant to: (a) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, as applicable; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security pursuant to the Plan; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax, fee, or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.

G.      **The Reorganized Debtors.**

On the Effective Date, the New Board shall be established, and Reorganized GCEH and the other Reorganized Debtors, as applicable, shall adopt the New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

H.      **Sources of Consideration for Plan Distributions.**

The Debtors shall fund or make distributions under the Plan, as applicable, and in each case consistent with the Restructuring Transactions Steps Memorandum, with: (i) the Exit RCF Facility, (ii) the Exit Term Loan Facilities, (iii) the Exit EPC Claims, (iv) the New Common Equity, (v) the New Preferred Equity, and (vi) the Debtors' Cash on hand.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Equity and New Preferred Equity, will be exempt from Securities Act registration, as described more fully below.

1.      **Exit RCF Facility.**

On the Effective Date, the Reorganized Debtors shall enter into the Exit RCF Facility, the terms, conditions, structure, and principal amount of which will be set forth in the Exit RCF Credit Agreement and which shall be in form and substance reasonably acceptable to the Reorganized Debtors, the Required Consenting Term Loan Lenders, the Required Consenting RCF Lenders, and the DIP RCF Lenders.  Confirmation of the Plan shall be deemed approval of the Exit RCF Facility, including the Exit RCF Credit Agreement and the other Exit RCF Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit RCF Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit RCF Facility.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit RCF Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit RCF Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit RCF Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

2.      **Exit Term Loan Facilities.**

On the Effective Date, the Reorganized Debtors shall enter into the Exit Term Loan Facilities, the terms of which will be set forth in the Exit Term Loan Credit Agreements and which shall be in form and substance reasonably acceptable to the Reorganized Debtors, the Required Consenting Term Loan Lenders, and the DIP Term Loan Lenders.  Confirmation of the Plan shall be deemed approval of the Exit Term Loan Facilities, including the Exit Term Loan Credit Agreements and other Exit Term Loan Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments

provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Term Loan Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Term Loan Facilities.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Term Loan Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Term Loan Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Term Loan Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

        3.      **New Common Equity and New Preferred Equity.**

Reorganized GCEH shall be authorized to issue a certain number of units of New Common Equity and New Preferred Equity pursuant to its New Organizational Documents and the New Preferred Equity Documents, as applicable.  On the Effective Date, the New Common Equity and New Preferred Equity shall be issued and distributed pursuant to, and in accordance with, the Plan.

All of the units of the New Common Equity and the New Preferred Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in <u>Article VI</u> of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The New Common Equity and New Preferred Equity will not be registered under the Securities Act or listed on any national securities exchange as of the Effective Date.

        **I.**      **Private Company**

The Reorganized Debtors shall not have any class of Interests listed on a national securities exchange and shall make commercially reasonable efforts to take the steps necessary to be a private company without any Securities Act or Exchange Act reporting obligations upon emergence or as soon as reasonably practicable thereafter in accordance with and to the extent permitted by the Securities Act and the Exchange Act.

        **J.**      **Corporate Existence.**

Except as otherwise provided in the Plan, the Plan Supplement, the New Organizational Documents, or the Restructuring Transactions Steps Memorandum, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified in accordance with the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound

down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**K.      Vesting of Assets in the Reorganized Debtors.**

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances and interests.  On and after the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**L.      Corporate Action.**

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (a) selection of the directors, officers, or managers for the Reorganized Debtors; (b) the distribution of the New Common Equity and New Preferred Equity; (c) implementation of the Restructuring Transactions; (d) entry into the Exit Facilities Documents; (e) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (f) adoption of the New Organizational Documents; (g) adoption of the New Preferred Equity Documents; (h) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (i) adoption or assumption, as applicable, of the Employment Obligations; and (j) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed, as applicable, to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Equity, the New Preferred Equity, the New Organizational Documents, the New Preferred Equity Documents, the Exit Facilities, the Exit Facilities Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by <u>Article IV.G.5</u> of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**M.      New Organizational Documents.**

On or immediately prior to the Effective Date, the New Organizational Documents shall be adopted or amended in a manner acceptable to the Debtors, as may be necessary to effectuate the transactions contemplated by the Plan.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation or formation in accordance with the corporate laws of the respective state, province, or country of incorporation or formation.  The New Organizational Documents will prohibit the issuance of non voting Interests, to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of incorporation or formation and the terms of such documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or other applicable formation and constituent documents as permitted by the laws of the applicable states, provinces, or countries of incorporation or formation and the New Organizational Documents without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### N.        Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors of GCEH shall expire, and the members for the initial term of the New Board shall be appointed.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  The New Board shall initially consist of seven members, including four members appointed by the Common Holders, two members appointed by CTCI, and one independent member to be selected by a majority of the other members of the New Board, which independent member shall be appointed in consultation with the Required Consenting RCF Lenders.  Except to the extent that a current director on the board of directors of GCEH is designated to serve as a director, manager, or sole manager of a Reorganized Debtor, the current directors on the board of directors of GCEH prior to the Effective Date, in their capacities as such, shall have no continuing obligations to GCEH on or after the Effective Date, and such director shall be deemed to have resigned or shall otherwise cease to be a director of GCEH on the Effective Date.  Each of the directors, managers, sole managers, and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor and may be designated, replaced, or removed in accordance with such New Organizational Documents.

### O.        Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### P.        Certain Securities Law Matters.

Any New Common Equity and New Preferred Equity issued under the Plan will be issued (a) to the fullest extent permitted and applicable, without registration under the Securities Act or similar federal, state or local laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or (b) to the extent section 1145 is not permitted or applicable, pursuant to other applicable exemptions under the Securities Act.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of New Common Equity and New Preferred Equity in reliance on the exemption set forth in section 1145 of the Bankruptcy Code shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act and any other applicable federal, state, local, or other law requiring registration prior to the offering, issuance, distribution, or sale of securities.  Such units of New Common Equity and New Preferred Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code (a) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act, and (b) will be freely tradable and transferable in the United States by each recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer.  Notwithstanding the foregoing, the units of New Common Equity and New Preferred Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code will remain subject to compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities and subject to any restrictions in the New Organizational Documents and the New Preferred Equity Documents, as applicable.  The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Any New Common Equity or New Preferred Equity that cannot be issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

47

The Debtors recommend that potential recipients of securities issued under the Plan consult their own counsel concerning their ability to freely trade such securities in compliance with the federal securities laws and any applicable "Blue Sky" laws.  The Debtors make no representation concerning the ability of a person to dispose of such securities.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the securities to be issued under the Plan through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the securities to be issued under the Plan under applicable securities laws.  DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the securities to be issued under the Plan are exempt from registration and/or eligible for DTC book entry delivery, settlement, and depository services.

### Q. Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions described, identified, or otherwise included in the Schedule of Retained Causes of Action, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII thereof.  The Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Person or Entity may rely on the absence of a specific reference in the RSA, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### R. Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases, as determined by the Reorganized Debtors and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

## IX. OTHER KEY ASPECTS OF THE PLAN

**A.      Treatment of Executory Contracts and Unexpired Leases.**

1.      **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases that are not otherwise rejected will be deemed assumed by the applicable Reorganized Debtor or Reorganized GCEH, as applicable, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (a) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (b) previously expired or terminated pursuant to their own terms; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) are the subject of a motion to reject that is pending on the Effective Date; or (e) have an ordered or requested effective date of rejection that is after the Effective Date.

Notwithstanding anything to the contrary herein, the Debtors or the Reorganized Debtors, as applicable, shall not assume or enter into, without the prior written consent of the Required Consenting Stakeholders, any employment, retention, bonus, severance, or other compensation agreements or contracts with any employee other than the Assumed Agreements.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Rejected Executory Contracts and Unexpired Leases, or the Schedule of Assumed Executory Contracts and Unexpired Leases, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Assumed Executory Contracts and Unexpired Leases at any time up to forty-five (45) days after the Effective Date.  All Indemnification Provisions shall be deemed Executory Contracts and shall be assumed by the Reorganized Debtors under the Plan.  None of the Reorganized Debtors shall amend and/or restate its organizational documents on or after the Effective Date to, and the applicable organizational documents shall not, terminate, reduce, discharge, impair, or adversely affect in any way the rights of parties that are entitled to and benefit from the Indemnification Provisions.

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to section 365(a) of the Bankruptcy Code, and entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be Filed.

49

2.       **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (b) the effective date of such rejection, and (c) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article V.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

3.       **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

No later than seven (7) calendar days before the Confirmation Hearing, the Debtors shall serve notices of proposed assumptions to the counterparties to the agreements listed on the Schedule of Assumed Executory Contracts and Unexpired Leases, which shall include a description of the procedures for resolving disputes related to the proposed assumption of applicable Executory Contracts and Unexpired Leases. In the event that any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the provision of notices of proposed assumptions described above, a notice of proposed assumption with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof.

Unless otherwise agreed in writing by the parties in the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served, and actually received by counsel to the Debtors no later than the date and time specified in the notice (which shall not be less than fourteen (14) days after such notice is served). The Debtors or the Reorganized Debtors, as applicable, may reconcile and settle in the ordinary course of the Debtors' business any dispute (following a timely filed objection) regarding any Cure or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court.

Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount (including any request for an additional or different cure amount) will be deemed to have assented to such assumption or Cure amount and any untimely request for an additional or different Cure amount shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the parties to such Executory Contracts or Unexpired Leases may agree; provided that if a dispute regarding assumption or Cure is unresolved as of the Effective Date, then payment of the applicable Cure amount shall occur as soon as reasonably practicable after such dispute is resolved. Any Cure shall be deemed fully satisfied, released, and discharged upon payment of the Cure amount.

The assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any nonmonetary defaults arising from or triggered by the filing of these Chapter 11 Cases, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (a) the date of entry

of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (b) the effective date of such assumption, or (c) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

4.      **Preexisting Obligations to the Debtors Under the Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

5.      **Insurance Policies.**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (a) the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

6.      **Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

7.      **Indemnification Provisions.**

All Indemnification Provisions, consistent with applicable Law, currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the benefit of current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be (a) reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the Indemnification Provisions in place prior to the Effective Date, and (b) shall be assumed by the Reorganized Debtors.

8.      **Reservation of Rights.**

Nothing contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have

forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

 9. **Nonoccurrence of Effective Date.**

 In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

 10. **Contracts and Leases Entered Into After the Petition Date.**

 Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## X. PROVISIONS GOVERNING DISTRIBUTIONS

### A. Timing and Calculation of Amounts to Be Distributed.

 Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII.D of the Plan. Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### B. Disbursing Agent.

 All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

### C. Rights and Powers of Disbursing Agent.

#### a. Powers of the Disbursing Agent.

 The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

#### b. Expenses Incurred On or After the Effective Date.

 Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation

and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

**D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

**1.      Record Date for Distribution.**

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security, is transferred [twenty (20) or fewer days] before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

**2.      Delivery of Distributions in General.**

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

**3.      Minimum Distributions.**

No fractional units of New Common Equity or New Preferred Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of units of New Common Equity or New Preferred Equity that is not a whole number, the actual distribution of units of New Common Equity or New Preferred Equity shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded up to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded down to the next lower whole number with no further payment therefore.  The total number of authorized units of New Common Equity or New Preferred Equity to be distributed to Holders of Allowed Claims or Allowed Interests shall be adjusted as necessary to account for the foregoing rounding.  For distribution purposes (including rounding), DTC will be treated as a single Holder.  Neither the Reorganized Debtors or the Disbursing Agent shall have any obligation to make a distribution that consists of less than one share of New Common Equity or New Preferred Equity or is less than two hundred and fifty dollars ($250) to any Holder of an Allowed Claim.

**4.      Undeliverable Distributions and Unclaimed Property.**

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable or otherwise cannot be delivered, no distribution to such Holder shall be made unless and until the Disbursing Agent, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months following such distribution.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.  To the extent such unclaimed property or interests in property is comprised of New Common Equity or New Preferred Equity, such New Common Equity or New Preferred Equity shall be cancelled.  The Disbursing Agent shall adjust the number of units of New Common Equity or New Preferred Equity outstanding as of the date of such cancellation to ensure that the distributions of New Common Equity or New Common Equity contemplated under the Plan are given full force and effect.

5.          **Surrender of Cancelled Instruments or Securities.**

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article VI of the Plan shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Reinstated under the Plan.

E.          **Manner of Payment.**

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in the applicable agreements.

F.          **Compliance with Tax Requirements.**

In connection with the Plan, to the extent applicable, the Disbursing Agent and the Reorganized Debtors shall comply with all applicable tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such applicable withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary to comply with such applicable withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. Any such amounts deducted or withheld and timely paid to the appropriate taxing authority shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Any person entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the applicable Disbursing Agent an appropriate Form W-9 or (if the payee is a non-U.S. Person) Form W-8.

G.          **Allocations.**

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.          **No Postpetition Interest on Claims.**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.          **Foreign Currency Exchange Rate.**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the

exchange rate for the applicable currency as published in [*The Wall Street Journal (National Edition)*] on the Effective Date.

      **J.**      **Setoffs and Recoupment.**

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and Holder of Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article VI of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

      **K.**      **Claims Paid or Payable by Third Parties.**

      1.      **Claims Paid by Third Parties.**

The Debtors or the Reorganized Debtors as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

      2.      **Claims Payable by Third Parties.**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

      3.      **Applicability of Insurance Policies.**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

XI.    **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

A.    **Allowance of Claims.**

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.  The Reorganized Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

B.    **Claims Administration Responsibilities.**

Except as otherwise specifically provided for in the Plan, after the Effective Date, the Reorganized Debtors shall have the exclusive authority to (a) File, withdraw, or litigate to judgment any objections to Claims, (b) settle or compromise any such objections to Claims without further notice to or action, order, or approval of the Bankruptcy Court, and (c) administer and adjust the Claims Register to reflect such settlements or compromises without further notice to or action, order, or approval of the Bankruptcy Court.  Except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Entity had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including the Causes of Action retained pursuant to the Plan.

C.    **Disputed Claims Process.**

If the Debtors or the Reorganized Debtors, as applicable, dispute any Proof of Claim that is Filed on account of an Unimpaired Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; provided that the Debtors or the Reorganized Debtors, as applicable, or the Holder of such Claim may elect to have the validity or amount of any Claim adjudicated by the Bankruptcy Court instead.  If a Holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.

If the Debtors or the Reorganized Debtors dispute any Impaired Claim that is not Allowed as of the Effective Date pursuant to Article VII.C of the Plan or a Final Order entered by the Bankruptcy Court (which may include the Confirmation Order), the Debtors or the Reorganized Debtors shall File an objection with, and the dispute shall be determined, resolved, or adjudicated before, the Bankruptcy Court.

D.    **Disputed Claims Reserve.**

On or before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall be authorized, but not directed, to establish one or more Disputed Claims Reserves, which Disputed Claims Reserve shall be administered by the Reorganized Debtors, to the extent applicable.

The Reorganized Debtors may, in their sole discretion, hold Cash in the Disputed Claims Reserve Amount in the Disputed Claims Reserve in trust for the benefit of the Holders of the total estimated amount of General Unsecured Claims ultimately determined to be Allowed after the Effective Date.  The Reorganized Debtors shall distribute such amounts (net of any expenses) as provided herein, as such Claims are resolved by Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article VII of the Plan solely to the extent of the amounts available in the applicable Disputed Claims Reserve.

E.    **Estimation of Claims and Interests.**

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection,

and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor or the Reorganized Debtor as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

F.      **Adjustment to Claims or Interests without Objection.**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

G.      **Disallowance of Claims or Interests.**

Except as otherwise expressly set forth herein, and subject to the terms hereof, including <u>Article VIII</u> of the Plan, and the DIP Order, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

H.      **No Distributions Pending Allowance.**

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

I.      **Distributions After Allowance.**

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

XII.     SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.     **Discharge of Claims and Termination of Interests.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.     **Release of Liens.**

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with <u>Article III.B.1</u> of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

C.     **Releases by the Debtors.** [27]

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and**

---

[27]    For the avoidance of doubt, the releases by the Debtors set forth herein and in the Plan remain subject to the investigation of the Special Committee.

representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors and their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtors, or the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Prepetition RCF Facility, the Prepetition Term Loan Facility, the Terminated EPC Agreement, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, any adversary proceedings, the formulation, preparation, dissemination, negotiation, entry into, or filing of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the DIP Facilities, the New CTCI Agreement, the DIP Documents, the New Preferred Equity Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any other Definitive Document, or any Restructuring Transactions, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the DIP Documents, the New Preferred Equity Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any Causes of Action described, identified, or otherwise included in the Schedule of Retained Causes of Action, (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan, or (c) any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring

Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

       **D.**       **Releases by the Releasing Parties.**

       **Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties (other than the Debtors and the Reorganized Debtors), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, and their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Prepetition RCF Facility, the Prepetition Term Loan Facility, the Terminated EPC Agreement, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in  or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, any adversary proceedings, the formulation, preparation, dissemination, negotiation, entry into, or filing of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, any contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring**

Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan, or (b) any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Release.

E.      Exculpation.

Notwithstanding anything contained in the Plan to the contrary, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documents, or any Restructuring Transactions, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be,

liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F. **Injunction**.

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Causes of Action or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors and any property dealt with by the Plan until the closing of these Chapter 11 Cases.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article VIII.C, Article VIII.D, and Article VIII.E of the Plan, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Reorganized Debtor, Exculpated Party, or Released Party, as applicable. The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

G. **Protections Against Discriminatory Treatment**.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H. **Document Retention**.

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.       **Reimbursement or Contribution.**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**XIII.**    **CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

**A.**      **Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX of the Plan:

1.    the RSA shall be in full force and effect and shall not have been validly terminated by any of the parties thereto;

2.    there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Debtors and the Required Consenting Stakeholders would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

3.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

4.    an order, statute, rule, regulation, executive order, stay, decree, judgment, or injunction shall not have been enacted, entered, issued, promulgated, enforced, or deemed applicable by any court or governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, that, in the reasonable judgment of the Debtors and the Required Consenting Stakeholders would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

5.    each document or agreement constituting a Definitive Document shall have been executed or otherwise effectuated as contemplated, shall be in form and substance consistent with the RSA (and subject to the parties' consent and consultation rights thereunder with respect to such Definitive Document) and the Restructuring Term Sheet, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived pursuant to the terms of the RSA and the applicable Definitive Document;

6.    to the extent invoiced, the payment of all reasonable and documented fees and expenses of the Debtors' professionals (solely if payment of such fees and expenses has been authorized by the Bankruptcy Court, including under the DIP Orders) and the Consenting Stakeholders' professionals related to the negotiation and implementation of the Restructuring Transactions and not previously paid by the Debtors;

7.     all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account;

8.     the Bankruptcy Court shall have entered the Confirmation Order, which shall be subject to the parties' consultation and consent rights set forth in the RSA, and such order shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered;

9.     the Required Consenting Term Loan Lenders and CTCI shall have consented (in each case, such consent shall not be unreasonably withheld, conditioned, or delayed) to the executory contracts to be rejected or assumed, if any;

10.    the New Organizational Documents shall have been executed and/or effectuated, shall be in form and substance consistent with the RSA and the Restructuring Term Sheet, and any conditions precedent related thereto, shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

11.    the Prepetition SOA and Prepetition SSA shall have been assumed by the Debtors and no events of default shall be outstanding thereunder; and

12.    the New Common Equity and the New Preferred Equity shall have been issued by Reorganized GCEH.

### B.     Waiver of Conditions.

The conditions to Confirmation and Consummation set forth in Article IX of the Plan may be waived by the Debtors only with the prior written consent of the Required Consenting Stakeholders (subject to Section 3.02 if the RSA), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

### C.     Effect of Failure of Conditions.

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

### D.     Substantial Consummation.

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## XIV.     MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.     Modification and Amendments.

Except as otherwise specifically provided in the Plan and consistent with the approval rights set forth in the RSA, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the RSA, and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate

proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### B.    Effect of Confirmation on Modifications.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### C.    Revocation or Withdrawal of Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## XV.    RISK FACTORS

Holders of Claims or Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

1.    **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.**

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, and any other transaction that could maximize the value of the Debtors' estates.  The terms of any alternative restructuring proposal may be less favorable to Holders of Claims or Interests than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Chapter 11 Cases or the confirmation of the Plan, or the threat of rejection of the Plan by the Bankruptcy Court, could add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring could have other adverse effects on the Debtors.  For example, it could adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with vendors.

2.   **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3.   **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or met, the Effective Date will not take place.  In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan.  If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

4.   **The Conditions Precedent to Consummation of the Exit Facilities May Not Occur.**

As more fully set forth in the Exit Facilities Documents, the Exit Facilities are subject to a number of conditions precedent.  If these conditions precedent are not satisfied or waived, the Exit Facilities may not be consummated.  Because consummation of the Exit Facilities is itself a condition precedent to the Effective Date, the Effective Date may not take place.

5.   **The Debtors May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  There can be no assurance that the requisite acceptances to confirm the Plan will be received.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the RSA.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction could be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan.  The Debtors do not believe that any such transaction exists or is likely to exist that could be more beneficial to the Estates or Holders of Claims or Interests than the Plan.

6.   **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  Under section 1129 of the Bankruptcy Code, confirming a chapter 11 plan requires, among other things, findings by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of allowed claims or allowed interests within a particular class under such plan will not be less than the value of distributions such holders could receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims and Allowed Interests could ultimately receive. As such, the most likely outcome is that the Debtors would liquidate under chapter 7 of the Bankruptcy Code and/or similar equivalent bankruptcy processes in other jurisdictions.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Interests, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

7.      **Nonconsensual Confirmation.**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if (a) at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and (b), as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to any such dissenting impaired class. The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

8.      **Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as changes in economic conditions, changes in the industry or to policies affecting the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for fuel alternatives, and increasing expenses. *See* Article XV.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

9.      **There is a Risk of Termination of the RSA.**

The RSA contains provisions that give the Consenting Stakeholders the ability to terminate the RSA upon the occurrence of certain events or if certain conditions are not satisfied, including the failure to achieve certain milestones. To the extent that events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor and other constituencies and could result in, among other things, the loss of financing commitments to consummate

the Plan, including the loss of access to the DIP Facilities.  Any such loss of support could adversely affect the Debtors' Chapter 11 Cases and their ability to confirm and consummate the Plan.

10. **The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it could be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee could be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 could result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets could have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which could be entitled to priority, that could be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

11. **The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan, subject to the terms of the RSA.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

12. **One or More of the Debtors' Chapter 11 Cases May be Dismissed.**

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

13. **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date is likely to occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

14. **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Voting Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may differ significantly from the estimates.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

15.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Excluded Parties. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts. The release and exculpation provisions are an integral component of the Plan and the significant deleveraging the Debtors believe the Plan will accomplish.

**B.     Risks Related to Recoveries Under the Plan.**

1.     **The Total Amount of General Unsecured Claims May Be Higher than Anticipated by the Debtors.**

With respect to Holders of General Unsecured Claims, the Claims filed against the Debtors' Estates may be materially higher than the Debtors' have estimated.

2.     **Certain Significant Holders of Shares of New Common Equity and New Preferred Equity May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date.**

Assuming that the Effective Date occurs, Holders of Claims and Interests who receive distributions representing a substantial percentage of the outstanding shares of the New Common Equity and New Preferred Equity may be in a position to influence the business and affairs of the Reorganized Debtors and matters requiring approval from the Holders of shares of New Common Equity and New Preferred Equity, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. The Holders may have interests that differ from those of the other holders of shares of New Common Equity and New Preferred Equity and may vote in a manner adverse to the interests of other holders of shares of New Common Equity or New Preferred Equity. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Equity or New Preferred Equity. Such actions by Holders of a significant number of shares of New Common Equity or New Preferred Equity may have a material adverse impact on the Reorganized Debtors' business, financial condition, and operating results.

3.     **Estimated Valuations of the New Common Equity and New Preferred Equity and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.**

The Debtors' estimated recoveries to Holders of Allowed Claims and Interests are not intended to represent the market value of the Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors via the Restructuring Transactions; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to maintain adequate liquidity to fund operations; (d) the assumption that capital and equity markets remain consistent with current conditions; and (e) the Debtors' ability to maintain critical existing customer relationships, including with its key customer.

4.     **The New Common Equity is Subject to Dilution.**

The ownership percentage represented by the New Common Equity and New Preferred Equity distributed on the Effective Date under the Plan will be subject to dilution from the New Common Equity and New Preferred Equity issued in connection with the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence. In addition, the Reorganized Debtors could issue shares or obtain additional equity financing in the future, which could adversely affect the value of the New Common

Equity or New Preferred Equity issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

5. **The Shares of New Common Equity and New Preferred Equity are Equity Interests and Therefore Subordinated to the Indebtedness of the Reorganized Debtors.**

In any liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Equity and New Preferred Equity would rank junior to all debt claims against the Reorganized Debtors.  As a result, holders of shares of New Common Equity and New Preferred Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all of their obligations to their debt holders have been satisfied.

6. **The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results.**

The Reorganized Debtors may not be able to achieve their projected financial results.  The Financial Projections represent the Debtors' management team's and advisors' best estimate of the Debtors' future financial performance.  Such estimate is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors and the status of the United States and world economies in general and the Debtors' industry segment in particular.  While the Debtors believe that the Financial Projections are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Common Equity may be negatively affected, and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

7. **A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt.**

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable.  Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

8. **Certain Tax Implications of the Plan.**

Holders of Allowed Claims should carefully review Article XVIII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

9. **The Debtors May Not Be Able to Accurately Report Their Financial Results.**

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

C.      **Risks Related to the Debtors' and the Reorganized Debtors' Businesses.**

    1.      **The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness.

    2.      **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: the (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

    3.      **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.**

The Debtors' future results will depend upon the successful confirmation and implementation of a plan of reorganization. A long period of operating under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. Prolonged Chapter 11 Cases also may make it more difficult to retain management and other personnel necessary to the success and growth of the Debtors' businesses as well as various counterparties, who may lose confidence in the Debtors' ability to reorganize their businesses successfully and may seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. The chapter 11 proceedings also require the Debtors to seek debtor-in-possession financing to fund operations. If the Debtors are unable to obtain interim or final approval of such financing on favorable terms or at all, or if the Debtors are unable to fully draw on the availability under the DIP Facilities, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may increase, and, as a result, creditor recovery may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

4.      **Financial Results May Be Volatile and May Not Reflect Historical Trends.**

The Financial Projections attached hereto as **<u>Exhibit D</u>** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New Common Equity and the ability of the Debtors to make payments with respect to their indebtedness.  Because the actual results achieved may vary, perhaps significantly, from projected results, the Financial Projections should not be relied upon as a guarantee or other assurance that the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations, and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance may not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

5.      **The Debtors' Substantial Liquidity Needs May Impact Revenue.**

The Debtors operate in a capital-intensive industry.  If the Debtors' cash flow from operations remains depressed or decreases as a result of low commodity prices, decreased E&P sector capital expenditures, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand, cash flow from operations, and cash provided by the DIP Facilities will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and condition of any DIP Orders or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (d) the cost, duration, and outcome of the Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that cash on hand, cash flow from operations, and cash provided under the DIP Facilities are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing could be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the

foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

6.     **The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.**

The Debtors' operations are subject to extensive federal, state, and local laws and regulations, including complex environmental laws and occupational health and safety laws.  The Debtors may be required to make large expenditures to comply with such regulations.  Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties.  The Debtors' operations create the risk of environmental liabilities to the government or third-parties for any unlawful discharge of oil, gas or other pollutants into the air, soil or water.  In the event of environmental violations or releases of hazardous substances, the Reorganized Debtors may be charged with remedial costs and landowners may file claims for alternative water supplies, property damage or bodily injury.  The Debtors have also been required to obtain numerous governmental permits for the operation or ownership of its facilities.  Typically, environmental laws require a lengthy and complex process for obtaining licenses, permits and approvals prior to construction, operation or modification of a project or refining facility.  If there is a delay in obtaining, or complying with, required approvals or permits, or if the Debtors fail to obtain such permits, the operation of their facilities may be interrupted or subject the Debtors to civil or criminal liability, the imposition of liens or fines, or actions by regulatory agencies seeking to curtail the Debtors' operations.  The Debtors may also be exposed to risks arising from past, current or future contamination at their facilities, which could in some circumstances result in liability for environmental damage regardless of negligence or fault.  In addition, pollution and similar environmental risks generally are not fully insurable.  These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.  Federal laws and regulations govern, among other things, transactions by and with wholesale sellers and purchasers of fossil fuels, the development and construction of refining facilities, the ownership and operation of refining facilities, and the transport of refined fuels.  Refining facilities are also subject to federal, state and local laws and regulations that govern, among other things, the geographical location, zoning, land use, and operation of a facility.  The Debtors believe that they will have obtained all material refining-related federal, state and local permits and approvals currently required to operate their facilities.

7.     **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

8.     **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.**

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors may experience increased levels of employee attrition.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

At times of low unemployment rates of skilled laborers in the management expertise areas the Debtors may require, it can be difficult for the Debtors to find qualified and affordable personnel.  The Debtors may be unable to hire and retain a sufficient skilled labor force necessary to support the Debtors' operating requirements and growth strategy.  The Debtors' labor expenses may increase as a result of a shortage in the supply of skilled personnel.  Additionally, the Debtors may also be forced to incur significant training expenses if they are unable to hire employes with requisite skill.  Accordingly, labor shortages or increased labor or training costs could materially adversely affect the Debtors' business, financial condition, or results of operations.

9.     **The Debtors' Business Depends on Their Ability to Keep Pace with Rapid Technological Changes That Impact Their Industry, and Ability to Grow and Retain the Debtors' Customer Base.**

The Debtors operate in a complex and constantly shifting industry characterized by swift, and sometimes disruptive, technological developments, evolving industry standards, and changes in regulatory requirements.  Changes in technology, standards, and regulatory requirements in the Debtors' businesses continue to occur at unpredictable intervals, and the Debtors may not be able to respond adequately.  The impact of these changes may be magnified by the intense competition in the Debtors' industry.  If the Debtors are unable to successfully update and integrate their offerings to adapt to these changes, or if the Debtors do not successfully develop new capabilities needed by their customers to keep pace with these changes, the Debtors' business and financial results may suffer.

The Debtors' ability to keep up with technology and business changes is subject to a number of risks, and the Debtors may find it difficult or costly to, among other things, keep pace with competitor advances and update the Debtors' products and services to stay current with business, regulatory, and other developments in the industry.

10.     **The Debtors' Ability to Implement Their Business Strategy May Be Materially and Adversely Affected by Many Known and Unknown Factors.**

The Debtors' business strategy relies upon the Debtors' ability to successfully operate the Bakersfield Facility and to source Camelina and other feedstocks in a cost-effective manner.  The Debtors' business strategy relies on numerous assumptions and these assumptions are subject to significant economic, competitive, regulatory and operational uncertainties, contingencies and risks, many of which are beyond the Debtors' control.  The Debtors' future ability to execute their business strategy is uncertain and unproven, and it can be expected that one or more of their assumptions will prove to be incorrect, potentially resulting in unanticipated events and circumstances that may adversely affect the Debtors' business.  Among the factors that could have a material adverse effect on the Debtors' ability to implement their strategy and achieve their targets are the following:

- inability to source feedstock for the Bakersfield Facility, including Camelina, in sufficient quantities and/or at economically attractive prices;

- failure to manage third-party Camelina cultivation operations at the expected costs and in the projected time frame;

- inability to enroll a sufficient number of farmers to grow Camelina to fulfill forecasted Camelina feedstock requirements;

- inability to maintain existing or secure new offtake arrangements for our renewable diesel;

- failure of our proprietary Camelina varieties to produce the amount and quality of grain as expected;

- changes in existing laws and regulations affecting energy markets in general, and renewable energy markets in particular;

- changes in general economic, political and business conditions in the U.S., particularly those that affect the energy and renewable fuels markets;

- availability of farmland, relationship with farmers, and factors affecting agricultural operations in general, including adverse weather (e.g., floods and storms, severe heat, frost, and hail), changes in growing conditions, crop diseases or pest infestations); and

- increases in operating costs, including the need for additional or unexpected capital improvements, labor costs transportation, processing and storage costs, insurance premiums, general taxes, real estate taxes and utilities, environmental regulation compliance costs, and other costs affecting our profit margins.

**D.      Risks Related to the Offer and Issuance of Securities Under the Plan.**

**1.      The Debtors Do Not Intend to Register the Offer or Sale of New Common Equity and New Preferred Equity, and Certain Holders of New Common Equity and New Preferred Equity May Be Restricted in Their Ability to Transfer or Sell Their Securities.**

The New Common Equity and New Preferred Equity will not be registered under the Securities Act or any state securities laws and, subject to the discussion below and the discussion in Article XVII entitled "Certain Securities Laws Matters," unless so registered, may not be re-offered or re-sold except pursuant to an exemption from the registration requirements of the Securities Act and applicable state securities laws. In addition, the Reorganized Debtors do not expect to be subject to the reporting requirements promulgated under U.S. federal securities Law, and Holders of the New Common Equity and New Preferred Equity will not be entitled to any information except as expressly required in the applicable New Organizational Documents.

If shares of the New Common Equity and New Preferred Equity issued under the Plan are issued pursuant to section 1145(a)(1) of the Bankruptcy Code, such Securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, shares of such securities will not be freely tradeable if, at the time of transfer, the Holder is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by Holders of Claims who receive New Common Equity or New Preferred Equity pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Equity and New Preferred Equity will not be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any holder of New Common Equity or New Preferred Equity to freely resell shares of the New Common Equity or New Preferred Equity. *See* Article XVII to this Disclosure Statement entitled "Certain Securities Law Matters."

**2.      A Liquid Trading Market for the Shares of New Common Equity and New Preferred Equity May Not Develop.**

The Debtors do not expect to list the New Common Equity and New Preferred Equity on a national securities exchange upon Emergence, and even if they make such an application in the future, the Debtors make no assurance that they will be able to obtain such listing or that liquid trading markets for shares of New Common Equity or New Preferred Equity will develop. The liquidity of any market for New Common Equity or New Preferred Equity will depend upon, among other things, the number of holders of shares of New Common Equity or New Preferred Equity, the Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted. Accordingly, there can be no assurance that an active trading market for the New Common Equity or the New Preferred Equity will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell New Common Equity or New Preferred Equity may be substantially limited.

In addition, the Reorganized Debtors do not expect to be subject to the reporting requirements of U.S. federal securities law, and holders of the New Common Equity and the New Preferred Equity will not be entitled to any information except as expressly required by the New Organizational Documents. As a result, the information which the Debtors are required to provide in order to issue the New Common Equity and the New Preferred Equity may be less than the Debtors would be required to provide if the New Common Equity and New Preferred Equity were registered. Among other things, the Debtors may not be required to provide: (a) selected historical consolidated financial data of GCEH.; (b) selected quarterly financial data of GCEH; (c) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (d) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers. This lack of information could impair the ability of a holder of New Common Equity or New Preferred Equity to evaluate such holder's ownership and impair the marketability of the New Common Equity or New Preferred Equity.

### E. Miscellaneous Risk Factors and Disclaimers.

#### 1. The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to this Disclosure Statement) is without inaccuracies.

#### 2. No Legal or Tax Advice is Provided by This Disclosure Statement.

This Disclosure Statement does not constitute legal advice. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

#### 3. No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

#### 4. Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Cause of Action is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, File, and prosecute Claims or Causes of Action and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

#### 5. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to this Disclosure Statement.

6.      **No Representations Outside This Disclosure Statement Are Authorized.**

NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.     ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION.     VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF TEXAS.

## XVI.    CONFIRMATION OF THE PLAN

### A.      The Confirmation Hearing.

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a chapter 11 plan.  The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

### B.      Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### C.      Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation of the debtor or the need for further financial reorganization of, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors prepared projected [●] (the "<u>Financial Projections</u>") attached hereto as **<u>Exhibit D</u>** and incorporated herein by reference.  Creditors and other interested parties should review **<u>Exhibit D</u>** and Article XV of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.      Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan accepts the plan.  A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[28]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that actually vote on the Plan cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by Holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such Class that *actually* vote on the Plan cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

### E.      Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.      No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will

---

[28] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the Holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the Holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the Holder of such claim or equity interest.

consider a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of similarly situated creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' Advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors, their management team, and the Committee believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

### G. Valuation Analysis

In conjunction with formulating the Plan and satisfying their obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going-concern value of the Reorganized Debtors, which estimate is attached hereto as Exhibit E (the "Valuation Analysis").  The Valuation Analysis should be considered in conjunction with the risk factors discussed in Article XV of this Disclosure Statement, entitled "Risk Factors," as well as the Financial Projections.  The Valuation Analysis is dated as of [●], 2025, and is based on data and information as of that date.  The Valuation Analysis is subject to various important qualifiers and assumptions that are set forth therein, and Holders of Claims and Interests should carefully review the information in the Valuation Analysis in its entirety. The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting classes. This valuation is not, and is not to be construed as (1) a recommendation to any Holder of Claims as to how to vote on, or otherwise act with respect to, the Plan, (2) an opinion as to the fairness from a financial point of view of the consideration to be received pursuant to the Restructuring Transactions, or (3) an appraisal of the assets of the Reorganized Debtors.

## XVII. CERTAIN SECURITIES LAW MATTERS

### A. New Common Equity and Preferred Equity.

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Common Equity and New Preferred Equity to certain Holders of prepetition Claims against the Debtors.  The Debtors believe that the

New Common Equity and the New Preferred Equity will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities laws.  Any New Common Equity and New Preferred Equity issued under the Plan will be issued (a) to the fullest extent permitted and applicable, without registration under the Securities Act or similar federal, state, or local laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or (b) to the extent section 1145 is not permitted or applicable, pursuant to other exemptions under the Securities Act.

The Debtors further believe that the issuance of the New Common Equity and the New Preferred Equity after the Petition Date pursuant to the restructuring transactions under the Plan is, and subsequent transfers of such New Common Equity and New Preferred Equity by the holders thereof that are not "underwriters" (which definition includes "Controlling Persons") will be, exempt from federal and state securities registration requirements under the Bankruptcy Code, Securities Act and any applicable state securities laws as described in more detail below, except in certain limited circumstances.

The following discussion of the issuance and transferability of the New Common Equity and the New Preferred Equity relates solely to matters arising under federal securities laws and state securities laws.  The rights of holders of New Common Equity and the New Preferred Equity, including the right to transfer such interests, will also be subject to any restrictions in the New Organizational Documents.  Recipients of the New Common Equity and the New Preferred Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.

B.    **Exemption from Registration Requirements; Issuance of New Common Equity and New Preferred Equity under the Plan.**

All of the shares, units, or equity interests (as the case may be based on how the New Common Equity and the New Preferred Equity is denominated) of New Common Equity and the New Preferred Equity will be issued after the Petition Date and, to the fullest extent permitted and applicable, in reliance on section 1145(a) of the Bankruptcy Code and without registration under the Securities Act, state securities laws or any similar federal, state, or local law.

Section 1145 of the Bankruptcy Code provides, among other things, that Section 5 of the Securities Act and any other applicable U.S. state or local law requirements for the registration of issuance of a security do not apply to the offering, issuance, distribution, or sale of stock, options, warrants or other securities by a debtor if (1) the offer or sale occurs under a plan of reorganization of the debtor, (2) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor or an affiliate thereof participating in the plan of reorganization, and (3) the securities are (i) issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or an affiliate thereof participating in the plan of reorganization, or (ii) issued principally in such exchange and partly for cash or property.  The Debtors believe that all shares, units, or equity interests (as the case may be based on how the New Common Equity and the New Preferred Equity is denominated) of New Common Equity and the New Preferred Equity issued after the Petition Date in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of New Common Equity or the New Preferred Equity.  Recipients of shares of the New Common Equity and New Preferred Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.  As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

C.      **Resales of New Common Equity and New Preferred Equity; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.**

1.      **Resales of New Common Equity and New Preferred Equity Issued Pursuant to Section 1145.**

New Common Equity and New Preferred Equity to the extent offered, issued, and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or Blue Sky Laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Equity and New Preferred Equity issued in exchange for Allowed Term Claims and Allowed Prepetition EPC Claims pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such New Common Equity or New Preferred Equity who are deemed to be "underwriters" may be entitled to resell their New Common Equity or New Preferred Equity pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act could permit the public sale of control securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person could be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Equity or New Preferred Equity could depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person could be deemed an "underwriter" with respect to such New Common Equity or New Preferred Equity and, in turn, whether any Person may freely trade such New Common Equity or New Preferred Equity. However, the Debtors do not intend to make publicly available the requisite information regarding the Debtors, and,

as a result, Rule 144 may not be available for resales of such New Common Equity or New Preferred Equity by Persons deemed to be underwriters or otherwise.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.  POTENTIAL RECIPIENTS OF NEW COMMON EQUITY AND NEW PREFERRED EQUITY ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATE BLUE SKY LAW.**

2.      **Resales of New Common Equity and New Preferred Equity Issued Pursuant to Section 4(a)(2) of the Securities Act, Regulation D Promulgated Thereunder, Regulation S under the Securities Act, and/or Other Available Exemptions from Registration.**

To the extent the exemption set forth in Section 1145(a) of the Bankruptcy Code is unavailable, New Common Equity and New Preferred Equity will be offered, issued, and distributed in reliance of Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period.  An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Common Equity or New Preferred Equity by affiliates of the Debtors. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any New Common Equity or New Preferred Equity offered, issued and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

To the extent New Common Equity or New Preferred Equity is not issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code, such New Common Equity or New Preferred Equity will be issued in

certificated or book-entry form and will bear a restrictive legend.  Each certificate or book-entry representing, or issued in exchange for or upon the transfer, sale, or assignment of, any New Common Equity or New Preferred Equity not issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], AND THE OFFER AND SALE OF THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED, OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Reorganized Debtors will reserve the right to require certification or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of New Common Equity or New Preferred Equity that was not issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code.  The Reorganized Debtors will also reserve the right to stop the transfer of any such securities if such transfer is not in compliance with Rule 144 or another applicable exemption from registration.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the New Common Equity and New Preferred Equity are exempt from the registration requirements of Section 5 of the Securities Act.

In addition to the foregoing restrictions, the New Common Equity and New Preferred Equity will also be subject to any applicable transfer restrictions contained in the Debtors' New Organizational documents.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.  THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES.  THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS.  BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF NEW COMMON AND NEW PREFERRED EQUITY STOCK MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.]**

**XVIII.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.**[29]

[*To Come*]

---

[29]   The Debtors expect to incorporate a discussion of tax considerations into this Disclosure Statement shortly following the Petition Date and in any event prior to the hearing on the adequacy of the Disclosure Statement.

## XIX.   RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  April 16, 2025                              Global Clean Energy Holdings, Inc.


                                                   /s/ *Noah Verleun*
                                                   _____
                                                   Noah Verleun
                                                   Chief Executive Officer

**<u>EXHIBIT A</u>**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL CLEAN ENERGY | ) | Case No. 25-90113 (ARP) |
| HOLDINGS, INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**GLOBAL CLEAN ENERGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

> **THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. THE INFORMATION IN THIS PLAN IS SUBJECT TO CHANGE. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**NORTON ROSE FULBRIGHT US LLP**
Jason L. Boland (SBT 24040542)
Robert B. Bruner (SBT 24062637)
Julie Harrison (SBT 24092434)
Maria Mokrzycka (SBT 24119994)
1550 Lamar Street, Suite 2000
Houston, Texas 77010-3095
Telephone:     (713) 651-5151
Facsimile:      (713) 651-5246
Email:  jason.boland@nortonrosefulbright.com
          bob.bruner@nortonrosefulbright.com
          julie.harrison@nortonrosefulbright.com
          maria.mokrzycka@nortonrosefulbright.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Brian Schartz, P.C. (TX Bar No. 24099361)
Ross J. Fiedler (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com
                bschartz@kirkland.com
                ross.fiedler@kirkland.com
-and-
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Peter A. Candel (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:          peter.candel@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  April 16, 2025

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/GCEHoldings.  The location of Debtor Global Clean Energy Holdings, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is: 6451 Rosedale Highway, Bakersfield, California 93308.

# **TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
GOVERNING LAW ...................................................................................................1
  A.     Defined Terms. ..........................................................................................................1
  B.     Rules of Interpretation. ...........................................................................................14
  C.     Computation of Time. ..............................................................................................15
  D.     Governing Law. ........................................................................................................15
  E.     Reference to Monetary Figures. ..............................................................................15
  F.     Reference to the Debtors or the Reorganized Debtors. ...........................................15
  G.     Nonconsolidated Plan. .............................................................................................15
  H.     Controlling Document. .............................................................................................16
  I.     Consultation, Notice, Information, and Consent Rights...........................................16

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING
EXPENSES................................................................................................................16
  A.     Administrative Claims. .............................................................................................16
  B.     DIP Claims. ..............................................................................................................16
  C.     Professional Fee Claims. ..........................................................................................17
  D.     Priority Tax Claims. .................................................................................................18
  E.     Payment of Restructuring Expenses. .......................................................................18

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS...................18
  A.     Classification of Claims and Interests. .....................................................................18
  B.     Treatment of Claims and Interests. ..........................................................................19
  C.     Special Provision Governing Unimpaired Claims. ...................................................23
  D.     Elimination of Vacant Classes. ................................................................................23
  E.     Voting Classes, Presumed Acceptance by Non-Voting Classes. ..............................23
  F.     Intercompany Interests. ............................................................................................23
  G.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................23
  H.     Controversy Concerning Impairment. ......................................................................24
  I.     Subordinated Claims. ...............................................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN.....................................................24
  A.     General Settlement of Claims and Interests. ............................................................24
  B.     Restructuring Transactions. .....................................................................................24
  C.     Director, Officer, and Manager Liability Insurance. ................................................25
  D.     Employment Obligations. .........................................................................................25
  E.     Cancellation of Notes, Instruments, Certificates, and Other Documents................25
  F.     Section 1146 Exemption. ..........................................................................................26
  G.     The Reorganized Debtors..........................................................................................26
  H.     Sources of Consideration for Plan Distributions. ....................................................26
  I.     Private Company. ......................................................................................................28
  J.     Corporate Existence. ................................................................................................28
  K.     Vesting of Assets in the Reorganized Debtors. .........................................................28
  L.     Corporate Action.......................................................................................................28
  M.     New Organizational Documents. ..............................................................................29
  N.     Directors and Officers of the Reorganized Debtors. ................................................29
  O.     Effectuating Documents; Further Transactions........................................................29
  P.     Certain Securities Law Matters. ...............................................................................30
  Q.     Preservation of Causes of Action. ............................................................................30
  R.     Closing the Chapter 11 Cases. .................................................................................31

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............31
  A.     Assumption and Rejection of Executory Contracts and Unexpired Leases. ...................31

|  | B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 32 |
|  | C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 33 |
|  | D. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. | 33 |
|  | E. | Insurance Policies. | 33 |
|  | F. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 34 |
|  | G. | Indemnification Provisions. | 34 |
|  | H. | Reservation of Rights. | 34 |
|  | I. | Nonoccurrence of Effective Date. | 34 |
|  | J. | Contracts and Leases Entered Into After the Petition Date. | 34 |

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................................... 35
|  | A. | Timing and Calculation of Amounts to Be Distributed. | 35 |
|  | B. | Disbursing Agent. | 35 |
|  | C. | Rights and Powers of Disbursing Agent. | 35 |
|  | D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 35 |
|  | E. | Manner of Payment. | 37 |
|  | F. | Compliance with Tax Requirements. | 37 |
|  | G. | Allocations. | 37 |
|  | H. | No Postpetition Interest on Claims. | 37 |
|  | I. | Foreign Currency Exchange Rate. | 37 |
|  | J. | Setoffs and Recoupment. | 37 |
|  | K. | Claims Paid or Payable by Third Parties. | 38 |

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS .......................................... 38
|  | A. | Allowance of Claims. | 38 |
|  | B. | Claims Administration Responsibilities. | 38 |
|  | C. | Disputed Claims Process. | 39 |
|  | D. | Disputed Claims Reserve | 39 |
|  | E. | Estimation of Claims and Interests. | 39 |
|  | F. | Adjustment to Claims or Interests without Objection. | 40 |
|  | G. | Disallowance of Claims or Interests. | 40 |
|  | H. | No Distributions Pending Allowance. | 40 |
|  | I. | Distributions After Allowance. | 40 |

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............................ 40
|  | A. | Discharge of Claims and Termination of Interests. | 40 |
|  | **B.** | **Release of Liens.** | 41 |
|  | **C.** | **Releases by the Debtors.** | 41 |
|  | **D.** | **Releases by the Releasing Parties.** | 42 |
|  | **E.** | **Exculpation.** | 44 |
|  | **F.** | **Injunction.** | 44 |
|  | G. | Protections Against Discriminatory Treatment. | 45 |
|  | H. | Document Retention. | 45 |
|  | I. | Reimbursement or Contribution. | 45 |

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN. | 46 |
|  | A. | Conditions Precedent to the Effective Date. | 46 |
|  | B. | Waiver of Conditions. | 47 |
|  | C. | Effect of Failure of Conditions. | 47 |
|  | D. | Substantial Consummation. | 47 |

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN | 47 |
|  | A. | Modification and Amendments. | 47 |
|  | B. | Effect of Confirmation on Modifications. | 47 |
|  | C. | Revocation or Withdrawal of Plan. | 48 |

ARTICLE XI. RETENTION OF JURISDICTION ............................................................................48

ARTICLE XII. MISCELLANEOUS PROVISIONS .........................................................................50
      A.      Immediate Binding Effect. ..............................................................................50
      B.      Additional Documents. ....................................................................................50
      C.      Payment of Statutory Fees. .............................................................................50
      D.      Statutory Committee and Cessation of Fee and Expense Payment. .................50
      E.      Reservation of Rights. .....................................................................................50
      F.      Successors and Assigns. ...................................................................................50
      G.      Notices. ...........................................................................................................50
      H.      Term of Injunctions or Stays. .........................................................................53
      I.      Entire Agreement. ...........................................................................................53
      J.      Exhibits. ..........................................................................................................53
      K.      Nonseverability of Plan Provisions. ...............................................................53
      L.      Votes Solicited in Good Faith. .......................................................................53
      M.      Waiver or Estoppel. ........................................................................................54

## INTRODUCTION[2]

Global Clean Energy Holdings, Inc. and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, various risk factors associated therewith, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

### ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Administrative Claim*" means a Claim incurred on or after the Petition Date and before the Effective Date for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and before the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

2.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

3.      "*Agents*" means, collectively, the Prepetition RCF Agent, the Prepetition Term Loan Agent, and the DIP Agents.

4.      "*Allowed*" means, with respect to a Claim or Interest, any Claim or Interest (or portion thereof) against any Debtor that (a) is not Disputed within the applicable period of time, if any, fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, (b) is allowed, compromised, settled, or otherwise resolved pursuant to the terms of the Plan, in any stipulation that is approved by a Final Order of the Bankruptcy Court, or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith, or (c) has been allowed by a Final Order of the Bankruptcy Court. For the avoidance of doubt, any Claim or Interest (or portion thereof) that has been disallowed pursuant to a Final Order shall not be an "Allowed" Claim.

5.      "*Assumed Agreements*" means those certain employment agreements with the individuals set forth on Exhibit E to the Restructuring Term Sheet.

6.      "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or

---

2      [**NTD**: The Plan and all terms and conditions and transactions contemplated hereby remain subject to ongoing tax analysis and review by K&E tax.]

other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

7.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

8.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

9.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, including the Procedures for Complex Cases in the Southern District of Texas.

10.      "*Bar Date Order*" means the [*Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving the Form and Manner of Notice Thereof, (III) Approving the Form and Manner for Filing Proofs of Claim, and (IV) Granting Related Relief*] [Docket No. [●]] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

11.      "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

12.      "*Cash*" *or* "*$*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

13.      "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

14.      "*Causes of Action*" means, collectively, any and all Claims, Interests, damages, remedies, causes of action, demands, rights (including rights to payment), actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, interests, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, Law, equity, or otherwise.  "Causes of Action" also includes:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) Claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common Law, including fraudulent transfer Laws.

15.      "*CCI Claims*" means Claims arising under or in connection with that certain revised letter agreement, dated as of December 8, 2024 (as amended, modified, amended and restated, or supplemented from time to time consistent with the terms thereof), by and among Castleton Commodities Merchant Trading, L.P. and GCEH.

16.      "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

17.      "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

18.      "*Claims and Noticing Agent*" means Epiq Corporate Restructuring, LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

2

19.     "*Claims Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by (a) the Bar Date Order, (b) a Final Order of the Bankruptcy Court, or (c) the Plan.

20.     "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

21.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

22.     "*Class B Purchase Agreement*" means that certain Purchase Agreement, dated as of April 16, 2025, by and among Agribody Technologies, Inc., BKRF HCB, LLC, and the Class B Members signatories thereto as sellers.

23.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

24.     "*Common Holders*" has the meaning set forth in the Governance Term Sheet.

25.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

26.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

27.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

28.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29.     "*Consenting RCF Lender Advisors*" means Sidley Austin LLP, as legal counsel to the Consenting RCF Lenders and the Prepetition RCF Agent.

30.     "*Consenting RCF Lenders*" has the meaning set forth in the RSA.

31.     "*Consenting Stakeholders*" means, collectively, the Consenting Term Loan Lenders, the Consenting RCF Lenders, and CTCI.

32.     "*Consenting Term Loan Lender Advisors*" means (a) Latham & Watkins LLP, as legal counsel, (b) Hunton Andrews Kurth LLP, as local counsel, (c) Matthew Crisp, as consultant, and (d) Perella Weinberg Partners LP, as investment banker to the Consenting Term Loan Lenders and the Prepetition Term Loan Agent.

33.     "*Consenting Term Loan Lenders*" has the meaning set forth in the RSA.

34.     "*Consummation*" means the occurrence of the Effective Date.

35.     "*CTCI*" means, collectively, CTCI Americas, Inc. and each of its Affiliates party to the Terminated EPC Agreement.

36.     "*CTCI Advisors*" means, collectively, (a) Davis Wright Tremaine LLP and Haynes and Boone, LLP as legal counsel, and (b) BDO Capital Advisors, LLC, as financial advisor.

37.     "*Cure*" means all amounts, including an amount of $0, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

38.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") maintained by or for the benefit of the Debtors for liabilities against any of the Debtors' current or former directors, managers, and officers, and all agreements, documents or instruments relating thereto.

39.     "*Debtor Release*" means the release set forth in Article VIII.C.

40.     "*Debtors*" means, collectively, each of the following:  Global Clean Energy Holdings, Inc.; GCE Holdings Acquisitions, LLC; Rosedale FinanceCo LLC; BKRF HCB, LLC; BKRF HCP, LLC; BKRF OCP, LLC; BKRF OCB, LLC; Bakersfield Renewable Fuels, LLC; Agribody Technologies, Inc.; Sustainable Oils, Inc.; GCE International Development, LLC; GCE Texas, LLC; GCEH Ventures, LLC; GCEH CS Acquisition, LLC; and GCE Operating Company, LLC.

41.     "*Definitive Documents*" has the meaning set forth in the RSA.

42.     "*DIP Agents*" means, collectively, the DIP RCF Agent and the DIP Term Loan Agent.

43.     "*DIP Claims*" means any Claim held by (a) the DIP Lenders or the DIP Agents arising under or relating to the DIP Credit Agreements or the DIP Orders on account of funding the DIP Facilities, including any and all fees, interest paid in kind, and accrued but unpaid interest and fees arising under the DIP Facilities, the DIP Credit Agreements, or the other DIP Documents and (b) CTCI arising under or relating to the New CTCI Agreement or the DIP Orders, including any and all amounts arising under the New CTCI Documents subject to the limitations set forth therein.

44.     "*DIP Credit Agreements*" means, collectively, the DIP Term Loan Credit Agreement and the DIP RCF Credit Agreement.

45.     "*DIP Documents*" means, collectively, the DIP Term Loan Documents and the DIP RCF Documents.

46.     "*DIP Facilities*" means, collectively, the DIP Term Loan Facility and the DIP RCF Facility.

47.     "*DIP Lenders*" means, collectively, the DIP Term Loan Lenders and the DIP RCF Lenders.

48.     "*DIP Orders*" means, as applicable, the interim and final orders of the Bankruptcy Court approving, among other things, the terms of the DIP Facilities, each of which shall be in form and substance acceptable to the Required Consenting Stakeholders and consistent with the DIP Credit Agreements, the priority of certain Claims under the New CTCI Agreement as set forth in the New CTCI Documents, the Debtors' entry into the DIP Documents and the New CTCI Documents, and the use of Cash collateral.

49.     "*DIP RCF Agent*" means Vitol Americas Corp., as the administrative agent and collateral agent under the DIP RCF Credit Agreement, including its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP RCF Credit Agreement.

50.     "*DIP RCF Claims*" means any Claim held by the DIP RCF Lenders or the DIP RCF Agent arising under or relating to the DIP RCF Credit Agreement or the DIP Orders on account of funding the DIP RCF Facility, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP RCF Facility, the DIP RCF Credit Agreement, or the other DIP RCF Documents.

51.     "*DIP RCF Credit Agreement*" means that certain super-senior secured debtor-in-possession loan and security agreement, dated as of April 16, 2025, by and among the Debtors, the DIP RCF Agent, and the DIP RCF Lenders party thereto, setting forth the terms and conditions of the DIP RCF Facility.

52.     "*DIP RCF Documents*" means, collectively, the DIP RCF Credit Agreement, any amendments, modifications, or supplements to the foregoing, including, but not limited to, any related notes, certificates, agreements, security agreements, documents, or instruments (including any amendments, restatements, supplements,

or modifications of any of the foregoing) related to or executed in connection therewith, and the Prepetition SOA and Prepetition SSA and related guarantees, in each case, which shall be in form and substance acceptable to the DIP RCF Secured Parties.

53.     "*DIP RCF Facility*" means a $100,000,000 super-senior, secured debtor-in-possession revolving financing facility to be provided to the Debtors by the Consenting RCF Lenders on the terms and conditions set forth in the DIP RCF Term Sheet, the DIP RCF Documents, the DIP Orders, and on other terms and conditions to be agreed upon by the Debtors and the DIP RCF Lenders, which terms shall be reasonably acceptable to the Required Consenting Term Loan Lenders, consistent with the DIP RCF Documents and including, on and after the Petition Date, the Prepetition SOA and Prepetition SSA.

54.     "*DIP RCF Lenders*" means the lenders under the DIP RCF Credit Agreement.

55.     "*DIP RCF Secured Parties*" means Vitol, in its capacity as a party under the Prepetition SOA and Prepetition SSA, the DIP RCF Lenders, and the DIP RCF Agent.

56.     "*DIP RCF Term Sheet*" means the term sheet setting forth the terms and conditions of the DIP RCF Facility, attached to the Restructuring Term Sheet as <u>Exhibit A-1</u>, together with any exhibits and appendices annexed thereto, each of which shall be in form and substance acceptable to the DIP RCF Secured Parties.

57.     "*DIP Term Loan Agent*" means Orion Energy Partners TP Agent, LLC, as the administrative agent and collateral agent under the DIP Term Loan Credit Agreement, including its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Term Loan Credit Agreement.

58.     "*DIP Term Loan Claims*" means any Claim held by the DIP Term Loan Lenders or the DIP Term Loan Agent arising under or relating to the DIP Term Loan Credit Agreement or the DIP Orders on account of funding the DIP Term Loan Facility, including any and all fees, interest paid in kind, accrued but unpaid interest, premiums, and fees arising under the DIP Term Loan Facility, the DIP Term Loan Credit Agreement, or the other DIP Term Loan Documents.

59.     "*DIP Term Loan Credit Agreement*" means that certain super-senior secured debtor-in-possession loan and security agreement, dated as of April 16, 2025, by and among the Debtors, the DIP Term Loan Agent, and the DIP Term Loan Lenders party thereto.

60.     "*DIP Term Loan Documents*" means, collectively, the DIP Term Loan Credit Agreement and any amendments, modifications, or supplements to the foregoing, including, but not limited to, any related notes, certificates, agreements, security agreements, documents, or instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing), and other documentation necessary to effectuate the incurrence of the DIP Term Loan Facility.

61.     "*DIP Term Loan Facility*" means the $75,000,000, super-senior, secured debtor-in-possession term loan financing facility to be provided to the Debtors on the terms and conditions set forth in the DIP Term Loan Term Sheet, the DIP Term Loan Documents, the DIP Orders, and on other terms and conditions to be agreed upon by the Debtors and the DIP Term Loan Lenders consistent with the DIP Term Loan Documents.

62.     "*DIP Term Loan Lenders*" means the lenders under the DIP Term Loan Credit Agreement.

63.     "*DIP Term Loan Term Sheet*" means the term sheet setting forth the terms and conditions of the DIP Term Loan Facility, attached to the Restructuring Term Sheet as <u>Exhibit A-2</u>, together with any exhibits and appendices annexed thereto.

64.     "*Disbursing Agent*" means the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan, which Entity may include the Claims and Noticing Agent.

65.     "*Disclosure Statement*" means the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Global Clean Energy Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (as may be amended, supplemented, or modified from time to time in accordance with the terms thereof), including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

66.     "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest (or a portion thereof):  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

67.     "*Disputed Claims Reserve*" means a reserve of Cash or other consideration in the Disputed Claims Reserve Amount that may be funded after the Effective Date pursuant to Article VIII.

68.     "*Disputed Claims Reserve Amount*" means the amount of Cash or other consideration determined by the Debtors or the Reorganized Debtors, as applicable, subject to the prior written consent of the Required Consenting Term Loan Lenders and CTCI (in each case which consent shall not be unreasonably withheld), to be held in the Disputed Claims Reserve on account of Disputed General Unsecured Claims.

69.     "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date as specified in the Confirmation Order; *provided* that, to the extent Holders of the Debtors' publicly-traded securities are entitled to receive a distribution under the Plan, the Distribution Record Date shall not apply to any of the Debtors' publicly-traded securities deposited with DTC, and such Holders shall receive a distribution in accordance with the customary procedures of DTC used in connection with such distributions.

70.     "*DTC*" means The Depository Trust Company.

71.     "*Effective Date*" means the date that is the first Business Day after Confirmation on which (a) the Confirmation Order is in effect and not subject to stay; (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A have been satisfied or waived in accordance with Article IX.B; and (c) the Debtors declare the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

72.     "*Employment Obligations*" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with the Plan.

73.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

74.     "*Equity Security*" means any equity security, as defined in section 101(16) of the Bankruptcy Code.

75.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

76.     "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a *et seq*., as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

77.     "*Exculpated Partie*s" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the independent directors or managers of any Debtor, for conduct within the scope of their duties; and (c) any statutory committees appointed in the Chapter 11 Cases and each of their respective members, solely in their respective capacities as such.

78.     "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

6

79.     "*Exit EPC Claims*" means, collectively, the Post-Exit CTCI Senior DIP Payment Obligations, the Subordinated Senior Secured EPC Claims, the Subordinated Secured EPC Claim, and the Subordinated Junior EPC Claim.

80.     "*Exit EPC Claims Documents*" means, collectively, any agreements or documents memorializing the Exit EPC Claims, including any amendments, modifications, and supplements thereto.

81.     "*Exit Facilities*" means, collectively, the Exit RCF Facility, the Exit Term Loan Facilities, and the Exit EPC Claims.

82.     "*Exit Facilities Documents*" means, collectively, the Exit RCF Facility Documents, the Exit Term Loan Facilities Documents, and the Exit EPC Claims Documents.

83.     "*Exit Facilities Term Sheet*" means the term sheet attached to the Restructuring Term Sheet as Exhibit C, together with any exhibits and appendices annexed thereto.

84.     "*Exit RCF Credit Agreement*" means the credit agreement with respect to the Exit RCF Facility, as may be amended, supplemented, or otherwise modified from time to time.

85.     "*Exit RCF Facility*" means that certain $100,000,000 revolving credit facility, supply and offtake agreement, and storage services agreement to be entered into by the applicable Reorganized Debtors on the Effective Date pursuant to the Exit RCF Credit Agreement, the Exit SOA, or the Exit SSA, as applicable, on substantially the same terms as the Prepetition RCF Credit Agreement, the Prepetition SOA, or the Prepetition SSA, as applicable.

86.     "*Exit RCF Facility Documents*" means, collectively, the Exit RCF Credit Agreement and any other agreements or documents memorializing the Exit RCF Facility, including any amendments, modifications, and supplements thereto.

87.     "*Exit SOA*" means the supply and offtake agreement with respect to the Exit RCF Facility, as may be amended, supplemented, or otherwise modified from time to time consistent with the terms thereof, which may be an amended and restated Prepetition SOA.

88.     "*Exit SSA*" means the storage services agreement with respect to the Exit RCF Facility, as may be amended, supplemented, or otherwise modified from time to time consistent with the terms thereof, which may be an amended and restated Prepetition SSA.

89.     "*Exit Term Loan Credit Agreements*" means, collectively, the New Super Senior Exit Term Loan Credit Agreement, the New Senior Secured Term Loan Credit Agreement, the Subordinated Senior Secured Term Loan Credit Agreement, and the Subordinated Junior Term Loan Credit Agreement.

90.     "*Exit Term Loan Facilities*" means, collectively, the New Super Senior Exit Facility, the New Senior Secured Exit Facility, the First Out Subordinated Senior Secured Term Facility, the Second Out Subordinated Secured Term Facility, and the Subordinated Junior Term Facility.

91.     "*Exit Term Loan Facilities Documents*" means, collectively, the Exit Term Loan Credit Agreements and any other agreements or documents memorializing the Exit Term Loan Facilities, including any amendments, modifications, and supplements thereto.

92.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

93.     "*File,*" "*Filed,*" or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

94.     "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, that has not been reversed, stayed, modified, or amended, as entered on

the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

95.    "*First Out Subordinated Senior Secured Term Facility*" has the meaning set forth in the Exit Facilities Term Sheet.

96.    "*GCEH*" means Debtor Global Clean Energy Holdings, Inc., a company incorporated under the Laws of the State of Delaware.

97.    "*GCEH Existing Interests*" means Interests in GCEH.

98.    "*General Unsecured Claim*" means any unsecured Claim that is not (a) a DIP Claim, (b) an Administrative Claim, (c) a Professional Fee Claim, (d) a Priority Tax Claim, (e) an Other Secured Claim, (f) an Other Priority Claim; (g) a Prepetition RCF Claim; (h) a Prepetition Term Loan Claim; (i) a Prepetition EPC Claim; (j) a Section 510(b) Claim; or (k) an Intercompany Claim.  For the avoidance of doubt, General Unsecured Claims include (i) unsecured Claims resulting from the rejection of Executory Contracts and Unexpired Leases, (ii) the Targeted Growth Note Claims, (iii) the CCI Claims, and (iv) the payments due to that certain service provider under that certain Professional Services Agreement, dated as of May 22, 2023.

99.    "*Governance Term Sheet*" means the term sheet attached as <u>Exhibit D</u> to the Restructuring Term Sheet, together with any exhibits and appendices annexed thereto.

100.    "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

101.    "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

102.    "*GUC Cash Pool*" means an amount of $[●] available for distribution to Holders of Allowed General Unsecured Claims; *provided* that such amount shall be reduced dollar-for-dollar for the Allowed Professional Fee Claims incurred by any official committee of unsecured creditors appointed in the Chapter 11 Cases.

103.    "*Holder*" means an Entity holding a Claim or Interest.

104.    "*Impaired*" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

105.    "*Indemnification Provisions*" means each Debtor's indemnification provisions currently in place, whether in the respective Debtor's bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts, for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, other professionals, and respective agents of, or acting on behalf of, any of the Debtors.

106.    "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

107.    "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

108.    "*Interest*" means, collectively, (a) any Equity Security, or any other equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity), in any Debtor, (b) any other

rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, and (c) any and all Claims that are otherwise determined by the Bankruptcy Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest or subject to subordination as an equity interest pursuant to section 510(b) of the Bankruptcy Code.

109.    "*Interim Settlement Agreement*" means, that certain Interim Settlement Agreement, effective as of December 18, 2023, by and among BKRF and CTCI (as amended, restated, amended and restated, modified, or supplemented from time to time).

110.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

111.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, decree, injunction, order, ruling, assessment, writ, or other legal requirement or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

112.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

113.    "*New Board*" means the board of directors or similar Governing Body of Reorganized GCEH.

114.    "*New Common Equity*" means the new limited liability company membership units of Reorganized GCEH, issued to Holders of Claims as specifically provided for in the Restructuring Term Sheet and the Plan and as set forth in the Governance Term Sheet.

115.    "*New CTCI Agreement*" means that certain Project Management, Procurement, Construction, Operation and Maintenance Support Agreement, dated April 16, 2025 (as amended, restated, amended and restated, modified, or supplemented from time to time consistent with the terms thereof), by and between Bakersfield Renewable Fuels, LLC, the other Company Parties, and CTCI, attached to the Restructuring Term Sheet as <u>Exhibit B</u>.

116.    "*New CTCI Documents*" means, collectively, the New CTCI Agreement and any other documentation necessary to effectuate the transactions contemplated by the New CTCI Agreement, including, but not limited to, any notes, certificates, agreements, guarantees, security agreements, documents, or instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing).

117.    "*New Organizational Documents*" means the documents providing for corporate governance of Reorganized GCEH and the other Reorganized Debtors, as applicable, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable).

118.    "*New Preferred Equity*" means the preferred equity in Reorganized GCEH issued in accordance with the Governance Term Sheet.

119.    "*New Preferred Equity Documents*" means the applicable documents, to be dated as of the Effective Date, governing the New Preferred Equity, which documents shall be (a) included in the Plan Supplement, (b) in form and substance reasonably acceptable to the Reorganized Debtors, the Required Consenting Term Loan Lenders, and CTCI, and (c) shall be otherwise consistent in all material respects with the Governance Term Sheet.

120.    "*New Senior Secured Term Loan Credit Agreement*" means the credit agreement with respect to the New Senior Secured Term Facility, as may be amended, supplemented, or otherwise modified from time to time consistent with the terms thereof.

121.    "*New Senior Secured Term Facility*" has the meaning set forth in the Exit Facilities Term Sheet.

122.  "*New Super Senior Exit Facility*" has the meaning set forth in the Exit Facilities Term Sheet.

123.  "*New Super Senior Exit Term Loan Credit Agreement*" means the credit agreement with respect to the New Super Senior Exit Facility, as may be amended, supplemented, or otherwise modified from time to time.

124.  "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

125.  "*Other Secured Claim*" means any Secured Claim against the Debtors other than a DIP Claim, a Priority Tax Claim, a Prepetition RCF Claim, or a Prepetition Term Loan Claim.

126.  "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

127.  "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

128.  "*Plan*" means this *Joint Chapter 11 Plan of Reorganization of Global Clean Energy Holdings, Inc. and Its Debtor Affiliates* (which may be modified, amended, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, the RSA, or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference).

129.  "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with the Plan.

130.  "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors prior to the Confirmation Hearing to the extent available, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Schedule of Retained Causes of Action; (d) the New Organizational Documents; (e) the Exit Facilities Documents; (f) the New Preferred Equity Documents; (g) the Restructuring Transactions Steps Memorandum; and (h) to the extent known, the identity of the members of the New Board.

131.  "*Post-Exit CTCI Senior DIP Payment Obligation*" has the meaning set forth in the Exit Facilities Term Sheet.

132.  "*Prepetition EPC Claims*" means all amounts due and owing under the Terminated EPC Agreement and the Interim Settlement Agreement, which amounts, solely for the purposes of the Plan, total $949,318,504.23 as of March 31, 2025, including interest accrued through that date, *plus* all other obligations, amounts, and expenses arising under or in connection therewith, and with respect to which CTCI recorded a mechanic's lien on November 25, 2024 under California state Law.

133.  "*Prepetition RCF Agent*" means Vitol Americas Corp., in its capacity as the administrative and collateral agent under the Prepetition RCF Credit Agreement, including its successors, assigns, or any replacement agent appointed pursuant to the terms of the Prepetition RCF Credit Agreement.

134.  "*Prepetition RCF Claims*" has the meaning set forth in the Restructuring Term Sheet.

135.  "*Prepetition RCF Credit Agreement*" means that certain Credit Agreement, dated June 25, 2024, by and among Bakersfield Renewable Fuels, LLC, a Delaware limited liability company, as borrower, BKRF OCB, LLC, a Delaware limited liability company, as guarantor, BKRF OCP, LLC, a Delaware limited liability company, as guarantor, the lenders party thereto, and Vitol Americas Corp., a Delaware corporation, as the administrative and collateral agent, as may be amended, modified, amended and restated, or otherwise supplemented from time to time consistent with the terms thereof.

136. "*Prepetition RCF Facility*" means that certain revolving credit facility under the Prepetition Revolver Documents and includes, for the period prior to the Petition Date, the Prepetition SOA and Prepetition SSA.

137. "*Prepetition Revolver Documents*" means, collectively, the Prepetition RCF Credit Agreement and the related guarantees, security agreements, mortgages, intercreditor agreements, and other security documents.

138. "*Prepetition SOA*" means that certain Supply and Offtake Agreement, dated as of June 25, 2024, by and among Bakersfield Renewable Fuels, LLC and Vitol Americas Corp. (as amended, restated, amended and restated, modified, or supplemented from time to time consistent with the terms thereof).

139. "*Prepetition SSA*" means that certain Storage Services Agreement, dated as of June 25, 2024, by and between Bakersfield Renewable Fuels, LLC and Vitol Americas Corp. (as amended, restated, amended and restated, modified, or supplemented from time to time consistent with the terms thereof).

140. "*Prepetition Term Loan Agent*" means Orion Energy Partners TP Agent, LLC, in its capacity as the administrative and collateral agent under the Prepetition Term Loan Credit Agreement, including its successors, assigns, or any replacement agent appointed pursuant to the terms of the Prepetition Term Loan Credit Agreement.

141. "*Prepetition Term Loan Claims*" has the meaning set forth in the Restructuring Term Sheet.

142. "*Prepetition Term Loan Credit Agreement*" means that certain Super Senior Credit Agreement, dated May 4, 2020, by and among BKRF OCB, LLC, a Delaware limited liability company, as borrower, BKRF OCP, LLC, a Delaware limited liability company, as holdings, the lenders party thereto, and Orion Energy Partners TP Agent, LLC, as the administrative and collateral agent, as may be amended, modified, amended and restated, or otherwise supplemented from time to time consistent with the terms thereof.

143. "*Prepetition Term Loan Facility*" means the loans outstanding under the Prepetition Term Loan Credit Agreement.

144. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

145. "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

146. "*Professional*" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

147. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to the Effective Date as set forth in Article II.C.

148. "*Professional Fee Claim*" means any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

149. "*Professional Fee Escrow Account*" means an account funded by the Debtors or the Reorganized Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

150. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

151.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

152.    "*Related Party*" means, collectively, with respect to any Entity, each of, and in each case in its capacity as such, such Entity's current and former directors, managers, officers, committee members, members of any governing body, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Entity's respective heirs, executors, estates, and nominees.

153.    ["*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders; (d) the Agents; (e) the Consenting Stakeholders; (f) all Holders of Claims; (g) all Holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through this clause (i); *provided*, *however*, that, in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release, and such objection is not resolved before Confirmation.][3]

154.    ["*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders; (d) the Agents; (e) the Consenting Stakeholders; (f) all Holders of Claims; (g) all Holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through this clause (i); *provided*, *however*, that, in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not resolved before Confirmation.][4]

155.    "*Reorganized Debtors*" means, collectively, some or all of the Debtors as reorganized under the Plan, or any successor or assign thereto, by transfer, merger, consolidation, or otherwise, on or after the Effective Date.

156.    "*Reorganized GCEH*" means GCEH or any successor or assign thereto, by transfer, merger, consolidation, or otherwise, on and after the Effective Date, or a new corporation or limited liability company that will be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Equity and New Preferred Equity to be distributed pursuant to the Plan.

157.    "*Required Consenting RCF Lenders*" has the meaning set forth in the RSA.

158.    "*Required Consenting Stakeholders*" means, collectively, the Required Consenting RCF Lenders, the Required Consenting Term Loan Lenders, and CTCI.

159.    "*Required Consenting Term Loan Lenders*" has the meaning set forth in the RSA.

160.    "*Restructuring Expenses*" means the reasonable and documented fees and expenses accrued since the inception of their respective engagements related to the Restructuring Transactions (including the Plan) and invoiced and not previously paid by, or on behalf of, the Debtors of the Consenting Term Loan Lender Advisors, the Consenting RCF Lender Advisors, the CTCI Advisors, and counsel to the DIP Agents, in each case, in accordance

---

[3]    This definition and any related provision in this Plan remain subject to the outcome of any ongoing diligence efforts of, and approval by, the disinterested directors at the applicable Debtor entities.

[4]    This definition and any related provision in this Plan remain subject to the outcome of any ongoing diligence efforts of, and approval by, the disinterested directors at the applicable Debtor entities.

with any applicable engagement letter of such professional or other agreements signed by the Debtors, including terms agreed to in the DIP Orders, and in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals.

161.     "*Restructuring Term Sheet*" means the term sheet attached to the RSA as <u>Exhibit B</u>, together with any exhibits and appendices annexed thereto.

162.     "*Restructuring Transactions*" means the transactions described in Article IV.

163.     "*Restructuring Transactions Steps Memorandum*" means that certain memorandum, as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement.

164.     "*RSA*" means that certain restructuring support agreement, dated as of April 16, 2025 by and among the Debtors and the Consenting Stakeholders, including the Restructuring Term Sheet and all other exhibits thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms.

165.     "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases (with proposed Cure amounts) that will be assumed by the Reorganized Debtors, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

166.     "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases that will be rejected by the Debtors, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

167.     "*Schedule of Retained Causes of Action*" means the schedule of certain retained Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

168.     "*Schedules*" means, collectively, the schedules of assets and liabilities, the Schedule of Rejected Executory Contracts and Unexpired Leases, the Schedule of Assumed Executory Contracts and Unexpired Leases, the Schedule of Retained Causes of Action, and the statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

169.     "*SEC*" means the United States Securities and Exchange Commission.

170.     "*Section 510(b) Claim*" means any Claim subject to subordination pursuant to section 510(b) of the Bankruptcy Code.

171.     "*Secured Claim*" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the amount subject to setoff.

172.     "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

173.     "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

174.     "*Subordinated Junior EPC Claim*" has the meaning set forth in the Exit Facilities Term Sheet.

175.     "*Subordinated Junior Term Facility*" has the meaning set forth in the Exit Facilities Term Sheet.

176.     "*Subordinated Junior Term Loan Credit Agreement*" means the credit agreement with respect to the Subordinated Junior Term Facility, as may be amended, supplemented, or otherwise modified from time to time.

177.     "*Subordinated Secured EPC Claim*" has the meaning set forth in the Exit Facilities Term Sheet.

178.     "*Subordinated Senior Secured EPC Claim*" has the meaning set forth in the Exit Facilities Term Sheet.

179.     "*Subordinated Senior Secured Term Loan Credit Agreement*" means the credit agreement with respect to the First Out Subordinated Senior Secured Term Facility, as may be amended, supplemented, or otherwise modified from time to time.

180.     "*Subsidiary Existing Interests*" means any third-party Interests in the Debtors (excluding GCEH), including, for the avoidance of doubt, the interests of Delek US Holdings, Inc. under that certain Call Option Agreement, dated as of May 7, 2020, by and among GCEH, Alon Paramount Holdings, Inc., and GCE Holdings Acquisitions, LLC, to the extent such interests are not deemed Section 510(b) Claims.

181.     "*Takeback Debt*" means, collectively, debt under the Subordinated Senior Secured Term Facility, debt under the Subordinated Junior Term Facility, and the Exit EPC Claims, all as apportioned in accordance with the Exit Facilities Term Sheet.

182.     "*Targeted Growth Note Claims*" means any Claims arising under, or in connection with, that certain Demand Promissory Note, dated as of December 31, 2014 (as amended, restated, amended and restated, modified, or supplemented from time to time consistent with the terms thereof), by and among GCEH and Targeted Growth, Inc.

183.     "*Terminated EPC Agreement*" means that certain Turnkey Agreement with a Guaranteed Maximum Price for the Engineering, Procurement, and Construction of the Bakersfield Renewable Fuels Project, dated May 18, 2021 (as amended, restated, amended and restated, modified, or supplemented from time to time consistent with the terms thereof), by and between Bakersfield Renewable Fuels, LLC, as owner, and CTCI, terminated as of October 21, 2024.

184.     "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

185.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

186.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

*B.     Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the RSA, the Plan, or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document created or entered into in connection with the Plan, the

rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (16) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; and (18) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.      *Computation of Time.*

        Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law.*

        Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

        All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

        Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Nonconsolidated Plan.*

        Although for purposes of administrative convenience and efficiency this Plan has been Filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

*H.*     *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, including the Plan Supplement, the Confirmation Order shall control.

*I.*     *Consultation, Notice, Information, and Consent Rights.*

Notwithstanding anything herein to the contrary, all consultation, information, notice, and consent rights of the parties to the RSA, as applicable, and as respectively set forth therein, including, without limitation, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A) and fully enforceable as if stated in full herein until such time as the RSA is terminated in accordance with its terms.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

*A.*     *Administrative Claims.*

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of such Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim (including claims of the type described in section 503(b)(9) of the Bankruptcy Code) shall be paid in full in Cash: (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or Reorganized Debtors, as applicable; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

*B.*     *DIP Claims.*

On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed DIP Claim, each Holder of an Allowed DIP Claim (which shall include interest, fees, and all other amounts due and owing under the DIP Facilities and the New CTCI Documents) shall receive, on account of such Allowed DIP Claim:

(a)     with respect to Allowed DIP Claims on account of the DIP RCF Facility, (i) conversion into the Exit RCF Facility or (ii) such other treatment agreed to by Holders of the DIP RCF Claims (subject to the consent rights set forth in Section 3.02 of the RSA);

(b)     with respect to Allowed DIP Claims on account of the New CTCI Agreement, (i) conversion into the Post-Exit CTCI Senior DIP Payment Obligation or (ii) such other

treatment as agreed to by CTCI (subject to the consent rights set forth in Section 3.02 of the RSA); and

(c)    with respect to Allowed DIP Claims on account of the DIP Term Loan Facility, (i) conversion into the New Senior Secured Term Facility or (ii) such other treatment agreed to by holders of DIP Term Loan Claims (subject to the rights set forth in Section 3.02 of the RSA).

Unless and until Allowed DIP Claims are satisfied in accordance with the terms of the Plan, then notwithstanding entry of the Confirmation Order and anything to the contrary in this Plan or the Confirmation Order, (i) none of the DIP Claims shall be discharged, satisfied or released, or otherwise affected in whole or in part, and each of the DIP Claims shall remain outstanding, (ii) none of the Liens securing the DIP Claims shall be deemed to have been waived, released, satisfied, or discharged, in whole or in part, and (iii) neither the DIP Credit Agreements, the New CTCI Agreement, nor any other agreement, instrument, or document executed at any time in connection therewith shall be deemed terminated, discharged, satisfied or released, or otherwise affected in whole or in part, and each such agreement, instrument and document shall remain in effect.

Upon the satisfaction of Allowed DIP Claims in accordance with the terms of the Plan, all Liens and security interests securing the DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Person or Entity.

C.    *Professional Fee Claims.*

1.    <u>Final Fee Applications and Payment of Professional Fee Claims.</u>

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A.

2.    <u>Professional Fee Escrow Account.</u>

No later than the Effective Date, the Debtors or the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until such time as all Professional Fee Claims have been paid. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    <u>Professional Fee Amount.</u>

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's

final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

        4.        <u>Post-Confirmation Fees and Expenses.</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

*D.*       *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, on the Effective Date, each Holder of such Allowed Priority Tax Claim shall be treated in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

*E.*       *Payment of Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors, as applicable, shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.*       *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Prepetition RCF Claims | Impaired | Entitled to Vote |
| Class 4 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |
| Class 5 | Prepetition EPC Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| Class 10 | GCEH Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Subsidiary Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.**      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, compromise, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.      <u>Class 1 – Other Secured Claims.</u>

(a)      *Classification*: Class 1 consists of all Other Secured Claims.

(b)      *Treatment*: On the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor, unless otherwise agreed to by such Holder:

(i)      in full and final satisfaction of such Allowed Other Secured Claim, (A) payment in full in Cash in an amount equal to its Allowed Other Secured Claim or (B) delivery of the collateral securing its Allowed Other Secured Claim;

(ii)      Reinstatement of its Allowed Other Secured Claim; or

(iii)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

Bankruptcy Code. Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      <u>Class 2 – Other Priority Claims.</u>

    (a)     *Classification*: Class 2 consists of all Other Priority Claims.

    (b)     *Treatment*: On the Effective Date, each Holder of an Allowed Other Priority Claim, in full and final satisfaction of such Allowed Other Priority Claim, unless otherwise agreed to by such Holder, shall be paid in full in Cash on the Effective Date or in the ordinary course of business as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code.

    (c)     *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.      <u>Class 3 – Prepetition RCF Claims.</u>

    (a)     *Classification*: Class 3 consists of all Prepetition RCF Claims.

    (b)     *Allowance*: On the Effective Date, the Prepetition RCF Claims shall be Allowed in the aggregate principal amount of $[●], plus accrued and unpaid interest on such principal amount through the Effective Date, fees, costs, and other amounts due and owing pursuant to the RCF Credit Agreement, less any such Claims that are converted into DIP Claims.

    (c)     *Treatment*: On the Effective Date, each Holder of an Allowed Prepetition RCF Claim shall receive, in full and final satisfaction of such Allowed Prepetition RCF Claim, unless otherwise agreed by such Holder (subject to the consent rights set forth in Section 3.02 of the RSA), and solely to the extent such Allowed Prepetition RCF Claim is not converted into a DIP Claim, conversion of such Allowed Prepetition RCF Claim into the Exit RCF Facility.

    (d)     *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed Prepetition RCF Claims are entitled to vote to accept or reject the Plan.

4.      <u>Class 4 – Prepetition Term Loan Claims.</u>

    (a)     *Classification*: Class 4 consists of all Prepetition Term Loan Claims.

    (b)     *Allowance*: On the Effective Date, the Prepetition Term Loan Claims shall be Allowed in the aggregate amount of $[●] in principal outstanding, accrued and unpaid interest on such principal amount through the Effective Date, fees, costs, premiums, and other amounts due and owing pursuant to the Prepetition Term Loan Credit Agreement.

    (c)     *Treatment*: On the Effective Date, each Holder of an Allowed Prepetition Term Loan Claim shall receive, in full and final satisfaction of such Allowed Prepetition Term Loan Claim, unless otherwise agreed to by such Holder (subject to the consent rights set forth in Section 3.02 of the RSA), and solely to the extent such Allowed Prepetition Term Loan Claim is not converted into a DIP Claim, its *Pro Rata* share of:

        (i)     the Takeback Debt apportioned to Holders of Allowed Prepetition Term Loan Claims, on the terms and conditions set forth in the Exit Facilities Term Sheet;

        (ii)     4/9ths (44.4%) of the New Preferred Equity, in accordance with the terms and

conditions of the Governance Term Sheet; and

(iii)     100% of the New Common Equity.

(d)     *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed Prepetition Term Loan Claims are entitled to vote to accept or reject the Plan.

5.     Class 5 – Prepetition EPC Claims.

(a)     *Classification*:  Class 5 consists of all Prepetition EPC Claims.

(b)     *Treatment*:  On the Effective Date, each Holder of an Allowed Prepetition EPC Claim shall receive, in full and final satisfaction of such Allowed Prepetition EPC Claim, unless otherwise agreed to by such Holder (subject to the consent rights set forth in Section 3.02 of the RSA), its *Pro Rata* share of:

(i)     the Takeback Debt apportioned to Holders of Allowed Prepetition EPC Claims, on the terms and conditions set forth in the Exit Facilities Term Sheet; and

(ii)     5/9ths (55.6%) of the New Preferred Equity, in accordance with the terms and conditions of the Governance Term Sheet.

(c)     *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Prepetition EPC Claims are entitled to vote to accept or reject the Plan.

6.     Class 6 – General Unsecured Claims.

(a)     *Classification*:  Class 6 consists of all General Unsecured Claims.

(b)     *Treatment*:  On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim, its *Pro Rata* share of the GUC Cash Pool; *provided* that the GUC Cash Pool shall be reduced dollar-for-dollar for the Allowed professional fees and expenses incurred by any official committee of unsecured creditors appointed in the Chapter 11 Cases; *provided*, *further*, that if the Class of General Unsecured Claims votes to accept the Plan, the Holders of Allowed Prepetition Term Loan Claims and the Holders of Allowed Prepetition EPC Claims have agreed to waive, solely for purposes of distributions from the GUC Cash Pool, entitlement to any deficiency claim with respect to any portion of their Claims that is deemed unsecured (*provided* that any such unsecured portion is not the result of a challenge by any party of any Liens or security interests asserted by the Holders of Term Loan Claims or the Holders of Prepetition EPC Claims, as applicable).

(c)     *Voting*:  Class 6 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.     Class 7 – Section 510(b) Claims.

(a)     *Classification*:  Class 7 consists of all Section 510(b) Claims, if any.

(b)     *Treatment*:  On the Effective Date, all Section 510(b) Claims (if any) shall be cancelled, released, discharged, and extinguished and will be of no further force or effect, and the

21

Holders of such Claims will not receive any distribution on account of such Claims.

(c)  *Voting*: Class 7 is Impaired under the Plan.  Holders of Allowed Section 510(b) Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

8.  Class 8 – Intercompany Claims.

(a)  *Classification*:  Class 8 consists of all Intercompany Claims.

(b)  *Treatment*:  On the Effective Date, Intercompany Claims shall be (i) Reinstated or (ii) set off, settled, distributed, contributed, cancelled, converted to equity, or released without any distribution on account of such Allowed Intercompany Claim, or otherwise addressed at the option of the Reorganized Debtors, without any distribution.

(c)  *Voting*:  Holders of Intercompany Claims are either Unimpaired, and as such, Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and as such, Holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

9.  Class 9 – Intercompany Interests.

(a)  *Classification*:  Class 9 consists of all Intercompany Interests.

(b)  *Treatment*:  On the Effective Date, Intercompany Interests shall be (i) Reinstated or (ii) set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Allowed Intercompany Interest, or otherwise addressed at the option of the Reorganized Debtors.

(c)  *Voting*:  Holders of Intercompany Interests are either Unimpaired, and as such, Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and as such, Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

10.  Class 10 – GCEH Existing Interests.

(a)  *Classification*:  Class 10 consists of all GCEH Existing Interests.

(b)  *Treatment*:  On the Effective Date, each Holder of an Allowed GCEH Existing Interest shall, in full and final satisfaction, settlement, release, and discharge of such Allowed GCEH Existing Interest have its Allowed GCEH Existing Interest be cancelled, released, extinguished, and of no further force or effect, and such Holder shall not receive any

distribution, property, or other value under the Plan on account of such Allowed GCEH Existing Interest.

(c)     *Voting*:  Class 10 is Impaired under the Plan.  Holders of GCEH Existing Interests are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

11.     <u>Class 11 – Subsidiary Existing Interests.</u>

(d)     *Classification:*  Class 11 consists of all Subsidiary Existing Interests.

(e)     *Treatment*:  On the Effective Date, each Allowed Subsidiary Existing Interest shall, in full and final satisfaction, release, and discharge of such Allowed Subsidiary Existing Interest, be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Allowed Subsidiary Existing Interests shall not receive any distribution, property, or other value under the Plan on account of such Allowed Subsidiary Existing Interests.

(f)     *Voting*:  Class 11 is Impaired under the Plan.  Holders of Subsidiary Existing Interests are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.     *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Common Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

G.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the

treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

Before, on, and after the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including taking any actions set forth in the Restructuring Transactions Steps Memorandum, which transactions may include, as applicable, any of the following:  (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (iv) the execution, delivery, and entry into the Exit Facilities Documents; (v) the issuance and distribution of the New Common Equity as set forth in the Plan; (vi) the issuance and distribution of the New Preferred Equity as set forth in the Plan; (vii) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the

Reorganized Debtors, as applicable); (viii) such other transactions that, in the reasonable business judgment of the Debtors or the Reorganized Debtors, as applicable, and the DIP Lenders are required to effectuate the Restructuring Transactions; (ix) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized GCEH, which purchase shall be structured as a taxable transaction for United States federal income tax purposes; and (x) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

The Confirmation Order shall authorize the Debtors and the Reorganized Debtors, as applicable, to undertake the Restructuring Transactions contemplated by the RSA and other Definitive Documents, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

C.    *Director, Officer, and Manager Liability Insurance.*

After the Effective Date, Reorganized GCEH will not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions on or after the Effective Date.

D.    *Employment Obligations.*

On the Effective Date, the Reorganized Debtors shall (a) assume the Assumed Agreements and (b) assume and/or honor in the ordinary course of business any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for health care benefits, disability benefits, savings, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity on or after the effective date of any such agreement or, in each case, the full amount necessary to satisfy such obligations shall be set aside to satisfy such obligations.

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

E.    *Cancellation of Notes, Instruments, Certificates, and Other Documents.*

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements, and indentures, shall automatically be deemed cancelled, discharged, and of no further force and effect, and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments, certificates, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan or a Confirmation Order.

Notwithstanding the foregoing or anything to the contrary herein, any such agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of, as applicable: (a) enabling Holders of Allowed Claims under such agreements to receive distributions under the Plan as provided herein; and (b) allowing and preserving the rights of the Agents, and any other applicable paying agent or trustee, to (i) make distributions in satisfaction of Allowed Claims under such agreements, (ii) maintain and exercise their respective charging liens, against any such distributions, (iii) seek compensation and reimbursement for any reasonable and documented fees

and expenses incurred in making such distributions, (iv) maintain and enforce any right to indemnification, expense reimbursement, contribution, or subrogation or any other claim or entitlement, (v) exercise their rights and obligations relating to the interests of their holders, and (vi) appear and be heard in these Chapter 11 Cases.

If the record holder of any GCEH Existing Interests is DTC or its nominee or another securities depository or custodian thereof, and such underlying securities are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each Holder of such GCEH Existing Interests or other Debtors' securities shall be deemed to have surrendered such Holder's securities underlying such Holder's GCEH Existing Interests or other Debtors' securities.

F.      Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (including, for the avoidance of doubt, any transfers from a Debtor to a Reorganized Debtor or to any other Person) of property under or in connection with the Plan, including or pursuant to: (a) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, as applicable; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security pursuant to the Plan; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax, fee, or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.

G.      The Reorganized Debtors.

On the Effective Date, the New Board shall be established, and Reorganized GCEH and the other Reorganized Debtors, as applicable, shall adopt the New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

H.      Sources of Consideration for Plan Distributions.

The Debtors shall fund or make distributions under the Plan, as applicable, and in each case consistent with the Restructuring Transactions Steps Memorandum, with: (i) the Exit RCF Facility, (ii) the Exit Term Loan Facilities, (iii) the Exit EPC Claims, (iv) the New Common Equity, (v) the New Preferred Equity, and (vi) the Debtors' Cash on hand. Each distribution and issuance referred to in Article VI shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Equity and New Preferred Equity, will be exempt from Securities Act registration, as described more fully below.

1.      Exit RCF Facility.

On the Effective Date, the Reorganized Debtors shall enter into the Exit RCF Facility, the terms, conditions, structure, and principal amount of which will be set forth in the Exit RCF Credit Agreement and which shall be in

form and substance reasonably acceptable to the Reorganized Debtors, the Required Consenting Term Loan Lenders, the Required Consenting RCF Lenders, and the DIP RCF Lenders.  Confirmation of the Plan shall be deemed approval of the Exit RCF Facility, including the Exit RCF Credit Agreement and the other Exit RCF Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit RCF Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit RCF Facility.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit RCF Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit RCF Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit RCF Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

2.    Exit Term Loan Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Term Loan Facilities, the terms of which will be set forth in the Exit Term Loan Credit Agreements and which shall be in form and substance reasonably acceptable to the Reorganized Debtors, the Required Consenting Term Loan Lenders, the DIP Term Loan Lenders, and, only to the extent applicable under the RSA, the required Consenting RCF Lenders and CTCI.  Confirmation of the Plan shall be deemed approval of the Exit Term Loan Facilities, including the Exit Term Loan Credit Agreements and other Exit Term Loan Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Term Loan Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Term Loan Facilities.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Term Loan Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Term Loan Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Term Loan Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.   The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

3.    New Common Equity and New Preferred Equity.

Reorganized GCEH shall be authorized to issue a certain number of units of New Common Equity and New Preferred Equity pursuant to its New Organizational Documents and the New Preferred Equity Documents, as

applicable.  On the Effective Date, the New Common Equity and New Preferred Equity shall be issued and distributed pursuant to, and in accordance with, the Plan.

All of the units of the New Common Equity and the New Preferred Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The New Common Equity and New Preferred Equity will not be registered under the Securities Act or listed on any national securities exchange as of the Effective Date.

I.      *Private Company*

The Reorganized Debtors shall not have any class of Interests listed on a national securities exchange and shall make commercially reasonable efforts to take the steps necessary to be a private company without any Securities Act or Exchange Act reporting obligations upon emergence or as soon as reasonably practicable thereafter in accordance with and to the extent permitted by the Securities Act and the Exchange Act.

J.      *Corporate Existence.*

Except as otherwise provided in the Plan, the Plan Supplement, the New Organizational Documents, or the Restructuring Transactions Steps Memorandum, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified in accordance with the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

K.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances and interests.  On and after the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

L.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (a) selection of the directors, officers, or managers for the Reorganized Debtors; (b) the distribution of the New Common Equity and New Preferred Equity; (c) implementation of the Restructuring Transactions; (d) entry into the Exit Facilities Documents; (e) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (f) adoption of the New Organizational Documents; (g) adoption of the New Preferred Equity Documents; (h) the rejection, assumption, or assumption and assignment, as applicable, of

Executory Contracts and Unexpired Leases; (i) adoption or assumption, as applicable, of the Employment Obligations; and (j) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed, as applicable, to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Equity, the New Preferred Equity, the New Organizational Documents, the New Preferred Equity Documents, the Exit Facilities, the Exit Facilities Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.L shall be effective notwithstanding any requirements under non-bankruptcy law.

M.     *New Organizational Documents.*

        On or immediately prior to the Effective Date, the New Organizational Documents shall be adopted or amended in a manner acceptable to the Debtors, as may be necessary to effectuate the transactions contemplated by the Plan.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation or formation in accordance with the corporate laws of the respective state, province, or country of incorporation or formation.  The New Organizational Documents will prohibit the issuance of non-voting Interests, to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of incorporation or formation and the terms of such documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or other applicable formation and constituent documents as permitted by the laws of the applicable states, provinces, or countries of incorporation or formation and the New Organizational Documents without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

N.     *Directors and Officers of the Reorganized Debtors.*

        As of the Effective Date, the term of the current members of the board of directors of GCEH shall expire, and the members for the initial term of the New Board shall be appointed.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  The New Board shall initially consist of seven members, including four members appointed by the Common Holders, two members appointed by CTCI, and one independent member to be selected by a majority of the other members of the New Board, which independent member shall be appointed in consultation with the Required Consenting RCF Lenders.  Except to the extent that a current director on the board of directors of GCEH is designated to serve as a director, manager, or sole manager of a Reorganized Debtor, the current directors on the board of directors of GCEH prior to the Effective Date, in their capacities as such, shall have no continuing obligations to GCEH on or after the Effective Date, and such director shall be deemed to have resigned or shall otherwise cease to be a director of GCEH on the Effective Date.  Each of the directors, managers, sole managers, and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor and may be designated, replaced, or removed in accordance with such New Organizational Documents.

O.     *Effectuating Documents; Further Transactions.*

        On and after the Effective Date, the Reorganized Debtors and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized

Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

P.      *Certain Securities Law Matters.*

Any New Common Equity and New Preferred Equity issued under the Plan will be issued (a) to the fullest extent permitted and applicable, without registration under the Securities Act or similar federal, state or local laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or (b) to the extent section 1145 is not permitted or applicable, pursuant to other applicable exemptions under the Securities Act.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of New Common Equity and New Preferred Equity in reliance on the exemption set forth in section 1145 of the Bankruptcy Code shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act and any other applicable federal, state, local, or other law requiring registration prior to the offering, issuance, distribution, or sale of securities. Such units of New Common Equity and New Preferred Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code (a) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act, and (b) will be freely tradable and transferable in the United States by each recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer. Notwithstanding the foregoing, the units of New Common Equity and New Preferred Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code will remain subject to compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities and subject to any restrictions in the New Organizational Documents and the New Preferred Equity Documents, as applicable. The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Any New Common Equity or New Preferred Equity that cannot be issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

**The Debtors recommend that potential recipients of securities issued under the Plan consult their own counsel concerning their ability to freely trade such securities in compliance with the federal securities laws and any applicable "Blue Sky" laws. The Debtors make no representation concerning the ability of a person to dispose of such securities.**

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the securities to be issued under the Plan through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the securities to be issued under the Plan under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Q.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions described, identified, or otherwise included in

the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII.

The Reorganized Debtors may pursue such Causes of Action as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Person or Entity may rely on the absence of a specific reference in the RSA, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Person or Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

*R.*      *Closing the Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases, as determined by the Reorganized Debtors and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.*      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases that are not otherwise rejected will be deemed assumed by the applicable Reorganized Debtor or Reorganized GCEH, as applicable, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (a) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (b) previously expired or terminated pursuant to their own terms; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) are the subject of a motion to reject that is pending on the Effective Date; or (e) have an ordered or requested effective date of rejection that is after the Effective Date.

Notwithstanding anything to the contrary herein, the Debtors or the Reorganized Debtors, as applicable, shall not assume or enter into, without the prior written consent of the Required Consenting Stakeholders, any employment, retention, bonus, severance, or other compensation agreements or contracts with any employee other than the Assumed Agreements.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan,

the Schedule of Rejected Executory Contracts and Unexpired Leases, or the Schedule of Assumed Executory Contracts and Unexpired Leases, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Assumed Executory Contracts and Unexpired Leases at any time up to forty-five (45) days after the Effective Date. All Indemnification Provisions shall be deemed Executory Contracts and shall be assumed by the Reorganized Debtors under the Plan. None of the Reorganized Debtors shall amend and/or restate its organizational documents on or after the Effective Date to, and the applicable organizational documents shall not, terminate, reduce, discharge, impair, or adversely affect in any way the rights of parties that are entitled to and benefit from the Indemnification Provisions.

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to section 365(a) of the Bankruptcy Code, and entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be Filed.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (b) the effective date of such rejection, and (c) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B and may be objected to in accordance with the provisions of Article VIII and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

No later than seven (7) calendar days before the Confirmation Hearing, the Debtors shall serve notices of proposed assumptions to the counterparties to the agreements listed on the Schedule of Assumed Executory Contracts and Unexpired Leases, which shall include a description of the procedures for resolving disputes related to the proposed assumption of applicable Executory Contracts and Unexpired Leases.  In the event that any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the provision of notices of proposed assumptions described above, a notice of proposed assumption with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof.

Unless otherwise agreed in writing by the parties in the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served, and actually received by counsel to the Debtors no later than the date and time specified in the notice (which shall not be less than fourteen (14) days after such notice is served).  The Debtors or the Reorganized Debtors, as applicable, may reconcile and settle in the ordinary course of the Debtors' business any dispute (following a timely filed objection) regarding any Cure or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court.

Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount (including any request for an additional or different cure amount) will be deemed to have assented to such assumption or Cure amount and any untimely request for an additional or different Cure amount shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the parties to such Executory Contracts or Unexpired Leases may agree; *provided* that if a dispute regarding assumption or Cure is unresolved as of the Effective Date, then payment of the applicable Cure amount shall occur as soon as reasonably practicable after such dispute is resolved.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment of the Cure amount.

The assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any nonmonetary defaults arising from or triggered by the filing of these Chapter 11 Cases, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (b) the effective date of such assumption, or (c) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (a) the

Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Indemnification Provisions.*

All Indemnification Provisions, consistent with applicable Law, currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the benefit of current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be (a) reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the Indemnification Provisions in place prior to the Effective Date, and (b) shall be assumed by the Reorganized Debtors.

H.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

I.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

J.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

ARTICLE VI.
PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII. Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.    *Rights and Powers of Disbursing Agent.*

1.    Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security, is transferred [twenty (20) or fewer days] before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.        Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

3.        Minimum Distributions.

No fractional units of New Common Equity or New Preferred Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of units of New Common Equity or New Preferred Equity that is not a whole number, the actual distribution of units of New Common Equity or New Preferred Equity shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded up to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded down to the next lower whole number with no further payment therefor.  The total number of authorized units of New Common Equity or New Preferred Equity to be distributed to Holders of Allowed Claims or Allowed Interests shall be adjusted as necessary to account for the foregoing rounding.  For distribution purposes (including rounding), DTC will be treated as a single Holder.  Neither the Reorganized Debtors or the Disbursing Agent shall have any obligation to make a distribution that consists of less than one share of New Common Equity or New Preferred Equity or is less than two hundred and fifty dollars ($250) to any Holder of an Allowed Claim.

4.        Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable or otherwise cannot be delivered, no distribution to such Holder shall be made unless and until the Disbursing Agent, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months following such distribution.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.  To the extent such unclaimed property or interests in property is comprised of New Common Equity or New Preferred Equity, such New Common Equity or New Preferred Equity shall be cancelled.  The Disbursing Agent shall adjust the number of units of New Common Equity or New Preferred Equity outstanding as of the date of such cancellation to ensure that the distributions of New Common Equity or New Preferred Equity contemplated under the Plan are given full force and effect.

5.        Surrender of Cancelled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article VI shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Reinstated under this Plan.

E.      *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in the applicable agreements.

F.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Disbursing Agent and the Reorganized Debtors shall comply with all applicable tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such applicable withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary to comply with such applicable withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. Any such amounts deducted or withheld and timely paid to the appropriate taxing authority shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Any person entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the applicable Disbursing Agent an appropriate Form W-9 or (if the payee is a non-U.S. Person) Form W-8.

G.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in [*The Wall Street Journal (National Edition)*] on the Effective Date.

J.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and Holder of Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder.

In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Claims Paid or Payable by Third Parties.*

      1.      <u>Claims Paid by Third Parties</u>.

The Debtors or the Reorganized Debtors as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

      2.      <u>Claims Payable by Third Parties</u>.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

      3.      <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims*.

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.  The Reorganized Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided for in the Plan, after the Effective Date, the Reorganized Debtors shall have the exclusive authority to (a) File, withdraw, or litigate to judgment any objections to Claims, (b) settle or

compromise any such objections to Claims without further notice to or action, order, or approval of the Bankruptcy Court, and (c) administer and adjust the Claims Register to reflect such settlements or compromises without further notice to or action, order, or approval of the Bankruptcy Court.  Except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Entity had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including the Causes of Action retained pursuant to the Plan.

C.      *Disputed Claims Process.*

If the Debtors or the Reorganized Debtors, as applicable, dispute any Proof of Claim that is Filed on account of an Unimpaired Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or the Reorganized Debtors, as applicable, or the Holder of such Claim may elect to have the validity or amount of any Claim adjudicated by the Bankruptcy Court instead.  If a Holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.

If the Debtors or the Reorganized Debtors dispute any Impaired Claim that is not Allowed as of the Effective Date pursuant to Article III.B or a Final Order entered by the Bankruptcy Court (which may include the Confirmation Order), the Debtors or the Reorganized Debtors shall File an objection with, and the dispute shall be determined, resolved, or adjudicated before, the Bankruptcy Court.

D.      *Disputed Claims Reserve*

On or before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall be authorized, but not directed, to establish one or more Disputed Claims Reserves, which Disputed Claims Reserve shall be administered by the Reorganized Debtors, to the extent applicable.

The Reorganized Debtors may, in their sole discretion, hold Cash in the Disputed Claims Reserve Amount in the Disputed Claims Reserve in trust for the benefit of the Holders of the total estimated amount of General Unsecured Claims ultimately determined to be Allowed after the Effective Date.  The Reorganized Debtors shall distribute such amounts (net of any expenses) as provided herein, as such Claims are resolved by Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III solely to the extent of the amounts available in the applicable Disputed Claims Reserve.

E.      *Estimation of Claims and Interests.*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor or the Reorganized Debtor as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

F.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

G.      *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, and subject to the terms hereof, including Article VIII, and the DIP Order, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

H.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

I.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the

Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.      **Release of Liens.**

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

C.      **Releases by the Debtors.** [5]

**[Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors and their Estates (including the capital**

---

[5]      For the avoidance of doubt, the releases by the Debtors set forth herein remain subject to the investigation by the special committee of the board of directors of GCEH, all as more fully described in the Disclosure Statement.

structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtors, or the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the Prepetition RCF Facility, the Prepetition Term Loan Facility, the Terminated EPC Agreement, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, any adversary proceedings, the formulation, preparation, dissemination, negotiation, entry into, or filing of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the DIP Facilities, the New CTCI Agreement, the DIP Documents, the New Preferred Equity Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any other Definitive Document, or any Restructuring Transactions, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the DIP Documents, the New Preferred Equity Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any Causes of Action described, identified, or otherwise included in the Schedule of Retained Causes of Action, (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan, and (c) any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.]

D.      *Releases by the Releasing Parties.*

[Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the

Effective Date, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties (other than the Debtors and the Reorganized Debtors), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, and their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the Prepetition RCF Facility, the Prepetition Term Loan Facility, the Terminated EPC Agreement, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, any adversary proceedings, the formulation, preparation, dissemination, negotiation, entry into, or filing of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, any contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan, or (b) any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.]

E.      *Exculpation.*

Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documents, or any Restructuring Transactions, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, attaching,

collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Causes of Action or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors and any property dealt with by the Plan until the closing of these Chapter 11 Cases.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article VIII.C, Article VIII.D, and Article VIII.E, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Reorganized Debtor, Exculpated Party, or Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

G.    *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.    *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.    *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B:

    i.    the RSA shall be in full force and effect and shall not have been validly terminated by any of the parties thereto;

    ii.    there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Debtors and the Required Consenting Stakeholders would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

    iii.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

    iv.    an order, statute, rule, regulation, executive order, stay, decree, judgment, or injunction shall not have been enacted, entered, issued, promulgated, enforced, or deemed applicable by any court or governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, that, in the reasonable judgment of the Debtors and the Required Consenting Stakeholders, would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

    v.    each document or agreement constituting a Definitive Document shall have been executed or otherwise effectuated as contemplated, shall be in form and substance consistent with the RSA (and subject to the applicable consent and consultation rights thereunder with respect to such Definitive Document) and the Restructuring Term Sheet, and any conditions and customary matters, and all conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived pursuant to the terms of the RSA and the applicable Definitive Document;

    vi.    to the extent invoiced, the payment of all reasonable and documented fees and expenses of the Debtors' professionals (solely if payment of such fees and expenses has been authorized by the Bankruptcy Court, including under the DIP Orders) and the Consenting Stakeholders' professionals related to the negotiation and implementation of the Restructuring Transactions and not previously paid by the Debtors;

    vii.    all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account;

    viii.    the Bankruptcy Court shall have entered the Confirmation Order, which shall be subject to the consultation and consent rights set forth in the RSA, and such order shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered;

    ix.    the Required Consenting Term Loan Lenders and CTCI shall have consented (in each case, such consent shall not be unreasonably withheld, conditioned, or delayed) to the executory contracts to be rejected or assumed, if any;

      x.     the New Organizational Documents shall have been executed and/or effectuated, shall be in form and substance consistent with the RSA and the Restructuring Term Sheet, and any conditions precedent related thereto, shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

      xi.    the Prepetition SOA and Prepetition SSA shall have been assumed by the Debtors and no events of default shall be outstanding thereunder; and

      xii.   the New Common Equity and the New Preferred Equity shall have been issued by Reorganized GCEH.

*B.*     *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article IX may be waived by the Debtors only with the prior written consent of the Required Consenting Stakeholders (subject to Section 3.02 of the RSA), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

*C.*     *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

*D.*     *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

*A.*     *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and consistent with the approval rights set forth in the RSA, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the RSA, and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

*B.*     *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

i.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

ii.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

iii.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

iv.     ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

v.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

vi.     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

vii.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

viii.   resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

ix.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

x.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

xi.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K;

xii.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

xiii.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, including the RSA;

xiv.      enter an order concluding or closing the Chapter 11 Cases;

xv.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

xvi.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

xvii.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

xviii.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

xix.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

xx.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article VIII, regardless of whether such termination occurred prior to or after the Effective Date;

xxi.      enforce all orders previously entered by the Bankruptcy Court;

xxii.      hear any other matter not inconsistent with the Bankruptcy Code;

*provided*, that notwithstanding anything to the contrary in this Plan, the Bankruptcy Court shall not retain jurisdiction over matters or disputes arising from the Exit Facilities Documents, and the terms of such Exit Facilities Documents shall govern the jurisdiction and forum applicable to any such matters or disputes.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect.*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committee after the Effective Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or

made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

      1.      <u>if to the Debtors, to</u>:

      Global Clean Energy Holdings, Inc.
      6451 Rosedale Hwy
      Bakersfield, CA 93308
      Attention:  Antonio D'Amico, General Counsel
      E-mail address:  antonio.damico@gceholdings.com

      with copies to:

      Kirkland & Ellis LLP
      601 Lexington Avenue
      New York, New York 10022
      Attention:  Joshua A. Sussberg, P.C.
                Brian Schartz, P.C.
                Ross J. Fiedler
      E-mail addresses:  josh.sussberg@kirkland.com
                brian.schartz@kirkland.com
                ross.fiedler@kirkland.com

      -and-

      Kirkland & Ellis LLP
      333 West Wolf Point Plaza
      Chicago, Illinois 60654
      Facsimile:  (312) 862-2200
      Attention:  Peter A. Candel
      E-mail address:  peter.candel@kirkland.com

      -and-

      Norton Rose Fulbright US LLP
      1550 Lamar Street, Suite 2000
      Houston, Texas 77010-3095
      Attention:  Jason L. Boland,
                 Robert B. Bruner,
                 Jule Harrison
                 Maria Mokrzycka
      Email Addresses:  jason.boland@nortonrosefulbright.com
                 bob.bruner@nortonrosefulbright.com
                 julie.harrison@nortonrosefulbright.com
                 maria.mokrzycka@nortonrosefulbright.com

      2.      <u>if to a Consenting Term Loan Lender or DIP Term Loan Lender, to</u>:

      Latham & Watkins LLP
      355 South Grand Avenue, Suite 100
      Los Angeles, CA 90071
      Attention:  Jeff Greenberg
      E-mail address:  jeffrey.greenberg@lw.com

      and

Latham & Watkins LLP
330 N Wabash Ave #2800,
Chicago, IL 60611
Attention:  James Ktsanes
E-mail address:  james.ktsanes@lw.com

and

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:  Nacif Taousse
E-mail address:  nacif.taousse@lw.com

3.      if to a Consenting RCF Lender or DIP RCF Lender, to:

Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Attention:  Jackson Garvey
                 Robert Stephens
                 Maegan Quejada
E-mail address:  jgarvey@sidley.com
                        rstephens@sidley.com
                        mquejada@sidley.com

4.      if to CTCI, to:

Davis Wright Tremaine LLP
920 Fifth Ave., Suite 3300
Seattle, WA 98104
Attention: Ragan Powers
                 Hugh McCullough
E-mail address:  raganpowers@dwt.com
                        hughmccullough@dwt.com

and

Haynes and Boone, LLP
1221 McKinney St., Suite 4000
Houston, Texas 77010
Attention:  Kelli Norfleet
E-mail address:  kelli.norfleet@haynesboone.com

Haynes and Boone, LLP
2801 N. Harwood, Suite 2300
Dallas, Texas 75201
Attention:  Stephen Pezanosky
                 Ian Peck
E-mail address:  stephen.pezanosky@haynesboone.com
E-mail address:  ian.peck@haynesboone.com

         After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant

to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.     *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.     *Entire Agreement.*

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.     *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/GCEHoldings or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.     *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

L.     *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order finding that the Debtors have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, pursuant to section 1125(e) of the Bankruptcy Code, the Exculpated Parties, the directors and officers of any of the Debtors, each of the Reorganized Debtors, the DIP Agents and DIP Lenders, and, with respect to the foregoing, the Related Parties thereto to the extent permitted under section 1125(e) of the Bankruptcy Code will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.        *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  April 16, 2025                    Global Clean Energy Holdings, Inc.


                                          /s/  *Noah Verleun*
                                          Noah Verleun
                                          Chief Executive Officer

**EXHIBIT B**

**RSA**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO.  ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF THE DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 14.02 hereof, this "**Agreement**") is made and entered into as of April 16, 2025 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iv) of this preamble, and any Entity[1] that subsequently becomes a party hereto by executing and delivering to counsel to the Company Parties and counsel to each of the Consenting Stakeholders a Joinder, collectively, the "**Parties**"):

i.   Global Clean Energy Holdings, Inc., a company incorporated under the Laws of the state of Delaware ("**GCEH**"), and each of its subsidiaries listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

ii.       Vitol Americas Corp. ("**Vitol**") in its capacities as a (a) lender, administrative agent, and collateral agent under the Prepetition RCF Credit Agreement, and (b) lender, administrative agent, and collateral agent under the DIP RCF Facility, and in each case, any assignee thereof that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting RCF Lenders**");

iii.     the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold Prepetition Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting Term Loan Lenders**," and together with the Consenting RCF Lenders, the "**Consenting Lenders**"); and

iv.     CTCI Americas, Inc. ("**CTCI**," and together with the Consenting Lenders, the "**Consenting Stakeholders**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (together with any exhibits and appendices annexed thereto, the "**Restructuring Term Sheet**," and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

### *AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

2

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Prepetition Term Loan Facility, the Prepetition RCF Facility, and/or the DIP Facilities, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to such Party.

"**Alternative Restructuring Proposal**" means any written or oral plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to (a) a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture, partnership, debt incurrence (including, without limitation, any debtor-in-possession financing, use of Cash collateral, or exit financing) or similar transaction or series of transactions involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties, other than the Restructuring Transactions, or (b) any other transaction involving one or more of the Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

"**Business Day**" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash**" means cash and cash equivalents, including bank deposits, checks, and other similar items, in legal tender in the state of New York.

"**Causes of Action**" means, collectively, any and all Claims, Interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities,

guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, Law, equity, or otherwise.  "Causes of Action" also includes:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) Claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common Law, including fraudulent transfer Laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**CTTIA**" has the meaning set forth in the Exit Facilities Term Sheet.

"**Company Claims/Interests**" means any Claim against, or Interest in, a Company Party, including, without limitation, the Prepetition Term Loan Claims, the Prepetition RCF Claims, the Prepetition EPC Claims, and any other Claims or Interests held by the Consenting Stakeholders.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation**" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting RCF Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting Term Loan Lenders**" has the meaning set forth in the preamble of this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means, collectively, each of the documents listed in Section 3.01.

"**DIP Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**DIP Credit Agreements**" means, collectively, the DIP Term Loan Agreement and the DIP RCF Credit Agreement.

"**DIP Documents**" means, collectively, (a) the DIP RCF Documents and (b) the DIP Term Loan Documents.

"**DIP Facilities**" means, collectively, (a) the DIP Term Loan Facility and (b) the DIP RCF Facility.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order, each of which shall be in form and substance acceptable to the Required Consenting Stakeholders.

"**DIP RCF Agent**" means Vitol Americas Corp., as the administrative agent and collateral agent under the DIP RCF Credit Agreement, including its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP RCF Credit Agreement.

"**DIP RCF Credit Agreement**" means that certain super-senior secured debtor-in-possession loan and security agreement, dated as of April 16, 2025, by and among the Debtors, the DIP RCF Agent, and the DIP RCF Lenders party thereto, setting forth the terms and conditions of the DIP RCF Facility.

"**DIP RCF Documents**" means, collectively, the DIP RCF Credit Agreement and any amendments, modifications, or supplements to the foregoing, including any related notes, certificates, agreements, intercreditor agreements, security agreements, deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, and the Prepetition SOA and Prepetition SSA and related guarantees, in each case, which shall be in form and substance acceptable to the DIP RCF Secured Parties.

"**DIP RCF Facility**" means the $100,000,000 senior secured superpriority debtor-in-possession revolving financing facility to be provided to the Debtors by the Consenting RCF Lenders on the terms and conditions set forth in the DIP RCF Term Sheet, the DIP RCF Documents, the DIP Orders, and on other terms and conditions to be agreed upon by the Debtors and the Required Consenting RCF Lenders consistent with the DIP RCF Documents and, on and after the Petition Date, the Prepetition SOA and Prepetition SSA.

"**DIP RCF Lenders**" means the lenders under the DIP RCF Credit Agreement.

"**DIP RCF Secured Parties**" means Vitol, in its capacity as a party under the Prepetition SOA and Prepetition SSA, the DIP RCF Lenders, and the DIP RCF Agent.

"**DIP RCF Term Sheet**" means the term sheet setting forth the terms and conditions of the DIP RCF Facility, attached to the Restructuring Term Sheet as Exhibit A-1, which shall be in form and substance acceptable to the DIP RCF Secured Parties.

"**DIP Secured Parties**" means the lenders and agents under the DIP Documents and CTCI under the New CTCI Agreement.

"**DIP Term Loan Agent**" means Orion Energy Partners TP Agent, LLC, as the administrative agent and collateral agent under the DIP Term Loan Agreement, including its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Term Loan Agreement.

"**DIP Term Loan Agreement**" means that certain super-senior secured debtor-in-possession loan and security agreement, dated as of April 16, 2025, by and among the Debtors, the DIP Term Loan Agent, and the DIP Term Loan Lenders party thereto.

"**DIP Term Loan Documents**" means, collectively, the DIP Term Loan Agreement and any amendments, modifications, or supplements to the foregoing, including any related notes, certificates, agreements, intercreditor agreements, security agreements, deed of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"**DIP Term Loan Facility**" means the $75,000,000 senior secured superpriority debtor-in-possession term loan financing facility to be provided to the Debtors on the terms and conditions set forth in the DIP Term Loan Term Sheet, the DIP Term Loan Documents, the DIP Orders, and on other terms and conditions to be reasonably acceptable to the Required Consenting Term Loan Lenders, consistent with the DIP Term Loan Documents.

"**DIP Term Loan Lenders**" means the lenders under the DIP Term Loan Agreement.

"**DIP Term Loan Term Sheet**" means the term sheet setting forth the terms and conditions of the DIP Term Loan Facility, attached to the Restructuring Term Sheet as Exhibit A-2.

"**Disclosure Statement**" means that certain disclosure statement disclosing the terms and conditions of the Plan, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement and in accordance with, among other things, applicable securities Law, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law.

"**Entara**" means Entara LLC.

"**Entara MSA**" means that certain Management Services Agreement dated as of August 27, 2024 among Entara and certain Company Parties.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit EPC Claims**" means, collectively, the Post-Exit CTCI Senior DIP Payment Obligation, the Subordinated Senior Secured EPC Claims, the Subordinated Secured EPC Claim, and the Subordinated Junior EPC Claim.

"**Exit EPC Claims Documents**" means, collectively, any agreements or documents memorializing the Exit EPC Claims, including any amendments, modifications, and supplements thereto.

"**Exit Facilities Term Sheet**" means the term sheet attached to the Restructuring Term Sheet as Exhibit C, together with any exhibits and appendices annexed thereto.

"**Exit RCF Credit Agreement**" means the credit agreement with respect to the Exit RCF Facility, as may be amended, supplemented, or otherwise modified from time to time.

"**Exit RCF Facility**" means that certain $100,000,000 revolving credit facility, supply and offtake agreement, and storage services agreement to be entered into by the applicable Reorganized Debtors on the Effective Date pursuant to the Exit RCF Credit Agreement, the Exit SOA, or the Exit SSA, as applicable, on substantially the same terms as the Prepetition RCF Credit Agreement, the Prepetition SOA, or the Prepetition SSA, as applicable.

"**Exit RCF Facility Documents**" means, collectively, the Exit RCF Credit Agreement, the Exit SOA, the Exit SSA, and any other agreements or documents memorializing the Exit RCF Facility, including any amendments, modifications, and supplements thereto, in each case, which shall be in form and substance acceptable to the Consenting RCF Lenders.

"**Exit SOA**" means the supply and offtake agreement with respect to the Exit RCF Facility, as may be amended, supplemented, or otherwise modified from time to time consistent with the terms thereof, which may be an amended and restated Prepetition SOA.

"**Exit SSA**" means the storage services agreement with respect to the Exit RCF Facility, as may be amended, supplemented, or otherwise modified from time to time consistent with the terms thereof, which may be an amended and restated Prepetition SSA.

"**Exit Term Loan Credit Agreements**" means, collectively, the New Super Senior Exit Term Loan Credit Agreement, the New Senior Secured Term Loan Credit Agreement, the Subordinated Senior Secured Term Loan Credit Agreement, and the Subordinated Junior Term Loan Credit Agreement.

"**Exit Term Loan Facilities**" means, collectively, the New Super Senior Exit Facility, the New Senior Secured Term Facility, the First Out Subordinated Senior Secured Term Facility, the Second Out Subordinated Senior Secured Term Facility, and the Subordinated Junior Term Facility.

"**Exit Term Loan Facilities Documents**" means, collectively, the Exit Term Loan Credit Agreements and any other agreements or documents memorializing the Exit Term Loan Facilities, including any amendments, modifications, and supplements thereto.

"**Final DIP Order**" means the order entered by the Bankruptcy Court approving, among other things, the terms of the DIP Facilities, which shall be consistent with the DIP Credit Agreements, the priority of certain Claims under the New CTCI Agreement as set forth in the New CTCI Documents, the Debtors' entry into the DIP Documents and the New CTCI Documents, and the use of Cash collateral on a final basis.

"**First Day Pleadings**" means the first-day pleadings that the Debtors determine, in consultation with the Required Consenting Stakeholders, are necessary or desirable to file in the Chapter 11 Cases, which pleadings shall be consistent with this Agreement in all material respects

7

and otherwise in form and substance reasonably acceptable to the Required Consenting Stakeholders.

"**First Out Subordinated Senior Secured Term Facility**" has the meaning set forth in the Exit Facilities Term Sheet.

"**GCEH**" has the meaning set forth in the preamble to this Agreement.

"**Governance Term Sheet**" means the term sheet attached to the Restructuring Term Sheet as Exhibit D, together with any exhibits and appendices annexed thereto.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of June 25, 2024, by and between Vitol Americas Corp., as RCF Representative, Orion Energy Partners TP Agent, LLC, as Term Loan Representative, the Term Creditors party thereto from time to time, Bakersfield Renewable Fuels, LLC, as Project Company, BKRF OCB, LLC, as BKRF Borrower, and BKRF OCP, LLC, as Holdings (as from time to time amended and restated) and any documents related thereto.

"**Interest**" means, collectively, (a) any Equity Security, or any other equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity), in any Debtor, (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, and (c) any and all Claims that are otherwise determined by the Bankruptcy Court to be an interest, including any Claim or debt that is recharacterized as an interest or subject to subordination as an interest pursuant to section 510(b) of the Bankruptcy Code.

"**Interim DIP Order**" means the order entered by the Bankruptcy Court approving, among other things, the terms of the DIP Facilities, which shall be consistent with the DIP Credit Agreements, the priority of certain Claims under the New CTCI Agreement as set forth in the New CTCI Documents, the Debtors' entry into the DIP Documents and the New CTCI Documents, and the use of Cash collateral on an interim basis.

"**Joinder**" means an executed joinder to this Agreement, substantially in the form attached hereto as **Exhibit C**, providing, among other things, that the signing holder of Company Claims/ Interests is bound by the terms of this Agreement.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, decree, injunction, order, ruling, assessment, writ, or other legal requirement or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" means the milestones set forth in the Restructuring Term Sheet.

"**New Common Equity**" means the new limited liability company membership units of Reorganized GCEH, issued to holders of Claims as specifically provided for in the Restructuring Term Sheet and the Plan and as set forth in the Governance Term Sheet.

8

"**New CTCI Agreement**" means that certain Project Management, Procurement, Construction, Operation and Maintenance Support Agreement, dated April 16, 2025 (as amended, restated, amended and restated, modified, or supplemented from time to time consistent with the terms thereof), by and between Debtor Bakersfield Renewable Fuels, LLC, the other Company Parties, and CTCI, attached to the Restructuring Term Sheet as Exhibit B.

"**New CTCI Documents**" means, collectively, the New CTCI Agreement and any other documentation necessary to effectuate the transactions contemplated by the New CTCI Agreement, including, but not limited to, any notes, certificates, agreements, guarantees, security agreements, documents, or instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing).

"**New Preferred Equity**" means the preferred equity in Reorganized GCEH issued in accordance with the Governance Term Sheet.

"**New Preferred Equity Documents**" means all documentation necessary to effectuate the issuance of the New Preferred Equity (including any amendments, restatements, supplements, or modifications thereof).

"**New Senior Secured Term Loan Credit Agreement**" means the credit agreement with respect to the New Senior Secured Term Facility, as may be amended, supplemented, or otherwise modified from time to time consistent with the terms thereof.

"**New Senior Secured Term Facility**" has the meaning set forth in the Exit Facilities Term Sheet.

"**New Super Senior Exit Facility**" has the meaning set forth in the Exit Facilities Term Sheet.

"**New Super Senior Exit Term Loan Credit Agreement**" means the credit agreement with respect to the New Super Senior Exit Facility, as may be amended, supplemented, or otherwise modified from time to time consistent with the terms thereof.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means a Transfer of any Company Claims or any Interests that meets the requirements of Section 8.01.

"**Permitted Transferee**" means each transferee with respect to a Permitted Transfer.

"**Petition Date**" means the first date that any of the Debtors commence a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization that will be filed by the Debtors under chapter 11 of the Bankruptcy Code to implement the Restructuring Transactions in accordance with, and subject to the terms and conditions of, this Agreement, the Restructuring Term Sheet, the Definitive Documents, and any related exhibits.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Post-Exit CTCI Senior DIP Payment Obligation**" has the meaning set forth in the Exit Facilities Term Sheet.

"**Prepetition EPC Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Prepetition RCF Claims**" means any Claim on account of the Prepetition RCF Facility.

"**Prepetition RCF Credit Agreement**" means that certain Credit Agreement, dated June 25, 2024, by and among Bakersfield Renewable Fuels, LLC, a Delaware limited liability company, as borrower, BKRF OCB, LLC, a Delaware limited liability company, as guarantor, BKRF OCP, LLC, a Delaware limited liability company, as guarantor, the lenders party thereto, and Vitol Americas Corp., a Delaware corporation, as the administrative and collateral agent, as may be amended, modified, amended and restated, or otherwise supplemented from time to time consistent with the terms thereof.

"**Prepetition RCF Facility**" means that certain revolving credit facility under the Prepetition Revolver Documents and, for the period prior to the Petition Date, the Prepetition SOA and Prepetition SSA.

"**Prepetition Revolver Documents**" means the Prepetition RCF Credit Agreement and the related guarantees, security agreements, mortgages, intercreditor agreements, and other security documents.

"**Prepetition SOA**" means that certain Supply and Offtake Agreement, dated June 25, 2024, by and between Bakersfield Renewable Fuels, LLC, a Delaware limited liability company, and Vitol Americas Corp., a Delaware corporation, as may be amended, modified, amended and restated, or otherwise supplemented from time to time consistent with the terms thereof.

"**Prepetition SSA**" means that certain Storage Services Agreement, dated June 25, 2024, by and between Bakersfield Renewable Fuels, LLC, a Delaware limited liability company, and Vitol Americas Corp., a Delaware corporation, as may be amended, modified, amended and restated, or otherwise supplemented from time to time consistent with the terms thereof.

"**Prepetition Term Loan Claims**" means any secured Claim on account of the Prepetition Term Loan Facility.

"**Prepetition Term Loan Credit Agreement**" means that certain Credit Agreement, dated May 4, 2020, by and among BKRF OCB, LLC, a Delaware limited liability company, as borrower, BKRF OCP, LLC, a Delaware limited liability company, as holdings, the lenders party thereto, and Orion Energy Partners TP Agent, LLC, as the administrative and collateral agent, as may be

amended, modified, amended and restated, or otherwise supplemented from time to time consistent with the terms thereof.

"**Prepetition Term Loan Facility**" means that certain loan facility under the Prepetition Term Loan Credit Agreement.

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in any Company Claims/Interests), in its capacity as a dealer or market maker in any Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Remedial Action**" means any action to enforce, request the enforcement of (including any request upon a trustee or agent), or direct the enforcement of any of the rights and remedies available under any credit agreement, indenture, note, loan agreement, guaranty, security agreement, deed of trust, or other collateral agreement, or any agreements or instruments entered into in connection with any of the foregoing or any amendments or supplements to any of the foregoing (each, a "**Debt Document**"), including, without limitation, any action to accelerate or collect any amounts with respect to the obligations under a Debt Document, the sending of any written notice to the Company Party that a default or event of default has occurred under a Debt Document and is continuing, the sending of any written request to any trustee or agent under a Debt Document to initiate an action, suit, or proceeding such Debt Document, or any action to exercise any rights or remedies under such Debt Document, which is actually known to the Company Parties.

"**Reorganized Debtors**" means the Debtors as reorganized under the Plan, or any successor or assign thereto, by transfer, merger, consolidation, or otherwise.

"**Reorganized GCEH**" means GCEH after its conversion to a limited liability company, or any successor or assign thereto, by transfer, merger, consolidation, or otherwise, on and after the Plan Effective Date, or a new limited liability company that will be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or equity of the Debtors and issue the New Common Equity and New Preferred Equity to be distributed pursuant to the Plan.

"**Required Consenting RCF Lenders**" means, as of the relevant date, (a) the Consenting RCF Lenders holding at least 50.01% of the aggregate outstanding Prepetition RCF Claims held by the Consenting RCF Lenders and (b) the DIP RCF Agent.

"**Required Consenting Stakeholders**" means as of the relevant date, the Required Consenting RCF Lenders, the Required Consenting Term Loan Lenders, and CTCI.

"**Required Consenting Term Loan Lenders**" means, as of the relevant date, the Consenting Term Loan Lenders holding at least 50.01% of the aggregate outstanding Prepetition Term Loan Claims held by the Consenting Term Loan Lenders.

11

"**Restructuring Expenses**" means the prepetition and postpetition reasonable and documented fees and expenses of the professionals of the Consenting Term Loan Lenders, CTCI and the Consenting RCF Lenders that have been invoiced but not yet paid.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals of this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals of this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Out Subordinated Senior Secured Term Facility**" has the meaning set forth in the Exit Facilities Term Sheet.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**SOA SSA Assumption Motion**" has the meaning set forth in the Restructuring Term Sheet and shall be in form and substance acceptable to Vitol.

"**Solicitation Materials**" means, collectively, all documents, forms, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, including, but not limited to, the Disclosure Statement and the Plan, each of which shall contain terms and conditions that are materially consistent with this Agreement and otherwise reasonably acceptable to the Company Parties and the Required Consenting Stakeholders.

"**Subordinated Junior EPC Claim**" has the meaning set forth in the Exit Facilities Term Sheet.

"**Subordinated Junior Term Facility**" has the meaning set forth in the Exit Facilities Term Sheet.

"**Subordinated Junior Term Loan Credit Agreement**" means the credit agreement with respect to the Subordinated Junior Term Facility, as may be amended, supplemented, or otherwise modified from time to time consistent with the terms thereof.

"**Subordinated Secured EPC Claim**" has the meaning set forth in the Exit Facilities Term Sheet.

"**Subordinated Senior Secured EPC Claim**" has the meaning set forth in the Exit Facilities Term Sheet.

"**Subordinated Senior Secured Term Loan Credit Agreement**" means the credit agreement with respect to the First Out Subordinated Senior Secured Term Facility, as may be amended, supplemented, or otherwise modified from time to time.

"**Terminated EPC Agreement**" means that certain Turnkey Agreement with a Guaranteed Maximum Price for the Engineering, Procurement, and Construction of the Bakersfield Renewable Fuels Project, dated May 18, 2021 (as amended, restated, amended and restated, modified, or

supplemented from time to time consistent with the terms thereof), by and between Bakersfield Renewable Fuels, LLC, as owner, and CTCI, terminated as of October 21, 2024.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 11.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement, substantially in the form attached hereto as **Exhibit D**.

"**U.S. Trustee**" means the Office of the United States Trustee for the Southern District of Texas.

1.02.    Interpretation.  For purposes of this Agreement, the following rules of interpretation shall apply:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference contained herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments, supplements, or other modifications to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," "hereinafter," "hereunder," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

13

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    all exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein;

(j)    the use of "include" or "including" is without limitation, whether stated or not and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; and

(k)    the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 14.10 other than counsel to the Company Parties.

**Section 2.    *Effectiveness of this Agreement*.**  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Consenting Stakeholders;

(b)    the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties:

(i)    holders of at least 66 and 2/3% of the aggregate outstanding principal amount of the Prepetition Term Loan Claims;

(ii)    holders of 100% of the aggregate outstanding principal amount of the Prepetition RCF Claims; and

(iii)    CTCI;

(c)    the applicable Company Parties shall have entered into the new employment agreements identified on Exhibit E to the Restructuring Term Sheet, and such agreements shall be in full force and effect; and

(d)    counsel to the Company Parties shall have given notice to counsel to each of the Consenting Stakeholders in the manner set forth in Section 14.10 (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.    *Definitive Documents*.**

3.01.   The Definitive Documents governing the Restructuring Transactions shall include this Agreement and each of the following documents (and any modifications, amendments, or

supplements thereto):  (a) the Plan; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the order of the Bankruptcy Court approving the Disclosure Statement; (e) the Solicitation Materials;  (f) the First Day Pleadings and all orders entered in connection therewith; (g) the Plan Supplement (including, for the avoidance of doubt, the Schedule of Retained Causes of Action (as defined in the Plan));[2] (h) the DIP Documents; (i) the DIP Orders; (j) the New CTCI Agreement; (k) the New CTCI Documents; (l) the Exit RCF Facility Documents; (m) the Exit Term Loan Facilities Documents; (n) the New Preferred Equity Documents; (o) the CTTIA; (p) the Exit EPC Claims Documents; and (q) any other agreements, instruments, pleadings, forms, questionnaires, documents, applications, and other filings that are related to any of the foregoing or that may be necessary or advisable to implement or effectuate or that otherwise relate to the Restructuring Transactions.

3.02.    The Definitive Documents not executed or not in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement and the Restructuring Term Sheet, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, the Definitive Documents not executed or not in a form attached to this Agreement as of the Execution Date (and any modifications, amendments, or supplements thereto), and any agreement with respect to the treatment under the Plan of a holder of any Claim or Interest other than as expressly and specifically set forth in the Restructuring Term Sheet (any such agreement, an "**Alternative Treatment Agreement**"), shall be in form and substance subject to the consent of:

(a)    the Company Parties (whose consent shall not be unreasonably withheld, conditioned, or delayed);

(b)    the Required Consenting Term Loan Lenders (whose consent shall not be unreasonably withheld, conditioned, or delayed with respect to any Definitive Document or Alternative Treatment Agreement to which no Consenting Term Loan Lender is party);

(c)    CTCI (whose consent shall not be unreasonably withheld, conditioned, or delayed with respect to any Definitive Document or Alternative Treatment Agreement to which CTCI is not party); *provided* that, if any consent right granted to CTCI under this provision or elsewhere in this Agreement (other than the Exit Facilities Term Sheet and the Governance Term Sheet) is inconsistent with the consent rights (including limitations thereupon) set forth in the Exit Facilities Term Sheet and the Governance Term Sheet, the consent rights granted in the Exit Facilities Term Sheet and the Governance Term Sheet shall govern); and

(d)    the Required Consenting RCF Lenders (whose consent shall not be unreasonably withheld, conditioned, or delayed with respect to any Definitive Document or Alternative Treatment Agreement to which no Consenting RCF Lender is party); *provided*, that

---

[2]    References to definition contained in the "Plan" in this Section 3 are made by reference to the last version of the form Chapter 11 plan, contemplated to be filed concurrently with the Petition Date, that was provided to the Parties by counsel to the Company Parties prior to the Petition Date.

notwithstanding anything in this Section 3.02 to the contrary, the Required Consenting RCF Lenders' consent shall not be required with respect to the following documents:

(i)      the Purchase Agreement, dated as of April 16, 2025, by and among Agribody Technologies, Inc., BKRF HCB, LLC, and the Class B Members signatory thereto as sellers;

(ii)     Alternative Treatment Agreements (other than an Alternative Treatment Agreement with respect to the treatment of the Consenting RCF Lenders or the DIP RCF Lenders);

(iii)    except with respect to any agreement to which the Consenting RCF Lenders or Vitol is a party and the Entara MSA, the Schedule of Assumed Executory Contracts and Unexpired Leases (as defined in the Plan);

(iv)    except with respect to any agreement to which the Consenting RCF Lenders or Vitol is a party and the Entara MSA, the Schedule of Rejected Executory Contracts and Unexpired Leases (as defined in the Plan);

(v)     the Schedule of Retained Causes of Action (as defined in the Plan) (provided that the Schedule of Retained Causes of Action shall not contain any causes of action against the Consenting RCF Lenders, Vitol, or any of their Related Parties (as defined in the Restructuring Term Sheet));

(vi)    the New Organizational Documents (as defined in the Plan);

(vii)   the Exit Facilities Documents (as defined in the Plan) (other than Exit Facilities Documents to which the Consenting RCF Lenders or their Affiliates are a party) that are not materially adverse to the Consenting RCF Lenders;

(viii)  the New Preferred Equity Documents (as defined in the Plan);

(ix)    the Restructuring Transaction Steps Memorandum (as defined in the Plan); and

(x)     in each case with respect to the foregoing (d)(i) through (d)(xi), any agreements, instruments, or documents entered into in connection therewith.

**Section 4.**     *Commitments of the Consenting Stakeholders*.

4.01.   <u>General Commitments, Forbearances, and Waivers</u>.

(a)     During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, to:

(i)      support the Restructuring Transactions, act in good faith, vote all Company Claims/Interests owned, held, or otherwise controlled by such Consenting Stakeholder, and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which it is legally entitled to participate)

16

in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)     use commercially reasonable efforts to cooperate with the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)     use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 4.01(b), *provided* that the foregoing shall not require any Consenting Stakeholder to file any pleadings with respect thereto if, in consultation with the Debtors, they determine a pleading is not reasonably necessary to comply with this provision;

(iv)     give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions;

(v)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party; and

(vi)     with respect solely to CTCI, promptly satisfy any claims related to any unpaid subcontractor invoices related to work performed or services provided by such subcontractor to or at the request of CTCI before October 21, 2024.

(b)     During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly (except as otherwise expressly provided in the applicable DIP Documents or the New CTCI Documents, as applicable):

(i)     object to, delay (relative to the timeline contemplated in the Milestones), impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose, file, support, or vote (or allow any proxy appointed by it to vote) for any Alternative Restructuring Proposal;

(iii)     seek to modify the Definitive Documents, in whole or in part, in a manner inconsistent with this Agreement and the Restructuring Term Sheet, over the objection of any of the other Consenting Stakeholders or the Company Parties;

(iv)     execute or file any motion, objection, pleading, agreement, instrument, order, form, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Plan, or the Restructuring Term Sheet (nor directly or indirectly direct any other person or Entity to take such action);

(v)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, the Definitive Documents, or the other Restructuring Transactions contemplated herein against the Company Parties, the other Parties, or

their respective Affiliates other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement (nor directly or indirectly direct any other person or Entity to make such filing);

(vi)     object to any First Day Pleadings or "second day" pleadings consistent with this Agreement filed by the Debtors in furtherance of the Restructuring Transactions, including any motion seeking approval of the DIP Facilities or the New CTCI Agreement on the terms set forth herein and the DIP Documents and New CTCI Documents, as applicable;

(vii)    exercise, or direct any other person to exercise (either directly or indirectly), any right or remedy for the enforcement, collection, or recovery of any of its Claims against or Interests in the Company Parties;

(viii)   announce publicly its intention not to support the Restructuring Transactions;

(ix)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code;

(x)      object to or commence any legal proceeding challenging the liens or claims (including the priority thereof) granted or proposed to be granted to the DIP Secured Parties under the DIP Orders;

(xi)     file or support, directly or indirectly, a motion, application, adversary proceeding, or cause of action (a) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of the DIP Claims, the Prepetition Term Loan Claims, the Prepetition RCF Claims, the Prepetition EPC Claims, or the Liens securing such Claims, or (b) otherwise seeking to impose liability upon or enjoin the DIP Secured Parties or the Consenting Stakeholders;

(xii)    take any action that is inconsistent in any material respect with the Restructuring Transactions;

(xiii)   take any action that is inconsistent in any material respect with any Intercreditor Agreement to which such Consenting Stakeholder is a party;

(xiv)   object to or otherwise seek to hinder the Debtors' retention of and payment to Lazard Frères & Co. LLC ("**Lazard**") of the fees and expenses set forth in the engagement letter, dated as of February 24, 2025, among Lazard and the Company Parties, and any application seeking approval of or court order approving the same; or

(xv)    encourage or facilitate any person or Entity to do any of the actions described in the foregoing Section 4.01(b).

4.02.   <u>Commitments with Respect to the Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)     vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot; *provided*, *however*, that the consent or votes of the Consenting Stakeholders shall be immediately revoked and deemed void *ab initio* upon the occurrence of the Termination Date (other than a Termination Date caused solely by the Plan Effective Date);

(ii)    to the extent that it is permitted to elect to opt out of all of the releases set forth in the Plan, elect not to opt out of such releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)   not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses 4.02(a)(i) and (ii) above;

(iv)    agree to provide, and opt in to (to the extent applicable) and not object to, the releases set forth in the Plan;

(v)     agree to provide, support, and not opt out of (to the extent applicable) or object to, the debtor releases, third-party releases, injunctions, and discharge, indemnity, and exculpation provisions set forth in the Plan so long as they are substantially consistent with those set forth in <u>Exhibit F</u> of the Restructuring Term Sheet;

(vi)    not directly or indirectly, through any person, seek, solicit, propose, support, assist, engage in negotiations in connection with, or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede approval of the Disclosure Statement, solicitation of the Plan, or Confirmation and consummation of the Plan and the Restructuring Transactions; and

(vii)   support and take all commercially reasonable actions necessary or reasonably requested by the Company Parties to facilitate approval of the Disclosure Statement, solicitation of the Plan, and Confirmation and consummation of the Plan.

(b)    During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 5.    *Additional Provisions Regarding the Consenting Stakeholders' Commitments*.** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:  (a) affect

the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) require any Consenting Stakeholder to incur any material financial or other material liability other than as expressly described in this Agreement; (e) require any Consenting Stakeholder to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal privilege; (f) prevent any Consenting Stakeholder from taking any action which is required by applicable Law; (g) prohibit any Consenting Stakeholder from taking any action that is not inconsistent with this Agreement; or (h) prevent any DIP Secured Party from exercising any of its or their rights and privileges under the DIP Documents, the DIP Orders, or the New CTCI Documents.  Nothing in this Agreement shall impair or affect the right or obligations of any party under the DIP Documents, the New CTCI Documents, or the DIP Orders.

**Section 6.**      *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, the Restructuring Term Sheet, and the Definitive Documents;

(b)      comply with the Milestones unless extended or waived in writing by the Required Consenting Stakeholders;

(c)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary or desirable to address any such impediment;

(d)      use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals necessary to implement and/or consummate the Restructuring Transactions;

(e)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents (consistent with this Agreement and the Restructuring Term Sheet) and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)      provide a reasonable opportunity to counsel for the Consenting Term Loan Lenders, counsel for CTCI, and counsel for the Consenting RCF Lenders to review (which shall be at least two days prior to filing unless not reasonably practicable) (i) draft copies of the Definitive Documents, (ii) draft copies of the Solicitation Materials, and (iii) any other documents that the

Company Parties intend to file with Bankruptcy Court if such document materially affects the Consenting Term Loan Lenders, CTCI, or the Consenting RCF Lenders, as applicable;

(h)　　use commercially reasonable efforts to actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(i)　　actively oppose and object to any motion, application, adversary proceeding, or cause of action (i) seeking the entry of an order directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) seeking the entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) seeking the entry of an order dismissing the Chapter 11 Cases, or (iv) seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(j)　　upon reasonable request of any of the Consenting Stakeholders, inform counsel to the Consenting Stakeholders as to:  (i) the material business and financial (including liquidity) performance of the Company Parties; (ii) the status and progress of the Restructuring Transactions, including progress in relation to the Definitive Documents; and (iii) the status of obtaining any necessary or reasonably desirable authorizations (including any consents) from each Consenting Stakeholder, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(k)　　notify counsel to the Consenting Stakeholders in writing (email being sufficient) of any Remedial Action taken by any creditor within two (2) Business Days of the Company Parties receiving notice or obtaining actual knowledge of such Remedial Action;

(l)　　notify counsel to the Consenting Stakeholders in writing (e-mail being sufficient) of the commencement of any material governmental or third-party complaints, litigations, investigations, or hearings (or written communication indicating that reasonably foreseeably could result in third-party litigation, investigations, or hearings), in each case, as soon as reasonably possible, but no later than two (2) Business Days of the Company Parties receiving notice of any of the foregoing;

(m)　　notify counsel to the Consenting Stakeholders (email being sufficient) within two calendar days of the Company Parties receiving notice or obtaining actual knowledge of:  (i) any event or circumstance that has occurred that would permit any Party to terminate, or that would result in the termination of, this Agreement; (ii) any matter or circumstance that they know to be a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) a material breach of this Agreement (including a material breach by any Company Parties) and (iv) any representation expressly made under this Agreement that is or proves to have been materially incorrect or misleading in any respect as of the Execution Date;

21

(n)     use commercially reasonable efforts to maintain its and its Affiliates' good standing under the Laws of the state or other jurisdiction in which it and they are incorporated or organized;

(o)     use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent reasonably prudent and, to the extent the Company Parties receive any Joinders or Transfer Agreements, to notify the Consenting Stakeholders of the receipt of such Joinders and Transfer Agreements; and

(p)     promptly pay Restructuring Expenses, subject to appropriate Bankruptcy Court approval.

6.02.   <u>Negative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of, the Restructuring Transactions described in this Agreement, the Restructuring Term Sheet, the Definitive Documents, or the Plan;

(c)     modify this Agreement, the Restructuring Term Sheet, or the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)     file any motion, pleading, or Definitive Document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Restructuring Term Sheet, or the Plan;

(e)     solicit, initiate, endorse, propose, file, support, approve, or otherwise promote or advance any Alternative Restructuring Proposal, subject to Section 7.02;

(f)     take any action inconsistent with the Intercreditor Agreement;

(g)     take any action (i) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, the DIP Claims, the Prepetition EPC Claims, the Prepetition RCF Claims, or the Prepetition Term Loan Claims, or, in each case, the Liens securing such Claims or (ii) otherwise seeking to impose liability upon or enjoin the DIP Secured Parties, CTCI, the Consenting RCF Lenders, or the Consenting Term Loan Lenders;

(h)     sell, or file any motion or application seeking to sell, any material assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363), other than in the ordinary course of business, in respect of transactions for total net cash proceeds of more than $2,000,000 in the aggregate for each fiscal year without the prior written consent of the Required Consenting Stakeholders (which may be by email);

(i)     subject in all respects to the Restructuring Term Sheet, other than in the ordinary course of business or as required by Law or regulation, (i) enter into or amend, establish, adopt,

22

restate, supplement, or otherwise modify or accelerate (x) any deferred compensation, incentive, success, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements, or (y) any contracts, arrangements, or commitments that entitle any employee or director to indemnification from the Company Parties, or (ii) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements), in each case without the prior written consent of the Required Consenting Stakeholders (which may be by email);

(j)       other than in the ordinary course of business, (i) enter into any material settlement regarding any Claims or Interests (other than as allowed by the DIP Orders or orders approving the First Day Pleadings), (ii) enter into any material agreement that is materially inconsistent with this Agreement, (ii) amend, supplement, or otherwise modify, or terminate, any material agreement in a way that is materially inconsistent with this Agreement, (iii) knowingly allow any material agreement to expire if such expiration would frustrate or impede consummation of the Restructuring Transactions, or (iv) knowingly allow any material permit, license, or regulatory approval to lapse, expire, terminate, or be revoked, suspended, or modified, in each case without the prior written consent of the Required Consenting Stakeholders (which may be by email);

(k)       file with any court any motion, pleading, or Definitive Document (including any modifications or amendments thereto) that, in whole or in part, is materially inconsistent with this Agreement;

(l)       (i) operate its business outside the ordinary course, other than the Restructuring Transactions, or (ii) other than in the ordinary course of business or as contemplated by this Agreement or the Restructuring Transactions transfer any material asset or right of the Company Parties (or their Affiliates) or any material asset or right used in the business of the Company Parties (or their Affiliates) to any person or entity;

(m)      other than in the ordinary course of business or as contemplated by this Agreement or the Restructuring Transactions engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness, or other similar transaction; and

(n)      pay prepetition indebtedness, except as expressly provided for herein, the DIP Documents, the New CTCI Documents, or pursuant to orders entered upon pleadings in form and substance reasonably satisfactory to the Required Consenting Stakeholders.

**Section 7.       *Additional Provisions Regarding Company Parties' Commitments*.**

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body (including any special committee thereof) of a Company Party to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent such Company Party or the board of directors, board of managers, or similar governing body (including any special committee thereof) determines, after consulting with counsel, that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be

deemed to constitute a breach of this Agreement. The Company Parties shall give written notice (the "**Fiduciary-Out Notice**") to counsel to the Consenting Stakeholders (e-mail being sufficient) within one (1) Business Day of any determination by the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, (a) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (b) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal. This Section 7.01 shall not impede any Party's right to terminate this Agreement as a result of any action or inaction that would otherwise constitute a breach of this Agreement but for this Section 7.01.

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided* that the Company Parties shall provide the advisors to the Consenting Stakeholders (i) a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for any such Alternative Restructuring Proposal within two (2) Business Days of the Company Parties' or their advisors' receipt of such offer or proposal, (ii) upon reasonable request, updates as to the status and progress of such Alternative Restructuring Proposal, and (iii) reasonable responses to any information requests regarding such discussions as necessary to keep the Consenting Stakeholders' advisors contemporaneously informed as to the status of such discussions; *however* that, to the extent any Company Party is prohibited from doing so due to a confidentiality restriction or condition upon which such proposal was submitted, such Company Party shall (x) notify counsel to the Consenting Stakeholders upon the receipt of any confidential proposal of the existence of such confidential proposal, (y) use commercially reasonable efforts to obtain relief from such restriction or condition in order to comply with its obligations under this Section 7.02, and (z) subject to compliance with the preceding clauses (x) and (y), not be in breach of this Section 7.02.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**    *Transfer of Interests and Securities*.

8.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or

unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      in the case of any Company Claims/Interests, the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (iii) an institutional accredited investor (as defined in the Rules), or (iv) a Consenting Stakeholder;

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and provides notice of such Transfer (including the amount and type of Company Claim/Interest transferred) to counsel to the Company Parties at or before the time of the proposed Transfer; and

(c)      such Transfer shall not violate the terms of any order entered by the Bankruptcy Court with respect to preservation of net operating losses.

8.02.   Upon compliance with the requirements of Section 8.01, the transferee shall be deemed a Consenting Stakeholder and a Party for all purposes under this Agreement, and all of the Company Claims/Interests then held (and subsequently acquired) by such transferee shall be subject to this Agreement. Upon the effectiveness of the Transfer, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided, however*, that (a) such additional Company Claims/Interests shall automatically and immediately, upon acquisition by a Consenting Stakeholder, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of the effectiveness of such acquisition.

8.04.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests. Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreement.

8.05.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if:  (a) such Qualified Marketmaker subsequently

Transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an Entity that is not an Affiliate, affiliated fund, or affiliated Entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee; and (c) the Transfer otherwise is a Permitted Transfer.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in any Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**      *Representations and Warranties of Consenting Stakeholders*.  Each Consenting Stakeholder, severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)      it is the beneficial or record owner of the face amount of the Company Claims/Interests, or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests, reflected in such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8), and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)      it has the full power and authority to act on behalf of, vote, and consent to matters concerning such Company Claims/Interests;

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, Transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)      it (i) has access to adequate information regarding the terms of this Agreement to make an informed and knowledgeable decision with regard to entering into this Agreement and (ii) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision with respect hereto;

(f)      it has made no prior assignment, sale, participation, grant, conveyance, or other Transfer of, and has not entered into any agreement to assign, sell, participate, grant, convey, or

otherwise Transfer, in whole or in part, any portion of its rights, title, or interest in any Company Claims/Interests that is inconsistent with the representations and warranties of such Consenting Stakeholder herein or would render such Consenting Stakeholder otherwise unable to comply with this Agreement and perform its obligations hereunder; and

(g)     (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.     *Representations and Warranties of Company Parties*.**  Each Company Party represents and warrants that, as of the Execution Date, it believes that entry into this Agreement is consistent with the exercise of such Company Party's fiduciary duties, and it has not entered into or agreed to any arrangement with respect to an Alternative Restructuring Proposal.

**Section 11.     *Mutual Representations, Warranties, and Covenants*.**  Each of the Parties represents, warrants, and covenants to each other Party that, as of the date such Party executed and delivers this Agreement, a Transfer Agreement, or a Joinder, as applicable, and as of the Plan Effective Date:

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.**    *Termination Events*.

12.01.  <u>Consenting Lender Termination Events</u>.  This Agreement may be terminated (a) with respect to the Consenting Term Loan Lenders, by the Required Consenting Term Loan Lenders and (b) with respect to the Consenting RCF Lenders, by the Required Consenting RCF Lenders, in each case, by the delivery to all Parties of a written notice in accordance with Section 14.10 upon the occurrence of one or more of the following events:

(a)    the breach in any material respect by a Company Party of any of the representations, warranties, commitments, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Lenders seeking termination pursuant to this provision and (ii) to the extent capable of being cured, remains uncured for five (5) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with Section 14.10 detailing any such breach;

(b)    the breach in any material respect by another Consenting Lender of any of the representations, warranties, commitments, or covenants of such Consenting Lender set forth in this Agreement, that (i) is adverse to the Consenting Lender seeking termination pursuant to this provision and (ii) to the extent capable of being cured, remains uncured for five (5) Business Days after such terminating Consenting Lender transmits a written notice in accordance with Section 14.10 detailing any such breach;

(c)    the breach in any material respect by CTCI of any of the representations, warranties, commitments, or covenants of CTCI set forth in this Agreement that (i) is adverse to the Consenting Lenders seeking termination pursuant to this provision and (ii) to the extent capable of being cured, remains uncured for five (5) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with Section 14.10 detailing any such breach;

(d)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with Section 14.10 detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(e)    the Bankruptcy Court enters an order denying Confirmation of the Plan;

(f)    an Event of Default (as defined in the DIP Credit Agreements) under the DIP Credit Agreements occurs and is asserted by the applicable DIP Secured Party, and has not been waived or timely cured in accordance therewith;

(g)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Debtor seeking an order (without the prior written consent of the Required Consenting RCF Lenders or the Required Consenting Term Loan Lenders, as applicable), (i) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in

sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Debtor, or (iii) rejecting this Agreement;

(h)     any of the Company Parties sends a Fiduciary-Out Notice to any of the Consenting Stakeholders;

(i)     any Debtor files with the Bankruptcy Court any motion or application seeking authority to sell any material assets (other than (i) any sales contemplated in the Restructuring Term Sheet or the Plan or disclosed in writing by the Company Parties or their advisors and in reasonable detail to the Consenting RCF Lenders, Consenting Term Loan Lenders, or their respective advisors prior to the execution of any definitive sale agreement in respect of such sale or the filing of any motion or application by the Company Parties seeking Bankruptcy Court approval of such sale and the Required Consenting Stakeholders have consented in writing to such sale (*provided* that if such sale would have a material, disproportionate and adverse effect on any of the Company Claims held by the Consenting RCF Lenders or the Consenting Term Loan Lenders, a written consent to such sale shall also have been provided by either or all of the Consenting RCF Lenders or the Consenting Term Loan Lenders, respectively, upon which such material, disproportionate, and adverse effect shall, or shall reasonably be expected to, result) and (ii) any sales pursuant to any order establishing procedures for the sale of de minimis assets);

(j)     the occurrence of any one of the following events:

(i)     the Debtors or any Affiliate of the Debtors files a motion, application, adversary proceeding, or cause of action (a) challenging the validity, enforceability, perfection or priority of, or seeking avoidance, subordination, or recharacterization of the DIP Claims, the Prepetition RCF Claims, the Claims arising from the Prepetition SOA or Prepetition SSA, or the Prepetition Term Loan Claims, as applicable, or the Liens securing any of such Claims, as applicable, or (b) otherwise seeking to impose liability upon or enjoin the DIP Secured Parties, Consenting RCF Lenders, or the Consenting Term Loan Lenders, as applicable;

(ii)     the Debtors or any Affiliate of the Debtors support any application, adversary proceeding, or Cause of Action referred to in the immediately preceding clause filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action;

(k)     the entry of an order by a court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the DIP Claims, the Prepetition RCF Claims, the Claims arising from the Prepetition SOA or Prepetition SSA, or the Prepetition Term Loan Claims, as applicable, or the Liens securing any of such Claims, as applicable;

(l)     a Company Party or any of its Affiliates (i) publicly announces, or announces in writing, to any of the Consenting Stakeholders, its intention not to support or pursue the Restructuring Transactions or (ii) enters into definitive documentation regarding an Alternative Restructuring Proposal without the consent of the Required Consenting Term Loan Lenders and Required Consenting RCF Lenders;

(m)      the failure to comply with or achieve any of the Milestones, which have not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay of the part of a terminating Consenting Stakeholder in violation of its obligations under this Agreement;

(n)      any Company Party (i) files, amends, or modifies, or files a pleading seeking approval of, any Definitive Document or authority to amend, supplement, or otherwise modify any Definitive Document, in a manner that is inconsistent with the consent rights set forth in Section 3.02 or constitutes a breach of this Agreement, (ii) withdraws the Plan without the prior consent of the Required Consenting Stakeholders, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), which, in the case of each of the foregoing clauses (i) and (ii), remains uncured (to the extent curable) for five (5) Business Days after such terminating Required Consenting Stakeholders transmit a written notice detailing any such breach;

(o)      the filing of a motion, application, or other pleading by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders) reversing or vacating the Confirmation Order;

(p)      the applicable Company Party materially breaches the Entara MSA at a time when Entara is not otherwise in breach of the Entara MSA, other than (i) as a result of the filing of the Chapter 11 Cases or (ii) as a result of any rejection of such agreement pursuant to section 365 of the Bankruptcy Code;

(q)      the breach in any material respect by a DIP Secured Party (which shall not be the Consenting Lender seeking termination pursuant to this provision) of the applicable DIP Credit Agreement;

(r)      the breach in any material respect by CTCI of the New CTCI Agreement; or

(s)      any of the Parties terminates this Agreement with respect to one or more Parties; *provided*, that the termination of a Consenting Term Loan Lender shall not trigger this provision unless such termination results in the Consenting Term Loan Lenders holding, in the aggregate, less than at least 66 and 2/3% of the aggregate outstanding principal amount of the Prepetition Term Loan Claims.

12.02.  <u>CTCI Termination Events</u>.  This Agreement may be terminated by CTCI by the delivery to all Parties of a written notice in accordance with Section 14.10 upon the occurrence of one or more of the following events:

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, commitments, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to CTCI and (ii), to the extent capable of being cured, remains uncured for five (5) Business Days after CTCI transmits a written notice in accordance with Section 14.10 detailing any such breach;

(b)      the breach in any material respect by one or more Consenting Lenders of any of the representations, warranties, commitments, or covenants of such Consenting Lenders set forth in this Agreement that (i) is adverse to CTCI and (ii) to the extent capable of being cured, remains

uncured for five (5) Business Days after CTCI transmits a written notice in accordance with Section 14.10 detailing any such breach;

(c)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after CTCI transmits a written notice in accordance with Section 14.10 detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)     the Bankruptcy Court enters an order denying Confirmation of the Plan;

(e)     an Event of Default (as defined in the New CTCI Agreement) occurs under the New CTCI Agreement and has been asserted by CTCIA, and has not been waived or timely cured in accordance therewith;

(f)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Debtor seeking an order (without the prior written consent of CTCI) (i) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Debtor, or (iii) rejecting this Agreement;

(g)     any of the Company Parties sends a Fiduciary-Out Notice to any of the Consenting Stakeholders;

(h)     any Debtor files with the Bankruptcy Court any motion or application seeking authority to sell any material assets (other than any sales pursuant to any order establishing procedures for the sale of de minimis assets);

(i)     the occurrence of any one of the following events:

(i)     the Debtors or any Affiliate of the Debtors files a motion, application, adversary proceeding, or cause of action (A) challenging the validity, enforceability, perfection or priority of, or seeking avoidance, subordination, or recharacterization of the DIP Claims of CTCI or any Affiliate of CTCI, the Prepetition EPC Claims, or the Liens securing any of such Claims, as applicable, or (b) otherwise seeking to impose liability upon or enjoin CTCI or any Affiliate of CTCI;

(ii)     the Debtors or any Affiliate of the Debtors support any application, adversary proceeding, or cause of action referred to in the immediately preceding clause filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(j)     the entry of an order by a court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of

the Prepetition EPC Claims or the Claims arising under the New CTCI Agreement, as applicable, or the Liens securing any of such Claims, as applicable;

(k)      a Company Party or any of its Affiliates (i) publicly announces, or announces in writing, to any of the Consenting Stakeholders, its intention not to support or pursue the Restructuring Transactions or (ii) enters into definitive documentation regarding an Alternative Restructuring Proposal without the consent of CTCI;

(l)      the failure to comply with or achieve any of the Milestones, which have not been waived, or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay of the part of a terminating Consenting Stakeholder in violation of its obligations under this Agreement;

(m)      any Company Party (i) files, amends, or modifies, or files a pleading seeking approval of, any Definitive Document or authority to amend, supplement, or otherwise modify any Definitive Document, in a manner that is inconsistent with the consent rights set forth in Section 3.02 or constitutes a breach of this Agreement, (ii) withdraws the Plan without the prior consent of CTCI, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), which, in the case of each of the foregoing clauses (i) and (ii), remains uncured (to the extent curable) for five (5) Business Days after such terminating Required Consenting Stakeholders transmit a written notice detailing any such breach;

(n)      the filing of a motion, application, or other pleading by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders) reversing or vacating the Confirmation Order; or

(o)      the applicable Company Party materially breaches the Entara MSA at a time when Entara is not otherwise in breach of the Entara MSA, other than (i) as a result of the filing of the Chapter 11 Cases or (ii) as a result of any rejection of such agreement pursuant to section 365 of the Bankruptcy Code;

(p)      the breach in any material respect by any of the DIP Lenders of either of the DIP Credit Agreements;

(q)      any of the Parties terminates this Agreement with respect to one or more Parties; *provided*, that the termination of a Consenting Term Loan Lender shall not trigger this provision unless such termination results in the Consenting Term Loan Lenders holding, in the aggregate, less than at least 66 and 2/3% of the aggregate outstanding principal amount of the Prepetition Term Loan Claims.

12.03.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that, to the extent capable of being cured, remains uncured for a period of five (5) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal, in each case, in accordance with Section 7.01;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(d)      the Bankruptcy Court enters an order denying Confirmation of the Plan;

(e)      the breach in any material respect by (i) any of the DIP Lenders of either of the DIP Credit Agreements or (ii) CTCI of the New CTCI Agreement; or

(f)      any of the Parties terminates this Agreement with respect to one or more Parties; *provided*, that the termination of a Consenting Term Loan Lender shall not trigger this provision unless such termination results in the Consenting Term Loan Lenders holding, in the aggregate, less than at least 66 and 2/3% of the aggregate outstanding principal amount of the Prepetition Term Loan Claims.

12.04.   <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting RCF Lenders; (b) the Required Consenting Term Loan Lenders; (c) CTCI; and (d) each Company Party.

12.05.   <u>Automatic Termination</u>.  This Agreement shall terminate automatically as to all the Parties without any further required action or notice immediately after the Plan Effective Date.

12.06.   <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party, and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Upon the occurrence of a Termination Date prior to Confirmation, any and all consents, directions, or ballots provided to or tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided, however*, that any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 12.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal

ragraph

or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right or ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 12.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Sections 12.03(b) or 12.03(d).  Nothing in this Section 12.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.03(b).

**Section 13.** *Amendments and Waivers*.

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (i) each Company Party; (ii) the Required Consenting Term Loan Lenders; (iii) CTCI; and (iv) the Required Consenting RCF Lenders; *provided, however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver, or supplement.

(c)     Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.** *Miscellaneous*.

14.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for

the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.   <u>Exhibits Incorporated by Reference; Conflicts</u>.   Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.   <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.   <u>Complete Agreement</u>.   Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, negotiations, understandings, and agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05.   <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or other proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06.   <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07.   <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or Entity.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Global Clean Energy Holdings, Inc.
6451 Rosedale Hwy
Bakersfield, CA 93308
Attention:  Antonio D'Amico, General Counsel
E-mail address:  antonio.damico@gceholdings.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua A. Sussberg, P.C.
            Brian Schartz, P.C.
            Ross J. Fiedler
E-mail addresses:  jsussberg@kirkland.com
                   bschartz@kirkland.com
                   ross.fiedler@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Peter A. Candel
E-mail address:  peter.candel@kirkland.com

And

Norton Rose Fulbright US LLP
1550 Lamar Street, Suite 2000
Houston, Texas 77010-3095
Attention:  Jason L. Boland,
                    Robert B. Bruner,
                    Jule Harrison
                    Maria Mokrzycka
Email Addresses:  jason.boland@nortonrosefulbright.com
                           bob.bruner@nortonrosefulbright.com
                           julie.harrison@nortonrosefulbright.com
                           maria.mokrzycka@nortonrosefulbright.com

(b)      if to a Consenting Term Loan Lender or DIP Term Loan Lender, to:

Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Attention:  Jeff Greenberg
E-mail address:  jeffrey.greenberg@lw.com

and

Latham & Watkins LLP
330 N Wabash Ave #2800,
Chicago, IL 60611
Attention:  James Ktsanes
E-mail address:  james.ktsanes@lw.com

and

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:  Nacif Taousse
E-mail address:  nacif.taousse@lw.com

(c)      if to a Consenting RCF Lender or DIP RCF Lender, to:

Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Attention:  Robert Stephens
                    Jackson Garvey
                    Maegan Quejada
E-mail address: rstephens@sidley.com
                          jgarvey@sidley.com
                          mquejada@sidley.com

(d)      if to CTCI, to:

> Davis Wright Tremaine LLP
> 920 Fifth Avenue
> Suite 3300
> Seattle, WA 98104-1610
> Attention:  Ragan Powers
>               Hugh McCullough
> E-mail addresses:  raganpowers@dwt.com
>                   hughmccullough@dwt.com

> and

> Haynes and Boone, LLP
> 2801 N. Harwood Street, Suite 2300
> Dallas, TX 75201
> Attention: Stephen M. Pezanosky
>             Ian T. Peck
> E-mail addresses:  stephen.pezanosky@haynesboone.com
>                   ian.peck@haynesboone.com

> and

> Haynes and Boone, LLP
> 1221 McKinney Street, Suite 4000
> Houston, TX 77010
> Attention:  Kelli S. Norfleet
> E-mail address:  kelli.norfleet@haynesboone.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial, and other conditions, and prospects of the Company Parties.

14.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights, remedies, claims, and defenses.  Pursuant to Federal Rule of Evidence 408 and any other applicable

rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18.  <u>Capacities of the Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19.  <u>Survival</u>.  Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with this Agreement or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 13 and the Confidentiality Agreements (in accordance with their terms) shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

14.20.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 13, or otherwise, including a written approval by the Company Parties or the Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.21.  <u>Publicity; Non-Disclosure</u>.  No Party shall reference any of the other Parties or the terms or status of the Restructuring Transactions in any press releases or other public statements without the prior written consent of the other Parties (email being sufficient).

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signature pages follow.*]

# EXHIBIT A

## Company Parties

**AGRIBODY TECHNOLOGIES, INC.**
**BAKERSFIELD RENEWABLE FUELS, LLC**
**BKRF HCB, LLC**
**BKRF HCP, LLC**
**BKRF OCB, LLC**
**BKRF OCP, LLC**
**CAMELINA COMPANY ESPAÑA, S.L.**
**GCE HOLDINGS ACQUISITIONS, LLC**
**GCE INTERNATIONAL DEVELOPMENT, LLC**
**GCE OPERATING COMPANY, LLC**
**GCEH CS ACQUISITIONS, LLC**
**GCEH VENTURES, LLC**
**GLOBAL CLEAN (CANADA) RENEWABLE FUELS, ULC**
**GLOBAL CLEAN ENERGY HOLDINGS, INC.**
**GLOBAL CLEAN ENERGY TEXAS, LLC**
**GLOBAL CLEAN RENEWABLE (ARGENTINA) S.R.L.**
**GLOBAL CLEAN RENEWABLE (BRASIL) LTDA**
**ROSEDALE FINANCECO LLC**
**SUSTAINABLE OILS, INC.**

**<u>EXHIBIT B</u>**

**Restructuring Term Sheet**

## GLOBAL CLEAN ENERGY HOLDINGS, INC., ET AL.

## RESTRUCTURING TERM SHEET

### April 16, 2025

This term sheet (together with all annexes, schedules, and exhibits attached hereto, this "Term Sheet") summarizes the material terms and conditions of the proposed transactions (the "Restructuring Transactions") to restructure the existing indebtedness of, and interests in, Global Clean Energy Holdings, Inc. ("GCEH") and its direct and indirect subsidiaries (together with GCEH, the "Company Parties"), as supported by the Consenting Stakeholders[1] and the Company Parties.[2]  The Restructuring Transactions will be consummated through a joint prearranged chapter 11 plan of reorganization filed by the Debtors in the Chapter 11 Cases (as may be amended or supplemented from time to time in accordance with the terms of this Term Sheet and the RSA, the "Plan"), on the terms, and subject to the conditions, set forth herein and in the RSA.

THIS TERM SHEET IS NEITHER AN OFFER WITH RESPECT TO ANY SECURITIES NOR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND WITHIN THE RSA, DEEMED BINDING ON ANY OF THE PARTIES HERETO.  THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY PERSON OTHER THAN THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS AND THEIR RESPECTIVE PROFESSIONAL ADVISORS OR EXCEPT AS OTHERWISE SET FORTH IN ANY CONFIDENTIALITY AGREEMENT BETWEEN THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS OR THEIR RESPECTIVE PROFESSIONAL ADVISORS.

THIS TERM SHEET IS FOR DISCUSSION PURPOSES ONLY AND DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF THE DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution, and delivery of the Definitive Documents. The regulatory, tax, accounting, and other legal and financial matters and effects related to the Restructuring

---

[1]   "Consenting Stakeholders" means, collectively, (a) Vitol Americas Corp. ("Vitol") in its capacities as (i) lender, administrative agent, and collateral agent under the Prepetition RCF Credit Agreement, and any assignee thereof that have executed and delivered counterpart signature pages to the RSA, a Joinder, or a Transfer Agreement to counsel to the Company Parties and (ii) agent and lender under the DIP RCF Facility, (b) the holders of, or investments advisors, sub-advisors, or managers of discretionary accounts that hold, Term Loan Claims that have executed and delivered counterpart signatures pages to the RSA, a Joinder, or a Transfer Agreement to counsel to the Company Parties, and (c) CTCI.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them later in this Term Sheet or that certain Restructuring Support Agreement, dated as of the date hereof, by and among the Company Parties and the Consenting Stakeholders (together with the exhibits and schedules attached to such agreement, including this Term Sheet, each as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "RSA"), as applicable.

Transactions or any related restructuring or similar transaction have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring Transactions or related transactions.

This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

| RESTRUCTURING OVERVIEW[3] | |
|---|---|
| **Restructuring Summary** | The Restructuring Transactions will be consummated through the commencement by the Debtors of voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court," and such cases commenced, the "Chapter 11 Cases," and the date such Chapter 11 Cases are filed, the "Petition Date") on a prearranged basis, on the terms and subject to the conditions set forth in the RSA and this Term Sheet.

The Plan shall provide for, among other things, the treatment of Claims and Interests, subject to the terms and conditions provided herein and in the RSA, pursuant to, among other things, the distribution of New Common Equity of Reorganized GCEH (together with the other reorganized Company Parties, the "Reorganized Debtors") to certain holders of Claims as specifically provided for herein on the Plan Effective Date. |
| **Milestones** | The Debtors shall comply with the below milestones, subject to extension or waiver by the Required Consenting Stakeholders:

- on the Petition Date, the Debtors shall have filed a motion and proposed order to assume the Prepetition SOA and Prepetition SSA (the "SOA SSA Assumption Motion") (which, for the avoidance of doubt, may be contained within the motion seeking entry of the DIP Orders and such orders, respectively);

- no later than three (3) days after the Petition Date, subject to Bankruptcy Court availability, the Bankruptcy Court shall have entered the Interim DIP Order;

- no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order and the order approving the relief requested in the SOA SSA Assumption Motion (which, for the avoidance of doubt, may be contained within the Final DIP Order);

- no later than sixty (60) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement; |

---

[3]   The Restructuring Transactions, including transaction structure and steps, and all other matters described herein remain subject to ongoing tax review and analysis in all respects.

<table>
<tr><td></td><td>

- no later than one hundred and ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the order confirming the Plan; and

- no later than one hundred and twenty (120) days after the Petition Date, the Plan Effective Date shall have occurred.

</td></tr>
<tr><td>

**Current Indebtedness & GCEH Equity Interests**

</td><td>

The existing capital structure of the Company Parties includes as of December 31, 2024 (unless otherwise specified):

***Prepetition RCF Claims***:  Consisting of (a) approximately $39.1 million in unpaid principal, *plus* any accrued but unpaid interest, fees, and premiums, and all other obligations, amounts, and expenses arising under, or in connection with, that certain Credit Agreement, dated as of June 25, 2024 (as amended, restated, amended and restated, modified, or supplemented from time to time consistent with the terms thereof, the "<u>Prepetition RCF Credit Agreement</u>," such Claims thereunder, the "<u>Prepetition RCF Claims</u>," and such credit facility, the "<u>Prepetition RCF Facility</u>") by and among Bakersfield Renewable Fuels, LLC ("<u>BKRF</u>"), a Delaware limited liability company, as borrower, BKRF OCB, LLC, a Delaware limited liability company, as guarantor, BKRF OCP, LLC, a Delaware limited liability company, as guarantor, the lenders party thereto, and Vitol Americas Corp., a Delaware corporation ("<u>Vitol</u>"), as the administrative and collateral agent, and (b) all amounts due and owing under that certain Supply and Offtake Agreement, dated as of June 25, 2024, by and among BKRF and Vitol (as amended, restated, amended and restated, modified, or supplemented from time to time consistent with the terms thereof, the "<u>Prepetition SOA</u>"), and that certain Storage Services Agreement, dated as of June 25, 2024, by and between BKRF and Vitol (as amended, restated, amended and restated, modified, or supplemented from time to time consistent with the terms thereof, the "<u>Prepetition SSA</u>");

***Prepetition Term Loan Claims***:  Consisting, as of April 13, 2025, of unpaid principal in the amount of approximately $1.10 billion, *plus* accrued but unpaid interest, fees, premiums, and all other obligations, amounts, and expenses arising under, or in connection with that certain Senior Secured Credit Agreement, dated as of May 4, 2020 (as amended, restated, amended and restated, modified, or supplemented from time to time consistent with the terms thereof, the "<u>Prepetition Term Loan Credit Agreement</u>," such loans thereunder, the "<u>Prepetition Term Loan Facility</u>," and such Claims thereunder, the "<u>Prepetition Term Loan Claims</u>"), by and among BKRF OCB, LLC, a Delaware limited liability company, as borrower, BKRF OCP, LLC, a Delaware limited liability company, as holdings, the lenders party thereto (together with their successors and permitted assigns, the "<u>Term Loan Lenders</u>"), and Orion Energy Partners TP Agent, LLC, as the administrative and collateral agent;

***Prepetition EPC Claims***:  Consisting of all amounts due and owing under (a) that certain Turnkey Agreement with a Guaranteed Maximum Price for the Engineering, Procurement, and Construction of the Bakersfield Renewable Fuels Project, dated as of May 18, 2021 (as amended, restated, amended and restated, modified, or supplemented from time to time, the "<u>Terminated EPC Agreement</u>"), by and among BKRF and CTCI Americas, Inc. ("<u>CTCI</u>"), and (b) that certain Interim Settlement Agreement, effective as of December 18, 2023, by and among BKRF and CTCI (as amended, restated, amended and restated, modified, or supplemented from time to

</td></tr>
</table>

| | |
|---|---|
| | time, the "Interim Settlement Agreement"), which collective amounts, solely for purposes of the RSA, total approximately $949,318,504.23 as of March 31, 2025, including interest accrued through that date, *plus* all other obligations, amounts, and expenses arising under or in connection therewith (the "Prepetition EPC Claims"), and with respect to which CTCI recorded a mechanic's lien on November 25, 2024 under California state Law; and<br><br>***Existing Interests in GCEH***:  Consisting of all existing equity interests in GCEH, including all common stock issued by GCEH, which common stock trades on "OTCQB" under the ticker symbol "GCEH," and any other interests (including any common units), options, warrants, preferred securities, or Claims linked to the equity or profit of the Company Parties, other than any such Interests or Claims held by another Company Party (collectively, the "GCEH Existing Interests"), excluding, for the avoidance of doubt, Subsidiary Existing Interests.[4] |
| **DIP Facilities and Cash Collateral** | To fund the administration of the Chapter 11 Cases and the implementation of the Restructuring Transactions, (a) the Consenting RCF Lenders shall provide a $100 million super-senior, secured debtor-in-possession revolving financing facility (the "DIP RCF Facility"), consisting of (i) the conversion of the $75 million existing obligations under the Prepetition RCF Facility into the DIP RCF Facility, subject to a "creeping" roll-up upon entry of the Interim DIP Order, as more fully described in **Exhibit A-1** hereto, and full roll-up of the remaining obligations under the Prepetition RCF Facility upon entry of the Final DIP Order, and (ii) a roll-up of all amounts owed to Vitol under the Tranche D Loan (as defined in the Prepetition Term Loan Credit Agreement), in the approximate amount of $25 million in principal plus approximately $2.8 million in accrued interest (but excluding any prepayment premium in respect thereof), subject to entry of the Interim DIP Order, (b) the Consenting Term Loan Lenders shall provide a $75 million super-senior, secured debtor-in-possession term loan financing facility, consisting of (i) $25 million in new money and, (ii) subject to entry of the Final DIP Order, a $50 million roll-up of existing Prepetition Term Loan Claims held by such Consenting Term Loan Lenders (the "DIP Term Loan Facility," and together with the DIP RCF Facility, the "DIP Facilities," and the lenders thereto, the "DIP Lenders"), which facilities shall be on the terms and conditions set forth in the RCF DIP Term Sheet and the DIP Term Loan Term Sheet attached hereto as **Exhibits A-1** and **Exhibit A-2**, respectively, and the DIP Documents, and (c) CTCI shall enter into that certain Project Management, Procurement, Construction, Operation and Maintenance Support Agreement with BKRF, attached hereto as **Exhibit B** (the "New CTCI Agreement"), pursuant to which CTCI will supply up to $75 million in goods, services, and other consideration described therein on the terms and conditions set forth therein, giving rise to obligations to the benefit of CTCI (such obligations, together with the obligations under the DIP Facilities, the "DIP Claims"), subject to the terms set forth therein.<br><br>The relative lien, claim, and payment priority among the DIP Facilities, the Prepetition RCF Facility, the Prepetition Term Loan Facility, the DIP Claims, and the |

---

[4]  "Subsidiary Existing Interests" means any third-party Interests in the Debtors (excluding GCEH).  For the avoidance of doubt, "Subsidiary Existing Interests" includes the interests of Delek US Holdings, Inc. under that certain Call Option Agreement, dated as of May 7, 2020, by and among GCEH, Alon Paramount Holdings, Inc., and GCE Holdings Acquisitions, LLC, to the extent such interests are not deemed Claims arising under section 510(b) of the Bankruptcy Code.  Further, for the avoidance of doubt, "Subsidiary Existing Interests" does not include any Intercompany Interests.

| | |
|---|---|
| | Debtors' other secured obligations shall be as described on **Exhibits A-3** (but subject to the terms and conditions of the DIP Orders, including provisions reserving the rights of parties to challenge priorities under specified circumstances). Such exhibit shall be attached to the DIP Orders and the DIP Credit Agreements.<br><br>The Debtors shall seek approval of the DIP Facilities and the DIP Claims under the New CTCI Agreement through the DIP Orders, consistent with the DIP Documents and the New CTCI Documents. The DIP Orders shall provide for the Debtors' consensual use of the Cash collateral of the prepetition secured parties. |
| **Exit Facilities** | On the Plan Effective Date, the applicable Reorganized Debtors shall incur the exit facilities and issue the takeback debt (the "Takeback Debt"), set forth in the term sheet attached hereto as **Exhibit C** (the "Exit Facilities Term Sheet"), in each case on the terms and conditions set forth therein.<br><br>For the avoidance of doubt, Vitol agrees to provide the Exit RCF Facility on the terms and conditions set forth in **Exhibit C**. |
| **New Preferred Equity** | On the Plan Effective Date, Reorganized GCEH shall issue a single class of preferred equity interests (the "New Preferred Equity") on the terms and conditions set forth in the term sheet attached hereto as **Exhibit D** (the "Governance Term Sheet"). |
| **Subcontractor Claims** | Concurrently with the Bankruptcy Court's approval of the DIP Facilities, CTCI shall satisfy any claims related to any unpaid subcontractor invoices related to work performed at or at the request of CTCI before October 21, 2024. |

| CLASSIFICATION AND TREATMENT<br>OF CLAIMS AND INTERESTS UNDER THE PLAN | | |
|---|---|---|
| **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Unclassified Non-Voting Claims** | | |
| **DIP Claims** | On the Plan Effective Date, each holder of an Allowed DIP Claim (which shall include interest, fees, and all other amounts due and owing under the DIP Facilities and the New CTCI Documents) shall receive, in full and final satisfaction of such Allowed DIP Claim:<br><br>(a)  with respect to Allowed DIP Claims on account of the DIP RCF Facility, (i) conversion into the Exit RCF Facility or (ii) such other treatment agreed to by holders of DIP RCF Claims (subject to the parties' consent rights set forth in Section 3.02 of the RSA);<br><br>(b)  with respect to Allowed DIP Claims on account of the New CTCI Agreement, (i) conversion into the Post-Exit CTCI Senior DIP Payment Obligation (as defined in the Exit Facilities Term Sheet) or (ii) such other treatment agreed to by CTCI (subject to the parties' consent rights set forth in Section 3.02 of the RSA); and | N/A |

| | | |
|---|---|---|
| | (c) with respect to Allowed DIP Claims on account of the DIP Term Loan Facility, (i) conversion into the applicable Exit Term Loan Facility or (ii) such other treatment agreed to by holders of DIP Term Loan Claims (subject to the parties' consent rights set forth in Section 3.02 of the RSA). | |
| **Administrative Claims** | On the Plan Effective Date, each holder of an Allowed Administrative Claim shall receive Cash equal to the full amount of its Claim or such other treatment as required by section 1129(a)(9) of the Bankruptcy Code, unless otherwise agreed to by such holder or permitted by the Bankruptcy Code. | N/A |
| **Priority Tax Claims** | On the Plan Effective Date, each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests** | | |
| **Other Secured Claims** | On the Plan Effective Date, each holder of an Allowed Other Secured Claim shall receive, unless otherwise agreed to by such holder:<br><br>(a) in full and final satisfaction of such Allowed Other Secured Claim, (i) payment in full in Cash in an amount equal to its Allowed Other Secured Claim or (ii) delivery of the collateral securing its Allowed Other Secured Claim;<br><br>(b) reinstatement of its Allowed Other Secured Claim; or<br><br>(c) such other treatment rendering its Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| **Other Priority Claims** | On the Plan Effective Date, each holder of an Allowed Other Priority Claim, in full and final satisfaction of such Allowed Other Priority Claim, unless otherwise agreed to by such holder, shall be paid in full in Cash on the Plan Effective Date or in the ordinary course of business as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| **Prepetition RCF Claims** | On the Plan Effective Date, each holder of an Allowed Prepetition RCF Claim shall receive, in full and final satisfaction of such Allowed Prepetition RCF Claim, unless otherwise agreed by such holder (subject to the parties' consent rights set forth in Section 3.02 of the RSA), and solely to the extent such Allowed Prepetition RCF Claim is not converted into a DIP Claim, conversion of such Allowed Prepetition RCF Claim into the Exit RCF Facility. | Impaired / Entitled to Vote |
| **Prepetition Term Loan Claims** | On the Plan Effective Date, each holder of an Allowed Prepetition Term Loan Claim shall receive, in full and final satisfaction of such Allowed Prepetition Term Loan Claim and solely to the extent such | Impaired / Entitled to Vote |

| | Allowed Prepetition Term Loan Claim is not converted into a DIP Claim, its *pro rata* share of:<br><br>(a) the Takeback Debt (as defined in the Exit Facilities Term Sheet) apportioned to holders of Allowed Prepetition Term Loan Claims, on the terms and conditions set forth in the Exit Facilities Term Sheet;<br><br>(b) 4/9ths (44.4%) of the New Preferred Equity, in accordance with the Governance Term Sheet; and<br><br>(c) 100% of the New Common Equity;<br><br>or such other treatment agreed to by holders of Prepetition Term Loan Claims (subject to the parties' consent rights set forth in Section 3.02 of the RSA). | |
| **Prepetition EPC Claims** | On the Plan Effective Date, each holder of an Allowed Prepetition EPC Claim shall receive, in full and final satisfaction of such Allowed Prepetition EPC Claim, its *pro rata* share of:<br><br>(a) the Takeback Debt apportioned to holders of Allowed Prepetition EPC Claims, on the terms and conditions set forth in the Exit Facilities Term Sheet; and<br><br>(b) 5/9ths (55.6%) the New Preferred Equity, in accordance with the Governance Term Sheet;<br><br>or such other treatment agreed to by the holders of the Prepetition EPC Claims (subject to the parties' consent rights set forth in Section 3.02 of the RSA). | Impaired / Entitled to Vote |
| **General Unsecured Claims[5]** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim, its *pro rata* share of $[●][6] (the "GUC Cash Pool"); *provided* that the GUC Cash Pool shall be reduced dollar-for-dollar for the Allowed professional fees and expenses incurred by any official committee of unsecured creditors appointed in the Chapter 11 Cases; *provided, further*, that, if the class of General Unsecured Claims votes to accept the Plan, the holders of Allowed Prepetition Term Loan Claims and the holders of Allowed Prepetition EPC Claims have agreed to waive, solely for purposes of distributions from the GUC Cash Pool, entitlement to any deficiency | Impaired / Entitled to Vote |

[5] For the avoidance of doubt, General Unsecured Claims includes any and all Claims (a) under that certain Demand Promissory Note, dated as of December 31, 2014 (as amended, restated, amended and restated, modified, or supplemented from time to time consistent with the terms thereof, by and among GCEH, a Delaware corporation, and Targeted Growth, Inc., a Washington corporation, (b) under that certain revised letter agreement, dated as of December 8, 2024 (as amended, modified, or supplemented from time to time consistent with the terms thereof), by and among Castleton Commodities Merchant Trading, L.P. and GCE Holdings Acquisitions, LLC, and (c) related to the payments due to that certain service provider under that certain Professional Services Agreement, dated as of May 22, 2023.

[6] The amount of the GUC Cash Pool shall be acceptable to the Required Consenting Term Loan Lenders and CTCI.

|  | | |
|---|---|---|
|  | claim with respect to any portion of their Claims that are deemed unsecured (provided that any such unsecured portion is not the result of a challenge by any party of any liens or security interests asserted by the holders of the Term Loan Claims or the holders of Prepetition EPC Claims, as applicable). | |
| **Section 510(b) Claims** | On the Plan Effective Date, Claims arising under section 510(b) of the Bankruptcy Code, if any, shall be cancelled, released, discharged, and extinguished and will be of no further force or effect, and such holders will not receive any distribution on account of such Claims. | Impaired / Deemed to Reject |
| **Intercompany Claims** | On the Plan Effective Date, each Allowed Intercompany Claim shall be (a) reinstated or (b) set off, settled, discharged, contributed, cancelled, converted to equity, or released without any distribution on account of such Allowed Intercompany Claim, or otherwise addressed at the option of the Reorganized Debtors. | Unimpaired / Presumed to Accept<br><br>or<br><br>Impaired / Deemed to Reject |
| **Intercompany Interests** | On the Plan Effective Date, each Allowed Intercompany Interest shall be (a) reinstated or (b) set off, settled, discharged, contributed, cancelled, or released without any distribution on account of such Allowed Intercompany Interest, or otherwise addressed at the option of the Reorganized Debtors. | Unimpaired / Presumed to Accept<br><br>or<br><br>Impaired / Deemed to Reject |
| **GCEH Existing Interests** | On the Plan Effective Date, each holder of an Allowed GCEH Existing Interest shall, in full and final satisfaction, settlement, release, and discharge of such Allowed GCEH Existing Interest, have its Allowed GCEH Existing Interest be cancelled, released, extinguished, and of no further force or effect, and such holder shall not receive any distribution, property, or other value under the Plan on account of such Allowed GCEH Existing Interest. | Impaired / Deemed to Reject |
| **Subsidiary Existing Interests** | On the Plan Effective Date, each Allowed Subsidiary Existing Interest shall, in full and final satisfaction, release, and discharge of such Allowed Subsidiary Existing Interest, be cancelled, released, discharged, and extinguished and will be of no further force or effect, and the holders of such Interests shall not receive any distribution, property, or other value under the Plan on account of such Allowed Subsidiary Existing Interest. | Impaired / Deemed to Reject |
| **OTHER KEY TERMS** | | |
| **Securities Law Matters** | On the Plan Effective Date, Reorganized GCEH shall issue the New Common Equity and the New Preferred Equity in accordance with the terms of the Plan. | |

| | |
|---|---|
| | Any New Common Equity and New Preferred Equity issued under the Plan will be issued (a) to the fullest extent permitted and applicable, without registration under the Securities Act or similar federal, state, or local Laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or (b) to the extent that section 1145 of the Bankruptcy Code is not permitted or applicable, pursuant to other applicable exemptions under the Securities Act. |
| **Employment Obligations** | The Consenting Stakeholders consent to the continuation of the Company Parties' wages and benefits programs according to existing terms and practices, including the employment agreements[7] entered into prior to the Petition Date with the individuals listed in **Exhibit E** (the "Assumed Agreements"), and any motions in the Bankruptcy Court for approval thereof (subject to any Party's consultation or consent right set forth in the RSA in connection with any First Day Pleading).<br><br>The Reorganized Debtors shall (a) assume the Assumed Agreements and (b) assume and/or honor in the ordinary course of business any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for health care benefits, disability benefits, savings, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Company Parties who served in such capacity on or after the Agreement Effective Date or, in each case, the full amount necessary to satisfy such obligations shall be set aside to satisfy such obligations.<br><br>Pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Plan Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law. |
| **Survival of Indemnification Provisions and D&O Insurance** | All indemnification provisions, consistent with applicable Law, currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the benefit of current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties, as applicable, shall be (a) reinstated and remain intact, irrevocable, and shall survive the Plan Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties than the indemnification provisions in place prior to the Plan Effective Date, and (b) shall be assumed by the Reorganized Debtors.<br><br>After the Plan Effective Date, Reorganized GCEH will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Plan Effective Date or any other individuals covered by such |

---

[7]   Notwithstanding anything to the contrary in this Term Sheet (including the "Executory Contracts and Unexpired Leases" section herein) or in the RSA, the Debtors and the Reorganized Debtors, as applicable, shall not assume or enter into any employment, retention, bonus, severance, or other compensation agreements or contracts with any employee other than the Assumed Agreements.

| | |
|---|---|
| | insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions on or after the Plan Effective Date. |
| **Organizational Documents / Standstill** | The new corporate governance documents and any other documentation evidencing the corporate governance for any Reorganized Debtor and any direct or indirect subsidiary thereof (such documents, collectively, the "New Corporate Governance Documents"), including charters, bylaws, limited liability company agreements, shareholder agreements, and/or other organization documents of such entities, will be consistent with the RSA and subject to the parties' consent rights set forth in Section 3.02 of the RSA (provided that any New Corporate Governance Documents that are consistent with the Governance Term Sheet shall be deemed acceptable to such parties); *provided* that the New Corporate Governance Documents shall include certain consent rights for CTCI for certain transactions, including pursuant to an operations oversight committee, as to be agreed and set forth in the New Corporate Governance Documents.<br><br>The New Corporate Governance Documents shall provide that the Reorganized Debtors shall be prohibited from filing for bankruptcy or consummating a sale of the Reorganized Debtors or any of their significant assets prior to December 31, 2030, without the prior written consent of CTCI. |
| **Corporate Governance** | The board of directors or managers, as applicable, of Reorganized GCEH shall consist of seven members, including four members appointed by the Consenting Term Loan Lenders, two members appointed by CTCI, and one independent member to be selected by a majority of the other members, which independent member shall be appointed in consultation with the Required Consenting RCF Lenders. |
| **Diligence** | After the Agreement Effective Date, the Company Parties will use commercially reasonable efforts to promptly respond to reasonable due diligence requests from CTCI, the Consenting Term Loan Lenders, and the Consenting RCF Lenders. |
| **Executory Contracts and Unexpired Leases** | The Plan shall provide that executory contracts and unexpired leases that are not rejected as of the Plan Effective Date (either pursuant to the Plan or a separate motion, and which rejection shall be subject to the prior written consent of (i) the Required Consenting Term Loan Lenders and (ii) CTCI (in each case, not to be unreasonably withheld, conditioned, or delayed)) will be deemed assumed pursuant to section 365 of the Bankruptcy Code.<br><br>The Company Parties shall, subject to the prior written consent of (i) the Required Consenting Term Loan Lenders and (ii) CTCI (in each case, not to be unreasonably withheld, conditioned, or delayed), determine which non-employment agreement executory contracts are rejected by the Company Parties in connection with the Chapter 11 Cases; *provided* that, with respect to any such contracts in which there is an actual or potential conflict of interest (including, for the avoidance of doubt, that certain Management Services Agreement between BKRF and Entara LLC dated August 27, 2024), the applicable special committee of the Company Parties shall approve the decision to assume or reject such contract in lieu of the Company Parties; *provided*, *however*, that, to the extent the applicable special committee approves the rejection or assumption of any such non-employment executory contract, such |

Case 25-90113   Document 22   Filed in TXSB on 04/16/25   Page 212 of 421


| | |
|---|---|
| | rejection or assumption shall still require the prior written consent of (i) the Required Consenting Term Loan Lenders and (ii) CTCI (in each case, not to be unreasonably withheld, conditioned, or delayed). |
| **Retained Causes of Action** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions of the Plan. |
| **Retention of Jurisdiction** | The Plan shall provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Plan Releases and Exculpations** | The Plan and Confirmation Order shall include customary exculpation provisions and debtor and third-party release provisions providing for the release of claims, litigation, or other Causes of Action arising on or before the Plan Effective Date, substantially consistent with those set forth in **Exhibit F** attached hereto. |
| **Tax Structure** | To the extent practicable, the Restructuring Transactions contemplated by this Term Sheet will be structured so as to obtain the most beneficial tax structure, as determined by the Company Parties with the consent of the Required Consenting Term Loan Lenders and CTCI (in each case, solely with respect to any deviations from the tax structure set forth in the Exit Facilities Term Sheet and the Governance Term Sheet). |
| **Other Customary Plan Provisions** | The Plan will provide for other standard and customary provisions, including, among other things, provisions addressing the vesting of assets, release of liens, the compromise and settlement of Claims and Interests, and the resolution of disputed Claims. |
| **Conditions Precedent to Restructuring Effective Date** | It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived: <br><br> (a)   the RSA shall be in full force and effect and shall not have been validly terminated by any of the parties thereto; <br><br> (b)   there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened, or pending) before or by any court, governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Company Parties and the Required Consenting Stakeholders would prohibit, prevent, or restrict consummation of the Restructuring Transactions; <br><br> (c)   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated; <br><br> (d)   an order, statute, rule, regulation, executive order, stay, decree, judgment, or injunction shall not have been enacted, entered, issued, promulgated, enforced, or deemed applicable by any court or governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, that, in the |

reasonable judgment of the Company Parties and the Required Consenting Stakeholders would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

(e)   each document or agreement constituting a Definitive Document shall have been executed or otherwise effectuated as contemplated, shall be in form and substance consistent with the RSA (and subject to the parties' consent and consultation rights thereunder with respect to such Definitive Document) and this Term Sheet, and any conditions and customary matters, and all conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived pursuant to the terms of the RSA and the applicable Definitive Document;

(f)   to the extent invoiced, the payment of all reasonable and documented fees and expenses of the Company Parties' professionals (solely if payment of such fees and expenses have been authorized by the Bankruptcy Court, including under the DIP Order) and the Consenting Stakeholders' professionals related to the negotiation and implementation of the Restructuring Transactions and not previously paid by the Company Parties;

(g)   all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date have been placed in the professional fee escrow account;

(h)   the Bankruptcy Court shall have entered the Confirmation Order, which shall be subject to the parties' consultation and consent rights set forth in the RSA, and such order shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered;

(i)   the Required Consenting Term Loan Lenders and CTCI shall have consented (in each case, such consent shall not be unreasonably withheld, conditioned, or delayed) to the executory contracts to be rejected or assumed, if any;

(j)   the New Corporate Governance Documents shall have been executed and/or effectuated, shall be in form and substance consistent with the RSA and this Term Sheet, and any conditions precedent related thereto, shall have been satisfied prior to or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived;

(k)   the Prepetition SOA and Prepetition SSA shall have been assumed by the Debtors and no events of default shall be outstanding thereunder; and

(l)   the New Common Equity and the New Preferred Equity shall have been issued by Reorganized GCEH.

**Exhibit A-1**

**DIP RCF Term Sheet**

*Subject to Rule 408 of the Federal Rules of Evidence – Not Admissible in Court*

**SUMMARY OF PROPOSED TERMS AND CONDITIONS**
**FOR REVOLVING DIP FINANCING FACILITY AND USE OF CASH COLLATERAL**

**(Confidential - For Discussion Purposes Only; Not a Commitment)**

In re Global Clean Energy Holdings, Inc., et al.,
as Debtors and Debtors-in-Possession
April 16, 2025

*The terms and conditions summarized below are intended as a summary outline of a proposed financing and commercial commitment which is conditioned in all respects upon completion of due diligence, negotiation of definitive documentation and final credit approval and do not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation.  No DIP RCF Secured Party (as defined herein) is under any obligation to make a loan or enter into or continue commodity transactions or make any commitment to lend or enter into commodity transactions and any such commitment would be subject to, among other conditions, such DIP RCF Secured Party obtaining any necessary final credit authorizations and approvals and negotiation and execution of definitive documentation in form and substance satisfactory to such DIP RCF Secured Party.  This document is delivered to you with the understanding that neither it nor its substance shall be disclosed to any third party. Any provision of financial and commercial accommodations under such debtor-in-possession credit facility shall be further subject to the terms and conditions, and Bankruptcy Court approval, set forth below.*

*Reference is made to the:*

- *Credit Agreement, dated as of June 25, 2024 (as amended, supplemented, and otherwise modified from time to time, the "**Prepetition RCF Credit Agreement**" and the related guarantees, security agreements, mortgages, intercreditor agreements and other security documents, the "**Prepetition Revolver Documents**"), among the Borrower (as defined below), BKRF OCB, LLC, BKRF OCP, LLC, the Prepetition RCF Lenders (as defined below) and the Prepetition RCF Agent (as defined below);*

- *Supply and Offtake Agreement, dated as of June 25, 2024, by and between the Borrower and Vitol Americas Corp. ("**Vitol**") (as amended, supplemented, and otherwise modified from time to time, the "**SOA**"); and*

- *Storage Services Agreement, dated as of June 25, 2024, by and between the Borrower and Vitol (as amended, supplemented, and otherwise modified from time to time, the "**SSA**") with the facility collectively provided by the Prepetition Revolver Documents, and, for the period prior to the Petition Date, the SOA and the SSA being the "**Prepetition RCF Facility**").*

*Capitalized terms used in this term sheet (the "**RCF DIP Term Sheet**") and not otherwise defined herein shall have the meaning given to such terms in the Prepetition Revolver Documents or the Restructuring Support Agreement (as defined below), as applicable.*

| | |
|---|---|
| **Borrower:** | Bakersfield Renewable Fuels, LLC, as debtor and debtor in possession (the "**Borrower**") under chapter 11 of title 11 of the United States Code (such title, the "**Bankruptcy Code**") in the jointly administered cases of Borrower and certain of its affiliates (collectively, the "**Cases**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"). |
| **Guarantors:** | All obligations under the DIP RCF Facility (as defined below) and the other DIP RCF Documents (as defined below) will be unconditionally guaranteed (the "**Guarantee**") by each Affiliate of the Borrower that is a debtor-in-possession under the Bankruptcy Code (such parties, the "**Guarantors**"; and, together with the Borrower, collectively the "**Debtors**"), each of which Guarantors have been identified on Schedule 1 hereto. |
| **Prepetition RCF Agent:** | Vitol Americas Corp., in its capacities as Administrative Agent and Collateral Agent under the Prepetition Revolver Documents (the "**Prepetition RCF Agent**"). |
| **Prepetition RCF Lenders:** | Those lenders who are parties to the Prepetition RCF Credit Agreement as of the Petition Date (the "**Prepetition RCF Lenders**" and, collectively with the Prepetition RCF Agent, the "**Prepetition RCF Secured Parties**"). |
| **DIP RCF Agent:** | Vitol Americas Corp., in its capacity as Administrative Agent under the DIP RCF Credit Agreement (as defined below) and as Collateral Agent under the DIP RCF Facility (as applicable, the "**DIP RCF Agent**"). |
| **DIP RCF Lenders:** | The Prepetition RCF Lenders providing Revolving DIP Loan Commitments (as defined below) and Roll-Up RCF Loans (each as defined below) under the DIP RCF Facility (the "**DIP RCF Lenders**" and, collectively with the DIP RCF Agent, the "**DIP RCF Secured Parties**"). |
| **Petition Date:** | The date the Debtors file their Chapter 11 petitions (the "**Petition Date**"). |
| **Termination of Prepetition RCF Commitment:** | All commitments of the Prepetition RCF Lenders to lend under the Prepetition RCF Facility shall terminate on the Petition Date. |
| **Revolving DIP Facility and Roll-Up:** | Subject to the conditions precedent, the DIP RCF Lenders will provide to the Debtors a priming, senior secured, super-priority debtor-in-possession revolving credit agreement (the "**DIP RCF Credit Agreement**") made available to the Borrower for |

*GCEH DIP RCF Credit Facility Term Sheet*

loans (the "**Revolving DIP Loans**") in the aggregate maximum principal amount of up to $100 million for general corporate purposes (the "**Revolving DIP Loan Commitment**"), subject to a Borrowing Base as described below (inclusive of the Roll-Up RCF Loans (defined below), the "**DIP RCF Loans**"). The credit and commercial facility provided by the DIP Revolver Documents along with, on and after the Petition Date, the supply and offtake facilities provided by Vitol under the SOA and SSA, being the "**DIP RCF Facility**". The documentation relating to the DIP RCF Facility shall be substantially consistent with the Prepetition RCF Facility, except as specified herein or otherwise appropriate to reflect (i) the agreed commercial structure of the DIP RCF Facility, (ii) the appropriate parties thereto, and (iii) such other modifications or changes as may be agreed among the Parties thereto, including pursuant to the DIP RCF Credit Agreement.

(a) Subject to and effective upon entry of the Interim Order, all outstanding Tranche D Loans (as defined in the Term Credit Agreement) held by Vitol and all accrued but unpaid interest thereon, in the approximate amount of $25 million in principal amount plus approximately $2.8 million in capitalized and accrued interest (but excluding any prepayment premium in respect thereof), shall be rolled-up and become outstanding Revolving DIP Loans (the "**Tranche D Roll-Up Loans**").

(b) Subject to and effective upon entry of the Interim Order, the Debtors shall be deemed to remit all collections and proceeds of DIP RCF Collateral (including all Environmental Attributes or other environmental credits that constitute Prepetition RCF Collateral and are obtained by the Loan Parties in the ordinary course of business during the Bankruptcy Cases, the "**Prepetition RCF Collections**") to the Prepetition RCF Agent for application to the Prepetition RCF Obligations (other than amounts incurred pursuant to the SOA or SSA) in accordance with the Prepetition Revolver Documents on each business day, and upon such deemed remission and application an equivalent amount shall be deemed advanced as DIP RCF Loans, thereby, on each business day, creating a reduction in the Prepetition RCF Obligations in the amount of Prepetition RCF Collections, and a corresponding increase in DIP RCF Loans (amounts subject to this subsection (a), the "**Creeping Roll-Up Loans**" and, collectively with

*GCEH DIP RCF Credit Facility Term Sheet*

3

the Tranche D Roll-Up Loans, the "**Interim Roll-Up RCF Loans**").

(c) Subject to and effective upon entry of the Final Order, any and all remaining Prepetition RCF Obligations (other than amounts incurred pursuant to the SOA or SSA) shall be converted to Revolving DIP Loans (collectively with the Interim Roll-Up RCF Loans, the "**Roll-Up RCF Loans**").

Upon the conversion of obligations under the Prepetition RCF Credit Agreement to Roll-Up RCF Loans in connection therewith, the Roll-Up RCF Loans shall constitute DIP RCF Obligations (as defined below) in all respects, including for purposes of having the benefit of Section 364(e) of the Bankruptcy Code.

Revolving DIP Loan Commitments shall be made available to the Debtors during the period from the date of entry of the Interim Order by the Bankruptcy Court through the date of entry of the Final Order (as defined below) by the Bankruptcy Court. Pending the entry of the Final Order, the DIP RCF Agent and the DIP RCF Secured Parties shall be afforded all of the protections contained in the Interim Order.

The Revolving DIP Loans, subject to the foregoing and other applicable conditions and consistent with past ordinary course processing procedures, will be funded on the next business day following the submission of a proper notice of borrowing if such request is received by the DIP RCF Agent no later than 1:00 p.m., New York time, on the day that is one business day prior to the business day on which such borrowing is requested to be made. If such notice of borrowing is received by the DIP RCF Agent after 1:00 p.m., New York Time, such notice of borrowing shall be deemed to have been received on the business day following the date such request is actually received by the DIP RCF Agent.

**Exit RCF Credit Agreement:** Pursuant to that certain Restructuring Support Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Restructuring Support Agreement**"), dated April 16, 2025, by and among the Debtors, the DIP RCF Lenders, the Consenting Term Loan Lenders (as defined in the Restructuring Support Agreement), and CTCI, the DIP RCF Credit Agreement and remaining obligations under the Prepetition RCF Credit Agreement shall be converted into the $100 million Exit RCF Credit Agreement, which shall be provided by the DIP RCF Lenders on terms and conditions to be set forth in a term sheet describing, *inter alia*, terms for such Exit RCF Credit Agreement (the "**Exit RCF Term Sheet**")

*GCEH DIP RCF Credit Facility Term Sheet*

and subject to the requirements of the Restructuring Support Agreement. The credit and commercial facility provided by the Exit RCF Credit Agreement and the SOA and SSA upon exit as described below being the "**Exit RCF Facility**". The documentation relating to the Exit RCF Facility shall be substantially consistent with the Prepetition RCF Facility, except as specified herein or otherwise appropriate to reflect (i) the agreed commercial structure of the Exit RCF Facility, (ii) the appropriate parties thereto, and (iii) such other modifications or changes as may be agreed among the Parties thereto, including pursuant to the Exit RCF Term Sheet.

**SOA and SSA upon Exit:**  Pursuant to the Restructuring Support Agreement, the SOA and SSA shall be amended and restated upon exit of the Cases to take into account the completion of the Cases and, as amended and restated, shall remain in effect in accordance with the Restructuring Support Agreement. Without limiting the foregoing, the Close-out Amount in the SOA shall remain in effect for the remaining term of the SOA. Upon exit from the Cases, the SOA and SSA shall benefit from the same priority and lien package as the Exit RCF Credit Agreement.

**M&M Liens:**  Concurrently with the Bankruptcy Court's approval of the DIP RCF Facility, CTCI Americas, Inc. ("**CTCI**") shall satisfy any claims related to unpaid subcontractor invoices related to work performed or services provided by such subcontractor to the Debtors before October 21, 2024 (or reimburse any payments made by the Debtors on account of such unpaid invoices).

**Use of Proceeds:**  The DIP RCF Facility may be used only for (i) postpetition working capital purposes of the Debtors; (ii) current interest and fees under the DIP RCF Facility; (iii) interest and fees payable under the Prepetition RCF Facility; (iv) the payment of adequate protection payments to the Prepetition RCF Secured Parties, and Term Creditors that also constitute Prepetition RCF Secured Parties, including fees payable under the Prepetition RCF Credit Agreement and Term Credit Agreement; (v) funding the Carve-Out and the reasonable and documented expenses and professional fees for (a) the DIP RCF Agent, (b) the Prepetition RCF Agent, in each of its capacities as administrative agent and collateral agent of the Prepetition RCF Facility, and (c) the Prepetition RCF Lenders; and (vi) the allowed administrative costs and expenses of the Cases, in each case, solely in accordance with the Approved Budget (subject to the Variance Limit) and the DIP Orders (each as defined below) incorporating the terms hereof (the "**Acceptable Uses of Proceeds**"). The DIP RCF Facility may not be used to fund costs contemplated to be funded by CTCI under the DIP CTCI Contract unless and until CTCI has funded $75 million of costs under the DIP CTCI Contract with the sole

*GCEH DIP RCF Credit Facility Term Sheet*

exception of costs associated with the Borrower's purchase of feedstock from Vitol under the SOA.

**DIP Facility Interest Rate and Fees:**   See <u>Schedule 3</u> hereto with respect to rates and fees.

**Priority and Security:**   Subject to the Carve-Out, all obligations of the Debtors under the DIP RCF Facility and all Obligations of the Debtors arising under the SOA and the SSA on or after the Petition Date (the "**DIP RCF Obligations**") shall be:

    i.    entitled to super-priority claim status under Section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims and any unsecured claims against the Debtors now existing or hereafter arising under the Bankruptcy Code, including, without limitation, the claims of the DIP TL Secured Parties, the prepetition claims and adequate protection claims of the Prepetition RCF Agent on behalf of the Prepetition RCF Lenders, the prepetition claims of the Term Administrative Agent on behalf of the Term Creditors, the Subordinated EPC Secured Claim, the Subordinated Senior Secured EPC Claim, and the Subordinated Junior EPC Claim, subject only to the Carve-Out. The super-priority claims of the DIP RCF Secured Parties may be repaid from any cash of the Debtors, including without limitation, Cash Collateral (as defined below) and, subject to entry of the Final Order, any Avoidance Action Proceeds (as defined below);

    ii.    secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a first priority, perfected lien on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code) (but including, subject to entry of the Final Order, the proceeds of Avoidance Actions (as defined below) and property received or recovered thereby (the "**Avoidance Action Proceeds**"));

    iii.    secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a junior priority, perfected lien on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were subject to a lien permitted under the terms of the Prepetition RCF Credit Agreement that was

*GCEH DIP RCF Credit Facility Term Sheet*

6

perfected prior to the Petition Date or is perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the Liens securing the obligations under the Prepetition RCF Credit Agreement, the Term Indebtedness, the Subordinated EPC Secured Claim, the Subordinated Senior Secured EPC Claim, and the Subordinated Junior EPC Claim, which liens are addressed in (iv) below), which liens shall be senior to any liens securing the claims of the DIP TL Agent and DIP TL Lenders; and

iv.     secured, pursuant to Section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, priming first priority, fully perfected security interests in and liens upon all of the Debtors' rights in property of the Debtors' estates as of the Petition Date and all of the Debtors' rights in property acquired postpetition (and proceeds thereof), whether now existing or hereafter acquired or arising, that secure the obligations under the Prepetition Revolver Documents, the Term Credit Agreement and related documents, the Subordinated EPC Secured Claim, the Subordinated Senior Secured EPC Claim, and the Subordinated Junior EPC Claim, any obligations to any Affiliate of such Debtor, or the claims of the DIP TL Agent and DIP TL Lenders (but subject to clause (iii) above) (such lien, together with the liens described in clauses (ii) and (iii) above, the "**DIP RCF Liens**" and the collateral described in clauses (ii)–(iv) above, collectively, the "**DIP RCF Collateral**");

DIP RCF Collateral shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP RCF Collateral, without the necessity of any further action of any kind or nature by the DIP RCF Agent or the DIP RCF Secured Parties in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits.

Notwithstanding anything to the contrary contained herein, in no event shall any estate causes of action under Chapter 5 of the Bankruptcy Code (the "**Avoidance Actions**") constitute DIP RCF Collateral or be subject to a DIP RCF Lien; provided, however, DIP RCF Collateral shall include, and the DIP RCF Liens shall attach to, Avoidance Action Proceeds subject to entry of the Final Order as set forth in clause (ii) above.

The DIP RCF Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under

*GCEH DIP RCF Credit Facility Term Sheet*

Section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, or (iii) any intercompany or affiliate liens of the Debtors.

The DIP RCF Liens will automatically attach to the DIP RCF Collateral and become valid and perfected immediately upon entry of the Interim Order without the requirement of any further action by the DIP RCF Agent or the DIP RCF Secured Parties.  The DIP RCF Liens granted to the DIP RCF Secured Parties with respect to the Roll-Up RCF Loans will be *pari passu* (on a pro rata basis) to the DIP RCF Liens granted with respect to the Revolving DIP Loans.

**Use of Cash Collateral:**[1]   All cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all collateral pledged to the DIP RCF Agent constitute cash collateral, as contemplated by Section 363 of the Bankruptcy Code ("**Cash Collateral**").   Cash Collateral may be used only for Acceptable Uses of Proceeds and, in each case, solely in accordance with the Approved Budget (subject to the Variance Limit) and the DIP Orders (each as defined below) incorporating the terms hereof.  The DIP RCF Facility may not be used to fund costs contemplated to be funded by CTCI under the DIP CTCI Contract unless and until CTCI has funded $75 million of costs under the DIP CTCI Contract with the sole exception of costs associated with the Borrower's purchase of feedstock from Vitol under the SOA.

**Conditions Precedent:**   The closing of the DIP RCF Facility and the Debtors' right to use Cash Collateral pursuant to the terms hereof will be subject to the satisfaction of all conditions precedent to be set forth in the DIP RCF Facility deemed necessary or appropriate by the DIP RCF Agent and the Prepetition RCF Agent, as applicable, including but not limited to:

    i.   satisfactory completion of legal and collateral due diligence and transaction structuring, including due diligence concerning the Cases and the receipt of all required court approvals of the DIP RCF Facility and any other motions of the Debtors of concern to the DIP RCF Secured Parties;

---

[1] DIP Order to include certain provisions, protections, and reservations of rights for the Prepetition RCF Agent and the Prepetition RCF Lenders and other prepetition secured parties with respect to consent to use cash collateral.  Any omissions of such provisions, protections, and reservations in this RCF DIP Term Sheet are not a waiver or concession of such provision, protection, or reservation.

*GCEH DIP RCF Credit Facility Term Sheet*

    ii.    the DIP RCF Agent shall have received executed counterparts to the DIP RCF Documents from each DIP RCF Secured Party;

    iii.    on or prior to the Petition Date, the DIP RCF Agent and the Prepetition RCF Agent shall have received a cash forecast for the period from the Petition Date through the Scheduled Maturity Date (as defined below) setting forth projected cash flows and disbursements, to be in form, scope and substance acceptable to the DIP RCF Agent, the DIP RCF Secured Parties, and the Prepetition RCF Agent and the Prepetition RCF Lenders in each of their sole discretion (the "**Initial Approved Budget**");

    iv.    the Debtors shall have provided the DIP RCF Agent and the DIP RCF Secured Parties with a copy of the cash management motion and proposed order to be filed with the Bankruptcy Court in connection with the commencement of the Cases.  The cash management order filed by the Debtors and entered by the Bankruptcy Court shall be in form and substance reasonably satisfactory to the DIP RCF Agent;

    v.    the Debtors shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a chapter 11 plan or other exit strategy without the consent of the DIP RCF Agent;

    vi.    an interim debtor-in-possession financing and cash collateral order, substantially on the terms contemplated in this RCF DIP Term Sheet (and otherwise acceptable to the DIP RCF Agent and Prepetition RCF Agent) (the "**Interim Order**"), shall have been entered by the Bankruptcy Court within three days following the Petition Date and shall not have been vacated, reversed or stayed, appealed, or modified or amended without the prior written consent of the DIP RCF Agent.  Notwithstanding anything to the contrary contained herein, funding of any Interim Commitment shall be subject to entry of the Interim Order and funding of the balance of the commitments under the DIP RCF Facility and continued authority to use Cash Collateral shall be subject to entry, within 30 days following the Petition Date, of a final debtor-in-possession financing/use of cash collateral order, substantially on the terms contemplated by this RCF DIP Term Sheet and in form and substance acceptable

*GCEH DIP RCF Credit Facility Term Sheet*

to the DIP RCF Agent (the "**<u>Final Order</u>**" and, together with the Interim Order, collectively, the "**<u>DIP Orders</u>**"), which shall not have been vacated, reversed or stayed, appealed (and for which the appeal period has expired or has been waived), or modified or amended without the prior written consent of the DIP RCF Agent;

vii.    orders approving all "first day" motions shall have been entered, and, in the case of any "first day" motions and orders that affect the rights or duties of the DIP RCF Agent or DIP RCF Secured Parties, in form and substance reasonably acceptable to the DIP RCF Agent;

viii.    the execution and delivery, in form and substance acceptable to the DIP RCF Agent and the DIP RCF Lenders in their sole discretion, by the Debtors of definitive documentation for the DIP RCF Credit Agreement, the amendment and restatement of the SOA and SSA and related guarantees, security agreements, mortgages, intercreditor agreements and other security documents, and other agreements, customary opinions, officer's certificates, instruments and documents required by the DIP RCF Agent and the DIP RCF Secured Parties (collectively, the "**<u>DIP RCF Documents</u>**");

ix.    the representations and warranties of the Debtors contained in the DIP RCF Documents shall be true and correct in all material respects (or, in the case of any representation and warranty that is qualified as to "Material Adverse Effect" (as defined in the DIP RCF Documents) or otherwise as to "materiality", in all respects) as of the date on which the DIP RCF Facility becomes effective (the "**<u>Closing Date</u>**") (or as of such earlier date if the representation or warranty specifically relates to an earlier date);

x.    reimbursement in full in cash of the reasonable and documented out-of-pocket professional fees, costs and expenses of the DIP RCF Agent and Prepetition RCF Agent;

xi.    upon the entry of the Interim Order, the DIP RCF Agent shall, for the benefit of the DIP RCF Agent and the DIP RCF Secured Parties, have valid, perfected and enforceable first priority or superpriority priming, as applicable, liens on the DIP RCF Collateral to the extent set forth in the Interim Order, subject only to the

*GCEH DIP RCF Credit Facility Term Sheet*

Carve-Out and the liens permitted by the DIP RCF Documents;

xii.     on or prior to the Petition Date, each of the Debtors, the Prepetition RCF Agent, the Prepetition RCF Lenders, the Term Creditors and CTCI shall have executed the Restructuring Support Agreement in a form acceptable to the DIP RCF Agent in its sole discretion; and

xiii.    the DIP TL Facility (as defined in the Restructuring Support Agreement) shall have been approved by the Bankruptcy Court on an interim basis in accordance with the terms of this RCF DIP Term Sheet and the Restructuring Support Agreement and in a form acceptable to the DIP RCF Agent in its sole discretion.

Modifications of the DIP Orders shall require approval of the DIP RCF Agent and the Prepetition RCF Agent in their sole discretion.

**Conditions to Subsequent Credit Extensions:**    The obligation of each DIP RCF Lender to make a credit extension following the Closing Date is additionally subject to the satisfaction of the following conditions:

(i)      receipt of a written borrowing request in accordance with the requirements of the DIP RCF Credit Agreement;

(ii)     the representations and warranties of the Debtors contained in the DIP RCF Documents shall be true and correct in all material respects (or, in the case of any representation and warranty that is qualified as to "Material Adverse Effect" (as defined in the DIP RCF Documents) or otherwise as to "materiality", in all respects) as of such date (or as of such earlier date if the representation or warranty specifically relates to an earlier date);

(iii)    no default or event of default shall have occurred and be continuing or would result from such credit extension or from the application of proceeds thereof;

(iv)     the Borrower shall have arranged for payment on such Funding Date of all reasonable and documented out of pocket professional fees, costs and expenses then due and payable, to the extent invoiced prior to the date the Borrowing Request is delivered in connection with such Funding Date;

*GCEH DIP RCF Credit Facility Term Sheet*

(v)     the aggregate principal amount of all DIP RCF Loans outstanding on such date, after giving effect to the applicable borrowing, shall not exceed $100 million;

(vi)    as of such date, no development, event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect shall have occurred following the Closing Date and be continuing, or shall result from the transactions contemplated to occur on such date;

(vii)   there shall not exist any action, suit, investigation, litigation, or proceeding pending or threatened (other than the Cases) in any court or before any governmental authority that, in the reasonable opinion of the DIP RCF Agents, materially and adversely affects any of the transactions contemplated hereby, or that has or could reasonably be expected to result in a Material Adverse Effect;

(viii)  each Milestone Condition shall have been satisfied or waived on or before the corresponding Milestone Date; and

(ix)    DIP Orders:

        a.  prior to entry of the Final Order, the Interim Order shall be in full force and effect and shall (i) not have been vacated, stayed, reversed, or modified without the written consent of the DIP RCF Agents and Prepetition RCF Agent, and (ii) without limitation, approve the DIP RCF Tranche D Roll-Up Loans and the DIP RCF Creeping Roll-Up Loans;

        b.  the Bankruptcy Court shall have entered the Final Order within 30 days (or such later date consented to by the DIP RCF Agents and Required DIP RCF Lenders) following the Petition Date, which Final Order shall (i) be in substantially the form contemplated by the Interim Order, (ii) have been entered on the docket of the Bankruptcy Court, and (iii) be in full force and effect and shall not have been vacated, stayed, reversed or appealed (And for which the appeal period has expired or has been waived) or modified in any respect

*GCEH DIP RCF Credit Facility Term Sheet*

without the prior written consent of the DIP RCF Agents and Prepetition RCF Agent;

c.   after the entry of the Final Order, the Final Order shall (i) be in full force and effect, (ii) not have been vacated, stayed, reversed, or modified without the written consent of the DIP RCF Agents and Prepetition RCF Agent, and (iii) without limitation, approve the DIP RCF Final Roll-Up Loans;

d.   the Loan Parties shall be in compliance in all respects with the DIP Orders and, subject to application of the Variance Limit, with the Approved Budget; and

e.   no trustee or examiner (other than a fee examiner) shall have been appointed with respect to the Debtors or their property.

**Representations and Warranties:**

Each of the Debtors under the DIP RCF Documents will make the representations and warranties set forth in Article III of the Prepetition RCF Credit Agreement and the relevant provisions of the other Prepetition Revolver Documents (other than any representation of warranty in respect of solvency, no litigation that could reasonably expected to have a material adverse effect, no material adverse change, no material adverse effect and no default), modified as necessary to reflect the filing of the Cases and the Debtors' financial condition, other representations and warranties customarily found in loan documents for similar debtor-in-possession financings, and with such other modifications and such other representations and warranties as the DIP RCF Agent may require, including, but not limited to:

(a)   orders of the Bankruptcy Court related to the financing contemplated by the DIP RCF Facility remain in effect;

(b)   there are no defaults under material agreements arising after the Petition Date (i) that would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (ii) for which exercise of remedies would not be stayed by Section 362 of the Bankruptcy Code;

(c)   the Debtors have not failed to disclose any material assumptions with respect to the Initial Approved Budget and, as of the Closing Date, affirm the reasonableness of

*GCEH DIP RCF Credit Facility Term Sheet*

the assumptions in the Initial Approved Budget in all material respects, subject to customary qualifiers; and

(d) Other than as to be disclosed in the DIP RCF Credit Agreement, none of the Debtors have entered into any key employee retention plan or incentive plan as of the Petition Date.

**Milestones:** Each of the Debtors will agree to comply with the following deadlines (each of which may be extended as set forth further below or with the prior written consent of the DIP RCF Agent without further order of the Bankruptcy Court) (collectively, the "**Milestones**"):

(a) The Bankruptcy Court shall have entered the Interim Order no later than 3 days after the Petition Date;

(b) The Bankruptcy Court shall have entered the Final Order no later than 30 days after the Petition Date;

(c) The Bankruptcy Court shall have entered an order (which may be the Interim Order or the Final Order) approving the Debtors' assumption of the SOA and SSA on a final basis no later than 30 days after the Petition Date;

(d) The Debtors shall file a chapter 11 plan (a "**Plan**") and a disclosure statement for the Plan (a "**Disclosure Statement**") that provides for treatment acceptable to the DIP RCF Secured Parties (or such Plan provides for the indefeasible repayment of the DIP RCF Obligations and obligations under the Prepetition RCF Facility, in each case, in full in cash on the Effective Date and as a condition to emergence) (such Plan, an "**Approved Plan**", such Disclosure Statement, an "**Approved Disclosure Statement**", and together with an Approved Plan, collectively an "**Approved Plan and Disclosure Statement**"), in each case, no later than 30 days after the Petition Date; provided that for so long as the Restructuring Support Agreement is in effect the treatment provided in the Restructuring Support Agreement is acceptable to the DIP RCF Secured Parties;

(e) the Approved Disclosure Statement shall be approved by the Bankruptcy Court by the date that is no later than 60 days after the Petition Date;

(f) the Bankruptcy Court shall have entered an order confirming the Approved Plan by the date that is no later than 110 days after the Petition Date; and

*GCEH DIP RCF Credit Facility Term Sheet*

(g) the effective date of the Approved Plan (the "**Effective Date**") shall have occurred by the date that is no later than 120 days after the Petition Date.

**Borrowing Base**

The DIP RCF Credit Agreement will contain the "Borrowing Base" formulation under, and as defined in, the Prepetition RCF Credit Agreement; underline provided that the Borrowing Base under the DIP RCF Credit Agreement will include an additional Borrowing Base category for the value of the property, plant, and equipment of the Borrower, pledged as security for the DIP RCF Obligations, in the amount of $35 million; and *provided further* that the Borrowing Base under the DIP RCF Credit Agreement shall be reduced by any outstanding Prepetition RCF Obligations that have not become Roll-Up RCF Loans.

**Mandatory Prepayments**:

The DIP RCF Documents will contain the mandatory prepayment provisions under the Prepetition RCF Credit Agreement and the other Prepetition Revolver Documents, modified in a customary manner to reflect the nature and tenor of the DIP RCF Facility.  Without limiting the foregoing, in addition to the foregoing, the mandatory prepayment provisions shall include an obligation for Borrower to make mandatory prepayments in the case of (i) the sale, transfer or other disposition of any material assets or property not permitted to be disposed under the DIP RCF Documents and (ii) subject to customary restoration and reinvestment provisions, receipt of proceeds in respect of a loss of, destruction of or damage to, or any condemnation or other taking of any property of Borrower.

**Reporting and Information**:

The DIP RCF Documents will contain the reporting and information covenants made by the Debtors under the Prepetition RCF Credit Agreement and the other Prepetition Revolver Documents, modified in a customary manner to reflect the nature and tenor of the DIP RCF Facility. The Debtors shall provide all reporting and information provided to the DIP TL Agent to the DIP RCF Agent concurrently. Without limiting the foregoing, such reporting and information covenants shall include provision to the DIP RCF Agent (for circulation to the DIP RCF Secured Parties) of: (a) Weekly Inventory Reports, Weekly AR Reports, Weekly Feedstock In-transit Reports and Borrowing Base Certificates (each as defined in the Prepetition RCF Credit Agreement) in accordance with the requirements under the Prepetition RCF Credit Agreement  and (b) weekly reports detailing spending information. Without limiting the generality of the foregoing, the Debtors shall deliver to the DIP RCF Agent (i) Variance Reports (as defined below); (ii) copies of any motions to be filed by or on behalf of any Debtor in the Cases at least two

*GCEH DIP RCF Credit Facility Term Sheet*

15

business days prior to such filing (or, if not practicable, as soon as reasonably practicable), (iii) all notices and reporting required to be given to all parties specified in any DIP Order; and (iv) such other information (including access to the Debtors' books, records, personnel and advisors) as the DIP RCF Agent may reasonably request.

**Budget; Variance Covenant;**     On May 9, 2025 (the "**Initial Reporting Date**"), the Debtors
**Other Financial Covenants:** shall prepare for the DIP RCF Agent's and DIP RCF Secured Parties' review and consent an updated 13-week detailed cash projection, which shall be thereafter updated, as necessary, but shall not be updated less than once every four weeks (each, a "**Proposed Budget**"). Upon the Debtors' receipt of the DIP RCF Agent's and DIP RCF Secured Parties' consent to a Proposed Budget, (such consent not to be unreasonably conditioned, delayed, or withheld; <u>provided</u> that the DIP RCF Agent and DIP RCF Secured Parties shall have no less than five business days to review and respond to the Proposed Budget) which approval shall be in the DIP RCF Agent's and DIP RCF Secured Parties' sole discretion, such budget shall become an "**Approved Budget**" and shall replace the then-operative Approved Budget for all purposes. The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. The Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Variance Limit). The Debtors may submit additional Proposed Budgets to the DIP RCF Agent and DIP RCF Secured Parties, but until the DIP RCF Agent and DIP RCF Secured Parties consent to such Proposed Budget, it shall not become an Approved Budget and the Debtors shall continue to comply with the then-operative Approved Budget.

Beginning on April 24, 2025, and on the Thursday of each calendar week thereafter, the Debtors shall deliver to the DIP RCF Agent, in a form consistent with the form of the Approved Budget, a variance report comparing the Debtors' actual receipts and disbursements and G&A Disbursements for the prior calendar week and the prior four calendar weeks (on a cumulative basis) with the projected receipts and disbursements and G&A Disbursements for such week and the prior four calendar weeks (on a cumulative basis) as reflected in the applicable Approved Budget for such weeks, which variance report shall include a report from a financial officer of the Debtors (the "**Weekly Variance Report**").

*GCEH DIP RCF Credit Facility Term Sheet*

16

No later than 4:00 p.m. Central Time on the Initial Reporting Date and on each Thursday thereafter that is the two-week anniversary of the Initial Reporting Date (each such date, a "**Bi-Weekly Variance Testing Date**" and each such two-week period, the "**Bi-Weekly Variance Testing Period**"), the Debtors shall provide to the DIP RCF Agent (for circulation to the DIP RCF Secured Parties) and the Prepetition RCF Agent a report detailing (i) the aggregate disbursements of the Debtors during the applicable Bi-Weekly Variance Testing Period and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements of the Debtors made during such Bi-Weekly Variance Testing Period by the Debtors against the aggregate disbursements for the Bi-Weekly Variance Testing Period, as set forth in the applicable Approved Budget (a "**Bi-Weekly Variance Report**," together with the Weekly Variance Report, the "**Variance Reports**").

The Debtors shall comply with the following (collectively, the "**Variance Covenant**"):

As of any Bi-Weekly Variance Testing Date, for the Bi-Weekly Variance Testing Period ending on the Sunday preceding such Bi-Weekly Variance Testing Date, the Debtors shall not allow aggregate disbursements, excluding disbursements with respect to professional fees and G&A Disbursements, to be greater than 115% of the estimated disbursement for such item in the Approved Budget for such Bi-Weekly Variance Testing Period (collectively, the "**Variance Limit**"). Additional variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to the DIP RCF Agent's reasonable approval. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.

**Key Employee Plans**. No Debtor shall (a) enter into any key employee retention plan or incentive plan, other than such plans in effect as of the Petition Date or (b) amend or modify any existing key employee retention plan or incentive plan, unless such plan, amendment or modification, as applicable, is satisfactory to the DIP RCF Agent and DIP RCF Secured Parties in their reasonable discretion.

| | |
|---|---|
| **Affirmative and Negative Covenants:** | The DIP RCF Documents will contain the affirmative and negative covenants made by the Debtors under the Prepetition RCF Credit Agreement and the other Prepetition Revolver Documents, with such modifications thereto and such other affirmative and negative covenants as the DIP RCF Agent and DIP RCF Secured Parties shall require including customary modifications to reflect the nature and tenor of the DIP RCF |

*GCEH DIP RCF Credit Facility Term Sheet*

17

Facility; provided that the negative covenants made by the Debtors under the Prepetition RCF Credit Agreement and the other Prepetition Revolver Documents will be modified to include the following restrictions:

(a) disposing of assets outside of the ordinary course of business (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363) in respect of transactions for total net cash proceeds of more than $2,000,000 in the aggregate for each fiscal year;

(b) paying prepetition indebtedness, except as expressly provided for herein or pursuant to orders entered upon pleadings in form and substance reasonably satisfactory to the DIP RCF Agent; and

(c) asserting any right of subrogation or contribution against any other Debtors until all borrowings under the DIP RCF Facility are paid in full and the Revolving DIP Loan Commitments are terminated.

The DIP RCF Documents will contain an affirmative covenant that the Debtors will provide written notice to the DIP RCF Agent and the Prepetition RCF Agent if any of the Debtors intend to provide information with respect to the Prepetition Revolver Documents to a party in interest or is compelled to provide such information by order of the Bankruptcy Court.

**Events of Default:**
"**Events of Default**" shall include the events of default under the Prepetition RCF Credit Agreement and the other Prepetition Revolver Documents, modified in a customary manner to reflect the nature and tenor of the DIP RCF Facility and to include events of default customarily found in loan documents for similar debtor-in-possession financings, with such modifications as the DIP RCF Agent may require, including the following:

    i.   the Interim Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended without the prior written consent of the DIP RCF Agent;

    ii.   the Final Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, modified or amended without the prior written consent of the DIP RCF Agent, or shall not have been entered within 30 days after the Petition Date; provided that such time may be extended by agreement among the

*GCEH DIP RCF Credit Facility Term Sheet*

Borrower and DIP RCF Agent;

iii.　the inaccuracy in any material respect of any representation of any Debtor when made or deemed made;

iv.　failure of any Debtor (a) to comply with the Variance Covenant, (b) to satisfy any Milestone, (c) to have an Approved Budget; (d) to comply with any negative covenant or certain other customary affirmative covenants in the DIP RCF Documents or with any other covenant or agreement contained in the DIP Orders in any respect or (e) to comply with any other covenant or agreement contained in the DIP RCF Documents;

v.　(a) any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; a Chapter 11 U.S. Trustee or an examiner (other than a fee examiner) with enlarged powers relating to the operation of the business of any Debtor (powers beyond those expressly set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed, (b) any other super-priority claim (other than the Carve-Out (as defined below) or grant of any other lien (including any adequate protection lien) which is *pari passu* with or senior to the claims and liens of the DIP RCF Agent or the Prepetition RCF Agent shall be granted in any of the Cases, or (c) the filing of any pleading by any Debtor seeking or otherwise consenting to or supporting any of the matters set forth in clause (a) or clause (b) of this subsection (v));

vi.　other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget (A) in respect of accrued payroll and related expenses as of the commencement of the Cases, (B) in respect of adequate protection payments set forth herein and consented to by the DIP RCF Agent or otherwise permitted under the terms of the Intercreditor Agreement (as defined below), as applicable, or (C) in respect of certain critical vendors and other creditors, in each case to the extent authorized by one or more "first day" or other orders reasonably satisfactory to the DIP RCF Agent, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables (including without limitation, reclamation claims);

*GCEH DIP RCF Credit Facility Term Sheet*

vii.   the Bankruptcy Court shall enter one or more orders during the pendency of the Cases granting relief from the automatic stay to the holder or holders of any lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Debtor or the Debtors that have an aggregate value in excess of $1,000,000 without the prior written consent of the DIP RCF Agent;

viii.   the Termination Date (as defined below) shall have occurred;

ix.   the Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates for any reason;

x.   any Debtor petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP RCF Facility without the consent of the DIP RCF Agent (other than the Carve-Out);

xi.   failure of any Debtor to comply with the terms of the applicable DIP Order;

xii.   the Debtors' consensual use of the prepetition Cash Collateral of any secured party is terminated;

xiii.   the Debtors engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the DIP RCF Facility or the Prepetition Revolver Documents or the liens on or security interest in the assets of the Debtors securing the DIP RCF Obligations or the obligations under the Prepetition RCF Facility (the "**Prepetition RCF Obligations**" and the liens securing such obligations, the "**Prepetition RCF Liens**"), including without limitation seeking to equitably subordinate or avoid the liens securing the such indebtedness or (B) the Debtors engage in or support any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP RCF Agent, any DIP RCF Secured Party, the Prepetition RCF Agent or any Prepetition RCF Lender; provided, however, that it shall not constitute an Event of Default if any of the Debtors provides information with respect to the Prepetition Revolver Documents to a party in interest or is compelled to provide information by an order of the Bankruptcy Court;

*GCEH DIP RCF Credit Facility Term Sheet*

xiv. after entry of the Final Order, any person shall obtain a judgment under Section 506(c) of the Bankruptcy Code or similar determination with respect to the Prepetition RCF Obligations;

xv. after entry of the Final Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against any of the DIP RCF Collateral;

xvi. the consummation of a sale of any material portion of the DIP RCF Collateral (other than a sale in the ordinary course of business that is contemplated by the Approved Budget) without the advance written consent of the DIP RCF Agent and DIP RCF Secured Parties if such sale or other transaction does not satisfy the DIP RCF Obligations in full in Cash;

xvii. the confirmation of a plan of reorganization or liquidation that does not provide for treatment acceptable to the DIP RCF Secured Parties, or any Debtor proposes or supports, or fails to contest in good faith, the confirmation of such a plan of reorganization or liquidation, unless such plan contemplates indefeasibly paying the DIP RCF Obligations and Prepetition RCF Obligations in full, in cash on the effective date of such plan;

xviii. entry of an order by the Bankruptcy Court in favor of any statutory committee of unsecured creditors (the "**Creditors' Committee**"), if any, appointed in the Cases, any ad hoc committee, or any other party in interest, (a) sustaining an objection to claims of the DIP RCF Agent or any of the DIP RCF Secured Parties, (b) avoiding any liens held by the DIP RCF Agent or any of the DIP RCF Secured Parties, (c) sustaining an objection to claims of the Prepetition RCF Agent or any of the Prepetition RCF Lenders, or (d) avoiding any liens held by the Prepetition RCF Agent or any of the Prepetition RCF Lenders except as otherwise agreed by the Prepetition RCF Agent in writing; or

xix. if (a) that certain Intercreditor Agreement dated as of June 25, 2024, by and between Vitol Americas Corp., as RCF Representative, Orion Energy Partners TP Agent, LLC, as Term Loan Representative, the Term Creditors party thereto from time to time, Bakersfield Renewable Fuels, LLC, as Project Company, BKRF OCB, LLC, as BKRF Borrower, and BKRF OCP,

*GCEH DIP RCF Credit Facility Term Sheet*

LLC, as Holdings (as from time to time amended and restated) (the "**Intercreditor Agreement**") shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with its terms against the Borrower or any party thereto or any holder of the liens subordinated thereby, or be amended, modified or supplemented to cause the liens securing the obligations of the Term Creditors to be senior or *pari passu* in priority to the liens securing the obligations under the Prepetition Revolver Documents without the consent of the Prepetition RCF Agent, (b) the Borrower takes any action inconsistent with the terms of the Intercreditor Agreement (other than in connection with an Approved Plan), (c) any person bound by any Intercreditor Agreement takes any action inconsistent with the terms thereof or (d) any order of any court of competent jurisdiction is granted which is materially inconsistent with the terms of the Intercreditor Agreement and is adverse to the interests of the Prepetition RCF Agent or Prepetition RCF Lenders;

xx.   the Borrower shall be in breach in any material respect of, or in default in any material respect under, the Management Services Agreement, dated as of August 29, 2024, by and between Entara LLC and the Borrower (the "**Entara Contract**") at a time when Entara, LLC is otherwise not in breach of the Entara Contract (other than any breach resulting from the Debtors' entry into the Cases or from any rejection of the Entara Contract in connection with the Cases);

xxi.   (A) the termination of the Restructuring Support Agreement or the DIP CTCI Contract shall occur or (ii) CTCI shall fail to make any payments required to be made under the DIP CTCI Contract in accordance with the terms of the DIP CTCI Contract and the DIP Orders (including any budget set forth therein); or

xxii.   for any reason, including force majeure, the Refinery (as defined in the Term Loan Credit Agreement) is unable to sustain commercial operations for more than twenty-one (21) consecutive days during the Cases, or for more than thirty-five (35) total days during the Cases.

Upon the occurrence and during the continuance of any Event of Default, upon the direction of the DIP RCF Secured Parties, the DIP RCF Agent shall accelerate the DIP RCF Obligations

*GCEH DIP RCF Credit Facility Term Sheet*

and, thereafter, may (1) declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable and terminate, as applicable, any further commitments under the DIP RCF Facility and/or terminate, as applicable, the right of the Debtors to use Cash Collateral and (2) charge the default rate of interest under the DIP RCF Facility, enforce liens and security interests and take any other action or exercise any other right or remedy (including without limitation, with respect to the liens in favor of the DIP RCF Agent on behalf of the DIP RCF Secured Parties) permitted under the DIP RCF Documents or applicable law, each without further order of or application to the Bankruptcy Court; provided, however, in the that in the case of the termination of the Debtors' use of Cash Collateral or enforcement of liens or other remedies with respect to DIP Collateral pursuant to clause (2) above, the DIP RCF Agent shall file a motion with the Bankruptcy Court seeking emergency relief to exercise such remedies on at least five (5) business days' written notice (the "**Enforcement Notice Period**") seeking an emergency hearing before the Bankruptcy Court(an "**Enforcement Hearing**").

At the Enforcement Hearing, the Bankruptcy Court may consider whether an Event of Default has occurred and may fashion an appropriate remedy, including permitting the DIP RCF Agent to exercise the rights and remedies provided for in the DIP RCF Credit Agreement and/or the Interim Order; provided, that during the Enforcement Notice Period, the Debtors are permitted to use Cash Collateral to fund the Carve-Out and and meet payroll obligations and pay expenses associated with the Debtors' businesses that are necessary to avoid immediate and irreparable harm to the Debtors' estates, in accordance with the Budget (subject to the Permitted Variances); provided, further, that, prior to the expiration of the Enforcement Notice Period, the Debtors and any Committee may seek an emergency hearing before the Bankruptcy Court, with prompt notice of such hearing to the primary counsel to each of the DIP Agents, to contest whether an Event of Default occurred and to seek non-consensual use of Cash Collateral. For the avoidance of doubt, the Enforcement Notice Period shall not expire until the conclusion of the Enforcement Hearing.

Without limiting the foregoing, but subject to the Enforcement Notice Period, upon the occurrence and during the continuation of an Event of Default, each DIP RCF Secured Party (and its respective affiliates, including its various branches and offices) shall have the authority, subject to obtaining the prior written consent of the DIP RCF Agent and to the fullest extent permitted by applicable law, to set off and

*GCEH DIP RCF Credit Facility Term Sheet*

apply any and all deposits (of whatever type and in whatever currency) at any time held and other obligations or claims (of whatever type and in whatever currency) at any time owing by such DIP RCF Secured Party (or its affiliate) to or for the credit or account of the Borrower or any Guarantor against any and all of the DIP RCF Obligations of the Borrower or any Guarantor to such DIP RCF Secured Party; <u>provided</u> that the DIP RCF Documents shall contain provisions with respect to setoff (and sharing of proceeds of setoff) substantially similar to the Prepetition Revolver Documents.  The foregoing right of setoff shall apply irrespective of whether such DIP RCF Secured Party has made any demand under the DIP RCF Documents and even if the DIP RCF Obligations of the Borrower are contingent or unmatured.

**Maturity/Termination Date:** The DIP RCF Facility and the Debtors' right to use Cash Collateral (as applicable) shall automatically terminate without further notice or court proceedings on the earliest to occur of (i) four months after the Petition Date (the "**Scheduled Maturity Date**"); (ii) the date of termination of the Revolving DIP Loan Commitment and/or acceleration of any outstanding borrowings under the DIP RCF Facility pursuant to an Event of Default; (iii) the date of termination of the commitments under the DIP TL Facility or acceleration of amounts owed by any Debtor thereunder (iv) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto; (v) the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP RCF Agent; (vi) the dismissal of any of the Cases, unless otherwise consented to in writing by the DIP RCF Agent; (vii) the closing of a sale of substantially all of the equity or assets of the Debtors (unless effectuated pursuant to a confirmed chapter 11 plan); (viii) the date of repayment in cash in full by the Debtors of all DIP RCF Obligations and termination of the Revolving DIP Loan Commitment in accordance with the terms of the DIP RCF Facility;  and (ix) the effective date of any Debtor's plan of reorganization confirmed in the Cases (the "**Termination Date**"), unless extended, as to the DIP RCF Facility, with the prior written consent of the DIP RCF Agent and the DIP RCF Secured Parties, and as to the use of Cash Collateral, with the prior written consent of the Prepetition RCF Agent and Prepetition RCF Lenders.

**Assignments and Participations:** The DIP RCF Lenders will be permitted to assign DIP RCF Loans and Revolving DIP Loan Commitments under the DIP RCF Credit Agreement in accordance with the terms of the Prepetition RCF Credit Agreement.

*GCEH DIP RCF Credit Facility Term Sheet*

The DIP RCF Secured Parties will be permitted to assign the SOA and SSA in accordance with the terms of the existing agreements.

**Adequate Protection for Prepetition RCF Agent, Prepetition RCF Lenders, Term Administrative Agent, Term Collateral Agent, and Term Creditors:**

Subject to the Carve-Out, the Prepetition RCF Agent shall receive the following as adequate protection for the benefit of the Prepetition RCF Secured Parties:

   i.   a super-priority claim under Section 507(b) of the Bankruptcy Code against each of the Debtors, with priority over all administrative expense claims and unsecured claims now existing or after arising, <u>provided</u>, <u>however</u>, that such super-priority claim shall be junior and subject to the Carve-Out, the super-priority claim of the DIP RCF Agent for the benefit of the DIP RCF Lenders in respect of the DIP RCF Facility;

   ii.   a second priority, valid, enforceable, fully perfected security interest in and replacement lien on the DIP RCF Collateral, subordinate only to (a) the liens of the DIP RCF Agent for the benefit of the DIP RCF Secured Parties in respect of the DIP RCF Facility, (b) Permitted Liens (as defined in the Prepetition RCF Credit Agreement), and (d) the Carve-Out (the "**RCF Adequate Protection Liens**");

   iii.   payment by the Debtors of the reasonable, documented out-of-pocket fees, costs and expenses incurred or accrued by the Prepetition RCF Agent (the foregoing to include all unpaid prepetition fees, costs and expenses) in connection with any and all aspects of the Debtors' Cases, and including the reasonable and documented out-of-pocket fees and expenses of the legal advisors and any financial advisors and/or investment bankers to the Prepetition RCF Agent and other professionals, hired by or on behalf of the Prepetition RCF Agent;

   iv.   upon closing of the DIP RCF Facility, payment in cash of all accrued and unpaid interest at the non-default rate and fees then owing, in each case, under the Prepetition RCF Credit Agreement; and

   v.   so long as the loans under the Prepetition RCF Facility (the "**Prepetition RCF Loans**") shall not have become Roll-Up RCF Loans, the Prepetition RCF Lenders shall be entitled to cash payment of all interest accruing postpetition under the Prepetition Revolver Documents at the non-default rate and fees, in each

*GCEH DIP RCF Credit Facility Term Sheet*

case, as and when due pursuant to the Prepetition Revolver Documents;

<u>provided</u>, <u>however</u>, that (x) the adequate protection claims and liens described in the preceding clauses (i) and (ii) shall be granted only to the extent of any diminution in the value of any Cash Collateral or other collateral arising as a result of (A) the use, sale, or lease of Cash Collateral or other collateral, (B) the granting of priming liens to secure the DIP RCF Facility or (C) the imposition of the automatic stay, and (y) the adequate protection claim described in the preceding clause (i) and the adequate protection liens described in the preceding clause (ii) shall not attach to any Avoidance Actions but shall attach to any Avoidance Action Proceeds, subject to entry of the Final Order.

The DIP Orders shall provide for adequate protection in the form of replacement liens and superpriority claims, financial reporting and rights of access and information, payment of fees and expenses of professionals (as described below) for the benefit of the Term Administrative Agent, Term Collateral Agent, and the Term Creditors, in each case, to the extent permitted by the Intercreditor Agreements.

The foregoing adequate protection liens shall be deemed automatically perfected as of the Petition Date without further action, although if the DIP RCF Agent, the Prepetition RCF Agent, the Term Administrative Agent, or the Term Collateral Agent determine to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be lifted to allow such filings.

**Carve-Out:**

See <u>Exhibit A</u> attached hereto.

**Estate Professional Fees:**

DIP Orders to include language confirming that nothing in such orders or otherwise shall be construed as consent to the allowance of any fees, expenses, reimbursement or compensation sought by any professional retained by the Debtors or the Creditors' Committee, or shall affect the right of any party in interest, including any DIP RCF Secured Party or any Prepetition RCF Secured Party, to object to the allowance and payment of any such fees, expenses, reimbursement or compensation.

**Section 506(c) Waiver:**

Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged

*GCEH DIP RCF Credit Facility Term Sheet*

against or recovered from any collateral pursuant to Section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP RCF Agent or the Prepetition RCF Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP RCF Secured Parties or the Prepetition RCF Secured Parties; <u>provided</u> that the Debtors shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP RCF Secured Parties or Prepetition RCF Secured Parties upon the DIP RCF Collateral or the Prepetition RCF Collateral (as defined below), as applicable.

**Waiver of Marshaling:**

Except to the extent of the Carve Out, (i) in connection with any disposition of or exercise of rights and remedies with respect to the DIP RCF Collateral, the DIP RCF Agent shall use commercially reasonable efforts to first apply proceeds of the DIP RCF Collateral that is not Prepetition RCF Collateral to satisfy the DIP RCF Obligations before applying proceeds of DIP RCF Collateral that is Prepetition RCF Collateral to satisfy the DIP RCF Obligations and (ii) subject to and effective upon entry of the Final Order, the DIP RCF Secured Parties and the Prepetition RCF Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP RCF Obligations, Prepetition RCF Obligations, or the RCF Adequate Protection Obligations (as defined in the DIP Orders).

**Section 552(b):**

Subject to and effective upon entry of the Final Order, the DIP RCF Secured Parties and the Prepetition RCF Secured Parties shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under Section 552(b) of the Bankruptcy Code (subject to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order).

Furthermore, the Debtors and their estates shall be deemed to have irrevocably waived and have agreed not to assert any

*GCEH DIP RCF Credit Facility Term Sheet*

claim or right under Sections 552 or 726 of the Bankruptcy Code to avoid the imposition of DIP RCF Liens, RCF Adequate Protection Liens or the Prepetition RCF Liens on any property acquired by any of the Debtors or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP RCF Secured Parties and the Prepetition RCF Secured Parties upon the DIP RCF Collateral or the Prepetition RCF Collateral, as applicable (subject to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order).

**No Priming or Pari Passu Liens:**

No order shall be entered authorizing or approving any liens or encumbrances on the DIP RCF Collateral or the Prepetition RCF Collateral, as applicable, senior to or *pari passu* with the liens of the Prepetition RCF Agent for the benefit of the Prepetition RCF Lenders, or the DIP RCF Agent for the benefit of the DIP RCF Secured Parties other than as otherwise contemplated herein.

**Acknowledgement/Stipulations:**

The Debtors shall stipulate and acknowledge (i) to the amount, validity, priority and enforceability of the Prepetition RCF Obligations, (ii) that the Prepetition RCF Agent for the benefit of the Prepetition RCF Lenders has a valid, enforceable and fully perfected first priority lien in all of the collateral under the Prepetition Revolver Documents (the "**Prepetition RCF Collateral**"), including Cash Collateral, and all proceeds thereof, subject only to the DIP RCF Liens and the Carve-Out, (iii) that the Prepetition RCF Collateral is declining in value on a daily basis as the result of the Debtors' business operations, including capital expenditure and cash flow, and (iv) such additional matters as are reasonably customary for similarly situated chapter 11 cases (collectively, the "**Debtors' Stipulations**"). Upon entry of the Interim Order, but subject to entry of the Final Order, the Debtors shall provide a full release to DIP RCF Secured Parties and the Prepetition RCF Secured Parties.

**Challenge Period:**

The DIP Orders shall establish a deadline that (i) in the case of a Creditors' Committee, is no earlier than 60 days after the appointment of such committee, or (ii) in the case of any other party in interest, is within 75 days of the entry of the Interim Order, by which the Creditors' Committee, or any creditor or other party-in-interest (in any case, which has obtained the requisite standing) must commence an adversary proceeding, if at all, against the Prepetition RCF Secured Parties (as defined in the DIP Orders) for the purpose of challenging the validity, extent, priority, perfection and enforceability of the prepetition secured debt under the Prepetition RCF Credit

*GCEH DIP RCF Credit Facility Term Sheet*

Agreement or the other Prepetition Revolver Documents, or the liens, claims and security interests in the Prepetition RCF Collateral in favor of the Prepetition RCF Agent or the Prepetition RCF Secured Parties or otherwise asserting any claims or causes of action against the Prepetition RCF Agent or such Prepetition RCF Secured Parties on behalf of the Debtors' estates; provided, however, that nothing contained in this RCF DIP Term Sheet, the DIP RCF Documents or the DIP Orders shall be deemed to confer standing on the Creditors' Committee or any other party in interest to commence such an adversary proceeding. If such an adversary proceeding is not commenced within such period, then the Prepetition RCF Secured Parties Debtors' Stipulations shall automatically become binding on all parties in interest in the Cases and the liens of the Prepetition RCF Agent on behalf of the Prepetition RCF Secured Parties shall be valid, perfected, enforceable and unavoidable without any further action by the Prepetition RCF Secured Parties under the terms of the DIP Orders.

None of the Carve-Out, any Cash Collateral, the DIP RCF Facility, the DIP RCF Collateral, or the Prepetition RCF Collateral may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to (a) the DIP Documents, the Term Loan Credit Agreement (each as defined in the Restructuring Support Agreement), and any and all related guarantees, security agreements, mortgages, intercreditor agreements and other security documents entered into in connection therewith (collectively with the Term Loan Credit Agreement, the "**Prepetition Term Loan Documents**"), or the Prepetition Revolver Documents; (b) the security interests and liens securing any of the obligations under the DIP Documents, the Prepetition Term Loan Documents, or the Prepetition Revolver Documents; or (c) to fund prosecution or assertion of any claims, or to otherwise litigate against the Agents (as defined in the Restructuring Support Agreement), any DIP RCF Secured Party, any lenders under the Term Loan Facility (as defined in the Restructuring Support Agreement), or any Prepetition RCF Secured Party; provided that up to $75,000 shall be made available to the Creditors' Committee for investigation costs in respect of the stipulations set forth in the DIP Orders, which amount may be included in the Carve-Out.

**Expenses**:                 The reasonable, documented out-of-pocket fees, costs and expenses incurred by the DIP RCF Agent (the foregoing to include all unpaid prepetition fees, costs and expenses incurred by the DIP RCF Agent in connection with the DIP RCF Facility) in connection with any and all aspects of the Debtors' Cases, including, without limitation, the reasonable and documented out-of-pocket fees and expenses of the DIP RCF

Agent's legal counsel (Sidley Austin LLP), and financial advisor (RPA Advisors, LLC) and other professionals, hired by or on behalf of the DIP RCF Agent with the Debtors' reasonable consent, shall be payable by the Debtors under the DIP RCF Facility promptly upon submission by such professional of a summary invoice setting forth such fees, costs, and expenses.

**Indemnification:**

The Debtors shall agree to indemnify and hold harmless the DIP RCF Agent and the DIP RCF Secured Parties and each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented out-of-pocket fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby; provided that any such indemnities payable by the Debtors in connection with the DIP RCF Documents shall be subject to the prior approval of the Bankruptcy Court. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

**Confidentiality:**

Except as required by law or in connection with the implementation of this RCF DIP Term Sheet, the terms hereof will be kept strictly confidential by each of the Debtors and may only be disclosed to such Debtor's affiliates, legal counsel, financial advisors and consultants who have been informed of, and agree to abide by, the confidentiality of this RCF DIP Term Sheet.  To the extent that any disclosure becomes legally required, the DIP RCF Agent shall be notified promptly and before the required disclosure is made.

**Governing Law:**

The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code.

*GCEH DIP RCF Credit Facility Term Sheet*

## <u>Schedule 1</u>

**Guarantors**

1. Agribody Technologies, Inc.
2. BKRF HCB, LLC
3. BKRF HCP, LLC
4. BKRF OCB, LLC
5. BKRF OCP, LLC
6. GCE Holdings Acquisitions, LLC
7. GCE International Development, LLC
8. GCE Operating Company, LLC
9. GCEH CS Acquisition, LLC
10. GCEH Ventures, LLC
11. Global Clean Energy Holdings, Inc.
12. Global Clean Energy Texas, LLC
13. Rosedale FinanceCo LLC
14. Sustainable Oils, Inc.

## Schedule 2

**DIP RCF Lender Commitments**

| RCF Lender | DIP RCF Credit Agreement Commitment |
|---|---|
| Vitol Americas Corp. | $100 million, subject to the Borrowing Base |

**Schedule 3**

**Interest Rate and Fees**

| | |
|---|---|
| DIP RCF Interest Rate | Revolving DIP Loans: 12.50%<br>Roll-Up RCF Loans: 12.50% |
| Default RCF Interest Rate | Applicable rate plus an additional 2.00% per annum |
| Facility Fee | 5.00% per annum on the average unused portion of the DIP RCF Credit Agreement Commitment, calculated and paid quarterly in arrears (or monthly if an Event of Default exists), and on the Maturity Date or earlier termination. |

**Exhibit A**

**Carve-Out**

1. <u>Carve-Out</u>.

(a) <u>Carve-Out</u>.  As used in this Interim Order, the "<u>Carve-Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>"), including any restructuring fee, sale fee, financing fee, or other success fee, incurred by and payable to persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP TL Agent or the DIP RCF Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons (excluding any unearned (as of the date of the Carve-Out Trigger Notice) restructuring fee, sale fee, financing fee, or other success fee) in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP TL Agent or the DIP RCF Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve-Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP TL Agent or the DIP RCF Agent to the Debtors, their lead restructuring counsel, counsel to the DIP TL Agent (if delivered by the DIP RCF Agent), counsel to the DIP RCF Agent (if delivered

by the DIP TL Agent), the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP TL Credit Agreement or the DIP RCF Credit Agreement, respectively, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b) <u>Delivery of Weekly Fee Statements</u>.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors (or Debtors' counsel) a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "<u>Estimated Fees and Expenses</u>") incurred during the preceding week by such Professional Person (through Saturday of such week, the "<u>Calculation Date</u>"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "<u>Weekly Statement</u>"); <u>provided</u> that, within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause the Weekly Statements and such additional weekly statement to be delivered on the same day received to the DIP Agents' respective counsel).  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Pre-Carve-Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of

Allowed Professional Fees included in the Budget for such period for such Professional Person.

(c) <u>Carve-Out Reserves</u>.

(i)        Commencing with the week ended April 18, 2025, and on or before the Thursday of each week thereafter, the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of (a) the greater of (i) the aggregate unpaid amount of all Estimated Fees and Expenses reflected in the Weekly Statement delivered on the immediately prior Wednesday to the Debtors and the DIP Agents, and (ii) the aggregate amount of unpaid Allowed Professional Fees contemplated to be incurred in the approved Budget during such week, *plus* (b) the Post Carve-Out Trigger Notice Cap (which, for the avoidance of doubt, shall not be funded into such reserve more than once), *plus* (c) an amount equal to the amount of Allowed Professional Fees set forth in the Approved Budget for the week occurring after the most recent Calculation Date; *provided* that no amounts on account of any particular day's unpaid Estimated Fees and Expenses or Allowed Professional Fees, as applicable, shall be funded into such reserve more than once.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust (the "<u>Funded Reserve Account</u>") to pay such Allowed Professional Fees prior to satisfying any and all other claims or obligations, and all payments of Allowed Professional Fees incurred (whether prior to or after the Termination Declaration Date) shall be paid first from such Funded Reserve Account.

(ii)        On the day on which a Carve-Out Trigger Notice is given by the DIP TL Agent or the DIP RCF Agent, as applicable, to the Debtors with a copy to counsel to the Committee (the "<u>Termination Declaration Date</u>"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to, and the Debtors shall, utilize all cash on hand as of such date, including cash in the Funded Reserve Account, and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay

such then unpaid Allowed Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve") prior to satisfying any other claims or obligations.  On the Termination Declaration Date, the Carve-Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date, including cash in the Funded Reserve Account, and any available cash thereafter held by any Debtor, after funding the Pre-Carve-Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such Allowed Professional Fees benefiting from the Post-Carve-Out Trigger Notice Cap (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims.

(d) Application of Carve-Out Reserves.

(i)      All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above (the "Pre-Carve-Out Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until indefeasibly paid in full.  If the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed first to the DIP TL Agent and/or the DIP RCF Agent, as applicable, on account of the applicable DIP Obligations in accordance with the DIP Documents until indefeasibly paid in full, and thereafter to the Prepetition Parties in accordance with their rights and priorities as of the Petition Date, pursuant to any Intercreditor Agreement, and as otherwise set forth in this Interim Order.

(ii)      All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "Post-Carve-Out Amounts"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP TL Agent and the DIP RCF Agent, in the order specified for payment in the DIP Orders, for the benefit of the DIP TL Lenders and DIP RCF Lenders, as

applicable, in accordance with the DIP Documents, unless the DIP Obligations have been indefeasibly paid in full, in which case any such excess shall be paid to the Prepetition Parties in accordance with their rights and priorities as of the Petition Date, pursuant to any Intercreditor Agreement.

(iii)     Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve-Out Reserves is not funded in full in the amounts set forth in Paragraph [●](c), then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively (subject to the limits contained in the Post-Carve-Out Trigger Notice Cap), shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in Paragraph [●](c), prior to making any payments to the DIP Agents or the Prepetition Parties, as applicable.

(iv)     Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP TL Agent, the DIP RCF Agent, the Prepetition TL Agent, and the Prepetition RCF Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agents for application in accordance with the DIP Documents.

(v)     Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve-Out Reserves shall not constitute DIP RCF Loans, DIP Term Loans, or DIP CTCI Payments or increase or reduce the DIP Obligations, (ii) the failure of the Carve-Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out with respect to any shortfall (as described below), and (iii) subject to the limitations with respect to the DIP Agents, the DIP Lenders, and the Prepetition Parties set forth in this Paragraph [●], in no way shall the Initial Budget, any subsequent Budget, Carve-Out, Post-

Carve-Out Trigger Notice Cap or Carve-Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Obligations, the Prepetition Obligations, the Adequate Protection Obligations, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations and the Prepetition Obligations.

(e)  <u>Payment of Allowed Professional Fees Prior To the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(f)  <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  None of the DIP Agents, the DIP Lenders, or the Prepetition Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders, or the Prepetition Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)  <u>Payment of Allowed Professional Fees on or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis and shall be paid first from the Carve-Out Reserves.  Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

**Exhibit A-2**

**DIP Term Loan Term Sheet**

**PROJECT GREEN**

**SUMMARY OF DIP TERM LOAN FINANCING TERMS**

**April 16, 2025**

This summary of terms (together with all annexes attached hereto, the "**DIP Term Sheet**") sets forth the principal terms of the proposed superpriority, priming secured debtor-in-possession credit facility (the "**DIP TL Facility**," all outstanding obligations arising under the DIP TL Facility, inclusive of any DIP TL Loans (as defined herein), the "**DIP TL Obligations**," the credit agreement evidencing the DIP TL Facility, the "**DIP TL Credit Agreement**," and the DIP TL Credit Agreement, together with the other definitive documents governing the DIP TL Facility and the DIP Orders (as defined herein), the "**DIP TL Documents**," each of which shall be in form and substance acceptable to the applicable DIP Loan Parties, the DIP TL Lenders, and the DIP TL Agent (as defined herein) (the DIP TL Documents, together with the DIP Intercreditor Agreement, the definitive documents governing the DIP RCF Facility, and the DIP CTCI Contract, the "**DIP Documents**"), to be entered into with the DIP Loan Parties (as defined herein)) in connection with the DIP Loan Parties' cases (the "**Chapter 11 Cases**") under title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**"), as well as the terms of Adequate Protection (as defined herein) for **(i)** holders of claims under that certain Credit Agreement, dated as of May 4, 2020 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Prepetition TL Credit Agreement**," the term loan credit facility provided thereunder, the "**Prepetition TL Facility**," the holders of claims thereunder, the "**Prepetition TL Lenders**," and all related guarantees, security agreements, mortgages, intercreditor agreements, and other security documents entered into in connection therewith, the "**Prepetition TL Documents**"), by and among BKRF OCB, LLC (the "**Company**"), as Borrower, BKRF OCP, LLC, as Holdings, the Lenders from time to time party thereto, and Orion Energy Partners TP Agent, LLC, as the Administrative Agent and Collateral Agent thereunder (the "**Prepetition TL Agent**," and, together with the Prepetition TL Lenders, the "**Prepetition TL Secured Parties**"),[1] and **(ii)** holders of claims under that certain Credit Agreement, dated June 25, 2024 (as amended, restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition RCF Agreement**," the revolving credit facility provided thereunder, the "**Prepetition RCF Facility**," and all related guarantees, security agreements, mortgages, intercreditor agreements, and other security documents entered into in connection therewith, the "**Prepetition RCF Documents**"), by and among Bakersfield Renewable Fuels, LLC as Borrower, BKRF OCB, LLC and Guarantors, the lenders party thereto (the "**Prepetition RCF Lenders**"), and Vitol Americas Corp. as Administrative Agent and Collateral Agent (the "**Prepetition RCF Agent**," and, together with the Prepetition RCF Lenders, the "**Prepetition RCF Secured Parties**").

This DIP Term Sheet also references (i) the proposed payables financing arrangement (the "**EPC Financing Arrangement**," and the obligations arising therefrom, the "**EPC Obligations**") to be provided by CTCI Americas, Inc. ("**CTCI**") pursuant to a new engineering, procurement, and construction agreement, to be entered into by CTCI and Global Clean Energy Holdings, Inc. in connection with the Chapter 11 Cases (the "**DIP CTCI Contract**") and (ii) the proposed revolving debtor-in-possession financing facility

---

[1]    Capitalized terms used but not immediately defined shall have the meanings ascribed to them later in this DIP Term Sheet, in the Prepetition TL Credit Agreement, the DIP TL Credit Agreement, or in the Restructuring Support Agreement (as defined below), as applicable. All references to sections are to those contained in the DIP TL Credit Agreement, unless otherwise expressly indicated.

(the "**DIP RCF Facility**," and together with the DIP TL Facility, the "**DIP Facilities**," and, together with the EPC Obligations and the DIP TL Obligations, the "**DIP Obligations**," and (i) the loans extended pursuant to the DIP RCF Facility, and (ii) the obligations of the DIP Loan Parties under the Vitol Transaction Documents, the loans and obligations in the foregoing clauses (i) and (ii), collectively, the "**DIP RCF Loans**") to be provided by the Prepetition RCF Lenders (in such capacity, the "**DIP RCF Lenders**," and, together with the DIP RCF Agent, the "**DIP RCF Secured Parties**") and to be entered into by the DIP Loan Parties in connection with the Chapter 11 Cases.  This DIP Term Sheet is not intended to outline or negotiate the terms and conditions associated with the DIP CTCI Contract, the EPC Financing Arrangement, or the DIP RCF Facility, but references thereto are instead intended to provide clarity as to the relation between the DIP TL Facility, the DIP RCF Facility, and the EPC Financing Arrangement.

The DIP TL Facility, the Adequate Protection, and the EPC Financing Arrangement will be subject to the approval of the Bankruptcy Court in accordance with the DIP Orders, the DIP TL Documents, and the DIP CTCI Contract.

This DIP Term Sheet is highly confidential, remains subject to final approval by the Prepetition TL Agent's investment committee, the DIP Loan Parties, and CTCI, and does not constitute a commitment, a contract to provide a commitment, a contract to borrow, an offer to sell, any solicitation to enter into any transaction, or any agreement by the DIP TL Secured Parties and/or the DIP Loan Parties to enter into the financings described herein.  This DIP Term Sheet is qualified in its entirety by reference to the DIP TL Documents to be executed by the parties and the DIP Orders to be entered by the Bankruptcy Court, each of which shall constitute the definitive documentation with respect to the DIP TL Facility.

| DIP FINANCING AND ADEQUATE PROTECTION TERM SHEET | |
|---|---|
| **DIP Borrower** | Global Clean Energy Holdings, Inc., in its capacity as debtor in possession in connection with the Chapter 11 Cases (the "**DIP Borrower**" and, together with its subsidiaries and affiliates that are debtors in the Chapter 11 Cases, the "**Debtors**"), shall be the borrower under the DIP TL Facility. |
| **DIP Guarantors** | The DIP TL Obligations shall be guaranteed by all Debtors (other than the DIP Borrower) in the Chapter 11 Cases, including Bakersfield Renewable Fuels, LLC, a Delaware limited liability company (collectively, the "**DIP Guarantors**," and together with the DIP Borrower, the "**DIP Loan Parties**"). |
| **DIP TL Agent** | The Prepetition TL Agent shall serve as the "**DIP TL Agent**" (and together with the DIP RCF Agent, the "**DIP Agents**"). |
| **DIP TL Lenders** | The DIP TL Loans shall be provided by certain of the Prepetition TL Lenders (or their affiliates) (such lenders, the "**DIP TL Lenders**," and, together with the DIP TL Agent, the "**DIP TL Secured Parties**"). |
| **Amount & Type** | A superpriority senior secured priming debtor-in-possession loan facility, senior on a consensual basis to all outstanding indebtedness under the Prepetition TL Credit Agreement and the Prepetition CTCI Agreement, comprising: <br><br> (i)  new money term loans from the DIP TL Lenders in an aggregate principal amount of $25 million (the "**New Money DIP TL Loans**"); and <br><br> (ii)  subject to entry of the Final DIP Order, $50 million in roll-up tranche D |

<table>
<tr><td></td><td>claims to be issued to the DIP TL Lenders on account of obligations under the Prepetition TL Credit Agreement (the "<strong><u>Roll-Up DIP TL Loans</u></strong>," and together with the New Money DIP TL Loans, the "<strong><u>DIP TL Loans</u></strong>," and the DIP TL Loans, collectively with the DIP RCF Loans, the "<strong><u>DIP Loans</u></strong>").

The DIP TL Lenders shall make the New Money DIP TL Loans available to the DIP Borrower in the following manner (in each case upon the satisfaction or waiver of conditions precedent customary for financings of this type, including those described below):

(i)    Upon the Bankruptcy Court's entry of the Interim DIP Order (as defined herein) approving the DIP Facilities, the DIP TL Lenders shall fund $15 million of New Money DIP TL Loans (the "<strong><u>Interim Order DIP TL Loans</u></strong>") to the DIP Borrower (such funding date, the "<strong><u>Closing Date</u></strong>"); and

(ii)    Upon the Bankruptcy Court's entry of the Final DIP Order (as defined herein) approving the DIP Facilities, the DIP TL Lenders shall fund $10 million of New Money DIP TL Loans (the "<strong><u>Final Order DIP TL Loans</u></strong>") to the DIP Borrower in accordance with the Budget and the DIP TL Documents.

The New Money DIP TL Loans shall be funded into an account which will be subject to a springing account control agreement in favor of the DIP TL Agent and from which the DIP Borrower may draw in accordance with the Budget.</td></tr>
<tr><td><strong>DIP Financing Maturity Date</strong></td><td>The earliest to occur of (i) the date that is six months after the Petition Date, (ii) the Plan Effective Date or (iii) the termination of the Restructuring Support Agreement.

The DIP Financing Maturity Date may be extended with the written consent (which may be by email) of the DIP TL Agent, in its sole discretion.</td></tr>
<tr><td><strong>DIP TL Facility Interest Rate</strong></td><td>The DIP TL Loans shall bear interest at a rate of 8.00% per annum, payable monthly in arrears in kind.

Upon the occurrence and during the continuation of an Event of Default, at the election of the Required Lenders, all principal and past due interest under the DIP TL Facility will bear interest at the applicable rate, <u>plus</u> 2.00% per annum.</td></tr>
<tr><td><strong>Fees</strong></td><td>None.</td></tr>
<tr><td><strong>Exit Commitment</strong></td><td>On the Plan Effective Date, the outstanding DIP TL Obligations shall be converted as specified in the Exit Facilities Term Sheet.</td></tr>
<tr><td><strong>DIP TL Facility Mandatory Prepayments</strong></td><td>Mandatory prepayment provisions customary for financings of the DIP TL Facility's type.</td></tr>
</table>

| | |
|---|---|
| **Use of Proceeds** | The proceeds of the DIP TL Loans and Cash Collateral (as defined in section 363(a) of the Bankruptcy Code) shall be used by the Debtors (i) only in accordance with the Budget (as defined herein), including the applicable Variance Limit, and to fund the Carve-Out (as defined herein), and (ii) only to fund costs not otherwise contemplated to be funded by CTCI under the DIP CTCI Contract, as set forth in summary below and as described in further detail in the DIP CTCI Contract. The Borrower will not use the proceeds of the Loans to fund costs contemplated to be funded by CTCI under the DIP CTCI Contract unless and until CTCI has funded $75 million of costs under the DIP CTCI Contract.<br><br>Notwithstanding the foregoing, none of the DIP Facilities, the DIP Collateral (as defined herein), the collateral securing the obligations arising under Prepetition TL Credit Agreement or the Prepetition RCF Agreement (the "**Prepetition Collateral**") or the Carve-Out, or the proceeds of any of the foregoing, shall be used:<br><br>(i) to permit the Debtors, or any other party-in-interest, or their representatives to challenge or otherwise contest or institute any proceeding to determine (x) the amount, validity, perfection or priority of security interests in favor of any of the DIP TL Secured Parties, the Prepetition TL Secured Parties, the DIP RCF Secured Parties, the Prepetition RCF Secured Parties, or, so long as neither any Debtor nor CTCI has breached or terminated the Restructuring Support Agreement, CTCI, or (y) the amount, validity or enforceability of the obligations of the Debtors under the DIP TL Facility, the DIP RCF Facility, the DIP CTCI Contract, the Prepetition TL Facility, the Prepetition RCF Facility, or, so long as neither any Debtor nor CTCI has breached or terminated the Restructuring Support Agreement, the Prepetition CTCI Agreement;<br><br>(ii) to prevent, hinder, or otherwise delay the DIP TL Agent's, the DIP RCF Agent's, or CTCI's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Documents or the DIP CTCI Contract, as applicable, or the DIP Orders;<br><br>(iii) to seek to modify any of the rights granted to the DIP TL Secured Parties, the DIP RCF Secured Parties, or CTCI under the DIP Orders, the DIP Documents, or the DIP CTCI Contract, as applicable, without the prior written consent of the DIP TL Agent (with respect to rights granted to the DIP TL Agent and the DIP TL Lenders), the DIP RCF Agent (with respect to rights granted to the DIP RCF Agent or the DIP RCF Lenders), or CTCI (with respect to rights granted to CTCI), which may be given or withheld by the DIP TL Agent, the DIP RCF Agent, and CTCI, as applicable, in the exercise of their sole discretion;<br><br>(iv) to seek to modify any of the Adequate Protection rights granted to the Prepetition TL Secured Parties or the Prepetition RCF Secured Parties under the DIP Orders without the prior written consent of the Prepetition TL Agent (with respect to rights granted to the Prepetition TL Agent and the Prepetition TL Lenders) and the Prepetition RCF Agent (with respect to rights granted to the Prepetition RCF Agent or the Prepetition RCF Lenders), which may be given or withheld by the Prepetition TL Agent |

| | |
|---|---|
| | and the Prepetition RCF Agent, as applicable, in the exercise of their sole discretion; |
| | (v) to pay, subject to the Carve-Out, any amount on account of any claims arising prior to the Petition Date unless such payments are (x) approved by an order of the Bankruptcy Court (including, without limitation, under the DIP Orders) and (y) permitted under the DIP Documents or the DIP CTCI Contract, as applicable, or |
| | (vi) to investigate, analyze, commence, prosecute, threaten or defend any claim, motion, proceeding, or cause of action, or assert any defense or counterclaim, in each case, directly or indirectly, against any of the DIP TL Secured Parties, the DIP RCF Secured Parties, the Prepetition TL Secured Parties, the Prepetition RCF Secured Parties, or CTCI (so long as neither any Debtor nor CTCI has breached or terminated the Restructuring Support Agreement), or any of their agents, attorneys, advisors or representatives, including, without limitation, lender liability claims or claims pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; *provided* that up to $75,000 from the aggregate proceeds of the DIP TL Facility and the DIP RCF Facility shall be made available to any appointed official committee of unsecured creditors ("**Committee**") for investigation costs in respect of the stipulations set forth in the DIP Orders. |
| **DIP Orders** | The interim order approving the DIP TL Facility, which shall be in form and substance acceptable to the DIP TL Agent with respect to matters pertaining to the DIP TL Facility (the "**Interim DIP Order**"), shall, among other things, authorize and approve (i) the borrowing and making of the Interim Order DIP TL Loans, (ii) the granting of the superpriority claims and liens against the DIP Loan Parties and their assets in accordance with this DIP Term Sheet and the DIP TL Documents, in all respects subject to the Carve-Out, (iii) the payment of all fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to, or for the benefit of the DIP TL Agent and the DIP TL Lenders, (iv) the use of Cash Collateral, (v) customary stipulations by the Debtors, which shall be binding upon third parties (including any Committee) subject to any successful challenge by such third parties that is brought within 75 days of entry of the Interim DIP Order (or, solely with respect to the Committee, within 60 days of its formation) by any Committee and other interested parties (the "**Challenge Period**"), and (vi) the granting of the Adequate Protection.<br><br>The final order approving the DIP TL Facility, which shall be substantially in the same form as the Interim DIP Order (which final order shall contain, except as provided in this paragraph, only such modifications as are necessary to convert the Interim DIP Order into a final order or otherwise satisfactory to the DIP TL Agent with respect to matters pertaining to the DIP TL Facility) (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"), shall, among other things, authorize and approve: (i) the Final Order DIP TL Loans, (ii) the Roll-Up DIP TL Loans, subject to any successful challenge brought within the Challenge Period, (iii) the 506(c) Waiver, (iv) the 552(b) Waiver, |

| | |
|---|---|
| | (v) customary releases by the Debtors, and (vi) the Marshaling Waiver,. |
| **DIP Collateral** | Subject to the Carve-Out, the DIP RCF Credit Agreement, the Vitol Transaction Documents and any other Permitted Liens contemplated by the DIP TL Credit Agreement, all DIP TL Obligations shall be secured, pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, as follows:<br><br>(i)     The DIP TL Obligations arising under the DIP TL Documents shall be secured by a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, priming, automatically and properly perfected lien on, and security interest in (such liens and security interests, the "**DIP Liens**"), all present and after-acquired property of the DIP Loan Parties (the "**DIP Collateral**"), which lien and security interest shall be junior to any liens on DIP Collateral securing the DIP RCF Obligations and the Prepetition RCF Facility (if any), and *pari passu* with any lien and security interest securing obligations under the DIP CTCI Contract, but senior to all other liens on and security interests in the DIP Collateral.<br><br>Until the RCF Obligations Payment Date (as defined in the DIP Intercreditor Agreement), the RCF Representative (as defined in the Intercreditor Agreement) shall have exclusive enforcement rights with respect to any Collateral (as defined in the Intercreditor Agreement).<br><br>"**DIP Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of April 16, 2025, by and among Vitol Americas Corp. as RCF Representative, Orion Energy Partners TP Agent, LLC as Term Loan Representative, CTCI, the lenders party thereto from time to time, the DIP Borrower, and the DIP Guarantors. |
| **Priority of the DIP TL Facility** | All DIP TL Obligations shall, subject to the Carve-Out, the DIP RCF Credit Agreement, and the Vitol Transaction Documents, at all times be entitled to superpriority administrative expense claim status in the Chapter 11 Case of each DIP Loan Party, having priority over all administrative expenses and claims of any kind or nature whatsoever, specified in or ordered pursuant to section 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114 or any other provisions of the Bankruptcy Code, but junior to the superpriority administrative expense claims granted in connection with the DIP RCF Credit Agreement and the Vitol Transaction Documents and *pari passu* with the superpriority administrative expense claims granted in connection with the DIP CTCI Contract. |
| **Adequate Protection** | As adequate protection (the "**Adequate Protection**") for any diminution in value ("**Diminution in Value**"), including any diminution arising from (a) the sale, lease or use by the Debtors' of property subject to prepetition liens and security interests (including Cash Collateral), (b) the incurrence of the DIP TL Facility, the DIP CTCI Contract, and the DIP RCF Facility and the Vitol Transaction Documents and the priming of such prepetition security interests and liens and (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code: |

6

The Prepetition TL Agent (on behalf of the Prepetition TL Lenders) shall be entitled to receive, in connection with any amounts outstanding under the Prepetition TL Credit Agreement to the extent such amounts are not converted into Roll-Up DIP TL Loans:

(i)    a perfected security interest and lien on the DIP Collateral, which shall be subject to and immediately junior in priority to the Carve-Out, the DIP Liens, the liens securing the DIP RCF Obligations, the RCF Adequate Protection Lien, and Permitted Liens contemplated by the DIP TL Credit Agreements, but with priority over all other liens on the DIP Collateral (the "**TL Adequate Protection Lien**");

(ii)    superpriority administrative expense claim status in the Chapter 11 Case of each DIP Loan Party, solely to the extent of any Diminution in Value, with priority over all administrative expenses and claims of any kind or nature whatsoever, specified in or ordered pursuant to section 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114 or any other provisions of the Bankruptcy Code, subject and junior only to the Carve-Out, the RCF Adequate Protection Claim, and the superpriority administrative expense claims granted to the DIP TL Secured Parties, CTCI (on account of the DIP CTCI Contract), and the DIP RCF Secured Parties (the "**TL Adequate Protection Claim**"); and

(iii)    payment of the reasonable and documented legal and other professional fees and expenses of the Prepetition TL Agent required to be reimbursed by the Debtors pursuant to the terms of the Prepetition TL Credit Agreement.

The Prepetition RCF Agent (on behalf of the Prepetition RCF Lenders) shall be entitled to receive, in connection with any amounts outstanding under the Prepetition RCF Agreement, solely to the extent of any Diminution in Value and to the extent such amounts are not converted into roll-up debtor-in-possession financing loans:

(i)    a perfected security interest and lien on the DIP Collateral, which shall be subject to and immediately junior in priority to the Carve-Out, the DIP Liens, liens securing the DIP RCF Obligations, and Permitted Liens contemplated by the DIP TL Credit Agreement, but with priority over all other liens on the DIP Collateral (the "**RCF Adequate Protection Lien**");

(ii)    superpriority administrative expense claim status in the Chapter 11 Case of each DIP Loan Party, with priority over all administrative expenses and claims of any kind or nature whatsoever, specified in or ordered pursuant to section 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114 or any other provisions of the Bankruptcy Code, subject and junior only to the Carve-Out and the superpriority administrative expense claim granted to the DIP TL Lenders, CTCI (on account of the DIP CTCI Contract), and the

| | |
|---|---|
| | DIP RCF Lenders (the "**RCF Adequate Protection Claim**"); and <br><br> (iii)   payment of the reasonable and documented legal and other professional fees and expenses of the Prepetition RCF Agent required to be reimbursed by the Debtors pursuant to the terms of the Prepetition RCF Agreement. |
| **Documentation** | The DIP TL Credit Agreement, the DIP RCF Facility, the DIP CTCI Contract and the other documentation with respect to the DIP Obligations (collectively, the "**DIP Documentation**") shall be in the form of the existing forms of (a) the DIP TL Credit Agreement, (b) the DIP RCF Credit Agreement, and (c) the DIP CTCI Contract (in each case as distributed by Kirkland & Ellis LLP, counsel to the Debtors, on April 15, 2025). The foregoing, in each case, referred to herein, collectively, as the "**Documentation Principles**". |
| **Events of Default** | In each case, subject to Documentation Principles: <br><br> (a)   Borrower shall fail to pay any principal of any Loan (including any Accrued Interest that has been added to principal) when and as the same shall become due and payable, whether at the due date thereof or, in the case of payments of principal due pursuant to Section 2.06(b), at a date fixed for prepayment thereof; or <br><br> (b)   Borrower shall fail to pay, when the same shall be due and payable, (i) any interest on any Loan and such failure is not cured within five (5) Business Days or (ii) any fee or any other amount (other than an amount referred to in clause (a) or (b)(i) of this Section) payable under this Agreement or under any other Financing Document when and as the same shall become due and payable, and such failure shall continue unremedied for a period of ten (10) Business Days; or <br><br> (c)   any representation or warranty made by or deemed made by any Loan Party in this Agreement or any other Financing Document, or in any certificate or other document furnished to any Secured Party by or on behalf of such Loan Party in accordance with the terms hereof or thereof shall prove to have been incorrect in any material respect as of the time made or deemed made, confirmed or furnished (or, in the case of any such representation or warranty under this Agreement or any other Financing Document already qualified by materiality, such representation or warranty shall prove to have been incorrect) when made or deemed made; provided that such misrepresentation or such incorrect statement shall not constitute an Event of Default if (i) such condition or circumstance is not reasonably expected to result in a Material Adverse Effect and (ii) the facts or conditions giving rise to such misstatement are cured in such a manner as to eliminate such misstatement (or as to cure the adverse effects of such misstatement) within thirty (30) days after obtaining notice of such Default; provided, further that, if (A) such Default is not reasonably susceptible to cure within such thirty (30) days, (B) such Loan Party is proceeding with diligence and good faith to cure such Default and such Default is susceptible to cure and (C) the existence of such failure has not resulted in a Material Adverse Effect, such thirty (30) day period shall be extended as may be necessary to cure such |

failure, such extended period not to exceed ninety (90) days in the aggregate (inclusive of the original thirty (30) day period); or

(d)      any Loan Party shall fail to observe or perform any covenant or agreement, as applicable, contained in:

(i)      Sections 5.01 (as to existence), 5.11(f), 5.13, 5.30 or Article VI; or

(ii)      (A) Section 5.10(a), 5.10(b) or 5.10(c), and such failure has continued unremedied for a period of thirty (30) days, or (B) Section 5.06(a), and such failure has continued unremedied for a period of fifteen (15) Business Days; or

(iii)      Section 5.10(f) and such failure has continued unremedied for forty-five (45) days;

provided, that any such Event of Default that occurs and is continuing solely as a result of a failure of any Loan Party to provide a notice, a report, a budget, a certificate, financial statements or a similar written deliverable pursuant to Sections 5.10 or 5.11 (other than Section 5.11(f)) (collectively a "Reporting Deliverable") prior to the date set forth herein with respect thereto or the expiration of the time period specified for the delivery of such Reporting Deliverable shall be deemed to be cured upon delivery of such Reporting Deliverable to the DIP Term Loan Agent within the applicable cure period set forth under this Section 7.01(d), notwithstanding that the time period for delivery of such Reporting Deliverable shall have expired or passed under Sections 5.10 or 5.11; or

(e)      any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Financing Document (other than those specified in clause (a), (b), (c) or (d) of this Section) and such failure shall continue unremedied for a period of thirty (30) days; provided that, if (A) such failure is not reasonably susceptible to cure within such thirty (30) days, (B) such Loan Party is proceeding with diligence and good faith to cure such Default and such Default is susceptible to cure and (C) the existence of such failure has not resulted in a Material Adverse Effect, such thirty (30) day period shall be extended as may be necessary to cure such failure, such extended period not to exceed ninety (90) days in the aggregate (inclusive of the original thirty (30) day period); provided, that any such Event of Default that occurs and is continuing solely as a result of a failure of any Loan Party to provide a Reporting Deliverable prior to the date set forth herein with respect thereto or the expiration of the time period specified for the delivery of such Reporting Deliverable shall be deemed to be cured upon delivery of such Reporting Deliverable to the DIP Term Loan Agent within the applicable cure period set forth under this Section 7.01(e), notwithstanding that the time period for delivery of such Reporting Deliverable shall have expired or passed under Sections 5.10 or 5.11; or

(f)      the Project Company materially breaches the Entara Agreement at a time when Entara is not otherwise in breach of the Entara Agreement (other than any breach resulting from the Debtors' entry into the Chapter 11 Cases or from any rejection of the Entara Contract in connection with the Chapter 11 Cases); or

(g)      except for the allowance in the Chapter 11 Cases of a general unsecured claim, there is entered against any Loan Party or its Subsidiaries (i) a final judgment or order for the payment of money in an amount exceeding $15,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage), or (ii) a non-monetary final judgment or order that, either individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 60 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(h)      (i) any material provision of any Financing Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all Obligations, ceases to be in full force and effect; (ii) any Loan Party or its Subsidiaries contests in writing the validity or enforceability of any provision of any Financing Document or contests the validity or perfection of the Liens and security interests securing the Obligations; or any Loan Party or its Subsidiaries denies in writing that it has any or further liability or obligation under any Financing Document, or purports in writing to revoke, terminate or rescind any Financing Document; (iii) any Financing Document ceases to provide (to the extent required by such Financing Document and subject to the DIP Intercreditor Agreement) a perfected and first priority Lien (subject to the Carve-Out and Liens securing the DIP RCF Obligations) on the Collateral purported to be covered thereby in favor of the DIP Term Loan Collateral Agent, free and clear of all other Liens (except for Permitted Liens); or (iv) the DIP Intercreditor Agreement shall terminate, cease to be effective or cease to be legally valid, binding and enforceable against any RCF Representative (as defined in the DIP Intercreditor Agreement), any other holder of RCF Obligations (as defined in the DIP Intercreditor Agreement) or any other Person party to the DIP Intercreditor Agreement (other than in accordance with the express terms of the DIP Intercreditor Agreement); or

(i)      an ERISA Event has occurred which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; or

(j)      a Change of Control shall occur without the prior written consent of the DIP Term Loan Agents, other than with respect to any Change of Control resulting from a credit bid sale pursuant to Section 363(k) of the Bankruptcy Code in accordance with an Approved Plan; or

(k)      any Authorization necessary for the execution, delivery and performance of any material obligation under the Financing Documents is terminated or ceases to be in full force or is not obtained, maintained, or complied

10

with, unless such failure (i) could not reasonably be expected to result in a Material Adverse Effect or (ii) is remedied within ninety (90) days; or

(l)      an uninsured Event of Loss or a Condemnation in an amount exceeding $15,000,000, in each case with respect to a material portion of the Site, shall occur; or

(m)      an Event of Abandonment shall occur; or

(n)      (i) the termination of the Restructuring Support Agreement or the DIP CTCI Contract shall occur or (ii) CTCI shall fail to make any payments required to be made under the DIP CTCI Contract in accordance with the terms of the DIP CTCI Contract and the DIP Orders (including any budget set forth therein); or

(o)      other than with respect to the DIP RCF Credit Agreement or the DIP CTCI Contract, any Loan Party shall (i) default in making any payment of any principal, interest or premium of any Indebtedness incurred following the Petition Date (excluding the Loans and other Obligations) on the scheduled or original due date with respect thereto (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise), in each case, beyond any grace periods applicable thereto; or (ii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, in each case, beyond any grace periods applicable thereto, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with or without the giving of notice, the lapse of time or both, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that a default, event or condition described in clause (i) or (ii) of this paragraph (o) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i) and (ii) of this paragraph (o) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $15,000,000; provided, further, that clause (ii) of this paragraph (o) will not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness if such sale or transfer is permitted hereunder; or

(p)      (i) an "Event of Default" as defined in the DIP RCF Credit Agreement has occurred and is continuing and the DIP RCF Lenders or the DIP RCF Agent have caused the DIP RCF Obligations to become due prior to their scheduled maturity or (ii) an "Event of Default" as defined in the DIP CTCI Contract has occurred and is continuing and CTCI caused the obligations under the DIP CTCI Contract to become due prior to their scheduled maturity; or

(q)     the occurrence of any of the following:

(i)     the Interim DIP Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed or modified without the prior written consent of the DIP Term Loan Agent and Prepetition Term Loan Agent;

(ii)     the Final DIP Order (A) at any time ceases to be in full force and effect, (B) shall be vacated, reversed or stayed or modified without the prior written consent of the DIP Term Loan Agent and Prepetition Term Loan Agent, or (C) shall not have been entered by the Bankruptcy Court within thirty (30) days after Petition Date; provided that such time period in clause (C) may be extended by mutual agreement between the Borrower and DIP Term Loan Agent;

(iii)     any Milestone Condition shall remain unsatisfied or unwaived at the end of the corresponding Milestone Date or, having been satisfied, shall cease to be satisfied as applicable;

(iv)     dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a Chapter 7 case (or the filing of any pleading by a Loan Party seeking, consenting to or otherwise supporting such action);

(v)     appointment in any of the Chapter 11 Cases of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Loan Party (or the filing of any pleading by a Loan Party seeking, consenting to or otherwise supporting such action);

(vi)     subject to the Carve-Out, the DIP RCF Credit Agreement and the Vitol Transaction Documents, the Bankruptcy Court's granting in any of the Chapter 11 Cases, or the entering of an order that authorizes or approves, any Super-Priority Claim or any Lien (including any adequate protection lien) on the DIP Term Loan Collateral or Prepetition Term Loan Collateral which is *pari passu* with or senior to the claims or Liens of the DIP Term Loan Agent or the Prepetition Term Loan Agent (or the filing of any pleading by a Loan Party seeking, consenting to or otherwise supporting such action);

(vii)     the Loan Parties' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates for any reason;

(viii)     other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget (A) in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases, (B) in respect of adequate protection payments set forth in this Agreement and any DIP Order and consented to by the DIP Term Loan Agent, or otherwise permitted under the terms of the DIP

Intercreditor Agreement, as applicable, and (C) in respect of certain critical vendors and other creditors, in each case to the extent authorized by one or more "first day" or other orders reasonably satisfactory to the DIP Term Loan Agent, any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Indebtedness or payables (including without limitation, reclamation claims);

(ix)     the Bankruptcy Court shall enter one or more orders during the pendency of the Chapter 11 Cases granting relief from the Automatic Stay to the holder or holders of any Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Loan Party or Loan Parties that have an aggregate value in excess of $1,000,000 without the prior written consent of the DIP Term Loan Agent;

(x)     the Termination Date shall have occurred;

(xi)     any Loan Party petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the Liens securing the Obligations without the consent of the DIP Term Loan Agent (other than the Carve-Out or the DIP RCF Obligations);

(xii)     (A) the Loan Parties engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the Financing Documents, the Prepetition Term Loan Documents or the Liens on or security interest in the assets of the Loan Parties securing the Obligations or the Prepetition Term Loan Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the Obligations or Prepetition Term Loan Obligations or (B) the Loan Parties engage in or support any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Term Loan Agent, any Secured Party, the Prepetition Term Loan Agent or any Prepetition Term Loan Lender; provided, however, that it shall not constitute an Event of Default if any of the Loan Parties provides information with respect to the Prepetition Term Loan Credit Agreement to a party in interest or is compelled to provide information by an order of the Bankruptcy Court;

(xiii)     after entry of the Final DIP Order, the entry of any final order in the Chapter 11 Cases charging any of the DIP Term Loan Collateral, which is adverse to the Lenders or their rights and remedies under the Financing Documents in the Chapter 11 Cases or the occurrence of any claim or claims under Section 506(c) of the Bankruptcy Code against any of the DIP Term Loan Collateral;

(xiv)     the consummation of any sale or other Disposition (whether or not a Permitted Disposition) of all or a material portion of the DIP Term Loan Collateral (other than in ordinary course of business that is contemplated by the Approved Budget) without the advance written consent of the DIP Term Loan Agent and the Secured

13

Parties, in each case if such sale or other Disposition does not indefeasibly satisfy the Obligations in full in cash at the consummation of such Disposition, or any Loan Party proposes, supports, seeks to obtain Bankruptcy Court approval for or fails to contest in good faith the entry of such Disposition;

(xv)    any Person shall obtain a final and nonappealable judgment under Section 506(a) of the Bankruptcy Code, or a similar determination, with respect to the Prepetition Term Loan Obligations;

(xvi)    the confirmation of a plan of reorganization or liquidation that does not provide for treatment acceptable to the Secured Parties, or any Loan Party proposes or supports, or fails to contest in good faith, the confirmation of such a plan of reorganization or liquidation, unless such plan contemplates indefeasibly paying the Obligations and the Prepetition Term Loan Obligations in full, in cash on the effective date of such plan;

(xvii)    the entry of an order by the Bankruptcy Court in favor of the statutory committee of unsecured creditors (the "Creditors' Committee"), if any, appointed in the Chapter 11 Cases, any ad hoc committee, or any other party in interest, (i) sustaining an objection to claims of the DIP Term Loan Agent or any of the Secured Parties, (ii) avoiding any liens held by the DIP Term Loan Agent or any of the Secured Parties, (iii) sustaining an objection to claims of the Prepetition Term Loan Agent or any of the Prepetition Term Loan Lenders, or (iv) avoiding any liens held by the Prepetition Term Loan Agent or any of the Prepetition Term Loan Lenders except as otherwise agreed by the Prepetition Term Loan Agent in writing;

(xviii)    if (A) the Prepetition Intercreditor Agreement shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with its terms against the Borrower, any party thereto or any holder of the liens subordinated thereby, or shall be repudiated by any of them, or be amended, modified or supplemented to cause the liens securing the obligations of the Prepetition Term  Loan Lenders to be senior or *pari passu* in priority to the liens securing the Prepetition Term Loan Obligations without the consent of the Prepetition Term Loan Agent, (B) the Borrower takes any action inconsistent with the terms of the Prepetition Intercreditor Agreement (other than in connection with an Approved Plan), (C) any Person bound by the Prepetition Intercreditor Agreement takes any action inconsistent with the terms thereof or (D) any order of any court of competent jurisdiction is granted which is materially inconsistent with the terms of the Prepetition Intercreditor Agreement and is adverse to the interests of the Prepetition Term Loan Agent or Prepetition Term Loan Lenders;

14

| | |
|---|---|
| | (xix)     reversal or modification of the Rolled-Up Term Loans provided for hereunder by the Bankruptcy Court without the prior written consent of the DIP Term Loan Agent; |
| | (xx)      the failure of any Loan Party to comply with the terms of the applicable DIP Order; |
| | (xxi)     any Loan Party shall contest the validity or enforceability of any DIP Order or deny that it has further liability thereunder; |
| | (xxii)     any Loan Party shall attempt to invalidate or otherwise impair the Obligations or the liens granted to the Lenders under the Financing Documents; |
| | (xxiii)   any Loan Party's consensual use of prepetition Cash Collateral is terminated; |
| | (xxiv)   entry of a final order by the Bankruptcy Court terminating the use of Cash Collateral; and |
| | (r)       for any reason, including force majeure, the Project is unable to sustain commercial operations for more than twenty-one (21) consecutive days during the Chapter 11 Cases, or for more than thirty-five (35) total days during the Chapter 11 Cases |
| **Covenants, Representations and Warranties** | In each case subject to Documentation Principles, affirmative and negative covenants and representations and warranties customary for financings of this type and, where applicable, substantially consistent with the Prepetition TL Credit Agreement, together with such additions and modifications as are reasonably acceptable to the DIP TL Agent and the DIP Loan Parties, including, without limitation, bankruptcy-related covenants and limitations on non-ordinary course asset sales (above a threshold to be agreed) and going concern sales without the consent of the DIP TL Agent (unless the proceeds of such sale repays the DIP TL Facility in full in cash), with baskets, thresholds, qualifications and exceptions to be agreed. |
| **Change of Control** | Subject to Documentation Principles, "**Change of Control**" means an event or series of events by which: <br><br> (a)       Borrower shall cease to have Control of Project Company or shall cease to own, directly or indirectly, beneficially or of record, 100% of the Equity Interests in Project Company; or <br><br> (b)       Borrower shall cease to have Control of SusOils or shall cease to own, directly or indirectly, beneficially or of record, 100% of the Equity Interests in SusOils. |
| **Reporting** | In each case subject to Documentation Principles, the following documentation: <br><br> (a)       On May 9, 2025 (the "Initial Reporting Date"), the Loan Parties shall |

15

deliver to the DIP Term Loan Agent and the Secured Parties a detailed 13-week rolling cash forecast, containing line items of sufficient detail to reflect the Loan Parties' projected cash flows and disbursements for the applicable period, which shall thereafter be updated as necessary but not less than once every four weeks (each, a "Proposed Budget"). The DIP Term Loan Agent and the Secured Parties shall have five (5) Business Days after receipt thereof to approve any Proposed Budget (such approval not to be unreasonably conditioned, delayed, or withheld), provided that if the DIP Term Loan Agent and the Secured Parties do not approve any Proposed Budget within such five (5)-Business Day period, the then-operative Approved Budget shall remain in effect. Upon the Loan Parties' receipt of the DIP Term Loan Agent' and the Secured Parties' written approval of a Proposed Budget, such Proposed Budget shall become an Approved Budget and shall replace the then-operative Approved Budget for all purposes. The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved in accordance with this Section 5.20(a), following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. The Loan Parties shall operate in accordance with the Approved Budget and, subject to the Variance Limit, all disbursements shall be consistent with the provisions of the Approved Budget. The Loan Parties may submit additional Proposed Budgets to the DIP Term Loan Agent and the Secured Parties, but until the DIP Term Loan Agent and the Secured Parties approve such Proposed Budget in writing, such Proposed Budget shall not become an Approved Budget and the Loan Parties shall continue to comply with the then-operative Approved Budget.

(b)      Beginning on April 24, 2025, and on the Thursday of each calendar week thereafter, the Loan Parties shall deliver to the DIP Term Loan Agent, in a form consistent with the form of the Approved Budget, a variance report comparing the Loan Parties' actual receipts and disbursements and G&A Disbursements for the prior calendar week and the prior four calendar weeks (on a cumulative basis) with the projected receipts and disbursements and G&A Disbursements by line item for such week and the prior four calendar weeks (on a cumulative basis) as reflected in the applicable Approved Budget for such weeks, which variance report shall include a report from a financial officer of the Loan Parties identifying and addressing any variance of actual performance to projected performance for such prior weekly periods (such report, the "Weekly Variance Report").

(c)      No later than 4:00 p.m. Central Time on the Initial Reporting Date and on each Thursday thereafter that is the two (2)-week anniversary of the Initial Reporting Date (each such date, a "Bi-Weekly Variance Testing Date" and each such two (2)-week period, the "Bi-Weekly Variance Testing Period"), the Loan Parties shall deliver to the DIP Term Loan Agent (for circulation to the Secured Parties) and the Prepetition Term Loan Agent a report detailing (i) on a line item by line item basis, the aggregate disbursements of the Loan Parties during the applicable Bi-Weekly Variance Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between such disbursements made during such Bi-Weekly Variance Testing Period by the Loan Parties

| | |
|---|---|
| | against the applicable Approved Budget (a "Bi-Weekly Variance Report" and together with the Weekly Variance Report, the "Variance Reports"). |
| **Financial Covenants** | In each case, subject to Documentation Principles: <br><br> **Minimum liquidity**: The Loan Parties shall maintain, at all times while the Loans remain outstanding, $5,000,000 in unrestricted cash (subject to the Control Agreement), Availability (as that term is defined in the DIP RCF Credit Agreement as in effect as of the date hereof), or a combination of both amounting to $5,000,000 in aggregate. <br><br> **Budget variance testing**: As of any Bi-Weekly Variance Testing Date, for the Bi-Weekly Variance Testing Period ending on the Friday preceding such Bi-Weekly Variance Testing Date, the Loan Parties shall not allow aggregate disbursements, excluding disbursements with respect to professional fees, to be greater than 115% of the estimated disbursement for such item in the Approved Budget for such Bi-Weekly Variance Testing Period (collectively, the "**Variance Limit**"). Additional variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to the DIP Term Loan Agent's reasonable approval. |
| **Fees and Expenses Indemnification** | DIP Loan Parties shall be obligated under the DIP TL Facility to pay all reasonable and documented out-of-pocket fees, costs and expenses incurred or accrued by the DIP TL Agent and the DIP TL Lenders in connection with any and all aspects of the DIP TL Facility and the Chapter 11 Cases, including, without limitation, the reasonable and documented fees and expenses of legal counsel and financial advisors, hired by or on behalf of the DIP TL Agent and the DIP TL Lenders, which counsel and advisors shall be (i) Latham & Watkins LLP as counsel to the DIP TL Agent, (ii) Hunton Andrews Kurth LLP as local counsel to the DIP TL Agent, (iii) Perella Weinberg Partners as financial advisor to the DIP TL Agent, and (iv) Matthew Crisp, as consultant to the DIP TL Agent and the DIP TL Lenders. The DIP TL Credit Agreement shall also provide for customary indemnification by each of the DIP Loan Parties, on a joint and several basis, of the DIP TL Agent and the DIP TL Lenders together with their related parties and representatives (each, an "**Indemnified Person**"); *provided* that (a) any such indemnities payable by the Debtors in connection with the DIP TL Credit Agreement shall be subject to the prior approval of the Bankruptcy Court, and (b) no Indemnified Person will be indemnified for any losses, claims, damages, liabilities, or related expenses to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence, fraud, bad faith or willful misconduct of such Indemnified Person. |
| **Carve-Out** | The DIP Orders each shall include a carve-out, in the form attached hereto as **Annex A** (the "**Carve-Out**"). |
| **Conditions to Commitment / Closing / Funding** | Subject to Documentation Principles, conditions to commitment, closing, and funding to include customary conditions for financings of this type, as well as any other conditions agreed to by the DIP Loan Parties and the DIP TL Agent, including, without limitation, entry of the Interim DIP Order or the Final DIP Order (as applicable), execution and delivery of DIP TL Documents, delivery of |

| | |
|---|---|
| | an Initial Budget, perfection of collateral via the Interim DIP Order as to certain collateral (without the need for any execution, recordation or filing of any mortgages, deeds of trust, pledge or security agreements, lockbox or control agreements, financing statements, or any other similar documents or instruments, or the possession or control by the DIP TL Agent or the DIP TL Lenders of, or over, any assets), delivery of closing deliverables, payment of all out-of-pocket fees, costs and expenses owed to the DIP TL Agent and the DIP TL Lenders pursuant to the DIP TL Documents (including their advisors and counsel), no continuing default or event of default, and accuracy of representations and warranties in all material respects. |
| **Assignments and Participations** | Subject to Documentation Principles, customary for financings of the DIP TL Facility's type. |
| **DIP TL Agent's Credit Bidding** | Subject to the DIP Intercreditor Agreement and the DIP Orders, (i) The DIP TL Agent shall have the right to credit bid, on behalf of the DIP TL Lenders, in accordance with the DIP TL Documents, up to the full amount of the DIP TL Obligations in any sale of the DIP Collateral and (ii) the Prepetition TL Agent shall have the right to credit bid, on behalf of the Prepetition TL Lenders, in accordance with the Prepetition TL Documents, up to the full amount of the obligations outstanding under the Prepetition TL Documents in any sale of the collateral securing such obligations, in each case without the need for further court order authorizing the same and whether any such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. |
| **Waivers** | The DIP Orders shall provide that, subject to entry of the Final DIP Order, the DIP TL Facility shall at no time be subject to the equitable doctrine of marshaling (the "**Marshaling Waiver**"),  surcharge under section 506(c) of the Bankruptcy Code (the "**506(c) Waiver**"), or the "equities of the case" exception under section 552(b) of the Bankruptcy Code (the "**552(b) Waiver**"). |
| **Governing Law** | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |

ANNEX A
TO TERM SHEET

**Carve-Out**

1. <u>Carve-Out</u>.

(a)        <u>Carve-Out</u>.  As used in this Interim Order, the "<u>Carve-Out</u>" means the sum of  (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>"), including any restructuring fee, sale fee, financing fee, or other success fee, incurred by and payable to persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code  and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP TL Agent or the DIP RCF Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons (excluding any unearned (as of the date of the Carve-Out Trigger Notice) restructuring fee, sale fee, financing fee, or other success fee) in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP TL Agent or the DIP RCF Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve-Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP TL Agent or the DIP RCF Agent to the Debtors, their lead restructuring counsel, counsel to the DIP TL Agent (if delivered by the DIP RCF Agent), counsel to the DIP RCF Agent (if delivered by the DIP TL Agent), the U.S. Trustee, and counsel to the Committee,

which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP TL Credit Agreement or the DIP RCF Credit Agreement, respectively, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)      Delivery of Weekly Fee Statements.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors (or Debtors' counsel) a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided that, within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause the Weekly Statements and such additional weekly statement to be delivered on the same day received to the DIP Agents' respective counsel).  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Pre-Carve-Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget for such period for such Professional Person.

(c)      Carve-Out Reserves.

(i)      Commencing with the week ended April 18, 2025, and on or before the Thursday of each week thereafter, the Debtors shall utilize all cash on hand as of such date and any available

cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of (a) the greater of (i) the aggregate unpaid amount of all Estimated Fees and Expenses reflected in the Weekly Statement delivered on the immediately prior Wednesday to the Debtors and the DIP Agents, and (ii) the aggregate amount of unpaid Allowed Professional Fees contemplated to be incurred in the approved Budget during such week, *plus* (b) the Post Carve-Out Trigger Notice Cap (which, for the avoidance of doubt, shall not be funded into such reserve more than once), *plus* (c) an amount equal to the amount of Allowed Professional Fees set forth in the approved Budget for the week occurring after the most recent Calculation Date; *provided* that no amounts on account of any particular day's unpaid Estimated Fees and Expenses or Allowed Professional Fees, as applicable, shall be funded into such reserve more than once.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust (the "Funded Reserve Account") to pay such Allowed Professional Fees prior to satisfying any and all other claims or obligations, and all payments of Allowed Professional Fees incurred (whether prior to or after the Termination Declaration Date) shall be paid first from such Funded Reserve Account.

(ii)    On the day on which a Carve-Out Trigger Notice is given by the DIP TL Agent or the DIP RCF Agent, as applicable, to the Debtors with a copy to counsel to the Committee (the "Termination Declaration Date"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to, and the Debtors shall, utilize all cash on hand as of such date, including cash in the Funded Reserve Account, and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve") prior to satisfying any other claims or obligations.  On the Termination Declaration Date, the Carve-Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date, including cash in the Funded Reserve Account, and any available cash thereafter held by any Debtor, after funding the Pre-Carve-Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to

21

pay such Allowed Professional Fees benefiting from the Post-Carve-Out Trigger Notice Cap (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims.

(d)     Application of Carve-Out Reserves.

(i)     All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above (the "Pre-Carve-Out Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until indefeasibly paid in full.  If the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed first to the DIP TL Agent and/or the DIP RCF Agent, as applicable, on account of the applicable DIP Obligations in accordance with the DIP Documents until indefeasibly paid in full, and thereafter to the Prepetition Parties in accordance with their rights and priorities as of the Petition Date, pursuant to any Intercreditor Agreement, and as otherwise set forth in this Interim Order.

(ii)     All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "Post-Carve-Out Amounts"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP TL Agent and the DIP RCF Agent, in the order specified for payment in the DIP Orders, for the benefit of the DIP TL Lenders and DIP RCF Lenders, as applicable, in accordance with the DIP Documents, unless the DIP Obligations have been indefeasibly paid in full, in which case any such excess shall be paid to the Prepetition Parties in accordance with their rights and priorities as of the Petition Date, pursuant to any Intercreditor Agreement.

(iii)     Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve-Out Reserves is not funded in full in the amounts set forth in Paragraph [●](c), then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively (subject to the limits contained in the

Post-Carve-Out Trigger Notice Cap), shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in Paragraph [●](c), prior to making any payments to the DIP Agents or the Prepetition Parties, as applicable.

(iv)     Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP TL Agent, the DIP RCF Agent, the Prepetition TL Agent, and the Prepetition RCF Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agents for application in accordance with the DIP Documents.

(v)     Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve-Out Reserves shall not constitute DIP RCF Loans, DIP Term Loans, or DIP CTCI Payments or increase or reduce the DIP Obligations, (ii) the failure of the Carve-Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out with respect to any shortfall (as described below), and (iii) subject to the limitations with respect to the DIP Agents, the DIP Lenders, and the Prepetition Parties set forth in this Paragraph [●], in no way shall the Initial Budget, any subsequent Budget, Carve-Out, Post-Carve-Out Trigger Notice Cap or Carve-Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Obligations, the Prepetition Obligations, the Adequate Protection Obligations, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations and the Prepetition Obligations.

(e)     Payment of Allowed Professional Fees Prior To the Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

23

(f)        <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  None of the DIP Agents, the DIP Lenders, or the Prepetition Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders, or the Prepetition Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)        <u>Payment of Allowed Professional Fees on or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis and shall be paid first from the Carve-Out Reserves.  Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

**Exhibit A-3**

**Relative Lien, Payment, and Claim Priorities**

**Lien Priority Ranking on Collateral[1]**

| Relative Priority on Collateral | Bakersfield Renewable Fuels, LLC | BKRF OCB, LLC, BKRF OCP, LLC, Sustainable Oils, Inc., and Global Clean Energy Holdings, Inc. | Unencumbered Collateral (including Avoidance Action Proceeds) |
|---|---|---|---|
| 1 | Carve-Out | Carve-Out | Carve-Out |
| 2 | Permitted Senior Liens[2] | Permitted Senior Liens | Permitted Senior Liens |
| 3 | DIP RCF Liens | DIP RCF Liens | DIP RCF Liens |
| 4 | RCF Adequate Protection Liens | RCF Adequate Protection Liens | RCF Adequate Protection Liens |
| 5 | Prepetition RCF Liens | Prepetition RCF Liens | DIP Term Loan Liens; DIP CTCI Liens |
| 6 | DIP Term Loan Liens; DIP CTCI Liens | DIP Term Loan Liens; DIP CTCI Liens | Term Loan Adequate Protection Liens |
| 7 | Term Loan Adequate Protection Liens | Term Loan Adequate Protection Liens | -- |
| 8 | Prepetition Term Loan Liens | Prepetition Term Loan Liens | -- |
| 9 | CTCI Adequate Protection Liens | -- | -- |
| 10 | Prepetition CTCI Liens | -- | -- |

---

[1]  The relative priorities of the Prepetition Liens securing Prepetition Obligations owed to CTCI, the Prepetition RCF Secured Parties, and the Prepetition Term Loan Secured Parties have not been determined by a court or other adjudicative body of competent jurisdiction.  The ranking set forth in this exhibit with respect to such liens reflects the Restructuring Support Agreement and the Stipulations and is subject to the terms, conditions, and reservation of rights of the parties as set forth therein and in the Interim Order and Final Order, as applicable; provided that CTCI and its affiliates, the DIP Secured Parties, and the Prepetition Secured Parties each acknowledge and agree that notwithstanding any termination of the Restructuring Support Agreement, the DIP RCF Liens, RCF Adequate Protection Liens, and Prepetition RCF Liens shall remain senior to the DIP Term Loan Liens and DIP CTCI Liens. Upon a Restructuring Support Agreement termination, CTCI reserves the right to argue that the Prepetition CTCI Liens are not subordinate to the Prepetition Term Loan Liens or the Prepetition RCF Liens, and upon a successful Challenge the priority of the CTCI Adequate Protection Liens shall be immediately senior to the priority of the Prepetition CTCI Liens.

[2]  As used herein, to the extent any liens constitute Permitted Senior Liens with respect to some, but not all, DIP Facilities they shall prime only such DIP Facility or DIP Facilities and, where applicable, the prepetition credit facility or facilities provided by such parties.

## Priority Ranking of Claims[3]

| Relative Priority on Collateral | Bakersfield Renewable Fuels, LLC | BKRF OCB, LLC, BKRF OCP, LLC Sustainable Oils, Inc., and Global Clean Energy Holdings, Inc. | Unencumbered Collateral (including Avoidance Action Proceeds) |
|---|---|---|---|
| 1 | Carve-Out | Carve-Out | Carve-Out |
| 2 | DIP RCF Claims | DIP RCF Claims | DIP RCF Claims |
| 3 | RCF 507(b) Claims | RCF 507(b) Claims | RCF 507(b) Claims |
| 4 | Prepetition RCF Claims | Prepetition RCF Claims | DIP Term Loan Claims; DIP CTCI Claims |
| 5 | DIP Term Loan Claims; DIP CTCI Claims | DIP Term Loan Claims; DIP CTCI Claims | Term Loan 507(b) Claims |
| 6 | Term Loan 507(b) Claims | Term Loan 507(b) Claims | -- |
| 7 | Prepetition Term Loan Claims | Prepetition Term Loan Claims | -- |
| 8 | CTCI 507(b) Claims | -- | -- |
| 9 | Prepetition CTCI Claims | -- | -- |

---

[3] The relative priorities of the Prepetition Obligations owed to CTCI, the Prepetition RCF Secured Parties, and the Prepetition Term Loan Secured Parties have not been determined by a court or other adjudicative body of competent jurisdiction. The ranking of the Prepetition Obligations set forth in this exhibit with respect to such claims reflects the Restructuring Support Agreement and the Stipulations and is subject to the terms, conditions, and reservation of rights of the parties as set forth therein and in the Interim Order and Final Order, applicable; provided that CTCI and its affiliates, the DIP Secured Parties, and the Prepetition Secured Parties each acknowledge and agree that notwithstanding any termination of the Restructuring Support Agreement, the DIP RCF Claims, RCF 507(b) Claims, and Prepetition RCF Claims shall remain senior to the DIP Term Loan Claims and DIP CTCI Claims.

## Exhibit B

**New CTCI Agreement**

## PROJECT MANAGEMENT, PROCUREMENT, CONSTRUCTION, OPERATION AND MAINTENANCE SUPPORT AGREEMENT

This Project Management, Procurement, Construction, Operation and Maintenance Support Agreement (this "**Contract**") dated as of April 16, 2025 is between Bakersfield Renewable Fuels, LLC, a Delaware limited liability company (the "**Owner**"), and CTCI Americas, Inc., a Texas corporation (the "**Contractor**").

A.       The Owner and the Contractor are parties to the Turnkey Agreement with a Guaranteed Maximum Price for the Engineering, Procurement and Construction of the Bakersfield Renewable Fuels Project dated as of May 18, 2021 (as amended from time to time, the "**EPC Agreement**") and the Interim Settlement Agreement dated as of December 18, 2023 (as amended from time to time, the "**Interim Settlement Agreement**"), pursuant to which the Contractor provided services for the engineering, procurement, construction, pre-commissioning, commissioning, start-up and testing for the retooling and refurbishment of a renewable diesel production facility and the related refining facilities located near Bakersfield, California (as described in the EPC Agreement, the "**Project**"). The EPC Agreement, the Interim Settlement Agreement, and each related document, instrument, and agreement, in each case, which were entered into prior to the date hereof, are collectively referred to as the "**Prepetition CTCI Documents**."

B.       On or about October 21, 2024, the Owner delivered to the Contractor a notice of termination for default of the EPC Agreement. The Contractor disputed the Owner's right to terminate the EPC Agreement for default, commenced an action in the Superior Court for Kern County, California, and filed an amended demand for arbitration pursuant to the EPC Agreement.

C.       Following extensive negotiations, the Owner, the Contractor, and others have entered (i) into the Restructuring Support Agreement dated April 16, 2025 (as amended from time to time, the "**RSA**"), which provides, among other things, for the Owner, the Contractor, and others to enter into this Contract, and (ii) the Intercreditor Agreement dated April 16, 2025 (as amended pursuant to the terms thereof, the "**Intercreditor Agreement**"), which provides, among other things, for the priority of liens and claims in relation to other liens and claims during the Bankruptcy Cases.

D.       The Owner may request additional services in connection with the Project and the related refining facilities, including the payment of (or reimbursement for) certain invoices described in Exhibit D and fine-tuning, improving, and optimizing the efficiency and quality of ongoing production operations.

E.       The Owner and certain of its affiliates (collectively, the "**Debtors**") have filed for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**," and the filed cases, the "**Bankruptcy Cases**"). In connection with the RSA, (i) the Owner and the Contractor agreed to enter into this Contract and the other Contract Documents (as defined below); (ii) each Debtor

other than the Owner (each, a "**Guarantor**" and collectively with the Owner, the "**Obligors**") agreed to guarantee the Obligations (as defined below); and (iii) the Obligors agreed to grant liens in substantially all of their assets to secure the Obligations.

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows.

Article 1. *The Work.*

1.1     The Contractor shall execute the Work (as defined below).

Article 2. *Date of Commencement and Completion*.

2.1     This Contract will take effect, and the Work will become available, on the date (the "**Effective Date**") that the Bankruptcy Court enters the Interim DIP Order (as defined in the RSA) in form and substance reasonably satisfactory to the Contractor (with the Interim DIP Order and the Final DIP Order, as applicable, being the "**Approval Order**") (i) approving the terms of this Contract and the priority of claims under this Contract (as contemplated by the DIP Orders); (ii) approving the liens securing the Obligations (as defined further below) and their priority (as contemplated by the DIP Orders); (iii) granting and approving waivers and releases, acknowledgments of claims and liens, adequate protection for liens arising before the Bankruptcy Cases (if applicable), and other provisions with respect to goods, services, and other consideration extended by the Contractor to the Owner and its affiliates after the commencement of the Bankruptcy Cases; and (iv) approving debtor-in-possession financing and related matters. For the avoidance of doubt, the Interim DIP Order and the Final DIP Order (as defined in the RSA) satisfy the foregoing criteria and, thus, the Interim DIP Order shall be the Approval Order until it is replaced by the Final DIP Order, whereupon the Final DIP Order will be the Approval Order.

2.2     As used in this Contract, "**Obligations**" means the Contract Sum, all costs (including amounts accruing after the Maturity Date, interest accruing after the filing of any bankruptcy, and interest accruing after the effective date of a plan of reorganization in the Bankruptcy Cases), any amounts expended by the Contractor pursuant to the Contract Documents, liabilities, obligations, covenants and duties of, any Obligor arising under any Contract Document, or otherwise with respect to any costs hereunder, including the Cost of the Work, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising, and including interest and fees that accrue after the commencement by or against any Obligor or any affiliate thereof of any proceeding under any debtor-relief law naming such person as the debtor in such proceeding, regardless of whether such amounts are allowed claims in such proceeding. The Obligations do not include any liabilities or obligations under the Prepetition CTCI Documents.

2.3    The Contractor shall have no obligation to perform Work unless, as of the date of that Work, (i) no Event of Default shall have occurred and be continuing; (ii) the amount of Work requested, together with the aggregate amount of all Work previously performed, does not exceed the total aggregate amount of Work reflected in the Budget through such date; and (iii) the Termination Date has not yet passed.

2.4    The "**Termination Date**" is the earliest to occur of (a) the Maturity Date, (b) the date of the termination of the Work or the acceleration of all of the Obligations under this Contract following the occurrence and continuance of an Event of Default in accordance with Exhibit E, (c) the first business day on which the Approval Order expires by its terms or is terminated, (d) the conversion of any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Contractor, (e) the dismissal of any of the Bankruptcy Cases, unless otherwise consented to in writing by the Contractor, (f) the closing of a sale of all or substantially all of the equity or assets of the Obligors (unless effectuated pursuant to an Approved Plan), (g) the date of payment in full in cash of all Obligations (other than any contingent Obligations that survive the expiration or termination of this Contract) and termination of all of the Work in accordance with the terms herein, and (h) the effective date of any Debtor's Approved Plan, provided that the Termination Date may be extended, with respect to the use of cash collateral, with the prior written consent of the Contractor, and otherwise, with the prior written consent of the Contractor.

2.5    The date of completion of the Work is the date on which the Cost of the Work (which is exclusive of the Contractor's Fee (as defined below)) reaches $75 million. The Contractor shall have no obligation to continue performing Work after this threshold amount has been reached. If the Owner requests additional Work to be performed in excess of such amount, such Work (if consented to by the Contractor) shall be subject to either a separate contract between the parties or a Modification to this Contract, entered into at the sole discretion of the Contractor and with the consent of the Owner.

Article 3. *Contract Sum*.

3.1    The Owner shall, subject to the terms of the RSA and the Approval Order, pay the Contractor the Contract Sum for the Contractor's performance of the Work. The "**Contract Sum**" shall equal the Cost of the Work (which, for the avoidance of doubt, shall not exceed $75,000,000) *plus* the Contractor's Fee, in accordance with Section 3.3, below.

3.2    The Owner shall pay the Contract Sum to the Contractor on the Maturity Date in full and in cash, in U.S. dollars, without deduction, offset, or recoupment, *provided, however*, that if the Maturity Date occurs as a result of the occurrence of the effective date of an Approved Plan, the Contract Sum will be treated as provided in the RSA.

3.2.1   The "**Maturity Date**" is the earliest to occur of (i) the date that is six months after the Petition Date; (ii) the effective date of an Approved Plan; (iii) the date of the termination of the Restructuring Support Agreement; and (iv) the date that the Contractor demands payment after an Event of Default (as defined below) has occurred and is continuing.

3.2.2   An "**Approved Plan**" is a plan of reorganization in the Bankruptcy Cases that provides for treatment of the Obligations and all obligations owed to the Contractor under the Prepetition CTCI Documents as provided in the RSA.

3.2.3   The Owner and the Contractor agree to use reasonable efforts to coordinate with each other regarding the intended tax treatment of this Contract and the Obligations for the purposes of applicable United States federal, state and local tax laws and regulations.

3.3   *Cost of the Work Plus Contractor's Fee.*

3.3.1   The "**Cost of the Work**" is defined in **Exhibit A**.

3.3.2   The "**Contractor's Fee**" is sixteen-and-one-half percent (16.5%) of the Cost of the Work.

Article 4. *Contract Documents*

4.1   Subject to Modifications issued after execution of this Contract, the "Contract Documents" consist of:

4.1.1   This Contract.

4.1.2   Exhibit A, Determination of the Cost of the Work.

4.1.3   Exhibit B, Contractor's Proposal.

4.1.4   Exhibit C, Contractor Hourly Rate Schedule.

4.1.5   Exhibit D, Payment Terms and Procedures.

4.1.6   Exhibit E, Events of Default and Remedies

4.1.7   Exhibit F, Collateral

4.1.8   Exhibit G, Guarantee Terms and Conditions

4.1.9   Exhibit H, Form of RSA.

4.1.10  Exhibit I, Form of Intercreditor Agreement.

4.1.11  Exhibit J, Form of Approval Order.

4.2     The Contract and the additional documents referred to in this Article 4 (and such other documents referenced therein), but excluding the Prepetition CTCI Documents, represent the entire and integrated agreement between the parties hereto and supersede prior negotiations, representations, and agreements, either written or oral (in respect of the subject matter hereof). The Contract may be amended or modified only by a Modification. A "**Modification**" is a written amendment to the Contract signed by the Contractor and each Obligor.

Article 5. *General Provisions.*

5.1     *The Work.* The term "**Work**" means the goods, services, and other consideration that is described as the Contractor's responsibility and required by the Contract Documents (including work on Exhibit B if requested by the Owner and the provision of payments or reimbursements described in Exhibit D), whether completed or partially completed, and includes (if applicable) all other labor, materials, equipment, and services provided or to be provided by the Contractor to fulfill the Contractor's obligations; *provided, however*, the Work shall not require the Contractor to supervise any contractors, suppliers, or subcontractors of the Owner, even if they have been retained or paid by the Contractor, because their supervision shall be fully and solely the responsibility of the Owner. The Work may constitute the whole or a part of the Project or, in the case of the payment (or reimbursement) of the costs and expenses of the Owner or its affiliates described in Exhibit D, the Work may consist of making such payments and reimbursements. The Work will not include payments or reimbursements for the Owner's own overhead, general and administrative expenses, professional fees, payroll and benefits, or upstream and foreign-entity funding.

5.2     *Severability.* The invalidity of any provision of the Contract Documents shall not invalidate the Contract or its remaining provisions. If it is determined that any provision of the Contract Documents violates any law, or is otherwise invalid or unenforceable, then that provision shall be revised to the extent necessary to make that provision legal and enforceable. In such case the Contract Documents shall be construed, to the fullest extent permitted by law, to give effect to the parties' intentions and purposes in executing the Contract.

5.3     *Notice.* Where the Contract Documents require one party to notify or give notice to the other party, such notice shall be provided in writing to the designated representative of the party to whom the notice is addressed and shall be deemed to have been duly served if delivered in person, by registered mail, by courier, or by electronic transmission.

Article 6. *Owner.*

6.1     *Information and Services Required of Owner.*

      6.1.1   Prior to commencement of the Work, at the written request of the Contractor, the Owner shall furnish to the Contractor reasonable evidence

that the Owner has made financial arrangements to fulfill the Owner's obligations under this Contract. The Contractor shall have no obligation to commence the Work until the Owner provides such evidence. The Approval Order shall constitute such evidence.

6.1.2   The Owner shall furnish all other information or services reasonably requested by the Contractor and required by the Contractor for performance of the Work and under the Owner's reasonable control.

6.1.3   The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner.

6.1.4   The Owner shall secure and pay for all permits, fees, and other necessary approvals, easements, assessments, and charges required for the performance of the Work.

6.2   The Owner shall be solely responsible for site security.

Article 7. *Contractor.*

7.1   *Review of Contract Documents and Field Conditions by Contractor.*

7.1.1   The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities.

7.2   *Supervision and Construction Procedures.*

7.2.1   If applicable to the performance of the Contractor's obligations hereunder, the Owner shall supervise, direct, and approve the Work, using its diligent effort to provide skills and attention required. The Contractor shall not be responsible for or have control over construction means, methods, techniques, sequences, and procedures, or for coordinating any or all portions of the Work under the Contract (but the Contractor shall be responsible for making the payments or reimbursements contemplated by Exhibit D).

7.2.2   The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees only to the extent of such employee's bad faith, willful misconduct, or gross negligence.

7.3   *Labor and Materials*. If applicable and necessary to the goods or services to be provided pursuant to this Contract, the Owner may request, and the Contractor may (in its sole and absolute discretion) directly (rather than through subcontractors or suppliers) provide and pay for goods, services, labor, materials, equipment, tools, construction equipment and machinery, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be

6

incorporated in the Work, the costs of which shall be included as part of the Cost of the Work.

7.4 *Warranty.*

    7.4.1 The Owner hereby unequivocally waives all warranties for the Work, including any and all express or implied warranties (including but not limited to warranties of fitness of purpose and merchantability). Products, equipment, systems, or materials incorporated in the Work will be specified and purchased by the Owner and shall be covered exclusively by the warranty of the manufacturer.

    7.4.2 **THE CONTRACTOR MAKES NO WARRANTY WHATSOEVER WITH RESPECT TO THE WORK (WHETHER PERFORMED BY ONE OR MORE OF THE CONTRACTOR, SUBCONTRACTORS, SEPARATE CONTRACTORS, OR ANYONE ELSE), INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER EXPRESS OR IMPLIED BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE.**

7.5 *Permits, Fees, Notices, and Compliance with Laws.*

    7.5.1 Unless otherwise provided in the Contract Documents, the Owner shall secure and pay for the building permit as well as other permits, fees, licenses, and inspections by government agencies necessary for proper execution and completion of the Work.

    7.5.2 The Contractor and the Owner shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities applicable to performance of the Work.

7.6 *Indemnification.* To the fullest extent permitted by law, the Owner shall defend, indemnify, and hold harmless the Contractor and its directors, officers, employees, agents, attorneys, and advisors in respect of any claim or liability arising from or relating to the Contract Documents (but not, for the avoidance of doubt, any claim or liability arising from the CTCI Prepetition Documents); *provided*, that the Contractor is not indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from the Contractor's gross negligence, actual fraud, or willful misconduct.

Article 8. *Construction Administration.*

8.1 No architect has been engaged for this Work. The Owner, with or without the assistance of a consultant at its discretion, will administer this Contract and the Work and, to the extent required for the Work, will engage an architect, engineer, or other design professional.

8.2 As necessary, the Owner will visit the site at intervals appropriate to the stage of any construction to become generally familiar with the progress and quality of the portion of the Work completed, and to determine in general, if the Work observed is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents.

Article 9. *Subcontractors and Separate Contractors.*

9.1 The Contractor shall not enter into subcontracts with subcontractors to perform Work without the Owner's prior written consent.

9.2 Unless otherwise stated in the Contract Documents, the Owner, as soon as practicable after the execution of the Contract, shall notify the Contractor of the subcontractors or suppliers proposed for each of the principal portions of the Work, if any. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

9.3 Contracts between the Contractor and subcontractors shall require each subcontractor, to the extent of the Work to be performed by the subcontractor, to be bound to the Contractor by the terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the subcontractor's work, which the Contractor, by the Contract Documents, assumes toward the Owner.

9.4 The term "**Separate Contractors**" means other contractors retained by the Owner under separate agreements. The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces. The Contractor shall have no responsibility or liability for or with respect to any Separate Contractor. The Owner shall be fully and solely responsible for supervising the contractors, Separate Contractors, subcontractors, its own forces, and others performing any portion of the Work. The Contractor shall have no liability for work performed by Separate Contractors, contractors, or subcontractors, the Owner's own forces, or others, even those engaged or paid by the Contractor.

Article 10. *Changes in the Work.*

10.1 By appropriate Modification, changes in the Work may be accomplished after the execution of the Contract.

10.2 Adjustments in the Contract Sum resulting from a change in the Work shall be determined by mutual agreement of the parties by the Contractor's cost of labor,

material, equipment, and overhead and profit as provided elsewhere in this Contract, unless the parties agree on another method for determining the cost or credit.

10.3    The Contractor shall not be obligated to perform changes in the Work until a Modification has been executed.

Article 11. *Time.* The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

Article 12. *Protection of Persons and Property.*

12.1    *Safety Precautions and Program.* To the extent applicable to the Work, the Owner shall be responsible for initiating and maintaining all safety precautions and programs in connection with the performance of the Contract and the Work, including the work of subcontractors and Separate Contractors. To the extent applicable to the Work, the Owner shall and shall cause all subcontractors and Separate Contractors to take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury, or loss to:

12.1.1  employees on the Work and other persons who may be affected thereby;

12.1.2  the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, or under the care, custody, or control of the Contractor; and

12.1.3  other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation, or replacement in the course of construction.

The Owner shall comply in all material respects with, and give notices required by, applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities bearing on safety of persons and property and their protection from damage, injury, or loss.

12.2    *Hazardous Materials and Substances.*

12.2.1  The Owner is responsible for compliance with the requirements of the Contract Documents (if any) regarding hazardous materials or substances. If the Contractor encounters a hazardous material or substance on the site not addressed in the Contract Documents, and if reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and notify the Owner of the condition. When the material or substance has been rendered harmless by

9

Owner, Work in the affected area shall resume upon written agreement of the Owner and Contractor.

12.2.2  To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, subcontractors, and agents and employees of any of them from and against claims, damages, losses, and expenses, including but not limited to attorneys' fees and expert fees, arising out of or resulting from any and all hazardous materials and substances on or brought onto the Project site, including but not limited to, the performance of the Work in the affected area, if in fact, the material or substance presents the risk of bodily injury or death as described in Section 12.2.1 and has not been rendered harmless, *provided* that such claim, damage, loss, or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself).

12.2.3  If the Contractor is held liable by a government agency for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall reimburse the Contractor for all cost and expense thereby incurred.

Article 13. *Insurance and Bonds*

13.1  *Owner's Insurance.*

13.1.1  *Owner's Liability Insurance.* The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance.

13.1.2  *Property Insurance.* The Owner shall be responsible for purchasing and maintaining the Owner's usual and customary property insurance.

13.1.3  *Other Insurance.* The Owner shall be responsible for purchasing and maintaining all other insurance required by applicable law with respect to the Work.

13.1.4  *Additional Insured.* Subject to the Intercreditor Agreement, the Owner shall cause the Contractor to be named as an additional insured on any insurance policies related to the Work if any of the Work requires Contractor to perform work on the Project Site. In addition, if the Contractor is requested to perform any work on the Project site, the cost of the Contractor's insurance related to such work shall be constitute a Cost of the Work.

Article 14. *Miscellaneous Provisions.*

14.1  *Events of Default and Remedies.* Events of Default, and the Contractor's rights and remedies upon the occurrence of an Event of Default, are set forth in Exhibit E.

14.2 *Collateral for Obligations.* The collateral for the Obligations is described in Exhibit G and defined in the Approval Order.

14.3 *Guaranty by Affiliates.* By executing this Contract, each affiliate of the Owner guarantees the Obligations on the terms and conditions set forth in Exhibit F.

14.4 *Assignment of Contract.* No party to the Contract shall assign the Contract without written consent of the other parties.

14.5 *Governing Law.* The Contract shall be governed by the law of the place where the Project is located, excluding that jurisdiction's choice of law rules. The United Nations Convention on Agreements for the International Sale of Goods shall not apply to this Contract and shall be disclaimed in and excluded from any subcontracts entered into by the Owner in connection with the Work or the Project. The Bankruptcy Court shall have jurisdiction to resolve disputes arising out of or related to this Contract before the date of the confirmation of a plan of reorganization in the Bankruptcy Cases.

14.6 *Tests and Inspections.* Tests, inspections, and approvals of portions of the Work required by the Contract Documents or by applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities shall be made at an appropriate time. Unless otherwise provided, at the request of the Owner, the Contractor may (in its sole an absolute discretion) make arrangements for such tests, inspections, and approvals with an independent testing laboratory or entity and the Owner shall bear all related costs of tests, inspections, and approvals. The Contractor shall give the Owner timely notice of when and where tests and inspections are to be made so that the Owner may be present for such procedures. The Owner shall directly arrange and pay for tests, inspections, or approvals where building codes or applicable laws or regulations so require.

14.7 The Owner's representative:

Antonio D'Amico
Executive Vice President, Chief Administrative Officer, and General Counsel
Global Clean Energy Holdings, Inc.
6451 Rosedale Hwy
Bakersfield, California 93308
antonio.damico@globalcleanenergy.com

14.8 The Contractor's representative:

Yu-Jen Chen
Chairman and CEO
CTCI Americas, Inc.
15721 Park Row, Suite 300
Houston, Texas 77084
todd_chen@ctci.com

14.9     Neither the Owner's nor the Contractor's representative shall be changed without ten (10) days' prior notice to the other party.

14.10   *Waiver.* No action or failure to act by the Owner or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach there under, except as may be specifically agreed in writing.

14.11   *Contractor Obligations.* All of the Contractor's obligations, responsibilities, and liabilities from and after the date hereof related to this Contract, the Work, or the Project site, at any time whatsoever, are exclusively and exhaustively set out in this Contract, the Approval Order, the RSA, the Intercreditor Agreement and the additional documents referred to in Article 4 above.

14.12   *No Liability.* The Contractor and Owner shall not be held liable for or responsible for, and hereby waive claims against each other for, punitive, indirect, incidental, special, or consequential damages including without limitation, liability for loss of use, loss of any existing property, loss of profits, or loss of product or business interruption, however the same may be caused, including the fault or negligence (including without limitation, active, passive, sole, joint or concurrent) of either party, arising out of or relating to this Contract.

14.13   *Representations and Warranties.* Each Obligor represents and warrants, as of the date hereof, to the Contractor that the representations and warranties set forth in Article III of the DIP TL CA are true and correct in all material respects.

14.14   *Covenants.* Articles V and VI of the DIP TL CA (as defined in Exhibit E) are hereby incorporated herein, mutatis mutandis, for the benefit of the Contractor, it being agreed that references therein to the "DIP Term Loan Agent" and the "Secured Parties" shall be deemed to refer to the Contractor for the purposes of this Section 14.14.

14.15   *Budget.* The "**Budget**" means the then most current budget prepared by the Owner and approved by the Contractor in accordance with this Contract (it being acknowledged and agreed that the budget attached to the Interim DIP Order is approved by and satisfactory to the Contractor and is and shall be the Budget unless and until replaced in accordance with terms of this Contract.

   14.15.1  Section 5.20 of the DIP TL CA (as defined in Exhibit E) is hereby incorporated herein, *mutatis mutandis*, for the benefit of the Contractor, it being agreed that references therein to the "DIP Term Loan Agent" and the "Secured Parties" shall be deemed to refer to the Contractor for the purposes of this Section 14.15.1.

   14.15.2  Section 6.18 of the DIP TL CA (as defined in Exhibit E) is hereby incorporated herein, *mutatis mutandis*, for the benefit of the Contractor, it being agreed that references therein to the "DIP Term Loan Agent" and

the "Secured Parties" shall be deemed to refer to the Contractor for the purposes of this Section 14.15.2.

14.16   *Payment of Contractor's Professional Expenses.* In addition to the Cost of the Work, the Owner shall pay the Contractor's professional fees incurred during the Bankruptcy Cases as provided in the DIP Order.

14.17   *Information Rights.* The Owner shall deliver to the Contractor all Reporting Deliverables (as defined in the DIP TL CA) as and when they are delivered by or with respect to any Debtor to the DIP Term Loan Agent (as defined in the DIP TL CA), and the Contractor shall have the same rights to request Reporting Deliverables from the Debtors as the DIP Term Loan Agent under the DIP TL CA.

<div align="center">* * *</div>

IN WITNESS WHEREOF, the parties to this Contract have executed this Contract with the intention of being bound thereby.

**Bakersfield Renewable Fuels, LLC**

By _____

Its _____


**CTCI Americas, Inc.**

By _____

Its _____

GUARANTORS:

1.　　　BKRF OCP, LLC, a Delaware limited liability company

2.　　　Global Clean Energy Holdings, Inc., a Delaware corporation

3.　　　BKRF HCB, LLC, a Delaware limited liability company

4.　　　BKRF HCP, LLC, a Delaware limited liability company

5.　　　BKRF OCB, LLC, a Delaware limited liability company

6.　　　GCE Holdings Acquisitions, LLC, a Delaware limited liability company

7.　　　GCE International Development, LLC, a Delaware limited liability company

8.　　　GCE Operating Company, LLC, a Delaware limited liability company

9.　　　GCEH CS Acquisitions, LLC, a Delaware limited liability company

10.　　GCEH Ventures, LLC, a Delaware limited liability company

11.　　Global Clean Energy Texas, LLC, a Delaware limited liability company

12.　　Rosedale FinanceCo LLC, a Delaware limited liability company

13.　　Sustainable Oils, Inc., a Delaware corporation

14.　　Agribody Technologies, Inc., a Delaware corporation


By: _____

Name: [●]

Authorized Signatory

**EXHIBIT A**
**DETERMINATION OF THE COST OF THE WORK; PAYMENT**
**PROCEDURES**

<u>Cost of the Work</u>. The Cost of the Work is equal to the sum of (i) all amounts actually paid by the Contractor to subcontractors, suppliers, and others (or reimbursement of such amounts paid by the Owner) pursuant to the Payment Procedures (as defined in Exhibit D), (ii) all out-of-pocket costs incurred by the Contractor in connection with such payments, including but not limited to transportation, permits, licenses, royalties, taxes (including sales, use, grow receipts, value added or similar taxes), except to the extent that such costs are paid directly by the Owner, and (iii) out-of-pocket costs, if any, incurred by the Contractor, in each of the cases of clauses (ii) and (iii), relating to the Work. The Cost of the Work does not include the Contractor's Fee.

**EXHIBIT B**
**CONTRACTOR'S PROPOSAL**

[see attachment]

Exhibit B

# Scope of Work

## 1. Purpose

The purpose of this Scope of Work ("SOW") is to define the role of **CTCIA** in supporting **Bakersfield Renewable Fuels, LLC ("BKRF")** at the **Bakersfield Renewable Fuels Facility ("BRF")** with focused services to complete the Project, including to fine-tune, improve, and optimize the efficiency and quality of ongoing production operations.

CTCIA's role is strictly supportive and does not include operational control. All plant operations remain under the sole responsibility and authority of BKRF.

## 2. General Description

CTCIA may provide technical, logistical, and manpower support to assist BKRF in:

- Finalizing Work to achieve final completion

- Improving unit performance

- Enhancing system reliability

- Optimizing product quality (e.g. Renewable Diesel, Naphtha, Propane, Butane, and Fuel Gas)

- Increasing production efficiency through equipment tuning and process adjustments

All activities will be performed under the direction of BKRF operations leadership and in accordance with applicable facility procedures and regulatory standards.

## 3. Scope Boundaries

Support activities will apply to the process and utility systems within the BRF battery limits, including:

- **Feedstock Receiving & Storage Systems** (Unit 70)

- **Hydrogen Plant** (Unit 20)

- **Hydroprocessing Unit** (Unit 21)

- **Gas Plant** (Unit 24)

- **Finished Products Storage & Loading** (Unit 71)

## 4. Scope of Work. The scope of work may include the following (subject to mutual agreement of CTCIA and BKRF)

### A. Technical Support

- Support process troubleshooting and system analysis to identify performance bottlenecks and inefficiencies.

- Assist in the execution of operational tests to improve unit throughput, yields, and energy utilization.

- Provide engineering input on adjustments to process parameters and equipment operating conditions to enhance product quality.

### B. Operational Support

- Supply qualified field personnel (e.g., mechanical, electrical, I&C) through the subcontractors to assist BKRF in implementing system improvements.

- Assist in the tuning of control systems and instrumentation under BKRF supervision.

- Support the execution of temporary system modifications or optimizations as directed by BKRF.

- Engage  manpower for the maintenance support for the Plant.

### C. Subcontractor and Vendor Coordination

- Source, engage specialty subcontractors and vendor support for performance improvement initiatives.

- Schedule third-party efforts related to inspections, calibrations, and vendor-specified optimization programs.

### D. Material, Procurement and Logistics Support

- Procure and deliver materials (including feedstock and operating supplies), equipment, tools, consumables, and chemicals necessary to execute tuning and optimization efforts.

- Engage subcontractors  related to temporary rentals, scaffolding, specialty equipment, and site mobilization.

- Procure required materials, equipment, and logistical resources necessary to execute fine-tuning and optimization activities, including but not limited to:

  - **Feedstock**: Refined, Bleached, and Deodorized Soybean Oil and other feedstock

  - **Chemicals:** Dimethyl Disulfide (DMDS), Methyl Diethanolamine (MDEA)

  - **Utilities, Operating Consumables, and Test Equipment:** Including steam, nitrogen, instrument air, lubricants, calibration gases, filters, cleaning agents, and portable testing instruments as required to support ongoing plant optimization work.

Specific amounts and specifications for procurement of goods and services are to be agreed by the parties.

## 5. Responsibility and Limitations

- CTCIA shall act **solely in a support capacity**, with no authority or responsibility for operations, product custody, or regulatory compliance, .

- BKRF shall remain the **Owner and Operator of the BRF facility**, and shall retain full control over all decisions, operations, and production outcomes.

- CTCIA's support services are limited to the scope herein and shall not extend beyond performance enhancement, unless separately agreed in writing.

3

**EXHIBIT C**
**CONTRACTOR HOURLY RATE SCHEDULE**

[see attachment]

## EXHIBIT C – HOURLY RATES

Proposal for Project Management, Procurement, Maintenance Support Services

Submitted by: CTCI Americas, Inc. ("Contractor")

To: Bakersfield Renewable Fuels, LLC ("Owner")

### 1.  RATES

The contract Hourly Rates for the contractor's personnel performing work are set forth below. The rates set forth herein shall remain fixed until the end of each year and be adjusted (cost escalation) 3% annually.  The rates do not include 16.5% of overhead and profit and shall be paid additionally.

### 2.  TABLE

| HOME OFFICE REIMBURSABLE RATE SCHEDULE | | |
|---|---|---|
| **Description** | **ST Hourly Rate** | **OT Hourly Rate** |
| **PROJECT MANAGEMENT** | | |
| Project Director | $260 | $260 |
| Project Manager | $245 | $245 |
| Project Engineer | $160 | $160 |
| Administrative Assistant | $103 | $140 |
| | | |
| **ENGINEERING** | | |
| Principle, Process Engineer | $251 | $251 |
| Principle, Civil/Structural Engineer | $201 | $201 |
| Principal, Mechanical Engineer | $194 | $194 |
| Principle, Instrument & Electrical Engineer | $194 | $194 |
| Process Engineer | $168 | $168 |
| Civil/Structural Engineer | $175 | $175 |
| Mechanical Engineer | $175 | $175 |
| Instrument & Electrical Engineer | $175 | $175 |
| Piping Engineer | $175 | $175 |
| | | |
| **DRAFTING** | | |
| Design Supervisor | $207 | $207 |
| Lead Designer | $194 | $194 |
| Piping Designer | $168 | $168 |
| Civil/Structural Designer | $168 | $168 |

## HOME OFFICE REIMBURSABLE RATE SCHEDULE

|  | | ST Hourly Rate | OT Hourly Rate |
|---|---|---|---|
|  | Electrical Designer | $168 | $168 |
|  | Instrument & Control Designer | $168 | $168 |
|  | | | |
| **ESTIMATING AND PROJECT CONTROL** | | | |
|  | Manager, Estimating | $210 | $210 |
|  | Estimator | $194 | $194 |
|  | Project Controls Manager | $210 | $210 |
|  | Cost Specialist | $155 | $155 |
|  | Scheduling Specialist | $155 | $155 |
|  | | | |
| **PROJECT SERVICES** | | | |
|  | Project Accountant | $129 | $129 |
|  | Document Control | $116 | $116 |

## FIELD REIMBURSABLE RATE SCHEDULE

| Description | | ST Hourly Rate | OT Hourly Rate |
|---|---|---|---|
| **CONSTRUCTION** | | | |
|  | Construction Manager | $200 | $200 |
|  | Construction Engineer | $180 | $180 |
|  | Field Contract Manager | $180 | $180 |
|  | Materials Controller | $122 | $122 |
|  | Safety Manager | $171 | $171 |
|  | Mechanical Inspector | $152 | $152 |
|  | Electrical Inspector | $152 | $152 |
|  | Material Expeditor | $118 | $118 |
|  | Shipping Coordinator | $118 | $118 |
|  | Pre-Commissioning Engineer | $165 | $165 |
|  | Construction Supervisor | $165 | $165 |
|  | HSE Coordinator | $140 | $140 |
|  | Manager, Procurement | $178 | $178 |
|  | Buyer | $140 | $140 |
|  | Expeditor | $127 | $127 |
|  | Freight Coordinator | $127 | $127 |
|  | Subcontracts Manager | $171 | $171 |
|  | Manager QA/QC | $184 | $184 |

**EXHIBIT D**
**PAYMENT TERMS AND PROCEDURES**

The performance by the Contractor of the Work described herein is subject to the satisfaction of each condition to the Work in Article 2 of the Contract.

Subject to the occurrence of the Effective Date and the explicit conditions to performing the Work (including the payment or reimbursement of amounts as described in this Exhibit D) set forth in this Contract, the Contractor agrees that it has an obligation to fund amounts pursuant to the Contract and this Exhibit D for the Cost of the Work up to $75,000,000.

For purposes of paragraphs 2–6 below, the Contractor acknowledges and agrees that it will promptly cause each such Subcontractor or Supplier (including, for the avoidance of doubt, Vitol (as defined below) to the extent Vitol is not registered as of the date hereof) paid pursuant to each paragraph to be registered in the Contractor's system so as to be able to make payments in accordance with the Budget. The parties will reasonably cooperate in providing documents and other information necessary to enable the payments and reimbursements described below, and Contractor shall reasonably cooperate to register vendors, including Vitol, in the Contractor's supplier system.

## 1.    Payment Procedures.

The Owner shall provide 5 business days' notice to the Contractor (or such shorter period as the Contractor may agree) of a request by the Owner to provide for payment to a subcontractor (a "**Subcontractor**") or supplier (a "**Supplier**") of goods or services or for reimbursement of payments made by the Owner to a Subcontractor or Supplier. The notice to the Contractor shall include an invoice from the Subcontractor or Supplier (or other mutually agreed form of request for payment) (the "**Subcontractor/Supplier Invoice**"). In connection with a request for direct payment to a Subcontractor or Supplier, before providing such notice to the Contractor, the Subcontractor or Supplier shall have signed an acknowledgment in a form reasonably acceptable to the Contractor providing, among other things, that the Contractor is not liable to such Subcontractor or Supplier.

Within 2 business days of receipt of a Subcontractor/Supplier Invoice, the Contractor will provide an invoice (the "**Contractor's Invoice**") showing the Cost of the Work and the Contractor's Fee (in each case with respect to such Contractor's Invoice) to the Owner. The Contractor will pay the Subcontractor/Supplier Invoice, or reimburse the Owner with respect to the Subcontractor/Supplier Invoice, within 2 business days of receipt from the Owner of an acknowledgment ("**Owner's Acknowledgment**") confirming the Owner's request that the Contractor pay, or reimburse the Owner with respect to, the Subcontractor/Supplier Invoice and that that upon such payment or reimbursement by the Contractor, the amount of the Contractor's Invoice (exclusive of the Contractor's Fee) will be added to the Cost of the Work and the Contractor's Fee will be added to the Contract Sum. The parties will separately track the Cost of the Work and the Contractor's Fee.

"**Payment Procedures**" means the payment procedures set forth in this paragraph 1.

## 2.     Outstanding Pre-Petition Invoices

Subject to the Owner's compliance with the Payment Procedures and the last sentence of this paragraph 2, the Owner may request payment for goods delivered and services rendered by a Subcontractor or Supplier before the Petition Date (as defined in the RSA) by preparing and delivering invoices to the Contractor with supporting documentation and the Contractor shall pay such invoiced amounts on behalf of the Owner (or reimburse the Owner for such invoiced amounts) within two business days of the receipt thereof of the Owner's Acknowledgement. Each Subcontractor or Supplier paid pursuant to this paragraph must be registered in the Contractor's system, there must be a purchase order or other agreement setting forth the terms of the agreement for the provision of the goods or services, and there must be one or more invoices supporting the request for payment.

## 3.     Reimbursement for Invoices Paid by the Owner Before the Petition Date

Subject to the Owner's compliance with the Payment Procedures and the last sentence of this paragraph 3, the Owner may request reimbursement for payments made by the Owner for goods delivered and services rendered by a Subcontractor or Supplier before the Petition Date (as defined in the RSA). Each Subcontractor or Supplier paid pursuant to this paragraph must be registered in the Contractor's system, there must be a purchase order or other agreement setting forth the terms of the agreement for the provision of the goods or services, and there must be one or more invoices supporting the request for payment.

## 4.     Subcontractors

Subject to the Owner's compliance with the Payment Procedures and the last sentence of this paragraph 4, the Owner may request that the Contractor enter into an agreement with a Subcontractor pursuant to which the Contractor will be responsible for paying the Subcontractor (but will not be responsible for the delivery of work, the quality of work delivered, or the supervision of the subcontractor) for services rendered after the Petition Date and the Contractor shall pay any such amounts owed as and when they become due. Each such agreement shall not impose any obligation on the Contractor other than the obligation to make payment when due. All such payments made pursuant to agreements between the Contractor and Subcontractors shall be added to the Cost of the Work. The Subcontractor must be registered as a contractor in the Contractor's supplier system, there must be a purchase order or other agreement setting forth the terms of the agreement, and there must be one or more invoices supporting requests for payment by such subcontractor.

### 5.       Vitol Americas Corp. and its Affiliates

The Owner purchases feedstock for the Project from Vitol Americas Corp. ("**Vitol**") pursuant to a Supply and Offtake Agreement, dated as of June 25, 2024 (as amended, the "**Vitol Agreement**"). In connection with the Vitol Agreement, the Owner confirms purchase agreements (each, a "**Purchase Agreement**" pursuant to which the Owner agrees to purchase feedstock for the Project. Subject to the Owner's compliance with the Payment Procedures, the Owner may request that the Contractor take an assignment of and assume certain payment obligations of the Owner to Vitol under a Purchase Agreement. Such assignment and assumption will be evidenced by an agreement in a form reasonably acceptable to the Owner, the Contractor, and Vitol.

In the case of invoices issued by Vitol pursuant to a Purchase Agreement that have not been satisfied pursuant to draws on the Owner's revolving credit facility with Vitol, the Contractor will pay the amount due on such invoices to Vitol. Such invoices will be stamped "Assigned to CTCI Americas, Inc. by Bakersfield Renewable Fuels, LLC" or similar language before they are submitted to the Contractor. Any such stamp will not relieve the Owner of any liability to Vitol.

In the case of invoices issued by Vitol pursuant to a Purchase Agreement that have been satisfied pursuant to the Owner's revolving credit facility with Vitol, the Contractor will pay the amount of the satisfied invoice through the revolving credit facility with Vitol to the Owner. In connection with its request to the Contractor for reimbursement of each Vitol invoice, the Owner will generate an invoice to the Contractor and include a copy of the Vitol invoice that has been paid. Notwithstanding the foregoing, there will only be a single payment to Vitol or satisfaction of each invoice.

The Owner acknowledges that Vitol must be registered as a vendor in the Contractor's supplier system prior to the making of any payments under this paragraph 5. Any transactions involving Vitol will be subject to the requirements of this paragraph 5.

### 6.       Other Suppliers

Subject to the Owner's compliance with the Payment Procedures in paragraph 1 and the last sentence of this paragraph 6, the Owner may also request that the Contractor enter into an agreement with a Supplier pursuant to which the Contractor will be responsible for paying the Supplier for goods or services provided after the Petition Date (but will not be responsible for the Supplier's performance under that agreement) and the Contractor shall pay any such amounts owed as and when they become due. Each such agreement shall not impose any obligation on the Contractor other than the obligation to make payment when due. All such payments made pursuant to agreements between the Contractor and Suppliers shall be added to the Cost of the Work. The Supplier must be registered as a contractor in the Contractor's supplier system, there must be a purchase order or other agreement setting forth the terms of the agreement, and there must be one or more invoices supporting requests for payment by such Supplier.

**EXHIBIT E**

**EVENTS OF DEFAULT AND REMEDIES**

1.    Each of the following is an "**Event of Default**" under this Contract.

    1.1.    any Obligor fails to pay the Contractor any required payment (including without limitation the Contract Sum) when and as due and payable and such failure has not been cured within 5 business days; it being understood that any such payments shall be made in accordance with and subject to the terms of this Contract, the Approval Order and the Intercreditor Agreement;

    1.2.    an "Event of Default" (as defined in that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement) (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms of the Intercreditor Agreement, the "**DIP RCF CA**") by and among the Owner, affiliates of the Owner, Vitol Americas Corp., as administrative agent and collateral agent, and the lenders party thereto has occurred and is continuing and has led to the acceleration of the outstanding principal thereunder;

    1.3.    an "Event of Default" (as defined in that certain Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement) (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms of the Intercreditor Agreement, the "**DIP TL CA**") by and among Global Clean Energy Holdings, Inc. ("**GCEH**"), affiliates of GCEH, Orion Energy Partners TP Agent, LLC, as administrative agent and collateral agent, and the lenders party thereto from time to time) has occurred and is continuing and has led to the acceleration of the outstanding principal thereunder;

    1.4.    any representation or warranty made by or deemed made by any Obligor in any Contract Document, or in any certificate or other document furnished by or on behalf of such Obligor pursuant to the Contract Documents, shall prove to have been incorrect in any material respect as of the time made or deemed made, confirmed, or furnished;

    1.5.    any Obligor shall fail to observe or perform any covenant, condition, or agreement in any Contract Document and such failure shall continue unremedied for a period of thirty (30) days; provided that, if (A) such failure is not reasonably susceptible to cure within such thirty (30) days, (B) the Owner is proceeding with diligence and good faith to cure such failure and such failure is susceptible to cure and (C) the existence of such failure has not resulted in a material adverse effect on the Owner, such thirty (30) day period shall be extended as may be necessary to cure such

failure, such extended period not to exceed ninety (90) days in the aggregate (inclusive of the original thirty (30) day period);

1.6.   the Approval Order, together with the Contract Documents, shall cease to create a valid and perfected lien on the collateral with such priority required by the RSA;

1.7.   any Contract Document (a) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)), or the enforceability thereof shall be challenged in writing by any Debtor, (b) ceases to provide (to the extent permitted by law and to the extent required by the Contract Documents) lien on the assets purported to be covered thereby in favor of the Contractor in accordance with the DIP Orders and subject to the Intercreditor Agreement, free and clear of all other liens (other than liens permitted by the Contract Documents), including the liens contemplated by the RSA or the DIP Orders, or (c) becomes unlawful or is declared void;

1.8.   any authorization necessary for the execution, delivery and performance of any material obligation under the Contract Documents is terminated or ceases to be in full force or is not obtained, maintained, or complied with, unless such failure could not reasonably be expected to result in a material adverse effect on any Obligor or is remedied within ninety (90) days; or

1.9.   the Approval Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed or modified without the prior written consent of the Contractor;

1.10.   except as provided in the Approval Order and subject to the Carve-Out (as defined in the Approval Order) and the DIP RCF CA and the SOA and SSA referenced in the DIP RCF CA (but only, in each case, to the extent set forth in the Approval Order), the Bankruptcy Court's granting in any of the Bankruptcy Cases, or the entering of an order that authorizes or approves, the incurrence of any super-priority claim or any lien (including any adequate protection lien) on any collateral securing the Obligations that is pari passu with or senior to the claims or liens of the Contractor (or the submission of any request by a Debtor seeking, consenting to or otherwise supporting such action);

1.11.   the Debtors engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the Contract Documents, the Prepetition CTCI Documents or the liens on or security interest in the assets of the Debtors securing the Obligations, including requests to equitably subordinate or avoid the liens securing the Obligations;

1.12.   the Debtors engage in or support any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against the Contractor; *provided*, however, that it shall not constitute an Event of Default if any Debtor provides information with respect to the Prepetition CTCI Documents to a party in interest or is compelled to provide information by an order of the Bankruptcy Court;

1.13.   after entry of the Approval Order on a final basis, the entry of any final order in the Bankruptcy Case charging any of the Contractor's collateral that secures the Obligations in a manner that is adverse to the Contractor or its rights and remedies under the Contract Documents in the Bankruptcy Cases;

1.14.   the consummation of any sale or other disposition of all or a material portion of the Contractor's collateral (other than in ordinary course of business that is contemplated by the Budget) without the advance written consent of the Contractor, in each case if such sale or other disposition does not satisfy the Obligations in full in cash at the consummation of such sale or disposition;

1.15.   except with respect to the Debtor prior to the entry of the Approval Order on a final basis, any Person shall obtain a final and nonappealable judgment under section 506(a) of the Bankruptcy Code, or a similar determination, with respect to the Contractor's claims under the Prepetition CTCI Documents;

1.16.   the confirmation of a plan of reorganization or liquidation that does not provide for treatment of the Contractor and its liens and claims that is in accordance with the RSA;

1.17.   the entry of an order by the Bankruptcy Court (i) sustaining an objection to claims of the Contractor against one or more Debtors or (ii) avoiding any liens held by the Contractor with respect to any property of any Debtor;

1.18.   the failure of any Debtor to comply with the terms of the Approval Order;

1.19.   any Debtor shall contest the validity or enforceability of the Approval Order or deny that it has further liability thereunder;

1.20.   except as otherwise provided in 1.13 and 1.15 of this Exhibit E, any Debtor shall attempt to invalidate or otherwise impair claims of the Contractor or liens granted to the Contractor;

1.21.   any Debtor's consensual use of prepetition cash collateral is terminated;

1.22.   the Bankruptcy Court enters an order terminating the use of cash collateral; or

1.23.   the provisions of the Intercreditor Agreement shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect, or any Obligor shall contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations for any reason shall not have the priority contemplated by this Contract or the Intercreditor Agreement.

2.   Upon the occurrence of one or more Events of Default (as defined above), and in every such event, and at any time thereafter during the continuance of such event, but subject to the Intercreditor Agreement and the DIP Orders, the Contractor may take any or all of the following actions, at the same or different times, without order of or application to the Bankruptcy Court:

2.1.   terminate the Work and payment or reimbursement of costs therefor, and thereupon the Work and all such payments and reimbursements shall terminate immediately;

2.2.   declare the Contract Sum then outstanding to be due and payable in whole (or in part, in which case any amount not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the Contract Sum so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations of the Obligors accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Obligors; and

2.3.   enforce the liens and security interests that secure the Obligations and take any other action or exercise any other right or remedy (including without limitation, with respect to the liens in favor of the Contractor) available under the Contract Documents and applicable law.

**EXHIBIT F**

**COLLATERAL**

1.      Each Obligor, for good and valuable consideration, hereby grants and pledges to the Contractor a continuing security interest in its presently existing and hereafter acquired or arising Collateral (as defined below) to secure prompt repayment of any and all Obligations and to secure prompt performance by each Obligor of its covenants and duties under the Contract Documents. Such security interest constitutes a valid security interest in the presently existing Collateral and will constitute a valid security interest in later-acquired Collateral. Notwithstanding any termination of this Contract or any filings undertaken related to the Contractor's rights under the Bankruptcy Code, the Contractor's lien on the Collateral shall remain in effect for so long as any Obligations are outstanding. As used herein, "**Collateral**" means the "DIP Collateral" as defined in the Interim DIP Order and the Final DIP Order, as applicable (each as defined in the RSA).

2.      The obligations of the Obligors under this Exhibit F are made solely to the extent and manner set forth in, and are subject to the terms and conditions of, the Approval Order.

**EXHIBIT G**

**GUARANTY**

1.    *Guaranty.*

1.1.    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor jointly and severally, hereby unconditionally and irrevocably guarantees the full and punctual payment and performance (whether at stated maturity, upon acceleration or otherwise) of all Guaranteed Obligations, in each case as primary obligor and not merely as surety and with respect to all such Guaranteed Obligations howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. This is a guaranty of payment and not merely of collection. As used herein, "**Guaranteed Obligations**" means the Obligations whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Obligor or any affiliate thereof of any proceeding under any debtor relief law naming such person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. For the avoidance of doubt, the Guaranteed Obligations do not include obligations under the Prepetition CTCI Documents.

1.2.    All payments made by the Guarantors shall be payable in the manner required for payments by the Owner under the Contract Documents.

1.3.    Any term or provision of this guaranty to the contrary notwithstanding the aggregate maximum amount of the Guaranteed Obligations for which any Guarantor shall be liable under this guaranty shall not exceed the maximum amount for which such Guarantor can be liable without rendering this guaranty or any other Contract Document, as it relates to such Guarantor void or voidable under applicable law relating to fraudulent conveyance or fraudulent transfer.

2.    *Guaranty Unconditional.* The Guaranteed Obligations shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

2.1.    any extension, renewal, settlement, compromise, waiver or release in respect of any obligations of the Owner or any Guarantor by operation of law or otherwise (other than with respect to any such extension, renewal, settlement, compromise, waiver or release agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations);

2.2.    any modification or amendment of or supplement to this Contract or any other Contract Document (other than with respect to any modification,

amendment or supplement agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations);

2.3.    any release, impairment, non-perfection or invalidity of any Collateral;

2.4.    any change in the corporate existence, structure or ownership of any Obligor;

2.5.    the existence of any claim, set-off or other rights that the Guarantors may have at any time against any Obligor, the Contractor or any other person, whether in connection herewith or with any unrelated transactions;

2.6.    any invalidity or unenforceability relating to or against any Obligor for any reason of any Contract Document, or any provision of applicable law purporting to prohibit the performance by any Obligor of any of its obligations under the Contract Documents (other than any such invalidity or unenforceability with respect solely to the Guaranteed Obligations); or

2.7.    any other act or omission to act or delay of any kind by any Obligor, Contractor or any other person or any other circumstance whatsoever that might, but for the provisions of this Section, constitute a legal or equitable discharge of the obligations of any Obligor under the Contract Documents.

3.    *Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances*. The Guaranteed Obligations shall remain in full force and effect until all of Owner's obligations under the Contract Documents shall have been paid or otherwise performed in full. If at any time any payment made under this Contract or any other Contract Document is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, reorganization or similar event of any Obligor or any other person or otherwise, then the Guaranteed Obligations with respect to such payment shall be reinstated at such time as though such payment had been due but not made at such time.

4.    *Waiver by the Guarantors*.

4.1.    Each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law: (i) notice of acceptance of the guaranty and notice of any liability to which this guaranty may apply, (ii) all notices that may be required by applicable law or otherwise to preserve intact any rights of Contractor against any Obligor, including any demand, presentment, protest, proof of notice of non-payment, notice of any failure on the part of any Obligor to perform and comply with any covenant, agreement, term, condition or provision of any agreement and any other notice to any other party that may be liable in respect of the Guaranteed Obligations (including any Obligor) except any of the foregoing as may be expressly required hereunder, (iii) any right to the enforcement, assertion or exercise by Owner of any right, power, privilege or remedy conferred upon such person under the Contract Documents or otherwise and (iv) any

requirement that Owner exhaust any right, power, privilege or remedy, or mitigate any damages resulting from a default, under any Contract Document, or proceed to take any action against any Collateral or against any Obligor or any other person under or in respect of any Contract Document or otherwise, or protect, secure, perfect or ensure any lien on any Collateral.

4.2.    The Owner and each holder of any Guaranteed Obligations may demand payment of, enforce and recover from each Guarantor or any other person obligated for any or all of such Guaranteed Obligations in any order and in any manner whatsoever, without any requirement that the Owner or such holder seek to recover from any particular Guarantor or other person first or each Guarantor or other persons pro rata or on any other basis.

5.    *Subrogation*. Upon any Guarantor making any payment, such Guarantor, as applicable, shall be subrogated to the rights of the payee against the Owner with respect to such obligation; *provided* that no Guarantor shall enforce any payment by way of subrogation, indemnity, contribution or otherwise, or exercise any other right, against any other Obligor (or otherwise benefit from any payment or other transfer arising from any such right) so long as any obligations under the Contract Documents (other than on-going but not yet incurred indemnity obligations) remain unpaid and/or unsatisfied.

6.    *Acceleration*. All amounts subject to acceleration under this Contract shall be payable by the Guarantors hereunder immediately upon demand by the Owner.

**EXHIBIT H**

**FORM OF RSA**

[Attached]

**EXHIBIT I**

**FORM OF INTERCREDITOR AGREEMENT**

[Attached]

*Proposed Final Version*

**INTERCREDITOR AGREEMENT**

dated as of April [\_\_], 2025

among

VITOL AMERICAS CORP.,

as RCF Representative,

ORION ENERGY PARTNERS TP AGENT, LLC,

as Term Loan Representative,

THE TERM LOAN CREDITORS PARTY HERETO FROM TIME TO TIME,

CTCI AMERICAS, INC.,

and

THE LOAN PARTIES PARTY HERETO FROM TIME TO TIME

# TABLE OF CONTENTS

**SECTION 1.**   Definitions; Rules of Construction ................................................................2

    1.1   UCC Definitions ........................................................................................2
    1.2   Defined Terms ...........................................................................................2
    1.3   Rules of Construction ................................................................................9
    1.4   Divisions ..................................................................................................10

**SECTION 2.**   Lien Priority; Certain Perfection Matters ....................................................10

    2.1   Liens and Subordination ..........................................................................10
    2.2   Prohibition on Contesting Liens ..............................................................11
    2.3   Nature of Obligations ...............................................................................11
    2.4   No New Liens ...........................................................................................11
    2.5   Separate Classification .............................................................................12
    2.6   Agreements Regarding Actions to Perfect Liens ....................................12

**SECTION 3.**   Enforcement Rights.......................................................................................13

    3.1   Exclusive Enforcement ............................................................................13
    3.2   Standstill and Waivers .............................................................................13
    3.3   Cooperation; Sharing of Information and Access.....................................14
    3.4   (Reserved) ................................................................................................15
    3.5   Actions Upon Breach ...............................................................................15
    3.6   Loan Party Consent ..................................................................................15

**SECTION 4.**   Application of Proceeds; Releases of Lien ...................................................15

    4.1   Application of Proceeds ...........................................................................15
    4.2   Releases of Liens .....................................................................................17
    4.3   Inspection Rights and Insurance; Certain Real Property Notices ............18

**SECTION 5.**   Insolvency Proceedings.................................................................................18

    5.1   Filing of Motions .....................................................................................18
    5.2   Financing Matters ....................................................................................19
    5.3   Relief From the Automatic Stay ..............................................................19
    5.4   Plan of Reorganization ............................................................................19

**SECTION 6.**   Amendments to and Refinancings of DIP Documents ...................................19

**SECTION 7.**   Purchase Option ............................................................................................20

    7.1   Notice of Exercise ...................................................................................20
    7.2   Purchase and Sale ....................................................................................20
    7.3   Payment of Purchase Price.......................................................................21
    7.4   Documentation; Limitation on Representations and Warranties ..............21

**SECTION 8.**      Reliance; Waivers; etc................................................................................21

    8.1    Reliance......................................................................................................21
    8.2    No Warranties or Liability........................................................................21
    8.3    No Waivers.................................................................................................21

**SECTION 9.**      Obligations Unconditional ...........................................................................22

**SECTION 10.**    (Reserved) ....................................................................................................22

**SECTION 11.**    Miscellaneous...............................................................................................22

    11.1    Rights of Subrogation ................................................................................22
    11.2    Further Assurances.....................................................................................22
    11.3    Conflicts.....................................................................................................23
    11.4    Continuing Nature of Provisions ...............................................................23
    11.5    Amendments; Waivers................................................................................23
    11.6    Information Concerning Financial Condition of the Loan Parties.............23
    11.7    Governing Law ..........................................................................................23
    11.8    Submission to Jurisdiction; JURY TRIAL WAIVER ..............................23
    11.9    Notices .......................................................................................................24
    11.10    Successors and Assigns..............................................................................24
    11.11    Headings ....................................................................................................24
    11.12    Severability ................................................................................................25
    11.13    Other Remedies .........................................................................................25
    11.14    Counterparts; Integration; Effectiveness...................................................25
    11.15    Additional Loan Parties .............................................................................25
    11.16    Electronic Signatures .................................................................................25
    11.17    Prepetition Intercreditor Agreement .........................................................25

**SECTION 12.**    Term Loan Intercreditor Matters....................................................................25

    12.1    Appointment of Term Loan Representative ...............................................25
    12.2    Pari Passu Ranking ....................................................................................26
    12.3    Voting Matters ...........................................................................................26

## INTERCREDITOR AGREEMENT

This Intercreditor Agreement (this "Agreement"), dated as of April [__], 2025, is made by and among VITOL AMERICAS CORP., in its personal capacity ("Vitol") and in its capacity as DIP RCF Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "RCF Representative") for the other RCF Secured Parties (as defined below), ORION ENERGY PARTNERS TP AGENT, LLC, in its capacity as DIP Term Loan Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "Term Loan Representative") for the Term Loan Creditors (as defined below), the Term Loan Creditors (as defined below) party hereto, CTCI AMERICAS, INC. ("CTCI"), in its capacity as the provider of goods, services, and other consideration under the DIP CTCI Agreement (as defined below) and the Loan Parties listed on the signature pages hereto (each a "Loan Party" and collectively, the "Loan Parties").

WHEREAS, Global Clean Energy Holdings, Inc. ("Holdco Borrower") and its subsidiaries (including the other Loan Parties) have commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") on April [__], 2025 and continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Bankruptcy Court entered the Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Credit, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Parties; (III) Modifying Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief on April [__], 2025 (the "Interim DIP Order");

WHEREAS, Holdco Borrower, the other Loan Parties, the Term Loan Representative and certain financial institutions and other entities are parties to the Senior Secured Super-Priority Debtor-In-Possession Term Loan Credit Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified, or refinanced or replaced from time to time pursuant to the terms hereof, the "Term Loan Agreement"), pursuant to which such financial institutions and other entities have agreed to make loans and extend other financial accommodations to the Holdco Borrower, and such loans and other financial accommodations are guaranteed by all of the Loan Parties;

WHEREAS, (a) Bakersfield Renewable Fuels, LLC (the "Project Company") (as borrower), the other Loan Parties (as guarantors), the RCF Representative, and Vitol and any other lenders party thereto from time to time are parties to the Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified, or refinanced or replaced, from time to time pursuant to the terms hereof, the "RCF Agreement") pursuant to which Vitol and such other lenders have agreed to make loans and extend other financial accommodations to the Project Company, and such loans and other financial accommodations are guaranteed by all of the Loan Parties, and (b) the Project Company and Vitol are parties to the Supply and Offtake Agreement, dated as of June 25, 2024, and amended and restated as of the date hereof (as further amended, restated, supplemented or otherwise modified, or replaced from time to time pursuant to the terms hereof, the "SOA") and the Storage Services

Agreement, dated as of June 25, 2024, (as further amended, restated, supplemented or otherwise modified, or replaced from time to time pursuant to the terms hereof, the "SSA");

WHEREAS, the Project Company, the Loan Parties and CTCI are parties to that certain Project Management, Procurement, Construction, Operation & Maintenance Support Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified, or replaced from time to time pursuant to the terms hereof, the "DIP CTCI Agreement");

WHEREAS, pursuant to the Interim DIP Order, the Term Loan Representative has security interests in the Collateral as security for payment of the Term Loan Obligations;

WHEREAS, pursuant to the Interim DIP Order, the RCF Representative has security interests in the Collateral as security for payment of the RCF Obligations; and

WHEREAS, pursuant to the Interim DIP Order, CTCI has security interests in the Collateral as security for payment of the DIP CTCI Obligations;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which is expressly recognized by all of the parties hereto, the parties agree as follows:

**SECTION 1.**  *Definitions; Rules of Construction*.

1.1    <u>UCC Definitions</u>.  Capitalized terms which are defined in the Uniform Commercial Code are used herein as so defined, except if otherwise defined herein.

1.2    <u>Defined Terms</u>.  The following terms, as used herein, have the following meanings:

"<u>Accounts Receivable</u>" shall have the meaning given to "<u>Accounts</u>" in the UCC.

"<u>Accounts Receivable Contracts</u>" means (a) all supply contracts, offtake agreements and similar contracts or agreements to which any Loan Party is a party and pursuant to such Loan Party sells Inventory or renders services; and (b) all contracts or agreements between any Loan Party and any other Person whereby such Loan Party is entitled to receive Inventory, or the benefit of Inventory, pursuant to an Inventory exchange arrangement with such other Person.  For purposes of this definition, the term "Inventory" shall have the meaning specified in the UCC.

"<u>Agreement</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Bankruptcy Code</u>" means the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended from time to time.

"<u>Bankruptcy Court</u>" has the meaning assigned to such term in the recitals hereto.

"<u>BKRF Borrower</u>" has the meaning set forth in the definition of "Prepetition Intercreditor Agreement".

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by law to close.

"CARB LCFS Regulations" means the regulations set forth at title 17, California Code of Regulations, sections 95480, *et seq.*, as amended from time to time.

"CFPC" means the Clean Fuels Production Credit which applies to Persons that sell or use certain low-emission transportation fuels, including (A) Persons that sell or use sustainable aviation fuels, as set forth in Internal Revenue Code Section 6426(k), and (B) Persons that sell or use alternative fuel as a fuel in a motor vehicle or motorboat and in aviation, as set forth in Internal Revenue Code Sections 6426 (d).

"Chapter 11 Cases" has the meaning assigned to such term in the recitals hereto.

"Collateral" means, all assets, whether now owned or hereafter acquired, existing or arising by any Loan Party and wherever located, in which a Lien is granted or purported to be granted to any RCF Creditor as security for any RCF Obligations or any Junior Creditor for any Junior Obligations.

"Copyright Licenses" means any and all agreements granting any right in, to or under Copyrights (whether a Loan Party is licensee or licensor thereunder).

"Copyrights" means all United States, state and foreign copyrights, whether registered or unregistered and whether published or unpublished, now owned or hereafter created or acquired by or assigned, and with respect to any and all of the foregoing: (a) all registrations and applications therefor, (b) all reissues, continuations, extensions and renewals thereof and amendments thereto, (c) all rights corresponding thereto throughout the world, (d) all rights to sue for past, present and future infringements thereof, (e) all licenses, claims, damages and proceeds of suit arising therefrom, and (f) all payments and royalties and rights to payments and royalties arising out of the sale, lease, license, assignment, or other disposition thereof.

"CTCI" has the meaning set forth in the introductory paragraph hereof.

"DIP CTCI Agreement" has the meaning set forth in the recitals hereto.

"DIP CTCI Documents" means the DIP CTCI Agreement and each other "Contract Document" (as defined in the DIP CTCI Agreement as in effect as of the date hereof). The DIP CTCI Documents shall not include the "Prepetition CTCI Documents" (as defined in the DIP CTCI Agreement as in effect as of the date hereof).

"DIP CTCI Obligations" means all obligations at any time owed to CTCI arising under, related to, or in connection with the DIP CTCI Documents. The DIP CTCI Obligations shall not include any obligations under the "Prepetition CTCI Documents" (as defined in the DIP CTCI Agreement as in effect as of the date hereof).

"DIP Documents" means, collectively, the DIP CTCI Agreement, the RCF Documents and the Term Loan Documents.

3

"Effective Date" is the date that the Bankruptcy Court enters the Interim DIP Order.

"Enforcement Action" means, with respect to any Obligations, the exercise of any rights and remedies with respect to any Collateral securing such Obligations or the commencement or prosecution of enforcement of any of the rights and remedies under the DIP Documents, or applicable law, including without limitation the exercise of any rights of set-off or recoupment, the exercise of any rights to credit bid debt, and the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction or under the Bankruptcy Code, *except* that the implementation or exercise of cash sweeps under or with respect to any cash management arrangements in effect as of the date hereof shall not constitute or be deemed to constitute an Enforcement Action.

"FBTC" means the Federal Blenders Tax Credit, which applies to blenders of Product mixtures as set forth in Internal Revenue Code Sections 6426(b) and (c).

"Final DIP Order" means the final order of the Bankruptcy Court, approving the DIP Documents on a final basis, in form and substance satisfactory to each Representative, as the same may be amended, modified or supplemented from time to time with the express written consent of each Representative.

"Feedstock" has the meaning assigned to such term in the RCF Agreement.

"Holdco Borrower" has the meaning assigned to such term in the recitals hereto.

"Holdings" has the meaning set forth in the definition of "Prepetition Intercreditor Agreement".

"Insolvency Proceeding" means any proceeding in respect of bankruptcy, insolvency, winding up, receivership, dissolution or assignment for the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law.

"Interim DIP Order" has the meaning set forth in the recitals hereto.

"Junior Collateral" means with respect to any Junior Secured Party, any Collateral on which it has a Junior Lien.

"Junior Documents" means, collectively, (i) the DIP CTCI Documents; and (ii) the Term Loan Documents.

"Junior Liens" means (i) the Liens of the Term Loan Representative on the Collateral securing the Term Loan Obligations and (ii) the Liens of CTCI on the Collateral securing the DIP CTCI Obligations.

"Junior Obligations" means the DIP CTCI Obligations and the Term Loan Obligations.

4

"Junior Obligations Payment Date" means the first date on which (a) the Junior Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in cash in full, (b) all commitments to extend credit, to make payment, or to provide goods and services to the Loan Parties under the Junior Documents have terminated, and (c) so long as the RCF Obligations Payment Date shall not have occurred, each Junior Representative has delivered a written notice to the RCF Representative stating that the events described in clauses (a) and (b) have occurred to the satisfaction of the Junior Secured Parties, which notice shall be delivered by each Junior Representative to the RCF Representative promptly after the occurrence of the events described in clauses (a) and (b).

"Junior Representatives" means CTCI and the Term Loan Representative.

"Junior Secured Parties" means the Junior Representatives, the Term Loan Creditors and any other holders of Junior Obligations.

"LCFS Credit" means "Credit" as defined in the CARB LCFS Regulations.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, deed to secure debt, lien, pledge, hypothecation, assignment, assignation, debenture, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Lien Priority" means, with respect to any Lien of the Secured Parties in the Collateral, the order of priority of such Lien specified in Section 2.1.

"Liquidation Proceeding" has the meaning assigned to such term in Section 5.1.

"Loan Party" has the meaning set forth in the introductory paragraph hereof and shall include each other Person that from time to time becomes a "Loan Party" in accordance with, and as defined in, the RCF Agreement or the Term Loan Agreement, as applicable. All references in this Agreement to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.

"Obligations" means, collectively, the Junior Obligations and the RCF Obligations.

"Patent License" means all agreements granting any right in, to, or under Patents (whether any Loan Party is licensee or licensor thereunder).

"Patents" means all United States and foreign patents and certificates of invention, or similar industrial property rights, now or hereafter in force, and with respect to any and all of the foregoing, (i) all applications and registrations therefore, (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof and amendments thereto, (iii) all rights corresponding thereto throughout the world, (iv) all inventions and improvements described and claimed therein, (v) all rights to sue for past, present and future infringements

thereof, (vi) all licenses, claims, damages, and proceeds of suit arising therefrom, and (vii) all payments and royalties and rights to payments and royalties arising out of the sale, lease, license, assignment, or other disposition thereof.

"Person" means any person, individual, sole proprietorship, partnership, joint venture, corporation, limited liability company, unincorporated organization, association, institution, entity, party, including any government and any political subdivision, agency or instrumentality thereof.

"Plan of Reorganization" means any plan of reorganization, plan of liquidation, agreement for composition, or other type of dispositive plan of arrangement proposed in or in connection with any Insolvency Proceeding.

"Prepetition Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of June 25, 2024, as amended by that certain Amendment No. 1 to Intercreditor Agreement, dated as of November 4, 2024, among Vitol Americas Corp., as RCF representative, Orion Energy Partners TP Agent, LLC as term loan representative, the term loan creditors party thereto, the Project Company, BKRF OCB, LLC, a Delaware limited liability company (the "BKRF Borrower") and BKRF OCP, LLC, a Delaware limited liability company ("Holdings").

"Prepetition RCF Agreement" means that certain Credit Agreement, dated as of June 25, 2024, among the Project Company, the BKRF Borrower, Holdings, the RCF Representative and lenders party thereto.

"Prepetition Term Loan Credit Agreement" means that certain Credit Agreement, dated as of May 4, 2020, as amended by that certain Amendment No. 1 to Credit Agreement and Waiver, dated as of July 1, 2020; that certain Amendment No. 2 to Credit Agreement, dated as of October 12, 2020; that certain Amendment No. 3 to Credit Agreement, dated as of March 26, 2021; that certain Amendment No. 4 to Credit Agreement, dated as of May 19, 2021; that certain Amendment No. 5 to Credit Agreement, dated as of July 29, 2021; that certain Amendment No. 6 to Credit Agreement, dated as of December 20, 2021; that certain Amendment No. 7 to Credit Agreement, dated as of February 2, 2022; that certain Amendment No. 8 to Credit Agreement, dated as of February 2, 2022; that certain Amendment No. 9 to Credit Agreement, dated as of August 5, 2022; that certain Amendment No. 10 to Credit Agreement, dated as of January 30, 2023; that certain Amendment No. 11 to Credit Agreement, dated as of May 19, 2023; Amendment No. 12 to Credit Agreement, dated as of June 21, 2023; that certain Amendment No. 13 to Credit Agreement, dated as of July 5, 2023; that certain Amendment No. 14 to Credit Agreement, dated as of April 9, 2024; that certain Amendment No. 15 to Credit Agreement, dated as of May 6, 2024; that certain Amendment No. 16 to Credit Agreement, dated as of June 25, 2024; Amendment No. 17 to Credit Agreement, dated as of August 29, 2024; that certain Amendment No. 18 to Credit Agreement, dated as of December 16, 2024; that certain Amendment No. 19 to Credit Agreement, dated as of January 27, 2025; that certain Amendment No. 20 to Credit Agreement, dated as of February 21, 2025; that certain Amendment No. 21 to Credit Agreement, dated as of February 27, 2025; and that certain Amendment No. 22 to Credit Agreement, dated as of April 3, 2025, among the BKRF Borrower, Holdings, the lenders party thereto and the Term Loan Representative.

"Proceeds" has the meaning assigned to such term in the UCC, but shall include, for the purposes of this Agreement, all Collateral received as the result of any credit bid and all adequate protection received in respect of any Collateral.

"Product" has the meaning assigned to such term in the RCF Agreement.

"Project" means the renewable diesel facility in Bakersfield, California presently owned by the Project Company.

"Project Company" has the meaning set forth in the recitals hereto.

"RCF Agreement" has the meaning set forth in the recitals hereto.

"RCF Creditors" means, collectively, the "DIP RCF Lenders" and the "DIP RCF Agents", each as defined in the RCF Agreement, and Vitol, as counterparty to the SOA and the SSA.

"RCF Documents" means the RCF Agreement, the SOA, the SSA and each other "DIP RCF Loan Document" as defined in the RCF Agreement.

"RCF Obligations" means all "DIP RCF Obligations" as defined in the RCF Agreement.

"RCF Obligations Payment Date" means the first date on which (a) the RCF Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in cash in full (or cash collateralized or defeased in accordance with the terms of the RCF Documents), (b) all commitments to extend credit or enter into transactions under the RCF Documents have been terminated and (c) so long as the Junior Obligations Payment Date shall not have occurred, the RCF Representative has delivered a written notice to each Junior Representative stating that the events described in clauses (a) and (b) have occurred to the satisfaction of the RCF Secured Parties, which notice shall be delivered by the RCF Representative to each Junior Representative promptly after the occurrence of the events described in clauses (a) and (b).

"RCF Priority Account(s)" means all Deposit Account(s) and Securities Account(s) and all (a) cash, (b) cash equivalents, (c) checks, negotiable Instruments (as defined in the UCC), funds and other evidences of payment, (d) securities and other financial assets credited thereto established (or established in the future) and (e) all Security Entitlements (as defined the UCC) arising therefrom.

"RCF Representative" has the meaning set forth in the introductory paragraph hereof.

"RCF Secured Parties" means the RCF Representative, the RCF Creditors and any other holders of the RCF Obligations.

"Renewable Attributes" means CFPCs, FBTCs, LCFS Credits, and RINs and, to the extent approved by Vitol in the SOA, other similar market valued renewable credit available from the Product output from the Project.

"Representative" means the Term Loan Representative, CTCI or the RCF Representative, as the context so requires.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of the date hereof, by and among the Holdco Borrower, the other Loan Parties and certain other subsidiaries of the Holdco Borrower party thereto, the Consenting Lenders (as defined therein) party thereto and CTCI and certain of its affiliates party thereto.

"RINs" means the unique numbers generated to represent volumes of renewable fuel as defined in 40 CFR § 80.1401 and which are required to be accumulated by obligated parties for compliance with the Renewable Fuel Standard as set out at 40 CFR § 80 Subpart M.

"Secured Parties" means the RCF Secured Parties and the Junior Secured Parties.

"Senior Collateral" means with respect to any RCF Secured Party, any Collateral on which it has a Senior Lien.

"Senior Liens" means the Liens of the RCF Representative on the Collateral securing the RCF Obligations.

"SOA" has the meaning set forth in the recitals hereto.

"SSA" has the meaning set forth in the recitals hereto.

"Term Loan Agreement" has the meaning set forth in the recitals hereto.

"Term Loan Creditors" means the "Lenders" and the "Secured Parties", each as defined in the Term Loan Agreement.

"Term Loan Documents" means each Term Loan Agreement and each other "Financing Document" as defined in the Term Loan Agreement.

"Term Loan Obligations" means all "Obligations" as defined in the Term Loan Agreement.

"Term Loan Representative" has the meaning set forth in the introductory paragraph hereof.

"Trade Secret Licenses" means any and all agreements granting any right in or to Trade Secrets (whether a Loan Party is licensee or licensor thereunder).

"Trade Secrets" means all trade secrets and all other confidential or proprietary information and know-how, whether or not reduced to a writing or other tangible form, now or hereafter in force, owned or used in, or contemplated at any time for use in, the business of any Loan Party, including with respect to any and all of the foregoing: (i) all documents and things embodying, incorporating, or referring in any way thereto, (ii) all rights to sue for past, present and future misappropriations thereof, (iii) all licenses, claims, damages, and proceeds of suit arising therefrom, (iv) all payments and royalties and rights to payments and royalties arising out of the

8

sale, lease, license, assignment, or other dispositions thereof and (v) rights corresponding thereto throughout the world.

"<u>Trademark Licenses</u>" means any and all agreements granting any right in or to Trademarks (whether a Loan Party is licensee or licensor thereunder).

"<u>Trademarks</u>" means all United States, state and foreign trademarks, service marks, certification marks, collective marks, trade names, corporate names, d/b/as, business names, fictitious business names, Internet domain names, trade styles, logos, other source or business identifiers, designs and general intangibles of a like nature, rights of publicity and privacy pertaining to the names, likeness, signature and biographical data of natural persons, now or hereafter in force, and, with respect to any and all of the foregoing: (i) all registrations and applications therefor, (ii) the goodwill of the business symbolized thereby, (iii) all rights corresponding thereto throughout the world, (iv) all rights to sue for past, present and future infringement or dilution thereof or for any injury to goodwill, (v) all licenses, claims, damages, and proceeds of suit arising therefrom, (vi) all payments and royalties and rights to payments and royalties arising out of the sale, lease, license assignment or other disposition thereof, (vii) reissues, continuations, extensions and renewals thereof and amendments thereto and (viii) rights corresponding thereto throughout the world.

"<u>Unasserted Contingent Obligations</u>" means, at any time, Obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding the principal of, and interest and premium (including (x) "Accrued Interest" and/or "Prepayment Premium," if any, as each such defined term is defined in the Term Loan Agreement and (y) "Accrued Interest," if any, as such defined term is defined in the RCF Agreement) on, and fees and expenses relating to, any Obligation) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"<u>Uniform Commercial Code</u>" or "<u>UCC</u>" means the Uniform Commercial Code, as in effect from time to time, of the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in such other applicable jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"<u>Vitol</u>" has the meaning set forth in the introductory paragraph hereof.

1.3    <u>Rules of Construction</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument

9

or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  Any reference herein to a term as defined in any other document shall refer to the definition in such document in effect as of the date hereof, unless the RCF Representative, with respect to the Term Loan Documents and DIP CTCI Documents, or the Term Loan Representative and CTCI Representative, with respect to the RCF Documents, or the RCF Representative and the Term Loan Representative, with respect to the DIP CTCI Documents, as the case may be, shall have consented in writing to any amendment or modification to such defined term.

       1.4    <u>Divisions</u>.  For all purposes under this Agreement, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

**SECTION 2.**  *Lien Priority; Certain Perfection Matters*.

       2.1    <u>Liens and Subordination</u>.

       (a)    As of the date hereof, the Secured Parties hold Liens against the Collateral as provided in the Interim DIP Order.

       (b)    Notwithstanding the date, manner or order of grant, attachment or perfection of any Senior Lien or Junior Lien in respect of any Collateral and notwithstanding any provision of the UCC, any applicable law, any security document, any alleged or actual defect or deficiency in any of the foregoing or any other circumstance whatsoever:

       (i)    any Senior Lien in respect of such Collateral, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be and shall remain senior and prior to any Junior Lien in respect of such Collateral (whether or not such Senior Lien is subordinated to any Lien securing any other obligation); and

       (ii)    any Junior Lien in respect of such Collateral, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise,

shall be junior and subordinate in all respects to any Senior Lien in respect of such Collateral.

2.2     Prohibition on Contesting Liens.  In respect of any Collateral, each party to this Agreement shall not, and hereby waives any right to:

(a)     contest, or support any other Person in contesting, in any proceeding (including any Insolvency Proceeding), the priority, validity or enforceability of any Lien of any Secured Party on such Collateral; or

(b)     demand, request, plead or otherwise assert or claim the benefit of any marshalling, appraisal, valuation or similar right which it may have in respect of such Collateral or the Liens of any Secured Party on such Collateral;

except, in each case, to the extent that such rights are expressly granted in this Agreement (and nothing herein shall limit the ability of the any Representative to contest, in any manner, the priority of any Lien on the Collateral to the extent such priority is inconsistent with the terms of this Agreement, including Section 2.1 and Section 2.5) and without limiting the terms and conditions of this Agreement.

2.3     Nature of Obligations.  A portion of the RCF Obligations represents debt that is revolving in nature.  The amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed or incurred.  Subject to the limitations set forth in Section 6, the terms of the RCF Obligations may be modified, extended or amended from time to time, and the aggregate amount of the RCF Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Junior Secured Parties and without affecting the provisions hereof.  The Lien Priorities provided in Section 2.1 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of any Obligations, or any portion thereof.

2.4     No New Liens.

(a)     Until the RCF Obligations Payment Date, no Junior Secured Party shall acquire or hold any Lien on any assets of any Loan Party to secure any Junior Obligation if those assets are not also subject to the Lien of the RCF Representative under the RCF Documents.  If any Junior Secured Party shall (nonetheless and in breach hereof) acquire or hold any Lien on any assets of any Loan Party to secure any Junior Obligation that are not also subject to the Lien of the RCF Representative under the RCF Documents, then such Junior Secured Party shall, without the need for any further consent of any other Junior Secured Party and notwithstanding anything to the contrary in any other Junior Document, be deemed to also hold and have held such Lien for the benefit of the RCF Representative as security for the RCF Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the RCF Representative in writing of the existence of such Lien.

(b)     Until the Junior Obligations Payment Date, no RCF Secured Party shall acquire or hold any Lien on any assets of any Loan Party securing any RCF Obligation if

those assets are not also subject to Junior Liens.  If any RCF Secured Party shall (nonetheless and in breach hereof) acquire or hold any Lien on any assets of any Loan Party to secure RCF Obligations that are not also subject to Junior Liens, then such RCF Secured Party shall, without the need for any further consent of any other RCF Secured Party and notwithstanding anything to the contrary in any other RCF Document, be deemed to also hold and have held such Lien for the benefit of the Junior Secured Parties as security for the Junior Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify each Junior Representative in writing of the existence of such Lien.

(c)     Notwithstanding the foregoing or any provision to the contrary, cash collateral may be posted to secure RCF Obligations without being subject to a Junior Lien or further restriction under this Agreement.

2.5     Separate Classification.  Liens securing the RCF Obligations, the DIP CTCI Obligations and the Term Loan Obligations constitute three separate and distinct Liens.  Because of, among other things, their differing rights in the Collateral, the RCF Obligations, the DIP CTCI Obligations and the Term Lender Obligations are fundamentally different and should be separately classified in any plan of reorganization, plan of liquidation or similar plan proposed or adopted in an Insolvency Proceeding; provided that, for the avoidance of doubt, the DIP CTCI Obligations and the Term Loan Obligations shall rank *pari passu* as among the Junior Secured Parties with respect to the Collateral in accordance with Section 12.2.

2.6     Agreements Regarding Actions to Perfect Liens.  To the extent that any Secured Party holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over Collateral pursuant to the Interim DIP Order or Final DIP Order, as applicable, such possession or control is also for the benefit of the other Secured Parties, but solely to the extent required to perfect their security interest in such Collateral.  Nothing in the preceding sentence shall be construed to impose any duty on any Secured Party (or any third party acting on any Secured Party's behalf) with respect to such Collateral or provide any Secured Party with any rights with respect to such Collateral beyond those specified in this Agreement, the Interim DIP Order or Final DIP Order, as applicable, provided that after the RCF Obligations Payment Date (so long as the Junior Obligations Payment Date shall not have passed), the RCF Representative shall (i) deliver to the Junior Representatives, at the Loan Parties' sole cost and expense, the Collateral in its possession or control together with any necessary endorsements to the extent required by the Junior Documents or (ii) direct and deliver such Collateral as a court of competent jurisdiction otherwise directs; provided, further, that after the Junior Obligations Payment Date (so long as the RCF Obligations Payment Date shall not have passed), the Junior Representatives shall (i) deliver to the RCF Representative, at the Loan Parties' sole cost and expense, the Collateral in its possession or control together with any necessary endorsements to the extent required by the RCF Documents or (ii) direct and deliver such Collateral as a court of competent jurisdiction otherwise directs.  The provisions of this Agreement are intended to govern the respective Lien Priority as between the RCF Secured Parties and the Junior Secured Parties and shall not impose on the Secured Parties any obligations in respect of the disposition of any

Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any Person that is not a Secured Party.

**SECTION 3.** *Enforcement Rights*.

    3.1   <u>Exclusive Enforcement</u>.

        (a)    Until the RCF Obligations Payment Date, the RCF Creditors shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action (including the right to credit bid their debt, subject to <u>Section 3.1(b)</u>) with respect to the Collateral, subject to the terms of the Interim DIP Order or Final DIP Order, as applicable, without any consultation with or consent of any Junior Creditor, but subject to <u>Section 5.1</u>; <u>provided</u> that nothing contained herein shall be construed as preventing any Junior Creditor from (A) taking any action which is reasonably necessary to (i) perfect the Junior Liens upon the Collateral (other than by possession or "control" (within the meaning of the Uniform Commercial Code)), or (ii) prove, preserve or protect (but not enforce) the Junior Liens upon the Collateral, so long as such action would not, in any case, adversely affect any Senior Lien or (B) credit bidding in respect of their debt as part of a combined cash and credit bid where the cash proceeds of such bid are sufficient to cause the RCF Obligations Payment Date to occur and are applied to the RCF Obligations.

        (b)    Upon the occurrence and during the continuance of a default or an event of default under the RCF Documents, the RCF Creditors may take and continue any Enforcement Action with respect to the RCF Obligations and the Collateral in such order and manner as they may determine in their sole discretion in accordance with the terms and conditions of the RCF Documents.

    3.2   <u>Standstill and Waivers</u>.  Until the RCF Obligations Payment Date has occurred, but subject to <u>Section 5.1</u>:

        (i)    the Junior Representatives will not take or cause to be taken any action, the purpose or effect of which is to make any Lien on any Collateral that secures any Junior Obligation *pari passu* with or senior to, or to give any Junior Secured Party any preference or priority relative to, the Liens on the Collateral securing the RCF Obligations;

        (ii)    no Junior Representative will contest, oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including without limitation the filing of an Insolvency Proceeding) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Collateral by the RCF Representative or any RCF Creditor or any other Enforcement Action taken (or any forbearance from taking any Enforcement Action) in respect of the Collateral by or on behalf of any RCF Creditor;

        (iii)    no Junior Representative shall have any right to (x) direct either the RCF Representative or any other RCF Creditor to exercise any right, remedy or power with respect to the Collateral or pursuant to the RCF Documents in respect

13

of the Collateral or (y) consent or object to the exercise by the RCF Representative or any other RCF Creditor of any right, remedy or power with respect to the Collateral or pursuant to the RCF Documents with respect to the Collateral or to the timing or manner in which any such right is exercised or not exercised (or, to the extent they may have any such right described in this clause (iii), whether as a junior lien creditor in respect of the Collateral or otherwise, they hereby irrevocably waive such right);

(iv)    the Junior Representatives will not institute any suit or other proceeding or assert in any suit or other proceeding any claim against any RCF Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, and no RCF Secured Party shall be liable for, any action taken or omitted to be taken by any RCF Secured Party with respect to the Senior Collateral or pursuant to the RCF Documents in respect of the Senior Collateral;

(v)    no Junior Representative will commence judicial or non-judicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of any Collateral, exercise any right, remedy or power with respect to, or otherwise take any action to enforce their interest in or realize upon, the Collateral, except as permitted by Section 3.1; and

(vi)    the Junior Representatives will not seek, and hereby waives any right, to have the Senior Collateral or any part thereof marshaled upon any foreclosure or other disposition of the Senior Collateral.

3.3    Cooperation; Sharing of Information and Access.

(a)    Each Junior Secured Party shall take such actions as the RCF Representative shall reasonably request in connection with the exercise by the RCF Secured Parties of their rights set forth herein in respect of the Collateral.

(b)    If the RCF Representative shall, in the exercise of its rights, receive possession or control of any books and records of any Loan Party that contain information identifying or pertaining to the Collateral, the RCF Representative shall promptly notify each Junior Representative of such fact and, upon request from any Junior Representative and as promptly as practicable thereafter, either make available to each Junior Representative such books and records for inspection and duplication or provide to each Junior Representative copies thereof.

(c)    If any Junior Representative shall, in the exercise of its rights, receive possession or control of any books and records of any Loan Party that contain information identifying or pertaining to any of the Collateral, such Junior Representative shall promptly notify the RCF Representative of such fact and, upon request from the RCF Representative and as promptly as practicable thereafter, either make available to the RCF Representative

14

such books and records for inspection and duplication or provide the RCF Representative copies thereof.

3.4     (Reserved)

3.5     Actions Upon Breach.  Should any Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, any other Secured Party (in its own name or in the name of the relevant Loan Party) may obtain relief against such Secured Party by injunction, specific performance and/or other appropriate equitable relief, provided that (i) the Secured Parties' damages may at that time be difficult to ascertain and may be irreparable, and (ii) each Secured Party waives any defense that the Loan Parties and/or the Secured Parties, as applicable, cannot demonstrate damage and/or be made whole by the awarding of damages.

3.6     Loan Party Consent.

(a)     No Junior Secured Party shall be accountable or liable to the Loan Parties for any action taken or omitted by any RCF Secured Party or any of their respective officers, employees, agents successors or assigns in connection therewith or incidental thereto or in consequence thereof, including any improper use or disclosure of any proprietary information or other intellectual property by any RCF Secured Party or any of their respective officers, employees, agents, successors or assigns or any other damage to or misuse or loss of any property of the Loan Parties as a result of any action taken or omitted by any RCF Secured Party or any of their respective officers, employees, agents, successors or assigns.

(b)     No RCF Secured Party shall be accountable or liable to the Loan Parties for any action taken or omitted by any Junior Secured Party or any of their respective officers, employees, agents successors or assigns in connection therewith or incidental thereto or in consequence thereof, including any improper use or disclosure of any proprietary information or other intellectual property by any Junior Secured Party or any of their respective officers, employees, agents, successors or assigns or any other damage to or misuse or loss of any property of the Loan Parties as a result of any action taken or omitted by any Junior Secured Party or any of their respective officers, employees, agents, successors or assigns.

**SECTION 4.**  *Application of Proceeds; Releases of Lien*.

4.1     Application of Proceeds.  In connection with any Enforcement Action or during any Insolvency Proceeding, all Collateral and all Proceeds thereof received by any Representative (or any other Secured Party) in connection with the collection, sale or disposition of Collateral (including all Collateral received as the result of any credit bid, which shall be held for the benefit of the applicable Secured Parties as their interests appear in this Section below until final collection, sale or disposition of such Collateral results in distributable funds to be applied as described in this Section 4.1 below), shall be applied as provided below.

(a)      Application of Proceeds of Collateral.  All Proceeds of Collateral (including any interest earned thereon) resulting from any Enforcement Action, and whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:

first, to the RCF Representative for the payment of costs and expenses (including reasonable attorneys' fees and expenses and court costs) of the RCF Representative in connection with such Enforcement Action;

second, to the RCF Representative to be applied to the RCF Obligations in accordance with the RCF Documents until the RCF Obligations Payment Date;

third, on a *pro rata* basis, to CTCI and the Term Loan Representative for the payment of costs and expenses (including reasonable attorneys' fees and expenses and court costs) of CTCI and the Term Loan Representative in connection with such Enforcement Action;

fourth, on a *pro rata* basis, to CTCI and the Term Loan Representative for the payment of (i) Obligations outstanding under the Term Loan Agreement and (ii) Obligations outstanding under the DIP CTCI Agreement; and

fifth, the balance, if any, to the Loan Parties or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

(b)      With respect to each type of Collateral, until the occurrence of the RCF Obligations Payment Date, no Junior Secured Party may accept any such Collateral, including any such Collateral constituting Proceeds, in satisfaction, in whole or in part, of the Junior Obligations in violation of Section 4.1(a).  Any Collateral received by a Junior Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the RCF Representative to be applied in accordance with Section 4.1(a) in the same form as received, with any necessary endorsements, and each Junior Secured Party hereby authorizes the RCF Representative to make any such endorsements as agent for the Junior Representatives (which authorization, being coupled with an interest, is irrevocable until the RCF Obligations Payment Date).  Upon the turnover of such Collateral as contemplated by the immediately preceding sentence, the Junior Obligations purported to be satisfied by the payment of such Collateral shall be immediately reinstated in full as though such payment had never occurred.

(c)      Notwithstanding anything to the contrary contained in this Agreement or any DIP Document, before the RCF Obligations Payment Date, the RCF Secured Parties are hereby permitted to treat all cash posted to secure RCF Obligations as separate collateral for the sole benefit of the applicable RCF Creditors.

(d)      Limited Obligation or Liability.  In exercising remedies, whether as a secured creditor or otherwise, the RCF Representative shall have no obligation or liability to any Junior Secured Party regarding the adequacy of any Proceeds or for any action or omission, save and except solely for an action or omission that breaches the express obligations undertaken by each party under the terms of this Agreement.

16

4.2     Releases of Liens.

(a)     Upon any release, sale or disposition of any Collateral in connection with any Enforcement Action that results in the release of the Senior Lien on such Collateral (other than the release of the Senior Lien due to the occurrence of the RCF Obligations Payment Date), (i) the Junior Lien on such Collateral (excluding any portion of the Proceeds of such Collateral remaining after the RCF Obligations Payment Date occurs) shall be automatically and unconditionally released with no further consent or action of any Person, (ii) the Junior Representatives shall promptly execute and deliver such release documents and instruments and shall take such further actions as the RCF Representative shall request to evidence any release of the Junior Lien described in this Section 4.2(a), and (iii) each Junior Representative hereby appoints the RCF Representative and any officer or duly authorized person of the RCF Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of such Junior Representative and in the name of such Junior Representative or in the RCF Representative's own name, from time to time, in the RCF Representative's sole discretion, for the purposes of carrying out the terms of this Section 4.2(a), to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this Section 4.2(a), including, without limitation, any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

(b)     To the extent a sale or disposition of Collateral is permitted by both the RCF Documents and the Junior Documents, upon any such sale or disposition of Collateral that results in the release of the applicable Senior Lien on any Collateral (excluding any sale or other disposition pursuant to any Enforcement Action, which is covered by clause (a) above) (other than release of the applicable Senior Lien due to the occurrence of the RCF Obligations Payment Date), (i) the Junior Lien on such Collateral (excluding any portion of the Proceeds of such Collateral remaining after the RCF Obligations Payment Date occurs) shall be automatically and unconditionally released with no further consent or action of any Person, (ii) each Junior Representative shall promptly execute and deliver such release documents and instruments and shall take such further actions as the RCF Representative shall request to evidence any release of the Junior Lien described in this Section 4.2(b), and (iii) each Junior Representative hereby appoints the RCF Representative and any officer or duly authorized person of the RCF Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of such Junior Representative and in the name of such Junior Representative or in the RCF Representative's own name, from time to time, in the RCF Representative's sole discretion, for the purposes of carrying out the terms of this Section 4.2(b), to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this Section 4.2(b), including, without limitation, any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

(c)      Except as contemplated in Section 4.2(a) and Section 4.2(b) above or as otherwise contemplated in this Agreement, under the DIP Documents as in effect on the date hereof, or at law, (i) the RCF Representative shall not without the consent of each Junior Representative consensually release or subordinate the Senior Liens on all or substantially all of the Collateral and (ii) no Junior Representative shall without the consent of the RCF Representative consensually release or subordinate the Junior Liens on all or substantially all of the Collateral; provided that nothing in this paragraph shall prohibit the release of the Senior Liens in connection with the repayment in full of the RCF Obligations or the release of the Junior Liens in connection with the repayment in full of the Junior Obligations.

4.3      Inspection Rights and Insurance; Certain Real Property Notices.

(a)      Until the RCF Obligations Payment Date, any RCF Secured Party and its representatives and invitees may, in accordance with this Agreement and the RCF Documents, inspect, repossess, remove and otherwise deal with the Collateral.  Pursuant to an Enforcement Action relating to the corresponding Collateral, the RCF Representative may advertise and conduct public auctions or private sales of such Collateral in each case without notice (other than any notice required by law or the applicable RCF Documents) to, the involvement of or interference by any Junior Creditor or liability to any Junior Creditor.

(b)      With respect to each type of Collateral, until the occurrence of the RCF Obligations Payment Date, the RCF Representative will have the sole and exclusive right (i) to be named as additional insured and loss payee under any insurance policies maintained from time to time by any Loan Party with respect to such Collateral (except that, if the applicable insurer permits, the applicable Junior Representative shall have the right to be named as an additional insured and/or loss payee, as its interests may appear, so long as its second lien status is identified in a manner reasonably satisfactory to such RCF Representative); (ii) to adjust or settle any insurance policy or claim covering such Collateral in the event of any loss thereunder; and (iii) to approve any award granted in any condemnation or similar proceeding affecting such Collateral, in each case in accordance with the applicable RCF Documents.  The Proceeds of any insurance policies shall be deposited into one or more RCF Priority Accounts (as specified in the RCF Documents).

**SECTION 5.**  *Insolvency Proceedings.*

5.1      Filing of Motions.  Notwithstanding anything to the contrary in this Agreement, each Junior Secured Party may (i) file a proof of claim in an Insolvency Proceeding or Liquidation Proceeding, (ii) vote on a Plan of Reorganization, (iii) file any pleadings, objections, motions or agreements that assert rights or interests available to unsecured creditors of the Loan Parties arising under either any Insolvency Proceeding, Liquidation Proceeding or applicable non-bankruptcy law, in each case not prohibited by the other terms and provisions of this Agreement, and (iv) file any necessary responsive or defensive pleadings in opposition to any motion or other pleadings made by any Person objecting to or otherwise seeking the disallowance of the claims or Liens of the Junior Secured Parties. A "Liquidation Proceeding" is the exercise by the RCF Representative

18

of those rights and remedies accorded to the RCF Representative under the DIP Documents and applicable laws as a creditor of the Loan Parties with respect to the realization on the applicable Collateral, including (after the occurrence and during the continuation of an event of default) the conduct by the Loan Parties acting with the consent of the RCF Representative, of any disposition of such Collateral for the purpose of liquidating such Collateral.

5.2    Financing Matters.  All Liens granted to one or more Representatives in any Insolvency Proceeding, whether as adequate protection or otherwise, are subject to the Lien Priority and the other provisions of this Agreement.  Notwithstanding anything in this Agreement to the contrary, except for Liens securing the Obligations, this Agreement does not alter or affect, in any way whatsoever, (i) any Liens, the attachment, perfection, validity, enforceability, or priority of Liens or claims secured by such Liens, or (ii) claims (as defined in the Bankruptcy Code) of or against any Person arising before the Petition Date, which as of the date of this Agreement, are subject to the terms and conditions of the Restructuring Support Agreement and not this Agreement.

5.3    Relief From the Automatic Stay.  Until the RCF Obligations Payment Date, no Junior Secured Party will seek relief from the automatic stay or from any other stay in any Insolvency Proceeding or take any action in derogation thereof, in each case in respect of any Collateral, without the prior written consent of the RCF Representative.

5.4    Plan of Reorganization.  No Secured Party shall take or support any other Person in taking any action to effect a Plan of Reorganization for the Loan Parties that is inconsistent with the Restructuring Support Agreement.

**SECTION 6.**  *Amendments to and Refinancings of DIP Documents.*  Each DIP Document may be amended, restated, supplemented or otherwise modified in accordance with its terms, all without affecting the lien subordination or other provisions of this Agreement; provided, however, that without the consent of each Representative, no such amendment, restatement, supplement or modification (a "Modification") shall have the effect of:

(a)    contravening or being inconsistent in any material respects with any provision of this Agreement;

(b)    (i) in the case of a Modification to the RCF Documents, contractually prohibiting the Loan Parties from making any payments under the Term Loan Agreement or (ii) in the case of a Modification to the Junior Documents, contractually prohibiting the Loan Parties from making any payments under the RCF Documents;

(c)    increasing the interest rate or fees under the DIP Documents (other than by giving effect to any default rate of interest thereunder), including the tenor of payment;

(d)    (i) increases the aggregate commitments under the RCF Documents or (ii) increases the aggregate commitments and outstanding loans under the Junior Documents other than as permitted under the Junior Documents to fund costs, expenses and other obligations and liabilities of the Holdco Borrower incurred, or to be incurred, consistent

19

with the Project construction, startup and sustained efficient operations plans of the Holdco Borrower as of the date hereof;

(e)    shortens the maturity date thereof (except as a result of acceleration or otherwise in connection with an Event of Default); or

(f)    in the case of a Modification to the RCF Documents, amend the definitions of "Change of Control" or "Permitted Holders" set forth therein;

provided that if any such amendment, restatement, supplement or modification would impose or result in any negative covenant restrictions on the Loan Parties, whether as a result of modifying a covenant, Event of Default or other provision contained in the DIP Documents or adding a new provision thereto, that is more restrictive than those that are applicable immediately prior to the effectiveness of such amendment, restatement, supplement or modification, then a Representative under the RCF Documents or Junior Documents (whichever is not party to such amendment, restatement, supplement or modification) may notify the Loan Parties requiring that a comparable amendment, restatement, supplement or modification be made to such DIP Documents and the Loan Parties shall promptly enter into such amendments or other documents as such Representative shall reasonably request in order to implement such amendment, restatement, supplement or modification. The applicable Representative shall provide advance written notice to the other Representative of any Modification to be effectuated pursuant to the foregoing and shall provide a written copy of such Modification promptly after the effective date thereof.

**SECTION 7.** *Purchase Option.*

7.1    Notice of Exercise.  If (i) all Tranche D obligations held by Vitol have been rolled up into RCF Obligations, (ii) the RCF Secured Parties have accelerated and declared all RCF Obligations under the RCF Agreement to be immediately due and payable, and (iii) the SOA and SSA have been terminated and Vitol has liquidated amounts due under Section 11.4 of the SOA (the events described in clauses (i), (ii), and (iii) above, a "Purchase Option Event"), then during the continuance of a Purchase Option Event, (x) all or a portion of the Term Loan Creditors, acting as a single group, and (y) CTCI, shall each have the option at any time upon five (5) Business Days' prior written notice to the RCF Representative to purchase from the RCF Secured Parties all (but not less than all) of the RCF Obligations.  Such notice to the RCF Representative shall be irrevocable.  If more than one party delivers such notice, then the RCF Representative shall sell (I) 50% of the RCF Obligations to the parties listed in the foregoing clause (x), and (II) 50% of the RCF Obligations to the parties listed in the foregoing clause (y), in each case, for their ratable share of the price set forth in Section 7.3 below.

7.2    Purchase and Sale.  On the date specified by the relevant Term Loan Creditors in the notice contemplated by Section 7.1 above (which shall not be less than five (5) Business Days, nor more than twenty (20) calendar days, after the receipt by the RCF Representative of the notice of the relevant Term Loan Creditor's election to exercise such option), the RCF Creditors shall sell to the relevant Term Loan Creditors, and the relevant Term Loan Creditors shall purchase from the RCF Creditors, the RCF Obligations and the portion of the Term Loan Obligations held by the RCF Secured Parties (and their affiliates), provided that, the RCF Secured Parties shall retain all

rights to be indemnified or held harmless by the Loan Parties in accordance with the terms of the RCF Documents, which indemnification and hold harmless obligations in favor of the RCF Secured Parties shall remain secured on a pari passu basis with all other obligations under the RCF Documents.  After delivery of any notice contemplated by Section 7.1 above and until the date designated in such notice, the RCF Secured Parties shall, in the absence of exigent circumstances, refrain from enforcing on, or exercising any rights in respect of, any Collateral unless the failure to do so would adversely affect the Senior Lien.

7.3    Payment of Purchase Price.  Upon the date of such purchase and sale contemplated by Section 7.2 above, the purchaser shall pay to the RCF Representative for the benefit of the RCF Creditors, as the purchase price therefor, (a) the full amount of all of the RCF Obligations then outstanding and unpaid (including principal, interest, fees, premium, termination and similar fees and expenses, including reasonable and documented out-of-pocket attorneys' fees and legal expenses) plus (b) all applicable payments owed to the RCF Creditors under Section 11.4 of the SOA, including the Close-out Amount, with the Close-out Amount Lost Margin LD (as defined therein) to the extent applicable.  Such purchase price shall be remitted by wire transfer in federal funds to such bank account in New York, New York as the RCF Representative may designate in writing for such purpose.

7.4    Documentation; Limitation on Representations and Warranties.  Such purchase and sale shall be documented pursuant to a customary assignment and assumption agreement.  Such purchase shall be expressly made without representation or warranty of any kind by any selling party (or the RCF Representative) and without recourse of any kind, except that the selling party shall represent and warrant: (a) the amount of the RCF Obligations being purchased from it, (b) that such RCF Secured Parties owns the RCF Obligations free and clear of any Liens or encumbrances and (c) that such RCF Secured Parties have the right to assign such RCF Obligations and the assignment is duly authorized.

**SECTION 8.** *Reliance; Waivers; etc.*

8.1    Reliance.  The DIP Documents are deemed to have been executed and delivered, and all extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement.  Each Secured Party waives all notice of the acceptance of and reliance on this Agreement by the other Secured Parties.

8.2    No Warranties or Liability.  No Representative has made or is making any representation or warranty with respect to the execution, validity, legality, completeness, collectability or enforceability of any DIP Document except as set forth in the DIP Documents.

8.3    No Waivers.  No right or benefit of any party hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of such party or any other party hereto or by any noncompliance by any Loan Party with the terms and conditions of any DIP Document.

**SECTION 9.** *Obligations Unconditional.* All rights, interests, agreements and obligations hereunder of the Secured Parties in respect of any Collateral shall remain in full force and effect regardless of:

> (a) any lack of validity or enforceability of any DIP Document and regardless of whether the Liens of the Secured Parties are not perfected or are voidable for any reason;

> (b) any change in the time, manner or place of payment of, or in any other terms of, all or any of the Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any DIP Document;

> (c) any exchange, release or lack of perfection of any Lien on any Collateral or any other asset, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any Obligations or any guarantee thereof; or

> (d) any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of any Obligation or of any Secured Party in respect of this Agreement.

**SECTION 10.**     *(Reserved).*

**SECTION 11.**     *Miscellaneous.*

11.1     <u>Rights of Subrogation</u>. No payment to any RCF Secured Party pursuant to the provisions of this Agreement shall entitle any Junior Secured Party to exercise any rights of subrogation in respect thereof until the RCF Obligations Payment Date. Following the RCF Obligations Payment Date, the RCF Representative shall execute such documents, agreements, and instruments as any Junior Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the RCF Obligations resulting from payments to the RCF Representative by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the RCF Representative are paid by such Person upon request for payment thereof. No payment to any Junior Secured Party pursuant to the provisions of this Agreement shall entitle any RCF Secured Party to exercise any rights of subrogation in respect thereof until the Junior Obligations Payment Date. Following the Junior Obligations Payment Date, each Junior Representative shall execute such documents, agreements, and instruments as any RCF Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the Junior Obligations resulting from payments to such Junior Representative by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by such Junior Representative are paid by such Person upon request for payment thereof.

11.2     <u>Further Assurances</u>. Each Representative will, at their own expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the other party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable the Representatives to exercise and enforce its rights and remedies hereunder; <u>provided,</u>

however, that no party shall be required to pay over any payment or distribution, execute any instruments or documents, or take any other action referred to in this Section 11.2, to the extent that such action would contravene any law, order or other legal requirement or any of the terms or provisions of this Agreement, and in the event of a controversy or dispute, such party may interplead any payment or distribution in any court of competent jurisdiction, without further responsibility in respect of such payment or distribution under this Section 11.2.

11.3    Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of any DIP Document, the provisions of this Agreement shall govern.

11.4    Continuing Nature of Provisions.  This Agreement shall become effective as of the Effective Date.  This is a continuing agreement and the Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, any Loan Party on the faith hereof.

11.5    Amendments; Waivers.  No amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by the parties to this Agreement.

11.6    Information Concerning Financial Condition of the Loan Parties.    Each Representative hereby assumes responsibility for keeping itself informed of the financial condition of the Loan Parties and all other circumstances bearing upon the risk of nonpayment of the Obligations.  No party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances (except as otherwise provided in the DIP Documents).  If any Representative, each in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information.

11.7    Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York, except as otherwise required by mandatory provisions of law and except to the extent that remedies provided by the laws of any jurisdiction other than the State of New York are governed by the laws of such jurisdiction.

11.8    Submission to Jurisdiction; JURY TRIAL WAIVER.

(a)    Each party to this Agreement hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and the appellate courts for the Bankruptcy Court or, if the Bankruptcy Court or such appellate courts do not have (or abstain from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each such party hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such

23

courts.  Each such party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any Secured Party may otherwise have to bring any action or proceeding against any Loan Party or its properties in the courts of any jurisdiction.

(b)     Each party to this Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding.

(c)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 11.9</u>.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(d)     EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH PARTY TO THIS AGREEMENT REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

11.9     <u>Notices</u>.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or five days after deposit in the United States mail (certified, with postage prepaid and properly addressed).  For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this <u>Section 11.9</u>) shall be as set forth below each party's name on the signature pages hereof, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

11.10     <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the Secured Parties and their respective successors and assigns, and nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral.

11.11     <u>Headings</u>.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

11.12  <u>Severability</u>.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

11.13  <u>Other Remedies</u>.  For avoidance of doubt, it is understood that nothing in this Agreement shall prevent any Secured Party from exercising any available remedy to accelerate the maturity of any indebtedness or other obligations owing under the DIP Documents to which it is a party or to demand payment under any guarantee in respect thereof.

11.14  <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.  This Agreement shall become effective when it shall have been executed by each party hereto.

11.15  <u>Additional Loan Parties</u>.  Holdco Borrower shall cause each Person that becomes a Loan Party after the date hereof to acknowledge this Agreement by execution and delivery by such Person of an acknowledgment.

11.16  <u>Electronic Signatures</u>.  The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation assignment and assumptions, amendments or other notices, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the parties hereto, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

11.17  <u>Prepetition Intercreditor Agreement</u>.  For the avoidance of doubt, this Agreement does not supersede, amend or modify in any respect the Prepetition Intercreditor Agreement, which shall continue to apply in respect of (a) the Prepetition Term Loan Credit Agreement and (b) the Prepetition RCF Agreement.

**SECTION 12.**  *Term Loan Intercreditor Matters*.

12.1  <u>Appointment of Term Loan Representative</u>.  Each Term Loan Creditor hereby designates and appoints Orion Energy Partners TP Agent, LLC as the Term Loan Representative under this Agreement, and each of the foregoing authorizes Orion Energy Partners TP Agent, LLC, in the capacity of Term Loan Representative, to (a) execute, deliver and perform the obligations, if any, of the Term Loan Representative under this Agreement, and (b) exercise such powers and

perform such duties as are expressly delegated to the Term Loan Representative by the terms of this Agreement, together with such other powers as are reasonably incidental thereto. By its signature below, Orion Energy Partners TP Agent, LLC accepts each such appointment. The provisions of Article VIII of the Term Loan Agreement (as in effect as of the date hereof) apply herein, *mutatis mutandis*, for the benefit of Orion Energy Partners TP Agent, LLC, as Term Loan Representative, with each Term Loan Creditor party hereto agreeing to the same matters as the "Lenders" under such Article VIII of the Term Loan Agreement (as in effect as of the date hereof).

12.2    Pari Passu Ranking.

(a)    As among the Junior Secured Parties with respect to the Collateral, all Junior Obligations shall rank *pari passu* (subject to Section 4.1) with any and all other Junior Obligations irrespective of the following:

(i)    the time, order or method of creation, attachment or perfection of the respective security interests and/or Liens granted in favor of any Junior Secured Party to secure the Junior Obligations;

(ii)    the validity or enforceability of the security interests and Liens granted in favor of any Junior Secured Party;

(iii)    the dating, execution or delivery of any agreement, document or instrument granting any Junior Secured Party security interests and/or Liens in or on any or all of the Property or assets of any Loan Party;

(iv)    the date on which any Indebtedness (as defined in the Term Loan Agreement) is extended;

(v)    the giving or failure to give notice of the acquisition or expected acquisition of any purchase money or other security interest;

(vi)    any provision of the UCC or any other applicable law, including any rule for determining priority thereunder or under any other law or rule governing the relative priorities of secured creditors;

(vii)    any provision set forth in any Junior Document; or

(viii)    the possession or control by any Junior Secured Party or any bailee of all or any part of any Collateral as of the date hereof or otherwise.

(b)    No Junior Secured Party shall be entitled to any preferences or priority over any other Junior Secured Party and the Junior Secured Parties shall share in the Collateral and all proceeds thereof in accordance with the terms of this Agreement and the Junior Documents.

12.3    Voting Matters.  Notwithstanding anything herein to the contrary, the Term Loan Representative (on behalf of itself and the other Term Loan Creditors) shall only take an

Enforcement Action at the joint written direction of the Required Lenders (as defined in the Term Loan Agreement).

<div align="center">(SIGNATURE PAGES FOLLOW)</div>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

RCF REPRESENTATIVE:

VITOL AMERICAS CORP., in its personal capacity and as RCF Representative for and on behalf of the RCF Secured Parties

By:_____
Name: [Richard J. Evans
Title: Senior Vice President and CFO][1]

Address for Notices:

[Vitol Americas Corp.
2925 Richmond Ave., Suite 1100
Houston, TX 77098
Attn: Contract Administration / General Counsel
Email: legalhouston@vitol.com
          xagreementshou@vitol.com][2]

---

[1] NTD: Vitol to confirm.

[2] NTD: Vitol to confirm.

*[Signature Page to BKRF DIP Intercreditor Agreement]*

TERM LOAN REPRESENTATIVE:


ORION ENERGY PARTNERS TP AGENT, LLC,
as Term Loan Representative for and on behalf of
the Term Loan Creditors


By:_____
Name: _____
Title: _____


Address for Notices:

[Orion Energy Partners TP Agent, LLC
292 Madison Avenue, Suite 2500
New York, NY 10017
Attention: Ethan Shoemaker and Mark Friedland


Email: Ethan@OIC.com; Mark@OIC.com;
ProjectGoldenBear@OIC.com][3]

---

[3] NTD: OIC to confirm.

TERM LOAN CREDITORS:

ORION FUND II NAV HOLDCO, L.P.

By:_____
Name: _____
Title: _____

ORION FUND II PV 2 NAV HOLDCO, L.P.

By:_____
Name: _____
Title: _____

ORION FUND II GPFA, NAV HOLDCO, L.P.

By:_____
Name: _____
Title: _____

ORION ENERGY CREDIT OPPORTUNITIES
GCE CO-INVEST, L.P.

By:_____
Name: _____
Title: _____

ORION ENERGY CREDIT OPPORTUNITIES
GCE CO-INVEST B, L.P.

By:_____
Name: _____
Title: _____

*[Signature Page to BKRF DIP Intercreditor Agreement]*

ORION ENERGY CREDIT OPPORTUNITIES FUND III, L.P.

By:_____
Name: _____
Title: _____


ORION ENERGY CREDIT OPPORTUNITIES FUND III PV, L.P.

By:_____
Name: _____
Title: _____


ORION ENERGY CREDIT OPPORTUNITIES FUND III GPFA, L.P.

By:_____
Name: _____
Title: _____


ORION ENERGY CREDIT OPPORTUNITIES FUND III GPFA PV, L.P.

By:_____
Name: _____
Title: _____


Address for Notices:

[Orion Energy Partners TP Agent, LLC
292 Madison Avenue, Suite 2500
New York, NY 10017
Attention: Ethan Shoemaker and Mark Friedland


Email: Ethan@OIC.com; Mark@OIC.com;
ProjectGoldenBear@OIC.com]


*[Signature Page to BKRF DIP Intercreditor Agreement]*

LIF AIV 1, L.P.


By:_____
Name: _____
Title: _____


Address for Notices:
[c/o Grosvenor Capital Management, L.P.
767 Fifth Avenue, 14th Floor
New York, NY 10153
Attention: Legal Notices, Matthew Rinklin, Joseph
Enright

Email: legal@gcmlp.com; mrinklin@gcmlp.com;
jenright@gcmlp.com][4]

---

[4] NTD: GCM to confirm.

*[Signature Page to BKRF DIP Intercreditor Agreement]*

VOYA RENEWABLE ENERGY
INFRASTRUCTURE ORIGINATOR I LLC


By:_____
Name: _____
Title: _____


VOYA RENEWABLE ENERGY
INFRASTRUCTURE ORIGINATOR L.P.


By:_____
Name: _____
Title: _____


Address for Notices:

[c/o Voya Investment Management LLC
230 Park Avenue
New York, NY 10169
Attention:  Private Placements, Thomas Emmons,
Edward Levin

Email:
Private.Placements@voya.com;
Howard.Wilamowski@voya.com;
Edward.Levin@voya.com;
Thomas.Emmons@voya.com][5]

---

[5] NTD: Voya to confirm.

*[Signature Page to BKRF DIP Intercreditor Agreement]*

CTCI AMERICAS, INC.


By:_____

Name: _____

Title: _____


Address for Notices:

[_____]

[_____]

[_____]

Attention: [_____]


Email: _____][6]

---

[6] NTD: CTCI to provide.

Each of the Loan Parties, by its execution of this Agreement, hereby acknowledges and agrees to the foregoing provisions of this Agreement.

LOAN PARTIES:

GLOBAL CLEAN ENERGY HOLDINGS, INC.,
a [Delaware corporation]

By:_____
Name:_____
Title:_____

AGRIBODY TECHNOLOGIES, INC.,
a Delaware corporation

By:_____
Name:_____
Title:_____

BAKERSFIELD RENEWABLE FUELS, LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

BKRF HCB, LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

BKRF HCP, LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

BKRF OCB, LLC,
a Delaware limited liability company


By:_____
Name:_____
Title:_____


BKRF OCP, LLC,
a Delaware limited liability company


By:_____
Name:_____
Title:_____


GCE HOLDINGS ACQUISITIONS, LLC,
a Delaware limited liability company


By:_____
Name:_____
Title:_____


GCE INTERNATIONAL DEVELOPMENT, LLC,
a Delaware limited liability company


By:_____
Name:_____
Title:_____


GCE OPERATING COMPANY, LLC,
a Delaware limited liability company


By:_____
Name:_____
Title:_____


GCEH CS ACQUISITIONS, LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____


GCEH VENTURES, LLC,
a Delaware limited liability company


By:_____
Name:_____
Title:_____


GLOBAL CLEAN ENERGY TEXAS, LLC,
a Delaware limited liability company


By:_____
Name:_____
Title:_____


ROSEDALE FINANCECO LLC,
a Delaware limited liability company


By:_____
Name:_____
Title:_____


SUSTAINABLE OILS, INC.,
a Delaware corporation


By:_____
Name:_____
Title:_____

**EXHIBIT J**

**FORM OF APPROVAL ORDER**

[Filed Contemporaneously Herewith]

**Exhibit C**

**Exit Facilities Term Sheet**

**EXIT FACILITIES TERM SHEET**

$100,000,000 New RCF Facility (plus related SOA and SSA obligations)
$[80,000,000] New Super Senior Exit Facility
$[150,000,000] New Senior Secured Facility
$[1,081,950,000] Subordinated Senior Secured Facility
$[321,250,000] Subordinated Secured EPC Claim
$[561,800,000] Subordinated Junior Facility

**<u>Summary of Principal Terms and Conditions</u>[1]**

**April 16, 2025**

This term sheet (together with all annexes, schedules, and exhibits attached hereto, this "***Term Sheet***") summarizes the material terms and conditions of the proposed transactions (the "***Transactions***") to restructure the existing indebtedness of Holdco Borrower (as defined below) and its direct and indirect subsidiaries (together with Holdco Borrower, the "***Company Parties***") upon the Plan Effective Date.

THIS TERM SHEET IS NEITHER AN OFFER WITH RESPECT TO ANY SECURITIES NOR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE CLOSING DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY PERSON OTHER THAN THE COMPANY PARTIES AND THE FINANCING PARTIES AND THEIR RESPECTIVE PROFESSIONAL ADVISORS OR EXCEPT AS OTHERWISE SET FORTH IN ANY CONFIDENTIALITY AGREEMENT BETWEEN THE COMPANY PARTIES AND THE FINANCING PARTIES OR THEIR RESPECTIVE PROFESSIONAL ADVISORS.

THIS TERM SHEET IS FOR DISCUSSION PURPOSES ONLY AND DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF THE DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution, and delivery of the definitive documentation for the Facilities. The regulatory, tax, accounting, and other legal and financial matters and effects related to the Transactions or any related restructuring or similar

---

[1] Capitalized terms used herein but not defined herein shall have the meaning assigned to such term in Exhibit B.

transaction have not been fully evaluated, and any such evaluation may affect the terms and structure of any Transactions or related transactions.

This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

| | |
|---|---|
| **Holdco Borrower**: | Reorganized GCEH (as defined in the Restructuring Support Agreement) (the "***Holdco Borrower***"), as borrower. |
| **Midco Borrower and Pledgor**: | The Holdco Borrower will form a new wholly-owned Delaware limited liability company subsidiary (the "***Midco Pledgor***"). |
| | Midco Pledgor will form a new wholly-owned Delaware limited liability company subsidiary (the "***Midco Borrower***"). |
| **Guarantors**: | For the Holdco Term Facilities (as defined below), none. |
| | For the New Super Senior Exit Facility and the RCF Facilities, each of Midco Pledgor, [BKRF OCB, *other existing holdcos*], [2] Bakersfield Renewable Fuels, LLC, a Delaware limited liability company ("***Project Company***"), Sustainable Oils, Inc., a Delaware corporation ("***SusOils***"), and Agribody Technologies, Inc., a Delaware corporation ("***ATI***") and any other subsidiaries of Holdco Borrower (other than Midco Pledgor, Midco Borrower and any foreign subsidiaries). |
| **New RCF Facility and Existing SOA/SSA**: | Vitol Americas Corp. ("***Vitol***" or "***RCF Agent***") will provide the following facilities to the Midco Borrower: |
| | (a) Revolving credit facility (the "***New RCF Facility***") in an aggregate principal amount of $100 million, to be set forth in a Credit Agreement among the Midco Loan Parties, the RCF Agent and Existing RCF Lenders (in such capacity, the "***New RCF Lenders***"); |
| | (b) Supply and offtake agreement, as amended upon exit (the "***New SOA***"), between the Project Company and Vitol and guaranteed by the other Midco Loan Parties; and |
| | (c) Storage Services Agreement, as amended on exit (the "***New SSA***" and together with the New RCF Facility and the New SOA, the "***RCF Facilities***"), between the Project |

---

[2] <u>NTD</u>: To be determined with GCEH/K&E. There are a number of middle-tier entities currently sitting between BKRF OCP and GCEH that just own equity interests, which may be removed.

|  | Company and Vitol and guaranteed by the other Midco Loan Parties. |
|---|---|

The secured obligations under the foregoing shall be referred to herein as the "***New RCF Obligations***".

| **New Super Senior Exit Facility**: | One or more new lenders (the "***New Super Senior Exit Lenders***") will agree to provide a new term loan to the Midco Borrower in an amount up to $80 million (the "***New Super Senior Exit Facility***"). The lenders under such facility will be known as the "***New Super Senior Exit Term Lenders***," the agent under such facility will be called the "***New Super Senior Exit Loan Agent***" and the credit agreement relating to such facility will be called the "***New Super Senior Exit Loan Credit Agreement***." |
|---|---|

The New Super Senior Exit Facility and the New RCF Facility will be known, collectively, as the "***Midco Facilities***."

| **Conversion of DIP Financing to New Senior Secured Facility**: | The New Senior Secured Term Lenders and CTCI will agree that the Company Parties' financial obligations in connection with the DIP Financing and the New CTCI Contract will be converted into the following obligations of Holdco Borrower: |
|---|---|

(a) a senior secured term loan facility (the "***New Senior Secured Term Facility***"), on terms and conditions to be set forth in a Term Loan Credit Agreement (the "***New Senior Secured Term Loan Credit Agreement***") among Holdco Borrower, the New Senior Secured Term Lenders and Orion Energy Partners TP Agent, LLC, as administrative agent and collateral agent (in such capacities, the "***New Senior Secured Term Loan Agent***"), consisting of an aggregate principal amount of $75 million in term loans (plus any accrued interest or interest paid in kind) ("***New Senior Secured Term Loans***"); and

(b) a post-confirmation payment obligation for $75 million plus any Senior EPC DIP Fee Claim, in each case, that arose under the New CTCI Contract and will remain under the New CTCI Contract, as amended, upon exit (the "***Post-Exit CTCI Senior DIP Payment Obligation***").

New definitions to be added to Defined Terms:

"***DIP Financing***" means debtor-in-possession financing provided to the Company Parties by certain of the Existing Term Lenders in the amount of $75 million (including $25 million of new funding

and the roll-up[3] of $50 million in pre-petition funding by certain of the Existing Term Lenders).

"**New Senior Secured Term Lenders**" means the Existing Term Lenders that provide DIP Financing to the Company Parties.

"**New CTCI Contract**" means a Procurement, Construction, Operation & Maintenance Support Services Agreement between CTCI and one or more of the Company Parties which will provide for provision of $75 million in goods and services as described in Exhibit D.  The Post-Exit CTCI Senior DIP Payment Obligation under the New CTCI Contract will require payment of  CTCI's overhead and profit at 16.5% (the "**EPC DIP Fee**") with (i) a portion of the EPC DIP Fee equal to 8% per annum on the goods and services provided by CTCI under the New CTCI Contract characterized as the "**Senior EPC DIP Fee Claim**" and (ii) any EPC DIP Fee in excess of the Senior EPC DIP Fee Claim characterized as the "**Excess EPC DIP Claims**".  The EPC DIP Fee will not be paid in cash but will be paid in kind during the bankruptcy of the Holdco Borrower, and no interest on the EPC DIP Fee or the cost of goods and services provided under the New CTCI Contract will accrue during the bankruptcy of the Holdco Borrower.  The Company Parties' obligations under the New CTCI Contract will be secured by the Collateral to the extent contemplated herein. The New CTCI Contract will take effect before the Plan Effective Date, but on the Plan Effective Date it will be amended to reflect the treatment given to the Post-Exit CTCI Senior DIP Payment Obligation as described herein, including the accrual of interest and an extended maturity.

**Conversion of Existing Term Facilities and EPC Agreement**:[4]

The various secured obligations owing to (i) CTCI under the Existing EPC Agreement and (ii) the Existing Term Lenders under the Existing Term Loan Credit Agreement (other than the portion thereof that is rolled-up and converted into DIP Financing) will be partially converted on the Closing Date into the following exit facilities (together with the New Senior Secured Term Facility and the Post-Exit CTCI Senior DIP Payment Obligation, collectively, the "**Holdco Term Facilities**", and together with the Midco

---

[3]  For the avoidance of doubt, the aggregate principal amount under the New Senior Secured Term Loan Credit Agreement shall be $75 million irrespective of whether the roll-up of $50 million in pre-petition funding by the applicable Existing Term Lenders is approved by the Bankruptcy Court.  If such roll-up is *not* approved, the $50 million in pre-petition funding by the Existing Term Lenders that would have otherwise been rolled up and converted into DIP Financing would nevertheless, upon the Plan Effective Date, be converted into New Senior Secured Term Loans as if the roll-up was approved by the Bankruptcy Court.

[4]  NTD: For the avoidance of doubt, these converted facilities will include no additional 'new money' funding.

Facilities, the "***Facilities***") provided to the Holdco Borrower, in the following order of priority:

(a) pursuant to and in accordance with the Plan, (i) first, a secured term loan facility (the "***First Out Subordinated Senior Secured Term Facility***"), on terms and conditions to be set forth in a Term Loan Credit Agreement (the "***Subordinated Senior Secured Term Loan Credit Agreement***") among the Holdco Borrower, the Existing Term Lenders and Orion Energy Partners TP Agent, LLC, as administrative agent and collateral agent (in such capacities, the **"*Subordinated Senior Secured Term Loan Agent***"), consisting of $16 million of obligations from the Existing Term Loan Credit Agreement and (ii) second, ratably, (A) a secured term loan facility (the "***Second Out Subordinated Senior Secured Term Facility***" and together with the First Out Subordinated Senior Secured Term Facility, the "***Subordinated Senior Secured Term Facility***"), on terms and conditions to be set forth in the Subordinated Senior Secured Term Loan Credit Agreement, consisting of $852.76 million of obligations from the Existing Term Loan Credit Agreement and (B) pursuant to and in accordance with the Plan (including any supplement thereto), Holdco Borrower has agreed to pay to CTCI $213.19 million of obligations under the Existing EPC Agreement (the "***Subordinated Senior Secured EPC Claim***");

(b) pursuant to and in accordance with the Plan (including any supplement thereto), Holdco Borrower has agreed to pay to CTCI $321.25 million of obligations under the Existing EPC Agreement (the "***Subordinated Secured EPC Claim***");

(c) pursuant to and in accordance with the Plan, (i) an unsecured, subordinated junior term loan facility (the "***Subordinated Junior Term Facility***"), on terms and conditions to be set forth in a Term Loan Credit Agreement (the "***Subordinated Junior Term Loan Credit Agreement***") among the Holdco Borrower, the Existing Term Lenders and Orion Energy Partners TP Agent, LLC, as administrative agent and collateral agent (in such capacities, the "***Subordinated Junior Term Loan Agent***"), and together with the New Super Senior Exit Loan Agent and the Subordinated Senior Secured Term Loan Agent, the "**Holdco Term Loan** Agent", consisting of $297.24 million obligations from the Existing Term Loan Credit Agreement

5

and (ii) (including any supplement thereto), Holdco Borrower has agreed to pay to CTCI (x) $264.56 million of obligations under the Existing EPC Agreement plus (y) any Excess EPC DIP Claims (the "***Subordinated Junior EPC Claim***" and together with the Post-Exit CTCI Senior DIP Payment Obligation, the Subordinated Senior Secured EPC Claim and the Subordinated Secured EPC Claim, the "***EPC Agreements***").

In addition to the foregoing, various obligations under the Existing Term Loan Credit Agreement and Existing EPC Agreement are being converted to common and preferred equity of the Holdco Borrower, as stated in the Governance Term Sheet.

| **Documentation Principles:** | The definitive documentation with respect to the New RCF Facility, New SOA and New SSA will be based on, and no less favorable to the Midco Borrower than the documentation in respect of the Existing RCF Credit Agreement, the Existing SOA and the Existing SSA (and related documentation) with modifications as are necessary to (a) reflect the terms set forth in this Term Sheet, including the first-priority nature of the liens on the Midco Loan Parties supporting such the RCF Facilities, including the RCF-Term Intercreditor Agreement described below, (b) reflect that the project is operational, (c) reflect any changes in law since the date of the Existing RCF Credit Agreement and (d) reflect the additional Facilities contemplated by this Term Sheet. |
|---|---|

The definitive documentation with respect to the New Senior Secured Term Facility, the Subordinated Senior Secured Term Facility and the Subordinated Junior Term Facility will be based on, and no less favorable to the Holdco Borrower than the documentation in respect of the Existing Term Loan Credit Agreement (and related documentation) with modifications as are necessary to (a) reflect the terms set forth in this Term Sheet, (b) reflect that the project is operational, (c) reflect any changes in law since the date of the Existing Term Loan Credit Agreement, (d) reflect the additional Facilities contemplated by this Term Sheet and (e) to reflect that such documentation will have no other representations, warranties, covenants or events of default other than as specified in the CTTIA.

The definitive documentation with respect to the New Super Senior Exit Facility (the "***Exit Facility***") shall be negotiated by the Midco Borrower, the requisite lenders under the Existing Term Loan Credit Agreement (the "***Existing Term Required Lenders***") and the New Senior Secured Term Lenders.  CTCI's consent (not to be

unreasonably withheld) shall be required to the terms of, and provider of, the Exit Facility in the following circumstances:

1. if one or more affiliates or insiders of lenders (past or present) under the Existing Term Loan Credit Agreement are providing more than 30% of such Exit Facility, then CTCI's consent (not to be unreasonably withheld) shall be required for the incurrence of such Exit Facility; or

2. if, after a bona fide customary marketing process for such Exit Facility in which offers are solicited on terms and conditions approved (not to be unreasonably withheld) by the Existing Term Required Lenders, the New Senior Secured Term Lenders, and CTCI (the "***Exit Facility Marketing Process***", there are multiple third-party offers for such Exit Facility, then CTCI's consent (not to be unreasonably withheld), shall be required in connection with (i) the Midco Borrower's, Existing Term Required Lenders' and New Senior Secured Term Lenders' selection of which offer to select and (ii) material terms and conditions relating to such Exit Facility. In the case of this clause 2., CTCI shall be required to consent to at least one of the third-party offers for such Exit Facility.

If after the Exit Facility Marketing Process, there is only one third-party offer for the Exit Facility, CTCI's consent shall not be required. In any event, the Existing Term Required Lenders will (x) consult in good faith with CTCI and its representatives throughout the Exit Facility Marketing Process, and (y) promptly provide all material written information, term sheets and/or offer documentation with regard to the Exit Facilities to CTCI or its representatives. The parties recognize the importance of the New Super Senior Exit Facility to the future success of the reorganized debtors and the need to negotiate and accept commercially reasonable terms for such financing.

The definitive documentation with respect to the New CTCI Agreement will (a) be substantially in the form set forth on Exhibit D and (b) in any event, shall have no other representations, warranties, covenants or events of default other than as specified in the CTTIA.

The definitive documentation with respect to the Post-Exit CTCI Senior DIP Payment Obligation, the Subordinated Senior Secured EPC Claim, the Subordinated Secured EPC Claim and the Subordinated Junior EPC Claim will (a) have the applicable terms referenced in the Plan (including any supplement thereto), and (b)

reflect that such documentation will have no other representations, warranties, covenants, events of default, enforcement rights or payment rights other than as specified in the CTTIA.

This section is referred to herein as the "***Documentation Principles***".

**Collateral:**              "***Collateral***" shall mean, in respect of any of the Facilities, the following:

(a) the New RCF Facility, the New SOA and the New SSA will be secured (in the priorities set forth below) by a first priority security interest in all present and after-acquired property of the Midco Loan Parties, subject to the Documentation Principles (with the liens in favor of the New RCF Facility, the New SOA and the New SSA being held by Vitol);

(b) the New Super Senior Exit Facility will be secured (in the priorities set forth below) by a second priority security interest in all present and after-acquired property of the Midco Loan Parties, subject to the Documentation Principles (with the liens in favor of the New RCF Facility, the New SOA and the New SSA being prior to the liens in favor of the New Super Senior Exit Facility being held by the New Super Senior Exit Loan Agent); and

(c) the New Senior Secured Term Facility, the Post-Exit CTCI Senior DIP Payment Obligation, the Subordinated Senior Secured Term Facility, the Subordinated Senior Secured EPC Claim, and the Subordinated Secured EPC Claim will be secured (in the priorities set forth below) by a security interest in all present and after-acquired property of the Holdco Borrower, and all equity interests in the Holdco Borrower, for the benefit of the holders of all of the Holdco Term Facilities that are secured by collateral, subject to customary agency and duty provisions, which shall be subject to the terms and conditions of the CTTIA. These facilities will not be secured by the assets or equity of, or claims against, the Midco Loan Parties, which shall secure exclusively the Midco Facilities. These facilities will not be secured by the assets or equity of, or claims against, the Midco Loan Parties, which shall secure exclusively the Midco Facilities.

Case 25-90113   Document 22   Filed in TXSB on 04/16/25   Page 369 of 421

The Subordinated Junior Term Facility and Subordinated Junior EPC Claim will be unsecured.

| | |
|---|---|
| **Purpose/Use of Proceeds**: | (a) Subject to the Documentation Principles, the purpose and use of proceeds of the New RCF Facility, the New SOA and the New SSA will be consistent with the Existing RCF Credit Agreement, the Existing SOA and the Existing SSA. |

(b) The New Super Senior Exit Facility will be used to pay transaction costs and expenses and (a) for general corporate purposes of the Midco Loan Parties and (b) G&A expenses of the Holdco Borrower (but not, for the avoidance of doubt, any distributions to owners of Holdco Borrower).

(c) The New Senior Secured Term Facility will be used to repay the DIP Financing, pay transaction costs and expenses, and for general corporate purposes of the Company Parties. The obligations under the New CTCI Agreement will convert as provided in the section entitled "Conversion of DIP Financing."

(d) The Subordinated Senior Secured Term Facility, the Subordinated Senior Secured EPC Claim, the Subordinated Secured EPC Claim, the Subordinated Junior Term Facility and the Subordinated Junior EPC Claim will be used to consummate the conversion of certain existing obligations (as set forth under the heading "Conversion of Existing Term Facilities and EPC Agreement" above).

**Availability of New Facilities:**

The availability of the New RCF Facility, the New SOA and the New SSA will be consistent with the Existing RCF Credit Agreement, the Existing SOA and the Existing SSA, provided that the borrowing base will include property, plant and equipment at the lesser of 100% of $35 million or, after the first year following exit, 50% of an appraised value of such assets, with such appraisal to be updated annually.

The loans under the New Super Senior Exit Facility will be available to be drawn by the Holdco Borrower on the Closing Date as may be agreed by the Board and the New Super Senior Exit Lenders.

**Maturity Date:**

<u>New RCF Facility, New SOA and New SSA</u>: June 25, 2027, subject to the extension rights set forth in the Existing SOA

New Super Senior Exit Facility: As negotiated with the New Super Senior Exit Lenders and in any event after the maturity of the New RCF Facility.

New Senior Secured Term Facility: 10 years after the Petition Date

Post-Exit CTCI Senior DIP Payment Obligation: 10 years after the Petition Date

Subordinated Senior Secured Term Facility: 10 years after the Petition Date

Subordinated Senior Secured EPC Claim: 10 years after the Petition Date

Subordinated Secured EPC Claim: 10 years after the Petition Date

Subordinated Junior Term Facility: 10 years after the Petition Date

Subordinated Junior EPC Claim: 10 years after the Petition Date

| | |
|---|---|
| **Mandatory Amortization** | New RCF Facility, New SOA and New SSA: Amortization will be consistent with the Existing RCF Credit Agreement, the Existing SOA and the Existing SSA. |
| | New Super Senior Exit Facility: As negotiated by the Board with the New Super Senior Exit Lenders and reasonably satisfactory to Vitol. |
| | New Senior Secured Term Facility and Post-Exit CTCI Senior DIP Payment Obligation: No mandatory amortization until the applicable Maturity Date, subject to the Excess Cash Flow Sweep. |
| | Subordinated Senior Secured Term Facility and Subordinated Senior Secured EPC Claim: No mandatory amortization until the applicable Maturity Date, subject to the Excess Cash Flow Sweep. |
| | Subordinated Secured EPC Claim, Subordinated Junior EPC Claim and Subordinated Junior Term Facility: No mandatory amortization until the applicable Maturity Date, subject to the Excess Cash Flow Sweep after repayment of senior facilities. |
| **Mandatory Prepayments**: | In respect of the New RCF Facility, the New SOA and New SSA, to be consistent with those set forth in the Existing RCF Credit Agreement, the Existing SOA and Existing SSA, but subject to the Documentation Principles, including priority in terms of mandatory prepayments from proceeds of collateral and insurance. |

10

In respect of the New Super Senior Exit Facility, as negotiated by the Board with the New Super Senior Exit Lenders, but subject to the Documentation Principles.

In respect of the Holdco Term Facilities, those mandatory prepayments set forth in <u>Exhibit C</u> as applicable to such facility, subject to the Documentation Principles.

**RCF-Term Intercreditor Agreement**:

Vitol and the New Super Senior Exit Loan Agent will enter into a customary intercreditor agreement (the "***RCF-Term Intercreditor Agreement***") in favor of the RCF Facilities on terms similar to the Existing RCF-Term Intercreditor Agreement and DIP period intercreditor agreement in favor of the Existing RCF Facility, Existing SOA, and Existing SSA.

**Common Terms and Term Intercreditor Agreement:**

The agents, lenders and secured parties party to the Holdco Term Facilities (such parties, the "***Holdco Term Financing Parties***") will enter into a Common Terms and Term Intercreditor Agreement (the "***CTTIA***") setting out: (i) the representations and warranties applicable to such facilities (ii) the affirmative and negative covenants applicable to such facilities, (iii) the events of default applicable to such facilities, (iv) the permitted remedies applicable to such facilities, (v) other intercreditor matters applicable to such facilities and (vi) none of the Holdco Term Facilities shall be entitled to any payments except for payments in the waterfall priorities as set forth in this Term Sheet.

<u>Exhibit C</u> sets forth the provisions that will be in the CTTIA in respect of the foregoing clauses (i) through (iii), which shall be set forth in the CTTIA in accordance with the Documentation Principles and shall include provisions agreed to by Holdco Borrower in respect of the Company Parties. Any actions expressly permitted under the Governance Term Sheet shall be permitted under the covenants in the Holdco Term Facilities. No other representations, covenants or events of default shall be included in the Holdco Term Facilities except as set forth in <u>Exhibit C</u>.

The CTTIA will grant CTCI and each other Holdco Term Financing Party adversely affected thereby, a consent right over the following amendments, modifications, consents or waivers:

- transfer, conveyance or release of any interest in (a) any of the equity Collateral and/or (b) any other material Collateral;

- to modify the payment waterfalls to be contained in the CTTIA or authorize any payment to a Holdco Term Financing Party that is not consistent with such waterfalls;

- to shorten the applicable maturity date or payment due date under any Holdco Term Facility; <u>provided</u>, that the foregoing shall not restrict enforcement actions taken on or after December 31, 2030;

- to increase the commitments, funding, reimbursement or other obligations of any holder of a Holdco Term Facility obligation;

- to reduce or forgive the principal amount (or amount payable to) of or reduce the rate of interest on or premium on any Holdco Term Facility obligation, increase interest rates, or to extend the date on which interest, fees, or premium are payable to any holder of a Holdco Term Facility obligation (*provided* that, the vote of Required Holdco Term Lenders shall be sufficient to waive any cash interest payment obligation that applies ratably to holders of Holdco Term Facility obligations within a tranche);

- increase the commitments or obligations under any of the Holdco Term Facilities;

- increase the commitments or obligations under the New Super Senior Exit Facility by more than $20 million (up to a total of $100 million), in each case, without the consent of CTCI and the Required Holdco Term Lenders;

- permit partial refinancings or repayments of obligations under the Holdco Term Facilities (other than repayments contemplated by this Term Sheet, such as the excess cash flow sweep) without the consent of CTCI and the Required Holdco Term Lenders;

- any action that disproportionately and materially adversely affects, any party's Holdco Term Facility rights and obligations as compared to the holders of the Holdco Term Facility obligations within such tranche (it being understood that a "tranche" refers to obligations that are at the same level in the waterfall, so for example, the New Senior Secured Term Loans and Post-Exit CTCI Senior DIP Payment Obligation are in the same tranche);

- any adverse modification to the sections governing amendments, consents and waivers; and

- the items requiring CTCI's consent as set forth in the Governance Term Sheet, including Annex A, as well as in Sections 1(i), 1(ii), 1(iii), 1(v), 2(i) and 2(ii) of the Governance Term Sheet.

All other amendments, consents and waivers shall require the written consent of the Holdco Borrower and the Required Holdco Term Lenders.

(a) After December 31, 2030, the Required Holdco Term Lenders shall be permitted to exercise remedies upon the occurrence and continuation of an Event of Default (as defined in the Holdco Term Facilities) and (b) at any time, the Required Holdco Term Lenders shall be permitted to exercise remedies upon the occurrence and continuation of a bankruptcy event of default with respect to a Company Party. Any proceeds of the exercise of remedies, and all other payments, distributions and other assets received at any time in connection with any Holdco Term Facility, shall be held in trust and distributed ratably to the agents, lenders and CTCI under the Holdco Term Facilities in accordance with the waterfall pursuant to the CTTIA and pursuant to customary intercreditor provisions. For the avoidance of doubt, the Holdco Term Facilities shall include standard secured party protections (including automatic acceleration of obligations) upon the occurrence of a bankruptcy event with respect to a Company Party, consistent with the Existing Term Loan Credit Agreement.

Except as provided in this Term Sheet, CTCI shall have no other voting or consent rights, and none of the Holdco Term Facilities will have any enforcement rights except as set forth in the CTTIA.

**Liquidation Waterfall**:   The CTTIA shall also set forth a liquidation waterfall, which will apply cash proceeds from an enforcement action as follows:

- *first*, as required under the RCF-Term Intercreditor Agreement, (i) first, to the obligations owing to the secured parties under the New RCF Facility (including the RCF Agent and Vitol under the SOA) and (ii) second, to the obligations owing under the New Super Senior Exit Loan Credit Agreement (including the New Super Senior Exit Loan Agent);

- *second*, on a *pro rata* basis, to the holders of the New Senior Secured Term Facility and Post-Exit CTCI Senior DIP Payment Obligation;

- *third,* (a) first, on a *pro rata* basis, to the holders of the First Out Subordinated Senior Secured Term Facility and (b) second, on a *pro rata* basis, to the holders of the obligations in respect of the Second Out Subordinated Senior Secured Term Facility and Subordinated Senior Secured EPC Claim;

- *fourth*, on a *pro rata* basis, to the holders of the obligations in respect of the Subordinated Secured EPC Claim;

- *fifth*, on a *pro rata* basis, to the holders of the obligations in respect of the Subordinated Junior Term Loan Credit Agreement and Subordinated Junior EPC Claim; and

- *sixth*, on a *pro rata* basis, to the equity holders of Holdco Borrower pursuant to the Governance Term Sheet.

Such priorities shall in each case include all permitted refinancings or incremental debt incurrence at the applicable level, in each case as set forth in the indebtedness covenant in <u>Exhibit C</u>.

Each holder of Holdco Term Facility obligations (including CTCI) agrees to the foregoing waterfall and priority provisions in connection with the transactions contemplated by this Term Sheet.

**Required Holdco Term Lenders:**

Holders of Holdco Term Facility obligations (including, without limitation, CTCI) holding outstanding obligations representing more than 50% of the total obligations across the Holdco Term Facilities in the aggregate.

**Interest Rates / Payment in Kind**:

<u>New RCF Facility, New SOA and New SSA</u>:  Interest rates and payment terms under the RCF Facilities will be consistent with the Existing RCF Credit Agreement, the Existing SOA and the Existing SSA.

<u>New Super Senior Exit Facility</u>: as negotiated by the Board with the New Super Senior Exit Lenders.

<u>New Senior Secured Term Facility</u>: 8.0%, paid in kind through December 31, 2027 and then, solely to the extent of available cash to the Holdco Borrower, paid quarterly in cash thereafter (and if cash is not available, paid in kind) (but subject to the Excess Cash Flow Sweep, in any event)

14

<u>Post-Exit CTCI Senior DIP Payment Obligation</u>: 8.0%, paid in kind through December 31, 2027 and then, solely to the extent of available cash to the Holdco Borrower, paid quarterly in cash thereafter (and if cash is not available, paid in kind) (but subject to the Excess Cash Flow Sweep, in any event)

<u>Subordinated Senior Secured Term Facility</u>: 8.0%, paid in kind (but subject to the Excess Cash Flow Sweep)

<u>Subordinated Senior Secured EPC Claim</u>: 8.0%, paid in kind (but subject to the Excess Cash Flow Sweep)

<u>Subordinated Secured EPC Claim</u>: 8.0%, paid in kind (but subject to the Excess Cash Flow Sweep)

<u>Subordinated Junior Term Facility</u>: 8.0%, paid in kind (but subject to the Excess Cash Flow Sweep)

<u>Subordinated Junior EPC Claim</u>: 8.0%, paid in kind (but subject to the Excess Cash Flow Sweep)

| | |
|---|---|
| **Fees**: | The Holdco Borrower and the Midco Borrower will pay certain fees in connection with the Holdco Term Facilities as set forth on <u>Exhibit A</u> to this Term Sheet. |
| **Representations and Warranties**: | In respect of the New RCF Facility, the New SOA and New SSA, to be consistent with those set forth in the Existing RCF Credit Agreement, the Existing SOA and Existing SSA, but subject to the Documentation Principles. |
| | In respect of the New Super Senior Exit Facility, as negotiated by the Board with the New Super Senior Exit Lenders, but no more restrictive than the New RCF Facility. |
| | In respect of the Holdco Term Facilities, those representations and warranties listed in <u>Exhibit C</u> hereto applicable to such facility which shall, in each case, be drafted in accordance with the Documentation Principles except as set forth in <u>Exhibit C</u>. |
| **Affirmative Covenants**: | In respect of the New RCF Facility, the New SOA and New SSA, to be consistent with those set forth in the Existing RCF Credit Agreement, the Existing SOA and Existing SSA, but subject to the Documentation Principles. |
| | In respect of the New Super Senior Exit Facility, as negotiated by the Board with the New Super Senior Exit Lenders, but no more burdensome than the New RCF Facility. |

15

In respect of the Holdco Term Facilities, the affirmative covenants listed in <u>Exhibit C</u> hereto applicable to such facility which shall, in each case, be drafted in accordance with the Documentation Principles except as set forth in <u>Exhibit C</u>.

**Negative Covenants**  In respect of the New RCF Facility, the New SOA and New SSA, to be consistent with those set forth in the Existing RCF Credit Agreement, the Existing SOA and Existing SSA, but subject to the Documentation Principles.

In respect of the New Super Senior Exit Facility, as negotiated by the Board with the New Super Senior Exit Lenders, but no more restrictive than the New RCF Facility.

In respect of the Holdco Term Facilities, the negative covenants listed in <u>Exhibit C</u> hereto applicable to such facility which shall, in each case, be drafted in accordance with the Documentation Principles except as set forth in <u>Exhibit C</u>.

**Events of Default**:  In respect of the New RCF Facility, the New SOA and New SSA, to be consistent with those set forth in the Existing RCF Credit Agreement, the Existing SOA and Existing SSA, but subject to the Documentation Principles.

In respect of the New Super Senior Exit Facility, as negotiated by the Board with the New Super Senior Exit Lenders, but no more restrictive than the New RCF Facility.

In respect of the Holdco Term Facilities, the events of default listed in <u>Exhibit C</u> hereto applicable to such facility which shall, in each case, be drafted in accordance with the Documentation Principles except as set forth in <u>Exhibit C</u>.

**Conditions Precedent to Exit from Bankruptcy**:  The conditions precedent to the closing (such date, the "**Closing Date**") shall be as set forth below:

- delivery of executed financing documents for the Holdco Term Facilities, the New Super Senior Exit Facility and the RCF Facilities, including intercreditor agreements, guaranties, security documents and other collateral deliverables;

- delivery of customary legal opinions and corporate deliverables;

- delivery of a borrowing request;

16

- the Plan Effective Date shall have occurred on the Closing Date;

- payment of fees and expenses (including a deposit of amounts sufficient to pay estate professionals in a professional fee escrow account pending approval of payment of such fees and expenses by the Bankruptcy Court (as defined in the Restructuring Support Agreement)); and

- otherwise as set forth in the Plan.

**Conditions to Subsequent Borrowings:**   [As specified in the RCF Facilities term sheet.]

**Expenses**:   The Holdco Borrower will pay all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented fees and expenses of counsel (including New York counsel, bankruptcy counsel and local counsel in each appropriate jurisdiction) and a financial advisor) for the Holdco Term Loan Agent and separate counsel for CTCI in connection with administering the Holdco Term Facilities, preparing all documents and enforcing any and all obligations relating to the Holdco Term Facilities.

The Midco Borrower will pay all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented fees and expenses of counsel (including New York counsel, bankruptcy counsel and local counsel in each appropriate jurisdiction) and a financial advisor) for the New Super Senior Exit Loan Agent and separate counsel for Vitol in connection with administering RCF Facilities, preparing all documents and enforcing any and all obligations relating to the Midco Facilities.

The Holdco Borrower will pay all reasonable and documented out-of-pocket costs and expenses of CTCI (including reasonable and documented fees and expenses of its counsel, local counsel and its financial advisor incurred in connection with workout negotiations and the bankruptcy case).

**Counsel to the Holdco Term Loan Agent:**   Latham & Watkins LLP.

**Counsel to CTCI:**   Davis Wright Tremaine LLP and Haynes & Boone, LLP.

**Counsel to the RCF Agent:**   Sidley Austin LLP.

17

## EXHIBIT A

### Fees and Premiums under Facilities

The Holdco Borrower and the Midco Borrower, as applicable, agrees to pay (or cause to be paid) the following:

| | |
|---|---|
| **RCF Fees:** | The fees under the RCF Facilities other than the RCF Exit Fee will be consistent with the Existing RCF Credit Agreement, the Existing SOA and the Existing SSA. |
| | RCF Exit Fee as negotiated with Vitol by the Board. |
| **New Super Senior Exit Facility Fees:** | As negotiated with the New Super Senior Exit Lenders by the Board. |
| **Holdco Term Facility Fees**: | None. |
| **Other Exit Premium and Upfront Fees**: | None. |

A-1

## EXHIBIT B

### Defined Terms

"***BKRF OCB***" means BKRF OCB, LLC, a Delaware limited liability company.

"***Board***" means the board of directors of Holdco Borrower.

"***CTCI***" means CTCI Americas, Inc., a Texas corporation.

"***Excess Cash Flow Sweep***" means a 100% excess cash flow sweep of actual cash received by the Holdco Borrower and remaining in the revenue account on each annual payment date; provided that, Holdco Borrower shall be permitted to reserve an amount of cash in the revenue account to pay reasonably anticipated SG&A of the Holdco Borrower, any debt service under the Holdco Term Facilities and any operating expenses (including maintenance capex) of the Midco Loan Parties.

"***Existing EPC Agreement***" means that certain Turnkey Agreement with a Guaranteed Maximum Price for the Engineering, Procurement and Construction of the Bakersfield Renewable Fuels Project, dated as of May 18, 2021, as amended by that certain Amendment No. 1 to Turnkey Agreement with a Guaranteed Maximum Price, dated as of May 19, 2021, that certain Change Order #1, dated as of June 10, 2022, that certain Change Order #3, dated as of July 8, 2022, that certain Change Order #4, dated as of October 10, 2022, that certain Amendment No. 2 to EPC Agreement, dated as of January 10, 2023, that certain Change Order #5, dated as of April 24, 2023, that certain Heads of Agreement for Proposed Settlement, dated as of October 30, 2023, that certain Change Order #6, dated as of November 10, 2023, that certain Change Order #7, dated as of November 10, 2023, that certain Interim Settlement Agreement, effective as of December 18, 2023, that certain Change Order #9, dated as of April 12, 2024, that certain Change Order #10, dated as of July 9, 2024 and that certain Change Order #11, dated as of August 29, 2024, by and between the Project Company and CTCI.

"***Existing RCF Credit Agreement***" means that certain Credit Agreement, dated as of June 24, 2024, by and among Project Company, BKRF OCB, Holdings, Vitol, as administrative agent and collateral agent (in such capacities, the "***Existing RCF Agent***"), and the other agents and lenders party thereto from time to time (the "***Existing RCF Lenders***") relating to the revolving loans made thereunder.

"***Existing RCF-Term Intercreditor Agreement***" means that certain Intercreditor Agreement, dated as of June 25, 2024, as amended by that certain Amendment No. 1 to Intercreditor Agreement, dated as of November 4, 2024, by and among the Existing RCF Agent, the Existing Term Loan Agent, the lenders party thereto, BKRF OCB, the Project Company and Holdings.

"***Existing SOA***" means that certain Supply and Offtake Agreement, dated as of June 25, 2024, by and between the Project Company and Vitol.

"***Existing SSA***" means that certain Storage Services Agreement, dated as of June 25, 2024, by and between the Project Company and Vitol.

"***Existing Term Loan Credit Agreement***" means that certain Credit Agreement, dated as of May 4, 2020, as amended by that certain Amendment No. 1 to Credit Agreement and Waiver, dated as of July 1, 2020, that certain Amendment No. 2 to Credit Agreement, dated as of October 12, 2020, that certain Amendment No. 3 to Credit Agreement, dated as of March 26, 2021, that certain Amendment No. 4 to Credit Agreement, dated as of May 19, 2021, that certain Amendment No. 5 to Credit Agreement, dated as of July 19, 2021, that certain Amendment No. 6 to Credit Agreement, dated as of December 20, 2021, that certain Amendment No. 7 to Credit Agreement, dated as of February 2, 2022, that certain Amendment No. 8 to Credit Agreement, dated as of February 2, 2022, that certain Amendment No. 9 to Credit Agreement, dated as of August 5, 2022, that certain Amendment No. 10 to Credit Agreement, dated as of January 30, 2023, that certain Amendment No. 11 to Credit Agreement, dated as of May 19, 2023, that certain Amendment No. 12 to Credit Agreement, dated as of June 21, 2023, that certain Amendment No. 13 to Credit Agreement, dated as of July 5, 2023, that certain Amendment No. 14 to Credit Agreement, dated as of April 9, 2024, that certain Amendment No. 15 to Credit Agreement, dated as of May 6, 2024, that certain Amendment No. 16 to Credit Agreement, dated as of June 25, 2024, that certain Amendment No. 17 to Credit Agreement, dated as of August 29, 2024, that certain Amendment No. 18 to Credit Agreement, dated as of December 16, 2024, that certain Amendment No. 19 to Credit Agreement, dated as of January 27, 2025, that certain Amendment No. 20 to Credit Agreement, dated as of February 21, 2025, that certain Amendment No. 21 to Credit Agreement, dated as of February 27, 2025, and that certain Amendment No. 22 to Credit Agreement, dated as of April 3, 2025, by and among the BKRF OCB, BKRF OCP, LLC ("***Holdings***"), the Project Company, Orion Energy Partners TP Agent, LLC, as administrative agent and collateral agent (in such capacities, the "***Existing Term Loan Agent***"), and the other agents and lenders party thereto from time to time (the "***Existing Term Lenders***") relating to the tranche A, B, C, C+ and D loans made thereunder.

"***Governance Term Sheet***" means that certain Governance Term Sheet attached as Exhibit D to the Restructuring Term Sheet.

"***Midco Loan Parties***" means Midco Pledgor, Midco Borrower, [BKRF OCB, *existing holdcos*,] the Project Company, SusOils and ATI.

"***Petition Date***" shall have the meaning assigned to such term in the Restructuring Support Agreement.

"***Plan***" shall have the meaning set forth in the Restructuring Support Agreement.

"***Plan Effective Date***" shall have the meaning set forth in the Restructuring Support Agreement.

"***Restructuring Support Agreement***" means that certain Restructuring Support Agreement, dated as of [__], 2025, to which this Term Sheet is attached.

"***Restructuring Term Sheet***" means that certain Restructuring Term Sheet for Holdco Borrower and its subsidiaries, dated as of [__], 2025.

"***Vitol***" means Vitol Americas Corp., a Delaware corporation.

B-2

EXHIBIT C

| | Term | **Covenants in CTTIA applicable to New Senior Secured Term Facility and Post-Exit CTCI Senior DIP Payment Obligation** | **Covenants in CTTIA applicable to Subordinated Senior Secured Term Facility and Subordinated Senior Secured EPC Claim** | **Covenants in CTTIA applicable to Subordinated Secured EPC Claim** | **Covenants in CTTIA applicable to Subordinated Junior Term Facility and Subordinated Junior EPC Claim** |
|---|---|---|---|---|---|
| Mandatory Prepayments | | | | | |
| 1. | Material Project Document Termination Proceeds | Yes, consistent with Section 2.06(b)(i) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(i) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(i) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(i) of Existing Term Loan Credit Agreement |
| 2. | Event of Loss | Yes, consistent with Section 2.06(b)(ii) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(ii) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(ii) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(ii) of Existing Term Loan Credit Agreement |
| 3. | Disposition of Assets | Yes, consistent with Section 2.06(b)(iii) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(iii) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(iii) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(iii) of Existing Term Loan Credit Agreement |
| 4. | Incurrence of Impermissible Debt | Yes, consistent with Section 2.06(b)(iv) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(iv) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(iv) of Existing Term Loan Credit Agreement | Yes, consistent with Section 2.06(b)(iv) of Existing Term Loan Credit Agreement |

C-1

| 5. | Excess Cash Flow Sweep applicability | Yes, as specified in term sheet. | Yes, as specified in term sheet. | Yes, as specified in term sheet. | Yes, as specified in term sheet. |
|----|--------------------------------------|----------------------------------|----------------------------------|----------------------------------|----------------------------------|
| <td colspan="5">Representations and Warranties[5]</td> | | | | | |
| 1. | Due Organization | Yes | Yes | Yes | Yes |
| 2. | Authorization | Yes | Yes | Yes | Yes |
| 3. | No conflict | Yes | Yes | Yes | Yes |
| 4. | Approvals | Yes | Yes | Yes | Yes |
| 5. | No MAE | Yes | Yes | Yes | Yes |
| 6. | Financial Statements | Yes | Yes | Yes | Yes |
| 7. | Litigation | Yes | Yes | Yes | Yes |
| 8. | Permits, Environmental Matters | Yes | Yes | Yes | Yes |
| 9. | Compliance with Laws | Yes | Yes | Yes | Yes |
| 10. | Taxes | Yes | Yes | Yes | Yes |
| 11. | Solvency | Yes | Yes | Yes | Yes |
| 12. | ERISA | Yes | Yes | Yes | Yes |
| 13. | Sanctions, OFAC, AML | Yes | Yes | Yes | Yes |

---

[5] NTD: Representations will be consistent with the relevant applicable representations set forth in the Existing Term Loan Credit Agreement, but will include MAE and materiality qualifiers (if not already contained therein).

| Affirmative Covenants | | | | | |
|---|---|---|---|---|---|
| 1. | Corporate Existence; Etc. | Yes, consistent with Section 5.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.01 of Existing Term Loan Credit Agreement |
| 2. | Conduct of Business | Yes, consistent with Section 5.02 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.02 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.02 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.02 of Existing Term Loan Credit Agreement |
| 3. | Compliance with Laws and Obligations | Yes, consistent with Section 5.03 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.03 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.03 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.03 of Existing Term Loan Credit Agreement |
| 4. | Maintenance of Title | Yes, consistent with Section 5.05 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.05 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.05 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.05 of Existing Term Loan Credit Agreement |
| 5. | Insurance | Yes, but to avoid an insurance schedule and include a general insurance maintenance covenant. | Yes, but to avoid an insurance schedule and include a general insurance maintenance covenant. | Yes, but to avoid an insurance schedule and include a general insurance maintenance covenant. | Yes, but to avoid an insurance schedule and include a general insurance maintenance covenant. |
| 6. | Payment of Taxes, Etc. | Yes, consistent with Section 5.09 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.09 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.09 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.09 of Existing Term Loan Credit Agreement |

C-3

| 7. | Financial Statements | Yes, consistent with Section 5.10 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.10 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.10 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.10 of Existing Term Loan Credit Agreement |
|---|---|---|---|---|---|
| 8. | Notices | Yes, consistent with Section 5.11 of Existing Term Loan Credit Agreement, but to remove construction-related items | Yes, consistent with Section 5.11 of Existing Term Loan Credit Agreement, but to remove construction-related items | Yes, consistent with Section 5.11 of Existing Term Loan Credit Agreement, but to remove construction-related items | Yes, consistent with Section 5.11 of Existing Term Loan Credit Agreement, but to remove construction-related items |
| 9. | Use of Proceeds | Yes, as set forth in term sheet | Yes, as set forth in term sheet | Yes, as set forth in term sheet | Yes, as set forth in term sheet |
| 10. | Security | Yes, consistent with Section 5.14 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.14 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.14 of Existing Term Loan Credit Agreement | No |
| 11. | Further Assurances | Yes, consistent with Section 5.15 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.15 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.15 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.15 of Existing Term Loan Credit Agreement |
| 12. | Bank Accounts | Yes, consistent with Section 5.18 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.18 of Existing Term Loan Credit Agreement | Yes, consistent with Section 5.18 of Existing Term Loan Credit Agreement | No |

C-4

| Negative Covenants | | | | | |
|---|---|---|---|---|---|
| 1. | Subsidiaries; Equity Issuances | Yes | Yes | Yes | Yes |
| 2. | Indebtedness | Yes, (i) to reflect this term sheet, (ii) to reflect other operational baskets consistent with Section 6.02 of Existing Term Loan Credit Agreement and (iii) other customary baskets (including permitted refinancings and working capital financings for SusOils) to be agreed. | Yes, (i) to reflect this term sheet, (ii) to reflect other operational baskets consistent with Section 6.02 of Existing Term Loan Credit Agreement and (iii) other customary baskets (including permitted refinancings and working capital financings for SusOils) to be agreed. | Yes, (i) to reflect this term sheet, (ii) to reflect other operational baskets consistent with Section 6.02 of Existing Term Loan Credit Agreement and (iii) other customary baskets (including permitted refinancings and working capital financings for SusOils) to be agreed. | Yes, (i) to reflect this term sheet, (ii) to reflect other operational baskets consistent with Section 6.02 of Existing Term Loan Credit Agreement and (iii) other customary baskets (including permitted refinancings and working capital financings for SusOils) to be agreed. |
| 3. | Liens | Yes | Yes | Yes | Yes |
| 4. | Investments | Yes. Any investments between the Company Parties shall be permitted. | Yes. Any investments between the Company Parties shall be permitted. | Yes. Any investments between the Company Parties shall be permitted. | Yes. Any investments between the Company Parties shall be permitted. |
| 5. | Business Activities | Yes, consistent with Section 6.05(b) of Existing Term Loan Credit Agreement for the Project Company | Yes, consistent with Section 6.05(b) of Existing Term Loan Credit Agreement for the Project Company | Yes, consistent with Section 6.05(b) of Existing Term Loan Credit Agreement for the Project Company | Yes, consistent with Section 6.05(b) of Existing Term Loan Credit Agreement for the Project Company |

| | | | | | |
|---|---|---|---|---|---|
| | | and to include holding company covenant for all entities other than operational entities | and to include holding company covenant for all entities other than operational entities | and to include holding company covenant for all entities other than operational entities | and to include holding company covenant for all entities other than operational entities |
| 6. | Restricted Payments | No restricted payments by the Holdco Borrower will be permitted except for tax distributions and other customary baskets to be agreed. The other Company Parties shall be permitted to make restricted payments to their parent. | No restricted payments by the Holdco Borrower will be permitted except for tax distributions and other customary baskets to be agreed. The other Company Parties shall be permitted to make restricted payments to their parent. | No restricted payments by the Holdco Borrower will be permitted except for tax distributions and other customary baskets to be agreed. The other Company Parties shall be permitted to make restricted payments to their parent. | No restricted payments by the Holdco Borrower will be permitted except for tax distributions and other customary baskets to be agreed. The other Company Parties shall be permitted to make restricted payments to their parent. |
| 7. | Fundamental Changes; Asset Sales | Yes | Yes | Yes | Yes |
| 8. | Accounting Changes | Yes, consistent with Section 6.08 of Existing Term Loan Credit Agreement | Yes, consistent with Section 6.08 of Existing Term Loan Credit Agreement | Yes, consistent with Section 6.08 of Existing Term Loan Credit Agreement | Yes, consistent with Section 6.08 of Existing Term Loan Credit Agreement |
| 9. | Transactions with Affiliates | Yes, consistent with Section 6.10 of Existing Term Loan Credit Agreement | Yes, consistent with Section 6.10 of Existing Term Loan Credit Agreement | Yes, consistent with Section 6.10 of Existing Term Loan Credit Agreement | Yes, consistent with Section 6.10 of Existing Term Loan Credit Agreement |

| | Events of Default | | | | |
|---|---|---|---|---|---|
| 1. | Payment Default | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement |
| 2. | Representation and Warranties breach | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement |
| 3. | Covenant Breach | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement |
| 4. | Bankruptcy | Yes, but only for Company Parties | Yes, but only for Company Parties | Yes, but only for Company Parties | Yes, but only for Company Parties |
| 5. | Judgments | Yes, but only for Company Parties | Yes, but only for Company Parties | Yes, but only for Company Parties | Yes, but only for Company Parties |
| 6. | Loss of Security Documents | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | No |
| 7. | ERISA Events | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement |

| 8. | Event of Total Loss | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement | Yes, consistent with Section 7.01 of Existing Term Loan Credit Agreement |
|---|---|---|---|---|---|
| 9. | Cross-payment EOD and cross-acceleration to other Debt | Yes | Yes | Yes | Yes |

# **EXHIBIT D**

Form of New CTCI Contract

[*Attached a Exhibit B to the Restructuring Term Sheet*]

**Exhibit D**

**Governance Term Sheet**

## Governance Term Sheet

This term sheet (together with all annexes, schedules, and exhibits attached hereto, this "**Governance Term Sheet**") summarizes the material terms of the proposed governance of Reorganized GCEH (the "**Company**"), and its direct and indirect subsidiaries (together with the Company, the "**Company Parties**" and each, individually, a "**Company Party**") (the transactions proposed herein the "**Governance Transactions**"). Capitalized terms used but not otherwise defined in this Governance Term Sheet shall have the respective meanings ascribed to such terms in that certain Restructuring and Support Agreement to which this Governance Term Sheet is attached (the "**RSA**").

THIS GOVERNANCE TERM SHEET IS NEITHER AN OFFER WITH RESPECT TO ANY SECURITIES NOR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS GOVERNANCE TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE OF THE ORGANIZATIONAL DOCUMENTS ON THE TERMS DESCRIBED HEREIN AND WITHIN THE RSA, DEEMED BINDING ON ANY OF THE PARTIES HERETO. THIS GOVERNANCE TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY PERSON OTHER THAN THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS AND THEIR RESPECTIVE PROFESSIONAL ADVISORS OR EXCEPT AS OTHERWISE SET FORTH IN ANY CONFIDENTIALITY AGREEMENT BETWEEN THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS OR THEIR RESPECTIVE PROFESSIONAL ADVISORS.

THIS GOVERNANCE TERM SHEET IS FOR DISCUSSION PURPOSES ONLY AND DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE GOVERNANCE TRANSACTIONS DESCRIBED HEREIN, WHICH GOVERNANCE TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF THE DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY GOVERNANCE TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

Without limiting the generality of the foregoing, this Governance Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution, and delivery of the Definitive Documents, including but not limited to the operating agreement and/or other applicable governance documents (the "**Organizational Documents**"). The regulatory, tax, accounting, and other legal and financial matters and effects related to the Governance Transactions or any related restructuring or similar transaction have not been fully evaluated, and any such evaluation may affect the terms and structure of any Governance Transactions or related transactions.

This Governance Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Governance Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

| Subject | Key Terms |
|---|---|
| **General Structure** | The Company will be a Delaware limited liability company that will elect to be classified as an association taxable as a corporation for U.S. federal income tax purposes effective as of the date of its conversion or formation, as the case may be, will be managed by a board of directors (the "**Board**"), which will be responsible for overseeing the operation of the business conducted by the Company Parties.<br><br>For the avoidance of doubt, the Company will not be a public reporting company or listed on any exchange as of the Plan Effective Date. |
| **Business Purpose** | The purpose of the Company and its subsidiaries shall be engaging in the direct or indirect investment in projects and businesses in connection with or related to any aspect of vertically integrated renewable fuels production, including generation and sale of renewable fuel sources and byproducts, through camelina varieties, crop feedstock and other plant science and/or other renewable fuel production sources, growth or production of renewable fuel production sources including camelina varieties, and research and development of plant science related to any of the foregoing, and engaging in any other lawful act or activity that now or in the future may be necessary, convenient, incidental or advisable to accomplish the foregoing and that is not forbidden by law in the jurisdictions in which the Company and/or its subsidiaries, as applicable, engage in such businesses or activities (the "**Business Purpose**"). |
| **Capitalization; Capital Contributions** | The Organizational Documents will provide that the equity interests of the Company will be initially evidenced by two classes of ownership interests: common units (each of which, a "**Common Unit**" and each holder of a Common Unit, a "**Common Holder**"), and preferred units (each of which, a "**Preferred Unit**", and collectively, with the Common Units, the "**Units**", and each holder of a Preferred Unit, a "**Preferred Holder**" and together with each Common Holder, a "**Holder**"). Each class of Units shall have the rights and obligations set forth herein.<br><br>The issued and outstanding Common Units as of the Plan Effective Date shall be owned 100% by the lenders or affiliates thereof under the Prepetition Term Loan Credit Agreement (such lenders, the "**Prepetition Term Loan Lenders**"), in such relative amounts as shall be determined by the Prepetition Term Loan Lenders prior to the Plan Effective Date.<br><br>The Preferred Units will be issued at a price of $1,000 per Preferred Units and, as of the Plan Effective Date, the issued and outstanding Preferred Units shall be owned (i) 44.4% by the Prepetition Term Loan Lenders or affiliates thereof (and allocated as among them in such relative amounts as shall be determined by the Prepetition Term Loan Lenders prior to the Plan Effective Date) in exchange for an aggregate amount of deemed capital contributions equal to $100,000,000 and (ii) 55.6% by CTCI or its affiliates (and allocated as among them in such relative amounts as shall be determined by CTCI prior to the Plan Effective Date) in exchange for an aggregate amount of deemed capital contributions equal to $125,000,000.<br><br>None of the Holders shall have any obligation to contribute capital to the Company. |

| Subject | Key Terms |
|---|---|
| | The Preferred Units shall be automatically redeemed, surrendered and canceled, without the need for further action by the Company, the Board or any other Person, on and as of the date on which the Holder of such Preferred Units receives distributions, as declared by the Board, from the Company or proceeds of a sale (including any Company Sale Transaction and/or Drag-Along) that, in any case, result in the Preferred Holder achieving the Preferred Return in respect of such Preferred Units. The Preferred Holders shall have no right to cause the Company to redeem the Preferred Units. |
| **Board; Governance** | The business and affairs of the Company Parties shall be governed by the Board, and, except as expressly set forth in this Governance Term Sheet (including the CTCI Consent Matters) no Holder, in its capacity as such, shall participate in the management or control of any Company Party's respective business, transact any business on behalf of any Company Party, or have the power to act for or bind any Company Party, said powers being vested solely and exclusively in the Board. Each direct and indirect subsidiary of the Company shall be managed by its members or shareholders, as applicable, with decisions and actions of such member or shareholder governed by the Board, except as required under the applicable laws of the jurisdiction of organization of any Subsidiary, as applicable, in which cases such subsidiaries shall be governed by a board of directors or similar governing body that is comprised of the same individuals as the Board and subject to the same voting and governance rights with respect thereto. |

<u>Board Composition</u>: The Board will initially be comprised of seven (7) directors selected as follows (each, a "**Director**"):

(i)      Four (4) directors designated by vote of the Common Holders holding, in the aggregate, at least a majority of the then-issued and outstanding Common Units (each, a "**Common Director**");

(ii)     Two (2) directors designated by CTCI Americas, Inc. (or any Affiliate thereof that is a Holder) (collectively, "**CTCI**") for so long as CTCI owns any Preferred Units (each, a "**CTCI Director**") (it being understood that such right to designate the CTCI Directors is not transferrable other than to a transferee of a majority of the Preferred Units, and then such transferee shall have the right to designate the CTCI Director only for so long as such transferee owns a majority of the then-issued and outstanding Preferred Units); and

(iii)    One (1) independent director (the "**Independent Director**") to be selected by a majority of the other Directors, which shall be a natural person with experience and expertise in or relating to the industry in which the Company operates and not an employee of any Holder.

<u>Director Removal; Replacement</u>: A Director may be removed at any time from the Board (with or without cause) at the written request of the designee of such Director (or, with respect to the Independent Director, as determined by a majority of the other Directors). In the event of the removal, resignation, death or incapacity of any Director, the Person(s) entitled to designate such Director shall be entitled to appoint

| Subject | Key Terms |
|---------|-----------|
|  | a new Director to fill such vacancy. A chairman of the Board will be determined by a majority vote of the Board.<br><br>Meetings: Meetings of the Board (and any committee thereof) shall be held at the principal office of the Company or at such other place as determined by the Board (or such committee). Notice of each such meeting shall be provided in writing and shall state the date, place and time of such meeting and provided to each member of the Board (or such committee) by hand, e-mail, overnight courier or the United States mail not less than 5 days and not more than 60 days prior to such meeting. Notice may be waived before or after such meeting by attendance without protest. A meeting of the Board may be held by telephone conference or similar remote communication equipment by means of which all individuals participating can be heard.<br><br>Quorum: Quorum will require attendance (whether in person, by remote communication or proxy) of a majority of the then-current Directors, which shall include the attendance of a CTCI Director; provided, however, that any Director actually present that voluntarily recuses themselves from a meeting or a vote shall be counted as present for quorum purposes. In the event that a quorum is not present for two (2) successive duly called meetings of the Board solely due to the absence of a CTCI Director (in person, by remote communication or by proxy) within one hour following the time appointed for the second of such meetings, the remaining directors may reconvene such meeting no earlier than 48 hours after the originally scheduled meeting, and the attendance of a CTCI Director shall not, at such reconvened meeting, be required to constitute a quorum, and the agenda for such reconvened meeting shall be the same as both previously called meetings.<br><br>Board Voting and Action by Written Consent: Each Director shall have one vote and, except with respect to the CTCI Consent Matters (described below) or as otherwise expressly set forth herein, action by the Board (or any committee thereof) shall require simple majority approval. Action by the Board (or any committee thereof) may be taken by vote at a meeting thereof or by written consent (without a meeting, without notice and without a vote) so long as such written consent is executed by all Directors whose affirmative vote or consent would have been required had the vote been held at a duly convened meeting and such consent is not effective until 48 hours after notice thereof of the taking of such consent has been provided to each Director. The Board will use reasonable efforts to consult with at least one CTCI Director prior to taking any action by written consent. For the avoidance of doubt, all actions taken by the Board by written consent require at least 48 hours advance notice to the directors designated by CTCI.<br><br>Board Compensation/Expense Reimbursement: The Independent Director shall receive reasonable compensation in an amount and form to be agreed by such Independent Director and the Board, and each Director shall receive reimbursement of reasonable and documented out-of-pocket expenses associated with attending meetings of the Board. |

| Subject | Key Terms |
|---|---|
| | **Fiduciary Duties:** No Director shall owe to the Company fiduciary duties in its capacity as such, and such duties shall be waived to the maximum extent permitted by applicable law.<br><br>**Indemnification; Insurance:** Each Director will be entitled to the benefits of customary director indemnification provisions and liability insurance to be set forth in the Organizational Documents of the Company.<br><br>**Committees:** The composition of any committee of the Board, and the authority thereof, will be subject to agreement by majority vote of the Board; provided, however, that in no event may the Board delegate to any committee the authority to take any action that constitutes a CTCI Consent Matter without obtaining the requisite approval from CTCI to take such action. Any committee of the Board shall include at least one member appointed by CTCI, unless such requirement is waived in advance by CTCI in writing. As of the Plan Effective Date, the Board shall be deemed to have approved the formation of an Operational Committee, which shall be comprised of three (3) to five (5) members, as determined by the Board, which members shall include at least one member appointed by CTCI. Such Operational Committee shall solely serve as an advisory committee to the Board but shall not, for the avoidance of doubt, be granted any authority or discretion to act on behalf of the Board.<br><br>**Board Observer:** Each Holder shall be entitled to designate one (1) individual representative (each, a "**Board Observer**") to attend (whether in person, by remote communication) any meeting of the Board. The Company will provide each Board Observer written notice of each applicable meeting at the same time and in the same manner notice is given to the Directors. For the avoidance of doubt, except for a Board Observer holding a valid written proxy from a Director, no Board Observer shall be taken into consideration for purposes of determining whether a quorum is present at any meeting and no Board Observer shall be entitled to vote on any matters presented before the Board. For purposes of clarity, the parties agree and acknowledge that no Board Observer shall have any fiduciary duties or obligations to the Company and, under no circumstances, shall any indemnity and/or advancement contemplated by the Organizational Documents be negated or otherwise impacted by any claim which alleges a breach of any such duties. Each Board Observer shall agree to keep confidential any confidential information obtained from the Company and its Affiliates in its capacity as Board Observer, and any Holder appointing a Board Observer will be responsible for any breach of the confidentiality restrictions set forth in the Organizational Documents by such Board Observer receiving disclosure of information in its capacity as such. Notwithstanding anything to the contrary herein, the Board reserves the right, on behalf of the Company, to reasonably withhold any information and to reasonably exclude any such Board Observer from any meeting or portion thereof if access to such information or attendance at such meeting would reasonably be expected to (a) adversely affect the attorney-client or work product privilege between the Company and its counsel, or (b) result in a conflict of interest (including with respect to any pending, threatened or completed action, suit or proceed, or any proposed or pending transaction, in each case involving the Company, on the one hand, and any Holder or its respective Affiliates, on the other hand) or otherwise violate the |

| Subject | Key Terms |
|---|---|
| | Company's or any of its subsidiaries' confidentiality obligations under any written agreement to which the Company or any of its subsidiaries is a party or is otherwise bound. |
| **CTCI Consent Matters** | Notwithstanding anything to the contrary herein, the matters set forth on **Annex A** attached hereto (each, a "**CTCI Consent Matter**") shall require the consent of the Board as well as CTCI so long as it owns any Preferred Units.<br><br>Except as otherwise expressly provided in this Governance Term Sheet, the CTCI Consent Matters shall be the only actions or matters that require the consent or approval of CTCI, and no other action or decision by the Company Parties, the Board or the Common Holders shall require the consent or approval of CTCI or any of the Preferred Holders in their capacity as such. |
| **Officers** | Appointment; Authority: The Board shall be entitled to appoint, delegate authority to and remove such officers of the Company as the Board may from time to time deem appropriate (each, an "**Officer**"). Each Officer shall serve in such capacity until removed or replaced by the Board. Any delegation of authority to an Officer to take any action must be approved, if applicable, in the same manner as would be required for the Board to approve such action directly. Any employment agreement of compensation payable to any Officer shall be subject to the approval of the Board.<br><br>Fiduciary Duties: Each Officer, in the performance of their duties as such, shall owe to the Company the same fiduciary duties as an officer of a Delaware corporation.<br><br>Indemnification; Insurance: Each Officer will be entitled to the benefits of customary officer indemnification provisions and liability insurance in the Organizational Documents of the Company. |
| **Management Incentives** | The Board, in its discretion and from time to time, may adopt and approve a cash bonus plan or similar form of compensation plan for the benefit of the employees of the Company and shall further have discretion to issue any awards thereunder on such terms as it may determine. |
| **Budget** | The Company shall prepare and provide to the Board at least 60 days prior to the end of any year (beginning with the year ended December 31, 2026) a proposed annual budget and operating plan for the immediately succeeding year ("**Annual Budget**"). Adoption of the Company's Annual Budget will require approval by consent of the Board with such revisions thereto as the Board may determine, which Annual Budget will require the approval of the Independent Director; provided, that, to the extent that any individual line item in the proposed Annual Budget also requires consent of CTCI as a CTCI Consent Matter, such consent shall also be obtained in connection with approving such Annual Budget; provided, further, that the proposed Annual Budget shall become effective with respect to (i) each individual line item that requires the consent of CTCI as a CTCI Consent Matter, if any, upon the consent of CTCI and consent of the Board, and (ii) each individual line item in such proposed Annual Budget that does not require consent of CTCI as |

| Subject | Key Terms |
|---------|-----------|
| | a CTCI Consent Matter, upon the consent of the Board with respect to adoption of such proposed Annual Budget (as modified by the Board, as applicable).<br><br>If an Annual Budget is not approved on or before the start of a fiscal year, then a default Annual Budget will apply to such fiscal year, which shall be equal to and consistent with the prior year's approved Annual Budget subject to the following: (i) operating expenses set forth in the prior year's Annual Budget shall roll forward subject to an escalator of 10%, (ii) recurring maintenance capital expenditures set forth in the prior year's Annual Budget shall roll forward and (iii) except with respect to recurring maintenance capital expenditures subject to clause (ii), all other capital expenditures set forth in the prior year's Annual Budget shall be excluded from such default Annual Budget except to the extent and only to the extent that any capital expenditure set forth in the prior year's Annual Budget was not actually incurred in the prior year.<br><br>The initial Annual Budget for the fiscal year ending December 31, 2025 will be adopted and approved by the Board in connection with the adoption of the Organizational Documents on the Plan Effective Date. |
| **Additional Issuances of Equity** | Preemptive Rights: If approved by the Board, the Company shall issue additional equity in the Company or its subsidiaries on such terms and with such rights and preferences as the Board may determine (subject to any required consent in respect of any applicable CTCI Consent Matters); provided that, except in connection with any Excluded Issuance, in respect of any future issuances, offering or sale of (i) equity securities in the Company that would rank senior or *pari passu* with the Preferred Units in order of priority with respect to distributions or (ii) securities convertible into or exchangeable for equity securities in any subsidiary of the Company ("**New Securities**"), the Preferred Holders will have *pro rata* preemptive rights with respect to such issuance. The Board shall provide written notice to Holders notifying them of the intent to issue, offer or sell such New Securities, which notice shall include a description of the New Securities, including the applicable price and terms thereof (the "**New Securities Notice**"). The Preferred Holders will have 30 days after receipt of the New Securities Notice (the "**Preferred New Issue Exercise Period**") to elect to purchase up to its pro rata share of the New Securities by providing written notice of such election to the Board. In the event that any Preferred Holder does not timely elect during the Preferred New Issue Exercise Period to purchase all of its pro rata share of the New Securities or declines to purchase any New Securities or the Preferred New Issue Exercise Period otherwise expires, then the Common Holders shall have the right to acquire their respective pro rata share of the amount of New Securities still available after such Preferred New Issue Exercise Period (the "**Remaining New Securities**") during the 30 days following receipt of written notice from the Board of such Remaining New Securities (the "**Common New Issue Exercise Period**"). In the event that any Common Holder does not timely elect during the Common New Issue Exercise Period to purchase all or its pro rata share of the Remaining New Securities or declines to purchase any Remaining New Securities of the Common New Issue Exercise Period otherwise expires, then the Board may then issue, offer or sell to a third party the amount of Remaining New Securities that are still available after such Common New Issue Exercise Period. Any third party that acquires any New |

| Subject | Key Terms |
|---|---|
| | Securities in accordance with the foregoing shall be admitted as a new Holder and shall deliver to the Company a written instrument agreeing to be bound by the terms of the Organizational Documents. Notwithstanding anything herein to the contrary, in the event that any New Securities are not issued to the Preferred Holders, the Common Holders or a third party pursuant to the foregoing within the period that is 120 days after the date of the expiration of the Common New Issue Exercise Period, as such 120-period may be extended as necessary in order to obtain any regulatory approvals required for such transaction, then such New Securities shall not be issued, offered or sold without again complying with the foregoing requirements.<br><br>Notwithstanding the foregoing, if the Board (including the Independent Director) reasonably determines that it is in the best interests of the Company, it may (i) if the Board (including the Independent Director) also determines that the Company has an urgent capital need that reasonably justifies shortening the Preferred New Issue Exercise Period and the Common New Issue Exercise Period, in each case, to a shorter period that is not less than 10 days, and/or (ii) offer and sell New Securities without first complying with the foregoing provisions so long as Holders are given the opportunity to purchase the New Securities that they would otherwise have had the right to purchase within 60 days after the sale of such New Securities.<br><br>"**Excluded Issuance**" means the issuance of any Units (or securities convertible into or exchangeable for Units) or of equity securities (or securities convertible into or exchangeable for equity securities) in a subsidiary of the Company (a) that rank junior in order of priority of distribution to the Preferred Units, (b) after the expiration of the Standstill Period, to any Person that is not a Holder or an Affiliate thereof as consideration in any acquisition or other strategic transaction (such as a joint venture, marketing or distribution arrangement, or participation or development arrangement) approved by the Board, (c) as a *pro rata* distribution to the equityholders or upon any split, subdivision or combination of Units, (d) following the Standstill Period, in connection with a Company Sale Transaction, (e) the proceeds of which will be used to redeem the Preferred Units in exchange for payment of the Preferred Return, or (f) to the Company or any other direct or indirect subsidiary of the Company. |
| **Transfer Restrictions** | Transfer Requirements: Any direct or indirect transfer of Units shall be made in accordance with and subject to satisfaction of the following conditions to transfer: (i) compliance with all applicable federal and state securities laws and regulations (including exemption from all registration requirements), (ii) the agreement by the applicable transferee in writing to be bound by the terms of such Organizational Documents in the form of a joinder to the Organizational Documents in form and substance acceptable to the Board, (iii) that such transfer shall not cause the Company to be deemed an "investment company" under the Investment Company Act of 1940, (iv) that such transferee is not an entity or person subject to sanctions, and (v) that such transferee is not a competitor of the Company (as reasonably determined by the Board including the Independent Director). The Board shall be entitled to waive any of the foregoing conditions to the extent permitted by applicable law. |

| Subject | Key Terms |
|---------|-----------|
| | <u>Common Transfers</u>: Aside from the transfer requirements described above, there shall be no restrictions on transfers of Common Units; <u>provided</u> that, for the avoidance of doubt, the Common Units shall be subject to the Drag-Along Rights described below.<br><br><u>Preferred Transfers</u>: The Preferred Units shall be subject to the Tag-Along Rights and Drag-Along Rights described below and the restrictions on transfer described above, but there shall be no other restrictions on transfer of the Preferred Units.<br><br><u>Standstill</u>: During the period commencing on the Plan Effective Date and ending on December 31, 2030 (the "**Standstill Period**"), in no event shall any of the Company or its subsidiaries (a) voluntarily file or cause to be filed a petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under the U.S. Bankruptcy Code or any other insolvency law, or the dissolution, winding up or liquidation of the Company or any of its subsidiaries, or (b) sell all or substantially all of the business of the Company or any of its subsidiaries (whether by way of purchase agreement, tender offer, merger, consolidation, business combination, equity sale or issuance or other similar transaction) (a "**Company Sale Transaction**"), in each case of (a) and (b) unless such filing or Company Sale Transaction, as applicable, either (i) is approved by CTCI (which consent right shall constitute a CTCI Consent Matter) and the Board (including the affirmative prior written consent of at least one CTCI Director) or (ii) approved by the Board and, in connection with such filing or transaction, all obligations owed to CTCI by any Company Party shall be satisfied in full, and each Preferred Unit will be redeemed in cash or marketable securities in exchange for receipt (when taken together with any prior distributions in respect of such Preferred Unit) of its applicable Preferred Return. For the avoidance of doubt, after the expiration of the Standstill Period, with respect to any Company Sale Transaction that will be consummated after the end of the Standstill Period, (i) there shall be no minimum return requirement with respect to consideration received by any Holder, and (ii) subject to approval by the Board, any such Company Sale Transaction may be in exchange for no equity consideration, in which case then-outstanding Units may be deemed to be automatically canceled upon consummation of such Company Sale Transaction for no consideration.<br><br><u>Drag-Along Rights</u>: If at any time the Board (by majority consent) elects to consummate a sale or transfer, in a bona fide arm's length transaction (or series of related transactions) (including by way of purchase agreement, tender offer, merger, consolidation, business combination or other similar transaction) for all or substantially all of the issued and outstanding Units, then, in such case the Company may require each of the Holders to transfer all of such Holder's Units to a Person or Persons (other than any Person that is an Affiliate of any Holder) (the foregoing, a "**Drag-Along Sale**"); <u>provided</u>, that, with respect to any such Drag-Along Sale that will be consummated prior to the end of the Standstill Period, the Preferred Holders shall only be obligated to participate in such Drag-Along Sale if, as a result of such Drag-Along Sale, such Preferred Holders will receive consideration in an amount sufficient to cause the Preferred Holders to achieve their Preferred Return (taking into account any prior distributions in respect of the Preferred Units) and automatically redeemed upon receipt of such consideration; <u>provided</u>, <u>further</u>, that, |

| Subject | Key Terms |
|---|---|
| | with respect to any such Drag-Along Sale that will be consummated after the end of the Standstill Period, (i) there shall be no minimum return requirement with respect to consideration received by any Holder, and (ii) subject to approval by the Board, any such Drag-Along Sale may be in exchange for no equity consideration, in which case then-outstanding Units may be deemed to be automatically canceled upon consummation of such Drag-Along Sale for no consideration. The definitive documentation will outline the mechanics for a Drag-Along Sale, including notification to and receipt by the Preferred Holders of information regarding such Drag-Along Sale. The consideration received by the Holders in connection with the Drag-Along Sale will be allocated among the Holders in the same proportion that such Holder would have received if such consideration had been distributed by the Company in a complete liquidation pursuant to the rights and preferences set forth below. In connection with a Drag-Along Sale, each Holder shall execute such documents (other than any non-competition, or other similar covenants restricting future business opportunities and activities of such Holder or its Affiliates) and make such customary representations and warranties with respect to title, power and authority, organization and good standing, enforceability, absence of liens or encumbrances and adverse claims, absence of conflicts, absence of consents and approvals, and absence of brokers ("**Fundamental Representations**"), and such covenants and indemnities, in each case, solely as to itself, as are executed and made by each other Holder and their respective Affiliates; <u>provided</u> that any indemnification or obligations as among such Holders will be apportioned pro rata (based on the consideration proceeds to be received by each Holder in such Drag-Along Sale) as among them (and each such Holder shall be severally, and not jointly, liable for its pro rata apportionment), other than any indemnification or other obligations with respect to such Holder's Fundamental Representations and warranties, to the extent relating individually to such Holder, its Units and its participation in the Drag-Along Sale (the indemnification and other obligations in respect of which shall be borne solely by such Holder); <u>provided</u>, <u>further</u>, that in no event shall any Holder's aggregate liabilities exceed the proceeds payable on the Preferred Units actually received by such Holder in such Drag-Along Sale. In connection with a Drag-Along Sale, each Holder agrees to (i) consent to and raise no objections against the Drag-Along Sale or the applicable process, (ii) waive and confirm such Holder has no dissenter's rights, appraisal rights, or other similar rights, (iii) all actions reasonably required or requested by the Board to consummate such Drag-Along Sale, and (iv) comply with the terms of the documentation related to such Drag-Along Sale.<br><br><u>Tag-Along Rights</u>: Each of the Preferred Holders shall have a tag-along right to participate in any sale by another Preferred Holder of any or all of its Preferred Units (other than customary exceptions, including transfers to Affiliates of the applicable transferring Preferred Holder or to other existing Holders or transfers of Preferred Units that are contemplated in connection with a transfer by such transferring Preferred Holder of any indebtedness of the Company or its subsidiaries owed to such transferring Preferred Holder) at the same time and on the same terms and conditions as the transferring Preferred Holder (a "**Tag-Along Sale**"). Any Preferred Holder that desires to sell any or all of its Preferred Units other than pursuant to the applicable exceptions shall provide written notice to each other Preferred Holder, which notice shall include the terms and conditions of the proposed Tag-Along Sale, |

| Subject | Key Terms |
|---------|-----------|
| | and the number of Preferred Units contemplated to be sold, and shall include copies of any written proposals or agreements related to such sale (the "**Tag-Along Notice**"). Within 15 days after receipt of such Tag-Along Notice, the recipient Preferred Holders may irrevocably elect to participate in such Tag-Along Sale and sell a *pro rata* portion of its Preferred Units to the proposed transferee on the same terms and conditions as set forth in the Tag-Along Notice. For the avoidance of doubt, the consideration in any Tag-Along Sale in which any Preferred Holder participates is not required to result in achievement of the Preferred Return. The definitive documentation will outline the mechanics for a Tag-Along Sale, including notification to and receipt by the Preferred Holders of information regarding such Tag-Along Sale and notification of election to participate therein. A Preferred Holder participating in a Tag-Along Sale shall not be required to (i) make any representations or warranties to the transferee other than Fundamental Representations and investment qualifications, or (ii) enter into any non-competition or similar covenants restricting the future business opportunities and activities of such participating Holder or its Affiliates. To the extent that the participating Holders are to provide any indemnification or assume any post-closing liabilities, each transferring Holder in such Tag-Along Sale shall do so severally and not jointly (and on a *pro rata* basis in accordance with the relative value of consideration received by such transferring Holders).<br><br>Notwithstanding the foregoing, to the extent that the aggregate number of Preferred Units proposed to be transferred pursuant to any sale with respect to which a Preferred holder's *pro rata* tag-along rights apply exceeds the total number of Preferred Units that a proposed transferee is willing to purchase, the number of Preferred Units to be transferred by each seller thereof shall be reduced such that a *pro rata* portion of each seller's Preferred Units are sold to such transferee. If no other Preferred Holder elects to participate in a Tag-Along Sale with the transferring Preferred Holder, then the transferring Preferred Holder may consummate the sale of such Preferred Units on the terms and conditions set forth in the Tag-Along Notice, subject to the other provisions of the Organizational Documents, within the 120-day period following the date of such Tag-Along Notice without again complying with the Tag-Along Sale procedures. |
| **Distributions** | At the times determined by the Board, all available cash (subject to customary reserves as determined by the Board) shall be distributed to the Holders as follows:<br><br>(i)   *First*, 100% to the Preferred Holders until each Preferred Holder has received the Preferred Return with respect to each Preferred Unit held by such Preferred Unit, *pro rata* based on relative amounts required to be distributed to each such Preferred Holder in order to achieve such Preferred Return with respect to each Preferred Unit held by such Preferred Holder; and<br><br>(ii)   *Thereafter*, 100% to the Common Holders, *pro rata* based on the number of Common Units held by each such Common Holder.<br><br>"**Preferred Return**" means an amount, with respect to each Preferred Unit and determined as of any applicable date, sufficient to cause the difference between |

| Subject | Key Terms |
|---|---|
| | (a) an amount equal to $1,000 per Preferred Unit (with respect to each Preferred Unit, the "**Preferred Unit Principal Amount**") plus interest on the Preferred Unit Principal Amount accreting daily from and after the Plan Effective Date and compounding quarterly at a rate of 8% per year and (b) the aggregate amount of distributions in respect of such Preferred Unit plus the amount of any sale proceeds received from the Company in respect of such Preferred Unit, including in connection with any Drag-Along Sale or Company Sale Transaction, to equal $0.<br><br>To the extent permitted by the Company and its subsidiaries material agreements, debt documents and law, and after setting aside reasonable reserves as determined by the Board and the payment of all other amounts then due and payable, any excess cash available will be distributed to the Company to pay the Preferred Return. |
| **Information Rights** | To be consistent with information rights set forth in the Exit Term Loan Credit Agreements and the New CTCI Agreement. |
| **Expenses** | The Company shall reimburse each Holder for their respective reasonable documented out-of-pocket third party expenses associated with any proposed amendment, consent or similar action of such Holder as may be requested or required to the extent such costs or expenses are incurred after the Plan Effective Date. |
| **Amendments** | The Organizational Documents (including the classification of the Company for U.S. federal income tax purposes) will not be amended, modified or waived without the approval of the Board.<br><br>Additionally, CTCI shall have the right to approve any amendment or modification to, or waiver under, the Organizational Documents that would remove or materially and adversely (as with respect to CTCI) alter Tag-Along Rights, Drag-Along Rights, Preemptive Rights, Information Rights, Standstill, the rights described above under the heading "CTCI Consent Matters" and other transfer and voting related provisions (or the meanings of any defined terms within such sections). Any modification of CTCI's Director-designation rights shall require the prior written consent of CTCI.<br><br>Additionally, the Preferred Holders (by approval of the Holders of a majority of the then-issued and outstanding Preferred Units) shall have the right to approve (which approval shall not be unreasonably withheld, conditioned or delayed) any amendment or modification to, or waiver under, the Organizational Documents that (i) would be material, adverse and disproportionate to the Preferred Holders (as compared to Holders of any other class of Units) and/or (ii) would remove or materially and adversely (as with respect to the Preferred Holders) alter Tag-Along Rights, Drag-Along Rights, Preemptive Rights, Information Rights, Standstill and other transfer and voting related provisions (or the meanings of any defined terms within such sections). Any modification of a Holder's (or group of Holder's) Director-designation rights shall require the prior written consent of such Holder (or group of Holders, as applicable). Except as explicitly provided pursuant to the |

| Subject | Key Terms |
|---|---|
| | foregoing, the Preferred Holders shall not have any consent rights with respect to amendments or modifications to, or waivers under, the Organizational Documents. |
| **Waiver of Corporate Opportunity** | The Company and each Holder recognizes and acknowledges (a) that each other Holder (i) has been and is engaged in, and is expected to engage in on or after the date hereof, directly or indirectly, many aspects of the business of the Company Parties and the energy, infrastructure and asset management industries and participates in, and is expected to continue to participate in, existing and future funds, investment vehicles, operating companies, portfolio companies and other entities, including operating companies, portfolio companies and other entities whose businesses relate to the business of the Company Parties and transact in a variety of assets, including real estate, energy and other assets, and also engage in a variety of commercial and financial transactions with counterparties in industries that may include those of the Company Parties and may otherwise be, are or will be competitive with the business of the Company Parties or that could otherwise be suitable for the Company or its Subsidiaries (the "**Other Businesses**"), (ii) has interests in, participates with, aids and maintains seats on the boards of directors or other governing bodies of, its Other Businesses, and (iii) may develop or become aware of business opportunities for its Other Businesses, and (b) each Holder Group may or will have conflicts of interest or potential conflicts of interest with any of the Company, its Affiliates or other Holders as a result of or arising from the Other Businesses and the nature of the such Holder Group's applicable business and other factors.<br><br>The Company and each Holder agree that: (A) any member of any other Holder Group and may engage, participate or invest in, or otherwise be involved with, any Other Businesses or other business opportunity of any nature, whether or not competitive with the businesses or activities of the Company Parties, and neither the Company Parties nor any other Holder will have any right by virtue of this Governance Term Sheet or the subsequent definitive Organizational Documents or the relationship created hereby in or to such Other Businesses, (B) nothing in this Governance Term Sheet or the subsequent definitive Organizational Documents will prohibit any member of a Holder Group from engaging in any Other Businesses or other business opportunity for its own account, (C) nothing in this Governance Term Sheet or the subsequent definitive Organizational Documents will require any member of the Holder Group to make any business opportunity available to the Company Parties or any other Holder, and (D) to the fullest extent permitted by applicable law, the legal doctrines of "business opportunity" and similar doctrines will not be applied to any Other Businesses and each other Holder and the Company (on behalf of itself and each other Company Party) each hereby renounce any interest, expectancy or other rights or interests in any Other Businesses or any other business opportunity in which any member of a Holder Group participates, including those that may relate to the Business. |
| **Lender Rights** | Ownership of equity interests of the Company will not impair any party's rights as a lender to the Company. |
| **Defined Terms** | "**Affiliate**" means any Person who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the |

| Subject | Key Terms |
|---|---|
| | Person specified. For purposes of this definition, the term "**control**" means the possession, directly or indirectly, of the power to direct, or to cause the direction of, the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. |
| | "**Governmental Authority**" means any applicable domestic or foreign federal, state, municipal or local governmental, regulatory or administrative authority, department, court, agency, board, commission or other governmental entity or instrumentality in the United States, including any political subdivision thereof. |
| | "**Holder Group**" means, with respect to any Holder, collectively: (i) such Holder, (ii) any Affiliate of such Holder, (iii) any fund, account, or other investment vehicle managed, advised or sponsored by any of the foregoing, but shall exclude any portfolio company of the foregoing. For purposes of clarity and without limitation of the foregoing, a Holder Group shall exclude any of the Company Parties. |
| | "**Person**" shall mean an individual natural person, a corporation, a partnership (limited or general), a joint venture, a trust, an unincorporated organization, a limited liability company, a government and any agency or political subdivision thereof, or any other entity. |
| | "**Representative**" means each director, officer, manager, employee, representative or agent of any Person. |
| | "**Third Party**" means any Person other than a Holder or any Affiliate of any Holder. |
| **Confidentiality** | Each Holder, on behalf of itself, its Affiliates (other than the Company), its investors and its advisors, acknowledges and agrees that the provisions of the Organizational Documents, all understandings, agreements and other arrangements between and among the Holders, with respect to the Company Parties, and all other non-public information received from or otherwise relating to the Company Parties or the business or assets of the Company Parties, including (i) the terms and conditions of the Organizational Documents and the other organizational and transaction documents of the Company Parties, (ii) any and all information about any project or any other business opportunity, project or prospect identified by the Company Parties and (iii) confidential or proprietary information received by any Company Party from a Third Party with respect to which any Company Party is subject to confidentiality obligations in favor of a Third Party to the extent known by the receiving party (such information, collectively, subject to the exclusions identified in the paragraphs below, the "**Confidential Information**") will be confidential, and will not be disclosed or otherwise released to any other Person, without the written consent of the Board, unless such disclosure or release is otherwise permitted pursuant to the terms of a separate agreement to which the Company (or any other Company Party) is a party, which agreement is approved by written consent of the Board. Each Holder agrees that it will not use any of such Confidential Information for any purpose other than for a valid purpose relating to the business of the Company Parties or otherwise in connection with its investment in the Company, including a potential transfer (directly or indirectly) of its Units. The obligations of a Holder pursuant to this paragraph will continue following the time such Person |

| Subject | Key Terms |
|---|---|
| | ceases to be a Holder, but thereafter such Person will not have the right to enforce the provisions of the Organizational Documents.<br><br>Notwithstanding the foregoing paragraph, "**Confidential Information**" shall not include, with respect to any Holder, any information that (i) is already lawfully in the possession or control of such Holder or its Representatives, so long as such information is not, to the knowledge of such Holder, subject to a legal, fiduciary or contractual obligation of confidentiality or secrecy to any Company Party or any other Holder, (ii) becomes publicly available other than through a breach of the Organizational Documents by such Holder or any of its Affiliates, (iii) becomes available to such Holder or its Representatives from a source other than any Company Party or another Holder (or its Representatives) so long as, to the knowledge of such Holder, such source is not bound by a legal, fiduciary or contractual obligation of confidentiality or secrecy to any Company Party or any other Holder, or (iv) is independently developed by such Holder or its Representatives without relying on any Confidential Information or otherwise breaching the Organizational Documents.<br><br>Notwithstanding anything to the contrary set forth in the Organizational Documents, nothing in the Organizational Documents shall prevent or restrict any Holder or any member of its Holder Group from (i) disclosing Confidential Information to a member of such Holder's Holder Group, each of which will be bound by the provisions of the first paragraph in this "*Confidentiality*" section of this Governance Term Sheet, (ii) disclosing information and documents to such Holder's Holder Group, as applicable, attorney, accountant or tax advisor exclusively for the purpose of securing legal, accounting or tax advice, and solely to the extent required for such purpose, (iii) making any disclosures to their respective direct or indirect investors or prospective investors or the Company's or the applicable Holder's Holder Group or, in either case, such investors' or prospective investors' respective advisors with respect to the operating results, prospects, transaction or project pipeline, and other similar information of or regarding the Company Parties, so long as such persons are subject to confidentiality restrictions, (iv) disclosing information to any contractor, consultant or other service provider engaged by a Company Party in connection with the development or operation of any project, so long as each such Person is subject to confidentiality restrictions, (v) disclosing information and documents to any bona fide potential transferee of such Holder's Units in the Company and the advisors thereof, so long as each such Person is subject to confidentiality restrictions or (vi) disclosing information and documents in connection with enforcing any rights a Holder has under any Organizational Documents or any other organizational and transaction documents of the Company Parties; <u>provided</u>, the disclosing Holder will be responsible for any breach of the confidentiality or use restrictions set forth herein by the Persons receiving such disclosure pursuant to the foregoing clauses (i) through (v). In addition, the obligations of the Holders hereunder will not apply to the extent that the disclosure of information otherwise determined to be confidential is required by applicable law (or applicable rule or regulation) or in performance of a Holder's customary public reporting disclosures; <u>provided</u> that, except with respect to any disclosure in connection with a Holder's customary public reporting disclosures or other general regulatory examinations or reviews, prior to disclosing such Confidential |

| Subject | Key Terms |
|---|---|
| | Information and to the extent not prohibited by applicable law (or applicable rule or regulation), a Holder must notify the Company thereof (if practicable, with sufficient notice to allow the Company to seek confidential treatment of such information), which notice will include the basis upon which such Holder believes the information is required to be disclosed. |
| **Public Announcements** | No Holder will issue, or permit any of its Affiliates or representatives to issue, any press release or otherwise make any public statements or announcements regarding this Governance Term Sheet or the Organizational Documents or the transactions contemplated hereby or thereby without the prior written consent (which consent will not be unreasonably withheld, conditioned or delayed) of the other Holders, except as otherwise determined to be necessary or appropriate to comply with applicable law or any rules or regulations of any stock exchange, supervisory, regulatory or other Governmental Authority having jurisdiction over it or any of its Affiliates (including the Securities and Exchange Commission and the New York Stock Exchange), in which case the Holder required to issue such press release or public announcement will use reasonable efforts to provide the other Holders a reasonable opportunity to comment on such press release or public announcement in advance of such publication. The Holders will consult with each other concerning the means by which the employees, customers, and suppliers of the Company Parties and others having dealings with the Company Parties will be informed of the transactions contemplated by this Governance Term Sheet. Notwithstanding the foregoing, nothing contained in this Agreement will limit any Holder's (or such Holder's respective Affiliates') rights to disclose the existence of this Agreement and the general nature of the transaction described herein on any earnings call or in similar discussions with financial media or analysts, stockholders and other members of the investment community. |
| **Dispute Resolution** | The Holders agree that any and all disputes or claims by any Holder or the Company arising from or related to this Governance Term Sheet that cannot be amicably settled (such disagreement, a "**Dispute**") will be determined solely and exclusively by arbitration in accordance with the Federal Arbitration Act and using the rules of the American Arbitration Association or any successor thereof when not in conflict with such act. Arbitration will take place at an appointed time and place in Houston, Texas. The parties to the Dispute will select two impartial arbitrators, and the two so designated will select a third impartial arbitrator. If the parties to the Dispute should fail to designate the two impartial arbitrator within seven (7) business days after arbitration is requested, or if the two arbitrators should fail to select a third arbitrator within seven (7) business days after their designation, then the applicable arbitrator(s) will be selected in accordance with the Commercial Arbitration Rules of the American Arbitration Association (such arbitrators, the "**Arbitrators**" and each individually, an "**Arbitrator**"). Each Arbitrator will have at least ten (10) years' experience in the relevant industry of the Company or applicable subsidiary with respect to which such Dispute pertains. Within ten (10) business days after the selection of the applicable Arbitrators, the parties to the Dispute shall provide to such Arbitrators any documents and materials and such evidence as such party deems appropriate to explain such party's position with respect to the Dispute. The Arbitrators' determination shall be made within fifteen (15) business days after submission of the matters in dispute, and shall be final and binding upon the parties |

| Subject | Key Terms |
|---|---|
| | to the Dispute, without right of appeal. Each party to the Dispute shall each bear its own legal fees and other costs of presenting its case. Each party to the Dispute shall bear the costs and expenses of the Arbitrators proportionally to the number of parties to the Dispute. Any decision rendered by the Arbitrators pursuant hereto shall be final, conclusive and binding on the parties and the parties irrevocably waive their right to any form of appeal, review or recourse to any state court or other judicial authority, insofar as such waiver may be validly made. Such decision will be enforceable against the parties in any court of competent jurisdiction. The arbitration process will be kept confidential and such conduct, statements, promises, offers, views and opinions will not be discoverable or admissible in any legal proceeding for any purpose, except to the extent reasonably necessary to enforce the final decision of the Arbitrators. The Arbitrators may not award damages, interest or penalties to the parties with respect to any matter.

Without limitation of any other provision in this Governance Term Sheet, each party hereto acknowledges that an award of damages for failure to comply with this Governance Term Sheet and subsequent definitive Organizational Documents would not be an adequate remedy for the Company or any Holder attempting to enforce this Governance Term Sheet and irreparable loss and damage will be suffered by the Company or such Holder should any other party hereto breach any of these covenants and restrictions, and accordingly the parties hereto expressly authorize any of the Company and any Holder to bring an action against any other party hereto for a permanent or temporary injunction and to compel the specific performance or any other equitable remedy by such other party hereto of its obligation to comply with such provisions without the necessity of posting bond or other security in connection therewith, including to prevent a breach or contemplated breach of this Governance Term Sheet and subsequent definitive Organizational Documents. This remedy is in addition to any other remedies at Law or in equity. The existence of any claim, demand, action or cause of action of any such party hereto against the Company or the applicable Holder shall not constitute a defense to the enforcement by the Company or such Holder of any of the covenants, restrictions or agreements herein |
| **Governing Law** | This Governance Term Sheet and subsequent definitive Organizational Documents shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law principles. |

**Annex A**

**CTCI Consent Matters**

The following are "CTCI Consent Matters" and are subject to the consent rights noted above in the "*Board; Governance*" section of this Governance Term Sheet and are without limitation to the Preferred Holder and CTCI consent rights, to the extent applicable, set forth in the "Standstill", "Drag-Along Rights" and "Amendment" sections of this Governance Term Sheet (each of which shall also constitute CTCI Consent Matters).

1.    Prior to the expiration of the Standstill Period, the Company shall not, and shall cause each of its subsidiaries not to, take any of the following actions, in each case, without the prior written consent of CTCI:

    (i)    Changing the Business Purpose of the Company or any of its subsidiaries or entering into a new line of business not consistent with the Business Purpose;

    (ii)    Incurring incremental indebtedness for borrowed money, other than indebtedness for borrowed money that is approved by the Board and (A) expressly permitted by the Exit Facilities Term Sheet to be incurred without CTCI's consent and/or (B) the proceeds of which will be used to redeem the Preferred Units by payment of the Preferred Return;

    (iii)    Issuing any New Securities, other than Excluded Issuances;

    (iv)    Without limitation to the Drag-Along Rights and terms of the Standstill (including with respect to any permitted Company Sale Transaction thereunder) and excluding the issuance of any equity by the Company or any of its subsidiaries otherwise in accordance with the LLCA and this Governance Term Sheet, including, as applicable, subject to the consent rights with respect thereto set forth in Section 1(iii) of this Annex A, selling, exchanging or disposing of any of the assets or properties of the Company or any of its subsidiaries in a transaction (or series of related transactions) with an aggregate value of more than $35 million, unless such sales are of obsolete or unused equipment or spare parts or of inventory or the proceeds of such sale will be used to redeem the Preferred Units by payment of the Preferred Return;

    (v)    Entering into or amending any contract between or among the Company or any of its subsidiaries, on the one hand, and any Holder or any of its Affiliates (other than the Company and its subsidiaries), on the other hand (each, an "**Affiliate Contract**"); <u>provided</u> that, for the avoidance of doubt, any agreement or contract entered into between or among any Holder or any of its Affiliates, on the one hand, and the Company or any of its subsidiaries, on the other hand, in connection with the issuance of any New Securities in accordance with the LLCA and this Governance Term Sheet (including, as applicable, subject to the consent rights with respect thereto set forth in Section 1(iii) of this Annex A) shall not constitute an Affiliate Contract), other than an Affiliate Contract that is on arms' length terms and that is approved by the Independent Director;

     (vi)    Commencing or effecting any initial public offering by the Company or any of its subsidiaries of equity securities or other offer or sale of equity securities pursuant to a registration statement filed with the U.S. Securities and Exchange Commission; or

     (vii)   Implementing or modifying any accounting or income tax policies, or making (or choosing to make) or changing any available tax election (including as to the tax classification of the Company or any of its subsidiaries), or changing the tax structure, in each case, of the Company or any of its subsidiaries in a manner that would have a materially disproportionate and adverse effect on the Preferred Holders (as compared to Holders of any other class of Units).

2.     From and after the expiration of the Standstill Period (as defined in the RSA), the Company shall not, and shall cause each of its subsidiaries not to, take any of the following actions, in each case, without the prior written consent of CTCI (not to be unreasonably withheld, conditioned or delayed):

     (i)    Changing the Business Purpose of the Company or any of its subsidiaries or entering into a new line of business not consistent with the Business Purpose;

     (ii)   Entering into or amending any Affiliate Contract, other than an Affiliate Contract that is on arms' length terms and that is approved by the Independent Director;

     (iii)   Incurring incremental indebtedness for borrowed money, other than indebtedness for borrowed money that is approved by the Board and (A) expressly permitted by the Exit Facilities Term Sheet to be incurred without CTCI's consent and/or (B) the proceeds of which will be used to redeem the Preferred Units by payment of the Preferred Return; or

     (iv)   Implementing or modifying any accounting or income tax policies, or making (or choosing to make) or changing any available tax election (including as to the tax classification of the Company or any of its subsidiaries), or changing the tax structure, in each case, of the Company or any of its subsidiaries in a manner that would have a materially disproportionate and adverse effect on the Preferred Holders (as compared to Holders of any other class).

## **Exhibit E**

**Assumed Agreements**

The Assumed Agreements shall comprise 9-month term employment agreements (starting April 10, 2025), to be entered into before the Petition Date, with the following individuals:

- Verleun, Noah

- D'Amico, Antonio

- Adkins, Wade

- Herreras, Yuri

- Centurion, Carlos

- Dineen, Kimberly Ann

- Doudnikova, Anna

- Jalali, Matthew Mehdi

- Jordan, Jeffrey Louis

- Lau, Thu Hong Tran

- Mandt, Mariah

- Monk, Kevin David

- Norton, Stephen Cole

- Palmer, Ben Earnest

- Plowman, Phillip Eugene

- Riches, Ryan

- Rodriguez, Oscar Alberto

- Sackewitz, Sarah

- Van Walsem, Jaco

- Wojtkowiak, Jamie

- Womack, Bradley Steven

**Exhibit F**[1]

**Form of Releases and Exculpation Language**

"Exculpated Parties" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the independent directors or managers of any Debtor, for conduct within the scope of their duties; and (c) any statutory committees appointed in the Chapter 11 Cases and each of their respective members, solely in their respective capacities as such.

"Final Order" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, dismissed, vacated, or reconsidered, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

"Related Party" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, such Person's or Entity's current and former directors, managers, officers, committee members, members of any governing body, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

"Released Parties" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders; (d) the Agents; (e) the Consenting Stakeholders; (f) all holders of Claims; (g) all holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through this clause (i); *provided*, *however*, that, in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release, and such objection is not resolved before Confirmation.

"Releasing Parties" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders; (d) the Agents; (e) the Consenting Stakeholders; (f) all holders of Claims; (g) all holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through this clause (i); *provided*, *however*, that, in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not resolved before Confirmation.

*Releases by the Debtors*.

Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and

---

[1]    For the avoidance of doubt, the terms herein, including with respect to the releases and exculpation, are under review, and shall be subject to approval, by the applicable special committees of the Company Parties.

discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Action and any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors and their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtors, or the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the Prepetition RCF Facility, the Prepetition Term Loan Facility, the Terminated EPC Agreement, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, any adversary proceedings, the formulation, preparation, dissemination, negotiation, entry into, or filing of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement,[2] the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the DIP Facilities, the New CTCI Agreement, the DIP Documents, the New Preferred Equity Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any other Definitive Document, or any Restructuring Transactions, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the DIP Documents, the New Preferred Equity Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any Causes of Action described, identified, or otherwise included in the Schedule of Retained Causes of Action, (b) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan, and (c) any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the

---

[2]    "Class B Purchase Agreement" shall mean that certain Purchase Agreement, dated as of April 16, 2025, by and among Agribody Technologies, Inc., BKRF HCB, LLC, and the Class B Members signatory thereto as sellers.

good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

*Releases by the Releasing Parties.*

Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties (other than the Debtors and the Reorganized Debtors), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, and their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the Prepetition RCF Facility, the Prepetition Term Loan Facility, the Terminated EPC Agreement, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, any adversary proceedings, the formulation, preparation, dissemination, negotiation, entry into, or filing of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, any contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or

omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan, or (b) any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release

*Exculpation.*

Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Plan Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim arising from the Petition Date through the Plan Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documents, or any Restructuring Transactions, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Definitive Documents, the Class B Purchase Agreement, the New Common Equity, the New Preferred Equity, the Takeback Debt, the Exit RCF Facility, the Exit Term Loan Facilities, the New CTCI Agreement, the DIP Facilities, the New Preferred Equity Documents, the DIP Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

<u>**EXHIBIT C**</u>

**Joinder Agreement**

The undersigned (the "<u>**Joinder Party**</u>") hereby acknowledges that it has read and understands that certain Restructuring Support Agreement, dated as of [●] (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "<u>**Agreement**</u>"),[1] by and among Global Clean Energy Holdings, Inc. and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders, and agrees to be bound by the terms and conditions thereof to the extent that the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting Term Loan Lender," a "Consenting RCF Lender," or within "CTCI" under the terms of the Agreement, as applicable.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date this Joinder Agreement is executed and any further date specified in the Agreement.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Prepetition RCF Claims | |
| Prepetition Term Loan Claims | |
| Prepetition EPC Claims | |
| Interests | |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## EXHIBIT D

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●] (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"),[1] by and among Global Clean Energy Holdings, Inc. and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting Term Loan Lender," a "Consenting RCF Lender," or within "CTCI" under the terms of the Agreement, as applicable.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):


| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Prepetition RCF Claims | |
| Prepetition Term Loan Claims | |
| Prepetition EPC Claims | |
| Interests | |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**<u>EXHIBIT C</u>**

**Company Organizational Chart**



Global Clean Energy Holdings, Inc. (DE)
Agribody Technologies, Inc. (DE)
Sustainable Oils, Inc. (DE)
Camelina Company España, S.L. (Spain)
GCE Holdings Acquisitions, LLC (DE)
GCE International Development, LLC (DE)
GCEH Ventures, LLC (DE)
GCE Operating Company, LLC (DE)
Global Clean Energy Texas, LLC (TX)
Rosedale FinanceCo LLC (DE)
Global Clean Renewable (Argentina) S.R.L. (Argentina)
Global Clean Renewable (Brasil) LTDA (Brazil)
GCEH CS Acquisition, LLC (DE)
Global Clean (Canada) Renewable Fuels, ULC (Canada)
BKRF HCP, LLC (DE)
BKRF HCB, LLC (DE)
BKRF OCP, LLC (DE)
BKRF OCB, LLC (DE)
Bakersfield Renewable Fuels, LLC (DE)
Legend
Filing Entity
Non-Filing Entity
Revolving Credit Facility
Revolving Credit Facility Borrower
Revolving Credit Facility Guarantor
Revolving Credit Facility Grantor
Revolving Credit Facility Pledged Equity
Senior Secured Term Loan
Secured Term Loan Borrower
Secured Term Loan Guarantor
Secured Term Loan Grantor
Secured Term Loan Pledged Equity
CCI Notes
CCI Notes

**<u>EXHIBIT D</u>**

**Financial Projections**

[***To Come***]

**<u>EXHIBIT E</u>**

**Liquidation Analysis**

**[*To Come*]**

**<u>EXHIBIT F</u>**

**Valuation Analysis**

[***To Come***]