PSLAM 7:11

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION: EMERGENCY MOTION TO DISMISS BANKRUPTCY CASE
### #25-90113

**GLOBAL CLEAN ENERGY HOLDINGS, INC.**
Case No.: 25-90113
Judge: Honorable Alfredo R. Pérez
Date Written: June 30, 2025
**Chapter 11**

United States Courts
Southern District of Texas
F I L E D

JUL 0 2 2025

Nathan Ochsner, Clerk of Court

**Emergency relief has been requested. Relief is requested no later than 12:00 p.m. (prevailing Central Time) on July 11, 2025. If you object to the relief requested or believe emergency consideration is not warranted, you must appear at the hearing if scheduled or file a written response before the above-stated date and time. Otherwise, the Court may treat this motion as unopposed and grant the requested relief.**

### EMERGENCY BASIS:
This motion is filed on an emergency basis due to the imminent and irreversible harm that will result if GCEH's restructuring plan is approved. The plan seeks to transfer ownership, eliminate shareholders, and finalize asset control within a highly accelerated timeline. If not stopped immediately, this proceeding will permanently extinguish shareholder rights and potentially conceal fraud or misconduct. Emergency intervention by the Court is necessary to prevent injustice and uphold the integrity of the bankruptcy process.

### BASIS FOR RELIEF:
Pursuant to 11 U.S.C. §1112(b), I, David Costaglio, respectfully move this honorable Court to dismiss the Chapter 11 bankruptcy filing of Global Clean Energy Holdings, Inc. ("GCEH"), alleging that the filing is fraudulent, improper, and made in bad faith, as outlined below:

**1. FRAUDULENT SEC FILINGS AND MATERIAL OMISSIONS:** Despite commencing commercial operations at its Bakersfield refinery in December 2024 and issuing multiple SEC filings, including a Form 8K filed on **December 20, 2024** and again on **December 27, 2024, Global Clean Energy Holdings, Inc. (GCEH)** never disclosed refinery production volumes or operational output in any official SEC filing.

The only reference to production appears in a **press release** linked to the **December 20, 2024 Form 8K**, which claims the refinery was producing **250,000 gallons per day**. This figure does **not** appear in the body of the SEC filing itself, nor is it mentioned in any subsequent filings including:

• **Amendment No. 19 to Credit Agreement** filed January 27, 2025
• **Amendment No. 20 to Credit Agreement** filed February 21, 2025
• **Amendment No. 21 to Credit Agreement** filed February 27, 2025
• **Amendment No. 22 to Credit Agreement** filed April 8, 2025
• **April 14, 2025 Form 8K** announcing bankruptcy and the Restructuring Support Agreement

Furthermore, documents submitted directly to the bankruptcy court, specifically the **"Declaration of Noah Verleun, Chief Executive Officer of Global Clean Energy Holdings, Inc., in Support of the Debtors' Chapter 11 Petitions"** dated **April 16, 2025**, reveal that GCEH generated **$26 million in revenue during 2024**, despite the refinery only operating for the final 11 days of the year. This directly contradicts the limited disclosure in the December 20, 2024 press release and strongly suggests that the 250,000-gallon-per-day figure is either inaccurate or materially understated, as it is clear that such a production rate could not possibly generate the $26 million in revenue reported for 2024.

The failure to disclose this material financial and operational performance in any SEC filing during a period when the company was actively preparing to file for Chapter 11 is not just misleading. **It is fraudulent**. It appears to have been done to conceal GCEH's solvency and justify a prepackaged, premeditated, bankruptcy designed to eliminate common shareholders and transfer control of the company to secured insiders.

This conduct violates several key securities laws and SEC disclosure rules, including:

**A. Rule 10b5 (17 CFR § 240.10b5)** prohibits any untrue statement of material fact or the omission of a material fact necessary to make other statements not misleading.

**B. Regulation FD (17 CFR § 243.100)** requires full and fair public disclosure of material nonpublic information and prohibits selective disclosure to favored parties.

**C. Form 8K Disclosure Requirements** under Items 2.02 and 8.01 require disclosure of material financial developments including changes in operating results and significant events.

**D. Section 13a of the Securities Exchange Act of 1934** mandates timely and complete filing of reports containing material information necessary for investors.

