**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **CASE NO. 25-90113 (ARP)** |
| | § | |
| **GLOBAL CLEAN ENERGY** | § | |
| **HOLDINGS, INC.,** *et al.,* [1] | § | |
| | § | **(Chapter 11)** |
| | § | |
| **DEBTORS.** | § | **Jointly Administered** |

**UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF THE SECOND
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF GLOBAL
CLEAN ENERGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**
*Related ECF No. 301-1*

TO THE HONORABLE ALFREDO R. PEREZ
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S.

Trustee") hereby files this objection to the *Second Amended Joint Chapter 11 Plan of*

*Reorganization for Global Clean Energy Holdings, Inc. and Its Debtor Affiliates* [ECF No. 301]

(the "Plan")[2] filed by Global Clean Energy Holdings, Inc., *et al*. (collectively, the "Debtors"). In

support of the objection, the U.S. Trustee represents as follows:

**INTRODUCTION**

1.    In *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 216–27 (2024) ("*Purdue*"),

the United States Supreme Court was unequivocal that, except in asbestos cases, chapter 11 plans

may not include nonconsensual releases of claims against non-debtor third parties. The Supreme

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/GCEHoldings. The location of Debtor Global Clean Energy Holdings, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is: 6451 Rosedale Highway, Bakersfield, California 93308.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Solicitation Motion, the Disclosure Statement, and Plan.

Court held that bankruptcy courts cannot involuntarily alter the relationships between non-debtors by imposing releases of claims between them. *Purdue*, 603 U.S. at 209, 227. The Debtors' plan runs afoul of the Supreme Court's holding in *Purdue* by imposing releases on non-debtor third parties without their affirmative and voluntary consent. As currently drafted, the Plan compels thousands of claim holders to release numerous third parties, many of whom are unidentified, unless they take timely action to opt out. This opt-out mechanism does not constitute affirmative and voluntary consent. Accordingly, the U.S. Trustee objects to confirmation of the Plan for the following reasons:

A. The Bankruptcy Code does not permit non-consensual releases of third parties by other non-debtor third parties;

B. The opt-out mechanism embedded in the Debtors' solicitation materials fails to constitute effective or voluntary consent to the third-party releases;

C. The Plan includes permanent injunction and gatekeeper provisions that contravene both the Bankruptcy Code and binding Fifth Circuit precedent established in *Highland II*.[3]

D. The Plan should expressly state that it does not release claims asserted by governmental entities acting under their police and regulatory authority; and

E. The Plan seeks a waiver of Rule 3020(e) 14-Day stay without a legal or factual basis to substantiate such waiver.

## **BACKGROUND**

2. On April 16, 2025, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The cases are jointly administered.

3. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

---

[3] *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, No. 23-10534, 2025 U.S. App. LEXIS 6320 (5th Cir. Mar. 18, 2025) ("Highland II").

4.   Additionally on April 16, 2025, the Debtors filed a motion seeking (1) approval of the adequacy of the disclosure statement; (ii) approving the solicitation and notice procedures with respect to confirmation f the Debtors' proposed joint chapter 11 plan; (iii) approving the forms of ballots and notices in connection therewith; (iv) scheduling certain dates with respect thereto, and (v) granting related relief ("Scheduling Motion") [ECF No. 21].

5.   On May 29, 2025, the Court conducted a hearing on the Scheduling Motion. Following the hearing, the Court entered the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Plan of Reorganization; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* ("Solicitation Order") [ECF No. 227].

6.   The following chart summarizes the Classes of Claims and Interests under the Plan, and whether they are entitled to vote.

| Class | Claim/Equity Interest | Status (Unimpaired or Impaired) | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| Class 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| ***Class 3*** | ***Prepetition RCF Claims*** | ***Impaired*** | ***Entitled to Vote*** |
| ***Class 4*** | ***Prepetition Term Loan Claims*** | ***Impaired*** | ***Entitled to Vote*** |
| ***Class 5*** | ***Prepetition EPC Claims*** | ***Impaired*** | ***Entitled to Vote*** |
| ***Class 6*** | ***General Unsecured Claims*** | ***Impaired*** | ***Entitled to Vote*** |
| Class 7 | Section 510(b) Claims | Impaired | Deemed to Reject |
| Class 8 | Intercompany Claims | Impaired/Unimpaired | Deemed to Reject/ Presumed to Accept |
| Class 9 | Intercompany Interests | Impaired/Unimpaired | Deemed to Reject/ Presumed to Accept |
| Class 10 | GCEH Existing Interests | Impaired | Deemed to Reject |

| Class | Claim/Equity Interest | Status (Unimpaired or Impaired) | Voting Rights |
|---|---|---|---|
| Class 11 | Subsidiary Existing Interests | Impaired | Deemed to Reject |

