PSLAM 10:12–18

# EMERGENCY MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE, INDEPENDENT EXAMINER, AND EQUITY COMMITTEE PURSUANT TO 11 U.S.C. §§ 1104(a), 1104(c), AND 1102(a)(2) - CASE #25-90113

**GLOBAL CLEAN ENERGY HOLDINGS, INC.**
**Case No.:** 25-90113
**Judge:** Honorable Alfredo R. Pérez
**Date Written:** July 12th, 2025
**Chapter 11**

United States Courts
Southern District of Texas
F I L E D

JUL 1 5 2025

Nathan Ochsner, Clerk of Court

**Emergency relief has been requested. Relief is requested no later than 12:00 p.m. (prevailing Central Time) on July 18, 2025. If you object to the relief requested or believe emergency consideration is not warranted, you must appear at the hearing if scheduled or file a written response before the above-stated date and time. Otherwise, the Court may treat this motion as unopposed and grant the requested relief.**

**EMERGENCY BASIS:**
This motion is filed on an emergency basis due to the imminent and irreversible harm that will result if GCEH's restructuring plan is approved. The plan seeks to transfer ownership, eliminate shareholders, and finalize asset control within a highly accelerated timeline. If not stopped immediately, this proceeding will permanently extinguish shareholder rights and potentially conceal fraud or misconduct. Emergency intervention by the Court is necessary to prevent injustice and uphold the integrity of the bankruptcy process.

**BASIS FOR RELIEF:**
Pursuant to 11 U.S.C. Sections 1104(a), 1104(c), and 1102(a)(2), and in the alternative Section 1112(b), I, David Costaglio, a common shareholder of Global Clean Energy Holdings Inc. (GCEH), respectfully move this Court to appoint (1) a Chapter 11 Trustee, (2) an Independent Examiner, and (3) an Official Committee of Equity Security Holders. These forms of relief are necessary to preserve the integrity of the bankruptcy process and to ensure that all stakeholders, especially shareholders **who I will soon prove are in the money**, are represented and protected in light of serious concerns regarding GCEH's conduct.

Statutory grounds for appointment exist in this case because credible allegations of fraud, concealment of material financial information, insider conflicts, and breach of fiduciary duty have been raised against GCEH's current management, triggering mandatory or discretionary relief under Sections 1104(a)(1), 1104(a)(2), and 1104(c) of the Bankruptcy Code.

Given the nature of these concerns, I respectfully request that this Motion be referred to the Office of the United States Trustee pursuant to 11 U.S.C. Section 307 and 28 U.S.C. Section 586, so that the United States Trustee may fulfill its oversight duties, evaluate the record, and determine whether intervention is warranted under the Bankruptcy Code. Appropriate Trustee offices are the **United States Trustee for Region 7**, Southern District of Texas (515 Rusk Street, Suite 3516, Houston, Texas 77002), as well as to their national oversight body, the **Executive Office for United States Trustees** at the U.S. Department of Justice (441 G Street NW, Suite 6150, Washington, DC 20530).

**1. FRAUDULENT SEC FILINGS AND MATERIAL OMISSIONS:** Despite commencing commercial operations at its Bakersfield refinery in December 2024 and issuing multiple SEC filings, including a Form 8K filed on **December 20, 2024** and again on **December 27, 2024, Global Clean Energy Holdings, Inc. (GCEH)** never disclosed refinery production volumes or operational output in any official SEC filing.

The only reference to production appears in a **press release** linked to the **December 20, 2024 Form 8K**, which claims the refinery was producing **250,000 gallons per day**. This figure does **not** appear in the body of the SEC filing itself, nor is it mentioned in any subsequent filings including:

• **Amendment No. 19 to Credit Agreement** filed January 27, 2025
• **Amendment No. 20 to Credit Agreement** filed February 21, 2025
• **Amendment No. 21 to Credit Agreement** filed February 27, 2025
• **Amendment No. 22 to Credit Agreement** filed April 8, 2025
• **April 14, 2025 Form 8K** announcing bankruptcy and the Restructuring Support Agreement

Furthermore, documents submitted directly to the bankruptcy court, specifically the **"Declaration of Noah Verleun, Chief Executive Officer of Global Clean Energy Holdings, Inc., in Support of the Debtors' Chapter 11 Petitions"** dated **April 16, 2025**, reveal that GCEH generated **$26 million in revenue during 2024**, despite the refinery only operating for the final 11 days of the year. This directly contradicts the limited disclosure in the December 20, 2024 press release and strongly suggests that the 250,000-gallon-per-day figure is either inaccurate or materially understated, as it is clear that such a production rate could not possibly generate the $26 million in revenue reported for 2024.

