PSALM 10:12-18

# EMERGENCY MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE, INDEPENDENT EXAMINER, AND EQUITY COMMITTEE PURSUANT TO 11 U.S.C. §§ 1104(a), 1104(c), AND 1102(a)(2) - CASE #25-90113

**GLOBAL CLEAN ENERGY HOLDINGS, INC.**
**Case No.:** 25-90113
**Judge:** Honorable Alfredo R. Pérez
**Date Written:** July 17th, 2025
**Chapter 11**

United States Courts
Southern District of Texas
F I L E D

JUL 1 8 2025

Nathan Ochsner, Clerk of Court

**EMERGENCY BASIS:**
This motion is filed on an emergency basis due to the imminent and irreversible harm that will result if GCEH's restructuring plan is approved. The plan seeks to transfer ownership, eliminate shareholders, and finalize asset control within a highly accelerated timeline. If not stopped immediately, this proceeding will permanently extinguish shareholder rights and potentially conceal fraud or misconduct. Emergency intervention by the Court is necessary to prevent injustice and uphold the integrity of the bankruptcy process.

**BASIS FOR RELIEF:**
Pursuant to 11 U.S.C. Sections 1104(a), 1104(c), and 1102(a)(2), and in the alternative Section 1112(b), I, David Costaglio, a common shareholder of Global Clean Energy Holdings Inc. (GCEH), respectfully move this Court to appoint (1) a Chapter 11 Trustee, (2) an Independent Examiner, and (3) an Official Committee of Equity Security Holders. These forms of relief are necessary to preserve the integrity of the bankruptcy process and to ensure that all stakeholders, especially shareholders **who I will soon prove are in the money**, are represented and protected in light of serious concerns regarding GCEH's conduct.

The statutory grounds for appointment of a Chapter 11 trustee are not only present in this case; they are substantial and undeniable. Credible allegations of fraud, concealment of material financial information, insider conflicts of interest, and breach of fiduciary duty have been raised against GCEH's current management. **This conduct, occurring both before and after the petition date, constitutes fraud, dishonesty, incompetence, or gross mismanagement under 11 U.S.C. § 1104(a)(1), which mandates the appointment of a trustee when cause exists.**

Even if the Court declines to appoint a trustee under Section 1104(a)(1), relief is still warranted under Section 1104(a)(2) because appointment is clearly in the best interests of creditors, equity holders, and the estate. Independent oversight is essential to restore trust, ensure transparency, and prevent further harm.

**In the alternative, the Court may appoint a disinterested examiner under 11 U.S.C. § 1104(c), as the allegations raised unquestionably justify an independent investigation into the debtor's conduct and the integrity of the proposed plan.**

Given the nature of these concerns, I respectfully request that this Motion be referred to the Office of the United States Trustee pursuant to 11 U.S.C. Section 307 and 28 U.S.C. Section 586, so that the United States Trustee may fulfill its oversight duties, evaluate the record, and

PSALM 10:12-18

determine whether intervention is warranted under the Bankruptcy Code. Appropriate Trustee offices are the **United States Trustee for Region 7**, Southern District of Texas (515 Rusk Street, Suite 3516, Houston, Texas 77002), as well as to their national oversight body, the **Executive Office for United States Trustees** at the U.S. Department of Justice (441 G Street NW, Suite 6150, Washington, DC 20530).

**1. KEY POINTS FROM JULY 12 HEARING:** At the July 12, 2025 hearing addressing my Emergency Motion to dismiss Docket #300, I read my oral statement into the record, which included material concerns raised during a phone call I received from an individual familiar with internal company matters. According to that call, former Chief Financial Officer Nikhil Vasa resigned because he was unwilling to sign the company's SEC filings due to ethical objections. This whistleblower information raises serious concerns that GCEH may have been falsifying or omitting material information in its SEC filings for over a year leading up to this bankruptcy. If true, these actions would constitute fraud and could fundamentally affect the legitimacy of this proceeding.

