AGE WRINKLES THE BODY. QUITTING WRINKLES THE SOUL." — GENERAL DOUGLAS MACARTHUR

**Emergency Motion to Appoint Chapter 11 Trustee to Address Imminent National Security Threat and Illegal Equity Transfer in Violation of the Defense Production Act (50 U.S.C. § 4565); Proposed Plan Requires Mandatory CFIUS Review Prior to Any Foreign Ownership or Control**

**GLOBAL CLEAN ENERGY HOLDINGS, INC.**
Case No.: 25-90113
Judge: Honorable Alfredo R. Pérez
Date Written: July 21st, 2025
Chapter 11



**EMERGENCY RELIEF REQUESTED:** Movant respectfully requests that the Court **act immediately upon receipt of this filing to prevent irreparable harm to the national interest of the United States of America and to preserve the integrity of these proceedings.** Given the nature of the allegations and the imminent risks involved, expedited relief is warranted. **In the alternative**, relief is requested **no later than 4:00 p.m. (prevailing Central Time) on July 25, 2025**, in advance of the confirmation hearing currently scheduled for July 28, 2025.

If you object to the relief requested herein or believe that emergency consideration is not warranted, you must either appear at the hearing if one is scheduled or file a written response with the Court before the above-stated date and time. Failure to do so may cause the Court to treat the motion as unopposed and grant the requested relief without further notice.

**EMERGENCY BASIS:**
This motion is filed on an emergency basis due to the imminent and potentially irreversible national security risks posed by the proposed restructuring plan. The plan will illegally transfer a controlling interest in a strategic U.S. energy asset, the Bakersfield renewable diesel refinery, to CTCI, a Taiwan based foreign contractor, without undergoing mandatory review by the Committee on Foreign Investment in the United States (CFIUS), as required under the Defense Production Act (50 U.S.C. § 4565). Approval of the plan under these conditions would violate federal law and result in unauthorized foreign control over critical domestic infrastructure. Emergency relief is essential to ensure compliance with national security protocols, preserve lawful oversight, and protect the public interest in maintaining American control of a vital energy facility.

**INTRODUCTION:**

This emergency motion is submitted to alert the Court to a serious and unresolved national security issue arising from the Debtors' proposed restructuring plan. The plan contemplates granting a controlling equity interest in Global Clean Energy Holdings Inc. and its critical domestic energy infrastructure to CTCI, a foreign based contractor headquartered in Taiwan. Under federal law, this type of foreign control transaction cannot lawfully proceed without prior review and clearance by the Committee on Foreign Investment in the United States (CFIUS), a multi agency body chaired by the U.S. Department of the Treasury and empowered to assess the national security implications of certain foreign investments in American businesses.

AGE WRINKLES THE BODY. QUITTING WRINKLES THE SOUL." — GENERAL DOUGLAS MACARTHUR

The governing law is Section 721 of the Defense Production Act of 1950, codified at 50 U.S.C. § 4565. This statute authorizes CFIUS to review, modify, or block any foreign acquisition, merger, or investment in a U.S. business that may result in foreign control of critical infrastructure, critical technologies, or sensitive personal data. If CFIUS determines that a covered transaction poses a national security risk and no mitigation measures can resolve it, the President of the United States may suspend or prohibit the transaction outright.

The law is unambiguous. CFIUS review is mandatory for transactions that result in foreign control of a U.S. business involved in critical infrastructure, such as energy production. The Bakersfield renewable diesel refinery operated by the Debtors qualifies as such an asset, especially given its strategic location, its role in California's isolated fuel supply, and its potential relevance to national defense installations throughout the region.

Any version of the Debtors' restructuring plan that awards equity or control to CTCI is categorically illegal unless and until CFIUS review has been initiated, completed, and clearance granted. To proceed otherwise would directly violate 50 U.S.C. § 4565, improperly bypass the executive branch's exclusive jurisdiction over foreign investment in national security infrastructure, and render the transaction void as a matter of law.

As a concerned shareholder and United States citizen, **I have already reported this matter to the Committee on Foreign Investment in the United States for urgent review**. In recognition of the Court's limited jurisdiction over national security matters, I now respectfully urge the Court to do the same by formally referring this case to the United States Department of the Treasury for review by CFIUS and by staying all action on the Debtors' plan until CFIUS has evaluated and ruled on the legality of the proposed equity transfer to CTCI.

