**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL CLEAN ENERGY | ) | Case No. 25-90113 (ARP) |
| HOLDINGS, INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF SECOND AMENDED PLAN SUPPLEMENT

 **PLEASE TAKE NOTICE** that, on May 29, 2025, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. 227] (the "Disclosure Statement Order"):   (a) authorizing the above-captioned debtors and debtors in possession (collectively,  the "Debtors") to solicit votes on the *Amended Joint Chapter 11 Plan of Reorganization of Global Clean Energy Holdings, Inc. and its Debtor Affiliates* [Docket No. 214]; (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Global Clean Energy Holdings, Inc. and its Debtor Affiliates* [Docket No. 215] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the Solicitation Packages, including the forms of Ballots and notices in connection therewith; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (as defined below) and for Filing objections to the Plan.

 **PLEASE TAKE FURTHER NOTICE** that, on July 3, 2025, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Reorganization of Global Clean Energy Holdings, Inc. and Its Debtor Affiliates* [Docket No. 301] (as modified, amended, or supplemented from time to time, consistent with the terms thereof, the "Plan").[2]

 **PLEASE TAKE FURTHER NOTICE** that, as contemplated by the Plan and the Disclosure Statement Order, the Debtors filed the *Notice of Filing of Plan Supplement* [Docket No. 304] (the "Initial Plan Supplement") with the Court on July 7, 2025.

 **PLEASE TAKE FURTHER NOTICE** that, as contemplated by the Plan and the Disclosure Statement Order, the Debtors filed the *Notice of Filing of First Amended Plan*

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/GCEHoldings.  The location of Debtor Global Clean Energy Holdings, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  6451 Rosedale Highway, Bakersfield, California 93308.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement Order, as applicable.

*Supplement* [Docket No. 316] (the "<u>First Amended Plan Supplement</u>") with the Court on July 15, 2025.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file this amendment to the Plan Supplement (this "<u>Second Amended Plan Supplement</u>," and together with the Initial Plan Supplement and First Amended Plan Supplement, the "<u>Plan Supplement</u>") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Second Amended Plan Supplement Filed herewith includes the following documents, as may be modified, amended, or supplemented from time to time in accordance with the Plan:

| | |
|---|---|
| **A** | Exit Facilities Documents |
| **B** | New Organizational Documents |
| **C** | Restructuring Transactions Steps Memorandum |

**PLEASE TAKE FURTHER NOTICE** that the hearing at which the Court will consider Confirmation of the Plan (the "<u>Confirmation Hearing</u>") will commence on **July 28, 2025 at 9:00 a.m.**, prevailing Central Time, before the Honorable Alfredo R. Perez, in the Court, located at 515 Rusk Street, Courtroom 400, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE** that, if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents free of charge, you should contact Epiq Corporate Restructuring, LLC, the claims and noticing agent retained by the Debtors in these chapter 11 cases (the "<u>Claims and Noticing Agent</u>"), by:   (a) emailing GCEHoldings@epiqglobal.com; (b) calling the Claims and Noticing Agent at (888) 827-0433 (domestic, toll free) or +1 (971) 402-2181 (international); or (c) accessing the Debtors' restructuring website at <u>https://dm.epiq11.com/GCEHoldings</u>.  You may also obtain copies of any pleadings Filed in these chapter 11 cases for a fee via PACER at:  <u>http://www.txs.uscourts.gov.</u>

2

Houston, Texas
Dated:  July 24, 2025

/s/ Jason L. Boland

**NORTON ROSE FULBRIGHT US LLP**
Jason L. Boland (SBT 24040542)
Robert B. Bruner (SBT 24062637)
Julie Harrison (SBT 24092434)
Maria Mokrzycka (SBT 24119994)
1550 Lamar Street, Suite 2000
Houston, Texas 77010-3095
Telephone:       (713) 651-5151
Facsimile:       (713) 651-5246
Email:       jason.boland@nortonrosefulbright.com
                 bob.bruner@nortonrosefulbright.com
                 julie.harrison@nortonrosefulbright.com
                 maria.mokrzycka@nortonrosefulbright.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Brian Schartz, P.C. (TX Bar No. 24099361)
Ross J. Fiedler (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:       jsussberg@kirkland.com
                 bschartz@kirkland.com
                 ross.fiedler@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Peter A. Candel (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:       peter.candel@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL CLEAN ENERGY | ) | Case No. 25-90113 (ARP) |
| HOLDINGS, INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED PLAN SUPPLEMENT FOR THE DEBTORS'**
**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF GLOBAL CLEAN ENERGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**Table of Contents[2]**

| Exhibit | Description |
|---|---|
| A | Exit Facilities Documents |
| B | New Organizational Documents |
| C | Restructuring Transactions Steps Memorandum |

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/GCEHoldings.  The location of Debtor Global Clean Energy Holdings, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  6451 Rosedale Highway, Bakersfield, California 93308.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Global Clean Energy Holdings, Inc. and its Debtor Affiliates* [Docket No. 301] (as modified, amended, or supplemented from time to time, consistent with the terms thereof, the "Plan") or the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 227] (the "Disclosure Statement Order"), as applicable.

## Exhibit A

### Exit Facilities Documents

Certain documents, or portions thereof, contained in this **Exhibit A** and the Plan Supplement remain subject to continued review by the Debtors, the Required Consenting Stakeholders, and interested parties with respect thereto.  The respective rights of the Debtors and the Required Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that, if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.

This **Exhibit A** includes the following Exit Facilities Documents:

**Exhibit A(i)**: Holdco Term Loan Credit Agreement

## Exhibit A(i)

**Holdco Term Loan Credit Agreement**

*Agreed Form*

CREDIT AGREEMENT

dated as of

[ ● ], 2025

among

GRAPEVINE ENERGY HOLDINGS, LLC,
as Holdco Borrower,

THE HOLDCO TERM LENDERS FROM TIME TO TIME PARTY HERETO,

and

ORION ENERGY PARTNERS TP AGENT, LLC,
as Holdco Term Loan Administrative Agent

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...................................................................................................2

    Section 1.01   Defined Terms ..........................................................................2
    Section 1.02   Terms Generally.......................................................................4
    Section 1.03   Accounting Terms.....................................................................4
    Section 1.04   Divisions ..................................................................................4

ARTICLE II THE CREDITS ...............................................................................................5

    Section 2.01   Holdco Term Facilities ...........................................................5
    Section 2.02   Evidence of Debt.....................................................................6
    Section 2.03   Fees..........................................................................................6
    Section 2.04   Increased Costs .......................................................................6
    Section 2.05   Taxes .......................................................................................8
    Section 2.06   Change of Lending Office .....................................................10
    Section 2.07   Acknowledgement and Consent to Bail-In of EEA Financial
                       Institutions.............................................................................10
    Section 2.08   Holdco Term Loan Payment Waterfall..................................11
    Section 2.09   Incorporation by Reference....................................................11

ARTICLE III REPRESENTATIONS AND WARRANTIES...............................................11

    Section 3.01   Incorporation of Common Terms and Term Intercreditor
                       Agreement..............................................................................11

ARTICLE IV CONDITIONS ..............................................................................................11

    Section 4.01   Conditions to the Closing Date ..............................................11

ARTICLE V COVENANTS.................................................................................................12

    Section 5.01   Covenants...............................................................................12

ARTICLE VI EVENTS OF DEFAULT ..............................................................................12

    Section 6.01   Events of Default ...................................................................12

ARTICLE VII THE AGENTS..............................................................................................12

    Section 7.01   Appointment and Authorization of the Holdco Term Loan
                       Administrative Agent.............................................................12
    Section 7.02   Rights as a Holdco Term Lender ...........................................13
    Section 7.03   Duties of Agent; Exculpatory Provisions ..............................13
    Section 7.04   Reliance by Holdco Term Loan Administrative Agent ...........13
    Section 7.05   Delegation of Duties ..............................................................14

**TABLE OF CONTENTS**
(continued)

Section 7.06    Withholding of Taxes by the Holdco Term Loan Administrative
Agent; Indemnification ................................................................14
Section 7.07    Resignation of Holdco Term Loan Administrative Agent.......................15
Section 7.08    Non-Reliance on Holdco Term Loan Administrative Agent or
Other Holdco Term Lenders .......................................................15
Section 7.09    No Other Duties; Etc.................................................................15
Section 7.10    Certain ERISA Matters ..............................................................15

ARTICLE VIII MISCELLANEOUS ................................................................17

Section 8.01    Incorporation by Reference........................................................17
Section 8.02    Successors and Assigns..............................................................17
Section 8.03    Amendments. ..........................................................................21
Section 8.04    Common Terms and Term Intercreditor Agreement ................................21

**TABLE OF CONTENTS**

Page

Exhibit A        -        Form of Assignment and Assumption
Exhibit B        -        Form of Note

Annex I          -        Holdco Term Loans
Annex II         -        Lending Offices

Schedule 1       -        Payment Waterfall

This CREDIT AGREEMENT (this "Agreement") is dated as of [ ● ], 2025, among GRAPEVINE ENERGY HOLDINGS, LLC, a Delaware limited liability company ("Holdco Borrower"), each HOLDCO TERM LENDER party hereto (collectively, the "Holdco Term Lenders" and individually, a "Holdco Term Lender") and ORION ENERGY PARTNERS TP AGENT, LLC, as the Holdco Term Loan Administrative Agent (as defined in the Common Terms and Term Intercreditor Agreement (as defined below)).

WHEREAS, Holdco Borrower and certain of its Affiliates (collectively, the "Debtors") commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (as defined in the Common Terms and Term Intercreditor Agreement) on April 17, 2025, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, in connection with the Chapter 11 Cases, Holdco Borrower and certain of its Affiliates entered into to that certain Senior Secured Super Priority as Debtor-in-Possession Term Loan Credit Agreement, dated as of April 17, 2025, by and among, *inter alios*, Holdco Borrower, Orion Energy Partners TP Agent, LLC, as administrative agent, and the lending institutions from time to time parties thereto (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Existing DIP Term Loan Credit Agreement").