By omitting known production volumes and verified revenue figures while soliciting debt and executing financial restructuring, GCEH misled the market and regulatory agencies at a critical juncture. **These omissions are not minor**. They strike at the heart of the integrity of public markets and warrant immediate scrutiny and corrective action.

**2. GCEH IS NOT BANKRUPT AND IS A PRIME CANDIDATE FOR REFINANCING, NOT RESTRUCTURING:** GCEH is not bankrupt in any meaningful or traditional sense. The company completed a major refinery rehabilitation project and, by its own admission, projected **$560 million in annual revenue for 2025**. This figure likely understates the company's actual performance, given that true robust revenue figures for 2024 were withheld and only disclosed once the bankruptcy process was already underway.

The **Bakersfield refinery**, a fully operational specialized renewable fuels refinery, is best understood as a high-value specialized commercial real estate asset. Therefor applying a common real estate valuation method is appropriate. At a conservative six percent capitalization rate, **the refinery would be valued at approximately $2.8 billion**. However, given its unique nature, rarity, and the stability of its income stream, most lenders would likely assign it an even

higher valuation. This makes GCEH an ideal candidate for **secured refinancing or asset-backed lending**, not Chapter 11 restructuring.

This reality fundamentally undermines any narrative that bankruptcy was necessary or justified.

GCEH never made production data public while its stock was still trading. If the **true operational capacity** and revenue trajectory had been fully disclosed, I conservatively estimate the share price would have reached **$50 or more per share**. At that valuation, the company could have raised hundreds of millions of dollars through a **public offering of new equity**. A capital raise of this nature could have been executed in **January 2025**, avoiding the need for bankruptcy altogether.

In addition, **high net worth shareholders** including **Michael Zilka, Stuart Risnek,** and **Jeffrey Skoll**, each of whom had material financial stakes in the company, could have been approached to provide **bridge financing or emergency capital** to preserve their investments. To my knowledge, no such outreach was made. This conspicuous omission raises significant questions about intent and supports the inference that **the real objective was to take the company private, not save it.**

Further compounding the issue, GCEH's wholly owned subsidiary **Sustainable Oils**, which previously received investment from ExxonMobil, is **conservatively valued at $200 million** based on the amount ExxonMobil paid for its stake. GCEH never explored the sale of Sustainable Oils to pay down debt or raise liquidity. Moreover, Sustainable Oils may not even represent the most competitive feedstock strategy moving forward. This suggests that divesting the asset would not have compromised GCEH's long-term business model.

**See Exhibit A** - *See Exhibit A for supporting calculations on estimated share price and cap rate valuation.*

**3. ABUSE OF BANKRUPTCY TO FACILITATE PRIVATIZATION:** It is clear that GCEH is not using bankruptcy as a last resort for financial survival, but rather as a strategic vehicle to achieve privatization, eliminate unsecured debts, and wipe out common shareholders. Through this process the company gains many of the typical advantages of going private including avoiding SEC oversight, eliminating the costs and transparency requirements of public reporting, consolidating ownership and control, and shielding strategic decisions from shareholders and activist investors. Most concerning, GCEH is using this structure to sidestep scrutiny from federal regulatory bodies and avoid compensating public shareholders who, in a conventional go-private transaction, would typically receive fair market value for their shares. Instead, this bankruptcy proceeding enables insiders and creditors to seize control without paying a premium or providing the disclosures that would be required in a standard privatization process.

**4. INFLATED CONTRACTOR COSTS AND CONFLICTS OF INTEREST:** The contractor CTCI likely inflated construction costs as part of a broader scheme to gain control of GCEH and its assets through the restructuring process. If true, this would represent more than just a conflict of interest. It could constitute illegal activity and independently warrant a federal investigation. **GCEH's fiduciary duty is to its shareholders, not its contractors.** Yet CTCI stands to become

the largest equity holder in the reorganized company. This arrangement strongly suggests the restructuring is not being conducted in good faith.

Furthermore, Orion Energy Partners, a key creditor and recipient of equity in the proposed plan, could be serving as a proxy for billionaire shareholders who wish to remain undisclosed. There is no clear accounting of who stands to benefit under the new structure. As someone who has communicated directly with one of these high net worth shareholders, I found the response dismissive and avoidant. This raises a critical question: why would a billionaire common shareholder, theoretically in the same position as me, not want to support a shareholder-led effort to preserve value? The implication is that the outcome has already been arranged behind closed doors, and I am being stonewalled simply because I am not part of the insider group.