7.   The Debtor transmitted Ballots to holders of claims in classes 3, 4, 5, and 6, which classes are entitled to vote on the plan. The Debtors did not solicit votes from holders of claims in Classes 1, 2, 7, 10, and 11, which classes are not entitled to vote on the plan. Instead, the Debtors served these classes with the Non-Voting Notice and Opt-Out Form. The Debtors did not solicit votes on the Intercompany Claims and Interests, likely because these claims are held by the Debtors or affiliates of the Debtors.

8.   On July 3, 2025, the Debtors filed the Plan. [ECF No. 301].

9.   Article I.A of the Plan defines the terms "Related Party," "Released Parties," and "Releasing Parties" as follows:

168. **"Related Party"** means, collectively, with respect to any Entity, each of, and in each case in its capacity as such, such Entity's current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Entity's respective heirs, executors, estates, and nominees.

169. **"Released Parties"** means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders; (d) the Agents; (e) the Consenting Stakeholders; (f) the Committee and each member of the Committee; (g) all Holders of Claims; (h) all Holders of Interests; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j); provided, however, that, in each case, an Entity shall not be a Released Party if

it: (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release, and such objection is not resolved before Confirmation.

**170. "Releasing Parties"** means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders; (d) the Agents; (e) the Consenting Stakeholders; (f) the Committee and each member of the Committee; (g) all Holders of Claims; (h) all Holders of Interests; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j); provided, however, that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not resolved before Confirmation.

10. Based on the Definition of "Releasing Parties," the Plan would impose third-party releases on all those who do not opt out of the release, either on the Ballot or the Non-Voting Notice. Specifically, the Plan will impose the third-party releases on all holders of claims who (i) vote to reject the Plan; (ii) vote to accept the plan; (iii) are deemed to accept or reject the Plan; or (iv) abstain from voting on the Plan, unless they exercise the opt-out procedure.

11. Under the Plan's definition of "Releasing Parties," third-party releases would be imposed on all holders of claims or interests who do not affirmatively opt out, either through the Ballot or the Non-Voting Notice. Specifically, the releases apply to those who: (i) vote to accept the Plan; (ii) vote to reject the Plan; (iii) are deemed to accept or reject the Plan; or (iv) abstain from voting—unless they timely submit an opt-out.

## OBJECTION

### A. Statutory Standards for Confirmation

12. Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if it complies with all" requirements of section 1129(a). 11 U.S.C. § 1129(a). The Bankruptcy Code further requires that the "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Among other requirements, section 1129(a) mandates that "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]." 11

U.S.C. § 1129(a)(1). The Debtors, as plan proponents, bear the burden of proof with respect to the confirmation requirements by a preponderance of the evidence. *Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown").

13. Consistent with the requirements set forth in sections 1125(a) and 1129(a), the U.S. Trustee objects to confirmation of the Plan because the Debtors have failed to show the requisite affirmative consent from all parties subject to the allegedly "consensual" third-party releases in the Plan. The opt-out procedures for creditors are insufficient to manifest the existence of affirmative consent required by law. As a result, the Debtors are seeking to impose nonconsensual third-party releases on numerous affected parties without their actual consent. Indeed, the third-party releases contained in the Plan would release conduct that may be unrelated to these cases and the reorganization. As the Supreme Court in *Purdue* made clear, the Bankruptcy Code does not permit non-consensual third-party releases, and therefore, the Debtors cannot show that they meet the requirements for approval of the Disclosure Statement and confirmation of the Plan.