The failure to disclose this material financial and operational performance in any SEC filing during a period when the company was actively preparing to file for Chapter 11 is not just misleading. **It is fraudulent.** It appears to have been done to conceal GCEH's solvency and justify a prepackaged, premeditated, bankruptcy designed to eliminate common shareholders and transfer control of the company to secured insiders.

This conduct violates several key securities laws and SEC disclosure rules, including:

**A. Rule 10b5 (17 CFR § 240.10b5)** prohibits any untrue statement of material fact or the omission of a material fact necessary to make other statements not misleading.

**B. Regulation FD (17 CFR § 243.100)** requires full and fair public disclosure of material nonpublic information and prohibits selective disclosure to favored parties.

**C. Form 8K Disclosure Requirements** under Items 2.02 and 8.01 require disclosure of material financial developments including changes in operating results and significant events.

**D. Section 13a of the Securities Exchange Act of 1934** mandates timely and complete filing of reports containing material information necessary for investors.

By omitting known production volumes and verified revenue figures while soliciting debt and executing financial restructuring, GCEH misled the market and regulatory agencies at a critical juncture. **These omissions are not minor.** They strike at the heart of the integrity of public markets and warrant immediate scrutiny and corrective action.

**2. GCEH IS NOT BANKRUPT A SOLVENT COMPANY WITH VALUABLE ASSETS STRONG REVENUE AND EQUITY IN THE MONEY A PRIME CANDIDATE FOR REFINANCING NOT RESTRUCTURING:** GCEH is not bankrupt in any meaningful or traditional sense. The company completed a major refinery rehabilitation project and, by its own admission, projected **$560 million in annual revenue for 2025**. This figure likely understates the company's actual performance, given that true robust revenue figures for 2024 were withheld and only disclosed once the bankruptcy process was already underway.

The **Bakersfield refinery,** a fully operational specialized renewable fuels refinery, is best understood as a high-value specialized commercial real estate asset. Therefor applying a common real estate valuation method is appropriate. At a conservative six percent capitalization rate, **the refinery would be valued at approximately $2.8 billion**. However, given its unique nature, rarity, and the stability of its income stream, most lenders would likely assign it an even higher valuation. The Bakersfield refinery is a **world-class commercial asset,** situated on approximately **500 acres of land** in the heart of a major California city. It includes its **own rail terminal,** enabling direct logistical access, and has a **legacy processing capacity of up to 70,000 barrels of oil per day**. These attributes further support the conclusion that the **$2.8 billion valuation is conservative,** and that GCEH is an ideal candidate for **secured refinancing or asset-backed lending,** not Chapter 11 restructuring.

This reality fundamentally undermines any narrative that bankruptcy was necessary or justified.

GCEH never made production data public while its stock was still trading. If the true operational capacity and revenue trajectory had been fully disclosed, I conservatively estimate the **share price would have reached $50 or more per share,** implying a **market capitalization of approximately $2.5 billion**. At that valuation, the company could have raised **hundreds of millions of dollars through a public offering of new equity**. A **capital raise of this nature could have been executed in January 2025,** avoiding the need for bankruptcy altogether.

**The value of the refinery itself, combined with the true value of the shares had they not been artificially extinguished through fraudulent activity leading up to this bankruptcy filing, would place equity holders firmly in the money.**

In addition, **high net worth shareholders** including **Michael Zilka, Stuart Risnek,** and **Jeffrey Skoll,** each of whom had material financial stakes in the company, could have been approached to provide **bridge financing or emergency capital** to preserve their investments. To my knowledge, no such outreach was made. This conspicuous omission raises significant questions about intent and supports the inference that **the real objective was to take the company private, not save it.**

Further compounding the issue, GCEH's wholly owned subsidiary **Sustainable Oils**, which previously received investment from ExxonMobil, is **conservatively valued at $200 million** based on the amount ExxonMobil paid for its stake. GCEH never explored the sale of Sustainable Oils to pay down debt or raise liquidity. Moreover, Sustainable Oils may not even represent the most competitive feedstock strategy moving forward. This suggests that divesting the asset would not have compromised GCEH's long-term business model.