It is duly noted that the **Honorable Judge Alfredo R. Pérez stated during the hearing that he is primarily concerned with post petition conduct not pre-petition allegations, and that such concerns should be brought to the attention of the United States Trustee or presented as evidence at the plan confirmation hearing.**

I fully respect and understand the Court's position. In accordance with that guidance, I have formally brought these concerns to the attention of the United States Trustee. However, I also understand that the United States Trustee not only has the authority under Title Eleven, Section 307, and Title Twenty Eight, Section 586, to intervene, but is also actively tasked with monitoring the administration of Chapter Eleven proceedings and addressing misconduct when necessary.

There is a long and well-established precedent in which allegations of fraud, mismanagement, and the concealment of material financial information have significantly impacted bankruptcy cases. These circumstances have frequently resulted in the appointment of a Chapter Eleven trustee, the assignment of an independent examiner, or the conversion of the case to Chapter Seven.

*See exhibit B for a copy of my Oral Statement read at the July 12th hearing*

**2. POST PETTION ILLEGALITIES & MIDSCONDUCT HAS NOW BEEN PROVEN BY THE US TRUSTEE:** On July 14, 2025, the United States Trustee for Region 7 filed a formal Objection to Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization. [Docket No. 312]. The objection details extensive legal deficiencies and highlights that the Plan violates fundamental provisions of the Bankruptcy Code, established Fifth Circuit precedent, and constitutional due process, rendering it unconfirmable in its current form.

First, the U.S. Trustee objects to the Plan's inclusion of nonconsensual third-party releases, which improperly seek to shield numerous nondebtor parties, including insiders, from future

PSLAM 9:16

PSALM 10:12-18

liability without their affirmative consent. According to the Trustee, these releases clearly contravene the Supreme Court's ruling in Purdue Pharma and binding Fifth Circuit authority, which strictly limit or outright prohibit such nonconsensual releases.

Second, the objection targets the Plan's flawed opt-out mechanism, whereby affected parties are deemed to consent to these third-party releases unless they proactively object. The U.S. Trustee argues convincingly that this procedure fails the Bankruptcy Code's requirement for informed, affirmative, and voluntary consent. Passive consent through silence, especially where parties may lack proper notice or understanding, violates fundamental fairness and established case law.

Third, the Plan contains gatekeeper and injunction provisions that prevent stakeholders from bringing litigation against insiders and affiliated entities without first obtaining permission from the Bankruptcy Court. The Trustee contends that these provisions violate due process rights by improperly restricting access to judicial remedies, thus unlawfully shielding parties from accountability for potentially wrongful acts.

Fourth, the Debtors improperly seek a waiver of the standard 14-day stay period provided under Rule 3020(e) of the Federal Rules of Bankruptcy Procedure. The Trustee asserts that waiving this stay is particularly inappropriate given the significant and unresolved legal challenges surrounding this confirmation. Such a waiver would unjustifiably curtail the opportunity for meaningful review or appeal of the Plan.

Fifth, and critically, the Plan contains language aimed at limiting the rights of government agencies, including the Department of Justice and the SEC, to pursue regulatory or enforcement actions independent of the bankruptcy proceedings. The Trustee categorically states that any attempt to constrain governmental investigatory or prosecutorial authority is legally unenforceable, contrary to public policy, and must be eliminated from any confirmable plan.

**Further, attempts to amend the Plan in response to the U.S. Trustee's Objection do not demonstrate good faith. Rather, they serve as a quiet admission of wrongdoing, a reaction to getting caught. The sudden willingness to revise these provisions after federal objection strongly suggests that the Debtors and their counsel knew what they were doing all along and are only now attempting compliance because their conduct was exposed.**

**At this juncture, the Debtors and their legal counsel have lost all credibility, forfeited stakeholder trust, and should lose the trust of this Court.** This breach of integrity should weigh heavily on the Court's conscience and legal judgment, as continued reliance on the same actors would further undermine the legitimacy of these proceedings. Their conduct raises serious questions about their fitness to continue overseeing this process and must weigh heavily in the Court's determination of next steps. The integrity of these bankruptcy proceedings demands immediate and neutral oversight. Therefore, the only viable and legally justified path forward is the immediate appointment of a Chapter 11 trustee pursuant to 11 U.S.C. § 1104. Without independent oversight, these proceedings will remain compromised, and public confidence in the bankruptcy process itself will be irreparably damaged.