## 1. THE BAKERSFIELD REFINERY IS CRITICAL AMERICAN INFASTRUCTURE & NO PORTION OF IT CAN BE TRANSFER TO A FORIENG ENTITY WITHOUT CFIUS REVIEW:

The Bakersfield Refinery stands as a proud testament to American perseverance and industrial resilience. Constructed in 1932 during the depths of the Great Depression, it was built by American workers using American materials and has withstood nearly a century of national trials, including World War II, The Cold War, energy crises, and economic upheavals.

Beyond its historical legacy, the refinery has recently been revitalized through substantial domestic capital investment and taxpayer-supported federal and state clean energy incentives. It continues to provide American jobs and reflects the innovation, grit, and strength of the nation's industrial sector. To permit foreign linked entities to gain control of this asset through a nontransparent bankruptcy process would undermine decades of American investment, public trust, and national pride.

**California's Strategic Energy Vulnerability and the National Security Significance of the Bakersfield Refinery**

California faces a uniquely fragile energy security environment. Often described as an energy island, the state is geographically isolated from the national fuel pipeline grid and relies heavily on in-state refining capacity to meet its needs, especially during times of national emergency or global disruption.

Within this vulnerable setting, the Bakersfield Refinery occupies a critical strategic role:

**a. Renewable Feedstock Independence**
Unlike traditional refineries, the Bakersfield facility does not rely on crude oil. It processes renewable feedstocks to produce high volumes of renewable diesel, a fuel essential for powering military vehicles, naval vessels, and potentially aircraft.

**b. Wartime Energy Assurance**
In the event of a global oil supply disruption, wartime embargo, or critical supply chain failure, the refinery would serve as an indispensable strategic resource, capable of sustaining domestic defense operations without dependence on foreign oil.

**c. Military Installation Support**
The refinery's geographic location and production capabilities position it to meet emergency fuel needs for major U.S. military installations across California, including but not limited to:

**(1) Naval Base San Diego**
**(2) Camp Pendleton**
**(3) Vandenberg Space Force Base**
**(4) Edwards Air Force Base**
**(5) Travis Air Force Base**

**d. National Security Classification**
Its ability to produce renewable diesel and potentially renewable aviation fuel without foreign oil dependency makes the Bakersfield Refinery a cornerstone of American national security and defense readiness. Any transfer of control to a foreign entity, particularly without review under the Defense Production Act at 50 U.S.C. section 4565, would place this vital infrastructure at risk and violate federal law.

**2. PRECEDENT CONFIRMS THAT FOREIGN CONTROL OF STRATEGIC ASSETS REQUIRES FEDERAL REVIEW AND CANNOT BE APPROVED THROUGH BANKRUPTCY PROCEEDINGS:**

The issues presented by the Debtors' plan are not novel. Courts and federal agencies have consistently held that foreign acquisition of United States businesses involved in critical infrastructure must be reviewed and approved by the federal government prior to consummation. This principle is now codified in Section 721 of the Defense Production Act, 50 U.S.C. section 4565, as amended by the Foreign Investment Risk Review Modernization Act of 2018, also known as FIRRMA. That statute provides the Committee on Foreign Investment in the United States, a multi agency executive body chaired by the United States Department of the Treasury,

with exclusive authority to investigate, mitigate, and block transactions that may threaten national security.

A leading judicial decision confirming that authority is **Ralls Corporation v. CFIUS**, 758 F.3d 296, decided by the United States Court of Appeals for the District of Columbia Circuit. In Ralls, a Chinese owned company acquired a United States wind energy project located near a naval weapons facility without CFIUS review. After a national security investigation, the President of the United States issued an executive order requiring the foreign entity to divest its interest. The D.C. Circuit upheld the President's decision and affirmed that the executive branch has exclusive jurisdiction to determine whether a foreign investment in critical infrastructure poses a national security threat. The court emphasized that such decisions are not subject to judicial substitution or interference.

Historical precedent reinforces the seriousness with which the United States has treated similar threats:

**a. CNOOC and Unocal (2005)**
China National Offshore Oil Corporation, a state owned enterprise, attempted to acquire Unocal, a United States oil company. Despite offering a highly competitive bid, the transaction collapsed under bipartisan Congressional pressure due to national security concerns about Chinese control over United States energy assets. No executive action was needed because political and regulatory pressure alone halted the transaction.

**b. Dubai Ports World (2006)**
A company based in the United Arab Emirates sought to manage terminal operations at six major United States ports. Despite the administration's initial support, the deal was withdrawn after widespread opposition in Congress and among the public, based on fears about foreign access to critical transportation infrastructure.