WHEREAS, BKRF OCB, LLC (the "Prepetition Term Loan Borrower") is party to that certain Credit and Guaranty Agreement, dated as of May 4, 2020, by and among, *inter alios*, the Prepetition Term Loan Borrower, certain Affiliates of the Prepetition Term Loan Borrower, as guarantors, Orion Energy Partners TP Agent, LLC, as administrative agent and collateral agent, and the lenders from time to time parties thereto (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Prepetition Term Loan Agreement").

WHEREAS, on July 3, 2025, the Debtors filed the Second Amended Plan of Reorganization of Global Clean Energy Holdings, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, dated July 3, 2025 (Docket No. 301) (together with all schedules, documents and exhibits contained therein, as may be further amended, supplemented or modified from time to time, the "Approved Plan").

WHEREAS, on [ ● ], 2025, the Bankruptcy Court entered an order confirming the Approved Plan (the "Confirmation Order").

WHEREAS, Holdco Borrower is entering into this Agreement and each other Holdco Term Financing Document (as defined in the Common Terms and Term Intercreditor Agreement) on the Closing Date to replace the Existing DIP Term Loan Credit Agreement and the Prepetition Term Loan Agreement.

WHEREAS, the Holdco Term Lenders are willing to provide the credit facility described herein upon the terms and subject to the conditions set forth herein and in the other Holdco Term Financing Documents.

NOW, THEREFORE, the parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS

Section 1.01    <u>Defined Terms</u>.    Capitalized terms used herein shall have the meanings provided in the Section 1.01 (*Certain Defined Terms*) of the Common Terms and Term Intercreditor Agreement.  In addition, the following terms shall have the meanings specified below:

"<u>Approved Plan</u>" has the meaning specified in the recitals hereto.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Holdco Term Lender and an assignee (with the consent of any party whose consent is required by <u>Section 8.04</u>), in the form of <u>Exhibit A</u> or any other form approved by the Holdco Term Loan Administrative Agent.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"<u>Chapter 11 Cases</u>" has the meaning specified in the recitals hereto.

"<u>Closing Date</u>" means the first date on which all conditions precedent specified in Section 4.01 (*Conditions to Closing Date*) of the Common Terms and Term Intercreditor Agreement are satisfied (or waived in accordance with Section 10.02 (*Waivers; Amendments*) of the Common Terms and Term Intercreditor Agreement).

"<u>Common Terms and Term Intercreditor Agreement</u>" means the Common Terms and Term Intercreditor Agreement, dated as of the Closing Date, by and among Holdco Borrower, the Holdco Term Loan Administrative Agent, the Holdco Term Collateral Agent and CTCI.

"<u>Confirmation Order</u>" has the meaning specified in the recitals hereto.

"<u>Debtors</u>" has the meaning specified in the recitals hereto.

"<u>Existing DIP Term Loan Credit Agreement</u>" has the meaning specified in the recitals hereto.

"<u>FATCA</u>" has the meaning assigned to such term in <u>Section 2.05(c)</u>.

"<u>First Out Subordinated Senior Secured Term Lender</u>" means a lender that holds First Out Subordinated Senior Secured Term Loans.

"<u>First Out Subordinated Senior Secured Term Loan</u>" means, with respect to any Holdco Term Lender at any time, the amount set forth opposite such Holdco Term Lender's name on <u>Annex I</u> under the caption "First Out Subordinated Senior Secured Term Loan" or, if such Holdco Term Lender has entered into one or more Assignment and Assumptions following the Closing Date, the amount set forth for such Holdco Term Lender in the Register maintained by the Holdco Term Loan Administrative Agent as such Holdco Term Lender's "First Out Subordinated Senior Secured Term Loan".

-2-

"Holdco Borrower" has the meaning specified in the introductory paragraph hereto.

"Holdco Term Facility" means, individually or collectively, as the context may require, the credit facilities with respect to the New Senior Secured Term Loans, the First Out Subordinated Senior Secured Term Loans, the Second Out Subordinated Senior Secured Term Loans and the Subordinated Junior Term Loans.

"Holdco Term Lenders" means, individually or collectively, as the context may require, the New Senior Secured Term Lender, the First Out Subordinated Senior Secured Term Lender, the Second Out Subordinated Senior Secured Term Lender and the Subordinated Junior Term Holdco Term Lenders.

"Holdco Term Loan Administrative Agent" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means the office designated as such beneath the name of a Holdco Term Lender set forth on Annex II of this Agreement or such other office of such Holdco Term Lender as such Holdco Term Lender may specify in writing from time to time to the Holdco Term Administrative Agent and Holdco Borrower.

"New Senior Secured Term Lender" means a lender that holds New Senior Secured Term Loans.

"New Senior Secured Term Loan" means, with respect to any Holdco Term Lender at any time, the amount set forth opposite such Holdco Term Lender's name on Annex I under the caption "New Senior Secured Term Loan" or, if such Holdco Term Lender has entered into one or more Assignment and Assumptions following the Closing Date, the amount set forth for such Holdco Term Lender in the Register maintained by the Holdco Term Loan Administrative Agent as such Holdco Term Lender's "New Senior Secured Term Loan".

"Note" means a promissory note substantially in the form of Exhibit B.

"Participant" has the meaning assigned to such term in Section 8.02(f).

"Participant Register" has the meaning assigned to such term in Section 8.02(f).

"Prepetition Term Loan Agreement" has the meaning specified in the recitals hereto.

"Prepetition Term Loan Borrower" has the meaning specified in the recitals hereto.

"Register" has the meaning assigned to such term in Section 8.02(c).

"Second Out Subordinated Senior Secured Term Lender" means a lender that holds Second Out Subordinated Senior Secured Term Loans.

"Second Out Subordinated Senior Secured Term Loan" means, with respect to any Holdco Term Lender at any time, the amount set forth opposite such Holdco Term Lender's name on Annex I under the caption "Second Out Subordinated Senior Secured Term Loan" or, if such

Holdco Term Lender has entered into one or more Assignment and Assumptions following the Closing Date, the amount set forth for such Holdco Term Lender in the Register maintained by the Holdco Term Loan Administrative Agent as such Holdco Term Lender's "Second Out Subordinated Senior Secured Term Loan".

"Subordinated Junior Term Facility" means the credit facility with respect to the Subordinated Junior Term Loans.

"Subordinated Junior Term Lender" means a lender that holds Subordinated Junior Term Loans.

"Subordinated Junior Term Loan" means, with respect to any Holdco Term Lender at any time, the amount set forth opposite such Holdco Term Lender's name on Annex I under the caption "Subordinated Junior Term Loan" or, if such Holdco Term Lender has entered into one or more Assignment and Assumptions following the Closing Date, the amount set forth for such Holdco Term Lender in the Register maintained by the Holdco Term Loan Administrative Agent as such Holdco Term Lender's "Subordinated Junior Term Loan".

"U.S. Tax Compliance Certificate" has the meaning specified in Section 2.05(b)(ii)(B)(III).

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02   Terms Generally.  Unless otherwise provided herein, this Agreement shall be governed by the principles of interpretation provided in Section 1.02 (*Terms Generally*) of the Common Terms and Term Intercreditor Agreement, *mutatis mutandis*.

Section 1.03   Accounting Terms.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP.  If Holdco Borrower notifies the Holdco Term Loan Administrative Agent that Holdco Borrower wishes to amend any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then Holdco Borrower's compliance with such provision shall be determined on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in a manner satisfactory to Holdco Borrower and the Holdco Term Loan Administrative Agent.

Section 1.04   Divisions.  Any reference herein or in any other Holdco Term Financing Document to a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a Person, or an allocation of assets to a series of a Person (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, assignment, sale or transfer or similar term, as applicable to, of or with a separate Person.  Any division of a limited liability company shall constitute a separate Person hereunder and under any other Holdco Term Financing Document (and each division of any limited liability company that is a Subsidiary, Affiliate, joint venture or

any other like term shall also constitute such a separate Person or entity hereunder or any other Holdco Term Financing Document).

## ARTICLE II

## THE CREDITS

Section 2.01    Holdco Term Facilities.

(a)    New Senior Secured Term Loan. Subject to the terms and conditions set forth in this Agreement and the Common Terms and Term Intercreditor Agreement (including Section 4.01 (*Conditions to Closing Date*) of the Common Terms and Term Intercreditor Agreement) and in reliance upon the representations and warranties of the Company Parties set forth in the Common Terms and Term Intercreditor Agreement, each New Senior Secured Term Lender severally, but not jointly, agrees to convert a portion of its principal, accrued interest, fees and other claims under the Existing DIP Credit Agreement to a New Senior Secured Term Loan as of the Closing Date in the applicable amount set forth on Annex I.

(b)    First Out Subordinated Senior Secured Term Loan. Subject to the terms and conditions set forth in this Agreement and the Common Terms and Term Intercreditor Agreement (including Section 4.01 (*Conditions to Closing Date*) of the Common Terms and Term Intercreditor Agreement) and in reliance upon the representations and warranties of the Company Parties set forth in the Common Terms and Term Intercreditor Agreement, each First Out Subordinated Senior Secured Term Lender severally, but not jointly, agrees to convert a portion of its principal, accrued interest, fees and other claims under the Prepetition Term Loan Agreement to a First Out Subordinated Senior Secured Term Loan as of the Closing Date in the applicable amount set forth on Annex I.

(c)    Second Out Subordinated Senior Secured Term Loan.  Subject to the terms and conditions set forth in this Agreement and the Common Terms and Term Intercreditor Agreement (including Section 4.01 (*Conditions to Closing Date*) of the Common Terms and Term Intercreditor Agreement) and in reliance upon the representations and warranties of the Company Parties set forth in the Common Terms and Term Intercreditor Agreement, each Second Out Subordinated Senior Secured Term Lender severally, but not jointly, agrees to convert a portion of its principal, accrued interest, fees and other claims under the Prepetition Term Loan Agreement to a Second Out Subordinated Senior Secured Term Loan as of the Closing Date in the applicable amount set forth on Annex I.