**5. FINANCIAL MISREPRESENTATION:** The claim of having only $2.6 million in cash at the time of filing appears to be a manipulated snapshot. In a company of this size and complexity, cash on hand could reasonably fluctuate by tens of millions of dollars on a daily basis. It is entirely possible that GCEH had just paid a large invoice or temporarily shifted cash when that figure was reported. Further, GCEH claims it sought additional financing, but that effort is inconsequential. Any company could pretend to be out of money or fail at managing its resources, then use that artificial scarcity as justification for bankruptcy. What precedent does that set? That mismanaging funds or timing their reporting strategically can wipe out shareholders and debts without consequence? If this tactic is allowed, what is the point of even having a stock market?

**6. INADEQUATE COURT RESOURCES:** Given the complexity of the allegations and financial maneuvers, the bankruptcy court may not be sufficiently equipped to uncover the full scope of this situation. Federal oversight is likely required.

**7. BREACH OF FIDUCIARY DUTY:** Management and the board appear to have breached their fiduciary duty by failing to pursue avenues that would maximize shareholder value and instead pursuing a course that serves insiders. GCEH, as a publicly traded company, has a legal obligation to act in the best interests of its shareholders. This includes a duty of care, loyalty, and good faith. By choosing bankruptcy and privatization without first pursuing legitimate alternatives such as capital raises, asset sales, new share issuances or seeking support from its wealthy shareholder base, GCEH has potentially violated these duties. Its executives and board have a responsibility to use public markets ethically and transparently to preserve and grow shareholder value, not to extinguish it behind closed doors. The actions taken appear to prioritize insider advantage over shareholder rights and erode the foundational trust that allows capital markets to function.

**8. RUSHED PROCEEDINGS:** GCEH is fast-tracking the bankruptcy process on an unusually short timeline. This raises suspicion that management seeks to avoid in-depth scrutiny or opposition.

**9. STRATEGIC TIMING OF NEW DEBT COMMITMENTS:** Just days before filing for bankruptcy, GCEH executed Amendment No. 22 to its Senior Credit Agreement, securing an additional $370 million from lenders. This suggests creditors still had confidence in the

company's assets and income. The timing of the bankruptcy, immediately after securing this credit, points to a strategic effort to restructure ownership rather than an urgent need to resolve insolvency.

**10. POTENTIAL FEDERAL INVESTIGATION AND WHISTLEBLOWER ACTIVITY:** I have reason to believe that federal authorities are already investigating GCEH and its affiliates. There may also be active whistleblower activity from within the company. Given these circumstances, it could be prudent to pause or dismiss this rushed attempt to take the company private.

**11. URGENCY AND JUDICIAL AWARENESS:** I respectfully urge the Court to consider that it may not be fully informed of the potential illegality of this filing. Time is of the essence, and prompt intervention is warranted.

**12. PUBLIC STATUS MUST BE PRESERVED:** This company must remain public. The public capital markets offer the most effective and proven method to raise capital through new share issuance. More importantly, GCEH has a legal and ethical duty to its shareholders to preserve its public structure. Remaining public provides transparency, access to capital, and long-term potential for sustainable growth and wealth creation for all stakeholders.

**13. DIRECT CONTACT REQUEST:** I respectfully request that I be contacted directly regarding the Court's decision on this motion no later than Friday, July 11th, 2025. I am available via email at Dcostaglio@gmail.com or by phone at (650) 464-8078.

**CONCLUSION:** This bankruptcy proceeding raises serious, complex, and far-reaching questions. Some of those questions may carry criminal consequences. Yet none of them can be meaningfully answered within the limited framework GCEH has chosen to exploit. In truth, there is only one question the Court can confidently answer: *Is GCEH, in any real or legal sense, bankrupt?* The answer to that question is a resounding and unequivocal **no**.

**This case is not about insolvency. It is a financial maneuver designed to strip public shareholders of their rights, conceal value, and privatize the company behind a veil of judicial process.** The Court should dismiss this bankruptcy in its entirety as an abuse of Chapter 11 and a potential fraud that may warrant further federal investigation.