**B. The Bankruptcy Code Does Not Authorize Nonconsensual Third-Party Releases**

14. Nonconsensual third-party releases are not authorized under the Bankruptcy Code. *Purdue*, 603 U.S. at 216–27. This has long been the conclusion held by the Fifth Circuit Court of Appeals. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions").

15. The Court in *Purdue* did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *Id*. at 226.

16. A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law. As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement. *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up). A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code. If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right of non-debtors.

17. For the reasons discussed below, a creditor's failure to check an opt-out box on a ballot or Non-Voting Notice does not constitute consent to a non-debtor release in a chapter 11 plan. Although opt-out provisions have been approved in some cases in the Southern District of Texas, a careful analysis of applicable law warrants reconsideration of the conclusion that imposing non-debtor releases based on a failure to opt out is permissible. As explained below, state contract law should govern whether non-debtors have agreed to a release. There is no federal law that preempts the requirements of state contract law for such releases.

18. Here, there is no existing release agreement between non-debtors. Debtors instead seek a confirmation order that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent. Such a confirmation order would

impermissibly alter the relations between non-debtors because a valid release does not exist under non-bankruptcy law.

### C. State Contract law Applies

19. "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979). Thus, courts apply state law when the question is whether a debtor has entered a valid settlement agreement. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

20. The rule is no different for third-party releases. They are separate agreements between non-debtors governed by state law. Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so*." *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original). *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority"). Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *Arrowmill*, 211 B.R. at 507.

21. Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law. There is no Bankruptcy Code provision that preempts otherwise applicable state contract law governing releases between non-debtors. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). Section 105(a), for example, "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted). But the Code does not confer any authority to impose a release of claims between non-debtors that would not be valid under state law. The Bankruptcy Code does not define a "consensual release." *See* 11 U.S.C. § 101. "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). And no Code provision authorizes bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

22. Some courts have held that federal rather than state law applies to determine whether a third-party release is consensual. But because there is no applicable Code provision, whether a non-debtor has consented to release another non-debtor is not, as one court concluded, a "matter of federal bankruptcy law." *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *18, *22 (Bankr. S.D.N.Y Mar. 7, 2025); *see also In re Robertshaw US Holding Corp.*, 662

B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code). Absent express authority in the Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims. Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return). Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

23. Accordingly, state-law contract principles govern whether a third-party release is consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than

upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original). Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223). And "any such consensual agreement would be governed by state law." *Id.*

24. Even if federal law applied, however, it would not lead to a different result. That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (cleaned up). *See also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).

25. In analyzing whether the third-party releases in the Plan are permissible, the Court should determine whether there is consent under state law. Here, the Debtors' use of the opt-out mechanism is insufficient for this Court to make a finding of consent, which is fatal to the confirmation of the Plan.

## D. Under State law, Silence Does Not Confer Consent in Contracts, Except in Limited Circumstances

26. Debtors bear the burden to prove that their plan is confirmable. *Cypresswood Land Partners*, I, 409 B.R. at 422. They have not met this burden because they have failed to establish that the third-party release is consensual under applicable state law.

27. Under Texas state law, like in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement.[4] Specifically, silence does not equate to consent except under limited circumstances not applicable in these cases. *See Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). Further, the Commission of Appeals of Texas stated that:

> A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services. Of course, in implied contracts as well as express contracts there must be shown the element of mutual agreement. But the only difference is that such agreement is expressly stated, in the one instance, and is inferred from the circumstances, in the other. A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one.

*Marr-Piper Co. v. Bullis*, 1 S.W.2d 572, 575 (Tex. Comm'n App. 1928).

28. Silence and inaction, however, will generally not be deemed assent to an offer because, with silence, there is no meeting of the minds. *Matagorda Cty.*, 52 S.W.3d at 132–33 (quoting 2 Williston on Contracts § 6:49 (4th ed. 1991)). "[A]s a matter of law, when a party is unilaterally informed of [a contract term], 'mere failure to object within a reasonable time . . ., without more, could not establish an agreement between the parties.'" *In re Couture Hotel Corp.*, 554 B.R. 369, 381 (Bankr. N.D. Tex. 2016) (quoting *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 665 S.W. 2d 443, 445–46 (Tex. 1982)). "[A] meeting of the minds is an essential element of an implied in fact contract." *Id*. (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008)) (internal

---

[4] Ordinary choice of law principles govern which state's law applies to contracts between non-debtors, although a choice of law analysis may not be necessary absent any assertion that there is a difference in potentially applicable state laws governing what constitutes consent. *See Smallhold*, 2024 WL 4296938, at *13 n.57. While the Plan provides that its construction and enforcement is governed by the laws of the State of New York, debtors cannot choose the law to apply to contracts between non-debtors.

quotation omitted); *see also Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 152 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("Silence cannot satisfy the basic requirements of contract creation.").