**See Exhibit A** - *See Exhibit A for supporting calculations on estimated share price and cap rate valuation.* ***Note:*** *Depreciation and amortization significantly impact reported net profit margins, especially in capital-intensive industries such as refining. A recently completed facility like the Bakersfield refinery is likely subject to substantial depreciation schedules, including bonus depreciation under federal tax law. These are non-cash expenses that reduce accounting net income but do not reflect actual cash flow. Accordingly, they should be treated as paper losses when evaluating profitability and assigning fair market value.*

## 3. SHAREHOLDERS ARE IN THE MONEY AND CHAPTER 7 MAY BE THE PROPER FORUM

Based on the valuation of GCEH's core assets and projected revenues, equity holders are demonstrably in the money. The Bakersfield renewable fuels refinery is an income-producing, world-class facility situated on approximately 500 acres, with its own rail terminal and a legacy processing capacity of up to 70,000 barrels per day. It has been conservatively valued at approximately $2.8 billion using a 6 percent capitalization rate. This valuation is consistent with real-world metrics for comparable infrastructure assets and may in fact be understated given the refinery's uniqueness, cash flow stability, and logistical advantages.

If sold in an open, court-supervised process, the value of the refinery alone would be more than sufficient to repay all secured and unsecured debts of the estate in full. Additionally, GCEH has admitted to generating approximately $560 million in annualized revenue, further supporting the conclusion that the company is likely solvent and capable of self-financing its operations outside of bankruptcy. This recurring revenue stream demonstrates that GCEH is not facing a liquidity crisis that would typically necessitate Chapter 11 relief.

Moreover, if GCEH had not withheld material production and revenue data prior to its Chapter 11 filing, the company's share price would have more accurately reflected its true earning potential. Based on projected 2025 net income of $168 million, a reasonable price-to-earnings multiple of 15, and 50 million shares outstanding, the share price would have reached approximately $50.40, yielding a market capitalization of $2.52 billion. At that valuation, the company could have raised hundreds of millions of dollars through a public equity offering to meet its obligations and avoid bankruptcy altogether. Instead, the shares were artificially depressed and extinguished through a process that concealed solvency and denied shareholders the opportunity to preserve their equity.

Under Title Eleven of the United States Code, Section 1129, Subsection B, Paragraph Two, Subparagraph B, the Absolute Priority Rule prohibits any junior class, such as equity holders, from receiving or retaining property unless all senior classes are paid in full or consent to their

treatment. The inverse is equally true. If the estate is solvent and creditors can be paid in full, then equity must be treated fairly and cannot be eliminated. Proceeding under a Chapter 11 plan that ignores this reality would violate the Bankruptcy Code and result in an unlawful transfer of value from shareholders to insiders or favored parties.

Accordingly, this case may be better suited for conversion to Chapter 7 under Title Eleven, Section 1112, Subsection B. That section mandates conversion where it is in the best interests of creditors and the estate. A Chapter 7 proceeding would allow for an impartial trustee to market and sell the refinery, value Sustainable Oils, and ensure that proceeds are distributed fairly, transparently, and in compliance with bankruptcy law. This path would ensure that creditors are fully repaid and shareholders receive any remaining surplus as required by the priority structure set forth in the Bankruptcy Code.

**4. ABUSE OF BANKRUPTCY TO FACILITATE PRIVATIZATION:** It is clear that GCEH is not using bankruptcy as a last resort for financial survival, but rather as a strategic vehicle to achieve privatization, eliminate unsecured debts, and wipe out common shareholders. Through this process the company gains many of the typical advantages of going private including avoiding SEC oversight, eliminating the costs and transparency requirements of public reporting, consolidating ownership and control, and shielding strategic decisions from shareholders and activist investors. Most concerning, GCEH is using this structure to sidestep scrutiny from federal regulatory bodies and avoid compensating public shareholders who, in a conventional go-private transaction, would typically receive fair market value for their shares. Instead, this bankruptcy proceeding enables insiders and creditors to seize control without paying a premium or providing the disclosures that would be required in a standard privatization process.