PSALM 10:12-18

**3. FRAUDULENT SEC FILINGS AND MATERIAL OMISSIONS:** Despite commencing commercial operations at its Bakersfield refinery in December 2024 and issuing multiple SEC filings, including a Form 8K filed on **December 20, 2024** and again on **December 27, 2024**, **Global Clean Energy Holdings, Inc. (GCEH)** never disclosed refinery production volumes or operational output in any official SEC filing.

The only reference to production appears in a **press release** linked to the **December 20, 2024 Form 8K**, which claims the refinery was producing **250,000 gallons per day**. This figure does **not** appear in the body of the SEC filing itself, nor is it mentioned in any subsequent filings including:

• **Amendment No. 19 to Credit Agreement** filed January 27, 2025
• **Amendment No. 20 to Credit Agreement** filed February 21, 2025
• **Amendment No. 21 to Credit Agreement** filed February 27, 2025
• **Amendment No. 22 to Credit Agreement** filed April 8, 2025
• **April 14, 2025 Form 8K** announcing bankruptcy and the Restructuring Support Agreement

Furthermore, documents submitted directly to the bankruptcy court, specifically the **"Declaration of Noah Verleun, Chief Executive Officer of Global Clean Energy Holdings, Inc., in Support of the Debtors' Chapter 11 Petitions"** dated **April 16, 2025**, reveal that GCEH generated **$26 million in revenue during 2024**, despite the refinery only operating for the final 11 days of the year. This directly contradicts the limited disclosure in the December 20, 2024 press release and strongly suggests that the 250,000-gallon-per-day figure is either inaccurate or materially understated, as it is clear that such a production rate could not possibly generate the $26 million in revenue reported for 2024.

The failure to disclose this material financial and operational performance in any SEC filing during a period when the company was actively preparing to file for Chapter 11 is not just misleading. **It is fraudulent.** It appears to have been done to conceal GCEH's solvency and justify a prepackaged, premeditated, bankruptcy designed to eliminate common shareholders and transfer control of the company to secured insiders.

This conduct violates several key securities laws and SEC disclosure rules, including:

**A. Rule 10b5 (17 CFR § 240.10b5)** prohibits any untrue statement of material fact or the omission of a material fact necessary to make other statements not misleading.

**B. Regulation FD (17 CFR § 243.100)** requires full and fair public disclosure of material nonpublic information and prohibits selective disclosure to favored parties.

**C. Form 8K Disclosure Requirements** under Items 2.02 and 8.01 require disclosure of material financial developments including changes in operating results and significant events.

**D. Section 13a of the Securities Exchange Act of 1934** mandates timely and complete filing of reports containing material information necessary for investors.

By omitting known production volumes and verified revenue figures while soliciting debt and executing financial restructuring, GCEH misled the market and regulatory agencies at a critical juncture. **These omissions are not minor**. They strike at the heart of the integrity of public markets and warrant immediate scrutiny and corrective action.

**4. GCEH IS NOT BANKRUPT A SOLVENT COMPANY WITH VALUABLE ASSETS STRONG REVENUE AND EQUITY IN THE MONEY A PRIME CANDIDATE FOR REFINANCING NOT RESTRUCTURING:** GCEH is not bankrupt in any meaningful or traditional sense. The company completed a major refinery rehabilitation project and, by its own admission, projected **$560 million in annual revenue for 2025**. This figure likely understates the company's actual performance, given that true robust revenue figures for 2024 were withheld and only disclosed once the bankruptcy process was already underway.

The **Bakersfield refinery**, a fully operational specialized renewable fuels refinery, is best understood as a high-value specialized commercial real estate asset. Therefor applying a common real estate valuation method is appropriate. At a conservative six percent capitalization rate, **the refinery would be valued at approximately $2.8 billion**. However, given its unique nature, rarity, and the stability of its income stream, most lenders would likely assign it an even higher valuation. The Bakersfield refinery is a **world-class commercial asset**, situated on approximately **500 acres of land** in the heart of a major California city. It includes its **own rail terminal**, enabling direct logistical access, and has a **legacy processing capacity of up to 70,000 barrels of oil per day**. These attributes further support the conclusion that the **$2.8 billion valuation is conservative**, and that GCEH is an ideal candidate for **secured refinancing or asset-backed lending**, not Chapter 11 restructuring.