**c. Shuanghui and Smithfield Foods (2013)**
Shuanghui International, a Chinese company now known as WH Group, acquired Smithfield Foods, the largest pork producer in the United States. The deal raised significant national security concerns, including food supply vulnerability and foreign control over critical agricultural infrastructure. Although the acquisition was ultimately approved by CFIUS, the case triggered bipartisan Congressional hearings and led to broader legislative scrutiny of foreign investments in sensitive domestic industries. It also played a central role in motivating Congress to pass the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA), which expanded the scope of CFIUS jurisdiction to prevent similar risks in the future.

In response to these and similar cases, Congress passed FIRRMA, expanding CFIUS jurisdiction to cover not just traditional mergers and acquisitions, but also noncontrolling investments, real estate transactions near military installations, and complex corporate restructurings that may result in foreign influence or access to sensitive infrastructure. FIRRMA also introduced mandatory declarations for certain transactions and broadened the scope of covered transactions to include those arising indirectly or through unconventional legal structures including bankruptcy.

The Debtors' proposed plan fits squarely within the class of transactions Congress intended FIRRMA to cover. It involves a controlling equity transfer to a foreign contractor in a strategic United States refinery through a nontraditional mechanism, a Chapter 11 restructuring plan. The method may differ, but the national security risk is the same. The fact that this transaction is occurring in bankruptcy does not exempt it from review. To the contrary, 50 U.S.C. section 4565, FIRRMA, and the Supremacy Clause of the United States Constitution, Article VI, Clause 2, require deference to federal national security authority.

Moreover, 11 U.S.C. section 363 subsection d prohibits the use or transfer of estate property in violation of nonbankruptcy law. This means the Court has no authority to confirm a plan that results in an unlawful foreign equity transfer under federal statute. Precedent and statute are aligned. This is a matter for CFIUS, not for the bankruptcy court to resolve unilaterally.

Accordingly, legal precedent confirms that:

**(1)** National security reviews of foreign transactions are not discretionary
**(2)** Judicial approval cannot substitute for federal executive review
**(3)** Foreign investment in United States strategic infrastructure must comply with mandatory pre clearance mechanisms established by Congress and enforced by the President

To proceed without that review would violate black letter law and run directly counter to well established precedent.

## 3. CTCI'S OPAQUE OWNERSHIP STRUCTURE MAY CONCEAL FOREIGN INFLUENCE, INCLUDING POTENTIAL LINKS TO ADVERSARIAL STATES:

Although CTCI is headquartered in Taiwan and often presents itself as a neutral engineering and procurement firm, its corporate structure, financing sources, and beneficial ownership are not transparent. There is no publicly available record identifying all entities or individuals who may hold direct or indirect interests in CTCI or its subsidiaries. Nor is there a clear accounting of its cross border partnerships, capital investments, or foreign financial backers.

This opacity presents a significant national security concern. The Committee on Foreign Investment in the United States (CFIUS) has long treated nontransparent ownership structures as a red flag, particularly when evaluating transactions involving critical infrastructure. Under the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA), CFIUS has express authority to investigate and block transactions where foreign beneficial ownership cannot be clearly traced or where indirect control mechanisms may conceal influence by foreign actors.

It is well established that adversarial states, including the People's Republic of China, frequently utilize layered and indirect investment structures such as offshore funds, holding companies, shell entities, and strategic partnerships to acquire stakes in critical industries while avoiding regulatory scrutiny. These tactics are specifically what FIRRMA was designed to detect and address.

In this case, the Debtors' plan proposes to grant CTCI a controlling equity interest in one of the nation's most strategically situated renewable fuel refineries without any inquiry into CTCI's underlying ownership or global exposure. This creates an unacceptable risk that foreign actors hostile to the United States may gain influence, financial, operational, or strategic, over a critical American energy asset through indirect or undisclosed means.

The law does not require proof that a threat is certain. It requires that a risk exists. In national security matters, uncertainty itself is a trigger for review. As such, the foreign equity transfer contemplated in this case cannot be approved by this Court without formal CFIUS review. Doing so would not only violate federal law but also invite an outcome that Congress has expressly sought to prevent.

### 4. FOREIGN COMMODITIES PARTNER VITOL FURTHER JEOPARDIZES NATIONAL SECURITY AND AMERICAN INTERESTS:

In addition to the proposed equity transfer to Taiwan based contractor CTCI, the Debtors' primary offtake partner is Vitol, a foreign commodities trading firm that plays a central role in the refinery's revenue model. Vitol is one of the largest energy traders in the world, with global operations spanning jurisdictions that may not align with U.S. national interests. In 2020, Vitol paid over 160 million dollars to resolve criminal bribery charges brought by the U.S. Department of Justice for violations of the Foreign Corrupt Practices Act, further casting doubt on the company's integrity and compliance history.