(d)    Subordinated Junior Term Loan.  Subject to the terms and conditions set forth in this Agreement and the Common Terms and Term Intercreditor Agreement (including Section 4.01 of the Common Terms and Term Intercreditor Agreement) and in reliance upon the representations and warranties of the Company Parties set forth in the Common Terms and Term Intercreditor Agreement, each Subordinated Junior Term Lender severally, but not jointly, agrees to convert a portion of its principal, accrued interest, fees and other claims under the Prepetition Term Loan Agreement to a Subordinated Junior Term Loan as of the Closing Date in the applicable amount set forth on Annex I.

(e)     No Reborrowing.  Amounts prepaid or repaid in respect of any Holdco Term Loan may not be reborrowed.

Section 2.02     Evidence of Debt.

(a)     Each Holdco Term Lender may maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of Holdco Borrower to such Holdco Term Lender resulting from the Holdco Term Loan made by such Holdco Term Lender, including the amounts of principal and interest payable and paid to such Holdco Term Lender from time to time hereunder.  In the case of a Holdco Term Lender that does not request execution and delivery of a Note evidencing the Holdco Term Loan made by such Holdco Term Lender to Holdco Borrower, such account or accounts shall, to the extent not inconsistent with the notations made by the Holdco Term Loan Administrative Agent in the Register, be conclusive and binding on Holdco Borrower absent manifest error; provided that the failure of any Holdco Term Lender to maintain such account or accounts or any error in any such account shall not limit or otherwise affect any obligations of Holdco Borrower.

(b)     Holdco Borrower agrees that, upon the request to the Holdco Term Loan Administrative Agent by any Holdco Term Lender, Holdco Borrower will execute and deliver to such Holdco Term Lender, as applicable, a promissory note (a "Note") substantially in the form of Exhibit B payable to such Holdco Term Lender in an amount equal to such Holdco Term Lender's Holdco Term Loan evidencing the Holdco Term Loan made by such Holdco Term Lender.  Holdco Borrower hereby irrevocably authorizes each Holdco Term Lender to make (or cause to be made) appropriate notations on the grid attached to such Holdco Term Lender's Notes (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate applicable to the Holdco Term Loan evidenced thereby.  Such notations shall, to the extent not inconsistent with the notations made by the Holdco Term Loan Administrative Agent in the Register, be conclusive and binding on Holdco Borrower absent manifest error; provided that the failure of any Holdco Term Lender to make any such notations or any error in any such notations shall not limit or otherwise affect any obligations of Holdco Borrower.  A Note and the obligation evidenced thereby may be assigned or otherwise transferred in whole or in part only in accordance with Section 8.02(b).

Section 2.03     Fees. Subject to Section 9.08 (*Obligation Payment Waterfall*) of the Common Terms and Term Intercreditor Agreement in all respects:

(a)     [Reserved].

(b)     Payment of Fees.  All fees that may be payable by Holdco Borrower to any Holdco Term Lender hereunder from time to time pursuant to a written agreement between Holdco Borrower and such Holdco Term Lender shall be paid on the dates due, in Dollars and immediately available funds, to the Holdco Term Loan Administrative Agent for distribution to the Holdco Term Lenders entitled thereto.  Fees paid shall not be refundable under any circumstances absent manifest error.

Section 2.04     Increased Costs.

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement (including any such requirement imposed by the Board under Regulation D or otherwise) against assets of, deposits with or for account of, or credit extended by, any Holdco Term Lender; or

(ii)    impose on any Holdco Term Lender any other condition not otherwise contemplated hereunder affecting this Agreement or the Holdco Term Loan made by such Holdco Term Lender;

and the result of any of the foregoing shall be to increase the cost to such Holdco Term Lender of making or maintaining any Holdco Term Loan (or of maintaining its obligation to make any such Holdco Term Loan) to Holdco Borrower or to increase the cost to such Holdco Term Lender or to reduce the amount of any sum received or receivable by such Holdco Term Lender hereunder (whether of principal, interest or otherwise), then Holdco Borrower will pay to such Holdco Term Lender such additional amount or amounts as will compensate such Holdco Term Lender for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Holdco Term Lender reasonably determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Holdco Term Lender's capital or on the capital of such Holdco Term Lender's holding company, if any, as a consequence of this Agreement or the Holdco Term Loan made by such Holdco Term Lender to a level below that which such Holdco Term Lender or such Holdco Term Lender's holding company could have achieved but for such Change in Law (taking into consideration such Holdco Term Lender's policies and the policies of such Holdco Term Lender's holding company with respect to capital adequacy), then from time to time Holdco Borrower will pay to such Holdco Term Lender such additional amount or amounts as will compensate such Holdco Term Lender or such Holdco Term Lender's holding company for any such reduction suffered.

(c)     Certificates from Holdco Term Lenders.  A certificate of a Holdco Term Lender setting forth calculations in reasonable detail of the amount or amounts necessary to compensate such Holdco Term Lender or its respective holding company, as the case may be, as specified in Section 2.04(a) or Section 2.04(b) shall be delivered to Holdco Borrower and shall be conclusive absent manifest error.  Holdco Borrower shall pay such Holdco Term Lender the amount shown as due on any such certificate within thirty (30) Business Days after receipt thereof.

(d)     Delay in Requests.  Promptly after any Holdco Term Lender has determined that it will make a request for increased compensation pursuant to this Section 2.04, such Holdco Term Lender shall notify Holdco Borrower thereof.  Failure or delay on the part of any Holdco Term Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Holdco Term Lender's right to demand such compensation; provided that Holdco Borrower shall not be required to compensate a Holdco Term Lender pursuant to this Section 2.04 for any increased costs or reductions incurred more than ninety (90) days prior to the date that such Holdco Term Lender notifies Holdco Borrower of the Change in Law giving rise to such increased costs or reductions and of such Holdco Term Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is

retroactive, then the ninety (90)-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.05   Taxes.

(a)   Payments Free of Taxes.  Any and all payments by or on account of any obligation of Holdco Borrower hereunder or under any other Holdco Term Financing Document shall be made free and clear of and without withholding or deduction for any Taxes; provided that if Holdco Borrower (or the applicable withholding agent) shall be required by law to withhold or deduct any Taxes from such payments, then Holdco Borrower shall make or shall cause to be made such withholdings and deductions and shall pay or shall cause to be paid the full amount withheld and deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)   Forms.  (i) Any of the Holdco Term Loan Administrative Agent, the Holdco Term Collateral Agent or any Holdco Term Lender (including any assignee Holdco Term Lender) that is legally entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which Holdco Borrower is located with respect to payments under this Agreement shall deliver to Holdco Borrower (with a copy to the Holdco Term Loan Administrative Agent), at the time or times reasonably requested in writing by Holdco Borrower, the Holdco Term Collateral Agent or the Holdco Term Loan Administrative Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without or at a reduced rate of, withholding.  In addition, any of the Holdco Term Loan Administrative Agent, the Holdco Term Collateral Agent or any Holdco Term Lender, if reasonably requested in writing by Holdco Borrower or the Holdco Term Loan Administrative Agent, shall deliver such other documentation prescribed by law or reasonably requested by Holdco Borrower or the Holdco Term Loan Administrative Agent as will enable Holdco Borrower or the Holdco Term Loan Administrative Agent to determine whether or not such Holdco Term Lender is subject to any withholding tax.  Upon the reasonable written request of Holdco Borrower or the Holdco Term Loan Administrative Agent, or if any form or certification previously delivered expires or becomes obsolete or inaccurate, any Holdco Term Lender shall update any such form or certification previously delivered pursuant to this Section 2.05(b)(i).  Notwithstanding anything to the contrary in the preceding three sentences, the completion, execution and submission of such documentation shall not be required if in the Holdco Term Lender's judgment such completion, execution or submission would subject such Holdco Term Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Holdco Term Lender.

(ii)   Without limiting the generality of the foregoing, in the event that Holdco Borrower is a US Person,

(A)   any Holdco Term Lender that is a US Person shall deliver to Holdco Borrower and the Holdco Term Loan Administrative Agent on or prior to the date on which such Holdco Term Lender becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of Holdco Borrower or the Holdco Term Loan Administrative Agent), executed copies of IRS Form W-9 certifying that such Holdco Term Lender is exempt from U.S. federal backup withholding tax;

(B)      any Holdco Term Lender who is not a US Person shall, to the extent it is legally entitled to do so, deliver to Holdco Borrower and the Holdco Term Loan Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Holdco Term Lender becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of Holdco Borrower or the Holdco Term Loan Administrative Agent), whichever of the following is applicable:

(I)      in the case of a Holdco Term Lender who is not a US Person claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under this Agreement or any Holdco Term Financing Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article (in the case of interest with respect to any portion of the Holdco Term Loans or other loans hereunder that are treated as indebtedness for U.S. federal income tax purposes, as determined by Holdco Borrower in accordance with its organizational documents ("Tax Indebtedness")) or the "dividends" article (in the case of interest with respect to any portion of the Holdco Term Loans or other loans hereunder that are not Tax Indebtedness) of such tax treaty and (y) with respect to any other applicable payments under this Agreement or any Holdco Term Financing Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)      executed copies of IRS Form W-8ECI;

(III)      in the case of a Holdco Term Lender who is not a US Person claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code with respect to interest in respect of any Tax Indebtedness, (x) a certificate to the effect that such Holdco Term Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Holdco Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable; or

(IV)      to the extent a Holdco Term Lender who is not a US Person is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if such Holdco Term Lender is a partnership and one or more direct or indirect partners of such Holdco Term Lender are claiming the portfolio interest exemption with respect to interest in respect of any Tax

-9-

Indebtedness, such Holdco Term Lender may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner.

(c)     If a payment made to the Holdco Term Loan Administrative Agent, the Holdco Term Collateral Agent or any Holdco Term Lender under this Agreement would be subject to U.S. federal withholding Tax imposed by the Foreign Account Tax Compliance Act ("FATCA") if such Holdco Term Loan Administrative Agent, Holdco Term Collateral Agent or Holdco Term Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Holdco Term Loan Administrative Agent, Holdco Term Collateral Agent or Holdco Term Lender shall deliver to Holdco Borrower and the Holdco Term Loan Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Holdco Borrower or the Holdco Term Loan Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Holdco Borrower or the Holdco Term Loan Administrative Agent as may be necessary for Holdco Borrower and the Holdco Term Loan Administrative Agent to comply with their obligations under FATCA and to determine that such Holdco Term Lender has complied with such Person's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(d)     Survival. Each party's obligations under this Section 2.05 shall survive the resignation or replacement of the Holdco Term Loan Administrative Agent or any assignment of rights by, or the replacement of, a Holdco Term Lender, the termination of the Holdco Term Loans and the repayment, satisfaction or discharge of all obligations under any Holdco Term Financing Documents.