**RELIEF REQUESTED:**
WHEREFORE, for the reasons stated above, I respectfully request that the Court:

1. Dismiss the Chapter 11 bankruptcy filing of Global Clean Energy Holdings, Inc. in its entirety, as it represents a strategic abuse of the process designed to benefit insiders at the expense of public shareholders. Alternatively, if the Court is not inclined to dismiss the case outright, it should replace GCEH's current reorganization plan with a new, transparent, and equitable plan rooted in the key points outlined below, one that preserves

shareholder rights, seeks fair asset disposition, and utilizes the capital markets ethically and effectively.
2. Recommend referral of this case for further investigation by the appropriate federal authorities to evaluate potential fraudulent actions and fiduciary breaches.
3. Grant any other relief deemed just and equitable by the Court.

**If the case is not dismissed outright, I request that GCEH's plan be rejected in favor of a shareholder led plan that:**

(a) **Keeps the company public.** The public capital markets are not only the most reliable and proven way to raise capital, they are also rooted in transparency, accountability, and fairness. Keeping GCEH public honors the trust of existing shareholders and aligns with the ethical foundation of a free and open economy.
(b) **Forces the sale of Sustainable Oils.** This asset is not critical to GCEH's core operations and can be responsibly sold to pay down debt, specifically to pay off CTCI in cash rather than granting them equity. Under no circumstance should CTCI be rewarded with a controlling share of the company, particularly given that they positioned themselves through force and possibly unlawful conduct. Their rise to power is a red flag that warrants scrutiny, not ownership. The Court should oversee the sale of Sustainable Oils to ensure it is conducted transparently, independently, and in the best interest of all stakeholders, not just insiders.
(c) **Facilitates a new public share offering to raise capital.** Executives can return a portion of their own shares to the company's treasury, and a new issuance of 15 million shares, at a conservative estimate of 50 dollars per share, could raise approximately 750 million dollars in capital. This is not only viable but prudent given the company's projected revenue. Importantly, any new offering should be structured to protect existing shareholders from unfair dilution, preserving their stake in the company they supported.

**In the alternative**, if the Court declines to dismiss the case and rejects the shareholder-led reorganization plan outlined above, I hereby move for immediate conversion of this case to a Chapter 7 liquidation under 11 U.S.C. §1112(b). This conversion is necessary to ensure transparency, prevent insider enrichment, protect remaining shareholder value, and subject the process to independent court-appointed oversight.

**Respectfully submitted,**


David Costaglio, pro se

*[signature]*   7/1/2025

PSLAM 7:11

## Exhibit A: Supporting Financial Calculations

### Estimated Share Price Calculation:

- Projected 2025 Revenue: $560,000,000
- Assumed Net Profit Margin: 30 percent → Net Income = $168,000,000
- Applied P/E Ratio: 15
- Shares Outstanding: 50,000,000
- **Estimated Share Price** = (Net Income × P/E Ratio) ÷ Shares
- **= ($168M × 15) ÷ 50M = $50.40 per share**

### Estimated Asset Value Based on Cap Rate:

- Assumed Net Operating Income (NOI) = $168,000,000
- Applied Capitalization Rate: 6 percent
- **Estimated Refinery Value** = NOI ÷ Cap Rate
- **= $168M ÷ 0.06 = $2,800,000,000**

These conservative estimates demonstrate that GCEH's financials suggest significant intrinsic value, which contradicts the narrative of insolvency.

PSALM 23:5-6

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuse may be a violation of federal law. This package is not for resale. EP13F. © U.S. Postal Service; October 2023; All rights reserved.

Case 25-90113   Document 300   Filed in TXSB on 07/02/25   Page 8 of 8

**PRIORITY MAIL EXPRESS®**

BURLINGAME, CA 94010
JUL 01, 2025
$31.40
S2322P500409-21
77002
RDC 07

FROM: COSTAGLIO
50 KAMMERER CT
HILLSBOROUGH CA 94010

TO: JUDGE ALFREDO R. PEREZ
515 RUSK ST
HOUSTON, TEXAS 77002

United States Courts
Southern District of Texas
FILED
JUL 02 2025
Nathan Ochsner, Clerk of Court

PO ZIP Code: 94010
Scheduled Delivery Date: 7/2
Postage: $31.40
Date Accepted: 7/1
Scheduled Delivery Time: 6:00 PM
Time Accepted: 4:49 PM
Flat Rate
Total Postage & Fees: $31.40

EP13F October 2023
OD: 12 1/2 x 9 1/2
PS10001000006