29. The Fifth Circuit explained: "Tacit acquiescence between relative strangers ignores the basic tenets of contract law . . . . While there may be exceptions in cases involving parties with longstanding relationships, generally speaking, 'silence or inaction does not constitute acceptance of an offer.'" *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. Sept. 2, 2020) (quoting *Norcia v. Samsung Telecomms Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017)). As another District Court within this Circuit explained, "[t]his idea that [the plaintiff] can unilaterally bind another party to a contract, however, is contrary to law. It is a fundamental principle of contract law that to create an enforceable contract, there must be a clear and definite offer followed by a clear and definite acceptance in accordance with the offer's terms." *Redmond v. Williams*, No. 22-cv-00910, 2023 LW 7984388, at *6 (E.D. Tex. Sept. 13, 2023). Acceptance of an offer "is established only by conforming to the rules governing acceptance, not a separate theory of 'waiver and ratification.'" *Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir. 1981).

30. Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *See also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3

(E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).

31. There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent." *Patterson*, 636 B.R. at 686; *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer"). "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

32. But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.* Further, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c. *See also Patterson*, 636 B.R. at 686 (explaining how contract law does not support consent by failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

**E.  Failing to Opt Out Does Not Provide the Required Affirmative Consent**

33. The Plan provides that all holders of claims who do not opt out will provide broad non-debtor third-party releases to numerous known and unknown third parties on conduct that may not be related to the bankruptcy cases or the reorganization. In other words, Debtors purport to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-

debtors, and their silence—the failure to opt out—is "deemed" consent. But under black-letter law that silence is not acceptance of the offer to release non-debtors. *See, e.g.*, *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

34. The Ninth Circuit's decision in *Norcia*, cited by the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), illustrates the point. In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *Id*. The customer did not take any steps to opt out. *Id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id*. at 1282-83.

35. The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the

customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." 845 F.3d at 1286 (quotation marks and citation omitted).

36. The Ninth Circuit held that none of the exceptions to this rule applied. *Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *Id*. at 1286.

37. Here, too, the Debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests acceptance of an offer to release them.

38. If confirmed, the Plan would impose broad non-debtor releases on every type of creditor who does not affirmatively opt out. Plan, Art. VII.D.

### F.  Not Voting and Not Opting Out Is Not Consent to Release Non-Debtors

39. Third-party releases cannot be imposed on those who do not vote and do not opt out. *See Smallhold,* 665 B.R. at 709[5]; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). 442 B.R. 314, 355

---

[5] *Smallhold* also found that, in at least some circumstances, a failure to opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if they do not vote. *See Smallhold,* 665 B.R. at 723.  The *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release.  *Id*.  But while voting is an "affirmative step" with respect to the debtor's plan, it is not a "*manifestation of intention* that silence may operate as acceptance" of a third-party release.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added).  That is because "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," *id.*—in this case, the federal right to vote on a chapter 11 plan.  11 U.S.C. § 1126(a).  Nor does it "impose on him any duty to speak," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box.  Thus, as discussed below, consent to release *third-party* claims (which are governed by *nonbankruptcy* law) cannot properly be inferred from a party's failure to check an opt-out box on a ballot to vote on the proposed treatment of claims against the *debtor* (governed by *bankruptcy* law).

(Bankr. D. Del. 2011). This applies both to those creditors who simply abstain from voting and those creditors who are not entitled to vote on a plan. There is no basis to infer consent by those who do not vote and are taking no action with respect to the plan.

40. Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *SunEdison*, 576 B.R. at 458–61. Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence). Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981). Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

41. Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt out that they must return to avoid being bound by the third-party release.