**5. INFLATED CONTRACTOR COSTS AND CONFLICTS OF INTEREST:** The contractor CTCI likely inflated construction costs as part of a broader scheme to gain control of GCEH and its assets through the restructuring process. If true, this would represent more than just a conflict of interest. It could constitute illegal activity and independently warrant a federal investigation. **GCEH's fiduciary duty is to its shareholders, not its contractors.** Yet CTCI stands to become the largest equity holder in the reorganized company. This arrangement strongly suggests the restructuring is not being conducted in good faith.

Furthermore, Orion Energy Partners, a key creditor and recipient of equity in the proposed plan, could be serving as a proxy for billionaire shareholders who wish to remain undisclosed. There is no clear accounting of who stands to benefit under the new structure. As someone who has communicated directly with one of these high net worth shareholders, I found the response dismissive and avoidant. This raises a critical question: why would a billionaire common shareholder, theoretically in the same position as me, not want to support a shareholder-led effort to preserve value? The implication is that the outcome has already been arranged behind closed doors, and I am being stonewalled simply because I am not part of the insider group.

**6. FINANCIAL MISREPRESENTATION:** The claim of having only $2.6 million in cash at the time of filing appears to be a manipulated snapshot. In a company of this size and complexity, cash on hand could reasonably fluctuate by tens of millions of dollars on a daily basis. It is entirely possible that GCEH had just paid a large invoice or temporarily shifted cash

when that figure was reported. Further, GCEH claims it sought additional financing, but that effort is inconsequential. Any company could pretend to be out of money or fail at managing its resources, then use that artificial scarcity as justification for bankruptcy. What precedent does that set? That mismanaging funds or timing their reporting strategically can wipe out shareholders and debts without consequence? If this tactic is allowed, what is the point of even having a stock market?

**7. INADEQUATE COURT RESOURCES:** Given the complexity of the allegations and financial maneuvers, the bankruptcy court may not be sufficiently equipped to uncover the full scope of this situation. Federal oversight is likely required.

**8. BREACH OF FIDUCIARY DUTY:** Management and the board appear to have breached their fiduciary duty by failing to pursue avenues that would maximize shareholder value and instead pursuing a course that serves insiders. GCEH, as a publicly traded company, has a legal obligation to act in the best interests of its shareholders. This includes a duty of care, loyalty, and good faith. By choosing bankruptcy and privatization without first pursuing legitimate alternatives such as capital raises, asset sales, new share issuances or seeking support from its wealthy shareholder base, GCEH has potentially violated these duties. Its executives and board have a responsibility to use public markets ethically and transparently to preserve and grow shareholder value, not to extinguish it behind closed doors. The actions taken appear to prioritize insider advantage over shareholder rights and erode the foundational trust that allows capital markets to function.

**9. RUSHED PROCEEDINGS:** GCEH is fast-tracking the bankruptcy process on an unusually short timeline. This raises suspicion that management seeks to avoid in-depth scrutiny or opposition.

**10. STRATEGIC TIMING OF NEW DEBT COMMITMENTS:** Just days before filing for bankruptcy, GCEH executed Amendment No. 22 to its Senior Credit Agreement, securing an additional $370 million from lenders. This suggests creditors still had confidence in the company's assets and income. The timing of the bankruptcy, immediately after securing this credit, points to a strategic effort to restructure ownership rather than an urgent need to resolve insolvency.

**11. POTENTIAL FEDERAL INVESTIGATION AND WHISTLEBLOWER ACTIVITY:** I have reason to believe that federal authorities are already investigating GCEH and its affiliates. There may also be active whistleblower activity from within the company. Given these circumstances, it could be prudent to pause or dismiss this rushed attempt to take the company private.

**12. URGENCY AND JUDICIAL AWARENESS:** I respectfully urge the Court to consider that it may not be fully informed of the potential illegality of this filing. Time is of the essence, and prompt intervention is warranted.

**13. PUBLIC STATUS MUST BE PRESERVED:** This company must remain public. The public capital markets offer the most effective and proven method to raise capital through new

share issuance. More importantly, GCEH has a legal and ethical duty to its shareholders to preserve its public structure. Remaining public provides transparency, access to capital, and long-term potential for sustainable growth and wealth creation for all stakeholders.

**14. KEY POINTS FROM JULY 12 HEARING:** At the July 12, 2025 hearing, I read my oral statement into the record, which included material concerns raised during a phone call I received from an individual familiar with internal company matters. According to that call, former Chief Financial Officer Nikhil Vasa resigned because he was unwilling to sign the company's SEC filings due to ethical objections. This whistleblower information raises serious concerns that GCEH may have been falsifying or omitting material information in its SEC filings for over a year leading up to this bankruptcy. If true, these actions would constitute fraud and could fundamentally affect the legitimacy of this proceeding.