This reality fundamentally undermines any narrative that bankruptcy was necessary or justified.

GCEH never made production data public while its stock was still trading. If the true operational capacity and revenue trajectory had been fully disclosed, I conservatively estimate the **share price would have reached $50 or more per share**, implying a **market capitalization of approximately $2.5 billion**. At that valuation, the company could have raised **hundreds of millions of dollars through a public offering of new equity**. A **capital raise of this nature could have been executed in January 2025**, avoiding the need for bankruptcy altogether.

**The value of the refinery itself, combined with the true value of the shares had they not been artificially extinguished through fraudulent activity leading up to this bankruptcy filing, would place equity holders firmly in the money.**

In addition, **high net worth shareholders** including **Michael Zilka, Stuart Risnek**, and **Jeffrey Skoll**, each of whom had material financial stakes in the company, could have been approached to provide **bridge financing or emergency capital** to preserve their investments. To my knowledge, no such outreach was made. This conspicuous omission raises significant questions about intent and supports the inference that **the real objective was to take the company private, not save it.**

Further compounding the issue, GCEH's wholly owned subsidiary **Sustainable Oils**, which previously received investment from ExxonMobil, is **conservatively valued at $200 million** based on the amount ExxonMobil paid for its stake. GCEH never explored the sale of Sustainable Oils to pay down debt or raise liquidity. Moreover, Sustainable Oils may not even represent the most competitive feedstock strategy moving forward. This suggests that divesting the asset would not have compromised GCEH's long-term business model.

**See Exhibit A** - *See Exhibit A for supporting calculations on estimated share price and cap rate valuation. Note: Depreciation and amortization significantly impact reported net profit margins, especially in capital-intensive industries such as refining. A recently completed facility like the Bakersfield refinery is likely subject to substantial depreciation schedules, including bonus depreciation under federal tax law. These are non-cash expenses that reduce accounting net income but do not reflect actual cash flow. Accordingly, they should be treated as paper losses when evaluating profitability and assigning fair market value.*

**5. SHAREHOLDERS ARE IN THE MONEY AND CHAPTER 7 MAY BE THE PROPER FORUM:** Based on the valuation of GCEH's core assets and projected revenues, equity holders are demonstrably in the money. The Bakersfield renewable fuels refinery is an income-producing, world-class facility situated on approximately 500 acres, with its own rail terminal and a legacy processing capacity of up to 70,000 barrels per day. It has been conservatively valued at approximately $2.8 billion using a 6 percent capitalization rate. This valuation is consistent with real-world metrics for comparable infrastructure assets and may in fact be understated given the refinery's uniqueness, cash flow stability, and logistical advantages.

If sold in an open, court-supervised process, the value of the refinery alone would be more than sufficient to repay all secured and unsecured debts of the estate in full. Additionally, GCEH has admitted to generating approximately $560 million in annualized revenue, further supporting the conclusion that the company is likely solvent and capable of self-financing its operations outside of bankruptcy. This recurring revenue stream demonstrates that GCEH is not facing a liquidity crisis that would typically necessitate Chapter 11 relief.

Moreover, if GCEH had not withheld material production and revenue data prior to its Chapter 11 filing, the company's share price would have more accurately reflected its true earning potential. Based on projected 2025 net income of $168 million, a reasonable price-to-earnings multiple of 15, and 50 million shares outstanding, the share price would have reached approximately $50.40, yielding a market capitalization of $2.52 billion. At that valuation, the company could have raised hundreds of millions of dollars through a public equity offering to meet its obligations and avoid bankruptcy altogether. Instead, the shares were artificially depressed and extinguished through a process that concealed solvency and denied shareholders the opportunity to preserve their equity.

Under Title Eleven of the United States Code, Section 1129, Subsection B, Paragraph Two, Subparagraph B, the Absolute Priority Rule prohibits any junior class, such as equity holders, from receiving or retaining property unless all senior classes are paid in full or consent to their treatment. The inverse is equally true. If the estate is solvent and creditors can be paid in full, then equity must be treated fairly and cannot be eliminated. Proceeding under a Chapter 11 plan

PSALM 10:12-18

that ignores this reality would violate the Bankruptcy Code and result in an unlawful transfer of value from shareholders to insiders or favored parties.