This relationship creates a dual foreign risk: CTCI potentially controlling the infrastructure, and Vitol controlling commercialization and global distribution. Together, they form a foreign influenced supply chain that could divert strategic renewable fuels away from domestic needs and into global markets, including to adversarial regimes.

The structure of the current plan not only enriches a foreign equity holder through bankruptcy but also empowers a foreign distributor to capitalize on U.S. taxpayer subsidized fuel production. This undermines the intent of domestic clean energy policy and poses serious national security concerns regarding where the refinery's output ultimately goes and who benefits from it.

Any plan that leaves such entangled foreign parties in control of both infrastructure and output must be reviewed by federal authorities. The involvement of Vitol, when considered alongside the proposed equity transfer to CTCI, compounds the national security threat and further supports the need for immediate oversight by the Committee on Foreign Investment in the United States and the appointment of a Chapter 11 Trustee to protect the integrity of this proceeding.

### 5. THIS COURT LACKS JURISDICTION TO APPROVE FOREIGN CONTROL WITHOUT FEDERAL REVIEW; ANY SUCH ACTION WOULD BE ULTRA VIRES AND PREEMPTED BY FEDERAL LAW:

The Bankruptcy Court is a court of limited jurisdiction. While it has authority to oversee financial restructuring under Title 11 of the United States Code, it does not possess the power to

authorize transactions that violate federal law, particularly where matters of national security are implicated.

The proposed plan contemplates the transfer of a controlling equity interest in a critical U.S. energy asset to CTCI, a foreign entity, without the mandatory review and clearance required under Section 721 of the Defense Production Act of 1950, codified at 50 U.S.C. section 4565. That statute places foreign acquisitions of U.S. businesses involved in critical infrastructure squarely under the jurisdiction of the Committee on Foreign Investment in the United States (CFIUS), a federal executive branch body chaired by the U.S. Department of the Treasury and authorized to investigate, mitigate, or block transactions that may threaten national security.

CFIUS review is not discretionary. Under Executive Order 13456, Executive Order 11858 as amended, and the statutory framework of the Defense Production Act, any transaction that could result in foreign control of critical infrastructure must be submitted for review before it can proceed. The equity transfer contemplated here clearly qualifies as a covered transaction. Until that review has occurred and a formal determination is issued by the Executive Branch, **any attempt by this Court to approve or confirm the plan would be premature, unlawful, and beyond the limits of its constitutional authority.**

This position is reinforced by 11 U.S.C. section 363 subsection d, which prohibits the use, sale, or lease of property in bankruptcy in violation of no bankruptcy law. Here, the no bankruptcy law in question, 50 U.S.C. section 4565, expressly requires executive review of foreign acquisitions involving national security. A bankruptcy confirmation order that overrides or bypasses that requirement would directly conflict with federal law and the Supremacy Clause of the United States Constitution, Article VI, Clause 2, which mandates that federal law prevails over conflicting judicial action.

Additionally, federal preemption doctrine bars this Court from asserting jurisdiction over matters that Congress and the Executive have placed exclusively within federal control. Foreign investment in national security infrastructure is such a domain. As the United States Court of Appeals for the District of Columbia Circuit held in Ralls Corporation v. CFIUS, 758 F.3d 296, the Executive Branch has broad and exclusive authority to block or unwind foreign acquisitions deemed threatening to U.S. interests, and courts may not substitute their judgment for that of national security agencies.

To the extent this Court authorizes the transfer of ownership or control to a foreign entity without CFIUS review and clearance, it would be acting ultra vires, beyond its lawful power, and any such order may be rendered void or subject to reversal.

Respectfully, the only lawful course is for this Court to refrain from approving any plan that includes foreign control unless and until CFIUS review is completed and clearance granted. In the alternative, the Court should stay all confirmation proceedings and formally notify the United States Department of the Treasury of the national security implications raised herein.

**CONCLUSION:**

The proposed plan, in its current form, presents an immediate and unacceptable national security risk. **It is illegal under federal law and cannot be confirmed** without violating the mandates of the Defense Production Act and the national security review process established by Congress. By transferring a controlling equity interest in one of the nation's most strategically located renewable fuel refineries to a foreign entity without CFIUS review, the Debtors are attempting to bypass federal law and compromise a matter of national interest through the mechanics of a bankruptcy proceeding.

This is not merely a financial restructuring. It is a transaction with far reaching implications for energy sovereignty, defense readiness, and lawful federal oversight. Under 50 U.S.C. section 4565 and the Foreign Investment Risk Review Modernization Act of 2018, any transaction resulting in foreign control of critical infrastructure must undergo formal review by the Committee on Foreign Investment in the United States. That process has not occurred here. Approval of this plan without it would be unlawful, premature, and beyond the scope of this Court's jurisdiction.