Section 2.06   Change of Lending Office.   If any Holdco Term Lender requests compensation under Section 2.04, then such Holdco Term Lender shall (i) file any certificate or document reasonably requested in writing by Holdco Borrower and/or (ii) use reasonable efforts to designate a different Lending Office for funding or booking its Holdco Term Loan hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the sole judgment of such Holdco Term Lender exercised in good faith, such designation or assignment (x) would eliminate or reduce amounts payable pursuant to Section 2.04 in the future and (y) would not subject such Holdco Term Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Holdco Term Lender in any material respect. Holdco Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Holdco Term Lender in connection with any such designation or assignment.

Section 2.07   Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Holdco Term Financing Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Holdco Term Financing Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Holdco Term Financing Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 2.08   Holdco Term Loan Payment Waterfall. Any payments of Holdco Term Obligations held by the Holdco Term Lenders pursuant to Section 9.08 (*Obligation Payment Waterfall*) of the Common Terms and Term Intercreditor Agreement shall be applied in the applicable order of priority set forth in Schedule 1.

Section 2.09   Incorporation by Reference. The provisions of Section 2.05(a) (*Optional Prepayments*), Section 2.06 (*Payments Generally; Ratable Treatment; Sharing of Setoffs*) and Section 2.07 (*Interest*) of the Common Terms and Term Intercreditor Agreement are hereby incorporated by reference as if fully set forth herein, *mutatis mutandis*.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.01   Incorporation of Common Terms and Term Intercreditor Agreement. The representations and warranties set forth in Article III (*Representations and Warranties*) of the Common Terms and Term Intercreditor Agreement have been made to and for the benefit of each of the Holdco Term Lenders and shall apply *mutatis mutandis* to this Article III as if fully set forth herein.

## ARTICLE IV

## CONDITIONS

Section 4.01   Conditions to the Closing Date. The occurrence of the Closing Date and the conversion of certain obligations of the Holdco Term Lenders under the Existing DIP Term Loan Credit Agreement and Prepetition Term Loan Agreement into Holdco Term Loans pursuant to Section 2.01 are subject to satisfaction of the conditions precedent set forth in Section 4.01 (*Conditions to Closing Date*) of the Common Terms and Term Intercreditor Agreement, each of which shall be reasonably satisfactory in form and substance to the Holdco Term Loan

Administrative Agent and each Holdco Term Lender (unless waived by each Holdco Term Lender in accordance with Section 10.02 (*Amendments, Etc.*) of the Common Terms and Term Intercreditor Agreement).

## ARTICLE V

## COVENANTS

Section 5.01    Covenants.  The covenants set forth in Article V (*Affirmative Covenants*) and Article VI (*Negative Covenants*) of the Common Terms and Term Intercreditor Agreement have been made to and for the benefit of each of the Holdco Term Lenders and shall apply *mutatis mutandis* to this Article V as if fully set forth herein.

## ARTICLE VI

## EVENTS OF DEFAULT

Section 6.01    Events of Default.  The occurrence of any Event of Default under the Common Terms and Term Intercreditor Agreement shall constitute an event of default under this Agreement, subject to all of the relevant provisions of the Common Terms and Term Intercreditor Agreement.

## ARTICLE VII

## THE AGENTS

Section 7.01    Appointment and Authorization of the Holdco Term Loan Administrative Agent.

(a)    Each of the Holdco Term Lenders hereby irrevocably appoints the Holdco Term Loan Administrative Agent to act on its behalf as its agent hereunder and under the other Holdco Term Financing Documents and authorizes the Holdco Term Loan Administrative Agent in such capacity, to take such actions on its behalf and to exercise such powers as are delegated to it by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Each of the Holdco Term Lenders hereby irrevocably appoints the Holdco Term Collateral Agent to act on its behalf as its agent under the Common Terms and Term Intercreditor Agreement and other Holdco Term Financing Documents and authorizes the Holdco Term Collateral Agent in such capacity, to take such actions on its behalf and to exercise such powers as are delegated to it by the terms thereof, together with such actions and powers as are reasonably incidental thereto. The Holdco Term Loan Administrative Agent, by executing this Agreement, hereby accepts such appointment.  The provisions of this Article are solely for the benefit of the Agents and the Holdco Term Lenders (other than the express rights of Holdco Borrower under Section 7.07), and Holdco Borrower shall have no rights as a third party beneficiary of any of such provisions.

(b)    The Holdco Term Loan Administrative Agent hereby agrees, and each Holdco Term Lender (and each Person that becomes a Holdco Term Lender hereunder pursuant to Section 8.02) hereby authorizes, directs and requires the Holdco Term Loan Administrative Agent to (i) execute, deliver and perform each of the Holdco Term Financing Documents to which such Agent

-12-

is intended to be a party on behalf of such Holdco Term Lender and (ii) enter into amendments and other modifications of the Holdco Term Financing Documents solely to the extent expressly permitted in accordance with <u>Section 10.02(b)</u> (*Amendments*) of the Common Terms and Term Intercreditor Agreement.

Section 7.02   <u>Rights as a Holdco Term Lender</u>.  The Holdco Term Loan Administrative Agent shall have the same rights and powers in its capacity as a Holdco Term Lender as any other Holdco Term Lender and may exercise the same as though it were not an Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Holdco Borrower or any of Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Section 7.03   <u>Duties of Agent; Exculpatory Provisions</u>.   The Holdco Term Loan Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Holdco Term Financing Documents.   All communications, notices, financial statements, projections, reports and other information received by the Holdco Term Loan Administrative Agent in relation to Holdco Term Financing Documents must be provided to each Holdco Term Lender within one (1) Business Day after receipt. Without limiting the generality of the foregoing, the Holdco Term Loan Administrative Agent (a) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Holdco Term Financing Documents that such Agent is required to exercise, and (c) shall not, except as expressly set forth herein and in the other Holdco Term Financing Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdco Borrower or any of its Subsidiaries that is communicated to or obtained by the financial institution serving as an Agent or any of its Affiliates in any capacity.   The Holdco Term Loan Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Holdco Term Lenders or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable decision. The Holdco Term Loan Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by Holdco Borrower or a Holdco Term Lender, and the Holdco Term Loan Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Holdco Term Financing Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Holdco Term Financing Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV (*Conditions*) of the Common Terms and Term Intercreditor Agreement or elsewhere herein or therein, other than to confirm receipt of items expressly required to be delivered to such Agent.

Section 7.04   <u>Reliance by Holdco Term Loan Administrative Agent</u>.  The Holdco Term Loan Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other

writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Holdco Term Loan Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Holdco Term Loan Administrative Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 7.05   Delegation of Duties. The Holdco Term Loan Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by such Agent.  The Holdco Term Loan Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Holdco Term Loan Administrative Agent and any such sub-agent, and shall apply to their respective activities as well as activities as the Holdco Term Loan Administrative Agent.

Section 7.06   Withholding of Taxes by the Holdco Term Loan Administrative Agent; Indemnification. To the extent required by any Applicable Law, the Holdco Term Loan Administrative Agent may withhold from any payment to any Holdco Term Lender an amount equivalent to any applicable withholding Taxes.  If any Governmental Authority asserts a claim that the Holdco Term Loan Administrative Agent did not properly withhold Taxes from amounts paid to or for the account of any Holdco Term Lender because the appropriate form was not delivered or was not properly executed or because such Holdco Term Lender failed to notify the Holdco Term Loan Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Taxes ineffective or for any other reason, or if the Holdco Term Loan Administrative Agent reasonably determines that a payment was made to a Holdco Term Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Holdco Term Lender shall promptly indemnify the Holdco Term Loan Administrative Agent fully for all amounts paid, directly or indirectly, by Holdco Term Loan Administrative Agent as Taxes or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.   Each Holdco Term Lender shall severally indemnify the Holdco Term Loan Administrative Agent, within ten days after demand therefor, for (i) any Taxes attributable to such Person, and (ii) any Taxes attributable to such Person's failure to comply with the provisions of Section 8.02(f) relating to the maintenance of a Participant Register, in each case, that are payable or paid by the Holdco Term Loan Administrative Agent in connection with any Holdco Term Financing Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Holdco Term Lender by the Holdco Term Loan Administrative Agent shall be conclusive absent manifest error.  Each Holdco Term Lender hereby authorizes the Holdco Term Loan Administrative Agent to set off and apply any and all amounts at any time owing to such Holdco Term Lender under any Holdco Term Financing Document or otherwise payable by the Holdco Term Loan Administrative Agent to the Holdco Term Lender from any other source against any amount due to the Holdco Term Loan Administrative Agent under this Section 7.06.

Section 7.07   <u>Resignation of Holdco Term Loan Administrative Agent</u>.  The Holdco Term Loan Administrative Agent may resign at any time upon thirty days' notice by notifying the Holdco Term Lenders and Holdco Borrower, and the Holdco Term Loan Administrative Agent may be removed at any time by the Required Holdco Term Lenders (with a prior written notice to Holdco Borrower).  Upon any such resignation or removal, the Required Holdco Term Lenders shall have the right, with the consent of Holdco Borrower (such consent not to be unreasonably withheld), to appoint a successor Holdco Term Loan Administrative Agent.  If no successor shall have been so appointed by the Required Holdco Term Lenders and approved by Holdco Borrower and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Holdco Term Lenders, appoint a successor Holdco Term Loan Administrative Agent, which shall be a Holdco Term Lender with an office in New York, New York, an Affiliate of a Holdco Term Lender or a financial institution with an office in New York, New York having a combined capital and surplus that is not less than $250,000,000.  Upon the acceptance of its appointment as Holdco Term Loan Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring (or retired) Agent and the retiring Agent shall be discharged from its duties and obligations hereunder (if not already discharged therefrom as provided above in this <u>Section 7.07</u>).  The fees payable by Holdco Borrower to a successor Holdco Term Loan Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Holdco Borrower and such successor.  After the Holdco Term Loan Administrative Agent's resignation or removal hereunder, the provisions of this Article and Section 10.03 (*Expenses; Indemnity; Etc.*) of the Common Terms and Term Intercreditor Agreement shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Holdco Term Loan Administrative Agent.