42. "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent'

beyond the breaking point." *Chassix*, 533 B.R. at 81. "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *Smallhold*, 665 B.R. at 721; *see also id.* at 719-20 (discussing *Chassix*). "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent. *Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

43. Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix*, 533 B.R. at 81–82.

## G. Voting on a Plan Plus a Failure to Opt Out does Not Manifest Consent to a Non-Debtor

44. Voting to accept a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than silence with respect to the offer to release claims against non-debtors. The act of voting on a chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors. RESTATEMENT

(SECOND) OF CONTRACTS § 69 cmt. a. Impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Merely exercising that right does not manifest consent to release claims against non-debtors.

45. Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box. Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan. As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*" 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

### H. Opt Outs Cannot Be Imposed Based on a Procedural Default Theory

46. Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[6] *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011); *In re Robertshaw US Holding Corp.*,

---

[6] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines*, 2025 WL 737068, at *17, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond, *id*. at *9-*10, *12-*13.

No. 24-90052, 2024 WL 3897812, at *17 (Bankr. S.D. Tex. 2024) (citing *Arsenal Intermediate Holdings, LLC*, 2023 WL 2655592, at *6-8). These courts reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release. *Cf. Smallhold*, 665 B.R. at 708 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

47. This is wrong. First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling. Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right. *United States v. Olano*, 507 U.S. 725, 731 (1993). Forfeiture, unlike waiver, is not an intentional relinquishment of a known right. *Id*. at 733. *Cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default."). Forfeiture principles thus do not show consent.

48. Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan. No one has submitted the released claims for adjudication by the bankruptcy court. *See Olano*, 507 U.S. at 731.

49. And "[u]nder established principles," courts may enter relief against a party who has procedurally defaulted by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation.[7]

---

[7] As discussed above, although the United States Trustee agrees with much of the analysis in *Smallhold*, he disagrees with its conclusion that voting on a plan combined with a failure to opt out constitutes consent.

*Smallhold*, 665 B.R. at 709; *see also id*. at 722 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

50. But a third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Smallhold*, 665 B.R. at 709. "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id*. That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id*. at 719-20.

51. Because a nonconsensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id*. at 709. And besides the flawed default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *Id*. Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their

mere failure to respond regarding the non-debtor release.[8] Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required. *Id*. at 720 (emphasis added).

## I.   Injunction and Gatekeeper Provisions Violate Fifth Circuit Law

52. The Bankruptcy Court may not approve the provisions at Art. XII.F that (i) enjoin interference with the Plan; (ii) enforce the non-debtor releases; and (iii) seek to direct all released claims to the bankruptcy court.[9]

53. The Fifth Circuit recently made this point clear with its *Highland II* decision when it stated, "[e]ven before *Purdue Pharma*, this court had held the same: that any provision that non-consensually releases non-debtors from liability for debts and/or conduct, **and any injunction that acts to shield non-debtors from such liability**, must be struck from a bankruptcy confirmation plan." *Highland II* at *12, (citing *In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009)) (Fifth Circuit case law "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions.") (emphasis added); *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1059, 1061-62 (5th Cir. 2012); *In re Zale Corp.*, 62 F.3d at 760 ("[W]e must overturn a § 105 injunction if it effectively discharges a nondebtor."). The Fifth Circuit further clarified that:

> the proper reading of *Highland I* is to require the bankruptcy court to narrow the definition of 'Protected Parties' used in the Gatekeeper Clause coextensively with the definition of 'Exculpated Parties' used in the Exculpation Provision, to read simply: 'collectively, (i) the Debtor; (ii) the Independent Directors, for conduct within the scope of their duties; (iii) the Committee; and (iv) the members of the Committee in their official capacities, for conduct within the scope of their duties.'

---

[8] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory.  *See id.* at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

[9] As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release ***in exactly one context***: asbestos-related bankruptcies, and these cases are not asbestos-related.  *See Purdue*, 144 S. Ct. at 2085 (citing 11 U.S.C. § 524(e)).

22

Both (1) the opinion's plain language and (2) the change made to the opinion on rehearing elucidate this holding.