It is duly noted that the Honorable Judge Alfredo R. Pérez stated during the hearing that he is not presently focused on pre-petition allegations, and that such concerns should be brought to the attention of the United States Trustee or presented as evidence at the plan confirmation hearing.

I fully respect and understand the Court's position. In accordance with that guidance, I have formally brought these concerns to the attention of the United States Trustee. However, I also understand that the United States Trustee not only has the authority under Title Eleven, Section 307, and Title Twenty Eight, Section 586, to intervene, but is also actively tasked with monitoring the administration of Chapter Eleven proceedings and addressing misconduct when necessary.

There is a long and well-established precedent in which allegations of fraud, mismanagement, and the concealment of material financial information have significantly impacted bankruptcy cases. These circumstances have frequently resulted in the appointment of a Chapter Eleven trustee, the assignment of an independent examiner, or the conversion of the case to Chapter Seven. **For that reason, it would be improper and premature to proceed with the July 22, 2025 confirmation hearing before this Court has received a formal response or determination from the United States Trustee regarding the allegations presented in this motion.** Allowing the plan to move forward without such oversight risks endorsing a process tainted by potential fraud and would undermine the integrity of the Bankruptcy Code.

*See exhibit B for a copy of my Oral Statement read at the July 12th hearing.*

**15. DIRECT CONTACT REQUEST:** I respectfully request that I be contacted directly regarding the Court's decision on this motion no later than Friday, July 18, 2025. I am also requesting direct communication from the United States Trustee's Office regarding any action, review, or investigation prompted by the concerns outlined in this motion. I am available via email at Dcostaglio@gmail.com or by phone at 650 464 8078.

**RELIEF REQUESTED:**
Pursuant to the authority provided under 11 U.S.C. §§ 1104(a), 1104(c), and 1102(a)(2), and in the alternative under 11 U.S.C. § 1112(b), I, David Costaglio, respectfully request that this Court grant the following relief:

**1. Postpone the July 22, 2025 Confirmation Hearing:**
I respectfully request that the Court postpone the scheduled plan confirmation hearing currently set for July 22, 2025, until it has received an official response from the United States Trustee's Office regarding the allegations and concerns raised in this motion. Proceeding without the input of the United States Trustee, who is charged under Title Eleven, Section 307, and Title Twenty Eight, Section 586, with monitoring the integrity of bankruptcy proceedings, would be premature given the serious claims of fraud, misconduct, and misrepresentation tied to this case.

**2. Respectfully Request the Court to Refer This Motion to the United States Trustee for Oversight and Action:**
I respectfully request that the Court formally transmit this motion and all supporting materials to the United States Trustee's Office for immediate review and response pursuant to Title Eleven, Section 307, and Title Twenty Eight, Section 586. Given the serious and credible allegations of fraud, concealment of material financial information, and potential misconduct by current management, it is essential that the oversight body charged with enforcing the integrity of this process be alerted without delay. Judge Pérez indicated at the July 11, 2025 hearing that concerns regarding pre-petition conduct should be presented to the United States Trustee. In accordance with that direction, and given the precedent for such allegations to materially impact Chapter Eleven proceedings, I urge the Court to ensure this matter is brought directly to their attention prior to any further progression toward plan confirmation.

**3. Appointment of a Chapter 11 Trustee (11 U.S.C. § 1104(a)):**
Appoint an independent Chapter 11 trustee to immediately assume fiduciary control of Global Clean Energy Holdings, Inc. ("GCEH"), relieve current management and their legal counsel of all duties and responsibilities, and restore integrity and transparency to this bankruptcy process. A trustee is necessary due to credible allegations of fraudulent or omitted material disclosures in SEC filings, gross mismanagement of company operations, breaches of fiduciary duty, and a bankruptcy filing made in bad faith that unfairly prejudices shareholders.

**4. Preservation of Public Company Status:**
Direct the appointed Chapter 11 trustee to prioritize maintaining GCEH's status as a publicly traded company. The public market represents the most transparent, efficient, and equitable avenue for maximizing recovery and preserving value for all stakeholders, including creditors, employees, and shareholders.