Accordingly, this case may be better suited for conversion to Chapter 7 under Title Eleven, Section 1112, Subsection B. That section mandates conversion where it is in the best interests of creditors and the estate. A Chapter 7 proceeding would allow for an impartial trustee to market and sell the refinery, value Sustainable Oils, and ensure that proceeds are distributed fairly, transparently, and in compliance with bankruptcy law. This path would ensure that creditors are fully repaid and shareholders receive any remaining surplus as required by the priority structure set forth in the Bankruptcy Code.

**6. ABUSE OF BANKRUPTCY TO FACILITATE PRIVATIZATION:** It is clear that GCEH is not using bankruptcy as a last resort for financial survival, but rather as a strategic vehicle to achieve privatization, eliminate unsecured debts, and wipe out common shareholders. Through this process the company gains many of the typical advantages of going private including avoiding SEC oversight, eliminating the costs and transparency requirements of public reporting, consolidating ownership and control, and shielding strategic decisions from shareholders and activist investors. Most concerning, GCEH is using this structure to sidestep scrutiny from federal regulatory bodies and avoid compensating public shareholders who, in a conventional go-private transaction, would typically receive fair market value for their shares. Instead, this bankruptcy proceeding enables insiders and creditors to seize control without paying a premium or providing the disclosures that would be required in a standard privatization process.

**7. INFLATED CONTRACTOR COSTS AND CONFLICTS OF INTEREST:** The contractor CTCI likely inflated construction costs as part of a broader scheme to gain control of GCEH and its assets through the restructuring process. If true, this would represent more than just a conflict of interest. It could constitute illegal activity and independently warrant a federal investigation. **GCEH's fiduciary duty is to its shareholders, not its contractors.** Yet CTCI stands to become the largest equity holder in the reorganized company. This arrangement strongly suggests the restructuring is not being conducted in good faith.

Furthermore, Orion Energy Partners, a key creditor and recipient of equity in the proposed plan, could be serving as a proxy for billionaire shareholders who wish to remain undisclosed. There is no clear accounting of who stands to benefit under the new structure. As someone who has communicated directly with one of these high net worth shareholders, I found the response dismissive and avoidant. This raises a critical question: why would a billionaire common shareholder, theoretically in the same position as me, not want to support a shareholder-led effort to preserve value? The implication is that the outcome has already been arranged behind closed doors, and I am being stonewalled simply because I am not part of the insider group.

**8. FINANCIAL MISREPRESENTATION:** The claim of having only $2.6 million in cash at the time of filing appears to be a manipulated snapshot. In a company of this size and complexity, cash on hand could reasonably fluctuate by tens of millions of dollars on a daily basis. It is entirely possible that GCEH had just paid a large invoice or temporarily shifted cash when that figure was reported. Further, GCEH claims it sought additional financing, but that effort is inconsequential. Any company could pretend to be out of money or fail at managing its

resources, then use that artificial scarcity as justification for bankruptcy. What precedent does that set? That mismanaging funds or timing their reporting strategically can wipe out shareholders and debts without consequence? If this tactic is allowed, what is the point of even having a stock market?

**9. INADEQUATE COURT RESOURCES:** Given the complexity of the allegations and financial maneuvers, the bankruptcy court may not be sufficiently equipped to uncover the full scope of this situation. Federal oversight is likely required.

**10. BREACH OF FIDUCIARY DUTY:** Management and the board appear to have breached their fiduciary duty by failing to pursue avenues that would maximize shareholder value and instead pursuing a course that serves insiders. GCEH, as a publicly traded company, has a legal obligation to act in the best interests of its shareholders. This includes a duty of care, loyalty, and good faith. By choosing bankruptcy and privatization without first pursuing legitimate alternatives such as capital raises, asset sales, new share issuances or seeking support from its wealthy shareholder base, GCEH has potentially violated these duties. Its executives and board have a responsibility to use public markets ethically and transparently to preserve and grow shareholder value, not to extinguish it behind closed doors. The actions taken appear to prioritize insider advantage over shareholder rights and erode the foundational trust that allows capital markets to function.