Movant respectfully urges this Court to **take immediate action** to protect the public interest. This includes halting confirmation proceedings, notifying the U.S. Department of the Treasury of the issues raised in this motion, and appointing a Chapter 11 Trustee to ensure compliance with federal law and preserve the integrity of these proceedings.

Movant has already notified CFIUS of this matter and will continue to pursue all lawful channels, including congressional oversight bodies and other executive agencies, should this plan proceed without required national security review.

The law is clear. The risk is real. And the duty to act now rests with the Court.

The Debtors have already been caught omitting material information from their SEC filings, including their failure to disclose refinery production and revenue data that would have revealed their solvency. They have already submitted an illegal plan to this Court, one that violates the Bankruptcy Code and has been formally challenged by the United States Trustee in Docket No. 312. Now, the Debtors cross yet another line by attempting to transfer control of a strategic American refinery to a foreign entity without federal review, thereby creating a direct threat to national security. Based on their conduct to date, the Debtors have shown they cannot be trusted to operate within the confines of the law and are now likely destroying or concealing evidence to avoid accountability. Immediate action is required. Your Honor, this case has gone too far. On behalf of every American citizen, I respectfully urge the Court to take immediate action.

**RELIEF REQUESTED:**

For the reasons set forth above, Movant respectfully requests that the Court:

**1. Immediately stay all confirmation proceedings** related to the Debtors' proposed plan, pending a full national security review under federal law.

**2. Refer this matter to the United States Department of the Treasury for review by the Committee on Foreign Investment in the United States (CFIUS),** and further **notify the United States Departments of Justice, Defense, Energy, and Homeland Security** of the national security risks identified in this motion. These agencies are responsible for enforcing the Defense Production Act, 50 U.S.C. section 4565, and the Foreign Investment Risk Review Modernization Act of 2018, and are empowered to take appropriate action to prevent unlawful foreign control of strategic American infrastructure.

**3. Appoint a Chapter 11 Trustee** pursuant to 11 U.S.C. section 1104(a)(1) and (a)(2), in the interests of public safety, national security, and the integrity of these proceedings.

**4. Declare that any plan awarding equity or control to CTCI or any foreign entity is unlawful** unless and until CFIUS review has been completed and formal clearance granted.

**5. Encourage legal counsel for the Debtors to evaluate their obligations** under Bankruptcy Rule 9011, Model Rules of Professional Conduct 1.2(d) and 3.3, and applicable provisions of federal law, and to withdraw from further advocacy of a restructuring plan that may violate national security law and public policy:

Movant respectfully submits that legal counsel for the Debtors, including firms of record in this case, are now on notice that the plan they are advancing may violate federal law, including national security statutes and public policy safeguards. Continuing to advocate for confirmation of a plan that transfers strategic United States infrastructure to a foreign entity without mandatory federal review may place counsel in conflict with their professional and ethical obligations under applicable rules of conduct.

**Movant does not believe that any attorney or law firm originally signed on to defend a transaction that poses a potential national security threat to the United States. At this stage, withdrawal of representation is not only justified but may be the most appropriate and ethically responsible course of action.**

Bankruptcy Rule 9011 and Model Rule of Professional Conduct 3.3 require attorneys to avoid making false statements of law or fact to the Court and to correct the record where material omissions exist. Rule 1.2(d) further prohibits lawyers from assisting a client in conduct they know to be criminal or fraudulent. Additionally, 11 U.S.C. section 363(d) prohibits transfers of estate property in violation of nonbankruptcy law, while 50 U.S.C. section 4565 and the Foreign Investment Risk Review Modernization Act of 2018 mandate federal oversight of transactions involving foreign control of critical infrastructure.

As set forth in this motion, the proposed plan may violate these federal requirements. Movant therefore respectfully encourages all attorneys of record for the Debtors to reconsider their continued participation in this case and, if necessary, to withdraw from further advocacy in support of an unlawful restructuring plan. The integrity of the legal profession and the rule of law depend on counsel recognizing when a client's objectives can no longer be pursued in good faith.

**6. Grant such other and further relief** as the Court deems just, proper, and in the interest of the United States and its citizens.

**7. Reserve all rights to pursue further relief** as may be warranted, including the right to supplement this motion, to raise additional objections, to seek appellate review, and to refer this matter to congressional oversight committees or other federal agencies with jurisdiction over national security, bankruptcy oversight, and foreign influence in critical infrastructure transactions.

**Respectfully submitted,**

**David Costaglio, Pro Se Movant**

7/21/2025