Section 7.08   <u>Non-Reliance on Holdco Term Loan Administrative Agent or Other Holdco Term Lenders</u>.  Each Holdco Term Lender acknowledges that it has, independently and without reliance upon the Holdco Term Loan Administrative Agent, the Affiliates of any Agent or any other Holdco Term Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Holdco Term Lender also acknowledges that it will, independently and without reliance upon the Holdco Term Loan Administrative Agent, the Affiliates of such Agent or any other Holdco Term Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Holdco Term Financing Document or any related agreement or any document furnished hereunder or thereunder.

Section 7.09   <u>No Other Duties; Etc</u>.  The parties agree that the Holdco Term Loan Administrative Agent shall not have any obligations, liability or responsibility under or in connection with this Agreement and the other Holdco Term Financing Documents and that the Holdco Term Loan Administrative Agent shall not have any obligations, liabilities or responsibilities except for those expressly set forth herein and in the other Holdco Term Financing Documents.

Section 7.10   <u>Certain ERISA Matters</u>.

(a)      Each Holdco Term Lender (x) represents and warrants, as of the date such Person became a Holdco Term Lender party hereto, to, and (y) covenants, from the date such Person became a Holdco Term Lender party hereto to the date such Person ceases being a Holdco Term Lender party hereto, for the benefit of the Holdco Term Loan Administrative Agent and each of its Affiliates, and not, for the avoidance of doubt, to or for the benefit of Holdco Borrower or any other Company Party, that at least one of the following is and will be true:

(i)      such Holdco Term Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more employee benefit plans (as defined in Section 3(3) of ERISA) in connection with the Holdco Term Loans;

(ii)      the prohibited transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable so as to exempt from the prohibitions of ERISA Section 406 and Code Section 4975, such Holdco Term Lender's entrance into, participation in, administration of and performance of the Holdco Term Loans and this Agreement;

(iii)      (A) such Holdco Term Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Holdco Term Lender to enter into, participate in, administer and perform the Holdco Term Loans and this Agreement, (C) the entrance into, participation in, administration of and performance of the Holdco Term Loans and this Agreement satisfies the requirements of sub-sections (b) through (g) and subsection (k) of Part I of PTE 84-14 and (D) to the best knowledge of such Holdco Term Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Holdco Term Lender's entrance into, participation in, administration of and performance of the Holdco Term Loans and this Agreement; or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the applicable Holdco Term Loan Administrative Agent, in its sole discretion, and such Holdco Term Lender.

(b)      In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Holdco Term Lender or such Holdco Term Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Holdco Term Lender further (x) represents and warrants, as of the date such Person became a Holdco Term Lender party hereto, to, and (y) covenants, from the date such Person became a Holdco Term Lender party hereto to the date such Person ceases being a Holdco Term Lender party hereto, for the benefit of the Holdco Term Loan Administrative Agent and each of its Affiliates, and not, for the avoidance of doubt, to or for the benefit of Holdco Borrower or any

other Company Party, that none of the Holdco Term Loan Administrative Agent or its respective Affiliates is a fiduciary with respect to the assets of such Holdco Term Lender (including in connection with the reservation or exercise of any rights by the Holdco Term Loan Administrative Agent under this Agreement, any Holdco Term Financing Document or any documents related to hereto or thereto).

ARTICLE VIII

MISCELLANEOUS

Section 8.01    Incorporation by Reference.    The provisions of Section 10.01 (*Notices*), Section 10.03 (*Expenses; Indemnity; Etc.*), Section 10.05 (*Survival*), Section 10.06 (*Counterparts; Integration; Effectiveness*), Section 10.07 (*Severability*), Section 10.08 (*Right of Setoff*), Section 10.09 (*Governing Law; Jurisdiction; Etc.*), Section 10.10 (*Headings*), Section 10.11 (*Confidentiality*), Section 10.12 (*Non-Recourse*), Section 10.13 (*No Third Party Beneficiaries*), Section 10.14 (*Reinstatement*), Section 10.15 (*USA PATRIOT Act*), Section 10.16 (*Electronic Execution of Assignments and Certain Other Documents.*), Section 10.17 (*USURY*) and Section 10.18 (*Certain Tax Matters*) of the Common Terms and Term Intercreditor Agreement are hereby incorporated by reference as if fully set forth herein, *mutatis mutandis*.

Section 8.02    Successors and Assigns.

(a)    Assignments Generally.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) Holdco Borrower may not assign or otherwise transfer, directly or indirectly, any of their respective rights or obligations hereunder or under any other Holdco Term Financing Document without the prior written consent of each Holdco Term Lender (and any attempted assignment or transfer by such Holdco Term Financing Party without such consent shall be null and void) and (ii) no Holdco Term Lender may assign or otherwise transfer, directly or indirectly, any of its rights or obligations hereunder except in accordance with this Section 8.02. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in Section 8.02(f)) and, to the extent expressly contemplated hereby, the Indemnified Parties referred to in Section 10.03(b) (*Indemnification by Holdco Borrower*) of the Common Terms and Term Intercreditor Agreement and the Related Parties of each of the Holdco Term Loan Administrative Agent and the Holdco Term Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Holdco Term Lenders.    Any Holdco Term Lender may assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Holdco Term Loan at the time owing to it); provided that:

(i)    except in the case of an assignment to a Holdco Term Lender or an Affiliate or Related Fund of a Holdco Term Lender, the amount of the Holdco Term Loan of the assigning Holdco Term Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Holdco

-17-

Term Loan Administrative Agent) shall not be less than $500,000 unless Holdco Borrower and the Holdco Term Loan Administrative Agent otherwise consent;

(ii)     except in the case of an assignment to a Holdco Term Lender or an Affiliate or Related Fund of a Holdco Term Lender, the Holdco Term Loan Administrative Agent must give its prior written consent to such assignment, not to be unreasonably withheld, conditioned or delayed;

(iii)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Holdco Term Lender's rights and obligations under this Agreement;

(iv)     except in the case of an assignment to an Affiliate, the parties to each assignment shall execute and deliver to the Holdco Term Loan Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

(v)     the assignee, if it shall not be a Holdco Term Lender, shall deliver to the Holdco Term Loan Administrative Agent an Administrative Questionnaire.

provided further that any consent of Holdco Borrower otherwise required under this clause (b) shall not be required if any Event of Default under Sections 7.01(a), (b) or, solely with respect to Holdco Borrower, (f) of the Common Terms and Term Intercreditor Agreement has occurred and is continuing and shall be deemed given if Holdco Borrower has not responded to a request for such consent within five (5) Business Days of the request.  Upon acceptance and recording pursuant to Section 8.02(d), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Holdco Term Lender under this Agreement, and the assigning Holdco Term Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Holdco Term Lender's rights and obligations under this Agreement, such Holdco Term Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.07 (*Payments Generally; Ratable Treatment; Sharing of Setoffs*) and 10.03 (*Expenses; Indemnity; Etc.*) of the Common Terms and Term Intercreditor Agreement).  Any assignment or transfer by a Holdco Term Lender of rights or obligations under this Agreement that does not comply with this Section 8.02(b) shall be treated for purposes of this Agreement as a sale by such Holdco Term Lender of a participation in such rights and obligations in accordance with Section 8.02(f).

(c)     Maintenance of Register by the Holdco Term Loan Administrative Agent.  The Holdco Term Loan Administrative Agent, acting for this purpose as an agent of Holdco Borrower, shall maintain at one of its offices in New York City a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Holdco Term Lenders, principal amount of the Holdco Term Loan owing to each Holdco Term Lender pursuant to the terms hereof from time to time and the amount of any Accrued Interest owing from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and Holdco Borrower, the Holdco Term Loan Administrative Agent and the Holdco Term Lenders

may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Holdco Term Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by Holdco Borrower and any Holdco Term Lender, at any reasonable time and from time to time upon reasonable prior notice.  The Holdco Term Loan Administrative Agent shall give to any Holdco Term Lender promptly upon request therefor, a complete and correct copy of the names and addresses of all registered Holdco Term Lenders.

(d)     Effectiveness of Assignments.  Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Holdco Term Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Holdco Term Lender hereunder), the processing and recordation fee referred to in Section 8.02(b) and any written consent to such assignment required by Section 8.02(b), the Holdco Term Loan Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 8.02(d).

(e)     Limitations on Rights of Assignees.  An assignee Holdco Term Lender shall not be entitled to receive any greater payment under Section 2.07 (*Payments Generally; Ratable Treatment; Sharing of Setoffs*) of the Common Terms and Term Intercreditor Agreement than the assigning Holdco Term Lender would have been entitled to receive with respect to the interest assigned to such assignee (based on the circumstances existing at the time of the assignment), unless Holdco Borrower's prior written consent has been obtained therefor.