*Highland II* at *14; quoting *In re Highland Cap. Mgmt., L.P. (Highland I)*, 48 F.4th 419 (5th Cir. 2022).

54. To comply with the Fifth Circuit's directives in *Highland II*, the language in Art. XII.F. that all entities and all other parties in interest "are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors, the Exculpated Parties, or the Released Parties" must be stricken or limited to the Debtors and parties properly exculpated under a plan under Fifth Circuit precedent. In addressing the injunction and gatekeeper, the Fifth Circuit in *Highland II* clarified that those protective parties must be limited to those parties entitled to exculpation as held in *Highland I*.

55. Additionally, in *Highland II*, the Fifth Circuit also held that the *Barton* doctrine would allow for a gatekeeping provision, but only for claims brought "'against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity' in a bankruptcy proceeding, even if the bankruptcy court would not have jurisdiction to actually adjudicate those claims" *Highland II* at *13–14 (quoting *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015). Accordingly, the gatekeeping language in Art. XII.F. must be stricken from the Plan or, again, limited to cover only the Debtors and parties properly exculpated under a plan under Fifth Circuit precedent. The gatekeeping provision, as written, would require hundreds of non-debtor third parties to seek permission from the bankruptcy court to bring suit against myriad parties.

56. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related. *Purdue* at 222 (citing 11 U.S.C. § 524(g)).

57. Even if the third-party release was consensual, that would not mean that the court has authority to impose an injunction. An injunction is critically different from a consensual non-debtor release. The legal effect of a consensual release is based on the parties' agreement. *See Cont'l Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Cont'l Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority"). If a release is consensual, the non-debtor parties themselves are altering their relationship; the court is not using its judicial power to effect that change. An injunction, by contrast, relies on the court's power to enter orders binding on parties. The court must therefore have both constitutional and statutory authority to enter an injunction. And, once such jurisdiction and authority are established, the court still must determine that an injunction is warranted. But jurisdiction, authority, and a showing that injunctive relief is warranted are all absent here.

58. First, the bankruptcy court lacks jurisdiction to enter a permanent injunction barring claims between non-debtors. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 755, 757 (1995). While 28 U.S.C. § 1334(b) provides concurrent jurisdiction over civil proceedings "related to" a bankruptcy case, the enjoined claims between non-debtors do not "relate to" the Debtors' chapter 11 cases.

59. "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and in any way impacts upon the handling and administration of the bankrupt estate." *Zale*, 62 F.3d at 752. "For jurisdiction to attach, the anticipated outcome of the action must both (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate." *Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1022 (5th Cir. 1999). Post-confirmation

jurisdiction is more limited. "After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.*), 266 F.3d 388, 390 (5th Cir. 2001). "No longer is expansive bankruptcy court jurisdiction required to facilitate 'administration' of the debtor's estate, for there is no estate left to reorganize." *Id*. (cleaned up).

60. Here, the claims between non-debtors are not property of the Debtors or the estates, will not impact the estates, and do not bear on the execution of the Debtors' plan. "[T]he state law causes of action" barred by the injunction "do not bear on the interpretation or execution of the debtor's plan." *Craig's Stores*, 266 F.3d at 391. Nor would the post-confirmation pursuit of such claims against non-debtors have any impact on the Debtors' bankruptcy estates, which cease to exist at confirmation. Accordingly, the bankruptcy court has no jurisdiction to enjoin those claims. *Craig's Stores*, 266 F.3d at 391; *Zale*, 62 F.3d at 756–57.

61. The bankruptcy court also lacks jurisdiction to enter injunctive relief because the Debtors lack standing to seek it. A party seeking injunctive relief must have standing to do so. *City of L.A v. Lyons*, 461 U.S. 95, 105 (1983); *Wells Fargo Bank, N.A. v. Stewart (In re Stewart)*, 647 F.3d 553, 557 (5th Cir. 2011). To have standing, the party seeking injunctive relief must show "that he has sustained or is immediately in danger of sustaining some direct injury" and "the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 105; *see also Stewart*, 647 F.3d at 557. "Absent such a showing, there is no case or controversy regarding prospective relief, and thus no basis in Article III for the court's power to

issue an injunction."[10] *Stewart*, 647 F.3d at 557; *accord Lyons*, 461 U.S. at 101–02. The Debtors have made no such showing here. Accordingly, the bankruptcy court lacks jurisdiction to enter injunctive relief barring the released claims.