**5. Formation of an Official Committee of Equity Security Holders (11 U.S.C. § 1102(a)(2)):**
Order the immediate formation of an Official Committee of Equity Security Holders to provide shareholders meaningful representation and input in these proceedings. To ensure effective representation, I respectfully nominate myself, David Costaglio, and Mr. Tom Madison to serve on this committee, helping steer the company toward transparency, fairness, and sustained value creation.

**6. Appointment of an Independent Examiner (11 U.S.C. § 1104(c)):**
If the Court is not yet prepared to appoint a trustee or equity committee, then appoint an independent examiner to thoroughly investigate all allegations of misconduct, fraud,

concealment of financial information, insider conflicts, and breaches of fiduciary duty as detailed in this motion, as well as any additional issues uncovered during the examination process.

**7. Conversion to Chapter 7 (11 U.S.C. § 1112(b)):**
In the alternative, if the Court determines reorganization under Chapter 11 is not feasible or appropriate, convert this case to a Chapter 7 proceeding, where the debtor's assets can be transparently and properly valued, marketed, and sold. Conversion is appropriate because the debtor is solvent, equity is demonstrably in the money, and liquidation under Chapter 7 would maximize recovery for all creditors and stakeholders while preventing insider manipulation or unfair treatment.

I request that this Court also direct this motion to the attention of the United States Trustee under 11 U.S.C. § 307 and 28 U.S.C. § 586, to ensure proper oversight, investigation, and response by the U.S. Trustee's office. Appropriate Trustee offices are the **United States Trustee for Region 7**, Southern District of Texas (515 Rusk Street, Suite 3516, Houston, Texas 77002), as well as to their national oversight body, the **Executive Office for United States Trustees** at the U.S. Department of Justice (441 G Street NW, Suite 6150, Washington, DC 20530).

**CONCLUSION:** This bankruptcy proceeding raises serious, complex, and far-reaching questions. Some of those questions may carry criminal consequences. Yet none of them can be meaningfully answered within the limited framework GCEH has chosen to exploit. In truth, there is only one question the Court can confidently answer at this stage: **Is GCEH, in any real or legal sense, bankrupt** The answer to that question is a resounding and unequivocal **no**.

This case is not about insolvency. It is a financial maneuver designed to strip public shareholders of their rights, conceal value, and privatize the company behind the appearance of judicial process. The Court should reject this misuse of Chapter Eleven as an abuse of the Bankruptcy Code and a potential fraud that may warrant further federal investigation.

**It is my understanding that when a motion such as this is filed citing Title Eleven, Section 1104, Subsection A; Section 1104, Subsection C; Section 1102, Subsection A, Paragraph Two; and Section 1112, Subsection B, it is procedural and expected that the United States Trustee's Office respond. These provisions relate directly to the appointment of a trustee, an examiner, the formation of an equity committee, and potential conversion to Chapter Seven. The United States Trustee has a statutory obligation under Title Eleven, Section 307, and Title Twenty Eight, Section 586 to monitor this case and take action where abuse, fraud, or gross mismanagement may be present. Failure to respond to credible allegations presented under these authorities can be seen as a dereliction of that duty.**

**Out of respect for the process and in accordance with the Court's guidance, I have submitted these concerns directly to the United States Trustee. However, this matter has now also been brought to the attention of appropriate federal regulatory agencies and local, state, and national media outlets. The public deserves transparency, and the law demands accountability.**

**The Court has the power and the responsibility to ensure that this process does not proceed under a cloud of unaddressed misconduct. Until the United States Trustee responds, this case should not be allowed to move forward.**


**Respectfully submitted,**


David Costaglio, pro se

## Exhibit A: Supporting Financial Calculations

**Estimated Share Price Calculation:**

- Projected 2025 Revenue: $560,000,000
- Assumed Net Profit Margin: 30 percent → Net Income = $168,000,000
- Applied P/E Ratio: 15
- Shares Outstanding: 50,000,000
- **Estimated Share Price** = (Net Income × P/E Ratio) ÷ Shares
- **= ($168M × 15) ÷ 50M = $50.40 per share**
- ***Note:*** *Depreciation and amortization significantly impact reported net profit margins, especially in capital-intensive industries such as refining. A recently completed facility like the Bakersfield refinery is likely subject to substantial depreciation schedules, including bonus depreciation under federal tax law. These are non-cash expenses that reduce accounting net income but do not reflect actual cash flow. Accordingly, they should be treated as paper losses when evaluating profitability and assigning fair market value.*

**Estimated Asset Value Based on Cap Rate:**

- Assumed Net Operating Income (NOI) = $168,000,000
- Applied Capitalization Rate: 6 percent
- **Estimated Refinery Value** = NOI ÷ Cap Rate
- **= $168M ÷ 0.06 = $2,800,000,000**

These conservative estimates demonstrate that GCEH's financials suggest significant intrinsic value, which contradicts the narrative of insolvency.