**11. RUSHED PROCEEDINGS:** GCEH is fast-tracking the bankruptcy process on an unusually short timeline. This raises suspicion that management seeks to avoid in-depth scrutiny or opposition.

**12. STRATEGIC TIMING OF NEW DEBT COMMITMENTS:** Just days before filing for bankruptcy, GCEH executed Amendment No. 22 to its Senior Credit Agreement, securing an additional $370 million from lenders. This suggests creditors still had confidence in the company's assets and income. The timing of the bankruptcy, immediately after securing this credit, points to a strategic effort to restructure ownership rather than an urgent need to resolve insolvency.

**13. POTENTIAL FEDERAL INVESTIGATION AND WHISTLEBLOWER ACTIVITY:** I have reason to believe that federal authorities are already investigating GCEH and its affiliates. There may also be active whistleblower activity from within the company. Given these circumstances, it could be prudent to pause or dismiss this rushed attempt to take the company private.

**14. URGENCY AND JUDICIAL AWARENESS:** I respectfully urge the Court to consider that it may not be fully informed of the potential illegality of this filing. Time is of the essence, and prompt intervention is warranted.

**15. PUBLIC STATUS MUST BE PRESERVED:** This company must remain public. The public capital markets offer the most effective and proven method to raise capital through new share issuance. More importantly, GCEH has a legal and ethical duty to its shareholders to

preserve its public structure. Remaining public provides transparency, access to capital, and long-term potential for sustainable growth and wealth creation for all stakeholders.

**16. DIRECT CONTACT REQUEST:** I respectfully request that I be contacted directly regarding the Court's decision on this motion no later than Friday, July 18, 2025. I am also requesting direct communication from the United States Trustee's Office regarding any action, review, or investigation prompted by the concerns outlined in this motion. I am available via email at Dcostaglio@gmail.com or by phone at 650 464 8078.

**RELIEF REQUESTED:**
Pursuant to the authority provided under 11 U.S.C. §§ 1104(a), 1104(c), and 1102(a)(2), and in the alternative under 11 U.S.C. § 1112(b), I, David Costaglio, respectfully request that this Court grant the following relief:

### 1. Appointment of a Chapter 11 Trustee (11 U.S.C. § 1104(a)):
Appoint an independent Chapter 11 trustee to immediately assume fiduciary control of Global Clean Energy Holdings Inc. ("GCEH"), relieve current management and their legal counsel of all authority, and restore integrity and transparency to this bankruptcy process. A trustee is warranted under 11 U.S.C. § 1104(a)(1) due to credible allegations of prepetition fraud, including material omissions from SEC filings, concealment of asset value, and a bankruptcy filing made in bad faith to eliminate shareholders and protect insiders. These concerns are now compounded by serious postpetition misconduct.

After the case was filed, the Debtors and their counsel submitted a reorganization plan that contains unlawful provisions. These include non-consensual third-party releases, improper opt-out mechanisms, and a structure that violates fundamental rights of creditors and equity holders. The United States Trustee has formally objected to the plan in Docket No. 312, calling out these provisions as illegal under binding precedent.

The submission of an unlawful plan by fiduciaries after the petition date is not a technical mistake. It is direct evidence that those currently in control cannot be trusted to act in accordance with the law. Their actions confirm a pattern of manipulation that began before the filing and continues in open court.

In light of this ongoing misconduct and the legal deficiencies identified by the United States Trustee, it is clear that the appointment of a Chapter 11 trustee is necessary to protect the integrity of the process, preserve the value of the estate, and ensure compliance with the Bankruptcy Code.

### 2. Preservation of Public Company Status:
Direct the appointed Chapter 11 trustee to prioritize maintaining GCEH's status as a publicly traded company. The public market represents the most transparent, efficient, and equitable avenue for maximizing recovery and preserving value for all stakeholders, including creditors, employees, and shareholders.

PSALM 10:12-18

### 3. Formation of an Official Committee of Equity Security Holders (11 U.S.C. § 1102(a)(2)):

I respectfully request that the Court direct the United States Trustee to appoint an Official Committee of Equity Security Holders pursuant to 11 U.S.C. § 1102(a)(2). Given the credible and well-substantiated allegations of insider misconduct, concealment of asset value, and potential recoveries for equity, shareholders are entitled to meaningful representation in this process.