(f)     Participations.  Any Holdco Term Lender may, without the consent of Holdco Borrower or the Holdco Term Loan Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Holdco Term Lender's rights and obligations under this Agreement and the other Holdco Term Financing Documents (including all or a portion of the Holdco Term Loan owing to it); provided that (i) such Holdco Term Lender's obligations under this Agreement and the other Holdco Term Financing Documents shall remain unchanged, (ii) such Holdco Term Lender shall remain solely responsible to the other parties hereto for the performance of any such obligations and (iii) Holdco Borrower, the Holdco Term Loan Administrative Agent and the other Holdco Term Lenders shall continue to deal solely and directly with such Holdco Term Lender in connection with such Holdco Term Lender's rights and obligations under this Agreement and the other Holdco Term Financing Documents.  Any agreement or instrument pursuant to which a Holdco Term Lender sells such a participation shall provide that such Holdco Term Lender shall retain the sole right to enforce this Agreement and the other Holdco Term Financing Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Holdco Term Financing Document; provided that, such agreement or instrument may provide that such Holdco Term Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.02(b) (*Waivers; Amendments*) of the Common Terms and Term Intercreditor Agreement that affects such Participant.    Subject to Section 8.02(g), Holdco Borrower agrees that each Participant shall be entitled to the benefits of Section 2.07 (*Payments Generally; Ratable Treatment; Sharing of Setoffs*) of the Common Terms and Term Intercreditor Agreement to the same extent as if it were a Holdco Term Lender and had acquired its interest by assignment pursuant to Section 8.02(b).  Each Holdco Term Lender that sells a participation shall,

-19-

acting solely for this purpose as a non-fiduciary agent of Holdco Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Holdco Term Loan or other obligations under the Holdco Term Financing Documents held by it (the "Participant Register"); provided that no Holdco Term Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Holdco Term Loan or its other obligations under any Holdco Term Financing Document) to any Person except to the extent that such disclosure is necessary to establish that such participation complies with this Section 8.02 and that such loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the proposed United States Treasury Regulations (or any amended or successor version thereof). The entries in the Participant Register shall be conclusive absent manifest error, and such Holdco Term Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Holdco Term Loan Administrative Agent (in its capacity as Holdco Term Loan Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(g) <u>Limitations on Rights of Participants</u>. A Participant shall not be entitled to receive any greater payment under Section 2.06 (*Payments Generally; Ratable Treatment; Sharing of Setoffs*) of the Common Terms and Term Intercreditor Agreement than the applicable Holdco Term Lender would have been entitled to receive with respect to the participation sold to such Participant, unless (i) the sale of the participation to such Participant is made with Holdco Borrower's prior written consent, or (ii) such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. A Participant shall comply with Section 2.05(b) as though it were a Holdco Term Lender (it being understood that the documentation required under Section 2.05(b) shall be delivered to the participating Holdco Term Lender).

(h) <u>Certain Pledges</u>.

(i) Any Holdco Term Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Holdco Term Lender, including any such pledge or assignment to a Federal Reserve Bank, the European Central Bank or any other central bank or similar monetary authority in the jurisdiction of such Holdco Term Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Holdco Term Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Holdco Term Lender as a party hereto; and provided further that any payment in respect of such pledge or assignment made by Holdco Borrower to or for the account of the pledging or assigning Holdco Term Lender in accordance with the terms of this Agreement shall satisfy Holdco Borrower's obligations hereunder in respect of such pledged or assigned Holdco Term Loan to the extent of such payment.

(ii) Notwithstanding any other provision of this Agreement, any Holdco Term Lender may, without informing, consulting with or obtaining the consent of any other party

-20-

to the Holdco Term Financing Documents and without formality under any Holdco Term Financing Documents, assign by way of security, mortgage, charge or otherwise create security by any means over, its rights under any Holdco Term Financing Document to secure the obligations of that Holdco Term Lender to any Person that would be a permitted assignee (without the consent of Holdco Borrower or any Agent) pursuant to Section 8.02(a) including (A) to the benefit of any of its Affiliates and/or (B) within the framework of its, or its Affiliates, direct or indirect funding operations.

Section 8.03    Amendments.

(a)      No amendment or waiver of any provision of this Agreement and no consent to any departure by Holdco Borrower hereunder shall be effective unless (x) in writing signed by the Holdco Term Loan Administrative Agent, the Holdco Term Lenders and Holdco Borrower and (y) in accordance with Section 10.02(c) (*Amendments to Holdco Term Credit Agreement and Holdco CTCI Deferred Payment Agreement*) of the Common Terms and Term Intercreditor Agreement.

(b)      The Holdco Term Loan Administrative Agent hereby agrees that it shall not consent to any amendment or waiver of any provision of, or consent to any departure by Holdco Borrower under, any Holdco Term Financing Document unless expressly permitted in accordance with Section 10.02(b) (*Amendments*) of the Common Terms and Term Intercreditor Agreement.

Section 8.04    Common Terms and Term Intercreditor Agreement.  Any actions, consents, approvals, authorizations or discretion taken, given, made or exercised, or not taken, given, made or exercised by the Holdco Term Loan Administrative Agent in accordance with the Common Terms and Term Intercreditor Agreement shall be binding on each Holdco Term Lender. Notwithstanding anything to the contrary herein, in the case of any inconsistency between this Agreement and the Common Terms and Term Intercreditor Agreement, the Common Terms and Term Intercreditor Agreement shall govern. Without limiting the foregoing, this Agreement shall be subject to, and governed by, the Common Terms and Term Intercreditor Agreement.

[Remainder of page intentionally left blank]

## Exhibit B

### New Organizational Documents

Certain documents, or portions thereof, contained in this **Exhibit B** and the Plan Supplement remain subject to continued review by the Debtors, the Required Consenting Stakeholders, and interested parties with respect thereto.  The respective rights of the Debtors and the Required Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that, if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.

This **Exhibit B** includes the following New Organizational Documents:

**Exhibit B(i)**: Form of LLCA of Subsidiaries of Reorganized Parent

## **Exhibit B(i)**

**Form of LLCA of Subsidiaries of Reorganized Parent**

**[ ● ] AMENDED AND RESTATED LIMITED**

**LIABILITY COMPANY AGREEMENT OF**

**[ ● ] LLC**

**A Delaware Limited Liability Company**

**[ ● ] AMENDED AND RESTATED LIMITED
LIABILITY COMPANY AGREEMENT OF
[ ● ] LLC**

This [ ● ] AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (as may be amended, modified, supplemented or restated from time to time, this "Agreement") of [ ● ] LLC, a Delaware limited liability company (the "Company") organized under the Delaware Limited Liability Company Act (6 Del. C. §18-101, et seq.) and any successor statute, as amended from time to time (the "Act"), is effective as of [ ● ], 2025 (the "Effective Date").

[**WHEREAS**, the Company was formed as a Delaware limited liability company on [ ● ] in accordance with the Act;

**WHEREAS**, the Company is governed by that certain Limited Liability Company Agreement, effective as of [ ● ] (the "Prior Agreement"); and

**WHEREAS**, in connection with transactions contemplated under that certain Second Amended Joint Chapter 11 Plan of Reorganization of Global Clean Energy Holdings, Inc. and its Debtor Affiliates, filed under Docket No. 301 before the Bankruptcy Court for the Southern District of Texas, Houston Division, in the jointly administered Chapter 11 case titled In re Global Clean Energy Holdings, Inc., Case No. 25-90113 (ARP), [ ● ] LLC, a [Delaware] limited liability company (the "Member"), desires to amend and restate the Prior Agreement in its entirety, as set forth in this Agreement, to, among other things (a) provide for the management of the Company, (b) set forth the rights and obligations of the Member and (c) provide for the organization and operation of the Company as a limited liability company in accordance with the Act.][1]

**NOW, THEREFORE**, in consideration of the mutual covenants and on the terms and conditions contained herein, the Member hereby agrees to amend and restate the Prior Agreement in its entirety as follows:

1.  Formation. The Company was formed as a limited liability company under the Act. The Member hereby ratifies and approves the certificate of formation of the Company filed with the Secretary of State of the State of Delaware on [ ● ] (the "Certificate of Formation").

2.  Member. The Member is the sole member of the Company. The Member owns 100% of the membership interests of the Company.

3.  Name. The name of the Company is "[ ● ] LLC", and all business of the Company shall be conducted in that name.

4.  Purpose. The purpose of the Company is to engage in any lawful business, purpose or activity for which limited liability companies may be formed under the Act.

---

[1] **Note to Draft**: To be modified as necessary with respect to each entity.

2

5.  <u>Registered Agent; Registered Office; Principal Office; Other Offices</u>. The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Member may designate in the manner provided by Law. The registered agent of the Company in Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Member may designate in the manner provided by Law. The principal office of the Company shall be at such place as the Member may designate. The Company may have such other offices as the Member may designate.

6.  <u>Term</u>. The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue in perpetuity unless the Company is dissolved or terminated in accordance with the provisions of <u>Section 15</u>. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

7.  <u>Capital Contributions</u>. The Member shall contribute to the Company such cash, property, or services as determined by the Member in its sole discretion; <u>provided</u>, that, absent such determination, the Member is under no obligation, express or implied, to make any such contribution.

8.  <u>Management</u>. The Company will be a member-managed limited liability company and therefore will not have "managers" (as such term is used in the Act). Subject to Section 6.12 and Article X of the Grapevine LLC Agreement, the Member will have full power and authority to do all things on such terms as it may deem necessary or appropriate to conduct, or cause to be conducted, the business and affairs of the Company. Any action taken by the Member in its capacity as such will constitute the act of and serve to bind the Company. The Member, when exercising its authority to conduct, or cause to be conducted, the business and affairs of the Company, may be referred to as the "Managing Member."

9.  <u>Officers</u>. The Member shall have the power to elect, delegate authority to and remove such officers of the Company as the Member may from time to time deem appropriate (each, an "<u>Officer</u>"). None of the Officers, in such capacity, shall be deemed to be a "manager" within the meaning of the Act. Each Officer shall serve in such capacity until removed or replaced by the Member. Any delegation of authority to an Officer to take any action must be approved, if applicable, in the same manner as would be required for the Member to approve such action directly. The Officers as of the Effective Date are set forth on <u>Schedule A</u>.

9.1.  <u>Fiduciary Duties of Officers</u>. The Officers, in the performance of their duties as such, will, to the fullest extent permitted by Law, have no fiduciary duties to the Member, the Company or any Grapevine Party; <u>provided</u>, that, the Member may assign fiduciary duties to specific Officers as it deems necessary or appropriate, from time to time, in its discretion; <u>provided</u>, for the avoidance of doubt, that such assigned fiduciary duties shall not exceed those of an officer of a Delaware corporation.

3

9.2. <u>Dismissal of Officers; Resignation of Officers</u>.

    9.2.1. <u>Removal</u>. The Member may dismiss any of the Company's Officers. Such dismissal may be made with or without cause at the Member's discretion.

    9.2.2. <u>Resignation</u>. An Officer may resign at any time by giving written notice to the Member at least sixty (60) days (or such shorter period of time as the Member may determine from time to time) prior to the effective date of such resignation; <u>provided</u>, that, if such Officer has an employment agreement in place with a Grapevine Party which specifies a different notice period for resignation, the notice period in the employment agreement shall govern.