62. Second, there is no authority in the Bankruptcy Code for the injunction barring claims between non-debtors. The Debtors cannot rely on section 105(a) for this authority because it "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted). But nothing in the Bankruptcy Code authorizes the court to use its judicial power to bar claims between non-debtors. *Id*. at 227. If granted, the issuance of the injunction would exceed this Court's power under the Bankruptcy Code and violate the limitations articulated by the Supreme Court in *Purdue*.

63. Finally, such an injunction is not warranted by the traditional factors that support injunctive relief. A party seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *id*. (noting that an injunction is an "extraordinary remedy").

---

[10] Although the bankruptcy court is not an Article III court, "[a] party that lacks standing to support jurisdiction in an Article III court also lacks standing for that claim to be adjudicated by a bankruptcy court." *Stewart*, 647 F.3d at 557.

64. In light of the foregoing, the injunction and gatekeeping provisions are unlawful and must be limited to the parties that are properly exculpated under a plan.

**J.   The Plan Should Clarify that Claims of Government Entities are Not Released Under the Third-Party Releases and Exculpation Provisions**

65. The "police and regulatory power" exception to the automatic stay found at 11 U.S.C. § 362(b)(4) is designed to ensure that the stay "does not impede government's ability to protect public health and safety." *In re Wyly*, 526 B.R. 194, 198 (Bankr. N.D. Tex. 2015).

66. The Debtors should modify the Plan to clarify that no party shall be released from any causes of action or proceedings brought by any governmental entity in accordance with its regulatory functions, including but not limited to criminal and environmental matters. The United States Trustee requests that the Debtors include the following language in the Plan:

> Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

**K.   The Court Should Not waive the Rule 3020 Stay**

67. The U.S. Trustee objects to the request to shorten the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 3020(e), which provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e). The Committee Notes explain that subsection (e) was

"added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot." *Id*.

68. Plan proponents frequently include stay waiver provisions to invoke the doctrine of "equitable mootness" as a sword to evade appellate review. *See In re Chemtura Corp*. No. 09–11233, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010). Courts, however, should be "wary of wholly denying any party at least an opportunity to seek a stay to avoid the mooting of its appeal" in deciding whether to waive Rule 3020(e)'s 14-day stay. *Id.*; *see also In re Adelphia Comm. Corp*., 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007) (denying request to waive automatic stay because "fairness to [objecting creditors] . . . requires that I not take an affirmative step that would foreclose all opportunities for judicial review"). "An orderly bankruptcy process depends on a concomitantly efficient appeals process," *In re Syncora Guarantee Inc*., 757 F.3d 511, 517 (6th Cir. 2014) (citations omitted), and a waiver of the 14-day stay undermines this goal by forcing parties to seek an emergency stay

69. The Debtors have presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review. The Court should thus deny their request to waive Rule 3020(e)'s stay.

## CONCLUSION

70. The Debtors' use of the opt-out provisions in the Solicitation Materials and Plan are insufficient to evidence a party's manifested consent to the release of its claims against third parties. Further, many of the individuals and entities included as Releasing Parties have not been identified or provided notice of the third-party releases and the Debtors will be unable to provide evidence that any such parties have consented. Absent the Debtors' showing appropriate,

affirmative, voluntary, and informed consent from all parties affected by the third-party releases in the Plan, the Court should not confirm the Plan.

WHEREFORE, the United States Trustee respectfully request this Court deny confirmation of the Plan and grant such other and further relief as it may deem just and proper.

RESPECTFULLY SUBMITTED:
KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

DATED: July 14, 2025

*/s/ Ha M Nguyen*
Ha Nguyen, Trial Attorney
CA Bar #305411
Fed. ID No. 3623593
United States Department of Justice
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, Texas 77002
E-mail: Ha.Nguyen@usdoj.gov
Cell: 202-590-7962

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by electronic means via ECF transmission to all Pacer System participants in these bankruptcy cases on July 14, 2025.

/s/ Ha M. Nguyen
Ha M. Nguyen