PSLAM 10:12–18

Exhibit B – Copy of Oral Statement Read During the July 12th Hearing

"Your Honor, thank you for considering my Emergency Motion to Dismiss and for giving me the opportunity to speak. I truly appreciate it.

I believe my motion sheds light on the **darkness surrounding this case**. In the week leading up to this hearing, I received numerous phone calls from people impacted by this bankruptcy. One stood out—a caller who claimed to be close to the inner workings of GCEH. This caller told me that **former CFO Nikhil Vasa resigned because he refused to sign the company's SEC filings**. According to this individual, Mr. Vasa stepped down for **ethical reasons**, unwilling to put his name on companies SEC filings that he believed were misleading or improper.

I looked into it myself and found the Form 8-K filed on November 17, 2023, with the SEC confirming that Mr. Vasa notified Global Clean Energy of his resignation on that date. He was replaced by board-appointed Wade Adkins. The filing provides no reason for Mr. Vasa's departure, but based on my source, I believe he resigned because he refused to sign filings he viewed as illegal or unethical. This suggests that GCEH may have been manipulating SEC filings for over a year—and that Mr. Adkins could have been complicit. This adds another layer of darkness to an already troubling situation.

My hope today is that this Court brings **light to that darkness**. I respectfully request that the Court **appoint a Chapter 11 trustee** to take control of GCEH, relieve current management and their legal counsel of their positions, and **restore a fair and conflict-free process**. This trustee should also be tasked with **preserving GCEH's public company status**, because the public market offers the **best and most transparent path** to making all parties **financially whole**. I believe cause exists under the law to appoint a trustee based on following:

1. **Fraudulent or omitted SEC disclosures**
2. **Gross mismanagement**
3. **Breach of fiduciary duty**
4. A bankruptcy filing made in **bad faith**

I'm not here to burn this company down. I'm here to help **save it from the people who have already tried to**.

I also request that an **Official Equity Committee** be formed to protect the interests of shareholders. I formally nominate myself, David Costaglio, and Mr. Tom Madison to serve on that committee and work toward a new vision for GCEH. One based on transparency, fairness, and real value creation.

If the Court is not yet prepared to take that step, then I ask that a **court-appointed examiner** be assigned to investigate the concerns outlined in my motion and any other potential misconduct.

Thank you, Your Honor. That concludes my statement."

PSLAM 10:12–18

PSLAM 9:16

PRIORITY MAIL EXPRESS®

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

Retail

JUL 14, 2025

$31.40

S2324M501055

RDC 07

77002

FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

PEEL FROM THIS CORNER



UNITED STATES POSTAL SERVICE® | PRIORITY MAIL EXPRESS®

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)   PHONE (650) 464 0398

COSTARCO
50 KAMMERER GT
HILLSBOROUGH, CA- 94010

**DELIVERY OPTIONS (Customer Use Only)**
☐ SIGNATURE REQUIRED
☐ No Saturday Delivery
☐ Sunday/Holiday Delivery Required

TO: (PLEASE PRINT)   PHONE ( )

Nathan Ochsner, Clerk of Court

JUDGE ALFRED R. PEREZ
515 RUSK ST
HOUSTON, TEXAS- 77002



**PAYMENT BY ACCOUNT (if applicable)**

ER 232 522 701 US

**ORIGIN (POSTAL SERVICE USE ONLY)**

| PO ZIP Code | Scheduled Delivery Date | Postage |
|---|---|---|
| 94010 | 7/15/24 | $ 31.40 |

Date Accepted 7/14/25   ☐ 6:00 PM

**DELIVERY (POSTAL SERVICE USE ONLY)**

Weight 5.5 lbs oz   ☐ Flat Rate

Time Accepted 12:25

Total Postage & Fees $ 31.40

LABEL 11-B, NOVEMBER 2023   PSN 7690-02-000-9996