To ensure effective representation, I respectfully nominate myself, David Costaglio, and Mr. Tom Madison to serve on this committee, helping steer the company toward transparency, fairness, and sustained value creation. This request is appropriate because, according to my independently submitted valuation analysis, shareholders are in the money. During the July 11, 2025 hearing, the Court acknowledged that equity representation may be warranted if shareholders can demonstrate they are in the money. That standard has now been met.

### 4. Appointment of an Independent Examiner (11 U.S.C. § 1104(c)):

If the Court is not yet prepared to appoint a trustee or equity committee, then appoint an independent examiner to thoroughly investigate all allegations of misconduct, fraud, concealment of financial information, insider conflicts, and breaches of fiduciary duty as detailed in this motion, as well as any additional issues uncovered during the examination process.

### 5. Conversion to Chapter 7 (11 U.S.C. § 1112(b)):

In the alternative, if the Court determines reorganization under Chapter 11 is not feasible or appropriate, convert this case to a Chapter 7 proceeding, where the debtor's assets can be transparently and properly valued, marketed, and sold. Conversion is appropriate because the debtor is solvent, equity is demonstrably in the money, and liquidation under Chapter 7 would maximize recovery for all creditors and stakeholders while preventing insider manipulation or unfair treatment.

I request that this Court also direct this motion to the attention of the United States Trustee under 11 U.S.C. § 307 and 28 U.S.C. § 586, to ensure proper oversight, investigation, and response by the U.S. Trustee's office. Appropriate Trustee offices are the **United States Trustee for Region 7**, Southern District of Texas (515 Rusk Street, Suite 3516, Houston, Texas 77002), as well as to their national oversight body, the **Executive Office for United States Trustees** at the U.S. Department of Justice (441 G Street NW, Suite 6150, Washington, DC 20530).

**CONCLUSION:** None of the serious questions raised in this proceeding can be meaningfully answered so long as the current Debtors and their legal counsel remain in control. In light of the serious concerns outlined in this motion regarding pre-petition misconduct, and the now-confirmed post-petition illegalities identified by the United States Trustee in its formal objection [Docket No. 312], it is clear that the Debtors and their counsel have qualified themselves for removal under 11 U.S.C. § 1104(a)(1). The U.S. Trustee's objection now establishes a clear record of post-petition misconduct that aligns precisely with the standard the Court referenced during the July 11 hearing as necessary for trustee appointment. Their conduct, which includes fraud, dishonesty, incompetence, and gross mismanagement, meets the statutory standard for the immediate appointment of a Chapter 11 trustee. This is no longer a matter of discretion or theory.

PSALM 10:12-18

It is the only legal, ethical, and rational path forward. The Court must act decisively to preserve the integrity of these proceedings and uphold the rule of law.

**It is my understanding that when a motion such as this is filed citing Title Eleven, Section 1104, Subsection A; Section 1104, Subsection C; Section 1102, Subsection A, Paragraph Two; and Section 1112, Subsection B, it is procedural and expected that the United States Trustee's Office respond. These provisions relate directly to the appointment of a trustee, an examiner, the formation of an equity committee, and potential conversion to Chapter Seven. The United States Trustee has a statutory obligation under Title Eleven, Section 307, and Title Twenty Eight, Section 586 to monitor this case and take action where abuse, fraud, or gross mismanagement may be present. Out of respect for the process and in accordance with the Court's guidance, I have submitted these concerns directly to the United States Trustee. However, this matter has now also been brought to the attention of appropriate federal regulatory agencies and local, state, and national media outlets. The public deserves transparency, and the law demands accountability. The Court has the power and the responsibility to ensure that this process does not proceed under a cloud of unaddressed misconduct.**