10. <u>No Liability of Member</u>. Except as required by any non-waivable provision of the Act or expressly provided herein or in any separate written instrument signed by the Member, the debts, Losses, Contracts and other obligations of the Company (whether arising in contract, tort or otherwise) shall be solely the debts, Losses, Contracts and other obligations of the Company, and the Member in its capacity as such shall not be liable personally for any debts, Losses, Contracts or any other obligations of the Company. The Member shall not have any responsibility to contribute to or in respect of the liabilities or obligations of the Company or to return distributions made by the Company, except as expressly provided herein or required by any non-waivable provision of the Act. However, if any court of competent jurisdiction orders, holds or determines that, notwithstanding the provisions of this Agreement, the Member is obligated to make any such contribution or make any such return, such obligation shall be the obligation of the Member and not of any other Person.

11. <u>Fiscal Year of the Company</u>. The Company's accounting period shall commence on January 1 and end on December 31 of each year.

12. <u>Tax Treatment</u>. [As long as the Company has only one member, it is the intention of the Company and the Member that the Company be classified as a disregarded entity for U.S. federal and applicable state and local income tax purposes, and neither the Company nor the Member shall take any action or make any election which is inconsistent with such tax classification. All provisions of this Agreement are to be construed so as to preserve the Company's tax classification as a disregarded entity. All items of income, gain, loss, deduction, and credit of the Company shall be treated for U.S. federal and applicable state and local income tax purposes as items of income, gain, loss, deduction, and credit of the Member.][2] [The Company shall be classified as an association taxable as a corporation for U.S. federal and applicable state and local income tax purposes effective as of the date of formation, and the Company shall file IRS Form 8832 to elect such classification with an effective date as of the date of its formation. Neither the Company nor the Member shall take any action or make any election which is inconsistent with such tax classification.][3]

---

[2]**Note to Draft**: To be used for subsidiaries that are disregarded entities.

[3]**Note to Draft**: To be used for subsidiaries taxed as corporations.

13. <u>Distributions</u>. Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.

14. <u>Article 8 Opt-In</u>. The Company hereby irrevocably elects that all membership interests in the Company shall be securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and each other applicable jurisdiction. Each certificate evidencing membership interests in the Company shall bear the following legend: "This certificate evidences an interest in [ ● ] LLC and shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and, to the extent permitted by applicable law, each other applicable jurisdiction." This provision shall not be amended, and any purported amendment to this provision, shall not take effect until all outstanding certificates have been surrendered for cancellation.[4]

15. <u>Dissolution and Winding Up</u>. The Company shall be dissolved and its affairs shall be wound up on the first to occur of the following: (a) the determination of the Member to dissolve the Company, (b) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by the Act or (c) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act. In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the property of the Company in an orderly manner) and the property of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

16. <u>Indemnification</u>.

    16.1. <u>No Liability of Covered Persons</u>. Except as required by any non-waivable provision of the Act or expressly provided herein or in any separate written instrument signed by the applicable Covered Person, the debts, Losses, Contracts and other obligations of the Company (whether arising in contract, tort or otherwise) shall be solely the debts, Losses, Contracts and other obligations of the Company, and no Covered Person in its capacity as such shall be liable personally for any debts, Losses, Contracts or any other obligations of the Company or the Member.

    16.2. <u>Exculpation</u>.

        16.2.1. <u>Liability</u>. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person on behalf of the Company that did not constitute a breach of this Agreement, except that no Covered Person shall be entitled to exculpation for any such loss, damage or claim incurred by reason of such Covered Person's (a) common law fraud, bad faith or willful misconduct and (b) breach of his or her express fiduciary duties, as applicable, to the Company, in each case, as established

---

[4] **Note to Draft**: Article 8 Opt-In language to be omitted from LLCA of Grapevine Energy Holdings Pledgor, LLC.

by a non appealable court order, judgment, decree or decision or pursuant to a final and binding decision of an arbitration panel.

16.2.2. <u>Reliance on Records</u>. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the Assets, liabilities or any other facts pertinent to the existence and amount of Assets from which distributions to the Member might properly be paid.

16.2.3. <u>Duties</u>. Except as expressly set forth in this Agreement, no Covered Person shall have any duties or liabilities, including fiduciary or other similar duties to the Company or the Member, and the provisions of this Agreement, to the extent that they restrict, eliminate or otherwise modify the duties and liabilities of a Covered Person otherwise existing at Law or in equity, are agreed by the Member and the Company to replace such other duties and liabilities of a Covered Person to the fullest extent permitted by Law, <u>provided</u>, <u>however</u>, that the general duty of good faith and fair dealings is owed by the Member to the Company.

16.3. <u>Indemnification of Covered Persons</u>. To the fullest extent permitted by Law, the Company shall indemnify and hold harmless each Covered Person from and against all Losses arising from or related to any act or omission performed or omitted by such Covered Person on behalf of the Company that did not constitute a breach of this Agreement or any duly stated or implied by Law (to the extent not restricted, eliminated or otherwise modified herein) and that was reasonably believed by such Covered Person to be within the scope of authority conferred on such Covered Person by this Agreement or a delegation of authority in accordance with this Agreement, except that: (a) no Covered Person shall be entitled to be indemnified in respect of any Loss by reason of such Covered Person's common law fraud, bad faith or willful misconduct, knowing and material violation of applicable securities Laws or knowing and material breach of this Agreement and (b) no Covered Person shall be entitled to be indemnified in respect of any Loss by reason of such Covered Person's breach of his or her express fiduciary duties, as applicable, to the Company, in each case, as established by a non-appealable court order, judgment, decree or decision or pursuant to a final and binding decision of an arbitration panel. Any indemnity under this <u>Section 16.3</u> shall be provided out of and to the extent of the Company's Assets only (including the proceeds of any insurance policy obtained pursuant to <u>Section 16.8</u>), and no Covered Person shall have any personal liability on account thereof. Any amendment, modification or repeal of this <u>Section 16.3</u> or any provision in this <u>Section 16.3</u> shall be prospective only and shall not in any way affect the rights of any Covered Person under this <u>Section 16.3</u> as in effect immediately prior to such amendment, modification or repeal with respect to matters occurring, in whole or in part, prior to such amendment,

modification or repeal, regardless of when Losses relating to such matters may arise or be asserted.

16.4. <u>Expenses</u>. To the fullest extent permitted by Law, expenses (including legal fees) incurred by a Covered Person in defending any Proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such Proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in <u>Section 16.3</u>; <u>provided</u>, <u>however</u>, that any obligation of the Company to make such advances under this <u>Section 16.4</u> shall be provided out of and to the extent of the Company's Assets only (including the proceeds of any insurance policy obtained pursuant to <u>Section 16.8</u>).

16.5. <u>Primary Obligation</u>. The Company hereby acknowledges that the Covered Persons may have certain rights to indemnification, advancement of expenses or insurance provided by a member of a Grapevine Holder Group (collectively, the "Grapevine Holder Indemnitors"). The Company hereby agrees that (a) it is the indemnitor of first resort (i.e., its obligations to the Covered Persons under <u>Section 16.3</u> and <u>Section 16.4</u> are primary and any obligation of the Grapevine Holder Indemnitors to advance expenses or to provide indemnification for the same expenses or Losses incurred by the Covered Persons are secondary), (b) it shall be required to advance the full amount of expenses incurred by the Covered Persons and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of <u>Section 16.3</u> and <u>Section 16.4</u> (or any other agreement between the Company and the Covered Person), without regard to any rights the Covered Person may have against the Grapevine Holder Indemnitors, and (c) it irrevocably waives, relinquishes and releases the Grapevine Holder Indemnitors from any and all claims against the Grapevine Holder Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Grapevine Holder Indemnitors on behalf of a Covered Person with respect to any claim for which the Covered Person has sought indemnification from the Company pursuant to <u>Section 16.3</u> and <u>Section 16.4</u> shall affect the foregoing, and the Grapevine Holder Indemnitors shall have a right of contribution or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the Covered Person against the Company. The Company agrees that the Grapevine Holder Indemnitors are express third party beneficiaries of the terms of this <u>Section 16.5</u>.

16.6. <u>Procedure for Indemnification</u>. Any indemnification or advancement of expenses under <u>Section 16.3</u> or <u>Section 16.4</u> shall be made only against a written request therefor (together with supporting documentation) submitted by or on behalf of the Person seeking indemnification or advance; <u>provided</u>, that, the omission to timely request indemnification or advance of expenses shall not relieve the Company from any obligations it may have to a Covered Person. To the fullest extent permitted by Law, all expenses (including reasonable attorneys' fees) incurred by such Person in connection with successfully establishing such Person's right to indemnification

7

or advancement of expenses under <u>Section 16.3</u> or <u>Section 16.4</u>, in whole or in part, shall also be indemnified by the Company.

16.7. <u>Contract Right; Non-Exclusivity; Survival</u>. The rights to indemnification and advancement of expenses provided by <u>Section 16.3</u> or <u>Section 16.4</u> (a) shall be deemed to be separate contract rights between the Company and each Covered Person that serves in any such capacity at any time while these provisions are in effect, and no repeal or modification of any of these provisions shall adversely affect any right or obligation of such Covered Person existing at the time of such repeal or modification with respect to any state of facts then or previously existing or any Proceeding previously or thereafter brought or threatened based in whole or in part upon any such state of facts, (b) shall not be deemed exclusive of any other indemnification or advancement of expenses to which a Covered Person seeking indemnification or advancement of expenses may be entitled and (c) shall inure to the benefit of the heirs, executors and administrators of such Covered Person.

16.8. <u>Insurance</u>. The Company shall purchase and maintain insurance, to the extent and in such amounts as the Member deems reasonable, on behalf of Covered Persons and such other Persons as the Member will determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Grapevine Parties or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.

17. <u>Amendments</u>. This Agreement may be amended or modified from time to time only by a written instrument executed by the Member.

18. <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

19. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Company, the Member and their respective successors and assigns.

20. <u>Severability</u>.