**Respectfully submitted,**

David Costaglio, pro se

*[signature]*  7/17/2025

PSLAM 9:16

## Exhibit A: Supporting Financial Calculations

### Estimated Share Price Calculation:

- Projected 2025 Revenue: $560,000,000
- Assumed Net Profit Margin: 30 percent → Net Income = $168,000,000
- Applied P/E Ratio: 15
- Shares Outstanding: 50,000,000
- **Estimated Share Price** = (Net Income × P/E Ratio) ÷ Shares
- = **($168M × 15) ÷ 50M = $50.40 per share**
- *Note: Depreciation and amortization significantly impact reported net profit margins, especially in capital-intensive industries such as refining. A recently completed facility like the Bakersfield refinery is likely subject to substantial depreciation schedules, including bonus depreciation under federal tax law. These are non-cash expenses that reduce accounting net income but do not reflect actual cash flow. Accordingly, they should be treated as paper losses when evaluating profitability and assigning fair market value.*

### Estimated Asset Value Based on Cap Rate:

- Assumed Net Operating Income (NOI) = $168,000,000
- Applied Capitalization Rate: 6 percent
- **Estimated Refinery Value** = NOI ÷ Cap Rate
- **= $168M ÷ 0.06 = $2,800,000,000**

These conservative estimates demonstrate that GCEH's financials suggest significant intrinsic value, which contradicts the narrative of insolvency.


PSALM 10:12-18

## Exhibit B – Copy of Oral Statement Read During the July 12th Hearing

"Your Honor, thank you for considering my Emergency Motion to Dismiss and for giving me the opportunity to speak. I truly appreciate it.

I believe my motion sheds light on the **darkness surrounding this case**. In the week leading up to this hearing, I received numerous phone calls from people impacted by this bankruptcy. One stood out—a caller who claimed to be close to the inner workings of GCEH. This caller told me that **former CFO Nikhil Vasa resigned because he refused to sign the company's SEC filings**. According to this individual, Mr. Vasa stepped down for **ethical reasons**, unwilling to put his name on companies SEC filings that he believed were misleading or improper.

I looked into it myself and found the Form 8-K filed on November 17, 2023, with the SEC confirming that Mr. Vasa notified Global Clean Energy of his resignation on that date. He was replaced by board-appointed Wade Adkins. The filing provides no reason for Mr. Vasa's departure, but based on my source, I believe he resigned because he refused to sign filings he viewed as illegal or unethical. This suggests that GCEH may have been manipulating SEC filings for over a year—and that Mr. Adkins could have been complicit. This adds another layer of darkness to an already troubling situation.

My hope today is that this Court brings **light to that darkness**. I respectfully request that the Court **appoint a Chapter 11 trustee** to take control of GCEH, relieve current management and their legal counsel of their positions, and **restore a fair and conflict-free process**. This trustee should also be tasked with **preserving GCEH's public company status**, because the public market offers the **best and most transparent path** to making all parties **financially whole**. I believe cause exists under the law to appoint a trustee based on following:

1. **Fraudulent or omitted SEC disclosures**
2. **Gross mismanagement**
3. **Breach of fiduciary duty**
4. A bankruptcy filing made in **bad faith**

I'm not here to burn this company down. I'm here to help **save it from the people who have already tried to**.

I also request that an **Official Equity Committee** be formed to protect the interests of shareholders. I formally nominate myself, David Costaglio, and Mr. Tom Madison to serve on that committee and work toward a new vision for GCEH. One based on transparency, fairness, and real value creation.

If the Court is not yet prepared to take that step, then I ask that a **court-appointed examiner** be assigned to investigate the concerns outlined in my motion and any other potential misconduct.

Thank you, Your Honor. That concludes my statement."

**Corrected Emergency Motion to Appoint Chapter 11 Trustee**
**Case No. 25-90113 – In re Global Clean Energy Holdings, Inc.**

Dear Clerk of Court,

Enclosed please find a signed, corrected version of my pro se Emergency Motion to Appoint a Chapter 11 Trustee in the above-referenced case.

This corrected filing is intended to replace the version previously submitted and includes updated facts and arguments based on recent developments in the docket. I am not requesting a hearing at this time, but respectfully ask that this motion be filed as soon as possible due to the time-sensitive nature of the upcoming plan confirmation proceedings.

Please let me know if any additional steps are required. I appreciate your assistance and attention to this matter.

Sincerely,

David Costaglio, pro se

*[signature]*   7/17/2025

Phone # - 650 464 8078

Email – Dcostaglio@gmail.com