20.1. <u>Invalid Terms</u>. If any term or other provision of this Agreement is finally determined by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

20.2. <u>Conflict with the Act</u>. This Agreement shall constitute the "limited liability company agreement" (as that term is defined in Section 18-101 of the Act) of the Company. The rights, powers, duties, obligations and liabilities of the Member shall be determined pursuant to the Act and this Agreement. In the event of a direct conflict between the provisions of this Agreement and any mandatory, non-waivable provision of the Act, such provision of the Act shall control. If any

8

provision of the Act provides that it may be varied or superseded in the agreement of a limited liability company (or otherwise by agreement of the members of a limited liability company), such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter.

21.    <u>Headings</u>. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

22.    <u>Electronic Signature</u>. Delivery of an executed signature page to this Agreement by portable document format (.pdf) or electronically using DocuSign, AdobeSign or other digital signature provider shall be as effective as delivery of a manually executed signature page to this Agreement.

23.    <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings:

"<u>Affiliate</u>" means any Person who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified. For purposes of this definition, the term "<u>control</u>" means the possession, directly or indirectly, of the power to direct, or to cause the direction of, the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Assets</u>" means, with respect to any Person, such Person's right, title and interest from time to time in all items of economic value owned or leased by such Person, including real property, equipment and other tangible personal property, and Contracts, data and records, and other intangible personal property.

"<u>Contract</u>" means any written or oral contract or agreement, including an agreement regarding indebtedness, lease, mortgage, license agreement, purchase order, commitment, letter of credit or any other legally binding arrangement, and any amendments thereto.

"<u>Covered Person</u>" means each current and former member, Officer and each of their respective Affiliates and each of their respective Representatives, liquidators, partners, stockholders and members, in each case, whether or not such Person continues to have the applicable status referred to above.

"<u>Governmental Authority</u>" means any applicable domestic or foreign federal, state, municipal or local governmental, regulatory or administrative authority, department, court, agency, board, commission or other governmental entity or instrumentality, including any political subdivision thereof.

"<u>Grapevine</u>" means Grapevine Energy Holdings, LLC, a Delaware limited liability company and ultimate parent of the Company.

"<u>Grapevine Holder Group</u>" means, collectively: (a) each Holder (as defined in the Grapevine LLC Agreement) of Grapevine (b) any Affiliate of any such Holder or (c) any

fund, account or other investment vehicle managed, advised or sponsored by any of the foregoing, but shall exclude any portfolio company of the foregoing. For purposes of clarity and without limitation of the foregoing, the Grapevine Holder Group shall exclude any of the Grapevine Parties.

"Grapevine LLC Agreement" means that certain Limited Liability Company Agreement of Grapevine, dated as of [ ● ], 2025.

"Grapevine Parties" means Grapevine and its Subsidiaries.

"Law" means any constitution, decree, resolution, law, statute, act, ordinance, rule, directive, order, treaty, code or regulation and any injunction or final non-appealable judgment or any interpretation of the foregoing, as enacted, issued or promulgated by any Governmental Authority.

"Losses" means all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated.

"Person" means an individual natural person, a corporation, a partnership (limited or general), a joint venture, a trust, an unincorporated organization, a limited liability company, a Governmental Authority or any other entity.

"Proceeding" means any demand, notice of violation, action, lawsuit, case, arbitration, mediation, hearing, audit, suit or other proceeding (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority, private arbitrator or mediator, and any inquiry or subpoena in connection therewith.

"Representative" means each director, officer, manager, employee, representative or agent of any Person.

"Subsidiary" means, with respect to any Person, any other Person in which such Person, directly or indirectly, owns fifty percent (50%) or more of the voting or economic equity interests or otherwise holds a controlling interest in or has the right to direct the management of such other Person.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, this Agreement has been executed by the Member as of the Effective Date.

**[ ● ] LLC**

By: _____
Name:
Title:

SCHEDULE A

<u>Initial Officers</u>

1.      [ ● ]

2.      [ ● ]

3.      [ ● ]

## **Exhibit C**

### **Restructuring Transactions Steps Memorandum**

Certain documents, or portions thereof, contained in this **Exhibit C** and the Plan Supplement remain subject to continued review by the Debtors, the Required Consenting Stakeholders, and interested parties with respect thereto.  The respective rights of the Debtors and the Required Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that, if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.

*Restructuring Transactions Steps Memorandum*

In accordance with the Plan,[1] the steps set forth in this Restructuring Transactions Steps Memorandum[2] remain subject to modification in accordance with the Plan until the Effective Date.

Unless otherwise set forth below, the following steps shall occur in the order set forth below.

Prior to the Effective Date

1.  Global Clean Energy Holdings, Inc. ("Holdco Borrower") shall form a Delaware limited liability company ("Midco Pledgor").

2.  MidCo Pledgor shall form a Delaware limited liability company ("Midco Borrower").

On or Prior to the Effective Date

3.  Each of Holdco Borrower, Agribody Technologies, Inc., and Sustainable Oils, Inc. shall convert to a Delaware limited liability company.

4.  Holdco Borrower shall contribute 100% of the equity interests in each of its first-tier subsidiaries other than Midco Pledgor (the "Contributed First-Tier Equity") to Midco Pledgor, and immediately thereafter, Midco Pledgor shall contribute the Contributed First-Tier Equity to Midco Borrower.

On the Effective Date

5.  Holdco Borrower shall issue to Midco Pledgor:  (a) the Post-Exit CTCI Senior DIP Payment Obligation to be received by CTCI on account of the New CTCI Agreement pursuant to the Plan; (b) the Takeback Debt to be received by Holders of Allowed Prepetition Term Loan Claims and Allowed Prepetition EPC Claims pursuant to the Plan; (c) the New Preferred Equity to be received by Holders of Allowed Prepetition Term Loan Claims and Allowed Prepetition EPC Claims pursuant to the Plan; and (d) the New Common Equity to be received by Holders of Allowed Prepetition Term Loan Claims pursuant to the Plan.

6.  Immediately after Step 5, Midco Pledgor shall contribute the property it received in Step 5 to Midco Borrower.

7.  Immediately after Step 6, Midco Borrower shall contribute to GCE Holdings Acquisitions, LLC the property it received in Step 6.

---

[1]  "Plan" means the *Second Amended Joint Chapter 11 Plan of Reorganization of Global Clean Energy Holdings, Inc. and Its Debtor Affiliates* [Docket No. 301] (as modified, amended, or supplemented from time to time, consistent with the terms thereof).

[2]  Capitalized terms that are not defined herein shall have the meaning ascribed to them in the Plan or the Disclosure Statement (as defined in the Plan), as the case may be.

8. Immediately after Step 7, GCE Holdings Acquisitions, LLC shall contribute to Rosedale FinanceCo, LLC the property it received in Step 7.

9. Immediately after Step 8, Rosedale FinanceCo, LLC shall contribute to BKRF HCP, LLC the property it received in Step 8.

10. Immediately after Step 9, BKRF HCP, LLC shall contribute to BKRF HCB, LLC the property it received in Step 9.

11. Immediately after Step 10, BKRF HCB, LLC shall contribute to BKRF OCP, LLC the property it received in Step 10.

12. Immediately after Step 11, BKRF OCP, LLC shall contribute to BKRF OCB, LLC the property it received in Step 11.

13. Immediately after Step 12, BKRF OCB, LLC shall contribute the property it received in Step 12 (except for the Takeback Debt to be received by Holders of Allowed Prepetition Term Loan Claims pursuant to the Plan, the New Preferred Equity to be received by Holders of Allowed Prepetition Term Loan Claims pursuant to the Plan, and the New Common Equity to be received by Holders of Allowed Prepetition Term Loan Claims pursuant to the Plan) to Bakersfield Renewable Fuels, LLC.[3]

14. Interests in the GUC Trust shall be contributed, directly or indirectly, as the case may be, to the applicable Debtor who is the counterparty to the applicable Allowed General Unsecured Claim.

15. The Debtors shall make distributions pursuant to the Plan in exchange for Allowed Claims, including:

   a) that Holdco Borrower shall issue New Senior Secured Term Facility to Holders of Allowed DIP Claims on account of the DIP Term Loan Facility; and

   b) Bakersfield Renewable Fuels, LLC shall (i) issue the Exit RCF Facility to the Holders of Allowed DIP Claims on account of the DIP RCF Facility and (ii) enter into the Exit SOA and Exit SSA).

16. Intercompany Claims will be converted to equity, otherwise set off, settled, distributed, contributed, canceled, or released, or otherwise addressed, in each case, as set forth in the books and records of the Debtors or the Reorganized Debtors.

17. All GCEH Existing Interests shall be cancelled, released, extinguished, and of no further force or effect.

---

[3]   Name changes of Bakersfield Renewable Fuels, LLC and Holdco Borrower are contemplated and may be effectuated as part of the steps described herein.

<u>On and After the Effective Date</u>

18. Each of GCE Holdings Acquisitions, LLC, Rosedale FinanceCo LLC, BKRF HCP, LLC, BKRF OCP, LLC, and BKRF OCB, LLC shall liquidate and cease to exist.

19. BKRF HCB, LLC shall remain a partnership for U.S. federal income tax purposes unless the Reorganized Debtors take an affirmative action, with the consent of the majority of the Holders of the New Common Equity, to cause BKRF HCB, LLC to be treated as other than a partnership for U.S. federal income tax purposes.

20. Each of Holdco Borrower, Midco Pledgor, Midco Borrower, Agribody Technologies, LLC, and Sustainable Oils, LLC shall file, within seventy-five (75) days after the applicable effective date listed in following clause (a) or (b), as the case may be, IRS Form 8832 to elect to be classified as an association taxable as a corporation for U.S. federal income tax purposes effective as of (a) in the case of Midco Pledgor and Midco Borrower, its date of formation, and (b) in the case of Holdco Borrower, Agribody Technologies, LLC, and Sustainable Oils, LLC, its date of conversion to a Delaware limited liability company in accordance with Step 3.

Solely for administrative convenience, each equity or debt instrument issued in accordance with this Restructuring Transactions Steps Memorandum may be issued and transferred directly to the Persons or Entities that will receive such instruments pursuant to the Plan, and the transactions described herein will be treated for all applicable purposes as occurring pursuant to the steps described herein.